1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
2    _____
     EAGLE VIEW TECHNOLOGIES, et al.
3         Plaintiffs,
                                          CIVIL ACTION
4              vs.                        NO. 1:15-cv-07025-RBK-JS

5    VERISK ANALYTICS, INC., et al.,
          Defendants.                     **MARKMAN HEARING**
6    _____
                                   UNITED STATES COURTHOUSE
7                                  ONE JOHN F. GERRY PLAZA
                                   4TH AND COOPER STREETS
8                                  CAMDEN, NEW JERSEY 08101
                                   OCTOBER 12, 2017
9

10   B E F O R E:      THE HONORABLE ROBERT B. KUGLER
                       UNITED STATES DISTRICT JUDGE

11   A P P E A R A N C E S:

12   WALSH PIZZI O'REILLY & FALANGA
          BY:  LIZA WALSH, ESQUIRE
13        and
     KIRKLAND & ELLIS LLP
14        BY:  ADAM ALPER, ESQUIRE
               GIANNI CUTRI, ESQUIRE
15             MICHAEL DeVRIES, ESQUIRE
               BRANDON BROWN, ESQUIRE
16                  *Counsel for Plaintiffs*

17   McCARTER & ENGLISH
          BY:  SCOTT CHRISTIE, ESQUIRE
18             LEE BROMBERG, ESQUIRE
               BRIAN LARIVEE, ESQUIRE
19             TOM FULFORD, ESQUIRE
               MATTHEW SKLAR, ESQUIRE
20                  *Counsel for Defendants*

21   ALSO PRESENT:

22        Erica Womer, Esquire

23   Certified as true and correct as required by Title 28,
     U.S.C., Section 753.
24
                         /S/ Karen Friedlander, CRR, RMR
25                           Robert B. Tate, CCR, RMR
                             Lisa Marcus, CCR, RMR


                    *United States District Court*
                      *Camden, New Jersey*

1                    **W I T N E S S   I N D E X**

2

3    **WITNESS**                                                        **PAGE**

4    **CHANDRA BAJAJ**                                                   14

5        DIRECT EXAMINATION OF CHANDRA BAJAJ BY MR. CUTRI:   15

6    **JOSEPH L. MUNDY**                                                 38

7        DIRECT EXAMINATION OF DR. MUNDY BY MR. BROMBERG:    39

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **E X H I B I T   I N D E X**

2

3

4  **EXHIBIT NUMBER**                                              **PAGE**

5

6    EXHIBIT P-1 WAS MARKED FOR IDENTIFICATION            20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Camden, New Jersey*

4

1          THE DEPUTY CLERK:  All rise.

2          (OPEN COURT, October 12, 2017, 9:45 a.m.)

3          THE COURT:  Good morning.

4          RESPONSE:  Good morning, Your Honor.

5          THE COURT:  Everybody have a seat, please.

6     Well, thank you all for coming to beautiful downtown

7  Camden.  I don't know if all of you have been here before, but

8  it's -- this is an interesting case, and I think we should

9  start with the appearance of counsel who intend to speak

10 today.

11         Let's start with Ms. Walsh.  Are you going to speak

12 today?

13         MS. WALSH:  Good morning.  I'm going to make the

14 introduction.

15         THE COURT:  Great.

16         MS. WALSH:  And then maybe handle if there are any

17 disputes.  But, hopefully, there are not going to be any, so

18 I'm going to be quiet for the remainder of the day.

19         Appearing on behalf of Eagle View, Liza Walsh from

20 Walsh Pizzi O'Reilly & Falanga.  With me is my co-counsel from

21 Kirkland & Ellis, Adam Alper.

22         MR. ALPER:  Good morning, Your Honor.

23         THE COURT:  Good morning.

24         MS. WALSH:  Gianni Cutri.

25         MR. CUTRI:  Good morning, Your Honor.

*United States District Court*
*Camden, New Jersey*

1          MS. WALSH:  And Michael DeVries.

2          MR. DeVRIES:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MS. WALSH:  And also back there, I have Brandon

5     Brown.

6          MR. BROWN:  Good morning, Your Honor.

7          THE COURT:  Good morning.  Thank you.

8          MS. WALSH:  All four gentlemen will be presenting

9     today, Your Honor.

10          THE COURT:  Okay.

11          MS. WALSH:  One at a time.

12          (Laughter.)

13          THE COURT:  Thank you.

14     And who do we have for defendants.

15          MR. CHRISTIE:  Good morning, Your Honor.  Scott

16     Christie from McCarter & English.  With me are my colleagues

17     and partner, Lee Bromberg.

18          MR. BROMBERG:  Good morning, Your Honor.

19          MR. CHRISTIE:  The two of us will be doing the

20     primary presentation today.  Also with us are our colleagues

21     Brian Larivee and Tom Fulford and Matt Sklar and we represent

22     the defendants Verisk and Xactware.

23          THE COURT:  Great.  Thank you.

24     How do you want to start this?  I understand that you

25     want to make a presentation on the technology involved, a

1   little tutorial, is that right?

2         MR. ALPER:  Yes, Your Honor.  Adam Alper for

3   plaintiff.

4         So we've agreed on a way to proceed, subject, of

5   course, to your approval, Your Honor.

6         THE COURT:  Sure.

7         MR. ALPER:  The parties would first like to begin

8   with some background on the technology.  We've decided to

9   present that to you through our experts.

10        THE COURT:  Okay.

11        MR. ALPER:  So we will do a little direct, each side

12  will do a little direct of our experts.  We will go first and

13  then the defendants will go, and then with Your Honor's

14  approval, we will move into the terms, and the way we've

15  decided to -- or we're proposing to go through those is to do

16  it, sort of what they call ping pong fashion where one side

17  puts on what they have to say, the other side puts on what

18  they have to say, and there can be rebuttal, subject to,

19  again, Your Honor's approval and patience.

20        And the way that we decided to go through those is that

21  we would alternate who goes first.  So the defendants will

22  start off, lead off on the first term, we will lead off on the

23  next, and split it down the middle.  Of course, again, if that

24  sounds good.

25        THE COURT:  That sounds like a good plan.

*United States District Court*
*Camden, New Jersey*

1          MR. ALPER:  Okay.  Great.

2          THE COURT:  Let's hear from the experts.

3          MR. CHRISTIE:  Your Honor, before that, may I make a

4     quick record?

5          We've exchanged slides late last night and we are

6     concerned a little bit about their proposed expert

7     presentation.  It appears from the slides, anyway, that it

8     contains largely factual information, promotional material

9     about their products and some legal advocacy.

10          If so, you know, there is no foundation for it and it

11     would be an inappropriate use of the expert and beyond the

12     scope of inappropriate technology.  So I've advised opposing

13     counsel of my concerns, but I just wanted to emphasize to the

14     Court that after the fact, we may move to strike some or all

15     of the expert presentation of plaintiffs.

16          THE COURT:  I'm not sure what the objection to

17     promotional materials is.

18          MR. CHRISTIE:  When I say "promotional material," I

19     mean promotional material about their products.  This is a

20     technology tutorial, Judge.  We are educating the Court about

21     the technology underlying the patents.  We're not promoting

22     how great the plaintiff's products are.  We're not introducing

23     factual information into the record through this expert

24     witness, and he's certainly not qualified to promote any legal

25     positions or do any legal advocacy.  So again, as a

1    prophylactic --

2            THE COURT:  I would ignore any legal advocacy.  I'm

3    not worried about that.  Why wouldn't I want to hear the

4    promotional materials?  This is what I assume they tell their

5    prospective clients as to how this works, right?

6            MR. CHRISTIE:  Well, Judge, I think there's some sort

7    of a disconnect because we're talking about the patents.

8    There's no foundation to establish that their products

9    practice the patented technology.  And again, we are here just

10   to talk about the patents.

11           THE COURT:  Well, I presume that the expert is going

12   to say this is what it does, this is how it does it, right?

13           MR. CHRISTIE:  I suspect that they will actually say

14   here's our product and here's what our product does.

15           THE COURT:  Right.

16           MR. CHRISTIE:  Not necessarily here is the patented

17   technology and here's an explanation of that to the Court as

18   to how this technology works, which again, is the source of

19   what we perceive to be part of the disconnect.

20           THE COURT:  I assume the tutorial is to demonstrate

21   how it works, what it is and how it works.

22           MR. CHRISTIE:  The technology.

23           THE COURT:  The legal conclusions to be drawn from

24   that are not the expert's, but they're mine, correct?

25           MR. CHRISTIE:  Correct.

*United States District Court*
*Camden, New Jersey*

1          THE COURT:  I think I can handle this.

2          MR. CHRISTIE:  Understood.  Thank you.

3          THE COURT:  Thank you.  Did you want to go first with

4    the expert?

5          MR. ALPER:  Yes.  And, Your Honor, I'm going to begin

6    with just a couple of words introducing our company and then

7    we will ask our expert, Dr. Bajaj, to come and bring you

8    through the tutorial.

9          THE COURT:  Fine.

10          MR. ALPER:  Okay.  So if I may take the podium, Your

11   Honor.

12          THE COURT:  Sure.

13          MR. ALPER:  And we're going to bring in some slides.

14          THE COURT:  Do you have a handout for me?

15          MR. ALPER:  I'm sorry?

16          THE COURT:  Do you have a handout to me?

17          MR. ALPER:  We do.  If we may approach to hand up the

18   slides.

19          THE COURT:  Thank you.  Do you have extra copies?

20          MR. ALPER:  Yes, Your Honor.

21          THE COURT:  Hand one to the young lady in the red

22   behind you, please.  That's Loretta Smith.  She's my law clerk

23   who is working on this particular case.  How did she get that

24   assignment?  Well, we won't go into that.

25          (Laughter.)

1      THE COURT:  Okay.

2      MR. ALPER:  Okay.  So, Your Honor, in your binder,

3  there are two tabs.  The first tab is going to be Dr. Bajaj's

4  technical tutorial.  The rest of the slides are the -- we will

5  call the lawyer slides, the slides that we will be making our

6  presentations.  My handful of slides, just to introduce the

7  parties, are going to start on that second tab.  So if you go

8  to the second tab for now, and we can go to Slide 2.  And, by

9  the way, I'll just note for the record, the cover of our

10  binder has the wrong date on it.  I apologize, Your Honor.  It

11  says October 11th, today is October 12th.

12      So if we could go to Slide 2.  We obviously represent

13  Eagle View.  Eagle View was founded in 2008, Your Honor, and

14  has been widely recognized for changing the roofing industry

15  through its technologies.

16      The technologies that Eagle View is responsible for

17  relate to -- relate to -- they're technologies that greatly

18  enhance and assist the ways that insurance companies value the

19  damage to roofs in order to efficiently, expeditiously assess

20  those claims and get them fixed.

21      If we go to the next slide, these are the inventors on

22  the two -- on the patents-in-suit.  They are the founders of

23  Eagle View and Mr. Pershing was the former chief technology

24  officer.

25      If we go to the next slide, this is Slide 4, these are

1    the products that Eagle View makes and sells.  Eagle View

2    creates software that has the patented technologies or relates

3    to the patented technologies that -- including software that

4    produces these roof reports.  It also sells the roof reports.

5    The roof reports are what the insurance companies then can use

6    to expeditiously assess claims and come up with the cost of

7    the damaged roof in order to get the claim paid, and then

8    Eagle View also has its own storehouse of aerial imagery that,

9    as you probably -- you know and as we will get into, is a key

10   input or a key part of the patented technology.

11        If we go to Slide 5, from the very beginning, from the

12   outset when the products hit the market, Eagle View's

13   technologies were recognized widely as being revolutionary.

14   We just put a couple of sample third-party press articles

15   here, but you can see, CNN, Finance, Bloomberg recognizing

16   Eagle View as reinventing the area of the roofing industry,

17   reshaping the entire industry and changing the way that the

18   insurance companies go about -- or insurance companies and

19   their roofers go about actually getting these damaged roofs

20   fixed.

21        And that's not only something -- that's not recognition

22   that's only occurring back when the products first hit the

23   market.

24        If we go to the next slide, Slide 6.  It's something

25   that goes on until today.  So, of course, we're all familiar

1    with the hurricanes that have plagued the southeastern United

2    States.   These are a couple of recent articles and statements

3    that -- about Eagle View's technology in connection with those

4    situations where people have their homes destroyed, their

5    roofs are damaged or destroyed, and they need to get them

6    fixed quickly and they have to work through their insurance

7    companies, and it's Eagle View's technology that allows for

8    the rapid assessment of the cost of those roofs in order to

9    get the claims assessed, get a contractor paid to get out

10   there and actually fix the roofs.

11       And as you can see, this is an article from 2016 on the

12   top and the one on the bottom from 2017, talking about Eagle

13   View's technology in connection with these hurricanes.  And,

14   in fact, Eagle View actually received accolades directly from

15   the insurance companies and also custom -- the people out in

16   the field for its technologies, because it helps them get

17   their houses fixed.

18       Okay.  I'm going to skip Slide 7.  That's just a

19   listing of the patents that are in suit here, and move on to

20   Slide 8.  So Xactware and Verisk, those are the same -- Verisk

21   is the parent entity, the Xactware is the subsidiary and their

22   business traditionally is on a little bit different side of

23   the insurance adjusting business.

24       They make software and other tools in order to allow

25   generally insurance companies to manage claims, and the Eagle

1    View part of this is sort of a -- they use that, they rely on

2    the Eagle View roof reports and Eagle View technologies in

3    order to assess claims, and they have kind of the overall --

4    whoops, I'm sorry -- the overall platform to allow insurance

5    companies to kind of intake the claims and deal with them.

6         Very early on, the defendants recognized the value of

7    Eagle View's technology when it hit the market and, in fact,

8    after Eagle View came out with its technologies, the

9    defendants attempted to purchase Eagle View, and they -- they,

10   recognizing the strength of the innovations and also the

11   patents, and I'll touch on that in just one moment.

12        They were unsuccessful in purchasing the company and

13   after that, came out with the competing roof reporting

14   technology that's, of course, the subject of this lawsuit.

15        But before they did that -- if we go to my final slide,

16   Slide 9.  Eagle View -- I mean -- I'm sorry, the defendants

17   recognized the strength of the Eagle View technology and the

18   strength of Eagle View's patents, and so this is an example of

19   that here, where the Verisk president and CEO is acknowledging

20   the significant intellectual property including 20 issued

21   patents that Eagle View has, and those 20 patents include the

22   seven patents-in-suit that we're here -- that are here today,

23   which, of course, all made it through the patent office and

24   I'm -- as Your Honor may be aware, have now survived 14

25   separate inter partes review petitions.

**1**         With that, I'm going to now ask my colleague Mr. Cutri

**2**  to come up and also our expert, Dr. Chandra Bajaj to come up

**3**  and do some more background to the technology.

**4**         THE COURT:  Something you want to say?

**5**         MR. BROMBERG:  Yes, Your Honor.  May I give a brief

**6**  response to that opening statement?

**7**         THE COURT:  Are you going to have your own opening

**8**  statement?

**9**         MR. BROMBERG:  Well, we will have our -- we will have

**10**  our expert witness to go on after Dr. Bajaj.

**11**         THE COURT:  All right.  Why don't we do it at that

**12**  time then.

**13**         MR. BROMBERG:  Do you want to do it at that time?

**14**         THE COURT:  Sure.  I think it makes more sense to do

**15**  it then.

**16**         THE COURT:  Doctor, come up here, please.  Would you

**17**  raise your right hand.

**18**  (**CHANDRA BAJAJ**, having been duly sworn as a witness, testified

**19**  as follows:)

**20**         THE COURT:  State your full name.

**21**         THE WITNESS:  Chandra Bajaj.

**22**         THE COURT:  Spell your last name, please.

**23**         THE WITNESS:  B-A-J-A-J.

**24**         THE COURT:  Doctor, have a seat here.  And try to

**25**  remember to speak into this, so they can hear what you've got

BAJAJ – DIRECT – CUTRI

1   to say, please.

2            Counsel, you may proceed.

3            MR. CUTRI:  Good morning, Your Honor.  Thank you for

4   the opportunity to present this tutorial to the Court.

5            I'm going to lead Dr. Bajaj just through his background

6   and then at that point, he will take over essentially, and try

7   to do his best to teach Your Honor about the background

8   technology that's at issue in the case.

9   (DIRECT EXAMINATION OF CHANDRA BAJAJ BY MR. CUTRI:)

10  Q.   So with that, Dr. Bajaj, if you would please tell the

11  Court a little bit about your background, and in particular,

12  how some of your background relates to the technology that's

13  at issue in this case.

14  A.   Well, thank you, Your Honor, for the opportunity to tell

15  you about the technology and background.  Briefly about

16  myself, I'm a professor of computer science at the University

17  of Texas at Austin.  You know, I've had about 35 years of

18  experience in the underlying technologies, the finished

19  processing, computer vision graphics.

20           I direct the Center of Computational Data Analysis and

21  Visualization at the center at the University of Texas now.

22  I'm also a fellow of several technical societies, the

23  Advancement of Science, Applied Mathematics and the ACM, which

24  is the computing machinery, which is the computer science main

25  technical society and the IEEE.  So that's a brief bio.

BAJAJ – DIRECT – CUTRI

1          MR. CUTRI:  Your Honor, Dr. Bajaj is prepared, if

2   it's okay with the Court, to step down here and to the podium

3   and do his presentation from here.  It may be a little bit

4   easier for him to gesture and reference certain slides.

5          THE COURT:  That's great.  Doctor, if you can do this

6   more easily down in the well of the court, please do so.

7          THE WITNESS:  Thank you very much.

8          Thank you.  I'm much more accustomed to standing up

9   and lecturing rather than sitting down.

10         THE COURT:  I bet you are.

11         THE WITNESS:  So, as I get into the technology and

12  the background, it was -- I was thinking it was time to at

13  least introduce a little bit about why this technology was --

14  is created.  There's a need for, you know, as Mr. Adam pointed

15  out, roof estimate reports are generated, the software

16  underlying the technology and that is -- there's a need felt

17  for it.

18         So why do we need roof estimate reports and why do we

19  need this kind of technology?

20         So what you're seeing on the picture on the left is, of

21  course, a damaged roof.  It seems to be a minor damage, but

22  it's a damage and it requires roof repair.

23         This on the right shows actually much more extensive

24  damage, and also it's, you know, the inability to access

25  portions of the roof getting hampered and, of course, you can

BAJAJ – DIRECT – CUTRI

1    get catastrophic damage as we are seeing in the last several

2    months, even just a few days ago in California where large

3    communities are being destroyed.  And so clearly, roof repair

4    is an absolute must and is occurring at a rapid pace.

5         So who needs this roof information?  And there are two

6    broad categories that Adam pointed out, but I thought I would

7    also mention it, they are the contractors and the builders,

8    and there's the insurance companies and they are needing to go

9    back in, repair the roofs and, of course, insurance companies

10   tend to pay for these roofs.

11        We've all dealt with them.  I've dealt with them, too,

12   as an individual.

13        So, you know, what is a prior art that this technology

14   replaces?  The state of the art has been, for a long time,

15   guesstimating, and this is a term that, you know, I -- is

16   often used and it's partly because the roofs are very

17   complicated and it's harder to access them and hence, they are

18   -- there's a danger involved to them as well, so contractors

19   are constantly under pressure not to underbid because if they

20   underbid, they lose money.  Insurance companies also don't

21   want to lose money and so they don't want to overestimate.

22        This idea of guesstimating is, of course, an

23   approximation and ends up that several times they are wrong,

24   and so partly, you know, the void that was filled in by this

25   technology is to go back and replace this guesstimating

BAJAJ − DIRECT − CUTRI

1    approach, as I'll show you.

2          Generally, roofs are hazardous, you know, roofs that

3    need repair, there can be very slick conditions and it's

4    dangerous to even go up and clamber up on even a four-story

5    roof.  Of course, roofs can be very complicated and they are

6    architecturally beautiful, but they are also with very steep

7    pitches and inclines, and even if you can manage to clamber up

8    those roofs, they are very dangerous.  Of course, there's also

9    the issue of scaleability, you know.

10          If you're going to have a community destroyed, every

11   house here potentially needs repair.  How do you go back and

12   send insurance adjusters; how do you back and send contractors

13   to go back and give you a guesstimate, you know.

14          So this -- the hazards, the time taken,

15   inaccessibility, all boils down to clearly there was a need

16   for a solution.

17          And this is what the inventors came up with.  Chris

18   Pershing, who was a software engineer at Microsoft and David

19   Carlson, who was actually a roof contractor, and they were

20   related, so, you know, David's brother-in-law is Chris

21   Pershing and as he, you know, explained in his deposition,

22   which I watched, he -- and I pulled out a small, little

23   excerpt from them:  Imagine if you could actually use

24   photographs, aerial photographs, and that was the idea of

25   using aerial photography to actually measure roofs, and he

BAJAJ - DIRECT - CUTRI

1    goes on to say that, you know, at the beginning, this is --
2    and also part of the deposition, which when you hear, saying,
3    I was constantly underbidding, I was losing money and it was
4    dangerous.  There were times I didn't go back and clamber up
5    on roofs and so on.
6         So that's when he went to Chris Pershing and he agreed
7    that we could use aerial photographs and they went and also
8    considered the fact that maybe a single photograph is not
9    enough.  We aren't going to be able to use just a top-down, as
10   I'll show you.  From a top-down, you can only make out
11   outlines, you can't make out these pitches of the roofs.  So
12   Chris, being a software engineer, quickly took to the idea and
13   he did some rough calculations, and this is his journal book
14   and I've taken out a few excerpts from it, and therein you
15   see, you know, his rough calculations.  And he's saying, is
16   this feasible, and you can see pictures of views from
17   different angles and some calculations and making area and
18   length measurements.
19        Then he actually did a brief case study on his own
20   house and that's what he documented in 2006.
21        So therein lies the seed of the invention and, of
22   course, this slide put into place in all these patents and
23   Adam has already pointed out the technology of the company.
24        So in my next few slides, I'm going to go back and show
25   you how this process works, very briefly.

*United States District Court*
*Camden, New Jersey*

BAJAJ – DIRECT – CUTRI

1      So how these roof models generated from aerial images
2  and how these roof estimate reports and the detail on some of
3  them.
4      The picture on the left is a snapshot from their
5  software called Render House which I've also observed in
6  action.  And what you can see here is an aerial photograph and
7  also you can see some -- some overlays in blue.  These
8  overlays in blue on this two-dimensional aerial image is
9  actually a projection from a three-dimensional wire frame
10  model.
11      This is, you know, a representation of the
12  three-dimensional roof model that they construct from these
13  aerial images, and what you're seeing on top are several
14  images in a thumbnail, and what they can do is select any one
15  of these images or select them in groups of two.
16      From this imagery, they go back and build these models,
17  and then they generate a roof estimate report.
18      MR. CUTRI:  Your Honor, we do have a sample copy of a
19  roof estimate report, and with the Court's permission, I can
20  hand it up and you can take a look at it.
21      THE COURT:  Let me see it.  Thank you.
22      Perhaps we should mark this as Plaintiff's 1.  P-1.
23  I'll mark it.  Thank you.
24  (EXHIBIT P-1 WAS MARKED FOR IDENTIFICATION)
25      MR. CUTRI:  We have an extra copy for staff.

*United States District Court*
*Camden, New Jersey*

BAJAJ - DIRECT - CUTRI

1      THE COURT:  Give one to Ms. Smith, please.

2      MR. CUTRI:  And for the record, Your Honor, this roof

3  report that I've handed Your Honor is partially excerpted and

4  blown up in the slides that were provided to opposing counsel,

5  but this is the underlying document and you can obtain these

6  -- this is a sample that Eagle View makes available for

7  prospective customers, but you can obtain this type of report

8  for essentially any roof in the United States in approximately

9  24 to 48 hours.

10     THE COURT:  Continue, Doctor.

11     THE WITNESS:  Thank you, Your Honor.

12     So, as you can see in this report, you know, it's at

13  least an eight-page report.  It's fairly detailed.  It's got

14  several aspects to it, but it also uses a lot of terminology,

15  which is, you know, consistent with roofs and their features.

16  And so I thought I'd give you a brief overview of some of the

17  terms that I've mentioned in the report, and as you go back

18  and see why they are also, you know, partly important.

19     One of the most important things are pitches.  It was

20  also mentioned in the -- in the testimony, or the deposition

21  of Carlson, we can't get pitches out of top-down views.  We

22  need more than one top-down view.  And pitches are essentially

23  the slope of the roof.  It's measured in units where you give

24  units of, you know, if you go, say, 12 feet forward, how high

25  do you go?  So that's the ratio of how high you go if you move

BAJAJ – DIRECT – CUTRI

1    12 feet forward.  That ratio is called the pitch.

2              There are other terms, as well, hips and ridges, and

3    while they might seem very familiar, they are also important

4    because certain things are used in valleys, which are

5    different to what I used on ridges.  So they need that kind of

6    labeling of the various features, and we use this term

7    "feature," to mention all of these lines and ridges and hips

8    and even corners.

9              Eaves are overhangs, dormers are like little windows

10   coming out of roofs, and rakes -- looks like a rake, is a

11   small little roof on top, like an A frame on top of the roof.

12   So this is what's expressed in this report, and as you look

13   through, you know, one of the pages has a length diagram and

14   this length diagram, you see the outline and you see color

15   coding.

16             The dark red are ridges, and it says ridges -- total

17   amount of ridges is 120 feet and the blue is valleys, and

18   there are 288 feet of valleys.  And rakes are 114, and so much

19   are the eaves.  The eaves are all in the black outlines in the

20   back.

21             And using this, you can start to see how a builder,

22   constructer needs that information to go back and see what

23   material costs are involved and what the different types of

24   labor is.

25             And it goes on, it tells you the pitches.  The pitches

*United States District Court*
*Camden, New Jersey*

BAJAJ – DIRECT – CUTRI

1   are labeled with numbers, and they just leave the number,

2   which is the numerator, so it's 10 divided by 12, that's the

3   steepness and that's a fairly steep slope.  If it's 12 by 12,

4   that would be nearly vertical.  Zero would be flat.

5          So given -- the numbers are important because it tells

6   you how the inclines are.  Then you go on and can see area

7   diagrams, and there are square feet measurements.  All of

8   these numbers are in square feet.  So depending on the measure

9   and the quantity, there's detail provided.  And then there's

10  an overall summary of the reports so that they can do some

11  analysis.

12         So it's a fairly detailed report, and I won't go and

13  spend more time on it, but that's partly, you know, what the

14  requirement is.

15         And to be accurate in this report is of primal

16  importance and hence, the need for the software technology

17  that would take imaging and build the roof models from which

18  these roof estimate reports can be generated.  Without that,

19  you can't -- you're guesstimating.

20         So that was the -- in some sense, the key portions of

21  the invention.  Of course, there's lots of detail and I'll

22  step through a few highlights only, given time.

23         So, you know, how do you generate these roof estimate

24  -- roof estimate reports from three-dimensional roof models

25  taken from aerial imaging?  So you've got plan views of aerial

BAJAJ – DIRECT – CUTRI

1   photographs, but as we know that there's not enough, you have

2   also what I call oblique perspective views.  These are views

3   from the side, so you can see parts of the elevation and not

4   just see the outlines of the roof and footprints of the roof,

5   so different, oblique.

6        So as you can see over here on this top view, there's

7   this black-colored roof and you can see the detail in this

8   oblique perspective view here, and you can see the front where

9   all these three dormers are.  You can see them in this view,

10  as well as this view.  Not everything is sometimes visible in

11  a single view and hence, the need for more than one view as

12  well.

13       So what the technology then does is goes back and takes

14  these images, extracts this information, these features and

15  goes back and builds the roof model.  So part of that

16  extraction is when you're working with two or more images, is

17  to get a certain amount of what is called correlation.  And

18  this is one of the terms that is being used.  And so what,

19  essentially, it does is -- says, look at the left image, the

20  top plan view and look at the right image.  I know that they

21  correspond.  But I want to be a little bit more exact.

22       I want to pluck out features.  There's a little ridge

23  feature marked in red, there's another ridge feature.  They

24  correspond.  So that's -- this peak here, which is colored in

25  blue, corresponds to this peak here.  This little facet, which

BAJAJ – DIRECT – CUTRI

1   is a section of the roof, corresponds to this facet.

2          So you're matching up features.  It's awfully important

3   not only to look at the roof features, but also get some kind

4   of relative ground level features.  So you can see this little

5   green L-shaped feature is the pavement and the pavement in

6   here and the pavement in there correspond.

7          And there's also a shrub, which is marked in a circle,

8   so that you're not flipping the house around and you're

9   registering it properly.  So you know that the shrub is in my

10  left corner of the house, so that must be on the left corner

11  of the house.  So such correspondence of features allows you

12  to correlate the images.

13         Once you -- this process of correlation also allows you

14  to build the third dimension, the missing dimension, because

15  aerial photographs or oblique photographs are all two

16  dimensional.  The roof models and the roof structure is three

17  dimensional, so how do you get that missing dimension?

18         Well, through this matching of these features within

19  the images, one can then get three-dimensional information for

20  all of the features of the three-dimensional model.  And I'm

21  showing you two pictures of the three-dimensional model or the

22  roof model, this is called the wire frame model in the

23  patents, and this is a shaded rendering of that wire frame

24  model.

25         But this is just an initial model, because there can be

BAJAJ - DIRECT - CUTRI

1    several inaccuracies, and so there's a process, then, of going

2    back and refining this model as explained in the -- in the

3    several patents.

4         The key term of "pitches," is one thing that is not

5    completely correct or confirmed to be correct, and that's the

6    refinement that I'd like to step you through in the next

7    couple of slides.

8         So how do I make sure that the model that I've

9    initially created, you know, how do I make sure that it's

10   completely consistent, as well as has accuracy, because that's

11   what the fundamental drive is for.

12        So there are several different interface tools and

13   there's software that allows you to manipulate this

14   three-dimensional model, and there's something called a

15   protractor tool, something called an envelope tool and a wire

16   frame tool.

17        Again, in interest of time, I'll just focus my

18   attention on the wire frame tool.  So this wire frame tool, as

19   you notice -- these are pictures, by the way, from the patent.

20   So this is the '737 patent and left to right are Figures 5B,

21   5D and 7B.  So I'm focused on 7B right here.

22        So in 7B, you will notice the -- are outlines and

23   little white squares that are given in the patent and also

24   labels.

25        So while the numbers, 7111 and so on are just labeling

BAJAJ – DIRECT – CUTRI

1   different sections of the roof, these little white handles is

2   explained to be handles, which can be manipulated by the user,

3   so the user can move them around to readjust the wire frame if

4   it doesn't fit right onto your aerial imagery, and the numbers

5   on top of these sections are the pitch.  It's plus 4.  That

6   means 4 divided by 12.  It's at a slope of one-third, so

7   that's the pitch.

8        And so you can change the pitch, and to change the

9   pitch, you can use this interface tool and this wire frame

10  model and directly edit this wire frame model.  And the key

11  part of this invention is, are we doing motions or

12  interactions -- the user, I should say, not I, the user will

13  be doing interactions at two dimensions on the imagery, on the

14  wire frame model, and he will be manipulating the shape in

15  three dimensions, and hence, refining the shape as he goes

16  along.

17       So as -- as a simple example, I made a small animation

18  to explain how this user interface can be used in this

19  scenario.  So these are the same picture from the patent, but

20  what I've done is, I've colored it and the red and the shading

21  is mine.  I just made that so that I could explain to you on a

22  better -- on what the motion could be, interaction is, and

23  these white handles are what we're going to manipulate.

24       So the user wants to change the pitch of this roof,

25  this panel.  Is going to change the panel pitch from four to

BAJAJ – DIRECT – CUTRI

1    five and he's going to use a two-dimensional image and he's

2    going to select these handles which as the patent specifies,

3    can be selected singly or in groups.

4         So you can select an individual handle or you can

5    select two or more such handles.  You can move an entire

6    feature collectively.  So if he selects the left one and the

7    right one, he selects this entire line feature and he's going

8    to drag this line feature to the blue, from the red position

9    to the blue.  And I built this little animation to show you

10   that.

11        So this was the original four pitch and he wants to

12   modify this pitch to a five, and he's going to drag this

13   feature from the red position to the blue, and when he drags

14   it, he changes the tilt of the pitch of that roof five.

15        So this is a computer graphics user interface,

16   sometimes they call it a graphical user interface icon that

17   you can manipulate as an operator so that you can then make

18   modifications on your roof model in three dimensions using

19   only two-dimensional imagery.

20        The next one is another kind of modification process.

21   So there are many steps that are built into the software.

22   It's not, you know, you have images and suddenly, you get a

23   model.  There's a whole process and accuracy and refinement --

24   I mean, to achieve accuracy, you have to constantly refine the

25   model.

BAJAJ – DIRECT – CUTRI

1    So in this process, we want to actually use twin views.

2    So in the first case, we're just using -- manipulating a

3    single image and then seeing it in the other.  Here, you can

4    manipulate an image and you can see it in the other and look

5    at the corresponding responsive changes that occur.  Because

6    after all, you are manipulating something in three dimensions

7    and you're looking at like persons in flatland and only

8    two-dimensional projections.  So you need that confirmation.

9    So here, the same drawing can be changed in one drawing

10   and automatically the system will go back and change those,

11   and so here, as you move this here, this thing moves there and

12   the software allows you to show that.  And this is one of the

13   other highlights of their shape modification and

14   three-dimensional modification of the -- so these are the

15   technologies that underlie.

16   I took this little snapshot but, you know, given

17   interest of time, if you'd like me to, I can -- you know, this

18   is part of their Eagle View Twister software and here is, you

19   know, the operator is making this change.  You can see on this

20   leftmost image, the initial wire frame model when projected

21   down has overlays, has lots of errors.  This thing is hanging

22   way out here.  You can see this error in the roof, you could

23   also see this ridge point should have been here at the rake,

24   it's not.  It's all been corrected here and by making these,

25   you know, user-operated changes, and as those changes are

BAJAJ – DIRECT – CUTRI

1   made, you're building a more accurate model of three

2   dimensions from which you generate the roof estimate report.

3        So that's the process.  There's a lot more detail, you

4   know.  This one, I actually, you know, worked with the

5   software engineers, they gave me a demo of this software

6   because I wanted to be convinced that it was part of the

7   interaction metaphor and how it worked, and these are

8   snapshots that they generated then from that.  I thought I

9   would include that as well here.

10       So with this -- you know, this is just my final

11  slide -- we're just saying, that's what's underneath the wraps

12  of -- starting from aerial imagery, building models,

13  generating roof estimate reports, and there's a lot more

14  details, I'm sure you will get into.

15       MR. CUTRI:  Thank you, Your Honor.

16       THE WITNESS:  Thank you.

17       MR. CUTRI:  I think that concludes Dr. Bajaj's

18  portion of the testimony, unless Your Honor has questions.

19       I was going to just direct you to the last two slides

20  in this stack.  On Slide 30, this is -- we're actually looking

21  at a screen shot from the defendants' software system, and you

22  can see that when an adjuster is preparing to consider whether

23  to pay a roof claim or pre-approve a claim for a damaged roof,

24  they can go to the tools menu and they can drop down and

25  request info from Eagle View.  And what that does, inside the

1    defendants' software, is it will generate some version or

2    parts of or the entire part of the roof report.  That roof

3    report then travels from Eagle View's system into Xactware's

4    system.

5            As Mr. Alper alluded to earlier, if you look at

6    Slide 31, what -- what happened was when Eagle View showed

7    that this could be done, that you could use aerial images to

8    create these roof reports in 2008, by about the fall of 2008,

9    Xactware had heard about this, and said, well, we'd like to

10   get that technology into our system, and you're seeing here on

11   Slide 31, a 2009 press release by March of that year.

12           Eagle View and the defendants had reached an

13   arrangement whereby the roof reports would be provided through

14   the defendants' system, and you could see that this is

15   Xactware's press release stating that:  Using aerial

16   photography and patent-pending software, Eagle View accurately

17   calculates measurements for the roof's ridges, rafters,

18   valleys, slopes and more.

19           And then there's a quote from Jim Loveland, who was

20   then the CEO of Xactware, and he says:  Eagle View provides

21   cheap technology for insurance adjusters and service providers

22   using our products within the reconstruction and remodeling

23   industries.

24           So where we are today is that since that time and since

25   the time that Xactware has tried to acquire Eagle View and has

1   been unsuccessful, Xactware has -- and I've got to be careful

2   about the public record, but they have developed technology to

3   generate roof reports that we think infringes Eagle View's

4   patents.

5          THE COURT:  Did you want to ask any questions of the

6   witness?

7          MR. BROMBERG:  No, Your Honor, but we have lost our

8   realtime feed for some reason.

9          THE COURT:  Let's get that fixed.

10         MR. BROMBERG:  I want to get that fixed, and then I'm

11  ready to proceed.

12         THE COURT:  Let's take a short break, then, so we can

13  work on this.

14         RESPONSE:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         (RECESS TAKEN; 10:26 a.m.)

17         (In open court at 10:34 a.m.)

18         THE DEPUTY COURT CLERK:  All rise.

19         THE COURT:  All right.  Are we fixed?  Up and

20  running?  I hope.  Let's go.  Have a seat.

21         MR. CHRISTIE:  Your Honor, may I briefly be heard

22  about Dr. Bajaj's presentation?

23         THE COURT:  Sure.

24         MR. CHRISTIE:  Thank you.  Based upon my prior

25  presentation to the Court, we do object in part to his

 1   presentation as follows, Judge:  As you heard, there was a

 2   focus on the Eagle View products, not on the patented

 3   technology, and there was no foundation whatsoever that their

 4   products practiced the patented technology at all.  In fact,

 5   our view is that plaintiffs are using the products of theirs

 6   to construe the patents which is inappropriate, and I think

 7   the most egregious example of that is slide number 22 which

 8   deals with three purported embodiments of a pitch

 9   determination marker.  And as you heard, Dr. Bajaj focused on

10   the third of them which is the wire frame.  Judge, that is

11   legal advocacy.

12        One of the key issues that you will hear about from us

13   is whether a wire frame constitutes an embodiment of a pitch

14   determination marker.  We strenuously disagree with that

15   perception and as a legal argument they are aware of that and

16   they are using their expert to bolster their legal argument in

17   their supposed technology tutorial.  For the above reasons,

18   Judge, we object to Dr. Bajaj's presentation.

19        THE COURT:  Did you want to respond?

20        MR. ALPER:  Certainly, your Honor, just briefly.  The

21   tutorial was intended to be just that, just background to the

22   technology.  To be very clear, and you will see this in our

23   presentations, we are not relying on expert testimony for our

24   constructions nor do we believe the Court needs to in order to

25   arrive at the proper constructions.  The intrinsic evidence is

1   everything you need.  So, I disagree with the objection, and

2   we are not certainly, as you will see when you get to the

3   presentations, we are not using the expert -- we're not

4   intending to rely on expert testimony for the constructions.

5          THE COURT:  Well, to the degree it's necessary, I'll

6   overrule the objection.  I'm not sure what the basis of it is.

7   I don't take any legal significance from what the doctor

8   stated.  He simply was explaining for my benefit how it works.

9   Whether or not it has anything do with how I construe some of

10  these terms remains to be seen.  So, let's proceed.

11         MR. BROMBERG:  Thank you, your Honor.  Lee Bromberg

12  for the defendants, and I'm going to present the technology

13  tutorial that we have prepared for the Court through our

14  expert witness, Dr. Joseph Mundy.

15         Before I do that, your Honor, I just wanted to make two

16  large points, and the first one was in relation to the factual

17  description that we heard from Mr. Alper at the beginning of

18  this presentation, and you notice that he said that Verisk

19  came into existence in 2008, the same year as Eagle View.

20  Well, Verisk was actually a new name for a company that had

21  been around for decades called Insurance Service Office, and

22  as the name, that name implies, it's a big provider of data

23  and information and services to major insurance companies.

24  That's its main business, tables on life expectancy, tables on

25  risk factors, information concerning claims, information

1   concerning underwriting.  So, that's its business.  It's been

2   around for a long time.

3         And then you will notice that Mr. Alper said that

4   Xactware goes back to 1986, and that's true.  Xactware was

5   started as a company to provide information concerning what it

6   would cost to renovate old houses.  And then it expanded, and

7   it developed along the way a very important tool called the

8   Xactimate® platform, and you will hear more about that as this

9   case goes along, your Honor.  The Xactimate® platform will

10  tell you how much it costs to reconstruct a house, a roof, a

11  shack, a castle, a big building, you name it, based upon the

12  local pricing for any particular area of the country.  So, if

13  you're building your -- rebuilding your house in the New York

14  suburbs, you might get one price, if you are building them in

15  the Iowa suburbs, it might be a different price.  But the

16  Xactimate® platform is the industry standard for insurance

17  companies in doing that.

18        Now, Verisk acquired Xactimate® in 2006, and at that

19  time the Xactimate® platform was already well established as

20  an industry standard for figuring out claims information and

21  underwriting information for insurance companies, and what

22  came along in 2008 with Eagle View was this roof estimation

23  software program, and there were actually a number of

24  companies, two of whom Eagle View sued to put out of business

25  at that time, and Xactware, then a division of Verisk, decided

*1*    to do a business partnership with them.

*2*         So, these parties are not only litigants in a patent

*3*    case, they are also business partners and they remain that

*4*    today, because virtually every roof report that comes out of

*5*    Eagle View that is on the insurance side goes through the

*6*    Xactimate® platform.

*7*         And what happened in 2008 after they signed this deal

*8*    for the Eagle View roof reports, just like the one that was

*9*    handed up to you, to be delivered to customers such as

*10*   insurance companies through Xactware's Xactimate® platform,

*11*   what happened once they signed up this deal at the end of 2008

*12*   was Eagle View's sales went from about a million to tens of

*13*   millions.  They went up like the proverbial rocket, because

*14*   once they were on the Xactimate® platform, which most of the

*15*   big insurers used, it became very desirable to use them.

*16*        So, we believe that that is what explains the great

*17*   success of this product in the marketplace, and it doesn't

*18*   have anything to do with the patents which are the subject

*19*   here today.

*20*        So, I'll leave it there, your Honor.  There's a

*21*   complicated history, but that's the basics.

*22*            THE COURT:  I just want to say this.  This is all

*23*   really interesting, Counsel, on both sides, and I thought it

*24*   fascinating that discussions about the attempted purchase and

*25*   it fell through and all that.  Maybe some day if it gets that

1  far the jury is going to enjoy hearing all this, but it isn't

2  helping me determine what these terms mean today, which is

3  really what I want to focus on, and I'm going to give you

4  great leeway because I'm interested in the background, I

5  really am, and how the parties got together and what happened

6  and all that and what they do, but it's not going to help me

7  define these terms.

8      MR. BROMBERG:  I couldn't agree with you more, your

9  Honor.  I would just say one thing about that purchase.  It

10  was agreed upon.  There was a signed agreement.  And the FTC

11  said no, you can't do that because you are competitors and

12  we're not going to narrow competition in this market.

13      THE COURT:  Well, maybe some day we'll straighten all

14  that out, figure it all out.  Maybe today is not the day.

15      MR. BROMBERG:  Okay.  So, the second thing I wanted

16  to say, your Honor, was simply that as your Honor has just

17  correctly pointed out, this is a claim construction hearing,

18  how to construe the terms of the patents, and I don't think we

19  heard one reference to the patents so far.

20      THE COURT:  We will.

21      MR. BROMBERG:  And the --

22      THE COURT:  Look, I don't -- I'm not going to

23  criticize the plaintiffs.  It was very helpful for me.

24  Reading the materials, I got some sense of how this all works,

25  but I think the doctor's explanation was very helpful just to

1    explain exactly what happens during the course of the process

2    in coming up with the report, and I anticipate that your

3    expert is going to help me further understand the process

4    here.

5              MR. BROMBERG:  Yes, I think he will do that, your

6    Honor, and with that, let me call him to the stand to give you

7    the background, the technology background to these patents.

8              So, we would call Dr. Joseph Mundy to the stand.

9              THE COURT:  Dr. Mundy, please.  Sir, how are you?

10             THE WITNESS:  Good.

11             THE COURT:  Raise your right hand.

12   (**JOSEPH L. MUNDY**, HAVING BEEN DULY SWORN, TESTIFIED AS

13   FOLLOWS:)

14             THE WITNESS:  Yes.

15             THE COURT:  State your full name.

16             THE WITNESS:  Joseph L. Mundy.

17             THE COURT:  Spell your last name, please.

18             THE WITNESS:  M-U-N-D-Y.

19             THE COURT:  Dr. Mundy, have a seat.  Now, are you

20   going to want to testify from the lectern?

21             THE WITNESS:  I think that would be more clear.

22             THE COURT:  All right.  Keep your voice up so we can

23   all hear what you've got to say.

24             MR. CHRISTIE:  Your Honor, may I hand out our copies

25   of the slide presentation?

*United States District Court*
*Camden, New Jersey*

MUNDY – DIRECT – BROMBERG

1          THE COURT:  Please.  Thank you.

2          MR. BROMBERG:  Your Honor, we plan to proceed in much

3     the same way that the plaintiffs did with Dr. Bajaj.

4          THE COURT:  Do you want to ask him a few questions

5     about his background?

6          MR. BROMBERG:  Sure.

7          THE COURT:  Or do you want to just let him explain

8     it.  Whatever you prefer, it's up to you.

9          MR. BROMBERG:  Yes, that's exactly what I want to do.

10     (DIRECT EXAMINATION OF DR. MUNDY BY MR. BROMBERG:)

11     Q.   Dr. Mundy, can you tell us, sir, what your educational

12     background is?

13     A.   I have a Ph.D. in electrical engineering from Rensselaer

14     Polytechnic Institute.

15     Q.   And, Dr. Mundy, where did you spend your -- where have

16     you spent your working career?

17     A.   My career started at General Electric's research

18     laboratory in Schenectady, New York.  I worked there for

19     around 35 years.  After that I became a professor of

20     engineering at Brown University.  I was there for 14 years.

21     And now I have a company in Providence, Rhode Island carrying

22     out research in photogrammetry for the U.S. intelligence

23     agencies.

24     Q.   What are the U.S. intelligence agencies, sir?

25     A.   It's a combination of the CIA, the National Geospatial

MUNDY – DIRECT – BROMBERG

1  Intelligence Agency called NGA, and we also do work for the

2  Defense Advanced Projects Research Agency, DARPA.

3  Q.  Have you done work for those companies before you started

4  your company, sir?

5  A.  Yes.  The National Geospatial Intelligence Agency funded

6  much of our work at Brown, the work of myself and my students.

7  Q.  When you were at GE for those 35 years, did you also have

8  an academic appointment, sir?

9  A.  Yes, I was an adjunct professor at Rensselaer Polytechnic

10  Institute for around 25 years.

11  Q.  And can you explain in general terms the areas that you

12  do your work in?

13  A.  My primary background is in computer vision with a

14  geometric emphasis, in other words, studying the properties of

15  three-dimensional models and their projection into images and

16  also how to recognize such objects from images.

17  Q.  Did you prepare a technology tutorial for us today, sir?

18  A.  I did.

19  Q.  And I think we have it up on the screen and I'm going to

20  let you proceed from here, if you will explain what you have

21  to present.

22  A.  All right.  Thank you.

23      If I could have the first slide, please.  Why don't we

24  go to the next slide.

25      The patent specification states that the operation of

MUNDY — DIRECT — BROMBERG

1  the patent ideas rely on the science of photogrammetry.  As we

2  can see from this excerpt from two of the patents, the basic

3  underlying procedure is something that's called triangulation,

4  which I'm going to explain in a moment, wherein we select two

5  points in two or more images.  Those points define rays, as I

6  will show in a moment, and these rays intersect in

7  three-dimensional space to define the location of a 3D point.

8        If we assemble enough of these 3D points, we can, of

9  course, construct a 3D model of an object, and that's the

10  basis of the technology that the patent relies on.  These

11  photogrammetric algorithms that are referred to here were not

12  actually a subject of the invention but preexisting technology

13  that the invention relies upon.  So, let's look at that

14  history of those algorithms.

15        Here is the basic approach of triangulation which I'm

16  going to explain.  We're going to run a little animation here

17  where first we're going to select a point in the first image

18  that defines a ray which is a line in space.  We have a second

19  point in the second image which defines a second ray.  Those

20  two rays intersect to create the 3D point.  I hope that's

21  clear.

22        The next slide shows the triangle that we just formed,

23  and through the principles of trigonometry, since we know the

24  distance between the two cameras and we know the angle of the

25  rays, we can compute the intersection point, which is the 3D

MUNDY – DIRECT – BROMBERG

1    location.  This principle of triangulation is what was

2    referred to in the specification quote that I just mentioned,

3    and this trigonometric calculation I think is familiar to

4    anyone who has graduated from high school.  I myself had it in

5    my junior year, so-called side angle angle formula.  Of

6    course, the principle of triangulation is not new, it's been

7    understood for maybe even millennia.

8          Next slide.  One more element of photogrammetry which

9    is part of the underlying technology is so-called epipolar

10   geometry where if we select a point in the first image, we may

11   not know where it lies in the second image, but has been shown

12   mathematically that it must lie on a line through the point

13   where the line joining the two camera centers intersect the

14   second image, the so-called epipole.  And the epipolar line is

15   swept out as we move the point through 3D space, since from

16   just a single image we don't know how far it is from the

17   camera, but we do know it is going to sweep out a line in the

18   second image.  That's so-called epipolar geometry that's

19   inherent in any pair of images.

20         So, these are the two fundamental principles of

21   photogrammetry that the algorithms refer to and the patents

22   rely upon, and these principles have been known for some time,

23   and let's look at that.

24         Next slide.  In the beginning, the idea of surveying on

25   the ground, of course, involves triangulation.  And if we go

MUNDY – DIRECT – BROMBERG

1   here to this picture, this is a textbook from 1702 which shows

2   the principle of triangulating 3D points on the ground by

3   changing the angle of a disc on the top of a horizontal table

4   and sighting a far away object, such as a bush that you see

5   there, and then the table is moved to a new location and you

6   resight that same feature, and from the difference in angles

7   you can compute how far away the feature is from the table

8   locations.  This is actually standard practice in surveying.

9   But again, it relies on this triangulation principle which we

10   just talked about which is inherent in using aerial images to

11   assess the location of 3D features.

12        Next slide, please.  This principle was then applied to

13   aerial imagery in the second half of the 19th century.  At

14   that time, as I'll explain in a moment, the collection of

15   images from the air was necessarily using hot air balloons

16   because aircraft hadn't been invented by that time.  But

17   nevertheless, one can capture images from above and then use

18   them, using the triangulation principle that I just mentioned,

19   to learn the 3D geometry of scenes on the ground.

20        If we go to the next slide, we see that by World War

21   II, the mathematics of photogrammetry had been embedded in a

22   mechanical computer so that an operator could fuse the two

23   images in their head and then essentially, just like virtual

24   reality today, they could fly through three-dimensional space

25   by adjusting these screw wheels that you see there to mark out

MUNDY – DIRECT – BROMBERG

1    3D points in the scene.  And through this mechanism, they

2    could create a topographic map from aerial photographs.  In

3    fact, I'll have a video in a moment that shows that.

4        Now, going back a bit earlier, though, to sort of trace

5    through the mathematical underpinnings of all this, it really

6    started with artists who were trying to understand how

7    complicated curved objects projected into a painting, and you

8    see here a wood cut by Duerer that shows an underlying

9    principle of how artists went about finding the projected

10   shape of 3D objects by essentially running strings from a

11   point on the wall to a point on the curved object and then

12   measuring where that projected into the image.  And so they

13   set up a whole set of rules for how this projection works so

14   that artists could create realistic paintings that had

15   realistic 3D depth impression.  But this wasn't understood

16   mathematically at this point in time.

17       It took another couple of centuries -- the next

18   slide -- for mathematicians to explain how this projection

19   really works.  One of the big puzzles that they had at that

20   time was how a point far away at infinity can project to a

21   finite point in a painting.  For instance, you're looking off

22   over the sea at the horizon which is infinitely far away, how

23   can that infinite point become a finite point in the image.

24   And that took the development of projective geometry in order

25   to explain that on a sound mathematical principle.  And

MUNDY – DIRECT – BROMBERG

1   Poncelet, that we see here, is one of the main contributors to
2   that theory.
3       Next slide, please.  Here we see that by the end of the
4   Nineteenth Century, the mathematics and the practice of
5   photogrammetry was essentially complete.  Here we see a paper
6   by Finsterwalder that describes the geometric theory of
7   photogrammetry, and I think he would be somewhat surprised to
8   learn that constructing roofs from aerial images was novel.
9   Here you see a figure from his paper that shows the 3D
10  reconstruction of a complete building.
11      Also, the epipolar geometry that I mentioned was also
12  well understood at that time.  Here we see a figure from 1883
13  which shows the construction that I illustrated in my first
14  slide.
15      Now, around the middle of the Nineteenth Century, it
16  became possible to collect aerial photographs.  Here we see I
17  think a rather remarkable photograph of the Arc de Triomphe
18  from 1868.  It has very good detail.  It was collected by
19  Tournachon in a hot air balloon.
20      In the next slide, we see another paper by
21  Finsterwalder where he has used two aerial images of an area
22  to construct a topographic map.  Essentially he is
23  constructing lines, contour lines at a given elevation as well
24  as the 3D geometry of the monastery that you see there
25  outlined in red.  And I do note here that he had no

MUNDY – DIRECT – BROMBERG

1    information really about the location of these photographs.

2    He was able to determine that mathematically from just the

3    photographs themselves.

4         Next slide, please.  So, let's move ahead to around

5    World War II.  Even though this video was taken from 1966, it

6    portrays really what was available at World War II in terms of

7    using aerial photography to recreate 3D models.  Here we see,

8    first of all, we have to collect the aerial imagery, that's

9    the camera, and then we are going to fly over an area of

10   interest, and we are using a bomb sight that you see there to

11   locate exactly where the photograph is being taken.  So, we

12   now have a bit more information about the photographs, which I

13   think you will hear talked about as metadata from time to time

14   during the proceedings, latitude and longitude of where the

15   photograph is taken.

16        Here we see the film being developed.  The images are

17   then pieced together into a larger scene.  They are put into

18   the machine that I mentioned.  The operator here is fusing the

19   images in his brain to create a 3D impression, and then he is

20   moving around in 3D space and plotting points.  And here you

21   see a contour line being plotted by the machine.  And at the

22   end, we can end up with a 3D model of the scene.

23        Here you see a technician who is constructing 3D models

24   based on the information collected from the aerial

25   photographs.  Obviously this is not very automated and it

MUNDY - DIRECT - BROMBERG

1    requires a machine shop to construct the models, but the

2    underlying mathematical and algorithmic tools were already in

3    place at that time.

4         Next slide, please.  Now we move into the '60s by which

5    time digital computation was available, and the idea of

6    reconstructing 3D objects from multiple images was of great

7    interest even from the very early days of the availability of

8    computers.  We see here a couple of images of work, early work

9    at MIT by Larry Roberts and Ivan Sutherland.  They sort have

10   had complementary skills.  Larry Roberts develops early

11   digital algorithms for reconstructing 3D models from images,

12   and Ivan Sutherland developed early display means by which

13   these models could be rotated and visualized in 3D on the

14   computer screen.  And so by that time then the digital

15   creation and display of 3D models was in hand.

16        Next slide, please.  By 1985, I had kind of entered the

17   picture here and this is the frontis piece of a paper that I

18   coauthored describing a system for digital reconstruction of

19   3D models from satellite imagery.

20        If we turn to the next slide, this shows the

21   reconstruction of a facility from multiple satellite images,

22   including 3D building roofs and the full building itself, as

23   well as roadways and then planar parking areas.  This

24   reconstruction was done by manually adjusting and positioning

25   points in multiple images to create the 3D model.  And even

*United States District Court*
*Camden, New Jersey*

MUNDY – DIRECT – BROMBERG

1  gable roofs were created by this tool which we see in the

2  lower right.  So, I think we can say at this point the

3  technology for creating building roofs was well in hand.

4       Next.  I thought I would just explain a little bit

5  about the underlying nature of the 3D models because we are

6  going to be hearing the term "wire frame" quite a bit and I

7  thought it would be good to know what that is.  A wire frame

8  is a set of 3D points joined by line segments.  In fact, we

9  could think of those line segments as wires and thus the term

10  "wire frame."

11       The faces of the model, the planar surfaces are not

12  explicitly represented, and, therefore, we sort of can look

13  through the model and see the back of it.  In fact, if you

14  look at it, you may perceive the back vertex is actually

15  sticking out towards you in the image because you're losing

16  kind of the 3D cues that you normally use to visualize a 3D

17  object because the faces are transparent.

18       And a way of representing the model which gives a

19  better 3D display capability is the mesh model where the

20  planar faces are filled in with an opaque plane surface, and

21  it gives a much more 3D look.

22       Now, you will see, also, in the patent specification

23  reference to a reference grid.  A reference grid is nothing

24  more than a set of 3D points wherein you can -- or 3D cells

25  wherein you can locate the 3D vertices of the wire frame, and

MUNDY – DIRECT – BROMBERG

1    I've shown that here by embedding the wire frame into a

2    reference grid.  Now, obviously we can make these cells as

3    small as we wish, and in the limit, they can become continuous

4    3D values, but this is the reference grid that's referred to

5    in the specification.

6         Next slide, please.  I'm going to show now a tool that

7    we developed at Brown University in and around 2005 which is

8    pretty much a copy of the radius system that I showed earlier.

9    Since I understood the underlying software algorithms and so

10   forth of the radius common development environment, I decided

11   at Brown I needed a similar tool, and the radius system by

12   that time was not available.  So, I'm just going to show the

13   operation of the system here which is very similar to that of

14   the radius system.

15        What I'm going to do here with this building which, by

16   the way, is in San Diego and these are satellite images that

17   you're looking at, I'm going to construct a top roof surface

18   of the building, and that will appear in the second image, but

19   it's not at the correct elevation, so I'm going to move the

20   roof vertically, which doesn't change its location in the

21   first image, but I'm moving along the epipolar line here and

22   lining up the points of the top polygon with the actual

23   location in the second image.

24        The next thing I'm going to do is extrude that polygon

25   to the ground, and here you see two wire frame projections,

MUNDY – DIRECT – BROMBERG

1    one in the first image and one in the second image.  And they
2    are simultaneously being adjusted to form the building.  Once
3    that's done, we actually have the 3D geometry of the building
4    which I am portraying here in the video.  So, that's how the
5    radius system worked and my copy of it worked essentially the
6    same way.
7        Now, here is an approach to modeling which isn't
8    described in the patent, but I thought I would just show it as
9    a contrast of what wouldn't be covered, at least by the
10   description in the specification, and this is called
11   constraint-based modeling where one already has a 3D model
12   prepared ahead of time in the form of a primitive like this,
13   but there's some unknown parameters, such as the center
14   location and the height and width of the object, but we can
15   determine those parameters by looking at an image.
16       Here we've moved the center of that parametric object
17   to line up with its center in the image and then we can adjust
18   its orientation to be parallel to the ground, which it should
19   be, and then in the next step, we can rotate it so that it
20   lines up with the projection in the overhead image, and -- but
21   the size isn't quite correct.  We can adjust its size then.
22   And now we know practically everything about the object except
23   its vertical position and its vertical height.
24       So, here we see the radius system doing exactly the
25   same procedure that I just outlined.  If we go to just the

MUNDY – DIRECT – BROMBERG

1    third row before the bottom, we have gotten to the point where
2    it's lined up in the first image as well as possible, but its
3    vertical position is incorrect and its height is incorrect,
4    and by using the second image, we learn those two parameters
5    and complete the model.  This is so-called constraint-based
6    modeling.
7         Next slide, please.  So, now we come to what does all
8    this have to do with roof models.  Obviously if we can
9    reconstruct 3D geometry from multiple images, a roof would not
10   be a challenge.
11        Next slide.  I think Professor Bajaj covered this
12   economic aspect very well in his presentation, so I won't
13   belabor it, but you can see that if you know the dimensions of
14   the roof, it is not difficult to compute the cost of repair or
15   replacement.  So, this then comes back to the patent
16   specification where again we are using the principles of
17   photogrammetry, which I hope I have explained now, to obtain
18   the geometry of the roof.
19        Next slide, please.  So, let's just go through the
20   steps.  First step is to select an image point in the first
21   image and that forms a ray.  Then we select the same point in
22   the other image.  That defines a second ray.  And thus we get
23   the first point.  And then we construct a second point and
24   join them with a line segment.  This is exactly what's
25   described in the specification as to how we form a first edge

MUNDY – DIRECT – BROMBERG

1    of the roof model.

2           Next slide, please.  We also have heard earlier about

3    pitch determination, and actually the specification goes at

4    quite length in describing how pitch is to be determined, and

5    it's to be determined using a pitch determination marker or an

6    envelope tool.  I am going to describe here only the pitch

7    determination marker, but the envelope tool has a similar

8    concept.

9           So, as we can see here in the figure from the patent,

10   the pitch determination marker has four arms.  Three of the

11   arms are just the X, Y and Z coordinates of the scene that we

12   are working with, and the fourth arm, so-called protractor

13   arm, is going to measure the angle of the pitch, and I'll

14   explain next how that's done.

15          Here we have two views of a building, and in the top

16   view we see the X and Y axes and the Z axis.  Since we're

17   looking vertically straight down, the Z axis is just a point.

18   From the side, though, we can see the X, Y and Z axes in sort

19   of a perspective view, and what the operator does is they move

20   the protractor arm so that it lines up precisely with the edge

21   of the roof.  That angle then, we would hope, would be the

22   pitch of the roof, but since we are looking at the building

23   sort of obliquely, that angle is not quite yet the pitch.  We

24   have to take into account the fact that we're looking from

25   above.  If you look to the right of the figure, you can see

MUNDY – DIRECT – BROMBERG

1   that we are not looking straight on at the end of the roof,

2   but looking sort of down obliquely at an angle theta that I've

3   indicated there.  So, in order to compensate for that oblique

4   view, we have to divide the angle observed by the protractor

5   arm by the cosign of theta in order to get the actual pitch.

6       The specification goes on to say then that this pitch,

7   once determined, is communicated to the 3D model.  And I'm

8   going to show that here in an animation.  We first measure the

9   pitch using the protractor tool.  It then informs the model.

10  The model then adjusts the pitch of the roof to match the

11  angle that was determined.  And this is what the patent

12  suggests is the way that pitch should be determined.

13      That I believe completes what I had to say, and I hope

14  it was helpful in understanding the terms.

15          THE COURT:  Thank you.

16          MR. BROMBERG:  Your Honor, I just have a question or

17  two for Dr. Mundy.

18          THE COURT:  Sure.

19  BY MR. BROMBERG:

20  Q.  Dr. Mundy, on your slide 33, if you go back to that one

21  for a second, you showed how we came up with one line segment.

22  How do you do the rest of the roof, sir?

23  A.  You follow the same steps that we just did here,

24  selecting a third point in both images, reconstructing the

25  corresponding 3D point, and then joining a line segment to

1  that, to the line -- to the other vertex.  We keep going until

2  we've outlined all of the sides of the roof.

3  Q.   And how many points do you need to use to determine -- to

4  get the whole roof done?

5  A.   Well, for this particular roof here, there might be 10 or

6  12 points needed to be selected in this way.  So, the operator

7  can do that relatively quickly.  They just sort of click in

8  both images, you've got one point, you click in both images,

9  and within a minute or two, you could construct all the line

10 segments needed to form this roof.

11           MR. BROMBERG:  Thank you.  That's all I have.

12           THE WITNESS:  Thank you.

13           THE COURT:  All right.  Do you want to start in on

14 the terms now?

15           MR. BROMBERG:  Yes, your Honor.  As Mr. Alper said,

16 your Honor, we agreed to, first one side will start, then the

17 other side will start, so I think we're up to bat on this

18 first term, which is "correlate."

19           THE COURT:  "Correlate?"

20           MR. BROMBERG:  "Correlate," yes.  And we heard a

21 little bit about "correlate" already, your Honor, and, of

22 course, when we're looking at patents, as the Court knows, the

23 terms are construed based upon the claim language, the

24 specification, sometimes the prosecution history comes into

25 it, sometimes the prior art comes into it, but that's the

1   so-called intrinsic evidence which forms the basics for

2   construing claim terms.

3          And on the "correlate" term, the terms that we are

4   construing are correlating the first aerial image with the

5   second aerial image, correlating two of the two or more images

6   by registering the pairs of points, so the defendants'

7   construction is that for each reference point on an object,

8   and we just heard Dr. Mundy explain there might be 10 or 12 on

9   that roof that he talked about, for each reference point on an

10  object, registering a pair of points that includes a first

11  point identified in the first aerial image and a second point

12  identified in the second aerial image, and we believe that

13  that is the correct construction of "correlate."

14         Of course, your Honor, "correlate" is a term that can

15  mean all kinds of things.  We could say that I've correlated

16  my presentation with Dr. Mundy's presentation or vice versa.

17  That's a form of correlation.  But, of course, that's not what

18  the patent is talking about when it uses that term

19  "correlate."  It's talking about something that is very

20  specific, and the meaning is supposed to be what that would

21  mean to a person of ordinary skill in the art, someone who

22  knows photogrammetry.

23         So, those are the basic principles, and in order to get

24  there, we first look at claim 1 and we see the phrase there

25  "correlate the first aerial image with the second aerial

1    image."  Well, how do we know that it has the meaning that the

2    defendants ascribe?  Well, first we can look at the context of

3    the claim language in the next slide, and we see that the

4    claim requires a specific order.  First, receive a first and a

5    second aerial image, and in this patent, it's specified there

6    in the italic text that you've got to have one image that's

7    top down and one image that's oblique.  That's fundamental to

8    this patent, your Honor, and that language is in italics

9    because it went through a reexamination procedure that the

10   plaintiffs themselves invoked.  So, the patent first came out

11   and then they went back to have it re-examined and they were

12   obligated to make these amendments that we see in italics in

13   order to obtain allowance of the patent.

14          So, the first thing is you receive a first and a second

15   aerial image.  Then the next step is correlate the first

16   aerial image with the second aerial image, and then generate a

17   three-dimensional model of the roof based on the correlation

18   between the first and second aerial images.  And, your Honor,

19   excuse me for belaboring this, but, of course, the whole

20   principle of photogrammetry is to get you from two-dimensional

21   images, as Dr. Bajaj suggested, images are just

22   two-dimensional, photographs, drawings, what have you, they're

23   in two dimensions, they have representations of

24   three-dimensional objects in them, but we all walk around in a

25   3D world and we know that.  So, when we're looking at an image

1   of a building, we understand that it has -- oh, yes, excuse

2   me, your Honor, Mr. Christie is going to hand up our slides

3   and also give, provide them to your clerk.

4           THE COURT:  While he's doing that, I just want to go

5   back to make sure I understand something.  Plaintiff, of

6   course, says the correlate is pretty obvious and unambiguous,

7   but they have a fallback position.  And I read your briefs,

8   and I get the sense from page 8 of your opening brief and page

9   2 of your responsive brief, that because you contest that, I

10  am not permitted to say and to conclude that they're right,

11  it's unambiguous, simply because you have contested that.  Is

12  that what you are saying?

13          MR. BROMBERG:  I believe the law says, your Honor, if

14  there is a dispute, that the Court should construe the claim.

15          THE COURT:  Why can't I construe it by saying they're

16  right, it's unambiguous?

17          MR. BROMBERG:  I think you have that choice, your

18  Honor, but here's the problem, and the whole purpose of the

19  *Markman* proceeding and the claim construction as delineated by

20  the Supreme Court and the Federal Circuit is that ultimately

21  this question goes to a jury.  So, is the jury going to be

22  scratching their head about what "correlate" means?  And the

23  plaintiffs will say, yeah, you can just take a feature, you

24  can take the chimney on this one and the chimney on that one

25  and you're done, but, of course, we know if we read the

*58*

1   patent, the chimney here and the chimney there will not give

2   you the 3D dimensions of that roof.  You have to go to the

3   reference points, you have to go to the --

4         THE COURT:  You need to correlate more things than

5   one, is really what they're saying, isn't it?

6         MR. BROMBERG:  I think it's more than just more

7   things than one, your Honor.  It's talking about the specific

8   meaning of this term to a person of skill in the art, someone

9   who knows photogrammetry.

10        THE COURT:  Dr. Mundy, all these examples, historical

11  examples that he gave, they were all correlations, weren't

12  they?  That's how it always worked.

13        MR. BROMBERG:  I don't understand what you mean, your

14  Honor.

15        THE COURT:  Going back in history, trying to

16  determine from 2D images what measurements would be in 3D

17  involves correlating different points, correct?  Isn't that

18  how we have always done it through history?

19        MR. BROMBERG:  That's true, your Honor.

20        THE COURT:  So, why wouldn't a person in the

21  industry, skilled in the art, know that when they read this?

22        MR. BROMBERG:  Well, the problem is that it's the

23  Court's job to instruct the jury, a jury of lay people, what

24  the term "correlate" means to a person of skill in the art,

25  and that term has a specific meaning, as your Honor just

*United States District Court*
*Camden, New Jersey*

1   pointed out.  Going back to that 1702 display with the table

2   that you are moving around to determine how far an object is,

3   they used the triangulation and then subsequently they used

4   the epipolar geometry as shown in the Finsterwalder paper so

5   that they were able to determine precise measurements of

6   objects in 3D based upon these 2D images.

7        So the correlation there would have to be understood to

8   mean that you are taking a point in one image and a point in

9   the other image and you are registering those two points, in

10  other words, you are recording where they are in space in some

11  way.  In the Eighteenth Century, of course, you wrote it down.

12  In the Twentieth Century, you can do it on a computer, same

13  thing.  You still have to be able to determine, using your

14  triangulation, where is the 3D point so that you can get from

15  the two dimensions to the third dimension.  And I think that a

16  person of skill in the art would understand that "correlate"

17  term to mean you have to be precise, you have to do it point

18  by point.

19       And so I agree with your Honor that that is the way it

20  has been done.  That's the way it's developed historically,

21  and employing triangulation and then epipolar geometry, which

22  came a little bit later, so that you could figure out how to

23  go from one image to a second image and find the 3D

24  coordinates of the same point in both images.  So, you do have

25  to do it a point at a time.

1        And we believe also, your Honor, that the patent makes

2   it clear that you've got to register these points, which means

3   you are doing this on a computer.  We all know that computers

4   work by you store data in memory and then you retrieve that

5   data in order to apply it to an issue like this.

6        THE COURT:  Isn't another way of saying you correlate

7   one datapoint with what you've got in your memory?  Isn't that

8   what computers do?  Isn't that how LexisNexis works and

9   Westlaw?  Isn't that how word searches work?  It's

10  correlation, isn't it?

11       MR. BROMBERG:  Well, your Honor, it's a specific kind

12  of correlation in the context of photogrammetry.  I don't

13  think it's the same as a LexisNexis search or a Google search.

14       THE COURT:  I'm not suggesting it's exactly the same,

15  but the concept is.  You are correlating, comparing a

16  datapoint with what other data you have in your memory

17  somehow.  Isn't that how it works?  Isn't that how computers

18  work?

19       MR. BROMBERG:  I think, your Honor, that this

20  process, of course, happened before computers in a great deal

21  of detail as Dr. Mundy explained, and what we have here is a

22  correlation that is specifically based on correlating one

23  point to another point, and again here we're in the 2D world,

24  and now we're trying to find the third point.  So, the third

25  point is another step, and the claim makes that explicit.  It

1  says generate, at least in part, based upon the correlation of

2  these two points, a 3D model.

3      And so going from the 2D world to the 3D world, which

4  is the whole point of photogrammetry, no pun intended, is what

5  you are trying to do, and if you can accurately depict the 3D

6  point of intersection of those two lines and then you repeat

7  that process for each point in the -- each reference point you

8  need, as Dr. Mundy displayed, you took one end of a gable and

9  then the other end, those two end points, and so you had two

10  sets of points, one in one, one in the other, one in one, one

11  in the other, by the time you had done, you had correlated

12  both of those points, you were then able to put in a line

13  segment that joined those two points and you were on your way

14  to doing your outline.

15      So, we submit that the "correlate" term needs to have

16  that clear understanding that it is a correlation process and

17  that the Court should spell it out for the benefit of the

18  proceedings and for the benefit of the jury, when, as and if

19  we get to a jury, to make it clear that they do not say, well,

20  you know, I correlate my wallet with my pocket or something

21  like that.  It's a vague and amorphous term, but in this

22  patent it has very specific meaning to a person of skill in

23  the art, and, indeed, I think that Dr. Mundy's presentation

24  makes that clear.

25      Now, there was some exception, perhaps, taken in Dr.

1   Bajaj's presentation, but we submit that Dr. Bajaj's

2   declaration submitted in this case, which was a rebuttal, is

3   entitled to very little, if any, weight simply because we are

4   not objecting to his expertise, but what he said when asked at

5   deposition whether correlating a corresponding feature could

6   be based on color -- and if we could have, this is one of our

7   slides -- he said, "Well, I was not asked to, you know, dwell

8   on hypotheticals.  The fact that it's an English term, and in

9   some sense, you know, it could be ambiguous."

10         So, that's exactly the problem, your Honor, in the

11   context of this patent, it is not ambiguous.  Dr. Bajaj thinks

12   it's ambiguous.  We need a clear definition of that term as a

13   matter of law to proceed with the case, both infringement

14   assessments, invalidity assessments, and assessments of

15   patentability under Section 101.  All those things depend upon

16   a clear understanding of that term.

17         So, where Dr. Bajaj says, gee, it could be ambiguous,

18   that we think is a clear flag that the "correlate" term should

19   be defined by the Court and we suggest that it means as we say

20   for each reference point on an object registering a pair of

21   points, including one in one image, one in the other image,

22   and we think that that would make it clear what the definition

23   would mean to a person of skill in the art.

24         THE COURT:  Thank you.

25         MR. BROMBERG:  Thank you, your Honor.

1         THE COURT:  Who is going to respond?

2         MR. DeVRIES:  Your Honor, I will, Mike DeVries on

3  behalf of' the plaintiff.

4         THE COURT:  Who will respond?

5         MR. DeVRIES:  Your Honor, I will.  Mike DeVries on

6  behalf of the plaintiff.

7         THE COURT:  Go ahead, please.

8         MR. DeVRIES:  Thank you, your Honor.

9     Again, my name is Mike DeVries.  I'm on behalf of the

10  plaintiff.

11     Your Honor, there is a primary and very important issue

12  to be decided in connection with this term.  And I'd like to

13  explain what that is.  It's whether your Honor should define

14  the word "correlating" to exclude an example of correlating,

15  of a type of correlating that's described in the specification

16  based almost exclusively on extrinsic evidence about what

17  supposedly was done in other contexts over the last couple

18  hundred years.  They are asking your Honor to limit the

19  claimed correlation to only one type described in the patent,

20  which is correlating points.  And they want you to limit that

21  definition so it doesn't include another type of correlation

22  that is defined and described in the specification, that is

23  correlation of linear features, and doing that would violate

24  black letter claim construction law, your Honor.  And I would

25  like to explain to you why.

1           Very briefly, I'd like to show your Honor the key parts

2    of the '436 patent that relate to this issue.  I will skip

3    over the general aspects, your Honor, because we've already

4    talked about them.  But, as your Honor knows, this patent

5    relates to a system, a technology for estimating roof areas.

6           And what the patent -- and I'm looking at Slide 13.

7    What the patent describes is using aerial images, and the

8    claims actually talk about specific types in several respects

9    of aerial images that are used, and then conducting an image

10   analysis that's also described in the patent.

11          And then now I'm showing your Honor the key part, and I

12   was surprised to not see this referenced at all in the

13   defendants' presentation.  But the patent describes what

14   correlation means in the context of the patent.  This is from

15   Column 8, which we believe is the critical portion of the

16   specification that relates to this.

17          And the patent describes, as I'm showing here, that

18   correlation between at least two of the aerial images

19   involves, for example, the roof modeling engine receiving an

20   indication of a corresponding feature, that's the keyword,

21   your Honor, corresponding feature that is shown in each of the

22   two aerial images.  And it goes on to describe, in the portion

23   that I've highlighted in the bottom in red and blue, some

24   examples of the corresponding images -- I'm sorry,

25   corresponding features in the images that can be correlated.

1          If we look at Slide 15, this is the first type that

2     they talked all about.  This is only kind of correlation that

3     you heard about from them.  It says, the patent says in the

4     intrinsic evidence, which should be guiding our analysis, of

5     course, that the corresponding feature may be, for example, a

6     vertex of the roof of the building where these two line

7     segments meet, the point where the two line segments meet; the

8     corner of one of the roof planes, another point; and a point

9     of a gable or hip of the roof, et cetera.  Those are examples

10    of the type of corresponding features that can be correlated.

11         But this is the part that's very key, your Honor, and

12    that if you were to provide them the construction that they

13    ask for, you would exclude this embodiment and that would be

14    inconsistent with the law.

15         So the patent goes on to describe that corresponding

16    feature may also be a linear feature.  And a linear feature is

17    a line feature.  And points are very different than lines.  A

18    point has no height, width, or length.  It has no dimension.

19    It is simply a point in an area in a two-dimensional surface,

20    it is a location there.

21         A line is very distinct.  It's a distinct mathematical

22    concept.  Unlike a point that has zero dimensions, a line has

23    one.  And the patent says that the corresponding feature,

24    referring back to what may be correlated in the images, may

25    also, also meaning in addition, be a linear feature.  And they

1   give examples, a ridge or valley lines between two planes of

2   the roof.  And I'm illustrating that here.

3       And if you look at Slide 17, it's again showing that

4   what the patent describes as features in the images that can

5   be correlated, again can be points, we don't dispute it can be

6   points, but it can alternatively, or to use the patent terms,

7   may also be a linear feature, the lines that we're showing on

8   the right-hand side.

9       And so I'm going to skip forward then all the way up to

10  what is the issue, Slide 21.  The primary issue, as I said, is

11  whether correlating should be limited to correlating points, a

12  pair of points, and should exclude linear features.

13      And then there's a secondary point, which I'm going to

14  spend less time on, your Honor, and that is whether you must

15  correlate each reference point of an object, which is a

16  term -- a phrase that, as you heard from their expert, even

17  when asked about his own example how many points you would

18  need to register, he couldn't tell you, maybe it's ten, maybe

19  it's 12, they don't know.  And so that's an ambiguous phrase

20  that also does not have any place in the construction.

21      And so I want to just head on to something your Honor

22  asked, which is does this need a construction?  We think that

23  the phrase is unambiguous and there's not a reason to restrict

24  it.  The law is clear, and I think that counsel for defendants

25  agrees, that there is not a requirement that you construe the

1    claim when the phrase is ambiguous.  But I want to say that we

2    are fine construing the phrase to provide some additional

3    detail about its meaning within the context of the

4    extrinsic -- intrinsic evidence, sorry, as long as it provides

5    the full scope of that description.

6         So our alternative construction comes exactly from the

7    patent in the place -- in the specification at Column 8 where

8    it most broadly describes correlation.  And I've shown that

9    correspondence here on Slide 24.  The patent says that, as an

10   example of correlation, the roof modelling engine receives an

11   indication of a corresponding feature that is shown in each of

12   the two aerial images.  Our alternative construction captures

13   that breadth by referring to a corresponding feature.

14        In contrast, this takes us back to the key point, the

15   defendants want to limit the type of correlation to

16   registering a pair of points.  Okay?  And there's several

17   reasons why that's wrong.  One of them, which I haven't talked

18   about yet, is there's the dependent claim.  And this dependent

19   Claim 37, which I've showed here, specifies correlation of a

20   particular type.  It says, correlating two of the two or more

21   images by registering the pair of points.  That's language

22   that doesn't appear in the claims that we're talking about

23   today, Claims 1 and Claims 18, they simply say correlating.

24   And so they're asking your Honor to restrict correlation to a

25   particular type, namely, by registering a pair of points

1    that's found in the dependent claim.  And the law is clear

2    that in a circumstance like this where the patentee has

3    specifically omitted language that it knows how to use, that

4    that certainly strongly suggests that adding in that

5    additional restriction would be improper.

6         But, more importantly, if you look at what they're

7    relying on to restrict correlation to just points, they look

8    at permissive language in examples.  If you look at their

9    slides, this is the same thing that they're looking at.  It

10   says in some embodiments correlating the aerial images may

11   include registering the pair of points.  They're not saying in

12   this invention this is what you have to do, they're saying

13   this is what you may do.  And we don't contest that that is

14   one way of correlating that is captured by the claims.  But

15   the law, as I've shown on Slide 28, is clear, that the -- that

16   you're not supposed to import examples from the specifications

17   into the claims generally.

18        And then more important, and I'll be just as brief

19   here, your Honor, because it's the same point I made before,

20   by restricting the claimed correlation to points, they are

21   excluding lines, linear features.  And Column 8, Lines 22 to

22   36, and specifically Lines 34 through 36, give as an example

23   of a type of feature and images that can be correlated, linear

24   features, and there is absolutely no basis to exclude that

25   embodiment from the construction.  And I'm showing that on

1     Slide 30.  Their construction would include the example on the

2     left, the points, and exclude the example on the right, the

3     lines.

4          So there's a couple of other things that relate to this

5     that I haven't talked about that I would like to share with

6     your Honor.

7          The first is in order to make their arguments, they

8     have to mischaracterize the specification.  So this is from

9     the respondents -- I'm sorry, the defendants' responsive

10    brief, and they say that there is "the embodiment" disclosed

11    in the specification.  They suggest that there's only one

12    description, one embodiment of correlating in the

13    specification of the patent.

14         And that's not right, your Honor.  There's multiple,

15    and I'm showing it again here, and I won't belabor the point,

16    but there are multiple ways of correlating, multiple types of

17    features that may be correlated that the patent describes.

18         And then let's look to see what Dr. Mundy says, because

19    they rely very heavily on Dr. Mundy's description about what

20    has happened and the way things could be done and, based on

21    that, ask your Honor to restrict this term to only a

22    particular type of correlation.

23         So he was asked in his deposition, your Honor, in what

24    I think is the key testimony:

25         QUESTION:  So you're saying that in the context of

1   the claims of the '436 patent the operator cannot correlate

2   linear features?

3          ANSWER:  Correct.

4          He is literally saying that they are interpreting these

5   claims to restrict correlating linear features.

6          And then he was asked:

7          QUESTION:  You understand that the patent says that

8   the corresponding features that may be correlated include

9   linear features, right?

10          ANSWER:  Sure, I saw that.

11          And we all saw that, that is what the patent says.  And

12   so in order to take their position, you'd need to exclude from

13   the scope of the claims an embodiment that everyone

14   acknowledges is described in the patent.

15          And then let's ask ourselves what Dr. Mundy didn't say.

16   Did he say that it would be impossible to do correlation using

17   linear features?  Absolutely not.  There's a good reason he

18   didn't say that because that would be false.  The patent

19   itself tells you that in addition to lots of other sources.

20   So he doesn't say you couldn't do it.  And even if he did say,

21   well, I know the patent says you can do it but I don't think

22   it works, that's not a claim construction issue, that's some

23   other invalidity type of argument.  But they're not making

24   that argument here.  And so the extrinsic evidence doesn't

25   support what they're asking your Honor to do.

1        And at one point, I just want to take this head on,

2   they say, well, in their responsive brief, you know, linear

3   features are necessarily defined by their points.  It's

4   actually not correct from a mathematical standpoint.

5        Lines, because a point is zero dimensional, it has no

6   dimension, a line is not merely a collection of points, it

7   would be an infinite collection because points do not have

8   dimensions, so lines and points are not the same.  And we

9   don't even have to get that mathematical to understand that

10  that's a difference, the patent itself distinguishes linear

11  features from points when it says the corresponding feature

12  "may also be linear features."

13        But the point I wanted to make here is their expert

14  isn't even taking this position.  Dr. Mundy, when asked about

15  this in his deposition, says, and I'm paraphrasing now to be

16  clear, yes, I am saying that you would exclude linear features

17  from the scope of the claims.  And that's just not correct.

18  It is not correct as the law -- as the law that we cited in

19  our briefing makes clear, to exclude embodiments in a

20  situation like this where there is no disavowal, there is no

21  definition restricting it only to the particular type of

22  correlation.

23        And so I think that brings me to, I think, two final

24  points for your Honor.

25        The first is this.  They want to in addition add a

1  requirement that correlation be performed for each referenced

2  point on an object, that's a different part of their proposed

3  construction.  And it's problematic.  It's ambiguous.  It is

4  uncertain what it means, and I can show you in two slides why.

5        First, the claims don't talk about a reference point

6  that we're talking about, and the claims don't talk about an

7  object.  But, more important, it's not clear what each

8  reference point refers to.  And you'll remember this, because

9  by now we all do, when asked right now how many reference

10  points do you need for this one example that you put in your

11  tutorial, their expert wasn't even able to say maybe it's ten,

12  maybe it's 12.  Introducing an ambiguous phrase into a

13  construction like that is just going to cause problems down

14  the road.

15        If you look at what he said in deposition, Dr. Mundy,

16  at Slide 37, he was asked:

17        QUESTION:  How do you know which reference points on

18  an object to correlate?

19        And he says:

20        ANSWER:  We come back to the first input, which is

21  the user, it's in the operator's brain, now I'm skipping, and

22  so it's up to them to decide.

23        I cannot imagine a more vague requirement that we would

24  add into claim than that.

25        And then if you look at their responsive brief at Page

1   8, it's not at all clear to me what they're saying.  They're

2   saying, well, it's not that we're saying every reference

3   point, it just needs to be for each.  Then they go on to

4   acknowledge that what they call the classic photogrammetric

5   method, which is something that we totally dispute that there

6   is such a method, requires only that a limited set of

7   corresponding points be registered.  So they say, well, it's

8   less than all.  But what's the answer to how many it needs to

9   be?  Their expert said I guess a sufficient number to define

10  the geometry of the roof, but he wasn't even certain with his

11  own example what that number would be or should be.  As the

12  law is clear, construing claims in a way that introduces

13  ambiguity is the antithesis of what the exercise should be in

14  claim construction.

15       And then, finally, although it wasn't really talked

16  about as part of their presentation, I did want to note this,

17  because in their responsive brief, they bring up a new

18  argument and it's in their slide so I thought they were going

19  to address it today.

20       They say that in the supplemental examination of the

21  patent, which we requested, that there was some kind of a

22  disclaimer.  And I'd like to say two things about that, and

23  then I'll conclude.

24       The first is the disclaimer that they say occurred has

25  nothing to do with the dispute we're here to talk about.  They

*United States District Court*
*Camden, New Jersey*

1    say that primitives were disclaimed.  I'm going to explain in

2    a minute that we disagree with their characterization of what

3    happened.  But putting that aside, we're here talking about

4    whether correlation should be restricted to points or whether

5    it should also involve, for example, linear features, and

6    whether or not primitives were or were not disclaimed is not

7    pertinent to that, it is irrelevant to this issue.  But, more

8    importantly, or maybe as importantly, they are

9    mischaracterizing what happened during the prosecution, so I

10   wanted to show the Court two things.

11        This is what was actually said during prosecution.  I

12   think they -- maybe I've got the paging wrong, but they filed

13   a corrected version of this I think to make sure the accurate

14   information was before the Court on this, but the patent owner

15   is talking about some -- the '749 patent, which was asserted

16   as prior art, and the patent owner says, distinguishes on the

17   correlating step, among others, and the patent owner says,

18   look, the '749 patent doesn't do the correlating in the

19   claims.  Instead, the patent owner says, the '749 patent is

20   generally directed to modeling a three-dimensional scene by

21   manually overlaying entire primitive 3D objects on an image,

22   an image singular.  And I want to show you why the patent

23   owner was saying that.

24        So this is Figure 2 from the patent, the '749 patent,

25   the one asserted as prior art, and, as you can see, what it is

1    describing is a process that can be performed on a single

2    image.  This is a single image process that is being described

3    here.  I've highlighted that the three-dimensional model in

4    the '749 patent can be constructed on top of one or more

5    images.  And, as you can see in the description here, it's

6    showing a single image and putting a primitive on this.  So

7    what's being described there is not correlation at all, it's

8    not disclaiming certainly linear feature correlation or

9    anything else, and so that argument is one that also doesn't

10   support them.

11         And so in conclusion, your Honor, we believe that your

12   Honor could construe this as plain and ordinary meaning, we

13   think it's unambiguous, but again, we believe that it's just

14   fine to provide a construction provided it doesn't necessarily

15   exclude embodiments in the patent.

16         Your Honor, I would be happy to answer any questions

17   you might have.

18         THE COURT:  I don't have any questions.

19         MR. BROMBERG:  Your Honor, may I respond briefly to

20   counsel's points?

21         THE COURT:  Sure.

22         MR. CHRISTIE:  Thank you.

23         We say in our brief, and it's a fact, your Honor, there

24   is one and only one embodiment displayed in the '436 patent.

25   They may say, oh, yeah, we can also do linear.  But when you

*United States District Court*
*Camden, New Jersey*

1    look at the text, which is excluded from their slide, even at

2    the text at Column 8, it makes it clear that a basic

3    proposition of geometry is that a line segment is simply a

4    collection of points.  And what you need to do to understand

5    the line segment is to identify and correlate the end points

6    and then you have a segment, just as Dr. Mundy explained.

7            There is no teaching of anything else in this patent,

8    you can read it from cover to cover, your Honor, and you will

9    not find another embodiment explicitly disclosed.  They might

10   say, oh, yeah, you can use linear elements.  But then if we

11   look at Column 8, the passage that was cited is the passage in

12   white, the corresponding features may be, for example, the

13   vertex of the roof of the building, the corner of one of the

14   roof planes or the roof, a point of a gable or hip, the

15   corresponding feature may also be a linear feature such as a

16   ridge or valley.

17           Then it goes on to say in one embodiment the indication

18   of a corresponding feature on the building includes

19   registration of a first point and a first aerial image and a

20   second point and a second aerial image, the first and second

21   points corresponding to substantially the same point on the

22   roof of the building.

23           So when it talks about linear components, it makes

24   clear that what it's talking about, again as we come back to

25   points, as Dr. Mundy said in this declaration and as he said

1   in his deposition, this patent does not tell you how to just

2   take linear features and correlate them, what it does tell you

3   is that you have to go back to the point by point

4   determination.  You find the two end points for the linear

5   segment, you can then draw the segment, then you go on the

6   next one.

7        And counsel was really taking cheap shots at the expert

8   who was asked how many points do you need to identify in this

9   picture, and he said, well, it could be ten or 12.  He would

10   be able to tell you precisely if he had a minute to count up

11   the points in the picture that define the components of the

12   roof structure.  So we think that the reference to linear

13   features gets you right back to points.

14        And, furthermore, your Honor, there is up above in the

15   section from 22 to 32 again more explanation.  In one

16   embodiment, again, the patent says in one embodiment or some

17   in some embodiments, but it only talks about one particular

18   embodiment, that's the only one it tells you how to do.  In

19   one embodiment, generating such a model at least in part on a

20   correlation between at least two of the aerial images of the

21   building.  For example, the roof modeling engine receives an

22   indication of a corresponding feature that is shown in each of

23   the two aerial images.  In one embodiment, explaining what

24   that means, an operator viewing two or more images of the

25   building inputs an indication of at least some of the

1   indications, the indications identifying which points, which

2   points of the images correspond to each other for model

3   generation purposes.

4        So again, your Honor, the emphasis is all on

5   identifying points and registering those points.

6        Now counsel also said to you -- let's go back to the

7   slide presentation.

8        Counsel also said to you there's nothing about

9   reference points in this patent.  Well, that's wrong, too.

10  Let's look at Slide No. 9.  And this is from Column 6, Lines

11  56 to 67.  Next, a set of reference points may be identified

12  in each of the images, further references to reference point.

13  So we didn't make this up out of thin air.  We took the

14  description in the patent of the only embodiment that is

15  described and we used that to come up with what we believe is

16  an accurate construction of the term "correlate" that can be

17  used for further purposes in this case.

18       And again, down at the bottom of this passage you see

19  highlighted in yellow a sentence that will ring true from what

20  Dr. Mundy had to say.  Repeating the process for all such

21  reference points allows the software to build a 3D structure

22  of the model.  It doesn't tell you -- and, of course, earlier

23  on it says use of regular methods of triangulation, there are

24  various algorithms and photogrammetry that allow you to do

25  this, all of which is true and all of which we've seen is

1   historically already developed.  But they don't say a single

2   word about how you would take linear segments and do

3   correlation using those.

4        I might add, your Honor, that there now is mathematics

5   to do that, but it's very complicated.  This patent doesn't

6   tell you how to do that.  So we think that it is correct that

7   there is one embodiment, despite the language suggesting there

8   might be more, that's just kind of the patent prosecutor's way

9   of protecting his flank in the event that someone comes up

10  with another way to do this, to try to do it.

11       So what the plaintiffs are doing here, your Honor, is

12  they are trying to stretch their patent beyond what their

13  claims specifically require to cover other ways to do the

14  reconstruction of 3D models, and we don't think that they

15  should be permitted to do so.

16       And on the question of whether correlation is -- okay.

17  So if you could put up Slide 11.  This, Slide 11, your Honor,

18  shows the attempts during patent prosecution, during re-exam

19  of the plaintiffs to distinguish their patent over the prior

20  art.  And they said we're not doing modelling of

21  three-dimensional scene by manually overlaying entire

22  primitive 3D objects on an image of the scene to determine the

23  initial dimensions, that's not what we're doing, we're doing

24  specific correlation of aerial images, roofs, et cetera.  And

25  again, when you look at the patent, you'll see that the

1    correlation that they describe is the point by point

2    registration that we have proposed as the definition for that

3    term "correlate."

4        So on the question, your Honor, of the ambiguity of

5    that term, we believe that it has a clear meaning to a person

6    of skill in the art but that that clear meaning should be

7    found by this Court and presented as a matter of law as the

8    meaning of "correlate" so that we all know what we're talking

9    about in subsequent motions, depositions, expert reports, and

10   in the presentation to the jury, because a layperson certainly

11   won't know what "correlate" means in the context of

12   photogrammetry, but a person of skill in the art would

13   understand that it means the point by point registration that

14   we have proposed in our definition.

15       Thank you, your Honor.

16       THE COURT:  Thank you.

17       MR. DeVRIES:  Your Honor, may I briefly respond in

18   two minutes?

19       THE COURT:  We'll be here for three days if we keep

20   this ping-pong game going.  I don't think I need it.

21       MR. DeVRIES:  Thank you, your Honor.

22       THE COURT:  Let's go to the next one the, pitch

23   determination marker.

24       MR. ALPER:  Your Honor, that remark will be leading

25   off of this one.

1        Okay.  If we could go to Slide -- I'm going to start

2  off with Slide 48 of our slides, skipping some of the

3  background because we've had quite a bit of it at this point.

4        May I proceed, your Honor?

5         THE COURT:  Sure.  Please do.

6         MR. ALPER:  Okay?  So we were introduced to the -- so

7  what is pitch?  Pitch is, we heard this in the background,

8  this is the angle, right, for the roof.  So we know what that

9  is, we know that through input to the roof reports.  The

10  question is how do you determine it?  And that's what this

11  pitch determination marker is all about, it's how do you

12  determine the pitch for purposes of the invention.

13        And there are three embodiments shown in the patent of

14  what the pitch determination marker is.  And there's going to

15  be a dispute about one of them, you probably kind of gathered

16  that from the introductory remarks.

17        I would like to by way of background talk about the

18  three embodiments briefly, then get into what the actual claim

19  construction disputes are.

20        So we're showing you on Slide 48 the three -- or three

21  of the embodiments, I should say, of the pitch determination

22  marker.  Figure 5B shows what's called the protractor tool.

23  Figure 5D, as in dog, shows the envelope tool.  And Figure 6C

24  shows the wire frame embodiment, which is also shown in Figure

25  7B.

1          Let me walk through these briefly.  All of them are

2     going to be used to line up a graphical component with the

3     edges of the building overlaid on the edge of the building and

4     then make adjustments in order to indicate or determine pitch.

5          So if we go to Slide 49, this is what the patent calls

6     the protractor tool.  You basically take the X and Y axis,

7     move them up to the lineup overlay with the edges of the

8     building, and then you use that dotted line, it's labeled 510D

9     in the Figure 5B, and you adjust it up and down so it lines up

10     with a sloped edge of the roof that then will be translated by

11     the system into a pitch.

12          That's the protractor tool.

13          If we go to Slide 50, we see the envelope tool

14     embodiment.  This is a wire frame that you can have appear

15     over one of the aerial images in Figure 5C.  And then in 5D

16     the user will bring it and arrange it, overlay it on -- adjust

17     it, rather, to overlay it on top of the roof in order to line

18     up with the edges and the slopes and that will further allow

19     the system to determine the pitch.

20          And then lastly you have the wire frame embodiments,

21     and this is on Slide 51.  And again, this is a wire frame you

22     put right on top of the building, you make adjustments to it

23     by grabbing the lines and, as we saw from Dr. Bajaj, that will

24     determine pitch.

25          And we're going to see this specifically in the

1    specification, I want to spend some time on that in a moment.

2         So if we go to Slide 52, this is, you know, an

3    exemplary claim, we've sort of up-leveled the elements.  As

4    you can see here, you display a graphical user interface,

5    which includes a pitch determination marker.  You then move

6    the pitch determination marker through user input in order to

7    overlay it on top of the roof on an aerial image.  You then

8    use -- that will determine the pitch.  And in this particular

9    claim, you generate an output or roof report that includes the

10   pitch as one of the features in the roof report.

11        The two terms -- if we go to the next slide.

12        The two terms that are up for construction are pitch

13   determination marker and envelope tool.  An envelope tool is a

14   species of pitch determination marker.  As you'll see in a

15   moment, the claim construction disputes between the parties

16   are identical for both terms, and so we can handle them

17   together as a group.

18        Let's then take a look at Slide 54, which shows the

19   competing claim constructions between the parties.

20   Highlighted in green the areas of agreement and in red the

21   areas of disagreement.

22        We start off by saying no construction is necessary for

23   this term.  I will show you why that is, because the term is

24   defined itself in the claim language.  Then we go ahead and

25   say, well, if we want -- if a construction is required, here's

1   this construction.  Let me tell you why we did that.  We did

2   that because to focus the disputes.  We looked at the

3   defendants' construction, we saw that there's a piece of it

4   that is what the claims say a pitch determination marker is.

5   We can -- in order to really show where the actual areas of

6   disagreement, we're fine with that as construction.  That then

7   leaves us with the red parts, which don't belong in the

8   construction, and that's where we have disagreement, and I'll

9   spend some time talking about that.

10          But basically we say and the claims say that a pitch

11   determination marker is a graphical user interface component

12   that can be manipulated by the user to specify the pitch of a

13   section of the roof, and that's what it is.

14          They say that it is that, so they agree that it's that,

15   the defendants do, but then they have these additional

16   requirements.  One is that the pitch determination marker

17   needs to be distinct from what they call the displayed model

18   of the roof.  And then they also say that it doesn't just

19   specify the pitch of the roof, it specifies the pitch of roof

20   model, they count on that extra word "model."  And I would

21   like to spend some time in a moment why those are

22   inappropriate additions to the construction for these terms.

23   Again, those disputes are the same between the two terms that

24   are up here, and so we can combine the issues.

25          Let me skip over 55 because I just basically covered it

1    a moment ago and go to 56.  So where do we start?  I want to

2    explain why our construction is correct first, and then we'll

3    talk about why those additions are incorrect.

4         Where do we start?  You always start with the claim

5    language.  Right?  That's the primary place when you're

6    thinking about -- when you're talking about what claim terms

7    mean.  And here it's a very simple story because the claim

8    language itself defines what a pitch determination marker is.

9    So if you look at what we've highlighted in green, it says a

10   pitch determination marker is an interactive user interface

11   control that can be manipulated by the operator in order to

12   specify pitch of the roof.  And that's exactly the

13   construction that we're proposing.

14        And we have a situation like that where the claim is --

15   the meaning of the term is clear from the claim language,

16   actually it's even more than clear, it's defined by the claim

17   language, then that's the end of the story.

18        Now, as I've indicated on this slide, the pitch

19   determination marker term is used in the remainder of the

20   claim, it tells you that it can moved, it tells it can be

21   adjusted, these are things that you can go with the pitch

22   determination marker.  But as far as the inquiry as to what a

23   pitch determination marker is, which is the inquiry that's

24   before the Court when it comes to construing that term, the

25   claim language tells us what it is and that's it.  And that's

**1**     what why we've -- how we've chosen our construction.

**2**         If we go to Slide 57, this just showing you in one of

**3**     the other independent claims that the term appears and

**4**     essentially says the same thing here, it's operable to

**5**     indicate pitch of a plane or roof section.  Again, operable by

**6**     a user that can manipulate it to indicate pitch for a section

**7**     of the roof.

**8**         So if we go to Slide 58, how does this line up with the

**9**     parties' constructions?  Well, ours comes from the claim

**10**    language itself because the claim language tells us what a

**11**    pitch determination marker is, it is identical to the claim

**12**    language.  That's why we said, by the way, your Honor, we

**13**    don't think that a construction is necessary because it's

**14**    already in the claims.  But if you're going to have a

**15**    construction, we should use the definition that's in the

**16**    claims.

**17**        And then you compare that to the defendants'

**18**    construction, which has this addition that the pitch

**19**    determination marker be distinct from the displayed model of

**20**    the roof.  And I will tell you that that aspect of their

**21**    construction is not found anywhere, it's not found in the

**22**    claims and it's not found in the specification, and it doesn't

**23**    belong, certainly does not belong as part of the definition of

**24**    what a pitch determination marker is.

**25**        So let's -- before we get into the specification,

1   because I'm going to address their construction specifically

2   in connection with the specification, let's see where this

3   leads us.  And there's some very important legal principles

4   that I think come into play here.

5        So if you go to the next slide, 59.  The federal

6   circuit is very clear, this is an undisputed aspect of the

7   law, and that is when the claim language is clear, you only

8   modify it, right, you only add things into it in two

9   circumstances.  One is when the patentee accesses its own

10  lexicographer, and that means -- we have some of the law right

11  here on this Slide 59.  The patentee clearly sets forth a

12  definition for the term elsewhere, like, for instance, in the

13  specification, in other words, pitch determination marker

14  herein shall mean something.  And the other instance when you

15  can change the clear meaning of the claims is when there is

16  what they call a clear disavowal of the claim scope.  So, for

17  instance, you have a disclaimer during the prosecution history

18  in order to get over prior art.

19       The thing about it here is that in this instance

20  everyone agrees neither of those two things are present.  So

21  what that leaves us with is a definition of what a pitch

22  determination marker is in the specification, and the only two

23  ways that the law allows us to modify that are absent, and no

24  one disputes that.

25       Okay.  But the evidence -- there's more.  So the

1   evidence is consistent across the board.  So if we go to Slide

2   60, if you look at the embodiment -- I'm going to walk you

3   through all three -- not all three, three of the forms of

4   embodiments that I showed you on that initial slide or the

5   examples that I showed on that initial slide.

6        Here's the protractor tool in Figure 5B.  And when you

7   look at the corresponding text in the specification that

8   describes it, it says the pitch determination marker in 510,

9   that's that protractor arm in -- or protractor tool in 5B, is

10  an interactive user interface control that can be directly

11  manipulated by the operator order to specify the pitch.

12  That's our construction.

13       Now we go to Slide 61, the envelope tool.  Same thing.

14  It's described in Figure 5C, the envelope tool is described in

15  the specification, it says the pitch determination marker 520

16  is an envelope tool, is interactive user interface control

17  that can be directly manipulated by the operator in order to

18  specify pitch.  Same thing.  That's our construction.

19       What about the wire frame embodiment?  Well, if you go

20  to Slide 62, here's Figure 6C.  Figure 6C shows wire frame

21  612.  And what does the specification say about that?  It

22  says, wire frame 612 is an interactive user interface element

23  that the operator can make changes to the wire frame, make

24  refinements and adjust the wire frame.  And just so there's no

25  doubt about it, what does the specification say you can do

1    with the wire frame 612 down at the bottom?  You can do pitch

2    determination.  And this is all in the description of Figure

3    6C, and, in particular, wire frame 612.

4         And we'll get to it in a moment, but you heard from

5    the -- from some of the introductory remarks that the wire

6    frame can't be a pitch determination marker.  Well, the

7    specification, it says that it can.

8         And you know what, let's go look at it again and Figure

9    7B.  Figure 7B, when it's describing Figure 7A through C,

10   including Figure 7B, the specification, there's a wire frame

11   710 -- I'm sorry.  Let me back up.  There's a wire frame 710

12   in Figure 7B, that's the wire frame in that figure, and when

13   the specification starts off describing 7A, B, and C, it says

14   these are illustrate techniques for reviewing various aspects

15   of the model, including reviewing roof pitch.  And that wire

16   frame 710 can be used to manipulate -- to manipulate the wire

17   frame, change the pitch that you're reviewing.  And that's all

18   in connection with Figure 7 and in particular 7B and wire

19   frame 710.  Okay.  So all of that, consistent with our

20   construction, supportive of our construction, which is based

21   on the claim language.

22        Now, let's go to Slide 64.  So let's talk about this

23   first addition to plaintiff's construction that the pitch

24   determination marker be distinct from the displayed model of

25   the roof.

1          And the first question that we have to ask ourselves is
2     what is a displayed model of the roof?  And once we get to
3     that, we can decide whether it's appropriate to limit the
4     claims to pitch determination markers that are distinct from
5     it.  Right?
6          So if we go to the next slide, we're going to talk
7     about what a display model of the roof is, at least this is
8     what it is according to defendants.  So you have a model of
9     the roof on the left side, this is just one of the conceptual
10    diagrams from the patents at issue, the '840 and the '376
11    patent, and then on the right side that's the displayed model
12    of the roof is the projection of the model graphically onto
13    the aerial image.  And we'll see in a moment that the,
14    according to the defendants, the wire frames are the displayed
15    models of the roof.  So when they say displayed model of the
16    roof, they mean the wire frame graphic user interfaces that
17    are on the -- in some of the figures.
18         And the first thing, before we even get to the distinct
19    from aspect of this, is it appropriate, the first question, is
20    it appropriate to include in the claims a requirement of the
21    displayed model of the roof?  Because that's what they are
22    doing with their construction.  And the answer is, if we go to
23    next slide, it isn't.  There's no requirement in the
24    independent claims that are at issue with these claim
25    constructions the other displayed model of the roof.

1      And I want to point out a couple of important things

2  here because I think there's a potential for a

3  misunderstanding based on the defendants' briefing.

4      The defendants point to in a couple of the claims, I'll

5  show you here, for instance, Claim 1 of the '840 patent, an

6  element that talks about modifying a model of the roof.

7  That's talking about modifying a model of the roof, doesn't

8  say the displayed model of the roof or require a wire frame or

9  anything like that.  So when they are now injecting into a

10 pitch determination marker a displayed model of the roof

11 requirement, that's something that's just not present in the

12 claim language, it's an additional reason to reject this

13 construction.

14     And we can see it again, by the way, on Slide 67.

15 Slide 67 talks about a roof report that includes various views

16 of a model of a roof, and that's not the displayed model of

17 the roof either.  The displayed model of the roof, it's the

18 wire frame, it's what shows up on the screen.  This is a roof

19 report that has generated an output on paper, right, or PDF,

20 which has what we're showing on the right, a number of figures

21 and diagrams, that's not the displayed model of the roof

22 either.

23     Okay.  So now what about -- so already we know we

24 shouldn't put in the word "displayed model of the roof" into

25 the term.  But let's assume -- assume that that's there.

1    Okay?  There's another problem with their construction and

2    that is that the displayed model of the roof is distinct from

3    the pitch determination marker.  And that's also inappropriate

4    because, as you'll see in a moment, it would exclude -- it

5    would restrict the claims, it would cause the claims to not

6    cover embodiments in the patents, and that going to be rarely,

7    and certainly in this case, not the right answer.

8        So if we go to Slide 68, this is a portion from

9    defendants' brief, and this is where they make the argument,

10   they say that a person of ordinary skill in the art would

11   understand the term pitch determination marker to mean a user

12   interface component distinct from the displayed model or wire

13   frame because they're equating those two things, the displayed

14   model to them is the wire frame.  And when we compare that to

15   the wire frame embodiments in the patent, what we'll see is

16   that the wire frame embodiments in the patent actually are

17   used for pitch determination and are not distinct from the

18   pitch determination marker.

19       So if we go to Slide 69, I already walked your Honor

20   through this aspect of the specification.  And it's, by the

21   way, for the record, it's Figure 6C, Item 612 in the '840

22   patent, Line 14.  If we can advance the slide by one.  And

23   this is it.  It says that wire frame 612 can be manipulated by

24   the user.  And right down there at the bottom it says that

25   wire frame 612 can be used for pitch determination.  This is

1   all right in one portion of the specification describing

2   Figure 6C.

3        And we see it again -- I'll just quickly show your

4   Honor on Slide 70.  This is a repeat of an earlier slide, we

5   saw it again for Figure 7B, it shows you the wire frame.  And,

6   of course, this is the case, your Honor, we saw it, Dr. Bajaj

7   illustrated this, when you move one of lines on these wire

8   frames, that has a corresponding effect on the pitch, of

9   course, depending on which line you move.  But you move one of

10  the lines, and there's no restriction on which line you can

11  move, that's going to adjust the pitch.  Of course the wire

12  frames can be used to determine pitch, it says it explicitly

13  in the specification.

14       So you line that up with -- if we go to the next slide,

15  71 -- you line that up with defendants' construction, they say

16  that the pitch determination marker can't be used -- or can't

17  be a wire frame, rather, and yet the specification says it can

18  be.  And what that would mean is that they are asking your

19  Honor to narrow the claim, to construe the claim in a manner

20  that would be inconsistent with the way that the inventors

21  describe their own invention, and that is never appropriate,

22  certainly not in these circumstances.

23       And we put a little clip from the *SynQor* case, the

24  Federal Circuit case, that's a well-established principle of

25  law.

*United States District Court*
*Camden, New Jersey*

1    Okay.  If we go to Slide 72, your Honor, now a couple

2  of points that the defendants make here.  They say the

3  portions of the specification that the plaintiff relies on

4  with respect wire frames, they're not about determining pitch,

5  they're about reviewing pitch.  And you can see that, we've

6  put that on the left side here in yellow from defendants'

7  brief.  And they further go on to say, in fact, the only

8  mention, and this is in the green part, the only mention of

9  pitch determination is in connection with Figures 5A through

10  D, the pitch determination marker, and -- I mean, the

11  protractor tool and the envelope tool, which are in this

12  Figure 5A through D figures.  But when you look at the

13  specification, that is just not true.  So this is in

14  connection -- this on the right side is from the '840 patent

15  at Line 15.

16    By the way, the specifications of the two patents that

17  are at issue here, the '840 patent the '376 patent, are the

18  same in relevant part, and so we have co-cites on our slides

19  here.  But in the '840 patent, Column 15, Line 24, it's

20  talking about 7B, Figure 7B, that's one of the ones that has

21  the wire frame, and what does it say?  Does it say that the

22  pitches in that figure are only reviewed?  No, it says that

23  they are determined.  And how are they determined?  Well, it

24  says they can be determined based on the tools that are shown

25  in Figure 5A through 5D, like the protractor tool and the

1    envelope tool.  Right?  But then we've highlighted in green,

2    they say they also can be based on the wire frame models shown

3    in the Figure 6A through 6D, including Figure 6C, which is the

4    one we just looked at where the specification explicitly says

5    that wire frame 612 can be used to determine pitch.

6         So when you look at the actual intrinsic evidence and

7    you look at the actual specification with the actual figures,

8    we see unequivocally that wire frames can be used for

9    determining pitch and they are not distinct from the pitch

10   determination marker.

11        Okay.  So where do they go when it comes to trying to

12   explain or reconcile this aspect of the specification with the

13   -- with the construction that they're proposing, and they get

14   into a little bit of expert testimony that I -- it's worth

15   showing, so this is on Slide 73.

16        This is some testimony from their expert.  We asked

17   him, we asked him and we said, could you -- changing the

18   handles of wire frame 710, it's your opinion that that would

19   not result in a change in pitch.  He says, correct, but that's

20   just not what the specification says.

21        The specification tells us that it can be used for

22   pitch determination, and this is what I was referring to

23   earlier, Your Honor, when we were talking about that

24   objection.  We don't think you need to rely on expert

25   testimony at all in connection with these proceedings, because

1   the specification says -- has everything that we need to know,

2   to know that our construction is correct and defendants is

3   incorrect.

4        However, we definitely should not rely on expert

5   testimony that conflicts with the intrinsic evidence, and

6   that's another basic precept of claim construction.

7        And in fact -- and that's what we have on Slide 74, a

8   little bit of law on that.  Your Honor is familiar with that.

9        And so what's the fallback for the expert when pressed

10   on this?  We asked him in deposition, well, you know, more

11   about the wire frame.  He said, when we asked him, well, would

12   one of ordinary skill in the art reading 57B conclude that

13   that is Item 710 and 7B is a wire frame?  He said, no, that's

14   not even a wire frame.  And so you can see what's going on

15   here.  They literally have to deny the existence of the

16   intrinsic evidence in order to reconcile it with their

17   construction.  Okay.

18        Couple of other quick points.

19        There's a claim differentiation -- well, defendants

20   cast as a claim differentiation argument in support of their

21   construction.

22        Claim 76 -- Slide 76 is a piece from the brief.  Claim

23   differentiation, of course, that means that if there's a

24   requirement in a dependent claim, that you have -- there's a

25   presumption that that requirement is not present in the

1    independent claim because why would you be adding it into the

2    dependent claim?  And that's not really an applicable

3    principle here.

4         So if we go to Slide 77, this argument relates to Claim

5    5 of the '840 Patent and Claim 5 of the '840 Patent adds an

6    element of displaying a wire frame rendering of the modified

7    model superimposed on the aerial image of the building.

8         We're not seeking to add that requirement into the

9    independent claim.  We're just not.  Our construction doesn't

10   add that at all, and so it's not really a claim

11   differentiation, or at least that principle doesn't apply

12   here.

13        If we're -- if I was to interpolate -- do a little bit

14   of interpolation as to what defendants mean by their claim

15   differentiation argument, it's that -- because I think what

16   their point is, that because Claim 5 talks about displaying a

17   wire frame, a wire frame of the modified model, that that

18   means that the pitch determination marker, which is an input

19   to the modified model, can't itself be a wire frame.

20        But if we go to the next slide, so they talk -- they

21   kind of set up sort of a sequence of the claims and they say,

22   well, because the ultimate output here is a modified wire

23   frame, that the input can't be a wire frame, but that's just

24   not the case at all.  It's not consistent with the

25   specification.  There's no requirements about that in the

1    claim language and it's just not a tenable position.

2         Of course, the pitch determination marker can be a wire

3    frame.  There's nothing in the claim language that prevents

4    that.  So the pitch determination marker is a wire frame, you

5    modify that wire frame, that allows a determination of pitch

6    to be made, that then allows for, in this particular claim,

7    Claim 1 of the '840 Patent, modified -- modifying a model.

8         So now we already have a model.  This is a claim that

9    never requires modifying a model, and then from there, you're

10   going to display a wire frame rendering of the modified model,

11   and that's -- that's not only very clear from the claim

12   language, but it's also very clear in the specification.

13        We saw Figure 6C.  You can make a modification to that

14   wire frame model that will then create a modification to the

15   underlying roof model, you will get a new display, not only on

16   6C, but in the specification describes 6B which is the other

17   views.  We saw it in the tutorials, the alternative views of

18   the model will then all automatically change.

19        That's what's being discussed here in Claim 5.  It's

20   certainly does not mean that the pitch determination marker

21   can't be a wire frame.  In fact, we know that it can be,

22   because the specification says that it can be.  In fact, the

23   specification says -- explicitly says it can be in 6C when you

24   are modifying the model, the wire frame, right?  That's the

25   whole point of 6C is to allow you to use that wire frame to

1  modify the model and that's what's going on here.  So that's

2  not supportive of their position.

3        Slide 79, they point to -- so you -- they talk a bit

4  about Figure 6B, and they say -- here's their argument about

5  6B.  They say, all right, you see 6B has wire frame 611 in it,

6  and then it's also got this tool, you see that tool, 610.

7        And they say that's the drawing tool and that can be

8  used for pitch determination, and their point here is that

9  Figure 6B therefore shows a pitch determination marker

10 separate from a wire frame, and from that, they extrapolate,

11 therefore, that the wire frame must be distinct from the pitch

12 determination marker.  And if that is a little bit hard to

13 follow, it really should be, because there are a lot of

14 premises built into that, none of -- many of which are

15 incorrect, and I'll just -- I have to respond to the argument

16 because they put it in their briefing.

17       But here's the issue:  So first of all, regardless --

18 no mater what 6B shows, that doesn't take away 6B and 7C,

19 right?  There are other embodiments that show a wire frame

20 being used for pitch determination.  It doesn't matter what 6B

21 shows.  If 6B did show a wire frame that's distinct from a

22 pitch determination marker, that's great.  That's one

23 embodiment, but there are others that show a wire frame as the

24 pitch determination marker.  Therefore, we know that we can't

25 say in the claims, as a matter of claim construction, that

1   those two things have to be for all purposes distinct.  So

2   that's the first point.

3           And then the second point is, they're just wrong.  This

4   tool, 610, the drawing tool, that's not a pitch determination

5   marker.  It's not described that way in the specification.

6   It's the drawing tool.  And the drawing tool is used to

7   outline the edge -- the edges of the building.  It's not used

8   for pitch determination.

9           And if we go to the next slide, Slide 80, Your Honor,

10  you can see on the left-hand side, we have some specifications

11  -- portions in the specification, for instance, the '840

12  Patent, Column 14, Line 4, it describes the drawing tool.  It

13  says it's an interactive user interface that can be used to

14  specify roof features, such as edges, ridges, valleys and

15  corners.  That's not the protractor tool.  That's not the

16  envelope tool, that's not the wire frames that are described

17  as doing pitch determinations.

18          So the premise of the argument that they make on 6B,

19  that it shows a distinction between a pitch determination tool

20  and a wire frame is incorrect, and in any event, it's

21  irrelevant because that's one of several embodiments and we

22  can't ignore the embodiments where the wire frame is the pitch

23  determination marker.

24          And then I just put on the slide here on the right

25  side, Your Honor, this is -- they rely on some testimony from

1    Dr. Bajaj, our expert, where he says that he doesn't -- that

2    the pitch determination marker is not illustrated in

3    Figure 6B.  That's because it's illustrated in Figure 6C and

4    7B as a wire frame, and also Figure 5, the figure -- the 5's,

5    the Figure 5's with the envelope tool and the pitch

6    determination marker.  Figure 6B is just irrelevant.

7         Okay.  Let me go to this last -- I'm finishing up here,

8    Your Honor.

9         If we go to Slide 82, this will be my final slide.

10   Remember they had the two -- we have the two disputes on this

11   term.  The last one is whether this tool -- or let me rephrase

12   that, whether the pitch determination marker needs to specify

13   the pitch of the section of the roof or a section of the roof

14   model.  This is a really simple one.

15        The claims talk about it specifying the pitch of the

16   roof, not the roof model.  And so, there's just no reason to

17   add the word "model," into the claims.  They don't justify it

18   and that's just, you know, a basic principle.  Why would we

19   inject something in the claims that's just not there?

20        Thank you, Your Honor

21         THE COURT:  Thank you.

22        Counsel, we agree that -- will you agree, excuse me,

23   excuse me, that the wire frame can be used for pitch

24   determination?

25         MR. BROMBERG:  No, Your Honor.

1          THE COURT:  No.  Under no circumstances, does this

2    patent provide that the wire frame can be used for pitch

3    determination?

4          MR. BROMBERG:  No, it does not, Your Honor.  And I

5    think what -- what counsel's argument, which is a very clever

6    and detailed argument overlooks is the fundamental proposition

7    that what we have here is, we've got a roof in the real world,

8    a 3D roof, and we're trying to determine what the pitch of

9    that roof is.

10          I mean, it goes section by section, but let's say, it's

11    just a simple roof.  We're trying to determine what the pitch

12    of that roof is.

13          So -- and I think counsel's argument loses sight of the

14    fact that we are dealing in two-dimensional images with wire

15    frame models, projections of wire frame models that are not

16    actual wire frame models because they're not in 3D, they're in

17    2D.

18          So, we're translating between the world of

19    two-dimensions, which is the one we're stuck with, with aerial

20    images and three dimensions, which is the one we walk around

21    in.  So when we look at a 2D image of a building, we know that

22    that building exists in 3D because that's the world we live

23    in.  But how to translate between the two and that's where

24    this confusion comes.

25          THE COURT:  Well, what am I to make of Figures 5B, 5D

*United States District Court*
*Camden, New Jersey*

1  and 6C then?

2          MR. BROMBERG:  Okay.  Well, I will address those,

3  Your Honor, very specifically.  I think Figures 5 --

4          THE COURT:  5B is protractor tool.

5          MR. BROMBERG:  Right.

6          THE COURT:  5B is envelope tool.

7          MR. BROMBERG:  Right.

8          THE COURT:  And 6C is the wire frame.

9          MR. BROMBERG:  Right.  So, Your Honor, for -- first

10  of all, there's no dispute about the protractor tool, the

11  envelope tool.  We think those are pitch determination markers

12  and they are used in the patent in order to determine the

13  pitch of the roof, the real roof that exists in the real world

14  based upon the information that has been collected.  So that

15  -- that's the key distinction.

16          But the wire frame is not -- there's no wire frame

17  embodiment of the pitch determination marker in this patent.

18  Can the wire frame -- does the wire frame display a pitch?

19  Yes, it does, and that is after that pitch has been determined

20  by the protractor tool or the envelope tool, as the case may

21  be.

22          And we again think, Your Honor, that this is a case of

23  plaintiffs trying to stretch their patent, they came up with a

24  protractor tool, they came up with an envelope tool.  Now

25  they're going to say, well, any wire frame will meet the need.

1   But it does not, because the wire frame is not used to

2   determine the pitch based on the aerial images.

3        The wire frame is modified as Claim 1 states, based

4   upon the input from the pitch determination marker.  You don't

5   start out with a wire frame and say, okay, let's put it on the

6   roof and see what the pitch is.  That's not how it works, and

7   we're also looking, in fact, here, at a series of steps that

8   are performed in time to get you to your result.

9        So you can use the protractor tool to get pitch, as is

10  indicated in -- let me find the right slide here, Your Honor.

11       In our Slide 27 that my colleague has up on the board,

12  you can use the protractor tool to come up with the pitch, as

13  shown in Figure 5B.  You can use the envelope tool to come up

14  with the pitch -- to determine the pitch as in Figure 5C, but

15  then when you get to Figure 7, which is what the plaintiffs

16  rely upon here, that is talking about -- this is in the

17  section of the patent called:  Roof model review.  You've

18  already determined the pitch based upon your protractor tool

19  or your envelope tool, and those -- those pitch determinations

20  have been put into the model, the wire frame model, so it's

21  modified to reflect those.

22       And now in Figure 7B, the first, as it says in the

23  patent, as shown in Figure 7B, the image portion includes a

24  wire frame that indicate pitches of corresponding sections of

25  Roof 407.  Indicate pitches that were previously determined by

1    the protractor tool, the pitch determination marker.

2        And then it goes on to say that the illustrated pitches

3    are determined by the roof estimation system based on the

4    pitch determination described with respect to Figures 5A to

5    5D.  Again, that is the protractor tool or the envelope tool,

6    not the wire frame.

7        So those two devices are used to make a determination

8    of the pitch of the real world roof object that you have out

9    there.  And then the operator specification of the wire frame

10   model with respect to Figures 6A to 6D above, do not

11   illustrate any embodiment of a wire frame used as a pitch

12   determination marker.

13       They simply refer you back to the two devices that

14   we've talked about earlier, and Dr. Bajaj explicitly said, as

15   counsel said during his presentation, this is in his

16   declaration, Your Honor, which is on file with you:  "Neither

17   the envelope tool nor any other embodiment of the pitch

18   determination marker is illustrated at all in Figure 6B."

19       And unquestionably, Figure 6B, as we see from the quote

20   -- from the '840 Patent in Column 14 and from the diagram that

21   we have up on the board there in our Slide 24, indisputably

22   Figure 6B shows a wire frame, but Dr. Bajaj says it's not a

23   pitch determination marker and he acknowledges in the next

24   slide, as he did at his deposition, that a wire frame model is

25   a form of a roof model in the context of this patent, but he

1    stands by his statement that 6B does not show a pitch

2    determination marker.

3         So that is explicitly excluding the wire frame from the

4    realm of pitch determination marker, and we believe, Your

5    Honor, that is consistent with the way the claim language

6    reads, the way the specification discusses this information.

7    The pitch determination marker is a distinct component and

8    there is no wire frame embodiment of the pitch determination

9    marker.

10        Now, if I may, I'll just address a couple of the

11   arguments that counsel made, and -- and again, we have to

12   think of this as a process in time where you're using your

13   pitch determination marker, either the protractor tool or the

14   envelope tool, to determine what is the pitch of the roof that

15   we see in the aerial images.  Once you have that, then you

16   engage in roof model review, because you have adjusted your

17   model based upon what the pitch determination markers showed

18   you was there, and, of course, the model, being a 3D model,

19   but just an image of a 3D model in 2D, but it's a 3D model, it

20   has a pitch as determined by the pitch determination marker.

21        Then the operator can, by pulling on the handles,

22   adjust that pitch, but he is not thereby -- he or she is not

23   thereby determining the pitch of the real roof, but simply

24   manipulating the model for whatever reason to come up with a

25   different configuration by pulling on line segments or

1   removing a gable or expanding it and thereby changing pitch

2   determinations based on mathematics.

3          But that is making changes in the pitch of the wire

4   frame model and not in the real world roof that is sitting out

5   there.

6          Now, why might you want to do that?  Well, you might

7   have, as we saw from Dr. Bajaj's slide, you know, a hurricane

8   came through and destroyed 50 houses in an area.  You don't

9   even have their roof.  So you go back to their -- what they

10  looked like originally from photographs or otherwise, and the

11  homeowners say, well, I want to change this.  In

12  reconstructing this, I want to make some changes.

13         So that might call for you to change your wire frame

14  model to get calculations of how much it's going to cost to

15  build a different style roof.  May be more, may be less.

16         So that would -- that would be a reason that you might

17  want to adjust your wire frame model.

18         But there again, the wire frame model is not

19  determining the pitch.  It is simply taking the pitch

20  determination from the pitch determination markers and

21  incorporating it and then modifying it.

22         So in Slide 21, which I think we have.  We have this

23  argument that comes right out of the claim language, Your

24  Honor, where we're displaying a pitch determination model,

25  we're receiving, based on the display pitch determination

1  model -- marker, either -- either version of which, an

2  indication of the pitch of the roof, and when we're talking

3  about the roof, we're talking about the real world roof.

4       So having received that indication of pitch, we then

5  modify a model of the roof, the wire frame model, to show the

6  pitch that was determined by the pitch determination model --

7  marker.  The wire frame itself does not perform that function,

8  and so that's why we think that the definition has to make it

9  clear that the wire frame itself is not a pitch determination

10 marker.

11      This patent says, the claim language says, the

12 specification says, we've got pitch determination markers.  We

13 have a protractor, a pitch determination marker, we have an

14 envelope tool pitch determination marker, that's it.

15      Those give you the values that you can use to modify

16 your model to reflect the pitch as determined by those

17 determination markers.

18      So you don't use the wire frame as a pitch

19 determination marker of the real world roof.  You simply use

20 the wire frame model as something that you may, if you wish,

21 modify, and in so modifying it, you modify the pitch values,

22 but they're not the pitch that, as determined from the real --

23 from the aerial images of the real world roof.

24      And that is the same reason why Dr. Mundy gave the

25 answers that he gave, that plaintiffs cite, namely, a wire

1  frame model is a 3D model.  A projection of a wire frame model

2  in a drawing is what we have in this patent, or for that

3  matter, in plaintiff's roof estimate reports.

4       So those are different things again reflecting the need

5  to be clear about what's in the 2D world, what's in the 3D

6  real world and how do you traverse the distance between them.

7       So that's why we say that you need to make it clear, we

8  would ask the Court to make it clear in the claim construction

9  ruling that the wire frame just cannot be a pitch

10  determination model -- marker, that there were only the two

11  pitch determination markers as explicitly disclosed in the

12  patent, and we also add the word "model" to the definition

13  because you are, of course, when you're manipulating the wire

14  frame in your computer program, you're not doing anything to

15  the real world roof, you're only manipulating the model.  So

16  that's why we say that should be limited to the model.

17       So we think a proper construction, Your Honor, would

18  include either the protractor tool or the envelope tool, but

19  not the wire frame, and that it would include reference to the

20  model, but not to the roof itself.  The roof itself is

21  whatever it is, and it doesn't get changed by your computer

22  manipulation.

23       The new roof might, but that's a different story and

24  that's not part of the claim.

25       So that would be our position, Your Honor.

*United States District Court*
*Camden, New Jersey*

1          THE COURT:  Thank you.

2          Do you want to respond briefly?

3          MR. ALPER:  Very briefly, Your Honor.  Just -- if we

4     could go to our slides, and I'll make this very brief because

5     I don't want to be repetitive, Your Honor.

6          The -- if we could go to slide -- sorry, it's going to

7     be 72.

8          There is no question, Your Honor, that the

9     specification discloses using wire frames as pitch

10    determination markers, in the -- for instance, in the

11    specification excerpt on Slide 72 for the '840 Patent at

12    Column 15, Line 24, it says that pitches are determined based

13    on the figures in 5A through 5D, but also the operator's

14    specification of the wire frame model described in Figures 6A

15    through 6D.  It says the -- it expressly says that pitches are

16    determined not just using the protractor tool and the envelope

17    tool in Figures 5A through 5D, but also the wire frames, for

18    instance, in Figure 6C.

19         If we go back to Slide 69, it shows it.  In Figure 6C,

20    Item 612, the wire frame can be manipulated by the user for

21    various purposes including -- in the specification, it says

22    pitch determination.

23         And so there's two main takeaways, Your Honor.  One is,

24    of course, the point that we've been making about how you

25    can't construe the claim in the way that defendants are

1   suggesting to exclude such clear embodiment.  And by the way,

2   this seemed to be a point that may not be in as much of a

3   dispute as it sounded, because it does sound like from what

4   defense -- what counsel was saying that, you know, we agree

5   that you can move the wire frame and that is going to modify

6   pitch.

7        But in any event, the first point is, you can't adopt a

8   construction like the one they're proposing that would exclude

9   embodiments.  But the second is something that we can't lose

10  sight of, and that is, if we take a big step back, we have got

11  claim language that says does not include the requirement that

12  the defendants are proposing.

13       The claim language defines what a pitch determination

14  marker is.  There's no dispute that in that instance, you need

15  something really big, very explicit to start excluding things,

16  embodiments, described or not, from the scope of the claims.

17  And so the question is, are we saying that a wire frame could

18  never be something that you could use for pitch determination?

19       Well, of course it can be used for pitch determination

20  because it can be, and also, the specification certainly says

21  it, and this doesn't come close to -- I mean, it's the

22  opposite of a lexicographer statement or some clear disavowal

23  or clear statement excluding wire frames from the scope of

24  what a pitch determination marker is.

25       And then the last thing that I just wanted to clear up,

*United States District Court*
*Camden, New Jersey*

1   Your Honor, if we go to Slide 66, this is an example.

2        THE COURT:  Which one, I'm sorry?

3        MR. ALPER:  Slide 66, Your Honor.  Yes.  I'm using

4   this slide because it shows Claim 1 of the '840 Patent and

5   there was a suggestion by counsel that the pitch determination

6   marker can only be used for the initial determination of

7   pitch.

8        But look at what this claim is talking about.  This

9   claim is talking about using the pitch determination marker to

10  modify a model.  So you have a model, right?  And then you're

11  going to use the pitch determination marker now to make

12  changes to it.  And that tells us that the pitch determines --

13  that argument is just wrong, that's not a correct argument.

14  I'm not sure that that argument amounts to an exclusion on the

15  claim in any event, but that argument is just factually wrong

16  and it's inconsistent with the claim language, and so for that

17  additional reason, we have to reject their proposals.

18       Thank you, Your Honor.

19       THE COURT:  All right.  Let's break for lunch.  It's

20  12:45.  Why don't we come back at 1:30, please?  See you then.

21       (RECESS; 12:46 p.m.)

22       THE DEPUTY CLERK:  All rise.

23       (OPEN COURT; 1:33 p.m.)

24       THE COURT:  Thank you.  Have a seat, please.  Okay.

25  Moving right along.

1       I think we are on visual marker, correct?

2           MR. BROMBERG:  That's correct, Your Honor.

3           THE COURT:  Let's start.

4           MR. BROMBERG:  So we're on to the visual marker terms

5   as Your Honor mentioned, and they appear in the '770 Patent,

6   Claims 1 to 12, and then the second visual marker appears in

7   the '770 Patent, Claim 1.

8           And incidentally, Your Honor, these terms, "visual

9   marker," they only appear in the claims, they do not appear in

10  the specification and indeed, there are only three things in

11  these patents that are referred to as markers, the

12  registration markers, the visual markers and the pitch

13  determination markers.

14          The wire frame is never referred to as a marker.  It's

15  referred to as a model or a 3D model or a wire frame model.

16          So these terms are distinctive, and one of the problems

17  we see in this case is the plaintiff's effort again to stretch

18  their patent to cover things that it doesn't cover, to stretch

19  their wire frame, no pun intended, to be all things to all

20  people, including pitch determination marker, a model, a wire

21  frame model and maybe even a visual marker and the law is

22  clear, of course, that if a claim lists elements separately,

23  those elements are distinct components of the patented

24  invention.  I'm citing the *Becton* case, which is in our

25  briefing.

1        So going on from there, we again request that the claim

2    construction makes it clear that the term "first visual

3    marker" is distinct from a displayed model of a roof, and that

4    the second graphical interface is distinct from both the first

5    visual marker and the second visual marker and the displayed

6    model of the roof and those are the points of disagreement.

7    Otherwise, I think we're in agreement about how those terms

8    should be construed.

9        And if we go to Slide 31, we say that because the

10   claims list the first visual marker and second visual marker

11   as separate elements, the two must be treated as distinct

12   components, again, citing the *Becton Dickinson* case.  And we

13   see here in Claim 1, the first visual marker appears in the

14   first clause of that claim, the second visual marker appears

15   in the second clause of that claim and, of course, we don't

16   get a model mentioned until later on.

17       On the next slide, we can see that there is Claim 12,

18   which I believe is the only remaining claim in the '770

19   Patent.  It's dependent on Claim 1, of course, so it includes

20   all the elements of Claim 1 as a dependent claim, but it also

21   further provides a digital wire frame model construction of

22   the roof structure based on the -- at least one location over

23   the roof structure and the displayed area limits it to which

24   the user moved, released one first visual marker.  I think

25   there's a little bit of a grammatical problem, but I think the

1    meaning is clear.

2          That we've got -- so we have between -- we have in

3    Claim 12, including the elements of Claim 1, we have a first

4    visual marker, a second visual marker and we have a digital

5    wire frame model, and we believe that it's important to make

6    it clear that those are each distinct claims and that's the

7    way -- it's our each distinct structures and that's the way

8    they would be understood by a person of skill in the art, but,

9    the jury, of course, needs to know what the proper

10   construction is, and that's why we ask for the Court to put

11   that in, that they are distinct.

12         And the display and movement of the first visual marker

13   proceeds -- serves as an input to and is necessarily distinct

14   from display of the second visual marker.

15         We see that on Slide 33 here, because first, you

16   display a first aerial image and a first visual marker,

17   moveable by the user, then you move the first visual marker to

18   a first location in the first aerial image, then you store

19   data in the memory about the location to which the first

20   visual marker was moved, a very standard way that a computer

21   operates, as Your Honor pointed out this morning, then display

22   a second aerial image and a second visual marker in a location

23   based on the stored location to which the first visual marker

24   was moved in the first image.

25         So the first visual marker must have existed and been

1  moved before, and thus, necessarily distinct from the second

2  visual marker.

3      And again, tracing the same set of steps, we then

4  finally get in Claim 12, the limitation, construct the wire

5  frame model based on the location to which the first visual

6  marker was moved by the user.

7      Well, the wire frame model could not be either the

8  first visual marker or the second visual marker because it

9  wasn't constructed until you got the first visual marker, the

10  second -- and the second visual marker, and then you did wire

11  frame model construction.  So again, the first visual marker

12  must already have existed before the wire frame was

13  constructed.

14      So the claim language dictates as a matter of logic,

15  the first visual marker is distinct from a wire frame model, a

16  projected wire frame model of the roof, because if the wire

17  frame, as the claim requires, is based on where the user

18  moved, in the past tense, the first visual marker, that first

19  visual marker must already have existed before the wire frame

20  was constructed, otherwise, the claim would be rendered

21  nonsensical.

22      Plaintiffs --

23      THE COURT:  Well, if that's true and seems to be

24  logical, why do you need to add a word "distinct?"  Isn't it

25  obvious it's distinct if you have a first and second, they are

1    different things?

2            MR. BROMBERG:  Well, first, second and wire frame,

3    Your Honor.  And I think that our concern is that the

4    plaintiffs not be able to argue at a later point in the case,

5    oh, well, the wire frame could be the first visual marker, it

6    could be the second visual marker and -- or it could be all

7    three things, wire frame, first visual marker, second visual

8    marker.  So we think it has to be clear that given the

9    admittedly somewhat clumsy language in which this claim is

10   written, that the Court should make it clear to the parties,

11   the experts who are going to be submitting expert reports in

12   this case on the merits and the jury that those are distinct

13   things.

14           I agree with Your Honor that it would appear to be

15   obvious.  I've been working on this case, however, for a

16   couple of years, I think it might be less obvious if you just

17   walked into court one day and said, okay, now you're a juror,

18   tell me what you think this means.  So I think we need the

19   Court's instruction to help avoid juror confusion.

20           And we think that -- that plaintiff's position would

21   render the terms "first and second" meaningless and really

22   leave them out of the claim.  If we just say, well, the

23   construction, that they either know construction or first

24   graphical user interface, second graphical user interface,

25   just to specify roof points, the first aerial and the second

1   aerial, respectively, we think it sort of leaves open the

2   possibility of the mischief of saying, well, you can have one

3   thing do both of those things, and, in fact, you can have one

4   thing that isn't even a first visual marker, but it's a wire

5   frame model do all three things.  And so that's what we're

6   trying to avoid here.

7        The -- and so let me conclude with a couple of

8   responses to arguments that appear in the plaintiff's

9   briefing.

10       The first one is the contention that our construction

11  of second visual marker excludes embodiments and is not

12  supported by the spec -- specifications.  We think the clause

13  in defendants' construction can be manipulated by a user as

14  permissive, and it honors what the specification teaches.

15       There's a fundamental aspect of the claim to markers

16  that they can be directly manipulated by the user, as we

17  indicate in the highlighted language there from the '770

18  Patent, Column 9, and the specification also teaches that this

19  user manipulations is applicable to both first and second sets

20  of markers.

21       So they -- they argue, well, you've got to do this by

22  means of the computer under our construction.  Not true.  Our

23  construction is permissive.  The computer could do it, the

24  operator can step in and do it as well.

25       And then the -- another argument that the plaintiffs

1  made was to argue that -- arguments that plaintiff's

2  prosecution attorney made during the prosecution back in 2013,

3  during the prosecution of the patent, about certain wire

4  frames representing visual markers saying, here it is in the

5  prosecution history, that's basically their argument, so that

6  means we know that they can be wire frames and that's a

7  completely wrong-headed argument for a couple of reasons.

8        First of all, they were the statements of the

9  patentee's lawyer attempting to overcome rejections.

10  Secondly, they were rejected out of hand by the patent

11  examiner who said these arguments have been fully considered

12  but are not persuasive.

13        So they don't constitute a prosecution record for

14  anything other than that the plaintiff's attorney made some

15  arguments that were rejected.

16        So we think on that basis, Your Honor, we would ask the

17  Court to give those terms the necessary clarity that the first

18  visual marker and the second visual marker are two distinct

19  things, and that the wire frame model is, which it's actually

20  constructed based upon them, is a third thing and cannot

21  represent all three things.  Thank you.

22        THE COURT:  Thank you.

23        MR. ALPER:  Your Honor, before I begin, this morning

24  when we made introductions, we inadvertently omitted one that

25  I feel compelled to do now, and that is the general counsel of

1    Eagle View has been here in the courtroom today.

2         THE COURT:  Welcome.

3         MR. ALPER:  Erica Womer, and we wanted to introduce

4    her to you.

5         THE COURT:  Thanks for coming.

6         MS. WOMER:  Thanks for having me.

7         MR. ALPER:  With that, I'll proceed, Your Honor.

8         And if we could go to our slides on -- if we could

9    start with Slide 88.  Some of the issues here on the first and

10   second visual marker terms are similar to the issues with the

11   pitch determination marker, so I'll try to skip slides where I

12   can here.

13        So the -- in the claims and we saw counsel walk through

14   the -- one of the representative claims, you have a claim

15   element for a first visual marker that gets moved and --

16   that's on a first aerial image, and the first visual marker is

17   moved and then that creates a corresponding movement of a

18   second visual marker on a second aerial image, and we'll get

19   into this in a little bit more detail, but on Slide 88, we are

20   showing one of the embodiments -- the embodiments of this.

21        And it's described this way, where you have 6B and 6C

22   and 6B is described as a wire frame or it includes wire frame

23   611, and that wire frame can be moved by the -- manipulated by

24   the user and then as the specification states, that creates a

25   corresponding change to wire frame 612 on Figure 6C, and you

1   can see Figure 6B and Figure 6C have different perspectives of

2   the roof.

3        The one on the left is an oblique perspective, the one

4   on the right is a little bit more of the top-down.  And the

5   point here in the patent is that you can obtain greater

6   accuracy with respect to your roof model by having the ability

7   to make changes to the -- the wire frame projection of the

8   roof model on one aerial image and have that impact the wire

9   frames on the other images that you're using.  And what the

10  patent says, and again I'll direct you to this specific aspect

11  of the specification on this in a moment.

12       But if we go to the next Slide 89, what that -- what

13  we've done here is we've flipped them, right, so now 7 -- or

14  6C is on the left and -- with wire frame 612, and 6B is on the

15  right, and what the patent says is that -- the specification

16  says that you can go in reverse, right?  You can make wire

17  frame 612 be the first visual marker, make changes to that and

18  then that will get carried over to the other wire frames in

19  the other aerial images.

20       And it's really that relationship between movement that

21  defines the first visual marker and then the corresponding

22  movement to the -- on the other aerial image that's the second

23  visual marker, and that's right out of the claim language.

24       If we now skip forward to -- let's skip Slide 93.  I'm

25  going to just jump ahead because counsel already covered kind

*United States District Court*
*Camden, New Jersey*

1    of the walkthrough of the claim.

2         What we see -- what we've displayed here is the

3    disputes between the parties and again, we've highlighted in

4    green the areas of agreement, and in red and yellow the areas

5    of disagreement, and this is another one of those instances --

6    we will show you, that where we think the claim language

7    defines -- tells you everything you need to know about what a

8    first visual marker is, is that no construction is necessary.

9    But to narrow the disputes again, we've adopted the parts of

10   defendants' constructions -- construction that is consistent

11   with that claim language.

12        And as you will see, you can see here one of the

13   disputes that we have is whether the visual marker needs to be

14   distinct from a displayed model of a roof.  It's a similar

15   issue to the one that we dealt with, with the pitch

16   determination marker that the defendants' saying that they

17   don't think that the visual marker can be a wire frame, it

18   must be distinct from a wire frame.

19        There's a couple of other disputes that we're going to

20   touch on.  Another one, which I think is a -- in -- at least

21   another one is -- actually the other two, I should say,

22   specifically regard the second visual marker, and one of the

23   additional requirements that defendants place on the claims is

24   that the second visual marker has the capability of being

25   manipulated by the user.  They say that's a requirement.  We

1    will talk about that briefly, and then they also say that the

2    first and the second visual marker, they need to be distinct.

3    I'll handle that very briefly because I think we don't have a

4    disagreement on what -- on an aspect of that, and there's just

5    one issue that we have there that we want to present to you.

6         But we're not trying to change the claim language from

7    first and second.  We agree there's a first one, there's a

8    second one, there's two different ones.  So that will be an

9    easy issue to deal with.

10        Okay.  Let's go to the claim language first, where we

11    started before, Slide 95, and what we're doing here is -- you

12    can see that our construction comes directly out of the claim

13    language.

14        So we say that a first visual marker is an interface

15    component that can be manipulated to specify roof points on a

16    first aerial image.  And when you look at the claim language,

17    that's exactly what it says.  It says it's movable by a user

18    on an aerial image and it can be -- two, it can be moved to a

19    first location, in other words, specified points.

20        That part of -- our construction, of course, is also

21    that at least, that's agreed to by the defendants, so we have

22    an agreement that's what the claim language means.

23        Then the second visual marker is the same thing.  We

24    say it's an interface component to specify roof points on a

25    second aerial image.

1        You can see from the claim language, it describes a

2    location on the roof structure of the building in the second

3    aerial image and, of course, it's an interface component, we

4    agree on that.

5        And so when you have very clear claim language like

6    this, the claim construction telling us what a first and

7    second visual marker, they actually are, the task of

8    performing claim construction here is very simple.

9        So if we go to Slide 96 and we kind of line up the

10   party's claim constructions for first visual marker, you can

11   see that ours is exactly what the claim language says and

12   theirs has that, too, but they have this addition in there

13   which is nowhere in the claim language, and -- or otherwise

14   described in the specifications.

15       And we're just sticking to the claim language right

16   now.  We will get to the specifications in a moment in the

17   file history.

18       Slide 97, the same thing, we're adopting the claim

19   language definition of what a second visual marker is and the

20   defendants are adding a number of additional requirements that

21   are not in the claim language, when the claim language tells

22   us what it is.

23       Okay.  Slide 98.  I'm not going to belabor this, but

24   this is that same situation that we were in, in the pitch

25   determination marker circumstance.  When the claim language is

 1    clear, the only time that you get to add in additional

 2    restrictions is when there is a very strong statement

 3    elsewhere in the intrinsic evidence or lexicographer statement

 4    or clear disavow, no dispute amongst the parties that no such

 5    lexicographer statement or clear disavow exists here.

 6          In fact, as we will see in the prosecution, there is

 7    strong evidence going the other way that actually, the

 8    defendants' construction is incorrect.

 9          Okay.  Let's go to the specification, because I think

10    that the claim language is dispositive, but the specification

11    is certainly also dispositive.  I mentioned before that I was

12    going to show Your Honor the text in the specification

13    regarding these figures.

14          Here is the discussion of Figure 6C, and in particular,

15    wire frame 611.  It describes it exactly in the way that the

16    claims describe the first visual marker.  It says, changes

17    that the operator makes to wire frame 611.  So that tells you

18    that wire frame 611 is something that the operator can change,

19    are concurrently displayed by the roof estimation system as

20    wire frame 612.

21          And that's on Figure 6C, and that is exactly what it --

22    what the first and second visual markers are described as and

23    what they do in the claims.  And there's no question about

24    that.

25          If we go to the next slide, slide 100, now we're going

1   to do it in reverse.  The specification tells us you can do it

2   in reverse.  Now wire frame 612 from Figure 6C is the first

3   visual marker and wire frame 611 from Figure 6B is the second

4   one, and it tells us, "Furthermore, the concurrently displayed

5   wire frame 612 is an interactive user interface element in

6   that the operator can make changes to wire frame 612, which

7   are then concurrently displayed in wire frame 611."  And that

8   is exactly what the claims say the first and second visual

9   markers are.

10      By the way, your Honor, these are excerpts from the

11  '770 patent.  That's the patent that has these terms.  And the

12  one that I just read was from column 14 starting at line 51.

13      And so, when we then look at -- so, the way that the

14  patentees describe the visual marker terms was by using the

15  wire frames.  This is the example that they are putting in the

16  specification, at least one of the examples in the

17  specification to describe that functionality, and, of course,

18  that goes to the very central part of the invention, which is

19  you put these wire frames on these aerial images and then you

20  can make adjustments, and one adjustment will automatically

21  update the other images so you don't have to go back and forth

22  manually to all the images, and that's the advantage for

23  accuracy purposes.

24      So, you look at the oblique perspective, make some

25  arrangements there that propagates through your other images,

1  maybe you then go to a top down perspective or a different

2  oblique perspective or more of an elevation view and make some

3  edits and so on and so forth.  And that's kind of one of the

4  powerful things about the technology, one of several.

5       So, if we go to slide 101, now we look at the addition

6  to defendants' construction that the first and second visual

7  marker need to be distinct from a displayed model of a roof.

8  Again, displayed model to defendants -- this is on the slide

9  102.  In this, just as with the pitch determination marker, in

10 this context also refers to a wire frame.  So, they are saying

11 that the, according to them, that the visual markers need to

12 be distinct from a wire frame.  But, again, I'm just

13 repeating, slide 103 just repeats what I showed your Honor.

14 It is the wire frame in the specification.  And it couldn't be

15 more clear, that is what the specification is describing.

16      And the same thing for slide 104, that's going in

17 reverse.  It's that same specification, piece of the

18 specification that I had just put up before.  This is all from

19 column 14 of the '770 patent.  It tells you, you make a move

20 of the first one and that creates an automatic move or a

21 corresponding move, rather, of the second one.  And while this

22 evidence in the claims and the specification is crystal clear,

23 the prosecution history is also crystal clear, and it puts --

24 it further confirms that the defendants's addition here is

25 incorrect.

*United States District Court*
*Camden, New Jersey*

1        So, if we go to slide 105, what we are showing at the
2   top here is a statement that the examiner -- I mean, I'm
3   sorry, that Eagle View, the applicant, made during prosecution
4   where they explicitly say wire frame 611 in Figure 6B
5   represents a first visual marker, and wire frame 612 in Figure
6   6C represents a second visual marker.
7        So let's take a step back and consider what this is.
8   This is intrinsic evidence.  Right?  Prosecution history is
9   part of the intrinsic evidence, and this is an explicit
10  statement that says that defendants' proposal is incorrect.
11  Their proposal actually conflicts with the applicant's
12  statement in the intrinsic evidence.  So, we know it's got to
13  be wrong.
14       I'm going to address the -- their arguments on the
15  prosecution history in a second, but before I do, slide 106,
16  this is a point that your Honor had made earlier.  We see that
17  there are embodiments in the specification where wire frames
18  are the first and second visual marker.  That was confirmed by
19  the applicants during prosecution.  There is no question.  One
20  thing that's not in dispute is that at least defendants are
21  attempting to exclude that embodiment and, therefore, we know
22  it can't be correct.
23       Let me now briefly respond to some of the arguments
24  that the defendants make to attempt to reconcile their
25  construction with some of this evidence.  So, first on the

1    prosecution history, you heard counsel say -- I'm going to be
2    going to slide 108, your Honor.  You heard counsel say that
3    the prosecution history statement by the applicant should be
4    disregarded because it was rejected by the examiner, but that
5    is not correct and I'd like to walk you through that here.
6         So, here's what happened.  The patent was rejected in
7    view of a -- by a reference, prior art reference called
8    Kennedy, and the applicant in its response did two things.
9    First they set up the technology.  They said, here, let me
10   explain to you what we have going on in this patent with the
11   first and second visual marker, and they described it with
12   respect to the specification.  So, I have reprinted that quote
13   at the top of this slide 108 here where they say -- let me
14   describe to you -- wire frame 611 represents a first visual
15   marker, wire frame 612 represents a second visual marker, and
16   then they go on to describe how those work together.  We make
17   a move of the first one and that causes a corresponding
18   projection on the second, for the second marker.  They then go
19   on to say, Kennedy doesn't have that.  Right?  They go on to
20   say Kennedy doesn't have the sort of automatic corresponding
21   movement feature of our patent.
22        If we go to the next slide, this is where the examiner
23   responds.  The examiner on slide 109, when he responds, he
24   says, I don't find your arguments persuasive.  It's not
25   because he thinks that a wire frame can't be a first visual

1   marker.  It's because he thinks that Kennedy has that

2   functionality in it.  So, he says, your arguments aren't

3   persuasive because I believe Kennedy -- the applicant argues

4   that Kennedy doesn't have that feature, but I disagree, I

5   think it does.  He never disputes that a wire frame can't

6   be -- or can be a first or second visual marker, never does

7   that.  You can search high and low in his response, he will

8   never say it.  In fact, he concedes it because he doesn't

9   mention it and he actually tries to apply that to the prior

10  art.

11        In any event, whatever the examiner is saying, it

12  doesn't take away the fact that the applicants, as part of the

13  intrinsic evidence, said that the first and second visual

14  marker could be wire frames.  And of course they can.  The

15  specification explicitly says so.

16        Okay.  And slide 110, this is just maybe a little bit

17  of color, you know, what is the ultimate response to that by

18  the expert?  The expert says that he didn't consider the

19  prosecution history, and you probably saw that in our

20  briefing.

21        All right.  Let's go to slide 112.  I'm going to skip

22  to slide 112.  There's an argument here, as there was in the

23  pitch determination marker context, about sort of a

24  distinction between the use of the word "wire frame" in claim

25  12 and the first and second visual markers in the independent

1    claim, and I'd like to address that.  So, what defendants say

2    is that because claim 12 claims performing by the system

3    digital wire frame model construction based on the move of the

4    first marker, that that means that the first marker can't be a

5    wire frame, and I think there's a couple of important things

6    here.

7            So, first of all, when you look at the claims, there's

8    no requirement -- there's just not -- there's nothing that

9    says that the first and second marker can't be a wire frame.

10   In fact, when we look at the specification, we know that they

11   can be a wire frame, and there's nothing inconsistent with the

12   first and second visual markers being a wire frame and then

13   performing that claim 12 element.  In fact, that's exactly

14   what we are talking about when we talk about Figure 6B and

15   Figure 6C.  So, let me walk you through that, because this

16   claim here, claim 12, tracks exactly with the 6B and 6C

17   embodiment.

18           So, if we look at the first visual marker, that's a

19   wire frame in 6B.  You are then going to make a movement on

20   that.  That will modify the model of the roof and it will

21   then -- I'm sorry, it will then cause a second visual marker,

22   a corresponding movement to the second visual marker.  And

23   then what happens in this claim is performing digital wire

24   frame model construction, but that's exactly what happens in

25   the embodiment.  When you make that move on 6B, that then

1    moves the second marker and creates a wire frame on 6C.  And

2    that's how exactly it's described in the specification.  So,

3    what they are describing here is the wire frame embodiment of

4    6B and 6C.  They are not excluding the use of the wire frame

5    in -- for the first or second visual marker.  They are saying

6    in this embodiment, it is a wire frame.  In fact, it's

7    literally, that displaying or performing construction of the

8    wire frame model, that's how you get the wire frame that's

9    shown in 6B and 6C.  And so it tracks almost exactly with the

10   described embodiments.

11       But the important thing here is that when we're looking

12   at construing the term "first visual marker" and "second

13   visual marker," we can't come up with a construction that

14   would eliminate the crystal clear embodiments, and, of course,

15   the statements by the applicant during prosecution.  The

16   addition of this claim element certainly doesn't allow us to

17   then construe the claims in a manner that would be

18   inconsistent with the way that the applicants describe their

19   own invention in the specification.

20       Okay.  Part of this argument, if we go to 113, part of

21   this argument or a fair amount of this argument for defendants

22   relies on the *Becton* case, and I think it's worth talking

23   about that for a moment.  You heard counsel mention the *Becton*

24   case a moment ago and, of course, that's a central focus in

25   their brief.  The *Becton* case was one where in the claims it

1  had these two requirements.  One was a spring.  There were two

2  structural requirements, one was a spring and the other was a

3  hinged arm.  And what the Court there said was, well, these

4  are the two structural requirements and they're actually

5  different requirements.  And they looked at the specification

6  and said they're different requirements in the specification.

7  When you look at what they say in that case, I think it's very

8  important here because the holding of the case supports our

9  construction and actually negates defendants' construction in

10  this case.

11       So, here on slide 113, what they say in *Becton* is, "In

12  the absence of any evidence to the contrary, we must presume

13  that the use of different terms in the claims connotes

14  different meanings."  But here we don't have an absence of

15  evidence to the contrary.  We have strong intrinsic evidence

16  that the first and second visual markers are -- we have

17  conclusive evidence that those are wire frames, and so the

18  *Becton* presumption would not apply and the *Becton* court here

19  would reject defendants' construction on that basis.

20       And if you go down to the bottom of 113, it says here,

21  they go on to say, "The specification in *Becton* comports with

22  the plain language of the claims."  But here we don't have --

23  the specification would contradict the proposed construction

24  from defendants.

25       Just lastly, your Honor, defendants, on slide 114,

1  defendants make the point that there's other aspects of the

2  specification that refer to the word "markers."  One of those

3  that they put in their brief is the registration markers.  The

4  registration markers, they have not shown that these are

5  actual embodiments of the first and second visual marker.  In

6  fact, when you read the spec here that we put at column 12,

7  line 4, what it says -- this is at the initial setting up of

8  the correlation.  You put the, manually put these registration

9  markers on each of the images and those are adjusted manually

10 on each image.  The specification doesn't appear to show them

11 doing the kind of the automatic moving or the automatic

12 corresponding that is done with the first and second visual

13 markers.  So, the fact that some things are called markers is

14 not dispositive.

15      And then lastly, your Honor, if we go to slide 16 -- or

16 116, I'm sorry, there's a requirement in defendants' proposed

17 construction that the second visual marker be manipulated by

18 the user.  This was really easy to deal with.  When you look

19 at the claim language, which one of the markers is

20 manipulatable by the user, it's the first one, not the second

21 one.  They're just adding this extra thing in.  It's not

22 necessary and it's not called for in the claims.

23      And then lastly, your Honor, on slide 117, the issue of

24 whether the first visual marker needs to be distinct from the

25 second visual marker, the claims already say first and second.

1    The case law we cited in our brief says that that's

2    sufficient.  You don't need a further construction to say that

3    these things are different.  And the problem with saying that

4    they're distinct, your Honor, is that they are not -- what

5    does that mean?  Because one definitely has an effect on the

6    other.  Right?  The first one moves and it has an effect on

7    the other, and our concern is that that introduces an

8    ambiguity that could potentially conflict with the actual way

9    that the claim is set up.  And given that there's already a

10   first and second requirement, we don't need it.

11        We agree, these are two different things.  You have a

12   first and a second.  That's not the reason that we are

13   opposing this aspect of their claim construction.  It's purely

14   because it would add an ambiguity in the claims.

15        I will note, your Honor, as I conclude, that this is

16   essentially an identical issue to one of the other terms

17   that's going to be before you actually next, and my colleague

18   Mr. Brown will handle that one there just so when you see that

19   one come up again.  Thank you, your Honor.

20        MR. BROMBERG:  May I respond briefly, your Honor?

21        THE COURT:  Yes, you may.

22        MR. BROMBERG:  Thank you, your Honor.  Your Honor, I

23   have to admit that I am confused by Mr. Alper's argument.

24   When I get confused, I like to go back to the law, and the

25   first point that I want to make is that the law is clear that

1   claims must be read, and I'm reading the second bullet point

2   up here, must be read in view of the specification of which

3   they are a part, and the specification is always highly

4   relevant to the claim construction analysis.  Usually it is

5   dispositive concerning the meaning of a disputed term.

6          So, Mr. Alper presents to you what I would describe as

7   the fallacy of the excluded middle.  Either there is an

8   explicit definition in the term, the lexicographer approach,

9   or there is explicit disavowal and there's nothing else.  But,

10  in fact, almost all the case law on claim construction

11  disputes is in between those two.  It's the middle.  It's

12  where you're grasping for the ordinary meaning, and that

13  doesn't mean the unvarnished meaning, it means the ordinary

14  meaning to a person of skill in the art.  And that's what --

15  that's where all of the debating takes place.

16         So, when we point to these patents, your Honor, we say

17  that you've got to have a person who is of skill in the art of

18  photogrammetry, understands triangulation, understands

19  epipolar geometry, and understands that the problem you are

20  addressing again is this fundamental problem of going from an

21  image that's in 2D and trying to get into the 3D space that we

22  know the real world has.  So, I think those are important

23  things to keep in mind when we try to construe these claims.

24         Now, if we can go to our slide 32, here again, your

25  Honor, we have the first visual marker, the second visual

1  marker, the digital wire frame model, each sitting in their

2  own clause of claim 12, which incorporates claim 1 by

3  reference, each a distinct claim element, and we believe it's

4  necessary for the Court to so state in the claim construction

5  to avoid exactly the kind of confusion and misdirection that I

6  believe Mr. Alper's argument would get us into.

7          Remember, he showed you repeatedly slides from 6B and

8  6C and they had those blue and green things saying first

9  visual marker, second visual marker, pointing to wire frames.

10 But those words are not in the description of 6B or 6C.  They

11 are not in the specification of the '770 patent.  They only

12 appear in the claims.  So, the argument that somehow it's just

13 plain as day like it assumes the conclusion, if you put a

14 label on it and say here's first visual marker, you're done,

15 and if you put a label on the second one and say here's second

16 visual marker, you're done, well, respectfully, your Honor,

17 you're not done because both of those point to wire frame

18 models which are nowhere described in the specification as

19 visual markers.  They are, in fact, wire frame models which

20 the user can manipulate as we discussed earlier, but that

21 doesn't make them first and second visual markers.

22         So, I think Mr. Alper has made clear that the

23 plaintiffs would like to have it all in a state of confusion,

24 just like their argument to the Patent Office which the Patent

25 Office rejected, that, oh, it's all -- it's all one, the wire

1    frame can be everything, and that's simply not what these

2    claims require, and indeed, where claim 12 requires that

3    digital wire frame model construction of the roof structure be

4    based on the place that the first visual marker was moved,

5    that makes it clear that you had to have a first visual marker

6    before you had a wire frame.  It can't be one and the same

7    thing.  It's simply a matter of logic.

8            So, on that, your Honor, there are a lot of other

9    points that Mr. Alper made that are of concern, and again, I

10   -- but I want to emphasize that this patent, you can read it

11   from one end to the other, it does not have the word "visual

12   marker" in the specification with one exception, column 20,

13   lines 13 to 17, it refers to a visual marker as the edge of

14   the building or a tall chimney.  Those are clearly not the

15   visual markers that are named in the claim.  So, you have no

16   definition of first visual marker, second visual marker, and

17   wire frame model in that patent.

18           And so we submit that it's really important to avoid

19   confusion for all concerned that it be clear that the first

20   visual marker and the second visual marker and the wire frame

21   model all be described as distinct from each other.  Thank

22   you.

23           THE COURT:  Thank you.  Okay.  Keep moving.

24           MR. BROWN:  Good afternoon, your Honor.  Brandon

25   Brown for the plaintiffs.

*United States District Court*
*Camden, New Jersey*

1       The one term that I'm going to address are the second

2   line drawing terms, your Honor, and a lot has already been

3   said about the primary issue of dispute here.  It comes down

4   to that word "distinct."  And I think I heard opposing counsel

5   and I heard your Honor say that it seems obvious in these

6   claims that these are different elements, and I agree with

7   you, and I think that is a good reason not to add this word

8   into the claims, but I also want to explain that there's a

9   risk, a danger of doing it that is worth exploring as well

10  just to understand what the real problem here is.

11      And so to do that I'd like to start by just doing a

12  very brief walkthrough of the claim to sort of set the stage

13  for where we are.  And so I have the '454 patent claim 26 up,

14  and this is slide 119 of the plaintiff's deck.  And the claim

15  initially calls for a first aerial image and a second aerial

16  image that's taken from a different angle.  And so in a

17  cartoon form, I have on slide 120 on the left side, the first

18  aerial image, and on the second, on the right side, the second

19  aerial image which is taken from a different angle.  You can

20  see it's being taken from the back of the house in the cartoon

21  that we have.

22      So, we go back to the claim on slide 121 and the claim

23  then requires, in addition to having a first image, we have to

24  have a first line drawing overlaid on that image and we have

25  to have a second line drawing overlaid on that image.  So far

1   it seems very obvious, your Honor, that there's a first line

2   drawing on the first image and a second line drawing on the

3   second image.  But this is where the risk comes in of the word

4   "distinct."  The claim also requires that the first line

5   drawing correspond to features on the second line drawing.

6   And what it means by that is that we be able to correspond,

7   when there's going to be a change to one line drawing, we want

8   to be able to make that change on the second line drawing.

9          And that happens in the next element, your Honor, where

10  in response to the user inputted, and I'm on slide 123, in

11  response to user input, we change a line in the first line

12  drawing, and then on the next element, the computer system

13  makes a change to the line on the second line drawing that

14  corresponds to the feature that we changed.

15         And so if we go to slide 124, and we have the user on

16  the left side make a little change where they pull out the

17  line drawing, make a little change to that line, on the right

18  side, the computer system makes that change automatically.

19  And so the issue here is that the claims have a relationship,

20  the first and second aerial image and the first and second

21  line drawing have a relationship to each other that is very

22  clearly defined by the claims.

23         And so when we go to the construction, and I'll skip

24  forward because we covered a lot of this already, the

25  construction that defendants propose attempts to vitiate that

1  relationship a little bit by implying that there's a

2  distinction, they're introducing a real risk that this patent,

3  that there's something not corresponding between these claims,

4  that there's no -- there's something that's other than a

5  correspondence so that there's something different about these

6  images.

7       And so if we sort of walk through the evidence here,

8  the defendant agrees with us that these are different and that

9  they're obvious, but what they don't notice is that the patent

10 really does in the specification, in the figures, and in the

11 claims, expressly tie these together.

12      So, on slide 133, we see that the embodiment shows that

13 the three-dimensional model that's ultimately created is

14 projected onto both the first and second aerial images,

15 meaning that these two aerial images and these two line

16 drawings are actually coming from the same model, they have

17 the same sort of source.  It's the 3D model of the house that

18 we're trying to you can't consider.  And we see that in the

19 figures as well, and this is evidence that the defendants rely

20 on.  They show that the wire frame corresponds to the other

21 wire frame in another image.

22      So, on the '454 patent at column 14, line 35 to 39, we

23 show that the wire frame 612, which we have covered in great

24 detail, has this direct correspondence.  And so if we look at

25 that and we think, okay, there's a relationship, there's a

1    correspondence that's explained in the claims, why can't we

2    just come in and say that they're distinct?  And the problem

3    is that -- if we go to slide 135 -- there's literally no

4    support in the patent that says that these two visual markers,

5    as in the previous term, or these two line drawings have to be

6    distinct from each other.  It's just not there.

7          And so when we introduce a word that has no basis in

8    the intrinsic evidence, that ends up being a dispute for

9    later.  What happens is if we come -- if we introduce the word

10   "distinct" here, at trial or at summary judgment we're not

11   going to have as much time to argue about whether or not the

12   claims read on the product.  We're going to have experts

13   arguing about what "distinct" means.

14         Defendants mean something else because it can't be what

15   the claims say.  It can't be just that there's an obvious

16   distinction between each of the elements, between each of the

17   line drawings; otherwise, they would agree with just the plain

18   meaning.  There's something to "distinct" that we don't know

19   yet that could be a risk and there's no reason to introduce

20   that confusion into the case.

21         THE COURT:  What could be the risk?

22         MR. BROWN:  I think the risk is this:  The jury goes

23   in, if the jury is reading the claims and they're hearing the

24   evidence and they hear the first line drawing has a

25   correspondence to the second, and they're thinking these all

1  come from the same model, there's a relationship, when you

2  change one, it changes the other, and then they hear a claim

3  construction that says, no, no, no, they're distinct from each

4  other.

5          THE COURT:  How does "distinct" alter the idea that

6  the one is dependent on the other?  In other words, number

7  two, the second marker is dependent on where the first one is

8  and moving in the first one.  The word "distinct," how does it

9  change that understanding?

10         MR. BROWN:  I think that's a great question, your

11 Honor, and I think that's a possible dispute that we'd be

12 kicking down the road, because there is a risk that it says

13 they can't have that relationship or they have something less

14 than that relationship, that we're narrowing that

15 correspondence.  And when you think of the word "distinct," it

16 does imply a separation of issues and it implies that there's

17 a big gap between those two issues, and that's just not the

18 case here.

19         There's another also risk, your Honor, that ties into

20 this.  I'm going to skip forward to slide 140.  In my cartoon,

21 I showed two houses that are -- or the same house from

22 different angles that are essentially square.  They're

23 symmetrical.  Now, these are two different line drawings and

24 this would meet the claims if it were sort of a real world

25 example, and you pull away the houses and we look at the line

1    drawings, they're actually identical.  They're not distinct

2    from each other because the house happens to be symmetrical.

3           And so what happens when you read in a word that

4    doesn't belong there, that hasn't been used in the patent, it

5    hasn't been used in the specification or the file history, you

6    start to accidentally read out embodiments that for all

7    practical purposes should be covered.  There's nothing that

8    says that these two line drawings can't be identical to each

9    other regardless of the angle.  And so when you read in

10   "distinct," you start making that slippery slope happen where

11   you just don't know where it is going to end up and what those

12   non-infringement arguments might be that really are outside

13   the scope of the patent.

14          Your Honor, just to transition just briefly to two

15   arguments that were made by opposing counsel in their

16   briefing, there was a reference to the Kennedy patent, and I'm

17   on slide 136, and the file history.  Defendants allege that

18   during prosecution Eagle View confirmed that the second line

19   drawing is actually distinct from the first line drawing.

20   This isn't the case at all.  There is no express statement or

21   any statement that these things are distinct.

22          Instead, if you look at what was said during the

23   prosecution, they're actually referring to another element of

24   the patent, and it's the same one that Mr. Alper referred to

25   earlier.  They're talking about how Kennedy doesn't have a

1   change that's made by the computer system to a second line

2   drawing if that change is made in the first.  And so there's

3   nothing in here that changes the plain meaning of the claims.

4   It is going to the exact same point and there was no real

5   statement there.

6        And finally, on the *Becton*, your Honor, defendants are

7   putting forth the *Becton* case almost as a rule that if every

8   element in every claim construction has to read the word

9   "distinct" in, that just isn't the case.  We don't put

10  "distinct" into every element merely because it appears in

11  every element or because they are different elements.  *Becton*

12  here is particularly inapplicable.

13       And to set the stage a little bit, *Becton* was about a

14  needle that had a safety on it and there was a hinged arm and

15  a spring means that could engage the safety and prevent

16  somebody from being injured by it.  The claim calls for a

17  different, a hinged arm, and a separate element, a spring

18  means.  The only relationship between those two is that they

19  were connected.  There's no mention of any sort of

20  correspondence or other relationship that would complicate

21  matters.  And so when the plaintiff came in and they actually

22  argued that a single device could meet both the hinged arm and

23  the spring means, that was a problem.  That was a problem for

24  non-infringement.

25       Unlike what happened in *Becton*, that just isn't the

1    case here.  That isn't what we're arguing.  Mr. Alper said it

2    very clearly, we will show a first aerial image with a first

3    line drawing on it, and we'll show a second aerial image with

4    a second line drawing on it.  And so there's really no dispute

5    here that there's any sort of trickery happening.  We're just

6    very concerned about the word "distinct" confusing or

7    otherwise misleading the jury or the factfinder.  Thank you,

8    your Honor.

9           THE COURT:  Thank you.

10           MR. CHRISTIE:  Your Honor, I hear a lot of agreement.

11           THE COURT:  A lot of agreement?

12           MR. CHRISTIE:  I hear some agreement from the other

13    side, Judge.  Basically they seem to acknowledge that the

14    first line drawing is separate and unique from the second line

15    drawing, and that --

16           THE COURT:  I wouldn't say it was unique, but it's

17    different.

18           MR. CHRISTIE:  It's different.  And the conundrum we

19    have, Judge, is that based upon the claim language, absent our

20    construction, it permits them to argue that the first line

21    drawing is the same structure, the same thing as the second

22    line drawing, and that is the problem.  There is no issue with

23    regard to the correspondence.  We acknowledge that there is a

24    correspondence between the first line drawing and the second

25    line drawing.  It is clear from the claim language, no

*United States District Court*
*Camden, New Jersey*

1    question about it.  Our request that your Honor use the word

2    "distinct" to make it clear that they are two separate

3    structures, two separate things does nothing to harm or cause

4    confusion with regard to that correspondence.  The concern

5    again that we have, Judge, is based --

6         THE COURT:  But the word "distinct," though --

7    address their concerns about if you use the word "distinct"

8    that's signaling that there is not this correspondence between

9    one and two, they're entirely separate and entirely different,

10   which is not the way the patent reads.

11        MR. CHRISTIE:  Okay.  Fair point, Judge.  You're

12   right, it's clear from the patent that there was a

13   correspondence between the first line drawing and the second

14   line drawing.  You make a change to the first line drawing and

15   there is an automatic change to the second line drawing.  So,

16   yes, undeniably there is that correspondence, but again,

17   they're two different things.  There's the first line drawing,

18   the user makes changes to it, and it results automatically in

19   changes to the second line drawing, but they can't be the same

20   thing.

21        And it's a theme, Judge, that we've seen in the past

22   with regard to efforts to have the wire frame model be a pitch

23   determination marker, efforts to have the wire frame model be

24   a first visual marker or a second visual marker.  They want to

25   have multipurpose tools in their arsenal.  They want to say,

1    well, this can be that or it can be the other thing.  All

2    we're looking for is to clarify, based upon the specification

3    and the claim language, to make it clear that these are two

4    separate issues, they're different.  We acknowledge that

5    they're different.

6           And the *Becton Dickinson* case is particularly relevant

7    here because, again, it stands for the proposition that where

8    a claim lists elements separately, the clear implication is

9    that the elements are distinct, and that's where we draw the

10   "distinct" from.  They're distinct components of the patented

11   invention.  And that's the *Becton* case, 616 F.3d at 1254.

12          And because they are distinct, they are listed

13   separately, obviously there is no harm to having that made

14   crystal clear, because otherwise, Judge, we run the risk, the

15   clear risk that plaintiff has suggested, and if given leave to

16   do it, may well do it at some point in the future, that if two

17   line drawings are displayed as projections of the same

18   underlying model, they may well argue that those line drawings

19   are not separate and distinct, but are the same thing, that

20   the first line drawing could, under some circumstances, be the

21   second line drawing; the second line drawing could, under some

22   circumstances, be the first line drawing; and that is

23   completely contrary to the claims, to the specification, and

24   we just want to make that crystal clear and narrow.

25          Your Honor acknowledged it in questioning opposing

1   counsel, what's the harm here.  There is no harm here.  We're

2   not doing violence to the correspondence or to the

3   relationship.  Far from it.  We are just making sure that when

4   the claims and the specification call out these line drawings

5   separately as first and second, that it means something, and

6   that you can't fudge it down the road and say, well, one can

7   be the other or the latter can be the former.  I mean, that is

8   the gravamen here, Judge.

9       And part of the concern is that we're talking about two

10  separate patents.  We're talking about the '454 patent as well

11  as the '737 patent.  And the '737 patent doesn't have that

12  nice correspondence.  It doesn't talk about first line drawing

13  and second line drawing.  It talks about a line drawing.  And

14  it talks about the line drawing being imposed on the first and

15  second aerial images, but there is a source of confusion here.

16  And because the '737 patent and the '454 patent derive from

17  the same almost identical specification, they're in the same

18  patent family, as your Honor knows, as a claim construction

19  principle, it all should be read consistently and interpreted

20  consistently.

21      So, therein lies the concern, Judge.  We have the

22  *Becton Dickinson* case which tells us that it should be

23  distinct.  We have an acknowledgment from the other side, and

24  I need not belabor it, that they are different.  They are

25  different structures.  And to make it more clear, I'll point

*United States District Court*
*Camden, New Jersey*

1    to the '454 patent, column 14, lines 7 to 49, which lays that

2    out in greater detail.

3          But I do need to talk about the prosecution history

4    because during the prosecution history, as opposing counsel

5    mention, there were issues with regard to this type of claim

6    term, and more particularly, the patentee was distinguishing

7    between those two claims -- I'm sorry, those two terms.  And

8    what's critical is in the first bullet point that we reference

9    on slide 42, it's a snippet from our reply to an office

10   action, and it talks about respectively, it talks about a

11   first line drawing on a first aerial image and, respectively,

12   a second line drawing on a second aerial image, making it

13   clear that we're talking about two things.  We're talking

14   about a first line drawing and a second line drawing.  Indeed,

15   they have correspondence, but they also have correspondence to

16   a separately identified aerial image, the first line drawing

17   to the first aerial image and the second line drawing to the

18   second aerial image.

19         Further down, Judge, indeed, contrary to opposing

20   counsel's argument, there was a clear distinction of the

21   Kennedy reference based upon this particular term.  In

22   distinguishing Kennedy, which they were required to do for

23   their office action response, they were saying, contrary to

24   Kennedy, no changes made to any second line drawing that

25   impacts the first line drawing.  So, what they were

1   deliberately doing is calling out the fact that Kennedy

2   doesn't do that.  And by virtue of arguing that, they

3   obviously got a patent issued.

4        So, by virtue of their affirmative statements in their

5   office action responses, by virtue of the fact of their

6   efforts to distinguish prior art, the Kennedy reference, they

7   are acknowledging, Judge, that these are distinct items and

8   that there was no issue or quarrel with calling them that by

9   virtue of a claim construction.

10       So, again, because we're talking about terms in two

11   different patents which are part of the same family, they

12   should be determined distinctly and with the same definition,

13   and it's clear, and opposing counsel acknowledged that we're

14   also talking about concurrent display, which was going to be

15   the next bunch of terms that we're going to talk about, that

16   the display is concurrent.  When you modify the first, the

17   first line drawing, by virtue of the computer, it is

18   automatically migrated to the second line drawing.

19       And you see, and I'm looking at claim 1 of the '737

20   patent, again we talk about the respective issue, respective

21   line drawings, and again, this harks back to my earlier point

22   that in the '737 patent it's not called out as neatly as in

23   the '454 patent by saying first line drawing, second line

24   drawing.  It does make clear that the line drawings overlay a

25   first aerial image and a second aerial image, but a clever

1   attorney could argue that, well, by virtue of that, this line

2   drawing in claim 1 of the '737 patent, despite the fact that

3   it overlays the first aerial image and the second aerial

4   image, could be the same thing.  And again, that's the point.

5   Judge, we need clarity because of the imprecision with which

6   the claims were crafted across the patents in the family that

7   are asserted here.

8        Finally, Judge, in conclusion, we agree that they are

9   different structures.  *Becton Dickinson* is directly on point

10  and suggests, not just suggests, but requires that there be a

11  call-out to render them distinct, and that there needs to be

12  some affirmative effort by the Court to construe the term in a

13  manner that does not allow plaintiffs to argue that the first

14  line drawing can ever be the second line drawing or the second

15  line drawing can ever be the first line drawing.  There is the

16  correspondence between the two.  We do not deny that.  And the

17  fact that you actually render a construction which calls them

18  distinct does nothing to harm that relationship.  And on that

19  I will conclude.  Thank you, Judge.

20       THE COURT:  Thank you.

21       MR. BROWN:  Very briefly, your Honor.  On slide 133

22  of the plaintiff's deck, your Honor, I just wanted to respond

23  to one thing that Mr. Christie said.  He said, and I wrote

24  this down, so it might be a bit of a paraphrase, but he said

25  the risk of not putting "distinct" in is if there are two line

1   drawings that are displayed as a projection of the same

2   underlying model, that is contrary to the claims.  That's what

3   he just argued as one of the risks or really the key risk of

4   putting "distinct" -- not putting "distinct" into the claims.

5         I want to take you to the '454 patent, column 23, line

6   10 to 13.  That risk that Mr. Christie just argued should be

7   excluded from the claims is literally what this element, what

8   this part of the specification says about one of its

9   embodiments.  It says, in one embodiment displaying the

10  feature from the modified three-dimensional model includes

11  projecting the three-dimensional model onto both the first and

12  second aerial images.  So, the risk that Mr. Christie was

13  articulating was not a risk that is at issue here because it

14  would exclude the embodiment if we were to read that out.

15  That's the only point I had, your Honor.  Thank you.

16        THE COURT:  Okay.  Thank you.  Who is next?

17        MR. CHRISTIE:  Your Honor, the last three terms are

18  very similar.  Again, they're all in the same patent family,

19  the '454 patent, the '152 patent, and the '737 patent, and all

20  of them have to do with the same issue, and the issue is

21  simultaneity or concurrent display and/or change.  That's the

22  issue.

23        We are dealing with a computer system.  The other side

24  acknowledges that we're dealing with computer systems.  And

25  when you are making changes to one line drawing, we have

1  acknowledged that there was a correspondence between that

2  first line drawing and the second line drawing, and the change

3  migrates to the second line drawing, but by virtue of the fact

4  that it's done by a computer system, it is done

5  simultaneously.

6          THE COURT:  Assume that's true, that in almost all

7  instances it will be done simultaneously, what does the patent

8  say about that?

9          MR. CHRISTIE:  The patent doesn't specifically use

10 that term, the claim, does not specifically use that term,

11 Judge.  But on the other hand, there is abundant references in

12 the specification which talk about simultaneity.  So, for

13 example, we're talking about the '152 patent displaying a

14 projection where the plaintiffs say that there is no need for

15 construction and they parrot the claim language, and what we

16 have asked to add for sake of clarity is the last clause,

17 slide 47, your Honor.

18         THE COURT:  47?  Thank you.

19         MR. CHRISTIE:  Yes.

20         THE COURT:  All right.

21         MR. CHRISTIE:  What we're asking is that the last

22 clause be added, so that the feature is displayed on the

23 second aerial image as the user indicates the feature on the

24 first aerial image.  Again, the concept of concurrence or

25 simultaneity.  Again, it seems logical, it seems obvious, the

*United States District Court*
*Camden, New Jersey*

1    fact that we have a computer system involved here, that that

2    is the case, and we want to just make that clear.

3         The next slide, 48, it's clear, these patents all talk

4    about concurrent display systems.  It can't get more clear

5    than that.  That's how they title their patent.  So, that's

6    what they're all --

7         THE COURT:  What are you concerned about?  There's no

8    dispute that it is going to be concurrent showing.  What does

9    "simultaneous" add to that?

10        MR. CHRISTIE:  Judge, we use the terms -- we intermix

11   the terms.  I mean --

12        THE COURT:  Well, they're not exactly the same.  I

13   mean, simultaneous is concurrent, but maybe not the other way,

14   concurrent doesn't have to be simultaneous.  In other words,

15   there is some kind of time frame you're talking about here,

16   but not necessarily simultaneous.

17        MR. CHRISTIE:  Fair point, Judge, and I guess it

18   depends upon how you define the term and what the context is.

19   Again, we're happy to live with concurrent because that

20   signifies that it happens automatically and without delay,

21   right after the first action happens.  The user makes a change

22   to the first aerial image, and voila, it shows up on the

23   second aerial image.  So, I don't think it's a quarrel between

24   concurrent and simultaneous more than it is an acknowledgment

25   that it is automatic, that it happens automatically, that it

**1**    happens without delay.

**2**         THE COURT:  I'm not sure I am following you now.  Are

**3**    you saying that you don't believe this patent says it's

**4**    automatic?

**5**         MR. CHRISTIE:  Well, there are portions of the

**6**    specification that talk about it being automatic, but we want

**7**    to make it clear, Judge, that based upon the claim language,

**8**    there is no way to get around the fact that the displaying, or

**9**    when we talk about changing, it is done automatically one to

**10**   the other.

**11**        So, let me just start out quickly, Judge, by pointing

**12**   you to claim 1 of the '152 patent, which is the independent

**13**   claim upon which claim 8 is dependent, and it sets forth the

**14**   framework here.  You are receiving an indication of a feature

**15**   and then you have that -- and then you are modifying the model

**16**   based upon that received indication, and then you're

**17**   displaying a projection of the feature onto the first and

**18**   second aerial images.  Okay.  That's a one-step process.

**19**   You're displaying it on the first and the second aerial

**20**   images.  It's a one-step process, it happens concurrently, it

**21**   happens automatically.

**22**        That's the issue, Judge.  It's simultaneous.  It

**23**   doesn't specifically say that.  But when you look at the spec,

**24**   the specification of the patent, and we're talking on the next

**25**   slide, which is slide 50, it lays this out rather nicely.  You

1   see that it says on the top "the described user interface is

2   also configured to concurrently display roof features onto

3   multiple images of a roof."  Okay.  And we're talking about

4   this again in the context of roof model generation.

5        We've heard in the past, and we will be talking about

6   it a little bit here, that this is the roof model generation

7   phase, not the review of the roof model after it has been

8   created.  The plaintiffs want to make much of the fact that

9   there is other language in the specification that doesn't talk

10  about simultaneity, that doesn't talk about concurrence, but

11  it's in the review process after the wire frame model has been

12  created, not the roof model generation process which we're

13  talking about here.

14       Finally, toward the end of that snippet, we talk about

15  the roof estimation system, the user interface concurrently

16  displays the feature in one or more images of the roof so that

17  the operator may obtain feedback, et cetera, et cetera.  So,

18  again, Judge, we're talking about it's replete that concurrent

19  is throughout the specification, that when you're talking

20  about displaying and later when we talked about changing

21  things, it is done concurrently.

22       So, again, more portions of the specification that

23  support this view, Judge, and I'm looking at slide 51, talks

24  about when the operator indicates a feature in the first

25  image, a projection of that feature is automatically presented

1    in the second image.  Again, talking about an automatic

2    simultaneous transition.  And then we have further down column

3    5, line 67, through column 6, line 4, again talks about

4    simultaneous projection in order to help the user understand

5    the correspondence between the image and the model.

6          And I have to commend to your attention, Judge, the

7    next slide, Figure 11, Figure 11 says what needs to be said.

8    It is a flow chart.  It is crystal clear.  It talks about the

9    concurrent feature display.  It doesn't get more clear than

10   that.  And it has an ordered listing of steps, and you will

11   see, of course, that the last one talks about concurrently

12   display a projection of the feature for the modified

13   three-dimensional model onto the first and second aerial

14   images.  Again, we're talking about concurrent, we're talking

15   about automatic, we're talking about simultaneous.

16          And if you look at the specification which interprets

17   this figure, you will see that that language is used, and I'm

18   looking at the next slide, which is slide 53, column 23, lines

19   14 to 21, and column 23, lines 22 to 32, talk about

20   simultaneous projection onto the second image, talks about

21   concurrent display multiple features, so that the operator can

22   view the work concurrently projected onto a second image.  So,

23   again, Judge, the specification is replete, replete with

24   guidance to show that this is all done automatically and

25   simultaneously.

1          And if that was not enough, I commend to your Honor's

2    attention Figure 6A through 6D, again which is model

3    construction.  We're in the model construction world.  And

4    we're looking at the specification which interprets those

5    figures.  You know, we see, for example, in the '152 patent,

6    column 13, lines 49 through 56, we talk about concurrent

7    display of the roof features.  And further down at the bottom

8    of the page, column 13, lines 64 to 67, again, the roof

9    estimation system concurrently displays the specified roof

10   sections in each of the other images.  So, Judge, that's what

11   the specification tells us with regard to this display term,

12   that it is concurrent, that it is automatic, that it is

13   simultaneous.

14          And, of course, you know, the specification is crystal

15   clear, but even in the prosecution history, again, we have

16   kernels of information which indicate that that is correct as

17   well, because again, in order to get their patent issued, and

18   I'm looking at slide number 55, the patentee again

19   distinguished the prior art.  Pershing, which is not -- it's

20   the same inventor but a different patent, distinguished this

21   prior art Pershing reference by indicating that there is no

22   show of projection of a feature onto any aerial images, let

23   alone a projection of a feature from a modified

24   three-dimensional model of a roof.  So, by virtue of their

25   distinguishing that reference, they are acknowledging crystal

1    clear that it is automatic, that it is simultaneous, and that

2    it is concurrent.

3         You know, finally -- no, not quite finally -- we have

4    their construction, and I'm specifically looking at further

5    prosecution history elements on the next slide, where they are

6    dealing with the '454 patent, which is a continuation.  Again,

7    I won't belabor it, Judge, because it's right before you.  It

8    talks about concurrent display repeatedly throughout that

9    office action reply acknowledging that that is how it should

10   be done.

11        Finally, Judge, with regard to the extrinsic evidence,

12   we have Dr. Mundy in his declaration, paragraph 99 and 98, as

13   well as his deposition testimony which is listed there on the

14   slide, advising clearly that the system discloses that a

15   change made in one image would correspond to a simultaneous

16   change in another image.  And their expert, Dr. Bajaj,

17   acknowledges that the '152 patent deals with concurrent

18   display systems.  So that all matches up, Judge.  We've got

19   the intrinsic evidence, we've got the extrinsic evidence, and

20   we need clarification to show that it is automatic, that it is

21   simultaneous, that it is concurrent.

22        There are a number of issues that the other side has

23   raised and I'll touch on some of them briefly, Judge, but let

24   them flesh out their arguments as well.  They raise a couple

25   of issues.  They claim that there is a claim differentiation

1    issue.  They point to claim 4 which talks about something that

2    is substantially coincident.  Substantially coincident, what

3    is that?  It sounds indefinite to me, but it clearly is

4    something different from concurrent or something different

5    from simultaneous.  So, we're not talking about claim

6    differentiation because we're not talking about an element of

7    a dependent claim that is -- that corresponds to what's

8    already in an independent claim.

9         And, for example, we have a representation by

10   plaintiffs in their responsive brief at page 24 which makes

11   clear that their view is a dependent claim frequently claims

12   one example of what is covered in a broader independent claim.

13   So, separate and apart from whether substantially coincident

14   is equivalent to concurrent or simultaneous, the claim

15   differentiation document, as your Honor knows, is a

16   presumption.  The presumption is not met here because of the

17   overwhelming evidence in the intrinsic record with regard to

18   the automatic nature of the display.

19        And again, finally, Judge, as I mentioned earlier, you

20   will hear at least from what the slides show me that they're

21   going to focus on Figure 7A.  They love Figure 7A because that

22   seems to fit their view of the world, but again, it's not

23   appropriate because Figure 7A, it talks about the roof model

24   review stage.  And as I demonstrated earlier, Judge, we're not

25   in the roof model review stage.  The roof model hasn't been

1    created or generated yet.  We're in the roof model generation

2    phase.  So, references to Figure 7A and a specification that

3    interprets Figure 7A don't do it for us.  They are irrelevant

4    and not worth considering in this context.  And they are

5    certainly not a preferred embodiment as plaintiffs make clear.

6         With that, Judge, I'm done with the displaying of

7    projection term and I'll turn it over to opposing counsel to

8    address.

9         THE COURT:  Thank you.

10        MR. CUTRI:  Your Honor, Gianni Cutri for the

11   plaintiff.

12        If you have our slides, I'll be beginning at Slide 149.

13        So we're here on Slide 149, we're talking about

14   responsive changes.  I'm going to begin with the '454 patent,

15   some of these issues carry over across patents but importantly

16   some do not.  In particular when they get to '737 patent,

17   there's something very different happening with respect to

18   what claim language we're supposed to be construing, and I

19   will go do my best to deal with that when we get there.

20        So if we go to the next slide, we're starting with the

21   '454 patent, on the next slide I thought it would be

22   important, your Honor, because at the very end of opposing

23   counsel's presentation you heard him make reference to Figure

24   7A, they love Figure 7A but it's irrelevant and sort of

25   discounted.  And I think that was a signal that they

1   understand that that's really a critical issue here, is that

2   we do have an embodiment that undermines their proposed

3   construction.

4        And so when we -- we can go through Claim 26 briefly on

5   the '454, it talks about displaying a first aerial image of

6   the roof; displaying a second aerial image of the roof;

7   displaying a line drawing overlaid on the first image;

8   displaying a line drawing overlaid on the second aerial image;

9   the purple says user changes line drawing; computer system

10  changes second line drawing in response; and then we generate

11  a roof estimate report.

12       If you go to the next slide, you can see that these are

13  the constructions.

14       But really what is most helpful is the next slide,

15  which is 153, now we can see an almost a track changes style,

16  what's different?

17       We believe that the claim language which is on the left

18  should be left unaltered.  They want to make two changes.  Now

19  this is the element where I just talked about where after user

20  has a made a change in the first -- to the first line drawing,

21  the computer changes a line in the second line drawing.  What

22  they have added here is really two things, but they've done it

23  at once.  And let talk about the simultaneous display

24  requirement.  All right?  That's what they're saying.  They're

25  saying let's add something onto this that as the user makes a

1  change in the first line drawing, it is simultaneously

2  displayed in the second line drawing.  Not merely that the

3  user makes a change and the computer makes a corresponding

4  change to the line drawing, but you simultaneously see both

5  displayed.  That's what they want you to add to this claim

6  element.

7          They also want you to delete the fact that the change

8  is made in response to the computer system, but we'll get to

9  that in just a little bit.

10         So if we go to the next slide, they have a similar

11  approach to the '152 patent.  I've put the claim language on

12  the left, which is what we think should be left undisturbed,

13  and then they're proposed construction on the right.  Here

14  they're not deleting, they're just adding.

15         And when we get to the '737, which is the next slide,

16  there's a lot going on here, and I'll have to come back to

17  that because I don't want to do two things at once in terms of

18  our analysis.

19         But let's look at Slide 156, because this is where you

20  will see Figure 7A.  Figure 7A is an embodiment where a user

21  makes the change to a wire frame in just one image.  You can

22  see that in Figure 7A, we've highlighted it in red, but

23  there's in dispute in Figure 7A there is a wire frame over

24  just the top-down image.  And we know that because it shows us

25  that in Figure 7A.  But it also says, Figure 7A shows the user

1  interface screen 400 after the operator has constructed a

2  model of the roof using one or more of the images 402 to 406.

3  In this example, a wire frame has been projected onto

4  (superimposed upon) image 402 and annotated with roof section

5  as we'll describe further in the enlarged portion 708 in image

6  Figure 7B.  So there's a dotted line around the red line

7  drawing.

8        And so if we go to the next slide, we can see Figure

9  7B.  What we've done is we've just extracted that line

10  drawing, the dotted line piece, and we're looking at it sort

11  of in close up.  And we know from our various discussions this

12  morning that Figure 7B talks about a wire frame that a user

13  can move.  Right?  And we see it right here.  For example,

14  when an operator drags handle 710a to a new location, the ends

15  of the two line segments connected to handle 710a will also

16  move.

17        So if we go back one slide, we see that there aren't

18  wire frames in the other images.

19        So what they want to say is, well, the patent should be

20  construed to not cover this situation.  Because what they want

21  to say is the patent should be construed only in the

22  situations where a user makes a change in the first line

23  drawing and it's simultaneously displayed in another line

24  drawing on a second image.  But there is no other second line

25  drawing on a second image in Figure 7A.

1        So how does Figure 7A work?  Why would you do this?

2        So what happens is you make a change here to this line

3   drawing.  You have visually these other images but you don't

4   have a line drawing on them.  It's quite small but over here

5   on the left in user -- in the interface there are five dots,

6   they are a center, a north -- I'm sorry, a top-down, a north,

7   a south, an east, and a west.  The quality is bad, but what is

8   happened here is I make a change in the top-down view, I'm

9   going to move my line and I'm going to try to get it closer to

10  ridge that runs along the top of the house.  Did I get it?

11  Let me display where I'm currently looking, where the top-down

12  view is, let me display the east view and see if that lines up

13  there.  At a later time, not at the same time, I'll do it just

14  one at a time.  That's what Figure 7A is describing.

15       And how do we know that that's what is meant?  How do

16  we know that it's do it one at a time, show a line drawing on

17  one image and then at a later time show it on another?

18       If you will go to, I'm jumping ahead just a little, on

19  162, just look at the bottom, if you would, your Honor, this

20  is Claim 31.  The method of Claim 26 further comprising.

21  Displaying the second line drawing overlaying the second

22  aerial image on the same display at a later time, after the

23  displaying of the first line drawing overlying the first

24  aerial image of the roof on the display.

25       If you were to say I'm going to construe the broader

*United States District Court*
*Camden, New Jersey*

1   dependent claim to always require simultaneous display, and I

2   put defendants' construction on Page 162 right above the

3   dependent claim, you would see that it would contradict Claim

4   31.  Now, I have this labeled as a claim differentiation

5   argument, but it's really not the legal principle claim

6   differentiation.  This is an effort where the proposed

7   construction literally contradicts the plain language of the

8   claims.  It would be an impossibility to always have a

9   simultaneous display of a change in a first line drawing show

10  up in a second line drawing if you were displaying the second

11  line drawing at a later time.

12          And so I'm going to go back but there is -- you know,

13  for us that's a fundamental issue, and I think that, you know,

14  the defendants urging of you to just ignore this and I think

15  the argument is, well, we're in a different mode in the

16  patent, we are not talking about roof review and not roof

17  construction.

18          THE COURT:  That's what they're saying.

19          MR. CUTRI:  That's what they're saying.

20          THE COURT:  It's all about the timing in the process,

21  where are you in the process.

22          MR. CUTRI:  Right.  But that doesn't mean that the

23  claim doesn't nonetheless have an optionality.  There isn't an

24  embodiment where during roof review we don't have simultaneous

25  display of changes being made.  And we know during roof

 1    review, if that's what they're going to call that section,

 2    even during roof review, which is on Page 157, the operator

 3    can drag the handles to a new location and make changes.  So

 4    that -- it doesn't -- saying, well, that's during roof

 5    construction, that's during model construction, that's during

 6    roof review doesn't really change the fact that there is an

 7    embodiment in this patent where you do not simultaneously

 8    display changes from a first line drawing at the same time in

 9    the second line drawing.  And that's just a very significant

10    issue because what they're asking you to do is exclude that

11    embodiment, just say take your pen and write it out of the

12    patent and pretend it doesn't exist.

13          And if you look at on Page 159, a claim construction,

14    this is the federal circuit, a claim construction that

15    excludes the preferred embodiment is rarely, if ever, correct.

16    That's what they're asking you to do.  So they're asking you

17    to get rid of what the patentee told the world this what I

18    have.

19          Now, to be clear, the patentee also said I have

20    concurrent display as well.  I have a concurrent display of

21    changes as well.  And that's what they mostly point to.  They

22    say, well, these other examples that talk about concurrent

23    display, there's no disagree between the parties that there's

24    also concurrent display.  There is a very significant

25    disagreement as to whether there is -- that is a requirement

1  of all claims and that's because there's embodiment that shows

2  that that's not the case.

3       Now, there's something else going on when you look at

4  the dependent claims, and that's on Slide 160.  Claim

5  differentiation is the principle that says, you know, when you

6  have something in a dependent claim, don't read it into an

7  independent claim because otherwise you're making the

8  independent claim irrelevant, that's claim differentiation.

9       And so what I've done on Slide 161 is I've pointed out

10 that when they have the simultaneous display, if you take that

11 simultaneous display requirement and you add it to the

12 dependent -- I'm sorry, the independent Claim 26 of the '454

13 patent, what you are doing is you are making Claim 29, which

14 talks about changing a second line drawing at a time that is

15 substantially concurrent to the time the changes are being

16 made by the user in the first line drawing, you're making that

17 irrelevant.

18      Now, I've heard a reference to, well, maybe

19 simultaneous doesn't mean substantially concurrent.  But I

20 also heard the defendants' counsel make reference to the

21 current and simultaneous being synonymous.  But, in any event,

22 Claim 31 really ends the inquiry because we have the reverse.

23 Right?  We have the patentee trying to claim, okay, I want to

24 make sure that the world knows I have an embodiment that has

25 substantially concurrent and I have an embodiment that says

1  the display of the first -- of the second line drawing can be

2  at a later time, and they told us that clear as day in words

3  and in figures.

4        So, as you know, because Slide 163 is sort of now the

5  classic slide on the day, you know, there's only two instances

6  they have to now, they're the ones telling you change the

7  claim language, add something to the change.  We don't have

8  any argument by them that the patentee put a definition and

9  said this is the only way to do it, and in fact we have the

10  opposite.  We don't have anything in the file history.

11       What we have, and what I've done on 164, is I've taken

12  every instance from the defendants' briefs, opening briefs and

13  responsive briefs, and I've made a little table for your Honor

14  so that when you look at their brief and you see their

15  references to concurrent, what you won't see is the fact that

16  in the patent those are always described as example

17  embodiments.  So what I have not done is I've shown you in the

18  patent everywhere that they've made reference to something and

19  suggested like this is the only way or this is what the

20  patentee was telling the world.  I'm showing you that the

21  language that's included in always "for example" or "in an

22  example embodiment."  And on 165 I've done the same thing.

23  They basically have four places they go to in their slides and

24  in their briefs and say here's some examples where it's

25  concurrent.  And we don't disagree that there are some

1  examples where the display is concurrent, where we disagree is

2  it's the only example provided in the patent.

3       So and even if there was a single embodiment, if this

4  was a patent that had a single embodiment where it was

5  concurrently displayed, it would still be improper to limit

6  the claims to that because the federal circuit says even if

7  there's a single embodiment, it's improper to limit the claims

8  to that if the claim language is broader.  But here it's twice

9  as wrong because we have the embodiment that contradicts their

10 claim construction.

11      Now they have reference here to the Kennedy reference.

12 They say, well, you know, there was a reference in the file

13 history, there was something that was said in the file history

14 that you should interpret to mean that the claims were -- the

15 claims should be limited to substantially -- to a

16 substantially -- I'm sorry, to a simultaneous display.  Right?

17 And so what they're really saying is if you go back and look

18 at the things the patentee said to try to get the patent,

19 you'll find the patentee disclaiming what is in Figure 7A and

20 saying we don't want what's in Figure 7A, we don't want a

21 nonsimultaneous display.  But I'm putting up here what was

22 said, the actual exhibit that they cite to and it doesn't say

23 that.  They're saying, well, this is a Kennedy does.  There's

24 no changes being made by the system to any line drawing

25 overlaying a second image based on changes by the user to the

1   first line drawing, and so in Kennedy the user manipulates

2   both view ports.  And so this isn't the kind of clear

3   disclaimer where the patentee says I am giving up what I told

4   the world I would otherwise be entitled to, and that's why the

5   disclaimer doesn't help this construction either.

6        They point to a different claim, Claim -- what was then

7   Claim 2 and ultimately issued as Claim 1 on 167.  That claim

8   is completely different.  That claim actually has a

9   correlating limitation that's asserted from this patent, so it

10  doesn't help them in that respect.

11       So let's talk about what -- so I think that covers in

12  the '454.  And, by the way, that embodiment, that 7A

13  embodiment, you find it in each of the '152, '454 and '737

14  patents, you find it across all of the patents with the same

15  description.

16       And so in the '454 patent what else are they doing?

17  The other issue we have is they're deleting the claim text.

18  And when you look at their briefs, they don't really dispute

19  that they're improperly -- that they're deleting the claim

20  text, they just say, well, we kind of feel like it's capture

21  by the red language.  I'm on 168.  They say, well, we've

22  deleted it but if you just put in what's in red underline,

23  that will be the same thing.  But they're clearly not the same

24  thing.  What's been deleted is the change in the second line

25  drawing being made by the computer system in response to the

1   change that was made by the user.  They actually took out one

2   of the fundamental parts of the patent and they're saying just

3   have the computer system simultaneously display it without

4   keeping in that cause and effect relationship.

5        And why would they do that?  Well, we know -- well,

6   first of all, it's improper to do that.  We know that the

7   federal circuits have said repeatedly you don't make changes

8   to claim language unless there's a very good reason.  And on

9   the affirmative side you always try to give all of the claims,

10  all the terms in the claim their full effect.  And that's on

11  169.

12       We also know that when we were getting the patent, we

13  relied on the fact that there was a user doing something and a

14  computer system making the change in response in order to

15  distinguish over other prior art.  So there's a danger, I

16  don't know it's an issue in this case right now, but there's a

17  danger that they'll say, oh, now we can point to where

18  anything happens in either image irrespective who it did it,

19  whether it was a user or computer system, it's important not

20  to just remove language.

21       I'm going to actually do the '152 right now.  I think

22  Mr. Christi just did the '152.  I don't know if he's going to

23  go patent by patent, I'm not sure, but I think he's going to

24  go patent by patent.  He did the '152.  In the interest of

25  time I'm going to do -- I did the '454, I'm going to do the

1    '152 right now, I think he's going to do did '154.  I guess

2    we'll get back up potentially and do to '737, but I'll touch

3    on what I think the issue is around the '737.

4            THE COURT:  Why don't we take a 15-minute break?  It

5    is 3:15.  Why don't we do that.

6            (Brief Recess)

7            THE COURT:  Everybody ready?

8            MR. CUTRI:  Yes.

9            THE COURT:  Lisa, you all set?

10           MS. MARCUS:  Yes, sir.

11           THE COURT:  Let get going.  Have a seat and let's go.

12       Go ahead.

13           MR. CUTRI:  Your Honor, I was just starting the

14   presentation on the '152.

15           The '152 patent has disclaim language, displaying a

16   projection of the feature from the modified three-dimensional

17   model onto the first and second aerial images as a line

18   drawing of the feature, each overlaid on corresponding

19   locations of the feature on the first and second aerial

20   images.

21           They've added -- they've just tried to capture the same

22   concept and put it into this claim language, I think, because

23   they say, so that the feature is displayed on the second

24   aerial image as the user indicates the feature on the first

25   aerial image.

1      I think this is fairly characterizing -- they id

2  characterize it as the simultaneous display.  They want the

3  display on the second aerial image as the user indicates the

4  feature on the first aerial image.

5      And so -- and in case there was any doubt on 173, we

6  have Dr. Mundy's declaration and he says one of ordinary skill

7  in the art would understand that it is also specified that

8  when the operator indicates a feature in the first view the

9  display --

10          THE COURT:  Counsel, slow down.

11          MR. CUTRI:  Sorry.

12          THE COURT:  She's really good, but nobody is that

13  good.  Go slower.

14          MR. CUTRI:  Indicates a feature in the first view of

15  the display of the corresponding -- in the first view the

16  display of the corresponding feature in the second view occurs

17  simultaneously.

18      They're clearly trying to put that same requirement in

19  here.

20      We have on 174 the same slides that I showed you

21  previously showing you that Figure 7A does not have wire

22  frames in the other images, so it would be impossible to have

23  the change to the second line drawing appearing in a second

24  line drawing because it hasn't yet been displayed.

25      I showed you on previously on 7B that of course we know

*United States District Court*
*Camden, New Jersey*

1   that the line drawing -- the wire frame can be modified by a

2   user.

3        I am pointing out here that in their brief on 176, they

4   say, you know, a fundamental aspect of the so-called invention

5   of, I think they're talking about the '152 here, and

6   italicized, in all embodiments is the ability to concurrently

7   display features in two or more images, so that as the user

8   indicates features in one image, those changes are

9   concurrently displayed in other images.

10       But it's not in all embodiments, that functionality is

11   not in all embodiments, and putting Figure 7A on here because

12   that is an embodiment without concurrent display.

13       We have the same claim differentiation concept in the

14   '152.  I think your Honor and Mr. Christi were discussing this

15   Claim 4 where there is displaying the feature in the first

16   aerial image as a first time, displaying a feature in the

17   second aerial image at a second time that is substantially

18   coincident to the first time.

19       What I'll note about this is putting aside whether

20   substantially coincident and simultaneous are the same, this

21   substantially undermines their claim that in the '152 patent,

22   because there is a displaying of projection from the 3D model

23   as a single step, it therefore must occur simultaneously.

24   Because what Claim 4 is telling you that there is displaying

25   the feature from the first aerial image at a first time and

1   displaying the feature in the second aerial image at a second

2   time.  Now, whether it's substantially coincident, I think

3   your Honor suggested that that might not be the same thing as

4   simultaneous.  If it does mean the same thing as simultaneous,

5   that would make their -- that would violate claim

6   differentiation.  If it doesn't, that supports our view, and I

7   think it does, that something can happen in first line drawing

8   a first time and then be displayed in the second line drawing

9   at a second time.

10          And so, again, 178, this is the same table, if you

11   will, of their citations to what they say are concurrent

12   display.  And in every instance I'm showing that what they've

13   omitted is the fact that they describe the embodiment, but the

14   page number on the left side of the scene is all that changed

15   because now we're talking about the '152 patent.

16          And so when we get to 180, they also have the

17   prosecution history estoppel.  And, again, I've taken their

18   brief and they said, in addition to the claims and the

19   specification, Xactware's proposed construction and also

20   supported by the '152 Patent's prosecution history.  During

21   prosecution, Eagle View distinguished its invention from prior

22   art by stating that the art did not display projections of

23   features on first and second aerial images.

24          Then they say, there are no figures of Pershing et al.

25   that show a projection of a feature onto any aerial images,

*United States District Court*
*Camden, New Jersey*

1   let alone a projection of a feature from a modified

2   three-dimensional model of a roof.

3        If this was a true prosecution history disclaimer, what

4   you would expect the patentee to be saying is our invention is

5   different from the prior art because we only always

6   simultaneous display.  That's not what you see.  I haven't

7   altered anything, that's their parenthetical and you can read

8   it, and if that's their best evidence that there's a

9   disclaimer, it's not a disclaimer.  The federal circuit has

10  said repeatedly if you're going to read something out of the

11  patent that's a dramatic step, and if you're going to do that

12  based on the prosecution history, there has to be a clear

13  unmistakable disavowal of claim scope, and that is not what's

14  in that parenthesis.

15       I'm going to touch on the '737.  If you were to flip

16  through these slides, you would see very much the same

17  references to Figure 7A, the fact that the prosecution history

18  doesn't support this addition.

19       But let me take you to what I think is the fundamental

20  problem with their approach to the '737 patent.

21       What I've done is I've taken the claim language on the

22  left that the defendants want you to construe and then I've

23  shown you on the right the construction they're proposing.

24  There's kind of a lot of things being cut out here and at the

25  end it's sort of the same kind of simultaneous display change.

1    But here's what happened -- here's what I understand

2 the defendants to be asking the Court to do.  If I go to the

3 next slide, 183, what the defendants appear to have done is

4 taken part of asserted Claim 8 at the top, on 183, the "making

5 corresponding changes" from Claim 8, then they've taken part

6 of the "displaying corresponding changes to the line drawing"

7 language of Claim 25.  Now, these are two different -- these

8 are about making corresponding changes and displaying

9 corresponding changes.  But then what they do is they take an

10 unasserted Claim 26, this is a claim that we're not alleging

11 in this case, and they take that and they say, well, that's a

12 changing, by the computer system of the roof estimate report,

13 a line in a second line drawing that corresponds to the same

14 feature in the first line drawing that was changed, the change

15 in the second line drawing being make by the computer system

16 in response to the change that was made in the first line

17 drawing.

18    That language should sound familiar to you because it's

19 kind of similar to what's in the '454 and the '152, but it's

20 not in any of the asserted claims in this case.  And so what

21 they're doing -- and then you look their construction and what

22 they do is they take that unasserted language, they poured it

23 over to their construction, they strike out all of the other

24 language that was in the asserted claims and they strike out

25 some more, including the same kind of deletion to the

1    relationship between the user making a change in the computer

2    making a corresponding change and they add in their

3    simultaneous display requirement.

4         The reason this is problematic is because the federal

5    circuit has said over and over and over if you're going to

6    construe claims, you start with the language of the claim

7    that's at issue.  And I don't believe I've ever seen a case

8    where someone says, well, I know that the claim that we're

9    talking about says something, but I'm going to take you to a

10   claim that we're not talking about in this case and I want you

11   to take that language and I want you to put it into the claim

12   that we're talking about.  There's a good reason for that,

13   because people write different claims when they're claiming

14   their invention, they have different species and ways of

15   expressing it.

16        So the remainder of '737 argument is essentially the

17   same.  If you just flip through, you'll see it's got a lot of

18   familiarity, should have a lot of familiarity of the issues

19   we've already talked about in Figure 7A, their same effort to

20   just pull out examples as what the claim should be limited to.

21   And then they have a claim -- prosecution history disclaimer

22   argument that I don't think is compelling for the same reasons

23   we've already discussed.

24        I would like to, since we haven't heard about the '737

25   or I haven't heard the defendants' position, I would like to

1    reserve the ability to respond at least to that issue of what

2    claim language could we possibly be construing in a way that

3    would be faithful to what the federal circuit said to do when

4    you construe claim language in the '737.

5            THE COURT:  Thank you.

6            MR. CHRISTIE:  Whenever you're ready, your Honor.

7            THE COURT:  Go ahead, please.

8            MR. CHRISTIE:  Thank you.

9         In order to try and make things less confusing, Judge,

10    I'll finish up on the '152 patent and then go onto the '454

11    and finally the '737, with the Court's permission.

12            THE COURT:  Sure.

13            MR. CHRISTIE:  So, you know, you heard from Mr. Cutri

14    about the '152 patent.  And, frankly, Judge it might be easier

15    for me to address some global issues, they have global

16    concerns and global issues with the three of these patents,

17    which again are part of the same patent family and,

18    accordingly, need to be construed consistently, so it might

19    save some time and I'll try to do that by trying to address

20    them globally.  And then perhaps when I'm in the '454 and

21    '737, if there's more that needs to be said, I will say it.

22         Number one, we are not deleting claim language, Judge,

23    that seems to be a consistent theme here, we are suggesting

24    claim language which narrows and the scope and is more

25    precise.  We're not saying change are not made in response,

1   we're not saying that they happen simultaneously, that they

2   happen concurrently.  Big difference.  So to say that we are

3   deleting things does not make sense here.

4        We've touched on and you heard me predict that they

5   would glorify Figure 7A, and they did.  And again, for the

6   reasons that you understand, Judge, it's not relevant here.

7   We are not excluding an embodiment that makes sense in this

8   context.  It is in the model review process after the wire

9   frame has been created and there's a review.  It's not the

10  creation because, as you've seen, Judge, when we're talking

11  about the claims that are at issue here, we're in the model

12  generation, the model creation, the model construction phase.

13  It's timing.  It's time based.

14       We talked also about the claim differentiation issues,

15  and I'll get to that in some of the other patents as well.

16  But Mr. Cutri basically says, you know, you lose either way,

17  heads I win, tails you loss because dependent Claim 4 if

18  substantially coincident, whatever that means, is not the same

19  as simultaneous, you lose.  And if it is the same, you lose

20  because of claim differentiation.  Nonsense.

21       Substantially coincident, whatever that may mean, is

22  not the same as simultaneous or concurrent.  And claim

23  differentiation, which again is a presumption, doesn't come

24  into play.  But even if someone were to think otherwise, there

25  is abundant, as we've seen, evidence which shows the

1    concurrency and the automatic display.

2         You saw Mr. Cutri also talk a lot about exemplary

3    embodiments.  They don't say that this is an exemplary

4    embodiment, Figure 11, Figure 6A through D.  Yes, the language

5    is there, Judge, in the patent.  They say things like this is

6    an example of this, this is an example of that.  But it's the

7    only example, it's only embodiment, Judge.  So even though

8    they may use those prefatory words, exemplary embodiments,

9    it's what the specification teaches, and it's the only thing

10   the specification teaches in the context that we are talking

11   about, the simultaneity, the automatic, the concurrent.

12        So with that having been said, why don't I delve into

13   the '454 a bit and we can talk a bit about the '737.

14        So I specifically focused on the '152, Judge, because

15   that dealt with display, displaying a projection.  These last

16   two claims deal with changing, we're dealing with a change

17   here -- a changing, by the computer system of the roof

18   estimate report system, a line in the second line drawing that

19   corresponds to the same feature in first line drawing that was

20   changed by the user, the change in the second line -- strike

21   that.  The change in the second drawing being made by the

22   computer system in response to the change that was made by the

23   user in first line drawing.  And again, this is Claims 26 and

24   33 of the '454 patent.

25        Again, Judge, this drives home the reality of what

1   we're dealing with.  We're talking about a computer system and

2   we're talking about a user who is making changes.  Your Honor

3   gets it.  If you have a user in front of -- an interface

4   making changes, of course the user is going to expect and the

5   changes are going to be simultaneous, otherwise, how is the

6   user going to make successive changes.  It's like slow dial up

7   for Internet, you wait and you wait and you wait.

8   Fortunately, we have Wi-Fi and fast Internet now, but the

9   expectation is that it's going to be instantaneous, it's going

10  to be simultaneous, it's going to be concurrent with regard to

11  the ability to make successive changes.  That's what we're

12  talking about.  That's what a computer system does.  That's

13  what a user expects.  And that's what a person of ordinary

14  skill in the art, most importantly, understands the term to

15  mean.

16        So again, Judge, the change that we are requesting to

17  make things clearer is the last clause, which adds the

18  language "so that the computer system simultaneously displays

19  the changes in both the first line drawing and second line

20  drawing."  Again, simultaneity, concurrence.

21        Again, Judge, without belaboring it, that's how they

22  titled the patents, concurrent display, doesn't get much clear

23  than that.

24        But then let's look at the claim language.  And

25  specifically I'm focusing your Honor's attention to Slide No.

1    61, which talks about Claim 26 of the '454 patent.

2          And you see, Judge, as is abundantly clear here, that

3    we're talking about a several step process.  We're talking

4    about and I'm referring to the language that is boxed on that

5    slide.  We have a user change to the line in the first line

6    drawing, in essence, that is something that automatically

7    triggers the corresponding change to the second line drawing.

8    Again, that the correspondence that we dealt with regard to

9    the line drawing terms that we dealt with.  You make a change

10   in the first line drawing and, voilà, automatically you got

11   this corresponding change in the second line drawing.  I don't

12   think there's any dispute, and we certainly don't dispute that

13   that is the case.

14         But what is clear is that these two changes are keyed

15   off of the same conduct, the user input.  So the user is

16   making a change in the first line drawing and then it shows up

17   on the second line drawing.  It seems that, you know, at

18   least -- at the very least from the claim language, that we're

19   talking about simultaneity, we're talking about automatic

20   actions.

21         Again, Judge, as opposing counsel, Mr. Cutri, mentioned

22   to you, and as I did as well, the specifications of these

23   three patents, the '737, the '454, and the '152, are almost

24   identical and have a lot of the same language, including the

25   same figures.  So we're talking also about Figure 11.  And, as

1   you may remember, Figure 11 was the flow chart which talked

2   about concurrent display.  And without belaboring, Judge,

3   because there is some repetition and overlap, on Slide No. 62,

4   I'll just refer your Honor to Column 23, Lines 21 to 28, as

5   well as Column 23, Lines 29 to 39, which again has the same

6   language that we saw in the '152 patent with regard to Figure

7   11 talking about substantially at the same time, simultaneous

8   projection, concurrently display, so it's all there in spades.

9        But I also want to point your Honor's attention to the

10  next slide, again 6A through 6D, again the world of model

11  generation, model construction, not the world of model review

12  where we're talking about the same issues, where the

13  specification says the same things.  And again, without

14  belaboring it and going into great detail over things I've

15  already talked about, in the first substantive bullet point, I

16  guess the second bullet point there, about halfway through the

17  paragraph, I want to point your Honor to Column 14, Lines 39

18  to 41, we talked about in the '152 patent simultaneity of

19  display, but it also carries over to the simultaneity of

20  changes.  And you see the language here making it crystal

21  clear, changes that the operator makes to wire frame 611 are

22  concurrently displayed, the changes are concurrently displayed

23  by the roof estimation system at wire frame 612.

24        And the next bit, the next quote, again from the spec,

25  Column 14, Lines 54 to 57, the concurrently displayed wire

1    frame 612 is an interactive user interface element in that the

2    operator makes changes to wire frame 612 which are then

3    concurrently displayed in wire frame 611.  Changes

4    concurrently displayed.

5            Next slide.

6            The remaining citations I have to the record, Judge,

7    are largely repetitive of those in the '152 patent, also

8    talking about automatic presentation, also talking about

9    concurrent display.  And I won't belabor those, it's in the

10   slides, it's in our brief, and your Honor can review that at

11   his leisure.

12           Again, we have the prosecution history issues, which

13   Mr. Cutri finds unpersuasive.  We obviously disagree.  And

14   again, it's more specifically laid out in greater detail in

15   our moving brief at Page 33.  But just to focus on it briefly,

16   again, we are talking about the Kennedy reference, they have

17   to respond to an office action because the Kennedy reference

18   has been raised to thwart there ability to get a patent so

19   they are contrasting what they do to the Kennedy patent.  And

20   in so doing they are making it clear that we're talking about,

21   in this patent, the '454 patent, we're talking about automatic

22   display, as well as change, concurrent display, concurrent

23   change, and the like.  And I won't belabor that because we've

24   already been over it.

25           And, finally, Judge, it bears mention that at the

*United States District Court*
*Camden, New Jersey*

1  bottom of that slide when they're talking about they're trying

2  to add on Claim 26, they characterize the claim in a manner

3  consistent with our construction and also rely on Figure 6A

4  through 6D, which again is the model construction realm in

5  which we're in, that's in Exhibit B, and that is more

6  specifically called out in our brief.

7       Also, I would be remiss if I didn't mention that our

8  expert, Dr. Mundy, Paragraphs 124 through 128 of his

9  declaration, specifically references this issue, an operator

10  changes in the first line drawing -- operator changes in the

11  first line drawing result in, quote, simultaneous changes

12  across views of the 3D model to the second line drawing.

13       He's a person of ordinary skill in the art.  He knows

14  this backwards and forwards and, you know, he concurs with

15  what is in the specification, what is in the claims with

16  regard to the concurrency with regards to the automatic

17  simultaneity.

18       Again, there are these other issues that Mr. Cutri

19  raised about claim differentiation and again, he points to

20  Claim 29 which talks about substantially concurrent.

21       Okay.  Substantially concurrent, substantially

22  coincident, we saw that.  Whatever does that mean?  Aside from

23  being indefinite, it sure isn't the same thing as

24  simultaneous.

25       So we don't have a claim differentiation issue because

1    we don't have that issue where the dependent claim can be read

2    into the independent claim.  So that's not a point that is

3    worthy of your attention, Judge, and -- but even if it was,

4    again, it's a presumption.

5          The Federal Circuit makes it clear that claim

6    differentiation is not automatic, yes or no, it is a

7    presumption, and a presumption can be overwrought, overwhelmed

8    as it is in this case, with the specification evidence that

9    demonstrates automatic, simultaneous, concurrent display and

10   change.

11         We also have the issue of deleting text.  And again, as

12   I've indicated, this is not deletion of text.  We are not

13   deleting text, we are capturing and keeping the text, the

14   spirit of the text that's there, but again, making clear, as

15   we must, because there is only one embodiment that deals with

16   this issue, and it deals with simultaneity and automatic

17   display and changes, that that is included and made clear,

18   especially from the perspective of a user who demands it and

19   would not have it any other way.  As well as the perception of

20   a person of ordinary skill in the art.

21         So, you know, Judge, they try mightily, you know, to

22   raise up these roadblocks with regard to our construction, you

23   know.  They, you know, barely acknowledged the fact that the

24   specification is replete -- replete with all of these

25   references to automatic display, automatic change,

190

1   simultaneity, concurrence.  It's there.  They don't want to

2   focus on it.  They want to go through and focus on

3   abstractions, because they realize that at the end of the day,

4   when you look at it, that is what controls here, that guides

5   the person of ordinary skill in the art to understand that

6   when we're talking about displaying, when we're talking about

7   changing, we're talking about something that happens

8   automatically, simultaneously and concurrently.

9        Finally, Judge, it might make sense for me just to

10  focus on the '737 Patent, if it's okay with Your Honor, and

11  I'll quickly go over that.

12       Again, much in the way of overlap.  And for that -- for

13  that claim, we're talking about the '737 Patent, Claims 1, 8

14  and 25.  8 and 25 are in case Claim 1 as a dependent -- sorry,

15  an independent claim from which they depend.  Again, the issue

16  is that we have claim language saying, quote:  Making

17  corresponding changes, comma, by at least one processer of the

18  roof estimate report system, comma, to the line drawing

19  overlaying the second aerial image, as well as displaying

20  corresponding changes to the line drawing overlaid on the

21  second aerial image.

22       So again, we're talking about change, we're talking

23  about corresponding change.  And again, we acknowledge that

24  there are corresponding changes as we've discussed when we

25  were dealing with the line drawing terms.

1       Not surprisingly, Judge, our construction for the

2  purpose of focussing and narrowing is the same as you've seen

3  in the past.  We seek to add language to indicate the last

4  clause, so that the computer system displays the changes in

5  the second line drawing as the user changes the feature on the

6  first line drawing.  Again, demonstrating the automatic

7  nature, the concurrence and the simultaneity.

8       Again, this patent is well -- they're all labeled and

9  titled concurrent display.  It speaks volumes.

10      But let's talk a little bit about the claim language

11  and I'm specifically referring to Slide No. 69, where we talk

12  about Claim 1 of the '737 Patent.  And again, this is, you

13  know, a common theme that we've seen just for the '454 Patent.

14  It's a stepped process.  Again, we've got the user input,

15  changing the first line drawing and, voilà, automatically

16  triggering the corresponding change to the second line

17  drawing.

18      So again, we have that simultaneity, which is clear

19  from a logical perspective, clear from the perspective of a

20  person of ordinary skill in the art resplendent here in

21  Claim 1.

22      Next slide, please.  And again, let me focus your

23  attention to Claim 16.  Again, Judge, we have the issue of

24  concurrent display, and that's called out clearly in the claim

25  language itself, and you will see that it is in response to

1  changes in the line drawing overlaid on the first aerial

2  image.

3      Again, we have the correspondence, the changes to the

4  first line drawing automatically reaching out and touching the

5  second line drawing and making those same changes.

6      Again, I won't belabor it, Judge, Figures 11 and

7  Figures 6A through 6D, again, because specification is largely

8  the same amongst -- between and amongst these three patents.

9  You will find the same language, you will find the same

10 figures and I will not belabor it because Your Honor can look

11 at that when you wish.

12     But again, simultaneous projection is talked about,

13 concurrent display is talked about all over the place, and,

14 you know, that is the issue here.  That is the guidance that

15 is provided by this specification as to how and under what

16 circumstances we have the display and we have the change.

17     Finally, Judge -- close to finally, we have, you know,

18 further evidence in the '737 Patent.  I'll specifically refer

19 you to Column 3, Lines 28 to 32, where we've got a user

20 interface of the system currently displaying features, okay.

21 And even more.  Column 5, Lines 49 through 63, we've got an

22 operator indicating a feature, the feature is simultaneously

23 projected in the multiple image views.

24     Okay.  We've got simultaneity down pat as well.

25     And just to drive home the point, Judge, again, these

1    three patents are all in the same family, all share the same

2    common specification, so it's important that there be

3    consistency between and among the construction for all three

4    of them.

5            Finally, as more precisely laid out in our opening

6    brief at Page 39, we have a person of ordinary skill in the

7    art, Dr. Mundy, specifically at Paragraph 136, in which he

8    echos the fact that there is simultaneity of changes, and I

9    won't belabor that because it's there, and you can review it

10   when you wish.

11           Finally, and I do mean finally at this stage, we have

12   the same issues that we've addressed in the past.  We are not

13   deleting claim language.  We are puzzled by this argument that

14   we are trying to adapt on asserted Claim 26.  You know, we are

15   not trying to shoehorn any particular unasserted claims into

16   this.  We are being guided by the entirety of the

17   specification in order to limit and narrow the scope, which

18   otherwise would be confusing and unduly broad.  So a little

19   unclear as to what Mr. Cutri means by that.

20           And again, we have the same unmeritorious claim

21   differentiation issues, we've got the substantially

22   coincidence.  Nonsense again, which I've already discussed and

23   I don't need to say any further words about them.

24           They've got the dependent Claim 21, which talks about

25   displaying, substantially at the same time as receiving.

1    Here, we're not talking about displaying at substantially the

2    same time as receiving, we're talking about simultaneous

3    display to images.  There's no receiving element to it.

4        So again, their claim differentiation argument holds no

5    water.

6        With that, Judge, I just want to end with saying, it's

7    important, as Your Honor knows, to think about this from the

8    perspective of a person of ordinary skill as we must, the user

9    as we must.  This is a computer system.  This is displays of

10   side-by-side images, making changes to one, having them appear

11   on the other, and it's a no-brainer, Judge.

12       Logic dictates that it must be simultaneous when you

13   are doing the model construction, the model generation, which

14   is where we are at now.  Again, we are not in the model review

15   world, so Figure 7A and the supporting specification with

16   regard to interpreting that figure has no merit here and

17   should be disregarded.  Thank you.

18       THE COURT:  Thank you.

19       MR. CUTRI:  Your Honor, I'll -- we appreciate the

20   Court's time and attention today, and if we don't get a chance

21   to say so, I'll say so on behalf of the entire team and I

22   think on behalf of both parties, we really appreciate the

23   Court's efforts and, of course, the Court's staff as well.

24       THE COURT:  That's what you pay us for.

25       (Laughter.)

*United States District Court*
*Camden, New Jersey*

1        THE COURT:  We're here to serve.

2        MS. WALSH:  Not a lot, though.

3        THE COURT:  It is what it is.

4        MR. CUTRI:  Well, Your Honor, I'll be as brief as I

5   can.  First, on the deletion issue, there's definitely -- if

6   we go to Slide 153, I think I heard opposing counsel say we're

7   not deleting text.  On Slide 153, they most assuredly are

8   deleting text.  They're saying they don't have a problem with

9   the concept being in the claim, so I think the better course

10  and certainly the Federal Circuit's guidance would be to not

11  change something, especially where the other side or where the

12  proponent of the construction openly admits that that concept

13  should be captured and left in the claim.

14        On excluding the embodiment, excluding 7A, which I'll

15  go to one -- Slide 162, if we could.

16        Actually, on 156, this embodiment that we have talked

17  about a number of times, what opposing counsel has said is, at

18  the very end, we should just disregard this.  That was the

19  very last thing he said, we should just disregard it, and I

20  think his position is -- the defendant's position is we're in

21  -- we're in model generation world, not model review world.

22  The claims don't say anything about this should be limited to

23  a model review or this should be limited to a model

24  generation.

25        There's nothing in the claim language that would compel

*United States District Court*
*Camden, New Jersey*

1    you to say, well, I'm just going to decide that this

2    particular claim is only applicable in this one narrow

3    circumstance and I don't -- and the Federal Circuit is

4    certainly very clear about not departing from claim language

5    unless it's absolutely required in very narrow circumstances.

6         I did not hear anything from opposing counsel on this

7    issue, which is on 162, the fact that there is explicitly

8    described in a dependent claim -- in a dependent claim that

9    you can display a second line drawing overlying the second

10   aerial image on the same display at a later time.

11        There was nothing in -- defendants simply don't have a

12   response to the fact that a dependent claim is -- actually

13   completely contradicts their claim construction.

14        There are -- there were a number of references to the

15   fact that there were multiple examples of concurrent display.

16   The defendants say, look, there are a number of examples of

17   concurrent display.  We don't disagree with that.  Even if

18   there were only examples of concurrent display, that would

19   still not be sufficient to limit this claim in that way

20   because the Federal Circuit on 163 say that the specification

21   and prosecution history only compel departure from the plain

22   meaning in two instances.

23        So, in other words, you don't impose a requirement, you

24   don't write in new claim language by way of a construction

25   unless you're in two narrow circumstances:  One, is the

1   patentee acting as their own lexicographer and saying, here is

2   my definition of the display requirement.  Display means

3   displaying simultaneously.  There's no glossary like that.

4        And then, two, was there anything in the file history

5   where the applicant said, I am disclaiming everything except

6   simultaneous display.

7        And this isn't a situation where the embodiment 7A or

8   the embodiments they're talking about are informing claim

9   language, the simultaneous embodiments.  They're just taking

10  that embodiment, they're just taking the simultaneous display

11  embodiment and they're saying, just put it into the claim.

12       And so I think with that, unless Your Honor has further

13  questions, I can conclude.

14       THE COURT:  I don't have any further questions.

15  Thank you.

16       MR. CUTRI:  Thank you.

17       THE COURT:  Is there anything else that counsel want

18  to --

19       MR. ALPER:  Nothing from us.  Nothing from us, Your

20  Honor.

21       THE COURT:  -- talk about?

22       MR. CHRISTIE:  Nothing from defendants, Your Honor.

23  Thank you.

24       THE COURT:  All right.  I almost hate to ask this

25  question though, are you seeking leave to submit anything

1  further in writing?

2       MR. ALPER:  No, Your Honor, not from us.

3       MR. CHRISTIE:  No, Judge.  We will rest on our briefs

4  and our submissions.  Thank you.

5       THE COURT:  Thank you.  Well, let me first thank

6  counsel.  That was a -- that was a real education.  I actually

7  thought that this technology is very interesting stuff, and I

8  want to thank the experts for explaining the technology and

9  the history of this technology.  That also was very

10  interesting to me.

11       And counsel, you did a great job presenting the issues

12  to the Court.  I am going to issue a written opinion in due

13  course in this.  I don't -- I mean, thank you for narrowing

14  the issues.  I mean, I've had some of these where there's

15  hundreds of disputes between counsel, and this is relatively

16  manageable.

17       So I don't imagine this is going to take too long for

18  me to get back to you.  But my initial impressions remain, and

19  that is, I do think that many of these terms are not

20  ambiguous, and don't require the Court to do a lot of

21  construction of them.

22       But as I said, you will get something from me in

23  writing.  Thank you very much.  I'll be in touch.

24       RESPONSE:  Thank you, Your Honor.

25       (4:51 p.m.)

*United States District Court*
*Camden, New Jersey*

## '

**'152** [26] - 153:19, 154:13, 156:12, 159:5, 160:17, 164:11, 172:13, 173:21, 173:22, 173:24, 174:1, 174:14, 174:15, 176:5, 176:14, 176:21, 177:15, 177:20, 179:19, 181:10, 181:14, 183:14, 185:23, 186:6, 186:18, 187:7
**'154** [1] - 174:1
**'376** [2] - 90:10, 94:17
**'436** [3] - 64:2, 70:1, 75:24
**'454** [26] - 139:13, 141:22, 149:10, 149:16, 150:1, 151:23, 153:5, 153:19, 160:6, 162:14, 162:21, 163:5, 169:12, 172:12, 172:13, 172:16, 173:25, 179:19, 181:10, 181:20, 183:13, 183:24, 185:1, 185:23, 187:21, 191:13
**'60s** [1] - 47:4
**'737** [26] - 26:20, 149:11, 149:16, 151:19, 151:22, 152:2, 153:19, 162:16, 164:15, 172:13, 174:2, 174:3, 178:15, 178:20, 180:16, 180:24, 181:4, 181:11, 181:21, 183:13, 185:23, 190:10, 190:13, 191:12, 192:18
**'749** [5] - 74:15, 74:18, 74:19, 74:24, 75:4
**'770** [7] - 113:5, 113:7, 114:18, 118:17, 126:11, 127:19, 137:11
**'840** [13] - 90:10, 91:5, 92:21, 94:14, 94:17, 94:19, 97:5, 98:7, 100:11, 105:20, 110:11, 112:4

## /

**/S** [1] - 1:24

## 0

**08101** [1] - 1:8

## 1

**1** [22] - 20:22, 55:24, 67:23, 91:5, 98:7, 104:3, 112:4, 113:6, 113:7, 114:13, 114:19, 114:20, 115:3, 137:2, 151:19, 152:2, 156:12, 172:7, 190:13, 190:14, 191:12, 191:21
**10** [4] - 23:2, 54:5, 55:8, 153:6
**100** [1] - 125:25
**101** [2] - 62:15, 127:5
**102** [1] - 127:9
**103** [1] - 127:13
**104** [1] - 127:16
**105** [1] - 128:1
**106** [1] - 128:15
**108** [2] - 129:2, 129:13
**109** [1] - 129:23
**10:26** [1] - 32:16
**10:34** [1] - 32:17
**11** [9] - 79:17, 158:7, 183:4, 185:25, 186:1, 186:7, 192:6
**110** [1] - 130:16
**112** [2] - 130:21, 130:22
**113** [3] - 132:20, 133:11, 133:20
**114** [2] - 22:18, 133:25
**116** [1] - 134:16
**117** [1] - 134:23
**119** [1] - 139:14
**11th** [1] - 10:11
**12** [24] - 1:8, 4:2, 21:24, 22:1, 23:2, 23:3, 27:6, 54:6, 55:8, 66:19, 72:12, 77:9, 113:6, 114:17, 115:3, 116:4, 130:25, 131:2, 131:13, 131:16, 134:6, 137:2, 138:2
**120** [2] - 22:17, 139:17
**121** [1] - 139:22
**123** [1] - 140:10
**124** [2] - 140:15, 188:8
**1254** [1] - 148:11
**128** [1] - 188:8
**12:45** [1] - 112:20
**12:46** [1] - 112:21
**12th** [1] - 10:11
**13** [5] - 64:6, 138:13, 153:6, 159:6, 159:8
**133** [2] - 141:12, 152:21
**135** [1] - 142:3
**136** [2] - 144:17, 193:7
**14** [13] - 2:4, 13:24, 39:20, 92:22, 100:12, 105:20, 126:12, 127:19, 141:22, 150:1, 158:19, 186:17, 186:25
**140** [1] - 143:20
**149** [2] - 162:12, 162:13
**15** [5] - 2:5, 65:1, 94:15, 94:19, 110:12
**15-minute** [1] - 174:4
**153** [3] - 163:15, 195:6, 195:7
**156** [2] - 164:19, 195:16
**157** [1] - 168:2
**159** [1] - 168:13
**16** [2] - 134:15, 191:23
**160** [1] - 169:4
**161** [1] - 169:9
**162** [4] - 166:19, 167:2, 195:15, 196:7
**163** [2] - 170:4, 196:20
**164** [1] - 170:11
**165** [1] - 170:22
**167** [1] - 172:7
**168** [1] - 172:21
**169** [1] - 173:11
**17** [2] - 66:3, 138:13
**1702** [2] - 43:1, 59:1
**173** [1] - 175:5
**174** [1] - 175:20
**176** [1] - 176:3
**178** [1] - 177:10
**18** [1] - 67:23
**180** [1] - 177:16
**183** [2] - 179:3, 179:4
**1868** [1] - 45:18
**1883** [1] - 45:12
**1966** [1] - 46:5
**1985** [1] - 47:16
**1986** [1] - 35:4
**19th** [1] - 43:13
**1:15-cv-07025-RBK-JS** [1] - 1:4
**1:30** [1] - 112:20
**1:33** [1] - 112:23

## 2

**2** [5] - 10:8, 10:12, 57:9, 74:24, 172:7
**20** [4] - 3:6, 13:20, 13:21, 138:12
**2005** [1] - 49:7
**2006** [2] - 19:20, 35:18
**2008** [7] - 10:13, 31:8, 34:19, 35:22, 36:7, 36:11
**2009** [1] - 31:11
**2013** [1] - 119:2
**2016** [1] - 12:11
**2017** [3] - 1:8, 4:2, 12:12
**21** [5] - 66:10, 107:22, 158:19, 186:4, 193:24
**22** [4] - 33:7, 68:21, 77:15, 158:19
**23** [5] - 153:5, 158:18, 158:19, 186:4, 186:5
**24** [6] - 21:9, 67:9, 94:19, 105:21, 110:12, 161:10
**25** [4] - 40:10, 179:7, 190:14
**26** [9] - 139:13, 163:4, 166:20, 169:12, 179:10, 183:23, 185:1, 188:2, 193:14
**27** [1] - 104:11
**28** [4] - 1:23, 68:15, 186:4, 192:19
**288** [1] - 22:18
**29** [3] - 169:13, 186:5, 188:20
**2D** [9] - 58:16, 59:6, 60:23, 61:3, 102:17, 102:21, 106:19, 109:5, 136:21

## 3

**3** [1] - 192:19
**30** [2] - 30:20, 69:1
**31** [6] - 31:6, 31:11, 114:9, 166:20, 167:4, 169:22
**32** [4] - 77:15, 136:24, 158:19, 192:19
**33** [4] - 53:20, 115:15, 183:24, 187:15
**34** [1] - 68:22
**35** [4] - 15:17, 39:19, 40:7, 141:22
**36** [2] - 68:22
**37** [2] - 67:19, 72:16
**38** [1] - 2:6
**39** [5] - 2:7, 141:22, 186:5, 186:17, 193:6
**3:15** [1] - 174:5
**3D** [67] - 41:7, 41:8, 41:9, 41:20, 41:25, 42:15, 43:2, 43:11, 43:19, 44:1, 44:10, 44:15, 45:9, 45:24, 46:7, 46:19, 46:20, 46:22, 46:23, 47:6, 47:11, 47:13, 47:15, 47:19, 47:22, 47:25, 48:5, 48:8, 48:16, 48:19, 48:21, 48:24, 48:25, 49:4, 50:3, 50:11, 51:9, 53:7, 53:25, 56:25, 58:2, 58:16, 59:6, 59:14, 59:23, 61:2, 61:3, 61:5, 74:21, 78:21, 79:14, 79:22, 102:8, 102:16, 102:22, 106:18, 106:19, 109:1, 109:5, 113:15, 136:21, 141:17, 176:22, 188:12

## 4

**4** [10] - 10:25, 27:5, 27:6, 100:12, 134:7, 158:3, 161:1, 176:15, 176:24, 182:17
**400** [1] - 165:1
**402** [2] - 165:2, 165:4
**406** [1] - 165:2
**407** [1] - 104:25
**41** [1] - 186:18
**42** [1] - 150:9
**47** [2] - 154:17, 154:18
**48** [4] - 21:9, 81:2, 81:20, 155:3
**49** [4] - 82:5, 150:1, 159:6, 192:21
**4:51** [1] - 198:25
**4TH** [1] - 1:7

## 5

**5** [9] - 11:11, 97:5, 97:16, 98:19, 101:4, 103:3, 158:3, 192:21

**5's** [2] - 101:4, 101:5
**50** [3] - 82:13, 107:8, 156:25
**51** [3] - 82:21, 126:12, 157:23
**510** [1] - 88:8
**510D** [1] - 82:8
**52** [1] - 83:2
**520** [1] - 88:15
**53** [1] - 158:18
**54** [2] - 83:18, 186:25
**55** [2] - 84:25, 159:18
**56** [3] - 78:11, 85:1, 159:6
**57** [2] - 86:2, 186:25
**57B** [1] - 96:12
**58** [1] - 86:8
**59** [2] - 87:5, 87:11
**5A** [6] - 94:9, 94:12, 94:25, 105:4, 110:13, 110:17
**5B** [9] - 26:20, 81:22, 82:9, 88:6, 88:9, 102:25, 103:4, 103:6, 104:13
**5C** [3] - 82:15, 88:14, 104:14
**5D** [8] - 26:21, 81:23, 82:15, 94:25, 102:25, 105:5, 110:13, 110:17

---

**6**

**6** [3] - 11:24, 78:10, 158:3
**60** [1] - 88:2
**61** [2] - 88:13, 185:1
**610** [2] - 99:6, 100:4
**611** [11] - 99:5, 120:23, 125:15, 125:17, 125:18, 126:3, 126:7, 128:4, 129:14, 186:21, 187:3
**612** [22] - 88:21, 88:22, 89:1, 89:3, 92:21, 92:23, 92:25, 95:5, 110:20, 120:25, 121:14, 121:17, 125:20, 126:2, 126:5, 126:6, 128:5, 129:15, 141:23, 186:23, 187:1, 187:2
**616** [1] - 148:11
**62** [2] - 88:20, 186:3
**63** [1] - 192:21
**64** [2] - 89:22, 159:8

**66** [2] - 112:1, 112:3
**67** [5] - 78:11, 91:14, 91:15, 158:3, 159:8
**68** [1] - 92:8
**69** [3] - 92:19, 110:19, 191:11
**6A** [8] - 95:3, 105:10, 110:14, 159:2, 183:4, 186:10, 188:3, 192:7
**6B** [30] - 98:16, 99:4, 99:5, 99:9, 99:18, 99:20, 99:21, 100:18, 101:3, 101:6, 105:18, 105:19, 105:22, 106:1, 120:21, 120:22, 121:1, 121:14, 126:3, 128:4, 131:14, 131:16, 131:19, 131:25, 132:4, 132:9, 137:7, 137:10
**6C** [31] - 81:23, 88:20, 89:3, 92:21, 93:2, 95:3, 98:13, 98:16, 98:23, 98:25, 101:3, 103:1, 103:8, 110:18, 110:19, 120:21, 120:25, 121:1, 121:14, 125:14, 125:21, 126:2, 128:6, 131:15, 131:16, 132:1, 132:4, 132:9, 137:8, 137:10
**6D** [7] - 95:3, 105:10, 110:15, 159:2, 186:10, 188:4, 192:7

---

**7**

**7** [5] - 12:18, 89:18, 104:15, 121:13, 150:1
**70** [1] - 93:4
**708** [1] - 165:5
**71** [1] - 93:15
**710** [6] - 89:11, 89:16, 89:19, 95:18, 96:13
**710a** [2] - 165:14, 165:15
**7111** [1] - 26:25
**72** [3] - 94:1, 110:7, 110:11
**73** [1] - 95:15
**74** [1] - 96:7
**753** [1] - 1:23
**76** [2] - 96:22

**77** [1] - 97:4
**79** [1] - 99:3
**7A** [29] - 89:9, 89:13, 161:21, 161:23, 162:2, 162:3, 162:24, 164:20, 164:22, 164:23, 164:25, 165:25, 166:1, 166:14, 171:19, 171:20, 172:12, 175:21, 176:11, 178:17, 180:19, 182:5, 194:15, 195:14, 197:7
**7B** [20] - 26:21, 26:22, 81:25, 89:9, 89:10, 89:12, 89:18, 93:5, 94:20, 96:13, 101:4, 104:22, 104:23, 165:6, 165:9, 165:12, 175:25
**7C** [1] - 99:18

---

**8**

**8** [13] - 12:20, 57:8, 64:15, 67:7, 68:21, 73:1, 76:2, 76:11, 156:13, 179:4, 179:5, 190:13, 190:14
**80** [1] - 100:9
**82** [1] - 101:9
**88** [2] - 120:9, 120:19
**89** [1] - 121:12

---

**9**

**9** [3] - 13:16, 78:10, 118:18
**93** [1] - 121:24
**95** [1] - 123:11
**96** [1] - 124:9
**97** [1] - 124:18
**98** [2] - 124:23, 160:12
**99** [1] - 160:12
**9:45** [1] - 4:2

---

**A**

**a.m** [3] - 4:2, 32:16, 32:17
**ability** [5] - 121:6, 176:6, 181:1, 184:11, 187:18
**able** [10] - 19:9, 46:2, 59:5, 59:13, 61:12,
72:11, 77:10, 117:4, 140:6, 140:8
**absence** [2] - 133:12, 133:14
**absent** [2] - 87:23, 146:19
**absolute** [1] - 17:4
**absolutely** [3] - 68:24, 70:17, 196:5
**abstractions** [1] - 190:3
**abundant** [2] - 154:11, 182:25
**abundantly** [1] - 185:2
**academic** [1] - 40:8
**access** [2] - 16:24, 17:17
**accesses** [1] - 87:9
**accidentally** [1] - 144:6
**accolades** [1] - 12:14
**according** [3] - 90:8, 90:14, 127:11
**accordingly** [1] - 181:18
**account** [1] - 52:24
**accuracy** [5] - 26:10, 28:23, 28:24, 121:6, 126:23
**accurate** [4] - 23:15, 30:1, 74:13, 78:16
**accurately** [2] - 31:16, 61:5
**accustomed** [1] - 16:8
**achieve** [1] - 28:24
**acknowledge** [5] - 73:4, 146:13, 146:23, 148:4, 190:23
**acknowledged** [4] - 148:25, 151:13, 154:1, 189:23
**acknowledges** [4] - 70:14, 105:23, 153:24, 160:17
**acknowledging** [4] - 13:19, 151:7, 159:25, 160:9
**acknowledgment** [2] - 149:23, 155:24
**ACM** [1] - 15:23
**acquire** [1] - 31:25
**acquired** [1] - 35:18
**acting** [1] - 197:1
**action** [7] - 20:6, 150:10, 150:23, 151:5, 155:21, 160:9, 187:17
**ACTION** [1] - 1:3
**actions** [1] - 185:20

**actual** [11] - 49:22, 53:5, 81:18, 84:5, 95:6, 95:7, 102:16, 134:5, 135:8, 171:22
**Adam** [5] - 4:21, 6:2, 16:14, 17:6, 19:23
**ADAM** [1] - 1:14
**adapt** [1] - 193:14
**add** [21] - 71:25, 72:24, 79:4, 87:8, 97:8, 97:10, 101:17, 109:12, 116:24, 125:1, 135:14, 139:7, 154:16, 155:9, 163:25, 164:5, 169:11, 170:7, 180:2, 188:2, 191:3
**added** [3] - 154:22, 163:22, 174:21
**adding** [5] - 68:4, 97:1, 124:20, 134:21, 164:14
**addition** [12] - 65:25, 70:19, 71:25, 86:18, 89:23, 124:12, 127:5, 127:24, 132:16, 139:23, 177:18, 178:18
**additional** [8] - 67:2, 68:5, 84:15, 91:12, 112:17, 122:23, 124:20, 125:1
**additions** [1] - 84:22, 85:3
**address** [11] - 73:19, 87:1, 103:2, 106:10, 128:14, 131:1, 139:1, 147:7, 162:8, 181:15, 181:19
**addressed** [1] - 193:12
**addressing** [1] - 136:20
**adds** [2] - 97:5, 184:17
**adjunct** [1] - 40:9
**adjust** [8] - 50:17, 50:21, 82:9, 82:16, 88:24, 93:11, 106:22, 107:17
**adjusted** [4] - 50:2, 85:21, 106:16, 134:9
**adjuster** [1] - 30:22
**adjusters** [2] - 18:12, 31:21
**adjusting** [3] - 12:23, 43:25, 47:24
**adjustment** [1] - 126:20
**adjustments** [3] -

82:4, 82:22, 126:20
**adjusts** [1] - 53:10
**admit** [1] - 135:23
**admits** [1] - 195:12
**admittedly** [1] - 117:9
**adopt** [1] - 111:7
**adopted** [1] - 122:9
**adopting** [1] - 124:18
**advance** [1] - 92:22
**Advanced** [1] - 40:2
**Advancement** [1] - 15:23
**advantage** [1] - 126:22
**advised** [1] - 7:12
**advising** [1] - 160:14
**advocacy** [4] - 7:9, 7:25, 8:2, 33:11
**aerial** [118] - 11:8, 18:24, 18:25, 19:7, 20:1, 20:6, 20:8, 20:13, 23:25, 25:15, 27:4, 30:12, 31:7, 31:15, 43:10, 43:13, 44:2, 45:8, 45:16, 45:21, 46:7, 46:8, 46:24, 55:4, 55:5, 55:11, 55:12, 55:25, 56:5, 56:15, 56:16, 56:18, 64:7, 64:9, 64:18, 64:22, 67:12, 68:10, 76:19, 76:20, 77:20, 77:23, 79:24, 82:15, 83:7, 90:13, 97:7, 102:19, 104:2, 106:15, 108:23, 115:16, 115:18, 115:22, 117:25, 118:1, 120:16, 120:18, 121:8, 121:19, 121:22, 123:16, 123:18, 123:25, 124:3, 126:19, 139:15, 139:18, 139:19, 140:20, 141:14, 141:15, 146:2, 146:3, 149:15, 150:11, 150:12, 150:16, 150:17, 150:18, 151:25, 152:3, 153:12, 154:23, 154:24, 155:22, 155:23, 156:18, 156:19, 158:13, 159:22, 163:5, 163:6, 163:8, 166:22, 166:24, 174:17, 174:19, 174:24, 174:25,

175:3, 175:4, 176:16, 176:17, 176:25, 177:1, 177:23, 177:25, 190:19, 190:21, 192:1, 196:10
**afternoon** [1] - 138:24
**agencies** [2] - 39:23, 39:24
**Agency** [3] - 40:1, 40:2, 40:5
**ago** [3] - 17:2, 85:1, 132:24
**agree** [13] - 37:8, 59:19, 84:14, 101:22, 111:4, 117:14, 123:7, 124:4, 135:11, 139:6, 142:17, 152:8
**agreed** [5] - 6:4, 19:6, 37:10, 54:16, 123:21
**agreement** [8] - 37:10, 83:20, 114:7, 122:4, 123:22, 146:10, 146:11, 146:12
**agrees** [3] - 66:25, 87:20, 141:8
**ahead** [8] - 46:4, 50:12, 63:7, 83:24, 121:25, 166:18, 174:12, 181:7
**air** [4] - 43:15, 45:19, 78:13
**aircraft** [1] - 43:16
**al** [3] - 1:2, 1:5, 177:24
**algorithmic** [1] - 47:2
**algorithms** [6] - 41:11, 41:14, 42:21, 47:11, 49:9, 78:24
**allege** [1] - 144:17
**alleging** [1] - 179:10
**allow** [7] - 12:24, 13:4, 78:24, 82:18, 98:25, 132:16, 152:13
**allowance** [1] - 56:13
**allows** [9] - 12:7, 25:11, 25:13, 26:13, 29:12, 78:21, 87:23, 98:5, 98:6
**alluded** [1] - 31:5
**almost** [9] - 63:16, 132:9, 136:10, 145:7, 149:17, 154:6, 163:15, 185:23, 197:24
**alone** [2] - 159:23, 178:1
**Alper** [11] - 4:21, 6:2, 31:5, 34:17, 35:3, 54:15, 136:6,

137:22, 138:9, 144:24, 146:1
**ALPER** [23] - 1:14, 4:22, 6:2, 6:7, 6:11, 7:1, 9:5, 9:10, 9:13, 9:15, 9:17, 9:20, 10:2, 33:20, 80:24, 81:6, 110:3, 112:3, 119:23, 120:3, 120:7, 197:19, 198:2
**Alper's** [2] - 135:23, 137:6
**ALSO** [1] - 1:21
**alter** [1] - 143:5
**altered** [1] - 178:7
**alternate** [1] - 6:21
**alternative** [4] - 67:6, 67:12, 98:17
**alternatively** [1] - 66:6
**ambiguity** [4] - 73:13, 80:4, 135:8, 135:14
**ambiguous** [9] - 62:9, 62:11, 62:12, 62:17, 66:19, 67:1, 72:3, 72:12, 198:20
**amendments** [1] - 56:12
**amorphous** [1] - 61:21
**amount** [3] - 22:17, 24:17, 132:21
**amounts** [1] - 112:14
**analysis** [5] - 23:11, 64:10, 65:4, 136:4, 164:18
**Analysis** [1] - 15:20
**ANALYTICS** [1] - 1:5
**AND** [1] - 1:7
**angle** [14] - 41:24, 42:5, 43:3, 52:13, 52:21, 52:23, 53:2, 53:4, 53:11, 81:8, 139:16, 139:19, 144:9
**angles** [3] - 19:17, 43:6, 143:22
**animation** [4] - 27:17, 28:9, 41:16, 53:8
**annotated** [1] - 165:4
**ANSWER** [3] - 70:3, 70:10, 72:20
**answer** [4] - 73:8, 75:16, 90:22, 92:7
**answers** [1] - 108:25
**anticipate** [1] - 38:2
**antithesis** [1] - 73:13
**anyway** [1] - 7:7
**apart** [1] - 161:13
**apologize** [1] - 10:10
**appear** [12] - 49:18,

67:22, 82:14, 113:5, 113:9, 117:14, 118:8, 134:10, 137:12, 179:3, 194:10
**appearance** [1] - 4:9
**appearing** [2] - 4:19, 175:23
**applicable** [3] - 97:2, 118:19, 196:2
**applicant** [6] - 128:3, 129:3, 129:8, 130:3, 132:15, 197:5
**applicant's** [1] - 128:11
**applicants** [3] - 128:19, 130:12, 132:18
**Applied** [1] - 15:23
**applied** [1] - 43:12
**apply** [4] - 60:5, 97:11, 130:9, 133:18
**appointment** [1] - 40:8
**appreciate** [2] - 194:19, 194:22
**approach** [7] - 9:17, 18:1, 41:15, 50:7, 136:8, 164:11, 178:20
**appropriate** [5] - 90:3, 90:19, 90:20, 93:21, 161:23
**approval** [3] - 6:5, 6:14, 6:19
**approve** [1] - 30:23
**approximation** [1] - 17:23
**Arc** [1] - 45:17
**architecturally** [1] - 18:6
**area** [9] - 11:16, 19:17, 23:6, 35:12, 45:21, 46:9, 65:19, 107:8, 114:23
**areas** [8] - 40:11, 47:23, 64:5, 83:20, 83:21, 84:5, 122:4
**argue** [4] - 117:4, 118:21, 119:1, 142:11, 146:20, 148:18, 152:1, 152:13
**argued** [3] - 145:22, 153:3, 153:6
**argues** [1] - 130:3
**arguing** [3] - 142:13, 146:1, 151:2
**argument** [40] - 33:15, 33:16, 70:23, 70:24,

73:18, 75:9, 92:9, 96:20, 97:4, 97:15, 99:4, 99:15, 100:18, 102:5, 102:6, 102:13, 107:23, 112:13, 112:14, 112:15, 118:25, 119:5, 119:7, 130:22, 132:20, 132:21, 135:23, 137:6, 137:12, 137:24, 150:20, 167:5, 167:15, 170:8, 180:16, 180:22, 193:13, 194:4
**arguments** [13] - 69:7, 106:11, 118:8, 119:1, 119:11, 119:15, 128:14, 128:23, 129:24, 130:2, 144:12, 144:15, 160:24
**arm** [9] - 52:12, 52:13, 52:20, 53:5, 88:9, 133:3, 145:14, 145:17, 145:22
**arms** [2] - 52:10, 52:11
**arrange** [1] - 82:16
**arrangement** [1] - 31:13
**arrangements** [1] - 126:25
**arrive** [1] - 33:25
**arsenal** [1] - 147:25
**art** [37] - 17:13, 17:14, 54:25, 55:21, 58:8, 58:21, 58:24, 59:16, 61:23, 62:23, 74:16, 74:25, 79:20, 80:6, 80:12, 87:18, 92:10, 96:12, 115:8, 129:7, 130:10, 136:14, 136:17, 151:6, 159:19, 159:21, 173:15, 175:7, 177:22, 178:5, 184:14, 188:13, 189:20, 190:5, 191:20, 193:7
**article** [1] - 12:11
**articles** [2] - 11:14, 12:2
**articulating** [1] - 153:13
**artists** [3] - 44:6, 44:9, 44:14
**AS** [1] - 38:12
**ascribe** [1] - 56:2

aside [3] - 74:3, 176:19, 188:22
aspect [11] - 51:12, 86:20, 87:6, 90:19, 92:20, 95:12, 118:15, 121:10, 123:4, 135:13, 176:4
aspects [4] - 21:14, 64:3, 89:14, 134:1
assemble [1] - 41:8
asserted [8] - 74:15, 74:25, 152:7, 172:9, 179:4, 179:20, 179:24, 193:14
assess [4] - 10:19, 11:6, 13:3, 43:11
assessed [1] - 12:9
assessment [1] - 12:8
assessments [3] - 62:14
assignment [1] - 9:24
assist [1] - 10:18
assume [5] - 8:4, 8:20, 91:25, 154:6
assumes [1] - 137:13
assuredly [1] - 195:7
attempt [1] - 128:24
attempted [2] - 13:9, 36:24
attempting [2] - 119:9, 128:21
attempts [2] - 79:18, 140:25
attention [8] - 26:18, 158:6, 159:2, 184:25, 186:9, 189:3, 191:23, 194:20
attorney [3] - 119:2, 119:14, 152:1
Austin [1] - 15:17
automated [1] - 46:25
automatic [26] - 127:20, 129:20, 134:11, 147:15, 155:25, 156:4, 156:6, 158:1, 158:15, 159:12, 160:1, 160:20, 161:18, 183:1, 183:11, 185:19, 187:8, 187:21, 188:16, 189:6, 189:9, 189:16, 189:25, 191:6
automatically [17] - 29:10, 98:18, 126:20, 140:18, 147:18, 151:18, 155:20, 155:25,

156:9, 156:21, 157:25, 158:24, 185:6, 185:10, 190:8, 191:15, 192:4
availability [1] - 47:7
available [4] - 21:6, 46:6, 47:5, 49:12
avoid [4] - 117:19, 118:6, 137:5, 138:18
aware [2] - 13:24, 33:15
awfully [1] - 25:2
axes [2] - 52:16, 52:18
axis [3] - 52:16, 52:17, 82:6

# B

B-A-J-A-J [1] - 14:23
background [18] - 6:8, 14:3, 15:5, 15:7, 15:11, 15:12, 15:15, 16:12, 33:21, 37:4, 38:7, 39:5, 39:12, 40:13, 81:3, 81:7, 81:17
backwards [1] - 188:14
bad [1] - 166:7
Bajaj [19] - 9:7, 14:2, 14:10, 14:21, 15:5, 15:10, 16:1, 33:9, 39:3, 51:11, 56:21, 62:11, 62:17, 82:23, 93:6, 101:1, 105:14, 105:22, 160:16
BAJAJ [4] - 2:4, 2:5, 14:18, 15:9
Bajaj's [7] - 10:3, 30:17, 32:22, 33:18, 62:1, 107:7
balloon [1] - 45:19
balloons [1] - 43:15
barely [1] - 189:23
based [42] - 32:24, 35:11, 46:24, 50:11, 51:5, 54:23, 56:17, 59:6, 60:22, 61:1, 62:6, 63:16, 69:20, 89:20, 91:3, 94:24, 95:2, 103:14, 104:2, 104:3, 104:18, 105:3, 106:17, 107:2, 107:25, 110:12, 114:22, 115:23, 116:5, 116:17, 119:20, 131:3, 138:4, 146:19, 147:5,

148:2, 150:21, 156:7, 156:16, 171:25, 178:12, 182:13
basic [6] - 41:2, 41:15, 55:23, 76:2, 96:6, 101:18
basics [2] - 36:21, 55:1
basis [6] - 34:6, 41:10, 68:24, 119:16, 133:19, 142:7
bat [1] - 54:17
bears [1] - 187:25
beautiful [2] - 4:6, 18:6
became [3] - 36:15, 39:19, 45:16
become [2] - 44:23, 49:3
Becton [18] - 113:24, 114:12, 132:22, 132:23, 132:25, 133:11, 133:18, 133:21, 145:6, 145:7, 145:11, 145:13, 145:25, 148:6, 148:11, 149:22, 152:9
BEEN [1] - 38:12
begin [4] - 6:7, 9:5, 119:23, 162:14
beginning [5] - 11:11, 19:1, 34:17, 42:24, 162:12
behalf [6] - 4:19, 63:3, 63:6, 63:9, 194:21, 194:22
behind [1] - 9:22
belabor [10] - 51:13, 69:15, 124:23, 149:24, 160:7, 187:9, 187:23, 192:6, 192:10, 193:9
belaboring [4] - 56:19, 184:21, 186:2, 186:14
belong [4] - 84:7, 86:23, 144:4
benefit [3] - 34:8, 61:17, 61:18
best [3] - 15:7, 162:19, 178:8
bet [1] - 16:10
better [3] - 27:22, 48:19, 195:9
between [35] - 41:24, 56:18, 64:18, 66:1, 77:20, 83:15, 83:19, 84:23, 100:19,

102:18, 102:23, 109:6, 115:2, 121:20, 122:3, 130:24, 136:11, 141:3, 142:16, 143:17, 145:18, 146:24, 147:8, 147:13, 150:7, 152:16, 154:1, 155:23, 158:5, 168:23, 180:1, 192:8, 193:3, 198:15
beyond [2] - 7:11, 79:12
big [8] - 34:22, 35:11, 36:15, 44:19, 111:10, 111:15, 143:17, 182:2
binder [2] - 10:2, 10:10
bio [1] - 15:25
bit [31] - 7:6, 12:22, 15:11, 16:3, 16:13, 24:21, 44:4, 46:12, 48:4, 48:6, 54:21, 59:22, 81:3, 95:14, 96:8, 97:13, 99:3, 99:12, 114:25, 120:19, 121:4, 130:16, 141:1, 145:13, 152:24, 157:6, 164:9, 183:13, 186:24, 191:10
black [3] - 22:19, 24:7, 63:24
black-colored [1] - 24:7
Bloomberg [1] - 11:15
blown [1] - 21:4
blue [9] - 20:7, 20:8, 22:17, 24:25, 28:8, 28:9, 28:13, 64:23, 137:8
board [3] - 88:1, 104:11, 105:21
boils [1] - 18:15
bolster [1] - 33:16
bomb [1] - 46:10
book [1] - 19:13
bottom [10] - 12:12, 51:1, 64:23, 78:18, 89:1, 92:24, 133:20, 159:7, 166:19, 188:1
boxed [1] - 185:4
brain [2] - 46:19, 72:21
brainer [1] - 194:11
Brandon [2] - 5:4, 138:24

BRANDON [1] - 1:15
breadth [1] - 67:13
break [3] - 32:12, 112:19, 174:4
Brian [1] - 5:21
BRIAN [1] - 1:18
Brief [1] - 174:6
brief [29] - 14:5, 15:25, 19:19, 21:16, 57:8, 57:9, 68:18, 69:10, 71:2, 72:25, 73:17, 75:23, 92:9, 94:7, 96:22, 110:4, 132:25, 134:3, 135:1, 139:12, 161:10, 170:14, 176:3, 177:18, 187:10, 187:15, 188:6, 193:6, 195:4
briefing [7] - 71:19, 91:3, 99:16, 113:25, 118:9, 130:20, 144:16
briefly [20] - 15:15, 19:25, 32:21, 33:20, 64:1, 75:19, 80:17, 81:18, 82:1, 110:2, 110:3, 123:1, 123:3, 128:23, 135:20, 144:14, 152:21, 160:23, 163:4, 187:15
briefs [7] - 57:7, 170:12, 170:13, 170:24, 172:18, 198:3
bring [4] - 9:7, 9:13, 73:17, 82:16
brings [1] - 71:23
broad [2] - 17:6, 193:18
broader [3] - 161:12, 166:25, 171:8
broadly [1] - 67:8
BROMBERG [43] - 1:18, 2:7, 5:18, 14:5, 14:9, 14:13, 32:7, 32:10, 34:11, 37:8, 37:15, 37:21, 38:5, 39:2, 39:6, 39:9, 39:10, 53:16, 53:19, 54:11, 54:15, 54:20, 57:13, 57:17, 58:6, 58:13, 58:19, 58:22, 60:11, 60:19, 62:25, 75:19, 101:25, 102:4, 103:2, 103:5, 103:7, 103:9, 113:2, 113:4, 117:2, 135:20, 135:22

Bromberg [2] - 5:17, 34:11
brother [1] - 18:20
brother-in-law [1] - 18:20
BROWN [6] - 1:15, 5:6, 138:24, 142:22, 143:10, 152:21
Brown [7] - 5:5, 39:20, 40:6, 49:7, 49:11, 135:18, 138:25
build [5] - 20:16, 23:17, 25:14, 78:21, 107:15
builder [1] - 22:21
builders [1] - 17:7
building [32] - 30:1, 30:12, 35:11, 35:13, 35:14, 45:10, 47:22, 48:3, 49:15, 49:18, 50:2, 50:3, 52:15, 52:22, 57:1, 65:6, 76:13, 76:18, 76:22, 77:21, 77:25, 82:3, 82:8, 82:22, 97:7, 100:7, 102:21, 102:22, 124:2, 138:14
builds [1] - 24:15
built [3] - 28:9, 28:21, 99:14
bullet [4] - 136:1, 150:8, 186:15, 186:16
bunch [1] - 151:15
bush [1] - 43:4
business [7] - 12:22, 12:23, 34:24, 35:1, 35:24, 36:1, 36:3
BY [8] - 1:12, 1:14, 1:17, 2:5, 2:7, 15:9, 39:10, 53:19

**C**

calculates [1] - 31:17
calculation [1] - 42:3
calculations [4] - 19:13, 19:15, 19:17, 107:14
California [1] - 17:2
call-out [1] - 152:11
Camden [1] - 4:7
CAMDEN [1] - 1:8
camera [3] - 42:13, 42:17, 46:9
cameras [1] - 41:24
cannot [4] - 70:1, 72:23, 109:9, 119:20

capability [2] - 48:19, 122:24
capture [3] - 43:17, 172:20, 174:21
captured [2] - 68:14, 195:13
captures [1] - 67:12
capturing [1] - 189:13
career [2] - 39:16, 39:17
careful [1] - 32:1
Carlson [2] - 18:19, 21:21
carried [1] - 121:18
carries [1] - 186:19
carry [1] - 162:15
carrying [1] - 39:21
cartoon [3] - 139:17, 139:20, 143:20
case [52] - 4:8, 9:23, 15:8, 15:13, 19:19, 29:2, 35:9, 36:3, 62:2, 62:13, 78:17, 92:7, 93:6, 93:23, 93:24, 97:24, 103:20, 103:22, 113:17, 113:24, 114:12, 117:4, 117:12, 117:15, 132:22, 132:24, 132:25, 133:7, 133:8, 133:10, 135:1, 136:10, 142:20, 143:18, 144:20, 145:7, 145:9, 146:1, 148:6, 148:11, 149:22, 155:2, 169:2, 173:16, 175:5, 179:11, 179:20, 180:7, 180:10, 185:13, 189:8, 190:14
cast [1] - 96:20
castle [1] - 35:11
catastrophic [1] - 17:1
categories [1] - 17:6
causes [1] - 129:17
CCR [2] - 1:25, 1:25
cells [2] - 48:24, 49:2
Center [1] - 15:20
center [5] - 15:21, 50:13, 50:16, 50:17, 166:6
centers [1] - 42:13
central [2] - 126:18, 132:24
centuries [1] - 44:17
century [2] - 43:13, 59:12

Century [3] - 45:4, 45:15, 59:11
CEO [2] - 13:19, 31:20
certain [5] - 16:4, 22:4, 24:17, 73:10, 119:3
certainly [17] - 7:24, 33:20, 34:2, 68:4, 75:8, 80:10, 86:23, 92:7, 93:22, 98:20, 111:20, 125:11, 132:16, 162:5, 185:12, 195:10, 196:4
Certified [1] - 1:23
cetera [4] - 65:9, 79:24, 157:17
challenge [1] - 51:10
chance [1] - 194:20
CHANDRA [4] - 2:4, 2:5, 14:18, 15:9
Chandra [2] - 14:2, 14:21
change [76] - 27:8, 27:24, 27:25, 29:10, 29:19, 49:20, 87:15, 89:17, 95:19, 98:18, 107:11, 107:13, 120:25, 123:6, 125:18, 140:7, 140:8, 140:11, 140:13, 140:16, 140:17, 140:18, 143:2, 143:9, 145:1, 145:2, 147:14, 147:15, 153:21, 154:2, 155:21, 160:15, 160:16, 163:20, 164:1, 164:3, 164:4, 164:7, 164:21, 165:22, 166:2, 166:8, 167:9, 168:6, 170:6, 170:7, 172:24, 173:1, 173:14, 175:23, 178:25, 179:14, 179:16, 180:1, 180:2, 181:25, 183:16, 183:20, 183:21, 183:22, 184:16, 185:5, 185:7, 185:9, 185:11, 185:16, 187:22, 187:23, 189:10, 189:25, 190:22, 190:23, 191:16, 192:16, 195:11
changed [6] - 29:9, 109:21, 140:14,

177:14, 179:14, 183:20
changes [63] - 28:14, 29:5, 29:25, 88:23, 107:3, 107:12, 112:12, 121:7, 121:17, 125:16, 126:6, 143:2, 145:3, 147:18, 147:19, 150:24, 153:25, 162:14, 163:9, 163:10, 163:15, 163:18, 163:21, 167:25, 168:3, 168:8, 168:21, 169:15, 171:24, 171:25, 173:7, 176:8, 179:5, 179:6, 179:8, 179:9, 184:2, 184:4, 184:5, 184:6, 184:11, 184:19, 185:14, 186:20, 186:21, 186:22, 187:2, 187:3, 188:10, 188:11, 189:17, 190:17, 190:20, 190:24, 191:4, 191:5, 192:1, 192:3, 192:5, 193:8, 194:10
changing [13] - 10:14, 11:17, 43:3, 95:17, 107:1, 156:9, 157:20, 169:14, 179:12, 183:16, 183:17, 190:7, 191:15
characterization [1] - 74:2
characterize [2] - 175:2, 188:2
characterizing [1] - 175:1
chart [2] - 158:8, 186:1
cheap [2] - 31:21, 77:7
chief [1] - 10:23
chimney [5] - 57:24, 58:1, 138:14
choice [1] - 57:17
chosen [1] - 86:1
Chris [4] - 18:17, 18:20, 19:6, 19:12
Christi [2] - 173:22, 176:14
Christie [5] - 5:16, 57:2, 152:23, 153:6, 153:12
CHRISTIE [31] - 1:17, 5:15, 5:19, 7:3, 7:18,

8:6, 8:13, 8:16, 8:22, 8:25, 9:2, 32:21, 32:24, 38:24, 75:22, 146:10, 146:12, 146:18, 147:11, 153:17, 154:9, 154:19, 154:21, 155:10, 155:17, 156:5, 181:6, 181:8, 181:13, 197:22, 198:3
CIA [1] - 39:25
circle [1] - 25:7
circuit [7] - 87:6, 93:24, 168:14, 171:6, 178:9, 180:5, 181:3
Circuit [4] - 57:20, 189:5, 196:3, 196:20
Circuit's [1] - 195:10
circuits [1] - 173:7
circumstance [3] - 68:2, 124:25, 196:3
circumstances [8] - 87:9, 93:22, 102:1, 148:20, 148:22, 192:16, 196:5, 196:25
citations [2] - 177:11, 187:6
cite [2] - 108:25, 171:22
cited [3] - 71:18, 76:11, 135:1
cites [1] - 94:18
citing [2] - 113:24, 114:12
CIVIL [1] - 1:3
claim [234] - 11:7, 30:23, 37:17, 54:23, 55:2, 55:24, 56:3, 56:4, 57:14, 57:19, 60:25, 63:24, 67:1, 67:18, 68:1, 70:22, 72:24, 73:14, 81:18, 83:3, 83:9, 83:15, 83:19, 83:24, 85:4, 85:6, 85:7, 85:14, 85:15, 85:16, 85:20, 85:25, 86:9, 86:10, 86:11, 87:7, 87:16, 89:21, 90:24, 91:12, 93:19, 96:6, 96:19, 96:20, 96:22, 96:24, 97:1, 97:2, 97:9, 97:10, 97:14, 98:1, 98:3, 98:6, 98:8, 98:11, 99:25, 106:5, 107:23, 108:11, 109:8, 109:24,

110:25, 111:11,
111:13, 112:8,
112:9, 112:15,
112:16, 113:22,
114:1, 114:14,
114:15, 114:18,
114:20, 116:14,
116:17, 116:20,
117:9, 117:22,
118:15, 120:14,
121:23, 122:1,
122:6, 122:11,
123:6, 123:10,
123:12, 123:16,
123:22, 124:1,
124:5, 124:6, 124:8,
124:10, 124:11,
124:13, 124:15,
124:18, 124:21,
124:25, 125:10,
130:24, 131:1,
131:2, 131:13,
131:16, 131:23,
132:16, 134:19,
135:9, 135:13,
136:4, 136:10,
137:2, 137:3, 137:4,
138:2, 138:15,
139:12, 139:13,
139:14, 139:22,
140:4, 143:2, 145:8,
145:16, 146:19,
146:25, 148:3,
148:8, 149:18,
150:5, 151:9,
151:19, 152:2,
154:10, 154:15,
156:7, 156:12,
156:13, 160:25,
161:1, 161:5, 161:7,
161:8, 161:11,
161:12, 161:14,
162:18, 163:17,
164:5, 164:11,
167:1, 167:3, 167:4,
167:5, 167:23,
168:13, 168:14,
169:4, 169:6, 169:7,
169:8, 169:23,
170:7, 171:8,
171:10, 172:6,
172:7, 172:8,
172:17, 172:19,
173:8, 173:10,
174:22, 176:13,
176:21, 177:5,
178:13, 178:21,
179:10, 180:6,
180:8, 180:10,
180:11, 180:20,
180:21, 181:2,

181:4, 181:22,
181:24, 182:14,
182:20, 182:22,
184:24, 185:18,
188:2, 188:19,
188:25, 189:1,
189:2, 189:5,
190:13, 190:15,
190:16, 191:10,
191:24, 193:13,
193:20, 194:4,
195:9, 195:13,
195:25, 196:2,
196:4, 196:8,
196:12, 196:13,
196:19, 196:24,
197:8, 197:11
**Claim** [44] - 67:19,
91:5, 96:22, 97:4,
97:5, 97:16, 98:7,
98:19, 104:3, 112:4,
113:7, 114:13,
114:17, 114:19,
114:20, 115:3,
116:4, 163:4,
166:20, 167:3,
169:12, 169:13,
169:22, 172:6,
172:7, 176:15,
176:24, 179:4,
179:5, 179:7,
179:10, 182:17,
185:1, 188:2,
188:20, 190:14,
191:12, 191:21,
191:23, 193:14,
193:24
**claimed** [2] - 63:19,
68:20
**claiming** [1] - 180:13
**claims** [101] - 10:20,
11:6, 12:9, 12:25,
13:3, 13:5, 34:25,
35:20, 64:8, 67:22,
68:14, 68:17, 70:1,
70:5, 70:13, 71:17,
72:5, 72:6, 73:12,
74:19, 79:13, 84:4,
84:10, 86:3, 86:14,
86:16, 86:22, 87:15,
90:4, 90:20, 90:24,
91:4, 92:5, 97:21,
99:25, 101:15,
101:17, 101:19,
111:16, 113:9,
114:10, 115:6,
120:13, 120:14,
122:23, 125:16,
125:23, 126:8,
127:22, 131:2,
131:7, 132:17,

132:25, 133:13,
133:22, 134:22,
134:25, 135:14,
136:1, 136:23,
137:12, 138:2,
139:6, 139:8,
140:19, 140:22,
141:3, 141:11,
142:1, 142:12,
142:15, 142:23,
143:24, 145:3,
148:23, 149:4,
150:7, 152:6, 153:2,
153:4, 153:7,
161:11, 167:8,
169:1, 169:4, 171:6,
171:7, 171:14,
171:15, 173:9,
177:18, 179:20,
179:24, 180:6,
180:13, 182:11,
183:16, 188:15,
193:15, 195:22
**Claims** [5] - 67:23,
113:6, 183:23,
190:13
**clamber** [3] - 18:4,
18:7, 19:4
**clarification** [1] -
160:20
**clarify** [1] - 148:2
**clarity** [3] - 119:17,
152:5, 154:16
**classic** [2] - 73:4,
170:5
**clause** [8] - 114:14,
114:15, 118:12,
137:2, 154:16,
154:22, 184:17,
191:4
**clear** [95] - 33:22,
38:21, 41:21, 60:2,
61:16, 61:19, 61:24,
62:12, 62:16, 62:18,
62:22, 66:24, 68:1,
68:15, 71:16, 71:19,
72:7, 73:1, 73:12,
76:2, 76:24, 80:5,
80:6, 85:15, 85:16,
87:6, 87:7, 87:15,
87:16, 98:11, 98:12,
108:9, 109:5, 109:7,
109:8, 111:1,
111:22, 111:23,
111:25, 113:22,
114:2, 115:1, 115:6,
117:8, 117:10,
124:5, 125:1, 125:4,
125:5, 127:15,
127:22, 127:23,

132:14, 135:25,
137:22, 138:5,
138:19, 146:25,
147:2, 147:12,
148:3, 148:8,
148:14, 148:15,
148:24, 149:25,
150:13, 150:20,
151:13, 151:24,
155:2, 155:3, 155:4,
156:7, 158:8, 158:9,
159:15, 160:1,
161:11, 162:5,
168:19, 170:2,
172:2, 178:12,
184:22, 185:2,
185:14, 186:21,
187:20, 189:5,
189:14, 189:17,
191:18, 191:19,
196:4
**clearer** [1] - 184:17
**clearly** [11] - 17:3,
18:15, 87:11,
138:14, 140:22,
146:2, 160:14,
161:3, 172:23,
175:18, 191:24
**CLERK** [3] - 4:1,
32:18, 112:22
**clerk** [2] - 9:22, 57:3
**clever** [2] - 102:5,
151:25
**click** [2] - 54:7, 54:8
**clients** [1] - 8:5
**clip** [1] - 93:23
**close** [3] - 111:21,
165:11, 192:17
**closer** [1] - 166:9
**clumsy** [1] - 117:9
**CNN** [1] - 11:15
**co** [2] - 4:20, 94:18
**co-cites** [1] - 94:18
**co-counsel** [1] - 4:20
**coauthored** [1] -
47:18
**coding** [1] - 22:15
**coincidence** [1] -
193:22
**coincident** [9] - 161:2,
161:13, 176:18,
176:20, 177:2,
182:18, 182:21,
188:22
**colleague** [3] - 14:1,
104:11, 135:17
**colleagues** [2] - 5:16,
5:20
**collect** [2] - 45:16,
46:8

**collected** [3] - 45:18,
46:24, 103:14
**collection** [4] - 43:14,
71:6, 71:7, 76:4
**collectively** [1] - 28:6
**color** [3] - 22:14, 62:6,
130:17
**colored** [3] - 24:7,
24:24, 27:20
**column** [14] - 126:12,
127:19, 134:6,
138:12, 141:22,
150:1, 153:5, 158:2,
158:3, 158:18,
158:19, 159:6,
159:8, 192:21
**Column** [16] - 64:15,
67:7, 68:21, 76:2,
76:11, 78:10, 94:19,
100:12, 105:20,
110:12, 118:18,
186:4, 186:5,
186:17, 186:25,
192:19
**combination** [1] -
39:25
**combine** [1] - 84:24
**coming** [5] - 4:6,
22:10, 38:2, 120:5,
141:16
**comma** [2] - 190:17,
190:18
**commend** [2] - 158:6,
159:1
**common** [3] - 49:10,
191:13, 193:2
**communicated** [1] -
53:7
**communities** [1] -
17:3
**community** [1] - 18:10
**companies** [17] -
10:18, 11:5, 11:18,
12:7, 12:15, 12:25,
13:5, 17:8, 17:9,
17:20, 34:23, 35:17,
35:21, 35:24, 36:10,
40:3
**company** [7] - 9:6,
13:12, 19:23, 34:20,
35:5, 39:21, 40:4
**compare** [2] - 86:17,
92:14
**comparing** [1] - 60:15
**compel** [2] - 195:25,
196:21
**compelled** [1] -
119:25
**compelling** [1] -
180:22

compensate [1] - 53:3

competing [2] - 13:13, 83:19

competition [1] - 37:12

competitors [1] - 37:11

complementary [1] - 47:10

complete [3] - 45:5, 45:10, 51:5

completely [6] - 26:5, 26:10, 119:7, 148:23, 172:8, 196:13

completes [1] - 53:13

complicate [1] - 145:20

complicated [5] - 17:17, 18:5, 36:21, 44:7, 79:5

component [7] - 82:2, 84:11, 92:12, 106:7, 123:15, 123:24, 124:3

components [5] - 76:23, 77:11, 113:23, 114:12, 148:10

comports [1] - 133:21

comprising [1] - 166:20

computation [1] - 47:5

Computational [1] - 15:20

compute [3] - 41:25, 43:7, 51:14

computer [40] - 15:16, 15:19, 15:24, 28:15, 40:13, 43:22, 47:14, 59:12, 60:3, 109:14, 109:21, 115:20, 118:22, 118:23, 140:12, 140:18, 145:1, 151:17, 153:23, 153:24, 154:4, 155:1, 163:9, 163:21, 164:3, 164:8, 172:25, 173:3, 173:14, 173:19, 179:12, 179:15, 180:1, 183:17, 183:22, 184:1, 184:12, 184:18, 191:4, 194:9

computers [5] - 47:8, 60:3, 60:8, 60:17, 60:20

computing [1] - 15:24

concedes [1] - 130:8

concept [8] - 52:8, 60:15, 65:22, 154:24, 174:22, 176:13, 195:9, 195:12

conceptual [1] - 90:9

concern [6] - 117:3, 135:7, 138:9, 147:4, 149:9, 149:21

concerned [4] - 7:6, 138:19, 146:6, 155:7

concerning [4] - 34:25, 35:1, 35:5, 136:5

concerns [3] - 7:13, 147:7, 181:16

conclude [7] - 57:10, 73:23, 96:12, 118:7, 135:15, 152:19, 197:13

concludes [1] - 30:17

conclusion [3] - 75:11, 137:13, 152:8

conclusions [1] - 8:23

conclusive [1] - 133:17

concurrence [5] - 154:24, 157:10, 184:20, 190:1, 191:7

concurrency [2] - 183:1, 188:16

concurrent [50] - 151:14, 151:16, 153:21, 155:4, 155:8, 155:13, 155:14, 155:19, 155:24, 157:18, 158:9, 158:14, 158:21, 159:6, 159:12, 160:2, 160:8, 160:17, 160:21, 161:4, 161:14, 168:20, 168:22, 168:24, 169:15, 169:19, 169:25, 170:15, 170:25, 171:1, 176:12, 177:11, 182:22, 183:11, 184:10, 184:22, 186:2, 187:9, 187:22, 188:20, 188:21, 189:9, 191:9, 191:24, 192:13, 196:15, 196:17, 196:18

concurrently [21] - 125:19, 126:4, 126:7, 156:20,

157:2, 157:15, 157:21, 158:11, 158:22, 159:9, 171:5, 176:6, 176:9, 182:2, 186:8, 186:22, 186:25, 187:3, 187:4, 190:8

concurs [1] - 188:14

conditions [1] - 18:3

conduct [1] - 185:15

conducting [1] - 64:9

configuration [1] - 106:25

configured [1] - 157:2

confirmation [1] - 29:8

confirmed [3] - 26:5, 128:18, 144:18

confirms [1] - 127:24

conflict [1] - 135:8

conflicts [2] - 96:5, 128:11

confused [2] - 135:23, 135:24

confusing [3] - 146:6, 181:9, 193:18

confusion [8] - 102:24, 117:19, 137:5, 137:23, 138:19, 142:20, 147:4, 149:15

connected [2] - 145:19, 165:15

connection [8] - 12:3, 12:13, 63:12, 87:2, 89:18, 94:9, 94:14, 95:25

connotes [1] - 133:13

consider [4] - 30:22, 128:7, 130:18, 141:18

considered [2] - 19:8, 119:11

considering [1] - 162:4

consistency [1] - 193:3

consistent [9] - 21:15, 26:10, 88:1, 89:19, 97:24, 106:5, 122:10, 181:23, 188:3

consistently [3] - 149:19, 149:20, 181:18

constantly [3] - 17:19, 19:3, 28:24

constitute [1] - 119:13

constitutes [1] - 33:13

constraint [2] - 50:11,

51:5

constraint-based [2] - 50:11, 51:5

construct [8] - 20:12, 41:9, 45:22, 47:1, 49:17, 51:23, 54:9, 116:4

constructed [6] - 75:4, 116:9, 116:13, 116:20, 119:20, 165:1

constructer [1] - 22:22

constructing [3] - 45:8, 45:23, 46:23

construction [129] - 37:17, 45:13, 55:7, 55:13, 57:19, 63:24, 65:12, 66:20, 66:22, 67:6, 67:12, 68:25, 69:1, 70:22, 72:3, 72:13, 73:14, 75:14, 78:16, 81:19, 83:12, 83:15, 83:22, 83:25, 84:1, 84:3, 84:6, 84:8, 84:22, 85:2, 85:13, 86:1, 86:13, 86:15, 86:18, 86:21, 87:1, 88:12, 88:18, 89:20, 89:23, 90:22, 91:13, 92:1, 93:15, 95:13, 96:2, 96:6, 96:17, 96:21, 97:9, 99:25, 109:8, 109:17, 111:8, 114:2, 114:21, 115:10, 116:11, 117:23, 118:10, 118:13, 118:22, 118:23, 122:8, 122:10, 123:12, 123:20, 124:6, 124:8, 125:8, 127:6, 128:25, 131:3, 131:24, 132:7, 132:13, 133:9, 133:19, 133:23, 134:17, 135:2, 135:13, 136:4, 136:10, 137:4, 138:3, 140:23, 140:25, 143:3, 145:8, 146:20, 149:18, 151:9, 152:17, 154:15, 159:3, 160:4, 163:3, 164:13, 167:2, 167:7, 167:17, 168:5, 168:13, 168:14, 171:10,

172:5, 177:19, 178:23, 179:21, 179:23, 182:12, 186:11, 188:3, 188:4, 189:22, 191:1, 193:3, 194:13, 195:12, 196:13, 196:24, 198:21

constructions [9] - 33:24, 33:25, 34:4, 83:19, 86:9, 90:25, 122:10, 124:10, 163:13

construe [16] - 33:6, 34:9, 37:18, 57:14, 57:15, 66:25, 75:12, 93:19, 110:25, 132:17, 136:23, 152:12, 166:25, 178:22, 180:6, 181:4

construed [5] - 54:23, 114:8, 165:20, 165:21, 181:18

construing [8] - 55:2, 55:4, 67:2, 73:12, 85:24, 132:12, 162:18, 181:2

contains [1] - 7:8

contention [1] - 118:10

contest [2] - 57:9, 68:13

contested [1] - 57:11

context [15] - 56:2, 60:12, 62:11, 64:14, 67:3, 69:25, 80:11, 105:25, 127:10, 130:23, 155:18, 157:4, 162:4, 182:8, 183:10

contexts [1] - 63:17

continuation [1] - 160:6

continue [1] - 21:10

continuous [1] - 49:3

contour [2] - 45:23, 46:21

contractor [2] - 12:9, 18:19

contractors [3] - 17:7, 17:18, 18:12

contradict [2] - 133:23, 167:3

contradicts [3] - 167:7, 171:9, 196:13

contrary [6] - 133:12, 133:15, 148:23, 150:19, 150:23, 153:2

contrast [2] - 50:9, 67:14

contrasting [1] - 187:19

contributors [1] - 45:1

control [3] - 85:11, 88:10, 88:16

controls [1] - 190:4

conundrum [1] - 146:18

convinced [1] - 30:6

COOPER [1] - 1:7

coordinates [2] - 52:11, 59:24

copies [2] - 9:19, 38:24

copy [4] - 20:18, 20:25, 49:8, 50:5

corner [4] - 25:10, 65:8, 76:13

corners [2] - 22:8, 100:15

correct [24] - 1:23, 8:24, 8:25, 26:5, 49:19, 50:21, 55:13, 58:17, 70:3, 71:4, 71:17, 71:18, 79:6, 85:2, 95:19, 96:2, 112:13, 113:1, 113:2, 128:22, 129:5, 159:16, 168:15

corrected [2] - 29:24, 74:13

correctly [1] - 37:17

correlate [29] - 25:12, 54:18, 54:19, 54:20, 54:21, 55:3, 55:13, 55:14, 55:19, 55:25, 56:15, 57:6, 57:22, 58:4, 58:24, 59:16, 60:6, 61:15, 61:20, 62:18, 66:15, 70:1, 72:18, 76:5, 77:2, 78:16, 80:3, 80:8, 80:11

correlated [9] - 55:15, 61:11, 64:25, 65:10, 65:24, 66:5, 68:23, 69:17, 70:8

correlating [22] - 55:4, 55:5, 58:17, 60:15, 60:22, 62:5, 63:14, 63:15, 63:20, 66:11, 67:20, 67:23, 68:10, 68:14, 69:12, 69:16, 70:5, 74:17, 74:18, 172:9

correlation [36] - 24:17, 25:13, 55:17,

56:17, 59:7, 60:10, 60:12, 60:22, 61:1, 61:16, 63:19, 63:21, 63:23, 64:14, 64:18, 65:2, 67:8, 67:10, 67:15, 67:19, 67:24, 68:7, 68:20, 69:22, 70:16, 71:22, 72:1, 74:4, 75:7, 75:8, 77:20, 79:3, 79:16, 79:24, 80:1, 134:8

correlations [1] - 58:11

correspond [7] - 24:21, 24:24, 25:6, 78:2, 140:5, 140:6, 160:15

correspondence [23] - 25:11, 67:9, 141:5, 141:24, 142:1, 142:25, 143:15, 145:20, 146:23, 146:24, 147:4, 147:8, 147:13, 147:16, 149:2, 149:12, 150:15, 152:16, 154:1, 158:5, 185:8, 192:3

corresponding [49] - 29:5, 53:25, 62:5, 64:20, 64:21, 64:24, 64:25, 65:5, 65:10, 65:15, 65:23, 67:11, 67:13, 70:8, 71:11, 73:7, 76:12, 76:15, 76:18, 76:21, 77:22, 88:7, 93:8, 104:24, 120:17, 120:25, 121:21, 127:21, 129:17, 129:20, 131:22, 134:12, 141:3, 164:3, 174:18, 175:15, 175:16, 179:5, 179:6, 179:8, 179:9, 180:2, 185:7, 185:11, 190:17, 190:20, 190:23, 190:24, 191:16

corresponds [7] - 24:25, 25:1, 140:14, 141:20, 161:7, 179:13, 183:19

cosign [1] - 53:5

cost [5] - 11:6, 12:8, 35:6, 51:14, 107:14

costs [2] - 22:23, 35:10

Counsel [3] - 1:16, 1:20, 36:23

counsel [36] - 4:9, 4:20, 7:13, 15:2, 21:4, 66:24, 77:7, 78:6, 78:8, 101:22, 105:15, 106:11, 111:4, 112:5, 119:25, 120:13, 121:25, 129:1, 129:2, 132:23, 139:4, 144:15, 149:1, 150:4, 151:13, 162:7, 169:20, 175:10, 185:21, 195:6, 195:17, 196:6, 197:17, 198:6, 198:11, 198:15

counsel's [5] - 75:20, 102:5, 102:13, 150:20, 162:23

count [2] - 77:10, 84:20

country [1] - 35:12

couple [19] - 9:6, 11:14, 12:2, 26:7, 44:17, 47:8, 63:17, 69:4, 91:1, 91:4, 94:1, 96:18, 106:10, 117:16, 118:7, 119:7, 122:19, 131:5, 160:24

course [53] - 6:5, 6:23, 11:25, 13:14, 13:23, 16:21, 16:25, 17:9, 17:22, 18:5, 18:8, 19:22, 23:21, 38:1, 41:9, 42:6, 42:25, 54:22, 55:14, 55:17, 56:19, 57:6, 57:25, 59:11, 60:20, 65:5, 78:22, 93:6, 93:9, 93:11, 96:23, 98:2, 106:18, 109:13, 110:24, 111:19, 113:22, 114:15, 114:19, 115:9, 123:20, 124:3, 126:17, 130:14, 132:14, 132:24, 158:11, 159:14, 175:25, 184:4, 194:23, 195:9, 198:13

COURT [140] - 1:1, 4:2, 4:3, 4:5, 4:15, 4:23, 5:3, 5:7, 5:10, 5:13, 5:23, 6:6, 6:10, 6:25, 7:2, 7:16, 8:2, 8:11, 8:15, 8:20, 8:23, 9:1, 9:3, 9:9,

9:12, 9:14, 9:16, 9:19, 9:21, 10:1, 14:4, 14:7, 14:11, 14:14, 14:16, 14:20, 14:22, 14:24, 16:5, 16:10, 20:21, 21:1, 21:10, 32:5, 32:9, 32:12, 32:15, 32:18, 32:19, 32:23, 33:19, 34:5, 36:22, 37:13, 37:20, 37:22, 38:9, 38:11, 38:15, 38:17, 38:19, 38:22, 39:1, 39:4, 39:7, 53:15, 53:18, 54:13, 54:19, 57:4, 57:15, 58:4, 58:10, 58:15, 58:20, 60:6, 60:14, 62:24, 63:1, 63:4, 63:7, 75:18, 75:21, 80:16, 80:19, 80:22, 81:5, 101:21, 102:1, 102:25, 103:4, 103:6, 103:8, 110:1, 112:2, 112:19, 112:23, 112:24, 113:3, 116:23, 119:22, 120:2, 120:5, 135:21, 138:23, 142:21, 143:5, 146:9, 146:11, 146:16, 147:6, 152:20, 153:16, 154:6, 154:18, 154:20, 155:7, 155:12, 156:2, 162:9, 167:18, 167:20, 174:4, 174:7, 174:9, 174:11, 175:10, 175:12, 181:5, 181:7, 181:12, 194:18, 194:24, 195:1, 195:3, 197:14, 197:17, 197:21, 197:24, 198:5

Court [28] - 7:14, 7:20, 8:17, 15:4, 15:11, 16:2, 32:25, 33:24, 34:13, 54:22, 57:14, 57:20, 61:17, 62:19, 74:10, 74:14, 80:7, 85:24, 109:8, 115:10, 117:10, 119:17, 133:3, 137:4, 152:12, 179:2, 198:12, 198:20

court [4] - 16:6, 32:17, 117:17, 133:19

Court's [7] - 20:19, 58:23, 117:19, 181:11, 194:20, 194:23

COURTHOUSE [1] - 1:6

courtroom [1] - 120:1

cover [8] - 10:9, 76:8, 79:13, 92:6, 113:18, 165:20

covered [8] - 50:9, 51:11, 84:25, 121:25, 140:24, 141:23, 144:7, 161:12

covers [1] - 172:11

crafted [1] - 152:6

create [7] - 31:8, 41:20, 44:2, 44:14, 46:19, 47:25, 98:14

created [8] - 16:14, 26:9, 48:1, 141:13, 157:8, 157:12, 162:1, 182:9

creates [5] - 11:2, 120:17, 120:24, 127:20, 132:1

creating [1] - 48:3

creation [3] - 47:15, 182:10, 182:12

critical [3] - 64:15, 150:8, 163:1

criticize [1] - 37:23

CRR [1] - 1:24

crystal [9] - 127:22, 127:23, 132:14, 148:14, 148:24, 158:8, 159:14, 159:25, 186:20

cues [1] - 48:16

current [1] - 169:21

curved [2] - 44:7, 44:11

custom [1] - 12:15

customers [2] - 21:7, 36:9

cut [2] - 44:8, 178:24

CUTRI [21] - 1:14, 2:5, 4:25, 15:3, 15:9, 16:1, 20:18, 20:25, 21:2, 30:15, 30:17, 162:10, 167:19, 167:22, 174:8, 174:13, 175:11, 175:14, 194:19, 195:4, 197:16

Cutri [10] - 4:24, 14:1, 162:10, 181:13, 182:16, 183:2, 185:21, 187:13,

188:18, 193:19

# D

**damage** [5] - 10:19,
16:21, 16:22, 16:24,
17:1
**damaged** [5] - 11:7,
11:19, 12:5, 16:21,
30:23
**danger** [4] - 17:18,
139:9, 173:15,
173:17
**dangerous** [3] - 18:4,
18:8, 19:4
**dark** [1] - 22:16
**DARPA** [1] - 40:2
**Data** [1] - 15:20
**data** [5] - 34:22, 60:4,
60:5, 60:16, 115:19
**datapoint** [2] - 60:7,
60:16
**date** [1] - 10:10
**David** [1] - 18:18
**David's** [1] - 18:20
**days** [3] - 17:2, 47:7,
80:19
**de** [1] - 45:17
**deal** [8] - 13:5, 36:7,
36:11, 60:20, 123:9,
134:18, 162:19,
183:16
**dealing** [7] - 102:14,
153:23, 153:24,
160:6, 183:16,
184:1, 190:25
**deals** [4] - 33:8,
160:17, 189:15,
189:16
**dealt** [6] - 17:11,
122:15, 183:15,
185:8, 185:9
**debating** [1] - 136:15
**decades** [1] - 34:21
**decide** [3] - 72:22,
90:3, 196:1
**decided** [6] - 6:8,
6:15, 6:20, 35:25,
49:10, 63:12
**deck** [2] - 139:14,
152:22
**declaration** [6] - 62:2,
76:25, 105:16,
160:12, 175:6, 188:9
**defendant** [1] - 141:8
**defendant's** [1] -
195:20
**defendants** [45] -
5:14, 5:22, 6:13,

6:21, 13:6, 13:9,
13:16, 31:12, 34:12,
56:2, 66:24, 67:15,
84:15, 90:8, 90:14,
91:4, 94:2, 96:2,
96:19, 97:14,
110:25, 111:12,
122:23, 123:21,
124:20, 127:8,
128:20, 128:24,
131:1, 132:21,
133:24, 133:25,
134:1, 140:25,
141:19, 142:14,
144:17, 145:6,
167:14, 178:22,
179:2, 179:3,
196:11, 196:16,
197:22
**Defendants** [2] - 1:5,
1:20
**defendants'** [25] -
30:21, 31:1, 31:14,
55:6, 64:13, 69:9,
84:3, 86:17, 91:3,
92:9, 93:15, 94:6,
118:13, 122:10,
122:16, 125:8,
127:6, 128:10,
133:9, 133:19,
133:16, 167:2,
169:20, 170:12,
180:25
**defendants's** [1] -
127:24
**Defense** [1] - 40:2
**defense** [1] - 111:4
**define** [7] - 37:7, 41:5,
41:7, 63:13, 73:9,
77:11, 155:18
**defined** [6] - 62:19,
63:22, 71:3, 83:24,
85:16, 140:22
**defines** [7] - 41:18,
41:19, 51:22, 85:8,
111:13, 121:21,
122:7
**definitely** [3] - 96:4,
135:5, 195:5
**definition** [18] - 62:12,
62:22, 63:21, 71:21,
80:2, 80:14, 86:15,
86:23, 87:12, 87:21,
108:8, 109:12,
124:19, 136:8,
138:16, 151:12,
170:8, 197:2
**degree** [1] - 34:5
**delay** [2] - 155:20,
156:1

**delete** [1] - 164:7
**deleted** [2] - 172:22,
172:24
**deleting** [10] - 164:14,
172:17, 172:19,
181:22, 182:3,
189:11, 189:13,
193:13, 195:7, 195:8
**deletion** [3] - 179:25,
189:12, 195:5
**deliberately** [1] -
151:1
**delineated** [1] - 57:19
**delivered** [1] - 36:9
**delve** [1] - 183:12
**demands** [1] - 189:18
**demo** [1] - 30:5
**demonstrate** [1] -
8:20
**demonstrated** [1] -
161:24
**demonstrates** [1] -
189:9
**demonstrating** [1] -
191:6
**deny** [2] - 96:15,
152:16
**departing** [1] - 196:4
**departure** [1] - 196:21
**dependent** [24] -
67:18, 68:1, 96:24,
97:2, 114:19,
114:20, 143:6,
143:7, 156:13,
161:7, 161:11,
167:1, 167:3, 169:4,
169:6, 169:12,
182:17, 189:1,
190:14, 193:24,
196:8, 196:12
**depict** [1] - 61:5
**deposition** [11] -
18:21, 19:2, 21:20,
62:5, 69:23, 71:15,
72:15, 77:1, 96:10,
105:24, 160:13
**depositions** [1] - 80:9
**depth** [1] - 44:15
**DEPUTY** [3] - 4:1,
32:18, 112:22
**derive** [1] - 149:16
**describe** [14] - 52:6,
64:22, 65:15, 80:1,
93:21, 125:16,
126:14, 126:17,
129:14, 129:16,
132:18, 136:6,
165:5, 177:13
**described** [29] - 50:8,
51:25, 63:15, 63:19,

63:22, 64:10, 70:14,
75:2, 75:7, 78:15,
88:14, 100:5,
100:16, 105:4,
110:14, 111:16,
120:21, 120:22,
124:14, 125:22,
129:11, 132:2,
132:10, 137:18,
138:21, 157:1,
170:16, 196:8
**describes** [12] - 45:6,
64:7, 64:13, 64:17,
66:4, 67:8, 69:17,
88:8, 98:16, 100:12,
124:1, 125:15
**describing** [9] - 47:18,
52:4, 75:1, 89:9,
89:13, 93:1, 127:15,
132:3, 166:14
**description** [10] -
34:17, 50:10, 67:5,
69:12, 69:19, 75:5,
78:14, 89:2, 137:10,
172:15
**desirable** [1] - 36:15
**despite** [2] - 79:7,
152:2
**destroyed** [5] - 12:4,
12:5, 17:3, 18:10,
107:8
**detail** [13] - 20:2, 23:9,
23:21, 24:7, 30:3,
45:18, 60:21, 67:3,
120:19, 141:24,
150:2, 186:14,
187:14
**detailed** [3] - 21:13,
23:12, 102:6
**details** [1] - 30:14
**determination** [112] -
33:9, 33:14, 52:3,
52:5, 52:7, 52:10,
77:4, 80:23, 81:11,
81:14, 81:21, 83:5,
83:6, 83:13, 83:14,
84:4, 84:11, 84:16,
85:8, 85:10, 85:19,
85:22, 85:23, 86:11,
86:19, 86:24, 87:13,
87:22, 88:8, 88:15,
89:2, 89:6, 89:24,
90:4, 91:10, 92:3,
92:11, 92:17, 92:18,
92:25, 93:16, 94:9,
94:10, 95:10, 95:22,
97:18, 98:2, 98:4,
98:5, 98:20, 99:8,
99:9, 99:12, 99:20,
99:22, 99:24, 100:4,

100:8, 100:19,
100:23, 101:2,
101:6, 101:12,
101:24, 102:3,
103:11, 103:17,
104:4, 105:1, 105:4,
105:7, 105:12,
105:18, 105:23,
106:2, 106:4, 106:7,
106:8, 106:13,
106:16, 106:20,
107:20, 107:24,
107:25, 108:6,
108:9, 108:12,
108:13, 108:14,
108:17, 108:19,
109:10, 109:11,
110:10, 110:22,
111:13, 111:18,
111:19, 111:24,
112:5, 112:6, 112:9,
112:11, 113:13,
113:20, 120:11,
122:16, 124:25,
127:9, 130:23,
147:23
**determinations** [3] -
100:17, 104:19,
107:2
**determine** [23] - 37:2,
46:2, 50:15, 54:3,
58:16, 59:2, 59:5,
59:13, 79:22, 81:10,
81:12, 82:4, 82:19,
82:24, 83:8, 93:12,
95:5, 102:8, 102:11,
103:12, 104:2,
104:14, 106:14
**determined** [19] -
52:4, 52:5, 53:7,
53:11, 53:12, 94:23,
94:24, 103:19,
104:18, 104:25,
105:3, 106:20,
108:6, 108:16,
108:22, 110:12,
110:16, 151:12
**determines** [1] -
112:12
**determining** [4] -
94:4, 95:9, 106:23,
107:19
**developed** [7] - 32:2,
35:7, 46:16, 47:12,
49:7, 59:20, 79:1
**development** [2] -
44:24, 49:10
**develops** [1] - 47:10
**device** [1] - 145:22
**devices** [2] - 105:7,

105:13

**DeVries** [11] - 1:15, 5:1, 5:2, 63:2, 63:5, 63:8, 63:9, 80:17, 80:21

**diagram** [3] - 22:13, 22:14, 105:20

**diagrams** [3] - 23:7, 90:10, 91:21

**dial** [1] - 184:6

**Dickinson** [4] - 114:12, 148:6, 149:22, 152:9

**dictates** [2] - 116:14, 194:12

**Diego** [1] - 49:16

**difference** [3] - 43:6, 71:10, 182:2

**different** [56] - 12:22, 19:17, 22:5, 22:23, 24:5, 26:12, 27:1, 35:15, 58:17, 65:17, 72:2, 106:25, 107:15, 109:4, 109:23, 117:1, 121:1, 123:8, 127:1, 133:5, 133:6, 133:13, 133:14, 135:3, 135:11, 139:6, 139:16, 139:19, 141:5, 141:8, 143:22, 143:23, 145:11, 145:17, 146:17, 146:18, 147:9, 147:17, 148:4, 148:5, 149:24, 149:25, 151:11, 152:9, 159:20, 161:4, 162:17, 163:16, 167:15, 172:6, 172:8, 178:5, 179:7, 180:13, 180:14

**differentiation** [22] - 96:19, 96:20, 96:23, 97:11, 97:15, 160:25, 161:6, 161:15, 167:4, 167:6, 169:5, 169:8, 176:13, 177:6, 182:14, 182:20, 182:23, 188:19, 188:25, 189:6, 193:21, 194:4

**difficult** [1] - 51:14

**digital** [10] - 47:5, 47:11, 47:14, 47:18, 114:21, 115:4, 131:3, 131:23,

137:1, 138:3

**dimension** [6] - 25:14, 25:17, 59:15, 65:18, 71:6

**dimensional** [34] - 20:8, 20:9, 20:12, 23:24, 25:16, 25:17, 25:19, 25:20, 25:21, 26:14, 28:1, 28:19, 29:8, 29:14, 40:15, 41:7, 43:24, 56:17, 56:20, 56:22, 56:24, 65:19, 71:5, 74:20, 75:3, 79:21, 102:14, 141:13, 153:10, 153:11, 158:13, 159:24, 174:16, 178:2

**dimensions** [14] - 27:13, 27:15, 28:18, 29:6, 30:2, 51:13, 56:23, 58:2, 59:15, 65:22, 71:8, 79:23, 102:19, 102:20

**DIRECT** [4] - 2:5, 2:7, 15:9, 39:10

**direct** [6] - 6:11, 6:12, 15:20, 30:19, 121:10, 141:24

**directed** [1] - 74:20

**directly** [7] - 12:14, 27:10, 88:10, 88:17, 118:16, 123:12, 152:9

**disagree** [9] - 33:14, 34:1, 74:2, 130:4, 168:23, 170:25, 171:1, 187:13, 196:17

**disagreement** [7] - 83:21, 84:6, 84:8, 114:6, 122:5, 123:4, 168:25

**disavow** [2] - 125:4, 125:5

**disavowal** [5] - 71:20, 87:16, 111:22, 136:9, 178:13

**disc** [1] - 43:3

**disclaim** [1] - 174:15

**disclaimed** [2] - 74:1, 74:6

**disclaimer** [9] - 73:22, 73:24, 87:17, 172:3, 172:5, 178:3, 178:9, 180:21

**disclaiming** [3] - 75:8, 171:19, 197:5

**disclosed** [3] - 69:10, 76:9, 109:11

**discloses** [2] - 110:9, 160:14

**disconnect** [2] - 8:7, 8:19

**discounted** [1] - 162:25

**discussed** [5] - 98:19, 137:20, 180:23, 190:24, 193:22

**discusses** [1] - 106:6

**discussing** [1] - 176:14

**discussion** [1] - 125:14

**discussions** [2] - 36:24, 165:11

**display** [85] - 47:12, 47:15, 48:19, 59:1, 83:4, 90:7, 98:10, 98:15, 103:18, 107:25, 115:12, 115:14, 115:16, 115:21, 151:14, 151:16, 153:21, 155:4, 157:2, 158:9, 158:12, 158:21, 159:7, 159:11, 160:8, 160:18, 161:18, 163:23, 166:11, 166:12, 166:22, 166:24, 167:1, 167:9, 167:25, 168:8, 168:20, 168:23, 168:24, 169:10, 169:11, 170:1, 171:1, 171:16, 171:21, 173:3, 175:2, 175:3, 175:9, 175:15, 175:16, 176:7, 176:12, 177:12, 177:22, 178:6, 178:25, 180:3, 183:1, 183:15, 184:22, 186:2, 186:8, 186:19, 187:9, 187:22, 189:9, 189:17, 189:25, 191:9, 191:24, 192:13, 192:16, 194:3, 196:9, 196:10, 196:15, 196:17, 196:18, 197:2, 197:6, 197:10

**displayed** [46] - 61:8, 75:24, 84:17, 86:19, 89:24, 90:2, 90:11, 90:14, 90:15, 90:21, 90:25, 91:8, 91:10,

91:16, 91:17, 91:21, 91:24, 92:2, 92:12, 92:13, 114:3, 114:5, 114:23, 122:2, 122:14, 125:19, 126:4, 126:7, 127:7, 127:8, 148:17, 153:1, 154:22, 164:2, 164:5, 165:23, 171:5, 174:23, 175:24, 176:9, 177:8, 186:22, 186:25, 187:3, 187:4

**displaying** [33] - 97:6, 97:16, 107:24, 132:7, 153:9, 154:13, 156:8, 156:17, 156:19, 157:20, 162:6, 163:5, 163:6, 163:7, 163:8, 166:21, 166:23, 167:10, 174:15, 176:15, 176:16, 176:22, 176:24, 177:1, 179:6, 179:8, 183:15, 190:6, 190:19, 192:20, 193:25, 194:1, 197:3

**displays** [5] - 157:16, 159:9, 184:18, 191:4, 194:9

**dispositive** [4] - 125:10, 125:11, 134:14, 136:5

**dispute** [19] - 57:14, 66:5, 73:5, 73:25, 81:15, 103:10, 111:3, 111:14, 125:4, 128:20, 139:3, 142:8, 143:11, 146:4, 155:8, 164:23, 172:18, 185:12

**disputed** [1] - 136:5

**disputes** [14] - 4:17, 81:19, 83:15, 84:2, 84:23, 87:24, 101:10, 122:3, 122:9, 122:13, 122:19, 130:5, 136:11, 198:15

**disregard** [2] - 195:18, 195:19

**disregarded** [2] - 129:4, 194:17

**distance** [2] - 41:24, 109:6

**distinct** [71] - 65:21,

84:17, 86:19, 89:24, 90:4, 90:18, 92:2, 92:12, 92:17, 95:9, 99:11, 99:21, 100:1, 106:7, 113:23, 114:3, 114:4, 114:11, 115:6, 115:7, 115:11, 115:13, 116:1, 116:15, 116:24, 116:25, 117:12, 119:18, 122:14, 122:18, 123:2, 127:7, 127:12, 134:24, 135:4, 137:3, 138:21, 139:4, 140:4, 142:2, 142:6, 142:10, 142:13, 142:18, 143:3, 143:5, 143:8, 143:15, 144:1, 144:10, 144:19, 144:21, 145:9, 145:10, 146:6, 147:2, 147:6, 147:7, 148:9, 148:10, 148:12, 148:19, 149:23, 151:7, 152:11, 152:18, 152:25, 153:4

**distinction** [6] - 100:19, 103:15, 130:24, 141:2, 142:16, 150:20

**distinctive** [1] - 113:16

**distinctly** [1] - 151:12

**distinguish** [3] - 79:19, 151:6, 173:15

**distinguished** [2] - 159:19, 159:20, 177:21

**distinguishes** [2] - 71:10, 74:16

**distinguishing** [3] - 150:6, 150:22, 159:25

**DISTRICT** [3] - 1:1, 1:1, 1:10

**divide** [1] - 53:4

**divided** [2] - 23:2, 27:6

**division** [1] - 35:25

**Doctor** [2] - 16:5, 21:10

**doctor** [3] - 14:16, 14:24, 34:7

**doctor's** [1] - 37:25

**document** [2] - 21:5, 161:15

**documented** [1] -

19:20
**dog** [1] - 81:23
**done** [34] - 27:20, 31:7, 40:3, 47:24, 50:3, 52:14, 54:4, 57:25, 58:18, 59:20, 61:11, 63:17, 69:20, 121:13, 134:12, 137:14, 137:16, 137:17, 154:4, 154:7, 156:9, 157:21, 158:24, 160:10, 162:6, 163:22, 165:9, 169:9, 170:11, 170:17, 170:22, 178:21, 179:3
**dormers** [2] - 22:9, 24:9
**dots** [1] - 166:5
**dotted** [3] - 82:8, 165:6, 165:10
**doubt** [2] - 88:25, 175:5
**down** [36] - 6:23, 16:2, 16:6, 16:9, 18:15, 19:9, 19:10, 21:21, 21:22, 29:21, 30:24, 52:17, 53:2, 56:7, 59:11, 72:13, 78:18, 82:9, 89:1, 92:24, 121:4, 127:1, 133:20, 139:3, 143:12, 149:6, 150:19, 152:24, 158:2, 159:7, 164:24, 166:6, 166:8, 166:11, 175:10, 192:24
**downtown** [1] - 4:6
**DR** [2] - 2:7, 39:10
**Dr** [51] - 9:7, 10:3, 14:2, 14:10, 15:5, 15:10, 16:1, 30:17, 32:22, 33:9, 33:18, 34:14, 38:8, 38:9, 38:19, 39:3, 39:11, 39:15, 53:17, 53:20, 55:8, 55:16, 56:21, 58:10, 60:21, 61:8, 61:23, 61:25, 62:1, 62:11, 62:17, 69:18, 69:19, 70:15, 71:14, 72:15, 76:6, 76:25, 78:20, 82:23, 93:6, 101:1, 105:14, 105:22, 107:7, 108:24, 160:12, 160:16, 175:6, 188:8, 193:7

**drag** [3] - 28:8, 28:12, 168:3
**drags** [2] - 28:13, 165:14
**dramatic** [1] - 178:11
**draw** [2] - 77:5, 148:9
**drawing** [136] - 29:9, 99:7, 100:4, 100:6, 100:12, 109:2, 139:2, 139:24, 139:25, 140:2, 140:5, 140:7, 140:8, 140:12, 140:13, 140:17, 140:21, 142:24, 144:19, 145:2, 146:3, 146:4, 146:14, 146:15, 146:21, 146:22, 146:24, 146:25, 147:13, 147:14, 147:15, 147:17, 147:19, 148:20, 148:21, 148:22, 149:12, 149:13, 149:14, 150:11, 150:12, 150:14, 150:16, 150:17, 150:24, 150:25, 151:17, 151:18, 151:23, 151:24, 152:2, 152:14, 152:15, 153:25, 154:2, 154:3, 163:7, 163:8, 163:9, 163:10, 163:20, 163:21, 164:1, 164:2, 164:4, 165:7, 165:10, 165:23, 165:24, 165:25, 166:3, 166:4, 166:16, 166:21, 166:23, 167:9, 167:10, 167:11, 168:8, 168:9, 169:14, 169:16, 170:1, 171:24, 172:1, 172:25, 174:18, 175:23, 175:24, 176:1, 177:7, 177:8, 179:6, 179:13, 179:14, 179:15, 179:17, 183:18, 183:19, 183:21, 183:23, 184:19, 184:20, 185:6, 185:7, 185:9, 185:10, 185:11, 185:16, 185:17, 188:10, 188:11, 188:12, 190:18, 190:20, 190:25, 191:5, 191:6, 191:15, 191:17, 192:1, 192:4, 192:5, 196:9
**drawings** [13] - 56:22, 141:16, 142:5, 142:17, 143:23, 144:1, 144:8, 148:17, 148:18, 149:4, 151:21, 151:24, 153:1
**drawn** [1] - 8:23
**drive** [2] - 26:11, 192:25
**drives** [1] - 183:25
**drop** [1] - 30:24
**due** [1] - 198:12
**Durer** [1] - 44:8
**DULY** [1] - 38:12
**duly** [1] - 14:18
**during** [23] - 38:1, 46:14, 74:9, 74:11, 79:18, 87:17, 105:15, 119:2, 119:3, 128:3, 128:19, 132:15, 144:18, 144:22, 150:4, 167:24, 167:25, 168:2, 168:4, 168:5, 177:20
**dwell** [1] - 62:7

**E**

**Eagle** [45] - 4:19, 10:13, 10:16, 10:23, 11:1, 11:8, 11:12, 11:16, 12:3, 12:7, 12:12, 12:14, 12:25, 13:2, 13:7, 13:8, 13:9, 13:16, 13:17, 13:18, 13:21, 21:6, 29:18, 30:25, 31:3, 31:6, 31:12, 31:16, 31:20, 31:25, 32:3, 33:2, 34:19, 35:22, 35:24, 36:5, 36:8, 36:12, 120:1, 128:3, 144:18, 177:21
**EAGLE** [1] - 1:2
**early** [5] - 13:6, 47:7, 47:8, 47:10, 47:12
**easier** [2] - 16:4, 181:14
**easily** [1] - 16:6
**east** [2] - 166:7, 166:12
**easy** [2] - 123:9,

134:18
**eaves** [3] - 22:9, 22:19
**echos** [1] - 193:8
**economic** [1] - 51:12
**edge** [6] - 51:25, 52:20, 82:3, 82:10, 100:7, 138:13
**edges** [5] - 82:3, 82:7, 82:18, 100:7, 100:14
**edit** [1] - 27:10
**edits** [1] - 127:3
**educating** [1] - 7:20
**education** [1] - 198:6
**educational** [1] - 39:11
**effect** [5] - 93:8, 135:5, 135:6, 173:4, 173:10
**efficiently** [1] - 10:19
**effort** [4] - 113:17, 152:12, 167:6, 180:19
**efforts** [4] - 147:22, 147:23, 151:6, 194:23
**egregious** [1] - 33:7
**eight** [1] - 21:13
**eight-page** [1] - 21:13
**Eighteenth** [1] - 59:11
**either** [12] - 91:17, 91:22, 106:13, 108:1, 109:18, 116:7, 117:23, 136:7, 172:5, 173:18, 182:16
**Electric's** [1] - 39:17
**electrical** [1] - 39:13
**element** [22] - 42:8, 88:22, 91:6, 97:6, 120:15, 126:5, 131:13, 132:16, 137:3, 140:9, 140:12, 144:23, 145:8, 145:10, 145:11, 145:17, 153:7, 161:6, 163:19, 164:6, 187:1, 194:3
**elements** [13] - 76:10, 83:3, 113:22, 113:23, 114:11, 114:20, 115:3, 139:6, 142:16, 145:11, 148:8, 148:9, 160:5
**elevation** [4] - 24:3, 45:23, 49:19, 127:2
**eliminate** [1] - 132:14
**ELLIS** [1] - 1:13
**Ellis** [1] - 4:21

**elsewhere** [2] - 87:12, 125:3
**embedded** [1] - 43:21
**embedding** [1] - 49:1
**embodiment** [62] - 33:13, 65:13, 68:25, 69:10, 69:12, 70:13, 75:24, 76:9, 76:17, 77:16, 77:18, 77:19, 77:23, 78:14, 79:7, 81:24, 82:14, 88:2, 88:19, 99:23, 103:17, 105:11, 105:17, 106:8, 111:1, 128:21, 131:17, 131:25, 132:3, 132:6, 141:12, 153:9, 153:14, 162:5, 163:2, 164:20, 167:24, 168:7, 168:11, 168:15, 169:1, 169:24, 169:25, 170:22, 171:3, 171:4, 171:7, 171:9, 172:12, 172:13, 176:12, 177:13, 182:7, 183:4, 183:7, 189:15, 195:14, 195:16, 197:7, 197:10, 197:11
**embodiments** [35] - 33:8, 68:10, 71:19, 75:15, 77:17, 81:13, 81:18, 81:21, 82:20, 88:4, 92:6, 92:15, 92:16, 99:19, 100:21, 100:22, 111:9, 111:16, 118:11, 120:20, 128:17, 132:10, 132:14, 134:5, 144:6, 153:9, 170:17, 176:6, 176:10, 176:11, 183:3, 183:8, 197:8, 197:9
**emphasis** [2] - 40:14, 78:4
**emphasize** [2] - 7:13, 138:10
**employing** [1] - 59:21
**end** [19] - 36:11, 45:3, 46:22, 53:1, 61:8, 61:9, 76:5, 77:4, 85:17, 138:11, 144:11, 157:14, 162:22, 178:25, 190:3, 194:6, 195:18

**ends** [4] - 17:23, 142:8, 165:14, 169:22
**engage** [2] - 106:16, 145:15
**engine** [3] - 64:19, 67:10, 77:21
**engineer** [2] - 18:18, 19:12
**engineering** [2] - 39:13, 39:20
**engineers** [1] - 30:5
**ENGLISH** [1] - 1:17
**English** [2] - 5:16, 62:8
**enhance** [1] - 10:18
**enjoy** [1] - 37:1
**enlarged** [1] - 165:5
**entered** [1] - 47:16
**entire** [7] - 11:17, 28:5, 28:7, 31:2, 74:21, 79:21, 194:21
**entirely** [1] - 147:9
**entirety** [1] - 193:16
**entitled** [2] - 62:3, 172:4
**entity** [1] - 12:21
**envelope** [26] - 26:15, 52:6, 52:7, 81:23, 82:13, 83:13, 88:13, 88:14, 88:16, 94:11, 95:1, 100:16, 101:5, 103:6, 103:11, 103:20, 103:24, 104:13, 104:19, 105:5, 105:17, 106:14, 108:14, 109:18, 110:16
**environment** [1] - 49:10
**epipolar** [8] - 42:9, 42:14, 42:18, 45:11, 49:21, 59:4, 59:21, 136:19
**epipole** [1] - 42:14
**equating** [1] - 92:13
**equivalent** [1] - 161:14
**Erica** [2] - 1:22, 120:3
**error** [1] - 29:22
**errors** [1] - 29:21
**especially** [2] - 189:18, 195:11
**Esquire** [1] - 1:22
**ESQUIRE** [10] - 1:12, 1:14, 1:14, 1:15, 1:15, 1:17, 1:18, 1:18, 1:19, 1:19
**essence** [1] - 185:6
**essentially** [13] - 15:6,

21:8, 21:22, 24:19, 43:23, 44:10, 45:5, 45:22, 50:5, 86:4, 135:16, 143:22, 180:16
**establish** [1] - 8:8
**established** [2] - 35:19, 93:24
**estimate** [15] - 16:15, 16:18, 20:2, 20:17, 20:19, 23:18, 23:23, 23:24, 30:2, 30:13, 109:3, 163:11, 179:12, 183:18, 190:18
**estimating** [1] - 64:5
**estimation** [6] - 35:22, 105:3, 125:19, 157:15, 159:9, 186:23
**estoppel** [1] - 177:17
**et** [7] - 1:2, 1:5, 65:9, 79:24, 157:17, 177:24
**event** [6] - 79:9, 100:20, 111:7, 112:15, 130:11, 169:21
**everywhere** [1] - 170:18
**evidence** [35] - 33:25, 55:1, 63:16, 65:4, 67:4, 70:24, 87:25, 88:1, 95:6, 96:5, 96:16, 125:3, 125:7, 127:22, 128:8, 128:9, 128:12, 128:25, 130:13, 133:12, 133:15, 133:17, 141:7, 141:19, 142:8, 142:24, 160:11, 160:19, 161:17, 178:8, 182:25, 189:8, 192:18
**exact** [2] - 24:21, 145:4
**exactly** [21] - 38:1, 39:9, 46:11, 50:24, 51:24, 60:14, 62:10, 67:6, 85:12, 123:17, 124:11, 125:15, 125:21, 126:8, 131:13, 131:16, 131:24, 132:2, 132:9, 137:5, 155:12
**exam** [1] - 79:18
**examination** [1] - 73:20
**EXAMINATION** [4] -

2:5, 2:7, 15:9, 39:10
**examined** [1] - 56:11
**examiner** [6] - 119:11, 128:2, 129:4, 129:22, 129:23, 130:11
**example** [32] - 13:18, 27:17, 33:7, 63:14, 64:19, 65:5, 66:17, 67:10, 68:22, 69:1, 69:2, 72:10, 73:11, 74:5, 76:12, 77:21, 112:1, 126:15, 143:25, 154:13, 159:5, 161:9, 161:12, 165:3, 165:13, 170:16, 170:21, 170:22, 171:2, 183:6, 183:7
**examples** [16] - 58:10, 58:11, 64:24, 65:9, 66:1, 68:8, 68:16, 88:5, 126:16, 168:22, 170:24, 171:1, 180:20, 196:15, 196:16, 196:18
**except** [2] - 50:22, 197:5
**exception** [2] - 61:25, 138:12
**excerpt** [3] - 18:23, 41:2, 110:11
**excerpted** [1] - 21:3
**excerpts** [2] - 19:14, 126:10
**exchanged** [1] - 7:5
**exclude** [15] - 63:14, 65:13, 66:12, 68:24, 69:2, 70:12, 71:16, 71:19, 75:15, 92:4, 111:1, 111:8, 128:21, 153:14, 168:10
**excluded** [3] - 76:1, 136:7, 153:7
**excludes** [2] - 118:11, 168:15
**excluding** [6] - 68:21, 106:3, 111:15, 111:23, 132:4, 182:7, 195:14
**exclusion** [1] - 112:14
**exclusively** [1] - 63:16
**excuse** [6] - 56:19, 57:1, 101:22, 101:23
**exemplary** [4] - 83:3, 183:2, 183:3, 183:8
**exercise** [1] - 73:13
**EXHIBIT** [3] - 3:4, 3:6,

20:24
**Exhibit** [1] - 188:5
**exhibit** [1] - 171:22
**exist** [1] - 168:12
**existed** [3] - 115:25, 116:12, 116:19
**existence** [2] - 34:19, 96:15
**exists** [3] - 102:22, 103:13, 125:5
**expanded** [1] - 35:6
**expanding** [1] - 107:1
**expect** [2] - 178:4, 184:4
**expectancy** [1] - 34:24
**expectation** [1] - 184:9
**expects** [1] - 184:13
**expeditiously** [2] - 10:19, 11:6
**experience** [1] - 15:18
**expert** [32] - 7:6, 7:11, 7:15, 7:23, 8:11, 9:4, 9:7, 14:2, 14:10, 33:16, 33:23, 34:3, 34:4, 34:14, 38:3, 66:16, 71:13, 72:11, 73:9, 77:7, 80:9, 95:14, 95:16, 95:24, 96:4, 96:9, 101:1, 117:11, 130:18, 160:16, 188:9
**expert's** [1] - 8:24
**expertise** [1] - 62:4
**experts** [6] - 6:9, 6:12, 7:2, 117:11, 142:12, 198:8
**explain** [21] - 27:18, 27:21, 38:1, 39:7, 40:11, 40:20, 41:4, 41:16, 43:14, 44:18, 44:25, 48:4, 52:14, 55:8, 63:13, 63:25, 74:1, 85:2, 95:12, 129:10, 139:8
**explained** [7] - 18:21, 26:2, 27:2, 51:17, 60:21, 76:6, 142:1
**explaining** [3] - 34:8, 77:23, 198:8
**explains** [1] - 36:16
**explanation** [3] - 8:17, 37:25, 77:15
**explicit** [5] - 60:25, 111:15, 128:9, 136:8, 136:9
**explicitly** [11] - 48:12, 76:9, 93:12, 95:4, 98:23, 105:14,

106:3, 109:11, 128:4, 130:15, 196:7
**exploring** [1] - 139:9
**express** [1] - 144:20
**expressed** [1] - 22:12
**expressing** [1] - 180:15
**expressly** [2] - 110:15, 141:11
**extensive** [1] - 16:23
**extra** [4] - 9:19, 20:25, 84:20, 134:21
**extracted** [1] - 165:9
**extraction** [1] - 24:16
**extracts** [1] - 24:14
**extrapolate** [1] - 99:10
**extrinsic** [5] - 63:16, 67:4, 70:24, 160:11, 160:19
**extrude** [1] - 49:24

---

## F

**F.3d** [1] - 148:11
**faces** [3] - 48:11, 48:17, 48:20
**facet** [2] - 24:25, 25:1
**facility** [1] - 47:21
**fact** [48] - 7:14, 12:14, 13:7, 19:8, 33:4, 44:3, 48:8, 48:13, 52:24, 62:8, 75:23, 94:7, 96:7, 98:21, 98:22, 102:14, 104:7, 118:3, 125:6, 130:8, 130:12, 131:10, 131:13, 132:6, 134:6, 134:13, 136:10, 137:19, 151:1, 151:5, 152:2, 152:17, 154:3, 155:1, 156:8, 157:8, 164:7, 168:6, 170:9, 170:15, 173:13, 177:13, 178:17, 189:23, 193:8, 196:7, 196:12, 196:15
**factfinder** [1] - 146:7
**factors** [1] - 34:25
**factual** [2] - 7:8, 7:23, 34:16
**factually** [1] - 112:15
**fair** [3] - 132:21, 147:11, 155:17
**fairly** [4] - 21:13, 23:3, 23:12, 175:1
**faithful** [1] - 181:3

**Falanga** [1] - 4:20
**FALANGA** [1] - 1:12
**fall** [1] - 31:8
**fallacy** [1] - 136:7
**fallback** [2] - 57:7, 96:9
**false** [1] - 70:18
**familiar** [5] - 11:25, 22:3, 42:3, 96:8, 179:18
**familiarity** [2] - 180:18
**family** [6] - 149:18, 151:11, 152:6, 153:18, 181:17, 193:1
**far** [11] - 37:1, 37:19, 42:16, 43:4, 43:7, 44:20, 44:22, 59:2, 85:22, 139:25, 149:3
**fascinating** [1] - 36:24
**fashion** [1] - 6:16
**fast** [1] - 184:8
**feasible** [1] - 19:16
**feature** [66] - 22:7, 24:23, 25:5, 28:6, 28:7, 28:8, 28:13, 43:6, 43:7, 57:23, 62:5, 64:20, 64:21, 65:5, 65:16, 65:17, 65:23, 65:25, 66:7, 67:11, 67:13, 68:23, 71:11, 75:8, 76:15, 76:18, 77:22, 129:21, 130:4, 140:14, 153:10, 154:22, 154:23, 156:14, 156:17, 157:16, 157:24, 157:25, 158:9, 158:12, 159:22, 159:23, 174:16, 174:18, 174:19, 174:23, 174:24, 175:4, 175:8, 175:14, 175:16, 176:15, 176:16, 176:25, 177:1, 177:25, 178:1, 179:14, 183:19, 191:5, 192:22
**features** [42] - 21:15, 22:6, 24:14, 24:22, 25:2, 25:3, 25:4, 25:11, 25:18, 25:20, 43:11, 63:23, 64:25, 65:10, 66:4, 66:12, 68:21, 68:24, 69:17, 70:2, 70:5, 70:8, 70:9, 70:17, 71:3, 71:11, 71:12, 71:16,

74:5, 76:12, 77:2, 77:13, 83:10, 100:14, 140:5, 157:2, 158:21, 159:7, 176:7, 176:8, 177:23, 192:20
**Federal** [5] - 57:20, 189:5, 195:10, 196:3, 196:20
**federal** [8] - 87:5, 93:24, 168:14, 171:6, 173:7, 178:9, 180:4, 181:3
**feed** [1] - 32:8
**feedback** [1] - 157:17
**feet** [6] - 21:24, 22:1, 22:17, 22:18, 23:7, 23:8
**fell** [1] - 36:25
**fellow** [1] - 15:22
**felt** [1] - 16:16
**few** [5] - 17:2, 19:14, 19:24, 23:22, 39:4
**Fi** [1] - 184:8
**field** [1] - 12:16
**Figure** [86] - 74:24, 81:23, 81:24, 82:9, 82:15, 88:6, 88:14, 88:20, 89:2, 89:8, 89:9, 89:10, 89:12, 89:18, 92:21, 93:2, 93:5, 94:12, 94:20, 94:25, 95:3, 98:13, 99:4, 99:9, 101:3, 101:4, 101:5, 104:13, 104:14, 104:15, 104:22, 104:23, 105:18, 105:19, 105:22, 110:18, 110:19, 120:25, 121:1, 125:14, 125:21, 126:2, 126:3, 128:4, 128:5, 131:14, 131:15, 158:7, 159:2, 161:21, 161:23, 162:2, 162:3, 162:23, 162:24, 164:20, 164:22, 164:23, 164:25, 165:6, 165:8, 165:12, 165:25, 166:1, 166:14, 171:19, 171:20, 175:21, 176:11, 178:17, 180:19, 182:5, 183:4, 185:25, 186:1, 186:6, 188:3, 194:15

**figure** [16] - 37:14, 45:9, 45:12, 52:9, 52:25, 59:22, 81:22, 81:23, 88:20, 89:9, 89:12, 94:22, 101:4, 101:6, 158:17, 194:16
**Figures** [9] - 26:20, 102:25, 103:3, 105:4, 105:10, 110:14, 110:17, 192:6, 192:7
**figures** [14] - 90:17, 91:20, 94:9, 94:12, 95:7, 110:13, 125:13, 141:10, 141:19, 159:5, 170:3, 177:24, 185:25, 192:10
**figuring** [1] - 35:20
**file** [8] - 105:16, 124:17, 144:5, 144:17, 170:10, 171:12, 171:13, 197:4
**filed** [1] - 74:12
**filled** [2] - 17:24, 48:20
**film** [1] - 46:16
**final** [4] - 13:15, 30:10, 71:23, 101:9
**finally** [17] - 73:15, 116:4, 145:6, 152:8, 157:14, 160:3, 160:11, 161:19, 181:11, 187:25, 190:9, 192:17, 193:5, 193:11
**Finance** [1] - 11:15
**fine** [4] - 9:9, 67:2, 75:14, 84:6
**finish** [1] - 181:10
**finished** [1] - 15:18
**finishing** [1] - 101:7
**finite** [2] - 44:21, 44:23
**Finsterwalder** [3] - 45:6, 45:21, 59:4
**first** [252] - 6:7, 6:12, 6:21, 6:22, 9:3, 10:3, 11:22, 29:2, 34:16, 40:23, 41:17, 42:10, 45:13, 46:8, 49:21, 50:1, 51:2, 51:20, 51:23, 51:25, 53:8, 54:16, 54:18, 55:4, 55:10, 55:11, 55:24, 55:25, 56:2, 56:4, 56:10, 56:14, 56:15, 56:18, 65:1, 69:7, 71:25, 72:5, 72:20,

73:24, 76:19, 76:20, 85:2, 89:23, 90:1, 90:18, 90:19, 99:17, 100:2, 103:9, 104:22, 111:7, 114:2, 114:4, 114:10, 114:13, 114:14, 114:24, 115:3, 115:12, 115:15, 115:16, 115:17, 115:18, 115:19, 115:23, 115:24, 115:25, 116:5, 116:8, 116:9, 116:11, 116:15, 116:18, 116:25, 117:2, 117:5, 117:7, 117:21, 117:23, 117:25, 118:4, 118:10, 118:19, 119:8, 119:17, 120:9, 120:15, 120:16, 121:17, 121:21, 122:8, 123:2, 123:7, 123:10, 123:14, 123:16, 123:19, 124:6, 124:10, 125:16, 125:22, 126:2, 126:8, 127:6, 127:20, 128:5, 128:18, 128:25, 129:9, 129:11, 129:14, 129:17, 129:25, 130:6, 130:13, 130:25, 131:4, 131:7, 131:9, 131:12, 131:18, 132:5, 132:12, 133:16, 134:5, 134:12, 134:20, 134:24, 134:25, 135:6, 135:10, 135:12, 135:25, 136:25, 137:8, 137:14, 137:21, 138:4, 138:5, 138:16, 138:19, 139:15, 139:17, 139:23, 139:24, 140:1, 140:2, 140:4, 140:11, 140:20, 141:14, 142:24, 143:7, 143:8, 144:19, 145:2, 146:2, 146:14, 146:20, 146:24, 147:13, 147:14, 147:17, 147:24, 148:20, 148:22, 149:5, 149:12,

149:14, 150:8, 150:11, 150:14, 150:16, 150:17, 150:25, 151:16, 151:17, 151:23, 151:25, 152:3, 152:13, 152:15, 153:11, 154:2, 154:24, 155:21, 155:22, 156:17, 156:19, 157:24, 158:13, 163:5, 163:7, 163:20, 164:1, 165:22, 166:23, 167:9, 168:8, 169:16, 170:1, 172:1, 173:6, 174:17, 174:19, 174:24, 175:4, 175:8, 175:14, 175:15, 176:15, 176:16, 176:18, 176:25, 177:7, 177:8, 177:23, 179:14, 179:16, 183:19, 183:23, 184:19, 185:5, 185:10, 185:16, 186:15, 188:10, 188:11, 191:6, 191:15, 192:1, 192:4, 195:5, 198:5
**fit** [2] - 27:4, 161:22
**five** [4] - 28:1, 28:12, 28:14, 166:5
**fix** [1] - 12:10
**fixed** [7] - 10:20, 11:20, 12:6, 12:17, 32:9, 32:10, 32:19
**flag** [1] - 62:18
**flank** [1] - 79:9
**flat** [1] - 23:4
**flatland** [1] - 29:7
**flesh** [1] - 160:24
**flip** [2] - 178:15, 180:17
**flipped** [1] - 121:13
**flipping** [1] - 25:8
**flow** [2] - 158:8, 186:1
**fly** [2] - 43:24, 46:9
**focus** [11] - 26:17, 33:2, 37:3, 84:2, 132:24, 161:21, 187:15, 190:2, 190:10, 191:22
**focused** [3] - 26:21, 33:9, 183:14
**focusing** [1] - 184:25
**focussing** [1] - 191:2
**follow** [2] - 53:23,

99:13
**following** [1] - 156:2
**FOLLOWS** [1] - 38:13
**follows** [2] - 14:19, 33:1
**footprints** [1] - 24:4
**FOR** [3] - 1:1, 3:6, 20:24
**form** [7] - 50:2, 50:12, 51:25, 54:10, 55:17, 105:25, 139:17
**formed** [1] - 41:22
**former** [2] - 10:23, 149:7
**forms** [3] - 51:21, 55:1, 88:3
**formula** [1] - 42:5
**forth** [6] - 49:10, 87:11, 126:21, 127:3, 145:7, 156:13
**fortunately** [1] - 184:8
**forward** [6] - 21:24, 22:1, 66:9, 121:24, 140:24, 143:20
**forwards** [1] - 188:14
**foundation** [3] - 7:10, 8:8, 33:3
**founded** [1] - 10:13
**founders** [1] - 10:22
**four** [6] - 5:8, 18:4, 27:25, 28:11, 52:10, 170:23
**four-story** [1] - 18:4
**fourth** [1] - 52:12
**frame** [206] - 20:9, 22:11, 25:22, 25:23, 26:16, 26:18, 27:3, 27:9, 27:10, 27:14, 29:20, 33:10, 33:13, 48:6, 48:7, 48:10, 48:25, 49:1, 49:25, 81:24, 82:14, 82:20, 82:21, 88:19, 88:20, 88:22, 88:23, 88:24, 89:1, 89:3, 89:6, 89:10, 89:11, 89:12, 89:16, 89:17, 89:19, 90:16, 91:18, 92:13, 92:14, 92:15, 92:16, 92:23, 92:25, 93:5, 93:17, 94:21, 95:2, 95:5, 95:18, 96:11, 96:13, 96:14, 97:6, 97:17, 97:19, 97:23, 98:3, 98:4, 98:5, 98:10, 98:14, 98:21, 98:24, 98:25, 99:5, 99:10, 99:11, 99:19, 99:21, 99:23, 100:20, 100:22,

101:4, 101:23, 102:2, 102:15, 102:16, 103:8, 103:16, 103:18, 103:25, 104:1, 104:3, 104:5, 104:20, 104:24, 105:6, 105:9, 105:11, 105:22, 105:24, 106:3, 106:8, 107:4, 107:13, 107:17, 107:18, 108:5, 108:7, 108:9, 108:18, 108:20, 109:1, 109:9, 109:14, 109:19, 110:14, 110:20, 111:5, 111:17, 113:14, 113:15, 113:19, 113:21, 114:21, 115:5, 116:5, 116:7, 116:11, 116:12, 116:15, 116:16, 116:17, 116:19, 117:2, 117:5, 117:7, 118:5, 119:19, 120:22, 120:23, 120:25, 121:7, 121:14, 121:17, 122:17, 122:18, 125:15, 125:17, 125:18, 125:20, 126:2, 126:3, 126:5, 126:6, 126:7, 127:10, 127:12, 127:14, 128:4, 128:5, 129:14, 129:15, 129:25, 130:5, 130:24, 131:3, 131:5, 131:9, 131:11, 131:12, 131:19, 131:24, 132:1, 132:3, 132:4, 132:6, 132:8, 137:1, 137:17, 137:19, 138:1, 138:3, 138:6, 138:17, 138:20, 141:20, 141:21, 141:23, 147:22, 147:23, 155:15, 157:11, 164:21, 164:23, 165:3, 165:12, 176:1, 182:9, 186:21, 186:23, 187:1, 187:2, 187:3
**frames** [21] - 90:14, 93:8, 93:12, 94:4, 95:8, 100:16, 110:9,

110:17, 111:23, 119:4, 119:6, 121:9, 121:18, 126:15, 126:19, 128:17, 130:14, 133:17, 137:9, 165:18, 175:22
**framework** [1] - 156:14
**frankly** [1] - 181:14
**frequently** [1] - 161:11
**Friedlander** [1] - 1:24
**front** [2] - 24:8, 184:3
**frontis** [1] - 47:17
**FTC** [1] - 37:10
**fudge** [1] - 149:6
**FULFORD** [1] - 1:19
**Fulford** [1] - 5:21
**full** [5] - 14:20, 38:15, 47:22, 67:5, 173:10
**fully** [1] - 119:11
**function** [1] - 108:7
**functionality** [3] - 126:17, 130:2, 176:10
**fundamental** [10] - 26:11, 42:20, 56:7, 102:6, 118:15, 136:20, 167:13, 173:2, 176:4, 178:19
**funded** [1] - 40:5
**furthermore** [2] - 77:14, 126:4
**fuse** [1] - 43:22
**fusing** [1] - 46:18
**future** [1] - 148:16

## G

**gable** [5] - 48:1, 61:8, 65:9, 76:14, 107:1
**game** [1] - 80:20
**gap** [1] - 143:17
**gathered** [1] - 81:15
**GE** [1] - 40:7
**gee** [1] - 62:17
**General** [1] - 39:17
**general** [3] - 40:11, 64:3, 119:25
**generally** [4] - 12:25, 18:2, 68:17, 74:20
**generate** [9] - 20:17, 23:23, 30:2, 31:1, 32:3, 56:16, 61:1, 83:9, 163:10
**generated** [6] - 16:15, 20:1, 23:18, 30:8, 91:19, 162:1
**generating** [2] - 30:13,

77:19
**generation** [10] - 78:3, 157:4, 157:6, 157:12, 162:1, 182:12, 186:11, 194:13, 195:21, 195:24
**gentlemen** [1] - 5:8
**geometric** [2] - 40:14, 45:6
**geometry** [14] - 42:10, 42:18, 43:19, 44:24, 45:11, 45:24, 50:3, 51:9, 51:18, 59:4, 59:21, 73:10, 76:3, 136:19
**Geospatial** [2] - 39:25, 40:5
**GERRY** [1] - 1:7
**gesture** [1] - 16:4
**Gianni** [2] - 4:24, 162:10
**GIANNI** [1] - 1:14
**given** [8] - 23:5, 23:22, 26:23, 29:16, 45:23, 117:8, 135:9, 148:15
**global** [3] - 181:15, 181:16
**globally** [1] - 181:20
**glorify** [1] - 182:5
**glossary** [1] - 197:3
**Google** [1] - 60:13
**grabbing** [1] - 82:23
**graduated** [1] - 42:4
**grammatical** [1] - 114:25
**graphic** [1] - 90:16
**graphical** [7] - 28:16, 82:2, 83:4, 84:11, 114:4, 117:24
**graphically** [1] - 90:12
**graphics** [2] - 15:19, 28:15
**grasping** [1] - 136:12
**gravamen** [1] - 149:8
**great** [14] - 4:15, 5:23, 7:1, 7:22, 16:5, 36:16, 37:4, 47:6, 60:20, 99:22, 141:23, 143:10, 186:14, 198:11
**greater** [3] - 121:5, 150:2, 187:14
**greatly** [1] - 10:17
**green** [7] - 25:5, 83:20, 85:9, 94:8, 95:1, 122:4, 137:8
**grid** [4] - 48:23, 49:2, 49:4
**ground** [6] - 25:4,

42:25, 43:2, 43:19, 49:25, 50:18
**group** [1] - 83:17
**groups** [2] - 20:15, 28:3
**guess** [4] - 73:9, 155:17, 174:1, 186:16
**guesstimate** [1] - 18:13
**guesstimating** [4] - 17:15, 17:22, 17:25, 23:19
**guidance** [3] - 158:24, 192:14, 195:10
**guided** [1] - 193:16
**guides** [1] - 190:4
**guiding** [1] - 65:4

## H

**half** [1] - 43:13
**halfway** [1] - 186:16
**hampered** [1] - 16:25
**hand** [13] - 9:17, 9:21, 14:17, 20:20, 38:11, 38:24, 47:15, 48:3, 57:2, 66:8, 100:10, 119:10, 154:11
**handed** [2] - 21:3, 36:9
**handful** [1] - 10:6
**handle** [8] - 4:16, 9:1, 28:4, 83:16, 123:3, 135:18, 165:14, 165:15
**handles** [8] - 27:1, 27:2, 27:23, 28:2, 28:5, 95:18, 106:21, 168:3
**handout** [2] - 9:14, 9:16
**hanging** [1] - 29:21
**happy** [2] - 75:16, 155:19
**hard** [1] - 99:12
**harder** [1] - 17:17
**harks** [1] - 151:21
**harm** [3] - 147:3, 148:13, 149:1, 152:18
**hate** [1] - 197:24
**HAVING** [1] - 38:12
**hazardous** [1] - 18:2
**hazards** [1] - 18:14
**head** [4] - 43:23, 57:22, 66:21, 71:1
**headed** [1] - 119:7
**heads** [1] - 182:17

**hear** [14] - 7:2, 8:3, 14:25, 19:2, 33:12, 35:8, 38:23, 46:13, 142:24, 143:2, 146:10, 146:12, 161:20, 196:6

**heard** [27] - 31:9, 32:21, 33:1, 33:9, 34:17, 37:19, 52:2, 54:20, 55:8, 65:3, 66:16, 81:7, 89:4, 129:1, 129:2, 132:23, 139:4, 139:5, 157:5, 162:23, 169:18, 169:20, 180:24, 180:25, 181:13, 182:4, 195:6

**hearing** [4] - 37:1, 37:17, 48:6, 142:23

**HEARING** [1] - 1:5

**heavily** [1] - 69:19

**height** [4] - 50:14, 50:23, 51:3, 65:18

**help** [6] - 37:6, 38:3, 117:19, 158:4, 172:5, 172:10

**helpful** [4] - 37:23, 37:25, 53:14, 163:14

**helping** [1] - 37:2

**helps** [1] - 12:16

**hence** [4] - 17:17, 23:16, 24:11, 27:15

**herein** [1] - 87:14

**high** [4] - 21:24, 21:25, 42:4, 130:7

**highlighted** [9] - 64:23, 75:3, 78:19, 83:20, 85:9, 95:1, 118:17, 122:3, 164:22

**highlights** [2] - 23:22, 29:13

**highly** [1] - 136:3

**hinged** [4] - 133:3, 145:14, 145:17, 145:22

**hip** [2] - 65:9, 76:14

**hips** [2] - 22:2, 22:7

**historical** [1] - 58:10

**historically** [2] - 59:20, 79:1

**history** [33] - 36:21, 41:14, 54:24, 58:15, 58:18, 87:17, 119:5, 124:17, 127:23, 128:8, 128:15, 129:1, 129:3, 130:19, 144:5, 144:17, 150:3,

150:4, 159:15, 160:5, 170:10, 171:13, 177:17, 177:20, 178:3, 178:12, 178:17, 180:21, 187:12, 196:21, 197:4, 198:9

**hit** [3] - 11:12, 11:22, 13:7

**holding** [1] - 133:8

**holds** [1] - 194:4

**home** [2] - 183:25, 192:25

**homeowners** [1] - 107:11

**homes** [1] - 12:4

**Honor** [202] - 4:4, 4:22, 4:25, 5:2, 5:6, 5:9, 5:15, 5:18, 6:2, 6:5, 7:3, 9:5, 9:11, 9:20, 10:2, 10:10, 10:13, 13:24, 14:5, 15:3, 15:7, 15:14, 16:1, 20:18, 21:2, 21:3, 21:11, 30:15, 30:18, 32:7, 32:14, 32:21, 33:20, 34:11, 34:15, 35:9, 36:20, 37:9, 37:16, 38:6, 38:24, 39:2, 53:16, 54:15, 54:16, 54:21, 55:14, 56:8, 56:18, 57:2, 57:13, 57:18, 58:7, 58:14, 58:19, 58:25, 59:19, 60:1, 60:11, 60:19, 62:10, 62:25, 63:2, 63:5, 63:8, 63:11, 63:13, 63:18, 63:24, 64:1, 64:3, 64:4, 64:11, 64:21, 65:11, 66:14, 66:21, 67:24, 68:19, 69:6, 69:14, 69:21, 69:23, 70:25, 71:24, 75:11, 75:12, 75:16, 75:19, 75:23, 76:8, 77:14, 78:4, 79:4, 79:11, 79:17, 80:4, 80:15, 80:17, 80:21, 80:24, 81:4, 86:12, 92:19, 93:4, 93:6, 93:19, 94:1, 95:23, 96:8, 100:9, 100:25, 101:8, 101:20, 101:25, 102:4, 103:3, 103:9, 103:22, 104:10, 105:16, 106:5, 107:24, 109:17, 109:25, 110:3,

110:5, 110:8, 110:23, 112:1, 112:3, 112:18, 113:2, 113:5, 113:8, 115:21, 117:3, 117:14, 119:16, 119:23, 120:7, 125:12, 126:10, 127:13, 128:16, 129:2, 133:25, 134:15, 134:23, 135:4, 135:15, 135:19, 135:20, 135:22, 136:16, 136:25, 137:16, 138:8, 138:24, 139:2, 139:5, 140:1, 140:9, 143:11, 143:19, 144:14, 145:6, 146:8, 146:10, 147:1, 148:25, 149:18, 152:21, 152:22, 153:15, 153:17, 154:17, 161:15, 162:10, 162:22, 166:19, 170:13, 174:13, 176:14, 177:3, 181:6, 184:2, 186:4, 186:17, 187:10, 190:10, 192:10, 194:7, 194:19, 195:4, 197:12, 197:20, 197:22, 198:2, 198:24

**Honor's** [5] - 6:13, 6:19, 159:1, 184:25, 186:9

**HONORABLE** [1] - 1:9

**honors** [1] - 118:14

**hope** [5] - 32:20, 41:20, 51:17, 52:21, 53:13

**hopefully** [1] - 4:17

**horizon** [1] - 44:22

**horizontal** [1] - 43:3

**hot** [2] - 43:15, 45:19

**hours** [1] - 21:9

**house** [12] - 18:11, 19:20, 25:8, 25:10, 25:11, 35:10, 35:13, 139:20, 141:17, 143:21, 144:2, 166:10

**House** [1] - 20:5

**houses** [5] - 12:17, 35:6, 107:8, 143:21, 143:25

**hundred** [1] - 63:18

hundreds [1] - 198:15

**hurricane** [1] - 107:7

**hurricanes** [2] - 12:1, 12:13

**hypotheticals** [1] - 62:8

---

**I**

**icon** [1] - 28:16

**id** [1] - 175:1

**idea** [6] - 17:22, 18:24, 19:12, 42:24, 47:5, 143:5

**ideas** [1] - 41:1

**identical** [7] - 83:16, 86:11, 135:16, 144:1, 144:8, 149:17, 185:24

**IDENTIFICATION** [2] - 3:6, 20:24

**identified** [4] - 55:11, 55:12, 78:11, 150:16

**identify** [2] - 76:5, 77:8

**identifying** [2] - 78:1, 78:5

**IEEE** [1] - 15:25

**ignore** [3] - 8:2, 100:22, 167:14

**II** [3] - 43:21, 46:5, 46:6

**illustrate** [2] - 89:14, 105:11

**illustrated** [6] - 45:13, 93:7, 101:2, 101:3, 105:2, 105:18

**illustrating** [1] - 66:2

**image** [140] - 20:8, 24:19, 24:20, 28:1, 29:3, 29:4, 29:20, 41:17, 41:19, 42:10, 42:11, 42:14, 42:16, 42:18, 44:12, 44:23, 48:15, 49:18, 49:21, 49:23, 50:1, 50:15, 50:17, 50:20, 51:2, 51:4, 51:20, 51:21, 51:22, 55:4, 55:5, 55:11, 55:12, 55:25, 56:1, 56:5, 56:6, 56:7, 56:15, 56:16, 56:25, 59:8, 59:9, 59:23, 62:21, 64:9, 74:21, 74:22, 75:2, 75:6, 76:19, 76:20, 79:22, 83:7, 90:13, 97:7, 102:21, 104:23, 106:19,

115:16, 115:18, 115:22, 115:24, 120:16, 120:18, 121:8, 121:22, 123:16, 123:18, 123:25, 124:3, 134:10, 136:21, 139:15, 139:16, 139:18, 139:19, 139:23, 139:24, 139:25, 140:2, 140:3, 140:20, 141:21, 146:2, 146:3, 150:11, 150:12, 150:16, 150:17, 150:18, 151:25, 152:3, 152:4, 154:23, 154:24, 155:22, 155:23, 157:25, 158:1, 158:5, 158:20, 158:22, 160:15, 160:16, 163:5, 163:6, 163:7, 163:8, 164:21, 164:24, 165:4, 165:5, 165:24, 165:25, 166:17, 166:22, 166:24, 171:25, 173:18, 174:24, 174:25, 175:3, 175:4, 176:8, 176:16, 176:17, 176:25, 177:1, 190:19, 190:21, 192:2, 192:23, 196:10

**imagery** [9] - 11:8, 20:16, 27:4, 27:13, 28:19, 30:12, 43:13, 46:8, 47:19

**images** [95] - 20:1, 20:13, 20:14, 20:15, 24:14, 24:16, 25:12, 25:19, 28:22, 31:7, 40:15, 40:16, 41:5, 42:19, 43:10, 43:15, 43:17, 43:23, 45:8, 45:21, 46:16, 46:19, 47:6, 47:8, 47:11, 47:21, 47:25, 49:16, 51:9, 53:24, 54:8, 55:5, 56:18, 56:21, 58:16, 59:6, 59:24, 64:7, 64:9, 64:18, 64:22, 64:24, 64:25, 65:24, 66:4, 67:12, 67:21, 68:10, 68:23, 75:5, 77:20, 77:23, 77:24, 78:2, 78:12, 79:24, 82:15,

102:14, 102:20,
104:2, 106:15,
108:23, 121:9,
121:19, 126:19,
126:21, 126:22,
126:25, 134:9,
141:6, 141:14,
141:15, 149:15,
153:12, 156:18,
156:20, 157:3,
157:16, 158:14,
159:10, 159:22,
165:2, 165:18,
166:3, 174:17,
174:20, 175:22,
176:7, 176:9,
177:23, 177:25,
194:3, 194:10
**imagine** [3] - 18:23,
72:23, 198:17
**imaging** [2] - 23:17,
23:25
**impact** [1] - 121:8
**impacts** [1] - 150:25
**implication** [1] - 148:8
**implies** [2] - 34:22,
143:16
**imply** [1] - 143:16
**implying** [1] - 141:1
**import** [1] - 68:16
**importance** [1] - 23:16
**important** [21] - 21:18,
21:19, 22:3, 23:5,
25:2, 35:7, 63:11,
68:18, 72:7, 87:3,
91:1, 115:5, 131:5,
132:11, 133:8,
136:22, 138:18,
162:22, 173:19,
193:2, 194:7
**importantly** [5] - 68:6,
74:8, 162:15, 184:14
**impose** [1] - 196:23
**imposed** [1] - 149:14
**impossibility** [1] -
167:8
**impossible** [2] -
70:16, 175:22
**imprecision** [1] -
152:5
**impression** [2] -
44:15, 46:19
**impressions** [1] -
198:18
**improper** [4] - 68:5,
171:5, 171:7, 173:6
**improperly** [1] -
172:19
**inability** [1] - 16:24
**inaccessibility** [1] -

18:15
**inaccuracies** [1] -
26:1
**inadvertently** [1] -
119:24
**inapplicable** [1] -
145:12
**inappropriate** [5] -
7:11, 7:12, 33:6,
84:22, 92:3
**INC** [1] - 1:5
**incidentally** [1] -
113:8
**inclines** [2] - 18:7,
23:6
**include** [10] - 13:21,
30:9, 63:21, 68:11,
69:1, 70:8, 90:20,
109:18, 109:19,
111:11
**included** [2] - 170:21,
189:17
**includes** [9] - 55:10,
76:18, 83:5, 83:9,
91:15, 104:23,
114:19, 120:22,
153:10
**including** [12] - 11:3,
13:20, 47:22, 62:21,
89:10, 89:15, 95:3,
110:21, 113:20,
115:3, 179:25,
185:24
**inconsistent** [5] -
65:14, 93:20,
112:16, 131:11,
132:18
**incorporates** [1] -
137:2
**incorporating** [1] -
107:21
**incorrect** [9] - 51:3,
85:3, 96:3, 99:15,
100:20, 125:8,
127:25, 128:10
**indeed** [5] - 61:23,
113:10, 138:2,
150:14, 150:19
**indefinite** [2] - 161:3,
188:23
**independent** [13] -
86:3, 90:24, 97:1,
97:9, 130:25,
156:12, 161:8,
161:12, 169:7,
169:8, 169:12,
189:2, 190:15
**indicate** [8] - 82:4,
86:5, 86:6, 104:24,
104:25, 118:17,

159:16, 191:3
**indicated** [4] - 53:3,
85:18, 104:10,
189:12
**indicates** [7] - 154:23,
157:24, 174:24,
175:3, 175:8,
175:14, 176:8
**indicating** [2] -
159:21, 192:22
**indication** [9] - 64:20,
67:11, 76:17, 77:22,
77:25, 108:2, 108:4,
156:14, 156:16
**indications** [2] - 78:1
**indisputably** [1] -
105:21
**individual** [2] - 17:12,
28:4
**industries** [1] - 31:23
**industry** [6] - 10:14,
11:16, 11:17, 35:16,
35:20, 58:21
**infinite** [2] - 44:23,
71:7
**infinitely** [1] - 44:22
**infinity** [1] - 44:20
**info** [1] - 30:25
**information** [19] - 7:8,
7:23, 17:5, 22:22,
24:14, 25:19, 34:23,
34:25, 35:5, 35:20,
35:21, 46:1, 46:12,
46:24, 74:14,
103:14, 106:6,
159:16
**informing** [1] - 197:8
**informs** [1] - 53:9
**infringement** [3] -
62:13, 144:12,
145:24
**infringes** [1] - 32:3
**inherent** [2] - 42:19,
43:10
**initial** [8] - 25:25,
29:20, 79:23, 88:4,
88:5, 112:6, 134:7,
198:18
**inject** [1] - 101:19
**injecting** [1] - 91:9
**injured** [1] - 145:16
**innovations** [1] -
13:10
**input** [11] - 11:10,
72:20, 81:9, 83:6,
97:18, 97:23, 104:4,
115:13, 140:11,
185:15, 191:14
**inputs** [1] - 77:25
**inputted** [1] - 140:10

**inquiry** [3] - 85:22,
85:23, 169:22
**inside** [1] - 30:25
**instance** [12] - 44:21,
87:12, 87:14, 87:17,
87:19, 91:5, 100:11,
110:10, 110:18,
111:14, 170:12,
177:12
**instances** [4] - 122:5,
154:7, 170:5, 196:22
**instantaneous** [1] -
184:9
**instead** [2] - 74:19,
144:22
**Institute** [2] - 39:14,
40:10
**instruct** [1] - 58:23
**instruction** [1] -
117:19
**Insurance** [1] - 34:21
**insurance** [19] - 10:18,
11:5, 11:18, 12:6,
12:15, 12:23, 12:25,
13:4, 17:8, 17:9,
17:20, 18:12, 31:21,
34:23, 35:16, 35:21,
36:5, 36:10
**insurers** [1] - 36:15
**intake** [1] - 13:5
**intellectual** [1] - 13:20
**intelligence** [2] -
39:22, 39:24
**Intelligence** [2] - 40:1,
40:5
**intend** [1] - 4:9
**intended** [3] - 33:21,
61:4, 113:19
**intending** [1] - 34:4
**inter** [1] - 13:25
**interaction** [2] - 27:22,
30:7
**interactions** [2] -
27:12, 27:13
**interactive** [7] - 85:10,
88:10, 88:16, 88:22,
100:13, 126:5, 187:1
**interest** [5] - 26:17,
29:17, 46:10, 47:7,
173:24
**interested** [1] - 37:4
**interesting** [4] - 4:8,
36:23, 198:7, 198:10
**interface** [27] - 26:12,
27:9, 27:18, 28:15,
28:16, 83:4, 84:11,
85:10, 88:10, 88:16,
88:22, 92:12,
100:13, 114:4,
117:24, 123:14,

123:24, 124:3,
126:5, 157:1,
157:15, 165:1,
166:5, 184:3, 187:1,
192:20
**interfaces** [1] - 90:16
**intermix** [1] - 155:10
**Internet** [2] - 184:7,
184:8
**interpolate** [1] - 97:13
**interpolation** [1] -
97:14
**interpret** [1] - 171:14
**interpreted** [1] -
149:19
**interpreting** [2] - 70:4,
194:16
**interprets** [3] -
158:16, 159:4, 162:3
**intersect** [3] - 41:6,
41:20, 42:13
**intersection** [2] -
41:25, 61:6
**intrinsic** [16] - 33:25,
55:1, 65:4, 67:4,
95:6, 96:5, 96:16,
125:3, 128:8, 128:9,
128:12, 130:13,
133:15, 142:8,
160:19, 161:17
**introduce** [6] - 10:6,
16:13, 120:3, 142:7,
142:9, 142:19
**introduced** [1] - 81:6
**introduces** [2] - 73:12,
135:7
**introducing** [4] - 7:22,
9:6, 72:12, 141:2
**introduction** [1] - 4:14
**introductions** [1] -
119:24
**introductory** [2] -
81:16, 89:5
**invalidity** [2] - 62:14,
70:23
**invented** [1] - 43:16
**invention** [16] - 19:21,
23:21, 27:11, 41:12,
41:13, 68:12, 81:12,
93:21, 113:24,
126:18, 132:19,
148:11, 176:4,
177:21, 178:4,
180:14
**inventor** [1] - 159:20
**inventors** [3] - 10:21,
18:17, 93:20
**invoked** [1] - 56:10
**involve** [1] - 74:5
**involved** [4] - 5:25,

17:18, 22:23, 155:1
**involves** [3] - 42:25, 58:17, 64:19
**Iowa** [1] - 35:15
**irrelevant** [7] - 74:7, 100:21, 101:6, 162:3, 162:24, 169:8, 169:17
**irrespective** [1] - 173:18
**Island** [1] - 39:21
**issue** [50] - 15:8, 15:13, 18:9, 60:5, 63:11, 64:2, 66:10, 70:22, 74:7, 90:10, 90:24, 94:17, 99:17, 122:15, 123:5, 123:9, 134:23, 135:16, 139:3, 140:19, 146:22, 151:8, 151:20, 153:13, 153:20, 153:22, 156:22, 161:1, 163:1, 167:13, 168:10, 172:17, 173:16, 174:3, 180:7, 181:1, 182:11, 188:9, 188:25, 189:1, 189:11, 189:16, 190:15, 191:23, 192:14, 195:5, 196:7, 198:12
**issued** [4] - 13:20, 151:3, 159:17, 172:7
**issues** [22] - 33:12, 84:24, 120:9, 120:10, 143:16, 143:17, 148:4, 150:5, 160:22, 160:25, 162:15, 180:18, 181:15, 181:16, 182:14, 186:12, 187:12, 188:18, 193:12, 193:21, 198:11, 198:14
**italic** [1] - 56:6
**italicized** [1] - 176:6
**italics** [2] - 56:8, 56:12
**Item** [3] - 92:21, 96:13, 110:20
**items** [1] - 151:7
**itself** [12] - 47:22, 70:19, 71:10, 83:24, 85:8, 86:10, 97:19, 108:7, 108:9, 109:20, 191:25
**Ivan** [2] - 47:9, 47:12

**J**

**JERSEY** [2] - 1:1, 1:8
**Jim** [1] - 31:19
**job** [2] - 58:23, 198:11
**JOHN** [1] - 1:7
**join** [1] - 51:24
**joined** [2] - 48:8, 61:13
**joining** [2] - 42:13, 53:25
**Joseph** [3] - 34:14, 38:8, 38:16
**JOSEPH** [2] - 2:6, 38:12
**journal** [1] - 19:13
**JUDGE** [1] - 1:10
**Judge** [60] - 7:20, 8:6, 33:1, 33:18, 146:13, 146:19, 147:5, 147:11, 147:21, 148:14, 149:8, 149:21, 150:19, 151:7, 152:8, 152:19, 154:11, 155:17, 156:7, 156:11, 156:22, 157:18, 157:23, 158:6, 158:23, 159:10, 160:7, 160:11, 160:18, 160:23, 161:19, 161:24, 162:6, 181:9, 181:14, 181:22, 182:6, 182:10, 183:5, 183:7, 183:14, 183:25, 184:16, 184:21, 185:2, 185:21, 186:2, 187:6, 187:25, 189:3, 189:21, 190:9, 191:1, 191:23, 192:6, 192:17, 192:25, 194:6, 194:11, 198:3
**judge** [3] - 33:10, 152:5, 155:10
**judgment** [1] - 142:10
**jump** [1] - 121:25
**jumping** [1] - 166:18
**junior** [1] - 42:5
**juror** [2] - 117:17, 117:19
**jury** [13] - 37:1, 57:21, 58:23, 61:18, 61:19, 80:10, 115:9, 117:12, 142:22, 142:23, 146:7

**justify** [1] - 101:17

**K**

**Karen** [1] - 1:24
**keep** [5] - 38:22, 54:1, 80:19, 136:23, 138:23
**keeping** [2] - 173:4, 189:13
**Kennedy** [19] - 129:8, 129:19, 129:20, 130:1, 130:3, 130:4, 144:16, 144:25, 150:21, 150:22, 150:24, 151:1, 151:6, 171:11, 171:23, 172:1, 187:16, 187:17, 187:19
**kernels** [1] - 159:16
**key** [13] - 11:9, 11:10, 23:20, 26:4, 27:10, 33:12, 64:1, 64:11, 65:11, 67:14, 69:24, 103:15, 153:3
**keyed** [1] - 185:14
**keyword** [1] - 64:20
**kicking** [1] - 143:12
**kind** [26] - 13:3, 13:5, 16:19, 22:5, 25:3, 28:20, 47:16, 48:16, 60:11, 65:2, 73:21, 79:8, 81:15, 97:21, 121:25, 124:9, 127:3, 134:11, 137:5, 155:15, 172:2, 172:20, 178:24, 178:25, 179:19, 179:25
**kinds** [1] - 55:15
**Kirkland** [1] - 4:21
**KIRKLAND** [1] - 1:13
**known** [1] - 42:22
**knows** [10] - 54:22, 55:22, 58:9, 64:4, 68:3, 149:18, 161:15, 169:24, 188:13, 194:7
**KUGLER** [1] - 1:9

**L**

**L-shaped** [1] - 25:5
**label** [2] - 137:14, 137:15
**labeled** [4] - 23:1, 82:8, 167:4, 191:8
**labeling** [2] - 22:6,

26:25
**labels** [1] - 26:24
**labor** [1] - 22:24
**laboratory** [1] - 39:18
**lady** [1] - 9:21
**laid** [2] - 187:14, 193:5
**language** [99] - 54:23, 56:3, 56:8, 67:21, 68:3, 68:8, 79:7, 83:24, 85:5, 85:8, 85:15, 85:17, 85:25, 86:10, 86:12, 87:7, 89:21, 91:12, 98:1, 98:3, 98:12, 106:5, 107:23, 108:11, 111:11, 111:13, 112:16, 116:14, 117:9, 118:17, 121:23, 122:6, 122:11, 123:6, 123:10, 123:13, 123:16, 123:22, 124:1, 124:5, 124:11, 124:13, 124:15, 124:19, 124:21, 124:25, 125:10, 133:22, 134:19, 146:19, 146:25, 148:3, 154:15, 156:7, 157:9, 158:17, 162:18, 163:17, 164:11, 167:7, 170:7, 170:21, 171:8, 172:21, 173:8, 173:20, 174:15, 174:22, 178:21, 179:7, 179:18, 179:22, 179:24, 180:6, 180:11, 181:2, 181:4, 181:22, 181:24, 183:4, 184:18, 184:24, 185:4, 185:18, 185:24, 186:6, 186:20, 190:16, 191:3, 191:10, 191:25, 192:9, 193:13, 195:25, 196:4, 196:24, 197:9
**large** [2] - 17:2, 34:16
**largely** [3] - 7:8, 187:7, 192:7
**larger** [1] - 46:17
**Larivee** [1] - 5:21
**LARIVEE** [1] - 1:18
**Larry** [2] - 47:9, 47:10
**last** [17] - 7:5, 14:22, 17:1, 30:19, 38:17,

63:17, 101:7, 101:11, 111:25, 153:17, 154:16, 154:21, 158:11, 183:15, 184:17, 191:3, 195:19
**lastly** [4] - 82:20, 133:25, 134:15, 134:23
**late** [1] - 7:5
**latitude** [1] - 46:14
**latter** [1] - 149:7
**Laughter** [2] - 9:25, 194:25
**laughter** [1] - 5:12
**law** [23] - 9:22, 18:20, 57:13, 62:13, 63:24, 65:14, 66:24, 68:1, 68:15, 71:18, 73:12, 80:7, 87:7, 87:10, 87:23, 93:25, 96:8, 113:21, 135:1, 135:24, 135:25, 136:10
**lawsuit** [1] - 13:14
**lawyer** [2] - 10:5, 119:9
**lay** [1] - 58:23
**layperson** [1] - 80:10
**lays** [2] - 150:1, 156:25
**lead** [3] - 6:22, 15:5
**leading** [1] - 80:24
**leads** [1] - 87:3
**learn** [3] - 43:19, 45:8, 51:4
**least** [20] - 16:13, 21:13, 50:9, 61:1, 64:18, 77:19, 77:20, 77:25, 90:7, 97:11, 114:22, 122:20, 123:21, 126:16, 128:20, 161:20, 181:1, 185:18, 190:17
**leave** [5] - 23:1, 36:20, 117:22, 148:15, 197:25
**leaves** [3] - 84:7, 87:21, 118:1
**lectern** [1] - 38:20
**lecturing** [1] - 16:9
**LEE** [1] - 1:18
**Lee** [2] - 5:17, 34:11
**leeway** [1] - 37:4
**left** [18] - 16:20, 20:4, 24:19, 25:10, 26:20, 28:6, 69:2, 90:9, 94:6, 100:10, 121:3, 121:14, 139:17,

140:16, 163:17, 163:18, 164:12, 166:5, 177:14, 178:22, 195:13
**left-hand** [1] - 100:10
**leftmost** [1] - 29:20
**legal** [11] - 7:9, 7:24, 7:25, 8:2, 8:23, 33:11, 33:15, 33:16, 34:7, 87:3, 167:5
**leisure** [1] - 187:11
**length** [5] - 19:18, 22:13, 22:14, 52:4, 65:18
**less** [6] - 66:14, 73:8, 107:15, 117:16, 143:13, 181:9
**letter** [1] - 63:24
**level** [1] - 25:4
**leveled** [1] - 83:3
**lexicographer** [6] - 87:10, 111:22, 125:3, 125:5, 136:8, 197:1
**LexisNexis** [2] - 60:8, 60:13
**lie** [1] - 42:12
**lies** [3] - 19:21, 42:11, 149:21
**life** [1] - 34:24
**limit** [9] - 49:3, 63:18, 63:20, 67:15, 90:3, 171:5, 171:7, 193:17, 196:19
**limitation** [2] - 116:4, 172:9
**limited** [7] - 66:11, 73:6, 109:16, 171:15, 180:20, 195:22, 195:23
**limits** [1] - 114:23
**line** [193] - 28:7, 28:8, 41:18, 42:12, 42:13, 42:14, 42:17, 46:21, 48:8, 48:9, 49:21, 50:17, 51:24, 53:21, 53:25, 54:1, 54:9, 61:12, 65:6, 65:7, 65:17, 65:21, 65:22, 71:6, 76:3, 76:5, 82:2, 82:8, 82:17, 86:8, 93:9, 93:10, 93:14, 93:15, 106:25, 124:9, 126:12, 134:7, 139:2, 139:24, 139:25, 140:1, 140:2, 140:4, 140:5, 140:7, 140:8, 140:11, 140:13,

140:17, 140:21, 141:15, 141:22, 142:5, 142:17, 142:24, 143:23, 143:25, 144:8, 144:18, 144:19, 145:1, 146:3, 146:4, 146:14, 146:20, 146:22, 146:24, 146:25, 147:13, 147:14, 147:15, 147:17, 147:19, 148:17, 148:18, 148:20, 148:21, 148:22, 149:4, 149:12, 149:13, 149:14, 150:11, 150:12, 150:14, 150:16, 150:17, 150:24, 150:25, 151:17, 151:18, 151:21, 151:23, 151:24, 152:1, 152:14, 152:15, 152:25, 153:5, 153:25, 154:2, 154:3, 158:3, 163:7, 163:8, 163:9, 163:10, 163:20, 163:21, 164:1, 164:2, 164:4, 165:6, 165:9, 165:10, 165:15, 165:22, 165:23, 165:24, 166:2, 166:4, 166:9, 166:16, 166:21, 166:23, 167:9, 167:10, 167:11, 168:8, 168:9, 169:14, 169:16, 170:1, 171:24, 172:1, 172:24, 174:17, 175:23, 175:24, 176:1, 177:7, 177:8, 179:6, 179:13, 179:14, 179:15, 179:16, 183:18, 183:19, 183:20, 183:23, 184:19, 185:5, 185:7, 185:9, 185:10, 185:11, 185:16, 185:17, 188:10, 188:11, 188:12, 190:18, 190:20, 190:25, 191:5, 191:6, 191:15, 191:16, 192:1, 192:4, 192:5, 196:9
**Line** [5] - 92:22, 94:15,

94:19, 100:12, 110:12
**linear** [26] - 63:23, 65:16, 65:25, 66:7, 66:12, 68:21, 68:23, 70:2, 70:5, 70:9, 70:17, 71:2, 71:10, 71:12, 71:16, 74:5, 75:8, 75:25, 76:10, 76:15, 76:23, 77:2, 77:4, 77:12, 79:2
**lined** [1] - 51:2
**Lines** [9] - 68:21, 68:22, 78:10, 186:4, 186:5, 186:17, 186:25, 192:19, 192:21
**lines** [24] - 22:7, 45:23, 50:20, 52:20, 61:6, 65:17, 66:1, 66:7, 68:21, 69:3, 71:5, 71:8, 82:9, 82:23, 93:7, 93:10, 138:13, 150:1, 158:18, 158:19, 159:6, 159:8, 166:12
**lineup** [1] - 82:7
**lining** [1] - 49:22
**Lisa** [2] - 1:25, 174:9
**list** [1] - 114:10
**listed** [2] - 148:12, 160:13
**listing** [2] - 12:19, 158:10
**lists** [2] - 113:22, 148:8
**literally** [6] - 70:4, 96:15, 132:7, 142:3, 153:7, 167:7
**litigants** [1] - 36:2
**live** [2] - 102:22, 155:19
**LIZA** [1] - 1:12
**Liza** [1] - 4:19
**LLP** [1] - 1:13
**local** [1] - 35:12
**locate** [2] - 46:11, 48:25
**location** [19] - 41:7, 42:1, 43:5, 43:11, 46:1, 49:20, 49:23, 50:14, 65:20, 114:22, 115:18, 115:19, 115:22, 115:23, 116:5, 123:19, 124:2, 165:14, 168:3
**locations** [2] - 43:8, 174:19
**logic** [3] - 116:14,

138:7, 194:12
**logical** [3] - 116:24, 154:25, 191:19
**longitude** [1] - 46:14
**look** [65] - 20:20, 22:12, 24:19, 24:20, 25:3, 29:4, 31:5, 37:22, 41:13, 42:23, 48:12, 48:14, 48:21, 52:25, 55:24, 56:2, 65:1, 66:3, 68:6, 68:7, 68:8, 69:18, 72:15, 72:25, 74:18, 76:1, 76:11, 78:10, 79:25, 83:18, 85:9, 88:2, 88:7, 89:8, 94:12, 95:6, 95:7, 102:21, 112:8, 123:16, 126:13, 126:24, 127:5, 131:7, 131:10, 131:18, 133:7, 134:18, 141:24, 143:25, 144:22, 156:23, 158:16, 164:19, 166:19, 168:13, 169:3, 170:14, 171:17, 172:18, 179:21, 184:24, 190:4, 192:10, 196:16
**looked** [4] - 84:2, 95:4, 107:10, 133:5
**looking** [25] - 29:7, 30:20, 44:21, 49:17, 50:15, 52:17, 52:22, 52:24, 53:1, 53:2, 54:22, 56:25, 64:6, 68:9, 104:7, 132:11, 148:2, 151:19, 157:23, 158:18, 159:4, 159:18, 160:4, 165:10, 166:11
**looks** [1] - 22:10
**Loretta** [1] - 9:22
**lose** [6] - 17:20, 17:21, 111:9, 182:16, 182:19
**loses** [1] - 102:13
**losing** [2] - 19:3, 48:15
**loss** [1] - 182:17
**lost** [1] - 32:7
**love** [2] - 161:21, 162:24
**Loveland** [1] - 31:19
**low** [1] - 130:7
**lower** [1] - 48:2
**lunch** [1] - 112:19

# M

**M-U-N-D-Y** [1] - 38:18
**machine** [3] - 46:18, 46:21, 47:1
**machinery** [1] - 15:24
**main** [4] - 15:24, 34:24, 45:1, 110:23
**major** [1] - 34:23
**manage** [2] - 12:25, 18:7
**manageable** [1] - 198:16
**manipulatable** [1] - 134:20
**manipulate** [8] - 26:13, 27:23, 28:17, 29:4, 86:6, 89:16, 137:20
**manipulated** [13] - 27:2, 84:12, 85:11, 88:11, 88:17, 92:23, 110:20, 118:13, 118:16, 120:23, 122:25, 123:15, 134:17
**manipulates** [1] - 172:1
**manipulating** [6] - 27:14, 29:2, 29:6, 106:24, 109:13, 109:15
**manipulation** [1] - 109:22
**manipulations** [1] - 118:19
**manner** [4] - 93:19, 132:17, 152:13, 188:2
**manually** [6] - 47:24, 74:21, 79:21, 126:22, 134:8, 134:9
**map** [2] - 44:2, 45:22
**March** [1] - 31:11
**MARCUS** [1] - 174:10
**Marcus** [1] - 1:25
**mark** [3] - 20:22, 20:23, 43:25
**marked** [2] - 24:23, 25:7
**MARKED** [2] - 3:6, 20:24
**marker** [186] - 33:9, 33:14, 52:5, 52:7, 52:10, 80:23, 81:11, 81:14, 81:22, 83:5, 83:6, 83:13, 83:14, 84:4, 84:11, 84:16, 85:8, 85:10, 85:19,

85:22, 85:23, 86:11, 86:19, 86:24, 87:13, 87:22, 88:8, 88:15, 89:6, 89:24, 91:10, 92:3, 92:11, 92:18, 93:16, 94:10, 95:10, 97:18, 98:2, 98:4, 98:20, 99:9, 99:12, 99:22, 99:24, 100:5, 100:23, 101:2, 101:6, 101:12, 103:17, 104:4, 105:1, 105:12, 105:18, 105:23, 106:2, 106:4, 106:7, 106:9, 106:13, 106:20, 108:1, 108:7, 108:10, 108:13, 108:14, 108:19, 109:10, 111:14, 111:24, 112:6, 112:9, 112:11, 113:1, 113:4, 113:6, 113:9, 113:14, 113:20, 113:21, 114:3, 114:5, 114:10, 114:13, 114:14, 114:24, 115:4, 115:12, 115:14, 115:16, 115:17, 115:20, 115:22, 115:23, 115:25, 116:2, 116:6, 116:8, 116:9, 116:10, 116:11, 116:15, 116:18, 116:19, 117:5, 117:6, 117:7, 117:8, 118:4, 118:11, 119:18, 120:10, 120:11, 120:15, 120:16, 120:18, 121:17, 121:21, 121:23, 122:8, 122:13, 122:16, 122:17, 122:22, 122:24, 123:2, 123:14, 123:23, 124:7, 124:10, 124:19, 124:25, 125:16, 126:3, 126:14, 127:7, 127:9, 128:5, 128:6, 128:18, 129:11, 129:15, 129:18, 130:1, 130:6, 130:14, 130:23, 131:4, 131:9, 131:18, 131:21, 131:22, 132:1, 132:5,

132:12, 132:13, 134:5, 134:17, 134:24, 134:25, 136:25, 137:1, 137:9, 137:14, 137:16, 138:4, 138:5, 138:12, 138:13, 138:16, 138:20, 143:7, 147:23, 147:24
**markers** [32] - 90:4, 103:11, 106:17, 107:20, 108:12, 108:17, 109:11, 110:10, 113:11, 113:12, 113:13, 118:15, 118:20, 119:4, 125:22, 126:9, 127:11, 130:25, 131:12, 133:16, 134:2, 134:3, 134:4, 134:9, 134:13, 134:19, 137:19, 137:21, 138:15, 142:4
**market** [4] - 11:12, 11:23, 13:7, 37:12
**marketplace** [1] - 36:17
**Markman** [1] - 57:19
**MARKMAN** [1] - 1:5
**match** [1] - 53:10
**matches** [1] - 160:18
**matching** [2] - 25:2, 25:18
**mater** [1] - 99:18
**material** [4] - 7:8, 7:18, 7:19, 22:23
**materials** [3] - 7:17, 8:4, 37:24
**mathematical** [6] - 44:5, 44:25, 47:2, 65:21, 71:4, 71:9
**mathematically** [3] - 42:12, 44:16, 46:2
**mathematicians** [1] - 44:18
**Mathematics** [1] - 15:23
**mathematics** [4] - 43:21, 45:4, 79:4, 107:2
**Matt** [1] - 5:21
**matter** [7] - 62:13, 80:7, 99:20, 99:25, 109:3, 116:14, 138:7
**matters** [1] - 145:21
**MATTHEW** [1] - 1:19
**McCarter** [2] - 1:17, 5:16

**mean** [37] - 7:19, 13:16, 28:24, 37:2, 55:15, 55:21, 58:13, 59:8, 59:17, 62:23, 85:7, 87:14, 90:16, 92:11, 93:18, 94:10, 97:14, 98:20, 102:10, 111:21, 128:2, 135:5, 136:13, 142:14, 149:7, 155:11, 155:13, 167:22, 169:19, 171:14, 177:4, 182:21, 184:15, 188:22, 193:11, 198:13, 198:14
**meaning** [22] - 55:20, 56:1, 58:8, 58:25, 61:22, 65:25, 67:3, 75:12, 80:5, 80:6, 80:8, 85:15, 87:15, 115:1, 136:5, 136:12, 136:13, 136:14, 141:15, 142:18, 145:3, 196:22
**meaningless** [1] - 117:21
**meanings** [1] - 133:14
**means** [29] - 27:6, 47:12, 57:22, 58:24, 60:2, 62:19, 64:14, 72:4, 77:24, 80:11, 80:13, 87:10, 96:23, 97:18, 117:18, 118:22, 119:6, 123:22, 131:4, 136:13, 140:6, 142:13, 145:15, 145:18, 145:23, 149:5, 182:18, 193:19, 197:2
**meant** [1] - 166:15
**measure** [4] - 18:25, 23:8, 52:13, 53:8
**measured** [1] - 21:23
**measurements** [5] - 19:18, 23:7, 31:17, 58:16, 59:5
**measuring** [1] - 44:12
**mechanical** [1] - 43:22
**mechanism** [1] - 44:1
**meet** [5] - 65:7, 103:25, 143:24, 145:22
**memory** [4] - 60:4, 60:7, 60:16, 115:19
**mention** [10] - 17:7,

22:7, 94:8, 130:9, 132:23, 145:19, 150:5, 187:25, 188:7
**mentioned** [11] - 21:17, 21:20, 42:2, 43:18, 45:11, 46:18, 113:5, 114:16, 125:11, 161:19, 185:21
**menu** [1] - 30:24
**merely** [3] - 71:6, 145:10, 164:2
**merit** [1] - 194:16
**merits** [1] - 117:12
**mesh** [1] - 48:19
**met** [1] - 161:16
**metadata** [1] - 46:13
**metaphor** [1] - 30:7
**method** [3] - 73:5, 73:6, 166:20
**methods** [1] - 78:23
**Michael** [1] - 5:1
**MICHAEL** [1] - 1:15
**Microsoft** [1] - 18:18
**middle** [4] - 6:23, 45:15, 136:7, 136:11
**might** [21] - 22:3, 35:14, 35:15, 54:5, 55:8, 75:17, 76:9, 79:4, 79:8, 107:6, 107:13, 107:16, 109:23, 117:16, 144:12, 152:24, 177:3, 181:14, 181:18, 190:9
**mightily** [1] - 189:21
**migrated** [1] - 151:18
**migrates** [1] - 154:3
**Mike** [3] - 63:2, 63:5, 63:9
**millennia** [1] - 42:7
**million** [1] - 36:12
**millions** [1] - 36:13
**mind** [1] - 136:23
**mine** [2] - 8:24, 27:21
**minor** [1] - 16:21
**minute** [3] - 54:9, 74:2, 77:10
**minutes** [1] - 80:18
**mischaracterize** [1] - 69:8
**mischaracterizing** [1] - 74:9
**mischief** [1] - 118:2
**misdirection** [1] - 137:5
**misleading** [1] - 146:7
**missing** [2] - 25:14, 25:17
**misunderstanding** [1]

- 91:3
**MIT** [1] - 47:9
**mode** [1] - 167:15
**model** [191] - 20:10, 20:12, 24:15, 25:20, 25:21, 25:22, 25:24, 25:25, 26:2, 26:8, 26:14, 27:10, 27:14, 28:18, 28:23, 28:25, 29:20, 30:1, 41:9, 46:22, 47:25, 48:11, 48:13, 48:18, 48:19, 50:11, 51:5, 52:1, 53:7, 53:9, 53:10, 56:17, 61:2, 75:3, 77:19, 78:2, 78:22, 84:17, 84:20, 86:19, 89:15, 89:24, 90:2, 90:7, 90:8, 90:11, 90:12, 90:15, 90:21, 90:25, 91:6, 91:7, 91:8, 91:10, 91:16, 91:17, 91:21, 91:24, 92:2, 92:12, 92:14, 97:7, 97:17, 97:19, 98:7, 98:8, 98:9, 98:10, 98:14, 98:15, 98:18, 98:24, 99:1, 101:14, 101:16, 101:17, 104:17, 104:20, 105:10, 105:24, 105:25, 106:16, 106:17, 106:18, 106:19, 106:24, 107:4, 107:14, 107:17, 107:18, 107:24, 108:1, 108:5, 108:6, 108:16, 108:20, 109:1, 109:10, 109:12, 109:15, 109:16, 109:20, 110:14, 112:10, 113:15, 113:20, 113:21, 114:3, 114:6, 114:16, 114:21, 115:5, 116:5, 116:7, 116:11, 116:15, 116:16, 118:5, 119:19, 121:6, 121:8, 122:14, 127:7, 127:8, 131:3, 131:20, 131:24, 132:8, 137:1, 138:3, 138:17, 138:21, 141:13, 141:16, 141:17, 143:1, 147:22, 147:23, 148:18, 153:2, 153:10, 153:11,

156:15, 157:4, 157:6, 157:7, 157:11, 157:12, 158:5, 158:13, 159:2, 159:3, 159:24, 161:23, 161:25, 162:1, 165:2, 168:5, 174:17, 176:22, 178:2, 182:8, 182:11, 182:12, 186:10, 186:11, 188:4, 188:12, 194:13, 194:14, 195:21, 195:23

**modeling** [6] - 50:7, 50:11, 51:6, 64:19, 74:20, 77:21

**modelling** [2] - 67:10, 79:20

**models** [24] - 20:1, 20:16, 23:17, 23:24, 25:16, 30:12, 40:15, 46:7, 46:23, 47:1, 47:11, 47:13, 47:15, 47:19, 48:5, 51:8, 79:14, 90:15, 95:2, 102:15, 102:16, 137:18, 137:19

**modification** [5] - 28:20, 29:13, 29:14, 98:13, 98:14

**modifications** [1] - 28:18

**modified** [14] - 97:6, 97:17, 97:19, 97:22, 98:7, 98:10, 104:3, 104:21, 153:10, 158:12, 159:23, 174:16, 176:1, 178:1

**modify** [13] - 28:12, 87:8, 87:23, 98:5, 99:1, 108:5, 108:15, 108:21, 111:5, 112:10, 131:20, 151:16

**modifying** [8] - 91:6, 91:7, 98:7, 98:9, 98:24, 107:21, 108:21, 156:15

**moment** [16] - 13:11, 41:4, 41:6, 43:14, 44:3, 83:1, 83:15, 84:21, 85:1, 89:4, 90:13, 92:4, 121:11, 124:16, 132:23, 132:24

**monastery** [1] - 45:24

**money** [3] - 17:20, 17:21, 19:3

**months** [1] - 17:2

**morning** [16] - 4:3, 4:4, 4:13, 4:22, 4:23, 4:25, 5:2, 5:3, 5:6, 5:7, 5:15, 5:18, 15:3, 115:21, 119:23, 165:12

**most** [7] - 21:19, 33:7, 36:14, 67:8, 163:14, 184:14, 195:7

**mostly** [1] - 168:21

**motion** [1] - 27:22

**motions** [2] - 27:11, 80:9

**movable** [1] - 123:17

**move** [29] - 6:14, 7:14, 12:19, 21:25, 27:3, 28:5, 29:11, 42:15, 46:4, 47:4, 49:19, 52:19, 82:7, 83:5, 93:7, 93:9, 93:11, 111:5, 115:17, 127:19, 127:20, 127:21, 129:17, 131:3, 131:25, 165:13, 165:16, 166:9

**moveable** [1] - 115:17

**moved** [14] - 43:5, 50:16, 85:20, 114:24, 115:20, 115:24, 116:1, 116:6, 116:18, 120:15, 120:17, 120:23, 123:18, 138:4

**movement** [7] - 115:12, 120:17, 121:20, 121:22, 129:21, 131:19, 131:22

**moves** [3] - 29:11, 132:1, 135:6

**moving** [8] - 46:20, 49:21, 59:2, 112:25, 134:11, 138:23, 143:8, 187:15

**MR** [125] - 2:5, 2:7, 4:22, 4:25, 5:2, 5:6, 5:15, 5:18, 5:19, 6:2, 6:7, 6:11, 7:1, 7:3, 7:18, 8:6, 8:13, 8:16, 8:22, 8:25, 9:2, 9:5, 9:10, 9:13, 9:15, 9:17, 9:20, 10:2, 14:5, 14:9, 14:13, 15:3, 15:9, 16:1, 20:18, 20:25, 21:2, 30:15, 30:17, 32:7, 32:10, 32:21, 32:24,

33:20, 34:11, 37:8, 37:15, 37:21, 38:5, 38:24, 39:2, 39:6, 39:9, 39:10, 53:16, 53:19, 54:11, 54:15, 54:20, 57:13, 57:17, 58:6, 58:13, 58:19, 58:22, 60:11, 60:19, 62:25, 63:2, 63:5, 63:8, 75:19, 75:22, 80:17, 80:21, 80:24, 81:6, 101:25, 102:4, 103:2, 103:5, 103:7, 103:9, 110:3, 112:3, 113:2, 113:4, 117:2, 119:23, 120:3, 120:7, 135:20, 135:22, 138:24, 142:22, 143:10, 146:10, 146:12, 146:18, 147:11, 152:21, 153:17, 154:9, 154:19, 154:21, 155:10, 155:17, 156:5, 162:10, 167:19, 167:22, 174:8, 174:13, 175:11, 175:14, 181:6, 181:8, 181:13, 194:19, 195:4, 197:16, 197:19, 197:22, 198:2, 198:3

**MS** [10] - 4:13, 4:16, 4:24, 5:1, 5:4, 5:8, 5:11, 120:6, 174:10, 195:2

**multiple** [11] - 47:6, 47:21, 47:25, 51:9, 69:14, 69:16, 157:3, 158:21, 192:23, 196:15

**multipurpose** [1] - 147:25

**MUNDY** [4] - 2:6, 2:7, 38:12, 39:10

**Mundy** [24] - 34:14, 38:8, 38:9, 38:16, 38:19, 39:11, 39:15, 53:17, 53:20, 55:8, 58:10, 60:21, 61:8, 69:18, 70:15, 71:14, 72:15, 76:6, 76:25, 78:20, 108:24, 160:12, 188:8, 193:7

**Mundy's** [4] - 55:16, 61:23, 69:19, 175:6

**must** [18] - 17:4, 25:10, 42:12, 66:14, 99:11, 114:11,

115:25, 116:12, 116:19, 122:18, 133:12, 136:1, 136:2, 176:23, 189:15, 194:8, 194:9, 194:12

---

# N

**name** [9] - 14:20, 14:22, 34:20, 34:22, 35:11, 38:15, 38:17, 63:9

**named** [1] - 138:15

**namely** [2] - 67:25, 108:25

**narrow** [8] - 37:12, 93:19, 122:9, 148:24, 193:17, 196:2, 196:5, 196:25

**narrowing** [3] - 143:14, 191:2, 198:13

**narrows** [1] - 181:24

**National** [2] - 39:25, 40:5

**nature** [3] - 48:5, 161:18, 191:7

**nearly** [1] - 23:4

**neatly** [1] - 151:22

**necessarily** [7] - 8:16, 43:15, 71:3, 75:14, 115:13, 116:1, 155:16

**necessary** [7] - 34:5, 83:22, 86:13, 119:17, 122:8, 134:22, 137:4

**need** [45] - 12:5, 16:14, 16:16, 16:18, 16:19, 18:3, 18:15, 21:22, 22:5, 23:16, 24:11, 29:8, 34:1, 54:3, 58:4, 61:8, 62:12, 66:18, 66:22, 70:12, 72:10, 76:4, 77:8, 80:20, 95:24, 96:1, 103:25, 109:4, 109:7, 111:14, 116:24, 117:18, 122:7, 123:2, 127:7, 127:11, 135:2, 135:10, 149:24, 150:3, 152:5, 154:14, 160:20, 181:18, 193:23

**needed** [3] - 49:11, 54:6, 54:10

**needing** [1] - 17:8

**needle** [1] - 145:14

**needs** [15] - 17:5, 18:11, 22:22, 33:24, 61:15, 73:3, 73:8, 84:17, 101:12, 115:9, 122:13, 134:24, 152:11, 158:7, 181:21

**negates** [1] - 133:9

**never** [7] - 93:21, 98:9, 111:18, 113:14, 130:5, 130:6, 130:8

**nevertheless** [1] - 43:17

**NEW** [2] - 1:1, 1:8

**New** [2] - 35:13, 39:18

**new** [9] - 34:20, 42:6, 43:5, 73:17, 98:15, 109:23, 165:14, 168:3, 196:24

**next** [69] - 6:23, 10:21, 10:25, 11:24, 19:24, 26:6, 28:20, 40:24, 41:22, 42:8, 42:24, 43:12, 43:20, 44:17, 45:3, 45:20, 46:4, 47:4, 47:16, 47:20, 48:4, 49:6, 49:24, 50:19, 51:7, 51:11, 51:19, 52:2, 52:14, 56:3, 56:15, 77:6, 78:11, 80:22, 83:11, 87:5, 90:6, 90:23, 93:14, 97:20, 100:9, 105:23, 114:17, 121:12, 125:25, 129:22, 135:17, 140:9, 140:12, 151:15, 153:16, 155:3, 156:24, 158:7, 158:18, 160:5, 162:20, 162:21, 163:12, 163:14, 164:10, 164:15, 165:8, 179:3, 186:10, 186:24, 187:5, 191:22

**NGA** [1] - 40:1

**nice** [1] - 149:12

**nicely** [1] - 156:25

**night** [1] - 7:5

**Nineteenth** [2] - 45:4, 45:15

**NO** [1] - 1:4

**no-brainer** [1] - 194:11

**nobody** [1] - 175:12

**non** [2] - 144:12, 145:24

**non-infringement** [2] - 144:12, 145:24
**none** [1] - 99:14
**nonetheless** [1] - 167:23
**nonsense** [2] - 182:20, 193:22
**nonsensical** [1] - 116:21
**nonsimultaneous** [1] - 171:21
**normally** [1] - 48:16
**north** [2] - 166:6
**note** [5] - 10:9, 45:25, 73:16, 135:15, 176:19
**nothing** [16] - 48:23, 73:25, 78:8, 98:3, 131:8, 131:11, 136:9, 144:7, 145:3, 147:3, 152:18, 195:25, 196:11, 197:19, 197:22
**notice** [2] - 26:19, 26:22, 34:18, 35:3, 141:9
**novel** [1] - 45:8
**nowhere** [2] - 124:13, 137:18
**number** [15] - 23:1, 33:7, 35:23, 73:9, 73:11, 91:20, 124:20, 143:6, 159:18, 160:22, 177:14, 181:22, 195:17, 196:14, 196:16
**NUMBER** [1] - 3:4
**numbers** [5] - 23:1, 23:5, 23:8, 26:25, 27:4
**numerator** [1] - 23:2

## O

**O'Reilly** [1] - 4:20
**O'REILLY** [1] - 1:12
**object** [18] - 32:25, 33:18, 41:9, 43:4, 44:11, 48:17, 50:14, 50:16, 50:22, 55:7, 55:10, 59:2, 62:20, 66:15, 72:2, 72:7, 72:18, 105:8
**objecting** [1] - 62:4
**objection** [4] - 7:16, 34:1, 34:6, 95:24
**objects** [8] - 40:16, 44:7, 44:10, 47:6,

56:24, 59:6, 74:21, 79:22
**obligated** [1] - 56:12
**oblique** [9] - 24:2, 24:5, 24:8, 25:15, 53:3, 56:7, 121:3, 126:24, 127:2
**obliquely** [2] - 52:23, 53:2
**observed** [2] - 20:5, 53:4
**obtain** [6] - 21:5, 21:7, 51:17, 56:13, 121:5, 157:17
**obvious** [9] - 57:6, 116:25, 117:15, 117:16, 139:5, 140:1, 141:9, 142:15, 154:25
**obviously** [7] - 10:12, 46:25, 49:2, 51:8, 148:13, 151:3, 187:13
**occur** [2] - 29:5, 176:23
**occurred** [1] - 73:24
**occurring** [2] - 11:22, 17:4
**occurs** [1] - 175:16
**OCTOBER** [1] - 1:8
**October** [3] - 4:2, 10:11
**OF** [5] - 1:1, 2:5, 2:7, 15:9, 39:10
**of'** [1] - 63:3
**Office** [3] - 34:21, 137:24, 137:25
**office** [6] - 13:23, 150:9, 150:23, 151:5, 160:9, 187:17
**officer** [1] - 10:24
**often** [1] - 17:16
**old** [1] - 35:6
**omitted** [3] - 68:3, 119:24, 177:13
**once** [9] - 25:13, 36:11, 36:14, 50:2, 53:7, 90:2, 106:15, 163:23, 164:17
**ONE** [1] - 1:7
**one** [194] - 5:11, 6:16, 9:21, 12:12, 13:11, 20:14, 21:1, 21:19, 21:22, 22:13, 24:11, 24:18, 25:19, 26:4, 27:6, 28:6, 28:7, 28:20, 29:9, 29:12, 30:4, 33:12, 34:16, 35:14, 36:8, 37:9, 37:19, 42:8, 43:17,

44:19, 45:1, 50:1, 50:11, 53:20, 53:21, 54:8, 54:16, 56:6, 56:7, 57:24, 58:5, 58:7, 59:8, 59:23, 60:7, 60:22, 61:8, 61:10, 62:6, 62:21, 63:19, 65:8, 65:23, 67:17, 68:14, 69:11, 69:12, 71:1, 72:10, 74:25, 75:4, 75:9, 75:24, 76:13, 76:17, 77:6, 77:15, 77:16, 77:17, 77:18, 77:19, 77:23, 79:7, 80:22, 80:25, 81:15, 82:15, 83:10, 84:16, 86:2, 87:9, 87:24, 90:9, 92:22, 93:1, 93:7, 93:9, 94:20, 95:4, 96:12, 99:22, 100:21, 101:11, 101:14, 102:19, 102:20, 110:23, 111:8, 112:2, 113:16, 114:22, 114:24, 117:17, 118:2, 118:3, 118:10, 119:24, 120:14, 120:20, 121:3, 121:8, 122:5, 122:12, 122:15, 122:20, 122:21, 122:22, 123:5, 123:7, 123:8, 126:4, 126:12, 126:16, 126:20, 127:3, 127:4, 127:20, 127:21, 128:19, 129:17, 132:25, 133:1, 133:2, 134:2, 134:19, 134:20, 134:21, 135:5, 135:6, 135:16, 135:18, 135:19, 137:15, 137:25, 138:6, 138:11, 138:12, 139:1, 140:7, 143:2, 143:6, 143:7, 143:8, 144:24, 147:9, 149:6, 152:23, 153:3, 153:8, 153:9, 153:25, 156:9, 156:18, 156:20, 157:16, 158:11, 160:15, 161:12, 164:21, 165:2, 165:17, 166:14, 166:16, 166:17, 173:1, 175:6, 176:8,

181:22, 189:15, 190:17, 194:10, 195:15, 196:2
**One** [1] - 196:25
**one-step** [2] - 156:18, 156:20
**one-third** [1] - 27:6
**ones** [3] - 94:20, 123:8, 170:6
**opaque** [1] - 48:20
**open** [2] - 32:17, 118:1
**OPEN** [2] - 4:2, 112:23
**opening** [3] - 14:6, 14:7, 57:8, 170:12, 193:5
**openly** [1] - 195:12
**operable** [2] - 86:4, 86:5
**operated** [1] - 29:25
**operates** [1] - 115:21
**operation** [2] - 40:25, 49:13
**operator** [30] - 28:17, 29:19, 43:22, 46:18, 52:19, 54:6, 70:1, 77:24, 85:11, 88:11, 88:17, 88:23, 105:9, 106:21, 118:24, 125:17, 125:18, 126:6, 157:17, 157:24, 158:21, 165:1, 165:14, 168:2, 175:8, 186:21, 187:2, 188:9, 188:10, 192:22
**operator's** [2] - 72:21, 110:13
**opinion** [2] - 95:18, 198:12
**opportunity** [2] - 15:4, 15:14
**opposing** [15] - 7:12, 21:4, 135:13, 139:4, 144:15, 148:25, 150:4, 150:19, 151:13, 162:7, 162:22, 185:21, 195:6, 195:17, 196:6
**opposite** [2] - 111:22, 170:10
**optionality** [1] - 167:23
**order** [30] - 10:19, 11:7, 12:8, 12:24, 13:3, 33:24, 44:24, 53:3, 53:5, 55:23, 56:4, 56:13, 60:5, 69:7, 70:12, 82:4,

82:17, 83:6, 84:5, 85:11, 87:18, 88:11, 88:17, 96:16, 103:12, 158:4, 159:17, 173:14, 181:9, 193:17
**ordered** [1] - 158:10
**ordinary** [14] - 55:21, 75:12, 92:10, 96:12, 136:12, 136:13, 175:6, 184:13, 188:13, 189:20, 190:5, 191:20, 193:6, 194:8
**orientation** [1] - 50:18
**original** [1] - 28:11
**originally** [1] - 107:10
**otherwise** [12] - 107:10, 114:7, 116:20, 124:13, 142:17, 146:7, 148:14, 169:7, 172:4, 182:24, 184:5, 193:18
**ourselves** [2] - 70:15, 90:1
**outline** [3] - 22:14, 61:14, 100:7
**outlined** [3] - 45:25, 50:25, 54:2
**outlines** [4] - 19:11, 22:19, 24:4, 26:22
**output** [2] - 83:9, 91:19, 97:22
**outset** [1] - 11:12
**outside** [1] - 144:12
**overall** [3] - 13:3, 13:4, 23:10
**overcome** [1] - 119:9
**overestimate** [1] - 17:21
**overhangs** [1] - 22:9
**overhead** [1] - 50:20
**overlaid** [8] - 82:3, 139:24, 139:25, 163:7, 163:8, 174:18, 190:20, 192:1
**overlap** [2] - 186:3, 190:12
**overlay** [5] - 82:7, 82:16, 82:17, 83:7, 151:24
**overlaying** [5] - 74:21, 79:21, 166:21, 171:25, 190:19
**overlays** [4] - 20:7, 20:8, 29:21, 152:3
**overlooks** [1] - 102:6
**overlying** [2] - 166:23,

196:9
**overrule** [1] - 34:6
**overview** [1] - 21:16
**overwhelmed** [1] - 189:7
**overwhelming** [1] - 161:17
**overwrought** [1] - 189:7
**own** [10] - 11:8, 14:7, 19:19, 66:17, 73:11, 87:9, 93:21, 132:19, 137:2, 197:1
**owner** [5] - 74:14, 74:16, 74:17, 74:19, 74:23

**P**

**P-1** [3] - 3:6, 20:22, 20:24
**p.m** [3] - 112:21, 112:23, 198:25
**pace** [1] - 17:4
**page** [6] - 21:13, 57:8, 159:8, 161:10, 177:14
**PAGE** [2] - 2:3, 3:4
**Page** [6] - 72:25, 167:2, 168:2, 168:13, 187:15, 193:6
**pages** [1] - 22:13
**paging** [1] - 74:12
**paid** [2] - 11:7, 12:9
**painting** [1] - 44:7, 44:21
**paintings** [1] - 44:14
**pair** [8] - 42:19, 55:10, 62:20, 66:12, 67:16, 67:21, 67:25, 68:11
**pairs** [1] - 55:6
**panel** [2] - 27:25
**paper** [6] - 45:5, 45:9, 45:20, 47:17, 59:4, 91:19
**Paragraph** [1] - 193:7
**paragraph** [2] - 160:12, 186:17
**Paragraphs** [1] - 188:8
**parallel** [1] - 50:18
**parameters** [3] - 50:13, 50:15, 51:4
**parametric** [1] - 50:16
**paraphrase** [1] - 152:24
**paraphrasing** [1] - 71:15

**parent** [1] - 12:21
**parenthesis** [1] - 178:14
**parenthetical** [1] - 178:7
**parking** [1] - 47:23
**parrot** [1] - 154:15
**part** [34] - 8:19, 11:10, 13:1, 19:2, 24:15, 27:11, 29:18, 30:6, 31:2, 32:25, 42:9, 61:1, 64:11, 65:11, 72:2, 73:16, 77:19, 86:23, 94:8, 94:18, 109:24, 123:20, 126:18, 128:9, 130:12, 132:20, 136:3, 149:9, 151:11, 153:8, 179:4, 179:5, 181:17
**partes** [1] - 13:25
**partially** [1] - 21:3
**particular** [18] - 9:23, 15:11, 35:12, 54:5, 67:20, 67:25, 69:22, 71:21, 77:17, 83:8, 89:3, 89:18, 98:6, 125:14, 150:21, 162:16, 193:15, 196:2
**particularly** [3] - 145:12, 148:6, 150:6
**parties** [1] - 6:7, 10:7, 36:2, 37:5, 83:15, 83:19, 117:10, 122:3, 125:4, 168:23, 194:22
**parties'** [1] - 86:9
**partly** [4] - 17:16, 17:24, 21:18, 23:13
**partner** [1] - 5:17
**partners** [1] - 36:3
**partnership** [1] - 36:1
**parts** [6] - 24:3, 31:2, 64:1, 84:7, 122:9, 173:2
**party** [1] - 11:14
**party's** [1] - 124:10
**passage** [3] - 76:11, 78:18
**past** [5] - 116:18, 147:21, 157:5, 191:3, 193:12
**pat** [1] - 192:24
**Patent** [18] - 97:5, 98:7, 100:12, 105:20, 110:11, 112:4, 113:5, 113:7, 114:19, 118:18, 137:24, 190:10,

190:13, 191:12, 191:13, 192:18
**patent** [193] - 13:23, 26:19, 26:20, 26:23, 27:19, 28:2, 31:16, 36:2, 40:25, 41:1, 41:10, 48:22, 50:8, 51:15, 52:9, 53:11, 55:18, 56:5, 56:8, 56:10, 56:13, 58:1, 60:1, 61:22, 62:11, 63:19, 64:2, 64:4, 64:6, 64:7, 64:10, 64:13, 64:14, 64:17, 65:3, 65:15, 65:23, 66:4, 66:6, 67:7, 67:9, 69:13, 69:17, 70:1, 70:7, 70:11, 70:14, 70:18, 70:21, 71:10, 73:21, 74:14, 74:15, 74:16, 74:17, 74:18, 74:19, 74:22, 74:24, 75:4, 75:15, 75:24, 76:7, 77:1, 77:16, 78:9, 78:14, 79:5, 79:8, 79:12, 79:18, 79:19, 79:25, 81:13, 82:5, 90:11, 91:5, 92:15, 92:16, 92:22, 94:14, 94:17, 94:19, 102:2, 103:12, 103:17, 103:23, 104:17, 104:23, 105:25, 108:11, 109:2, 109:12, 113:18, 119:3, 119:10, 121:5, 121:10, 121:15, 126:11, 127:19, 129:6, 129:10, 129:21, 137:11, 138:10, 138:17, 139:13, 141:2, 141:9, 141:22, 142:4, 144:4, 144:13, 144:16, 144:24, 147:10, 147:12, 149:10, 149:11, 149:16, 149:18, 150:1, 151:3, 151:20, 151:22, 151:23, 152:2, 153:5, 153:18, 153:19, 154:7, 154:9, 154:13, 155:5, 156:3, 156:12, 156:24, 159:5, 159:17, 159:20, 160:6, 160:17, 162:14,

162:16, 162:21, 164:11, 165:19, 165:21, 167:16, 168:7, 168:12, 169:13, 170:16, 170:18, 171:2, 171:4, 171:18, 172:9, 172:16, 173:2, 173:12, 173:23, 173:24, 174:15, 176:21, 177:15, 178:11, 178:20, 181:10, 181:14, 181:17, 183:5, 183:24, 185:1, 186:6, 186:18, 187:7, 187:18, 187:19, 187:21, 191:8
**Patent's** [1] - 177:20
**patent-pending** [1] - 31:16
**patentability** [1] - 62:15
**patented** [9] - 8:9, 8:16, 11:2, 11:3, 11:10, 33:2, 33:4, 113:23, 148:10
**patentee** [15] - 68:2, 87:9, 87:11, 150:6, 159:18, 168:17, 168:19, 169:23, 170:8, 170:20, 171:18, 171:19, 172:3, 178:4, 197:1
**patentee's** [1] - 119:9
**patentees** [1] - 126:14
**patents** [40] - 7:21, 8:7, 8:10, 10:22, 12:19, 13:11, 13:18, 13:21, 13:22, 19:22, 25:23, 26:3, 32:4, 33:6, 36:18, 37:18, 37:19, 38:7, 41:2, 42:21, 54:22, 90:10, 92:6, 94:16, 113:11, 136:16, 149:10, 151:11, 152:6, 155:3, 162:15, 172:14, 181:16, 182:15, 184:22, 185:23, 192:8, 193:1
**patents-in-suit** [2] - 10:22, 13:22
**patience** [1] - 6:19
**pavement** [3] - 25:5, 25:6
**pay** [3] - 17:10, 30:23, 194:24
**PDF** [1] - 91:19

**peak** [2] - 24:24, 24:25
**pen** [1] - 168:11
**pending** [1] - 31:16
**people** [5] - 12:4, 12:15, 58:23, 113:20, 180:13
**perceive** [2] - 8:19, 48:14
**perception** [2] - 33:15, 189:19
**perform** [1] - 108:7
**performed** [3] - 72:1, 75:1, 104:8
**performing** [5] - 124:8, 131:2, 131:13, 131:23, 132:7
**perhaps** [3] - 20:22, 61:25, 181:20
**permission** [2] - 20:19, 181:11
**permissive** [3] - 68:8, 118:14, 118:23
**permits** [1] - 146:20
**permitted** [2] - 57:10, 79:15
**Pershing** [7] - 10:23, 18:18, 18:21, 19:6, 159:19, 159:21, 177:24
**person** [20] - 55:21, 58:8, 58:20, 58:24, 59:16, 61:22, 62:23, 80:5, 80:12, 92:10, 115:8, 136:14, 136:17, 184:13, 188:13, 189:20, 190:5, 191:20, 193:6, 194:8
**persons** [1] - 29:7
**perspective** [11] - 24:2, 24:8, 52:19, 121:3, 126:24, 127:1, 127:2, 189:18, 191:19, 194:8
**perspectives** [1] - 121:1
**persuasive** [3] - 119:12, 129:24, 130:3
**pertinent** [1] - 74:7
**petitions** [1] - 13:25
**Ph.D** [1] - 39:13
**phase** [3] - 157:7, 162:2, 182:12
**photogrammetric** [2] - 41:11, 73:4
**photogrammetry** [16] - 39:22, 41:1, 42:8,

42:21, 43:21, 45:5, 45:7, 51:17, 55:22, 56:20, 58:9, 60:12, 61:4, 78:24, 80:12, 136:18
**photograph** [5] - 19:8, 20:6, 45:17, 46:11, 46:15
**photographs** [14] - 18:24, 19:7, 24:1, 25:15, 44:2, 45:16, 46:1, 46:3, 46:12, 46:25, 56:22, 107:10
**photography** [3] - 18:25, 31:16, 46:7
**phrase** [7] - 55:24, 66:16, 66:19, 66:23, 67:1, 67:2, 72:12
**picture** [7] - 16:20, 20:4, 27:19, 43:1, 47:17, 77:9, 77:11
**pictures** [3] - 19:16, 25:21, 26:19
**piece** [5] - 47:17, 84:3, 96:22, 127:17, 165:10
**pieced** [1] - 46:17
**ping** [2] - 6:16, 80:20
**ping-pong** [1] - 80:20
**pitch** [187] - 22:1, 27:5, 27:7, 27:8, 27:9, 27:24, 27:25, 28:11, 28:12, 28:14, 33:8, 33:13, 52:3, 52:4, 52:5, 52:6, 52:10, 52:13, 52:22, 52:23, 53:5, 53:6, 53:9, 53:10, 53:12, 80:22, 81:7, 81:11, 81:12, 81:14, 81:21, 82:4, 82:11, 82:19, 82:24, 83:5, 83:6, 83:8, 83:10, 83:12, 83:14, 84:4, 84:10, 84:12, 84:16, 84:19, 85:8, 85:10, 85:12, 85:18, 85:21, 85:23, 86:5, 86:6, 86:11, 86:18, 86:24, 87:13, 87:21, 88:8, 88:11, 88:15, 88:18, 89:1, 89:6, 89:15, 89:17, 89:23, 90:4, 91:10, 92:3, 92:11, 92:17, 92:18, 92:25, 93:8, 93:11, 93:12, 93:16, 94:4, 94:5, 94:9, 94:10, 95:5, 95:9, 95:19, 95:22, 97:18, 98:2, 98:4, 98:5,

98:20, 99:8, 99:9, 99:11, 99:20, 99:22, 99:24, 100:4, 100:8, 100:17, 100:19, 100:22, 101:2, 101:5, 101:12, 101:13, 101:15, 101:23, 102:2, 102:8, 102:11, 103:11, 103:13, 103:17, 103:18, 103:19, 104:2, 104:4, 104:6, 104:9, 104:12, 104:14, 104:18, 104:19, 105:1, 105:4, 105:8, 105:11, 105:17, 105:23, 106:1, 106:4, 106:7, 106:8, 106:13, 106:14, 106:17, 106:20, 106:22, 106:23, 107:1, 107:3, 107:19, 107:20, 107:24, 107:25, 108:2, 108:4, 108:6, 108:9, 108:12, 108:13, 108:14, 108:16, 108:18, 108:21, 108:22, 109:9, 109:11, 110:9, 110:22, 111:6, 111:13, 111:18, 111:19, 111:24, 112:5, 112:7, 112:9, 112:11, 112:12, 113:12, 113:20, 120:11, 122:15, 124:24, 127:9, 130:23, 147:22
**pitches** [14] - 18:7, 19:11, 21:19, 21:21, 21:22, 22:25, 26:4, 94:22, 104:24, 104:25, 105:2, 110:12, 110:15
**Pizzi** [1] - 4:20
**PIZZI** [1] - 1:12
**place** [9] - 19:22, 47:3, 66:20, 67:7, 85:5, 122:23, 136:15, 138:4, 192:13
**places** [1] - 170:23
**plagued** [1] - 12:1
**plain** [7] - 75:12, 133:22, 137:13, 142:17, 145:3, 167:7, 196:21
**plaintiff** [9] - 6:3, 57:5,

63:3, 63:6, 63:10, 94:3, 145:21, 148:15, 162:11
**Plaintiff's** [1] - 20:22
**plaintiff's** [10] - 7:22, 89:23, 109:3, 113:17, 117:20, 118:8, 119:1, 119:14, 139:14, 152:22
**Plaintiffs** [2] - 1:3, 1:16
**plaintiffs** [21] - 7:15, 33:5, 37:23, 39:3, 56:10, 57:23, 79:11, 79:19, 103:23, 104:15, 108:25, 116:22, 117:4, 118:25, 137:23, 138:25, 152:13, 154:14, 157:8, 161:10, 162:5
**plan** [4] - 6:25, 23:25, 24:20, 39:2
**planar** [3] - 47:23, 48:11, 48:20
**plane** [2] - 48:20, 86:5
**planes** [3] - 65:8, 66:1, 76:14
**platform** [8] - 13:4, 35:8, 35:9, 35:16, 35:19, 36:6, 36:10, 36:14
**play** [2] - 87:4, 182:24
**PLAZA** [1] - 1:7
**plotted** [1] - 46:21
**plotting** [1] - 46:20
**pluck** [1] - 24:22
**plus** [1] - 27:5
**pocket** [1] - 61:20
**podium** [2] - 9:10, 16:2
**point** [116] - 15:6, 29:23, 41:7, 41:17, 41:19, 41:20, 41:25, 42:10, 42:12, 42:15, 44:11, 44:16, 44:20, 44:21, 44:23, 48:2, 51:1, 51:20, 51:21, 51:23, 52:17, 53:24, 53:25, 54:8, 55:7, 55:9, 55:11, 59:8, 59:14, 59:17, 59:18, 59:24, 59:25, 60:23, 60:24, 60:25, 61:4, 61:6, 61:7, 62:20, 65:7, 65:8, 65:18, 65:19, 65:22, 66:13, 66:15, 67:14, 68:19, 69:15, 71:1, 71:5,

71:13, 72:2, 72:5, 72:8, 73:3, 76:14, 76:19, 76:20, 76:21, 77:3, 78:12, 80:1, 80:13, 81:3, 91:1, 91:4, 97:16, 98:25, 99:3, 99:8, 100:2, 100:3, 110:24, 111:2, 111:7, 117:4, 121:5, 128:16, 134:1, 135:25, 136:1, 136:16, 137:17, 145:4, 147:11, 148:16, 149:25, 150:8, 151:21, 152:4, 152:9, 153:15, 155:17, 161:1, 168:21, 172:6, 173:17, 186:9, 186:15, 186:16, 186:17, 189:2, 192:25
**pointed** [7] - 16:14, 17:6, 19:23, 37:17, 59:1, 115:21, 169:9
**pointing** [3] - 137:9, 156:11, 176:3
**points** [74] - 34:16, 41:5, 41:8, 43:2, 44:1, 46:20, 47:25, 48:8, 48:24, 49:22, 54:3, 54:6, 55:6, 55:10, 58:3, 58:17, 59:9, 60:2, 61:2, 61:9, 61:10, 61:12, 61:13, 62:21, 63:20, 65:17, 66:5, 66:6, 66:11, 66:12, 66:17, 67:16, 67:21, 67:25, 68:7, 68:11, 68:20, 69:2, 71:3, 71:6, 71:7, 71:8, 71:11, 71:24, 72:10, 72:17, 73:7, 74:4, 75:20, 76:4, 76:5, 76:21, 76:25, 77:4, 77:8, 77:11, 77:13, 78:1, 78:2, 78:5, 78:9, 78:11, 78:21, 94:2, 96:18, 114:6, 117:25, 123:15, 123:19, 123:24, 138:9, 188:19
**polygon** [2] - 49:22, 49:24
**Polytechnic** [2] - 39:14, 40:9
**Poncelet** [1] - 45:1
**pong** [2] - 6:16, 80:20

**portion** [7] - 30:18, 64:15, 64:22, 92:8, 93:1, 104:23, 165:5
**portions** [6] - 16:25, 23:20, 94:3, 100:11, 156:5, 157:22
**portraying** [1] - 50:4
**portrays** [1] - 46:6
**ports** [1] - 172:2
**position** [14] - 28:8, 28:13, 50:23, 51:3, 57:7, 70:12, 71:14, 98:1, 99:2, 109:25, 117:20, 180:25, 195:20
**positioning** [1] - 47:24
**positions** [1] - 7:25
**possibility** [1] - 118:2
**possible** [3] - 45:16, 51:2, 143:11
**possibly** [1] - 181:2
**potential** [1] - 91:2
**potentially** [3] - 18:11, 135:8, 174:2
**poured** [1] - 179:22
**powerful** [1] - 127:4
**practical** [1] - 144:7
**practically** [1] - 50:22
**practice** [3] - 8:9, 43:8, 45:4
**practiced** [1] - 33:4
**pre** [1] - 30:23
**pre-approve** [1] - 30:23
**precept** [1] - 96:6
**precise** [3] - 59:5, 59:17, 181:25
**precisely** [3] - 52:20, 77:10, 193:5
**predict** [1] - 182:4
**preexisting** [1] - 41:12
**prefatory** [1] - 183:8
**prefer** [1] - 39:8
**preferred** [2] - 162:5, 168:15
**premise** [1] - 100:18
**premises** [1] - 99:14
**prepare** [1] - 40:17
**prepared** [3] - 16:1, 34:13, 50:12
**preparing** [1] - 30:22
**PRESENT** [1] - 1:21
**present** [8] - 6:9, 15:4, 34:12, 40:21, 87:20, 91:11, 96:25, 123:5
**presentation** [24] - 5:20, 5:25, 7:7, 7:15, 16:3, 32:22, 32:25, 33:1, 33:18, 34:18, 38:25, 51:12, 55:16,

113:16

**procedure** [3] - 41:3, 50:25, 56:9
**proceed** [9] - 6:4, 15:2, 32:11, 34:10, 39:2, 40:20, 62:13, 81:4, 120:7
**proceeding** [1] - 57:19
**proceedings** [3] - 46:14, 61:18, 95:25
**proceeds** [1] - 115:13
**process** [25] - 19:25, 25:13, 26:1, 28:20, 28:23, 29:1, 30:3, 38:1, 38:3, 60:20, 61:7, 61:16, 75:1, 75:2, 78:20, 106:12, 156:18, 156:20, 157:11, 157:12, 167:20, 167:21, 182:8, 185:3, 191:14
**processer** [1] - 190:17
**processing** [1] - 15:19
**produces** [1] - 11:4
**product** [4] - 8:14, 36:17, 142:12
**products** [11] - 7:9, 7:19, 7:22, 8:8, 11:1, 11:12, 11:22, 31:22, 33:2, 33:4, 33:5
**Professor** [1] - 51:11
**professor** [3] - 15:16, 39:19, 40:9
**program** [2] - 35:23, 109:14
**project** [1] - 44:20
**projected** [9] - 29:20, 44:7, 44:9, 44:12, 116:16, 141:14, 158:22, 165:3, 192:23
**projecting** [1] - 153:11
**projection** [26] - 20:9, 40:15, 44:13, 44:18, 50:20, 90:12, 109:1, 121:7, 129:18, 153:1, 154:14, 156:17, 157:25, 158:4, 158:12, 158:20, 159:22, 159:23, 162:7, 174:16, 176:22, 177:25, 178:1, 183:15, 186:8, 192:12
**projections** [5] - 29:8, 49:25, 102:15, 148:17, 177:22
**projective** [1] - 44:24
**Projects** [1] - 40:2

**promote** [1] - 7:24
**promoting** [1] - 7:21
**promotional** [5] - 7:8, 7:17, 7:18, 7:19, 8:4
**propagates** [1] - 126:25
**proper** [3] - 33:25, 109:17, 115:9
**properly** [1] - 25:9
**properties** [1] - 40:14
**property** [1] - 13:20
**prophylactic** [1] - 8:1
**proponent** [1] - 195:12
**proposal** [2] - 128:10, 128:11
**proposals** [1] - 112:17
**propose** [1] - 140:25
**proposed** [10] - 7:6, 72:2, 80:2, 80:14, 133:23, 134:16, 163:2, 164:13, 167:6, 177:19
**proposing** [6] - 6:15, 85:13, 95:13, 111:8, 111:12, 178:23
**proposition** [2] - 76:3, 102:6, 148:7
**prosecution** [35] - 54:24, 74:9, 74:11, 79:18, 87:17, 119:2, 119:3, 119:5, 119:13, 125:6, 127:23, 128:3, 128:8, 128:15, 128:19, 129:1, 129:3, 130:19, 132:15, 144:18, 144:23, 150:3, 150:4, 159:15, 160:5, 177:17, 177:20, 177:21, 178:3, 178:12, 178:17, 180:21, 187:12, 196:21
**prosecutor's** [1] - 79:8
**prospective** [2] - 8:5, 21:7
**protecting** [1] - 79:9
**protractor** [27] - 26:15, 52:12, 52:20, 53:4, 53:9, 81:22, 82:6, 82:12, 88:6, 88:9, 94:11, 94:25, 100:15, 103:4, 103:10, 103:20, 103:24, 104:9, 104:12, 104:18, 105:1, 105:5,

106:13, 108:13, 109:18, 110:16
**proverbial** [1] - 36:13
**provide** [6] - 35:5, 57:3, 65:12, 67:2, 75:14, 102:2
**provided** [6] - 21:4, 23:9, 31:13, 75:14, 171:2, 192:15
**Providence** [1] - 39:21
**provider** [1] - 34:22
**providers** [1] - 31:21
**provides** [3] - 31:20, 67:4, 114:21
**public** [1] - 32:2
**pull** [2] - 140:16, 143:25, 180:20
**pulled** [1] - 18:22
**pulling** [2] - 106:21, 106:25
**pun** [2] - 61:4, 113:19
**purchase** [3] - 13:9, 36:24, 37:9
**purchasing** [1] - 13:12
**purely** [1] - 135:13
**purple** [1] - 163:9
**purported** [1] - 33:8
**purpose** [2] - 57:18, 191:2
**purposes** [7] - 78:3, 78:17, 81:12, 100:1, 110:21, 126:23, 144:7
**put** [33] - 11:14, 19:22, 35:24, 46:17, 61:12, 72:10, 79:17, 82:22, 91:24, 93:23, 94:6, 99:16, 100:24, 104:5, 104:20, 115:10, 126:19, 127:18, 134:3, 134:6, 134:8, 137:13, 137:15, 145:9, 164:11, 167:2, 170:8, 172:22, 174:22, 175:18, 180:11, 197:11
**puts** [3] - 6:17, 127:23
**putting** [10] - 74:3, 75:6, 126:15, 145:7, 152:25, 153:4, 171:21, 176:11, 176:19
**puzzled** [1] - 193:13
**puzzles** [1] - 44:19

**Q**

**qualified** [1] - 7:24
**quality** [1] - 166:7
**quantity** [1] - 23:9
**quarrel** [2] - 151:8, 155:23
**QUESTION** [3] - 69:25, 70:7, 72:17
**questioning** [1] - 148:25
**questions** [7] - 30:18, 32:5, 39:4, 75:16, 75:18, 197:13, 197:14
**quick** [2] - 7:4, 96:18
**quickly** [6] - 12:6, 19:12, 54:7, 93:3, 156:11, 190:11
**quiet** [1] - 4:18
**quite** [7] - 48:6, 50:21, 52:4, 52:23, 81:3, 160:3, 166:4
**quote** [7] - 31:19, 42:2, 105:19, 129:12, 186:24, 188:11, 190:16

**R**

**radius** [6] - 49:8, 49:10, 49:11, 49:14, 50:5, 50:24
**rafters** [1] - 31:17
**raise** [4] - 14:17, 38:11, 160:24, 189:22
**raised** [3] - 160:23, 187:18, 188:19
**rake** [2] - 22:10, 29:23
**rakes** [2] - 22:10, 22:18
**rapid** [2] - 12:8, 17:4
**rarely** [2] - 92:6, 168:15
**rather** [6] - 16:9, 45:17, 82:17, 93:17, 127:21, 156:25
**ratio** [2] - 21:25, 22:1
**ray** [4] - 41:18, 41:19, 51:21, 51:22
**rays** [4] - 41:5, 41:6, 41:20, 41:25
**re** [2] - 56:11, 79:18
**re-exam** [1] - 79:18
**re-examined** [1] - 56:11
**reached** [1] - 31:12

61:23, 62:1, 64:13, 73:16, 78:7, 80:10, 105:15, 162:23, 174:14, 187:8
**presentations** [3] - 10:6, 33:23, 34:3
**presented** [2] - 80:7, 157:25
**presenting** [2] - 5:8, 198:11
**presents** [1] - 136:6
**president** [1] - 13:19
**press** [3] - 11:14, 31:11, 31:15
**pressed** [1] - 96:9
**pressure** [1] - 17:19
**presume** [2] - 8:11, 133:12
**presumption** [8] - 96:25, 133:18, 161:16, 182:23, 189:4, 189:7
**pretend** [1] - 168:12
**pretty** [2] - 49:8, 57:6
**prevent** [1] - 145:15
**prevents** [1] - 98:3
**previous** [1] - 142:5
**previously** [3] - 104:25, 175:21, 175:25
**price** [2] - 35:14, 35:15
**pricing** [1] - 35:12
**primal** [1] - 23:15
**primary** [6] - 5:20, 40:13, 63:11, 66:10, 85:5, 139:3
**primitive** [4] - 50:12, 74:21, 75:6, 79:22
**primitives** [2] - 74:1, 74:6
**principle** [16] - 42:1, 42:6, 43:2, 43:9, 43:12, 43:18, 44:9, 44:25, 56:20, 93:24, 97:3, 97:11, 101:18, 149:19, 167:5, 169:5
**principles** [6] - 41:23, 42:20, 42:22, 51:16, 55:23, 87:3
**problem** [15] - 57:18, 58:22, 62:10, 92:1, 114:25, 135:3, 136:19, 136:20, 139:10, 142:2, 145:23, 146:22, 178:20, 195:8
**problematic** [2] - 72:3, 180:4
**problems** [2] - 72:13,

**reaching** [1] - 192:4
**read** [20] - 57:7, 57:25, 58:21, 76:8, 126:12, 134:6, 136:1, 136:2, 138:10, 142:12, 144:3, 144:6, 144:9, 145:8, 149:19, 153:14, 169:6, 178:7, 178:10, 189:1
**reading** [4] - 37:24, 96:12, 136:1, 142:23
**readjust** [1] - 27:3
**reads** [2] - 106:6, 147:10
**ready** [3] - 32:11, 174:7, 181:6
**real** [18] - 102:7, 103:13, 105:8, 106:23, 107:4, 108:3, 108:19, 108:22, 108:23, 109:6, 109:15, 136:22, 139:10, 141:2, 143:24, 145:4, 198:6
**realistic** [2] - 44:14, 44:15
**reality** [2] - 43:24, 183:25
**realize** [1] - 190:3
**really** [34] - 36:23, 37:3, 37:5, 44:5, 44:19, 46:1, 46:6, 58:5, 73:15, 77:7, 84:5, 97:2, 97:10, 99:13, 101:14, 111:15, 117:21, 121:20, 134:18, 138:18, 141:10, 144:12, 146:4, 153:3, 163:1, 163:14, 163:22, 167:5, 168:6, 169:22, 171:17, 172:18, 175:12, 194:22
**realm** [2] - 106:4, 188:4
**realtime** [1] - 32:8
**reason** [15] - 32:8, 66:23, 70:17, 91:12, 101:16, 106:24, 107:16, 108:24, 112:17, 135:12, 139:7, 142:19, 173:8, 180:4, 180:12
**reasons** [5] - 33:17, 67:17, 119:7, 180:22, 182:6
**rebuilding** [1] - 35:13

**rebuttal** [2] - 6:18, 62:2
**receive** [2] - 56:4, 56:14
**received** [3] - 12:14, 108:4, 156:16
**receives** [2] - 67:10, 77:21
**receiving** [6] - 64:19, 107:25, 156:14, 193:25, 194:2, 194:3
**recent** [1] - 12:2
**Recess** [1] - 174:6
**RECESS** [2] - 32:16, 112:21
**recognition** [1] - 11:21
**recognize** [1] - 40:16
**recognized** [4] - 10:14, 11:13, 13:6, 13:17
**recognizing** [2] - 11:15, 13:10
**reconcile** [3] - 95:12, 96:16, 128:24
**reconstruct** [2] - 35:10, 51:9
**reconstructing** [4] - 47:6, 47:11, 53:24, 107:12
**reconstruction** [6] - 31:22, 45:10, 47:18, 47:21, 47:24, 79:14
**record** [9] - 7:4, 7:23, 10:9, 21:2, 32:2, 92:21, 119:13, 161:17, 187:6
**recording** [1] - 59:10
**recreate** [1] - 46:7
**red** [15] - 9:21, 22:16, 24:23, 27:20, 28:8, 28:13, 45:25, 64:23, 83:20, 84:7, 122:4, 164:22, 165:6, 172:21, 172:22
**reexamination** [1] - 56:9
**refer** [5] - 42:21, 105:13, 134:2, 186:4, 192:18
**reference** [42] - 16:4, 37:19, 48:23, 49:2, 49:4, 55:7, 55:9, 58:3, 61:7, 62:20, 66:15, 72:5, 72:8, 72:9, 72:17, 73:2, 77:12, 78:9, 78:11, 78:12, 78:21, 109:19, 129:7, 137:3, 144:16,

150:8, 150:21, 151:6, 159:21, 159:25, 162:23, 169:18, 169:20, 170:18, 171:11, 171:12, 187:16, 187:17
**referenced** [2] - 64:12, 72:1
**references** [8] - 78:12, 154:11, 162:2, 170:15, 178:17, 188:9, 189:25, 196:14
**referred** [7] - 41:11, 42:2, 49:4, 113:11, 113:14, 113:15, 144:24
**referring** [6] - 65:24, 67:13, 95:22, 144:23, 185:4, 191:11
**refers** [3] - 72:8, 127:10, 138:13
**refine** [1] - 28:24
**refinement** [2] - 26:6, 28:23
**refinements** [1] - 88:24
**refining** [2] - 26:2, 27:15
**reflect** [2] - 104:21, 108:16
**reflecting** [1] - 109:4
**regard** [14] - 122:22, 146:23, 147:4, 147:22, 150:5, 159:11, 160:11, 161:17, 184:10, 185:8, 186:6, 188:16, 189:22, 194:16
**regarding** [1] - 125:13
**regardless** [2] - 99:17, 144:9
**regards** [1] - 188:16
**register** [2] - 60:2, 66:18
**registered** [1] - 73:7
**registering** [10] - 25:9, 55:6, 55:10, 59:9, 62:20, 67:16, 67:21, 67:25, 68:11, 78:5
**registration** [7] - 76:19, 80:2, 80:13, 113:12, 134:3, 134:4, 134:8
**regular** [1] - 78:23
**reinventing** [1] - 11:16
**reject** [3] - 91:12,

112:17, 133:19
**rejected** [5] - 119:10, 119:15, 129:4, 129:6, 137:25
**rejections** [1] - 119:9
**relate** [4] - 10:17, 64:2, 69:4
**related** [1] - 18:20
**relates** [5] - 11:2, 15:12, 64:5, 64:16, 97:4
**relation** [1] - 34:16
**relationship** [14] - 121:20, 140:19, 140:21, 141:1, 141:25, 143:1, 143:13, 143:14, 145:18, 145:20, 149:3, 152:18, 173:4, 180:1
**relative** [1] - 25:4
**relatively** [2] - 54:7, 198:15
**release** [2] - 31:11, 31:15
**released** [1] - 114:24
**relevant** [4] - 94:18, 136:4, 148:6, 182:6
**relied** [1] - 173:13
**relies** [5] - 41:10, 41:13, 43:9, 94:3, 132:22
**rely** [13] - 13:1, 34:4, 41:1, 42:22, 69:19, 95:24, 96:4, 100:25, 104:16, 141:19, 188:3
**relying** [2] - 33:23, 68:7
**remain** [2] - 36:3, 198:18
**remainder** [3] - 4:18, 85:19, 180:16
**remaining** [2] - 114:18, 187:6
**remains** [1] - 34:10
**remark** [1] - 80:24
**remarkable** [1] - 45:17
**remarks** [2] - 81:16, 89:5
**remember** [5] - 14:25, 72:8, 101:10, 137:7, 186:1
**remiss** [1] - 188:7
**remodeling** [1] - 31:22
**remove** [1] - 173:20
**removing** [1] - 107:1
**render** [5] - 117:21, 152:11, 152:17
**Render** [1] - 20:5

**rendered** [1] - 116:20
**rendering** [3] - 25:23, 97:6, 98:10
**renovate** [1] - 35:6
**Rensselaer** [2] - 39:13, 40:9
**repair** [6] - 16:22, 17:3, 17:9, 18:3, 18:11, 51:14
**repeat** [2] - 61:6, 93:4
**repeatedly** [4] - 137:7, 160:8, 173:7, 178:10
**repeating** [2] - 78:20, 127:13
**repeats** [1] - 127:13
**repetition** [1] - 186:3
**repetitive** [2] - 110:5, 187:7
**rephrase** [1] - 101:11
**replace** [1] - 17:25
**replacement** [1] - 51:15
**replaces** [1] - 17:14
**replete** [5] - 157:18, 158:23, 189:24
**reply** [2] - 150:9, 160:9
**report** [23] - 20:17, 20:19, 21:3, 21:7, 21:12, 21:13, 21:17, 22:12, 23:12, 23:15, 30:2, 31:2, 31:3, 36:4, 38:2, 83:9, 83:10, 91:15, 91:19, 163:11, 179:12, 183:18, 190:18
**reporting** [1] - 13:13
**reports** [19] - 11:4, 11:5, 13:2, 16:15, 16:18, 20:2, 23:10, 23:18, 23:24, 30:13, 31:8, 31:13, 32:3, 36:8, 80:9, 81:9, 109:3, 117:11
**represent** [3] - 5:21, 10:12, 119:21
**representation** [2] - 20:11, 161:9
**representations** [1] - 56:23
**representative** [1] - 120:14
**represented** [1] - 48:12
**representing** [2] - 48:18, 119:4
**represents** [4] - 128:5, 128:6, 129:14, 129:15
**reprinted** [1] - 129:12

request [3] - 30:25, 114:1, 147:1
requested [1] - 73:21
requesting [1] - 184:16
require [5] - 79:13, 91:8, 138:2, 167:1, 198:20
required [4] - 1:23, 83:25, 150:22, 196:5
requirement [22] - 23:14, 66:25, 72:1, 72:23, 90:20, 90:23, 91:11, 96:24, 96:25, 97:8, 111:11, 122:25, 131:8, 134:16, 135:10, 163:24, 168:25, 169:11, 175:18, 180:3, 196:23, 197:2
requirements [9] - 84:16, 97:25, 122:23, 124:20, 133:1, 133:2, 133:4, 133:5, 133:6
requires [10] - 16:22, 47:1, 56:4, 73:6, 98:9, 116:17, 138:2, 139:23, 140:4, 152:10
research [2] - 39:17, 39:22
Research [1] - 40:2
reserve [1] - 181:1
reshaping [1] - 11:17
resight [1] - 43:6
respect [7] - 94:4, 105:4, 105:10, 121:6, 129:12, 162:17, 172:10
respectfully [1] - 137:16
respective [2] - 151:20
respectively [3] - 118:1, 150:10, 150:11
respects [1] - 64:8
resplendent [1] - 191:20
respond [12] - 33:19, 63:1, 63:4, 75:19, 80:17, 99:15, 110:2, 128:23, 135:20, 152:22, 181:1, 187:17
respondents [1] - 69:9
responds [2] - 129:23
response [16] - 14:6,

129:8, 130:7, 130:17, 140:10, 140:11, 150:23, 163:10, 164:8, 172:25, 173:14, 179:16, 181:25, 183:22, 191:25, 196:12
RESPONSE [3] - 4:4, 32:14, 198:24
responses [2] - 118:8, 151:5
responsible [1] - 10:16
responsive [9] - 29:5, 57:9, 69:9, 71:2, 72:25, 73:17, 161:10, 162:14, 170:13
rest [3] - 10:4, 53:22, 198:3
restrict [6] - 66:23, 67:24, 68:7, 69:21, 70:5, 92:5
restricted [1] - 74:4
restricting [2] - 68:20, 71:21
restriction [2] - 68:5, 93:10
restrictions [1] - 125:2
result [3] - 95:19, 104:8, 188:11
results [1] - 147:18
retrieve [1] - 60:4
reverse [5] - 121:16, 126:1, 126:2, 127:17, 169:22
review [20] - 13:25, 104:17, 106:16, 157:7, 157:11, 161:24, 161:25, 167:16, 167:24, 168:1, 168:2, 168:6, 182:8, 182:9, 186:11, 187:10, 193:9, 194:14, 195:21, 195:23
reviewed [1] - 94:22
reviewing [4] - 89:14, 89:15, 89:17, 94:5
revolutionary [1] - 11:13
Rhode [1] - 39:21
rid [1] - 168:17
ridge [6] - 24:22, 24:23, 29:23, 66:1, 76:16, 166:10
ridges [8] - 22:2, 22:5, 22:7, 22:16, 22:17,

31:17, 100:14
right-hand [1] - 66:8
ring [1] - 78:19
rise [3] - 4:1, 32:18, 112:22
risk [16] - 34:25, 139:9, 140:3, 141:2, 142:19, 142:21, 142:22, 143:12, 143:19, 148:14, 148:15, 152:25, 153:3, 153:6, 153:12, 153:13
risks [1] - 153:3
RMR [3] - 1:24, 1:25, 1:25
road [3] - 72:14, 143:12, 149:6
roadblocks [1] - 189:22
roadways [1] - 47:23
Robert [1] - 1:25
ROBERT [1] - 1:9
Roberts [2] - 47:9, 47:10
rocket [1] - 36:13
Roof [1] - 104:25
roof [213] - 11:4, 11:5, 11:7, 13:2, 13:13, 16:15, 16:18, 16:21, 16:22, 16:25, 17:3, 17:5, 18:5, 18:19, 20:1, 20:2, 20:12, 20:17, 20:19, 21:2, 21:8, 21:23, 22:11, 23:17, 23:18, 23:23, 23:24, 24:4, 24:7, 24:15, 25:1, 25:3, 25:16, 25:22, 27:1, 27:24, 28:14, 28:18, 29:22, 30:2, 30:13, 30:23, 31:2, 31:8, 31:13, 32:3, 35:10, 35:22, 36:4, 36:8, 49:17, 49:20, 51:8, 51:9, 51:14, 51:18, 52:1, 52:21, 52:22, 53:1, 53:10, 53:22, 54:2, 54:4, 54:5, 54:10, 55:9, 56:17, 58:2, 64:5, 64:19, 65:6, 65:8, 65:9, 66:2, 67:10, 73:10, 76:13, 76:14, 76:22, 77:12, 77:21, 81:8, 81:9, 82:10, 82:17, 83:7, 83:9, 83:10, 84:13, 84:18, 84:19, 85:12, 86:5, 86:7, 86:20, 89:15, 89:25,

90:2, 90:7, 90:9, 90:12, 90:15, 90:16, 90:21, 90:25, 91:6, 91:7, 91:8, 91:10, 91:15, 91:16, 91:17, 91:18, 91:21, 91:24, 92:2, 98:15, 100:14, 101:13, 101:16, 102:7, 102:8, 102:9, 102:11, 102:12, 103:13, 104:6, 104:17, 105:3, 105:8, 105:25, 106:14, 106:16, 106:23, 107:4, 107:9, 107:15, 108:2, 108:3, 108:5, 108:19, 108:23, 109:3, 109:15, 109:20, 109:23, 114:3, 114:6, 114:22, 114:23, 116:16, 117:25, 121:2, 121:6, 121:8, 122:14, 123:15, 123:24, 124:2, 125:19, 127:7, 131:20, 138:3, 157:2, 157:3, 157:4, 157:6, 157:7, 157:12, 157:15, 157:16, 159:7, 159:8, 159:9, 159:24, 161:23, 161:25, 162:1, 163:6, 163:11, 165:2, 165:4, 166:24, 167:16, 167:24, 167:25, 168:2, 168:4, 168:6, 178:2, 179:12, 183:17, 186:23, 190:18
roof's [1] - 31:17
roofers [1] - 11:19
roofing [2] - 10:14, 11:16
roofs [22] - 10:19, 11:19, 12:5, 12:8, 12:10, 17:9, 17:10, 17:16, 18:2, 18:5, 18:8, 18:25, 19:5, 19:11, 21:15, 22:10, 45:8, 47:22, 48:1, 48:3, 79:24
rotate [1] - 50:19
rotated [1] - 47:13
rough [2] - 19:13, 19:15
row [1] - 51:1

rule [1] - 145:7
rules [1] - 44:13
ruling [1] - 109:9
run [2] - 41:16, 148:14
running [2] - 32:20, 44:10
runs [1] - 166:10

## S

safety [2] - 145:14, 145:15
sake [1] - 154:16
sales [1] - 36:12
sample [3] - 11:14, 20:18, 21:6
San [1] - 49:16
satellite [3] - 47:19, 47:21, 49:16
save [1] - 181:19
saw [14] - 70:10, 70:11, 82:23, 84:3, 93:5, 93:6, 98:13, 98:17, 107:7, 120:13, 130:19, 183:2, 186:6, 188:22
scaleability [1] - 18:9
scenario [1] - 27:19
scene [8] - 44:1, 46:17, 46:22, 52:11, 74:20, 79:21, 79:22, 177:14
scenes [1] - 43:19
Schenectady [1] - 39:18
school [1] - 42:4
science [3] - 15:16, 15:24, 41:1
Science [1] - 15:23
scope [11] - 7:12, 67:5, 70:13, 71:17, 87:16, 111:16, 111:23, 144:13, 178:13, 181:24, 193:17
Scott [1] - 5:15
SCOTT [1] - 1:17
scratching [1] - 57:22
screen [5] - 30:21, 40:19, 47:14, 91:18, 165:1
screw [1] - 43:25
sea [1] - 44:22
search [3] - 60:13, 130:7
searches [1] - 60:9
seat [6] - 4:5, 14:24, 32:20, 38:19, 112:24, 174:11

**second** [211] - 10:7,
10:8, 37:15, 41:18,
41:19, 42:11, 42:14,
42:18, 43:13, 49:18,
49:23, 50:1, 51:4,
51:22, 51:23, 53:21,
55:5, 55:11, 55:12,
55:25, 56:5, 56:14,
56:16, 56:18, 59:23,
76:20, 100:3, 111:9,
113:6, 114:4, 114:5,
114:10, 114:14,
114:15, 115:4,
115:14, 115:22,
116:1, 116:8,
116:10, 116:25,
117:2, 117:6, 117:7,
117:21, 117:24,
117:25, 118:11,
118:19, 119:18,
120:10, 120:18,
121:22, 122:22,
122:24, 123:2,
123:7, 123:8,
123:23, 123:25,
124:2, 124:7,
124:19, 125:22,
126:3, 126:8, 127:6,
127:21, 128:6,
128:15, 128:18,
129:11, 129:15,
129:18, 130:6,
130:13, 130:25,
131:9, 131:12,
131:21, 131:22,
132:1, 132:5,
132:12, 133:16,
134:5, 134:12,
134:17, 134:20,
134:25, 135:10,
135:12, 136:1,
136:25, 137:9,
137:15, 137:21,
138:16, 138:20,
139:1, 139:15,
139:18, 139:25,
140:2, 140:3, 140:5,
140:8, 140:13,
140:20, 141:14,
142:25, 143:7,
144:18, 145:1,
146:3, 146:4,
146:14, 146:21,
146:24, 147:13,
147:15, 147:19,
147:24, 148:21,
149:5, 149:13,
149:15, 150:12,
150:14, 150:17,
150:18, 150:24,
151:18, 151:23,
151:25, 152:3,
152:14, 153:12,
154:2, 154:3,
154:23, 155:23,
156:18, 156:19,
158:1, 158:13,
158:20, 158:22,
163:6, 163:8,
163:10, 163:21,
164:2, 165:24,
165:25, 166:21,
167:10, 168:9,
169:14, 170:1,
171:25, 172:24,
174:17, 174:19,
174:23, 175:3,
175:16, 175:23,
176:17, 177:1,
177:8, 177:9,
177:23, 179:13,
179:15, 183:18,
183:20, 183:21,
184:19, 185:7,
185:11, 185:17,
186:16, 188:12,
190:19, 190:21,
191:5, 191:16,
192:5, 196:9
**secondary** [1] - 66:13
**secondly** [1] - 119:10
**section** [13] - 25:1,
62:15, 77:15, 84:13,
86:5, 86:6, 101:13,
102:10, 104:17,
165:4, 168:1
**Section** [1] - 1:23
**sections** [4] - 27:1,
27:5, 104:24, 159:10
**see** [127] - 11:15,
12:11, 19:15, 19:16,
20:6, 20:7, 20:21,
21:12, 21:18, 22:14,
22:21, 22:22, 23:6,
24:3, 24:4, 24:6,
24:7, 24:8, 24:9,
25:4, 29:4, 29:19,
29:22, 29:23, 30:22,
31:14, 33:22, 34:2,
41:2, 43:4, 43:20,
43:25, 44:8, 45:1,
45:3, 45:5, 45:9,
45:12, 45:16, 45:20,
45:24, 46:7, 46:10,
46:16, 46:21, 46:23,
47:8, 48:1, 48:13,
48:22, 49:25, 50:24,
51:13, 52:9, 52:16,
52:18, 52:25, 55:24,
56:3, 56:12, 64:12,
69:18, 74:25, 75:5,
78:18, 79:25, 82:13,
82:25, 83:4, 83:14,
87:2, 90:13, 91:14,
92:4, 92:15, 93:3,
94:5, 95:8, 96:14,
99:5, 99:6, 100:10,
104:6, 105:19,
106:15, 112:20,
113:17, 114:13,
114:17, 115:15,
121:1, 122:2,
122:12, 123:12,
124:1, 124:11,
125:6, 128:16,
135:18, 139:20,
141:12, 141:18,
151:19, 157:1,
158:11, 158:17,
159:5, 163:12,
163:15, 164:4,
164:20, 164:22,
165:8, 165:13,
165:17, 166:12,
167:3, 170:14,
170:15, 178:6,
178:16, 180:17,
185:2, 186:20,
191:25
**seed** [1] - 19:21
**seeing** [5] - 16:20,
17:1, 20:13, 29:3,
31:10
**seek** [1] - 191:3
**seeking** [2] - 97:8,
197:25
**seem** [2] - 22:3,
146:13
**segment** [9] - 51:24,
53:21, 53:25, 61:13,
76:3, 76:5, 76:6,
77:5
**segments** [8] - 48:8,
48:9, 54:10, 65:7,
79:2, 106:25, 165:15
**select** [10] - 20:14,
20:15, 28:2, 28:4,
28:5, 41:4, 41:17,
42:10, 51:20, 51:21
**selected** [2] - 28:3,
54:6
**selecting** [1] - 53:24
**selects** [2] - 28:6, 28:7
**sells** [2] - 11:1, 11:4
**send** [2] - 18:12
**sense** [8] - 14:14,
23:20, 37:24, 57:8,
62:9, 182:3, 182:7,
190:9
**sentence** [1] - 78:19
**separate** [12] - 13:25,
99:10, 114:11,
145:17, 146:14,
147:2, 147:3, 147:9,
148:4, 148:19,
149:10, 161:13
**separately** [5] -
113:22, 148:8,
148:13, 149:5,
150:16
**separation** [1] -
143:16
**sequence** [1] - 97:21
**series** [1] - 104:7
**serve** [1] - 195:1
**serves** [1] - 115:13
**Service** [1] - 34:21
**service** [1] - 31:21
**services** [1] - 34:23
**set** [13] - 44:13, 48:8,
48:24, 73:6, 78:11,
97:21, 116:3, 129:9,
135:9, 139:12,
145:13, 174:9
**sets** [4] - 61:10, 87:11,
118:19, 156:13
**setting** [1] - 134:7
**seven** [1] - 13:22
**several** [13] - 15:22,
17:1, 17:23, 20:13,
21:14, 26:1, 26:3,
26:12, 64:8, 67:16,
100:21, 127:4, 185:3
**shack** [1] - 35:11
**shaded** [1] - 25:23
**shading** [1] - 27:20
**shall** [1] - 87:14
**shape** [4] - 27:14,
27:15, 29:13, 44:10
**shaped** [1] - 25:5
**share** [2] - 69:5, 193:1
**shoehorn** [1] - 193:15
**shop** [1] - 47:1
**short** [1] - 32:12
**shot** [1] - 30:21
**shots** [1] - 77:7
**show** [38] - 18:1,
19:10, 19:24, 28:9,
29:12, 41:6, 49:6,
49:12, 50:8, 53:8,
64:1, 72:4, 74:10,
74:22, 83:23, 84:5,
91:5, 93:3, 99:19,
99:21, 99:23, 106:1,
108:5, 122:6,
125:12, 134:10,
141:20, 141:23,
146:2, 146:3,
158:24, 159:22,
160:20, 161:20,
166:16, 166:17,
167:9, 177:25
**showed** [12] - 31:6,
49:8, 53:21, 67:19,
88:4, 88:5, 106:17,
127:13, 137:7,
143:21, 175:20,
175:25
**showing** [18] - 25:21,
64:11, 64:17, 66:3,
66:7, 68:25, 69:15,
75:6, 81:20, 86:2,
91:20, 95:15,
120:20, 128:1,
155:8, 170:20,
175:21, 177:12
**shown** [18] - 42:11,
49:1, 59:4, 64:21,
67:8, 67:11, 68:15,
77:22, 81:13, 81:24,
94:24, 95:2, 104:13,
104:23, 132:9,
134:4, 170:17,
178:23
**shows** [30] - 16:23,
41:22, 43:1, 44:3,
44:8, 45:9, 45:13,
47:20, 79:18, 81:22,
81:23, 81:24, 83:18,
88:20, 91:18, 93:5,
99:9, 99:18, 99:21,
100:19, 105:22,
110:19, 112:4,
141:12, 155:22,
164:24, 164:25,
169:1, 182:25,
185:16
**shrub** [2] - 25:7, 25:9
**side** [30] - 6:11, 6:16,
6:17, 12:22, 24:3,
36:5, 42:5, 52:18,
54:16, 54:17, 66:8,
90:9, 90:11, 94:6,
94:14, 100:10,
100:25, 139:17,
139:18, 140:16,
140:18, 146:13,
149:23, 153:23,
160:22, 173:9,
177:14, 194:10,
195:11
**side-by-side** [1] -
194:10
**sides** [2] - 36:23, 54:2
**sight** [3] - 46:10,
102:13, 111:10
**sighting** [1] - 43:4
**signal** [1] - 162:25
**signaling** [1] - 147:8
**signed** [3] - 36:7,
36:11, 37:10

**significance** [1] - 34:7
**significant** [3] - 13:20, 168:9, 168:24
**signifies** [1] - 155:20
**similar** [8] - 49:11, 49:13, 52:7, 120:10, 122:14, 153:18, 164:10, 179:19
**simple** [5] - 27:17, 85:7, 101:14, 102:11, 124:8
**simply** [14] - 34:8, 37:16, 57:11, 62:3, 65:19, 67:23, 76:3, 105:13, 106:23, 107:19, 108:19, 138:1, 138:7, 196:11
**simultaneity** [16] - 153:21, 154:12, 154:25, 157:10, 183:11, 184:20, 185:19, 186:18, 186:19, 188:17, 189:16, 190:1, 191:7, 191:18, 192:24, 193:8
**simultaneous** [46] - 155:9, 155:13, 155:14, 155:16, 155:24, 156:22, 158:2, 158:4, 158:15, 158:20, 159:13, 160:1, 160:15, 160:21, 161:5, 161:14, 163:23, 167:1, 167:9, 167:24, 169:10, 169:11, 169:19, 169:21, 171:16, 175:2, 176:20, 177:4, 178:6, 178:25, 180:3, 182:19, 182:22, 184:5, 184:10, 186:7, 188:11, 188:24, 189:9, 192:12, 194:2, 194:12, 197:6, 197:9, 197:10
**simultaneously** [16] - 50:2, 154:5, 154:7, 158:25, 164:1, 164:4, 165:23, 168:7, 173:3, 175:17, 176:23, 182:1, 184:18, 190:8, 192:22, 197:3
**single** [13] - 19:8, 24:11, 29:3, 42:16, 75:1, 75:2, 75:6,

79:1, 145:22, 171:3, 171:4, 171:7, 176:23
**singly** [1] - 28:3
**singular** [1] - 74:22
**sitting** [3] - 16:9, 107:4, 137:1
**situation** [5] - 71:20, 85:14, 124:24, 165:20, 197:7
**situations** [2] - 12:4, 165:22
**size** [2] - 50:21
**skill** [21] - 55:21, 58:8, 58:24, 59:16, 61:22, 62:23, 80:6, 80:12, 92:10, 96:12, 115:8, 136:14, 136:17, 175:6, 184:14, 188:13, 189:20, 190:5, 191:20, 193:6, 194:8
**skilled** [1] - 58:21
**skills** [1] - 47:10
**skip** [10] - 12:18, 64:2, 66:9, 84:25, 120:11, 121:24, 130:21, 140:23, 143:20
**skipping** [2] - 72:21, 81:2
**Sklar** [1] - 5:21
**SKLAR** [1] - 1:19
**slick** [1] - 18:3
**Slide** [78] - 10:8, 10:12, 10:25, 11:11, 11:24, 12:18, 12:20, 13:16, 30:20, 31:6, 31:11, 64:6, 65:1, 66:3, 66:10, 67:9, 68:15, 69:1, 72:16, 78:10, 79:17, 81:1, 81:2, 81:20, 82:5, 82:13, 82:21, 83:2, 83:18, 86:2, 86:8, 87:11, 88:1, 88:13, 88:20, 89:22, 91:14, 92:8, 92:19, 93:4, 94:1, 95:15, 96:7, 96:22, 97:4, 99:3, 100:9, 101:9, 104:11, 105:21, 107:22, 110:11, 110:19, 112:1, 112:3, 114:9, 115:15, 120:9, 120:19, 121:12, 121:24, 123:11, 124:9, 124:18, 124:23, 162:12, 162:13, 164:19, 169:4, 169:9, 170:4,

184:25, 186:3, 191:11, 195:6, 195:7, 195:15
**slide** [111] - 10:21, 10:25, 11:24, 13:15, 19:22, 30:11, 33:7, 38:25, 40:23, 40:24, 41:22, 42:8, 42:24, 43:12, 43:20, 44:18, 45:3, 45:14, 45:20, 46:4, 47:4, 47:16, 47:20, 49:6, 51:7, 51:11, 51:19, 52:2, 53:20, 56:3, 73:18, 76:1, 78:7, 83:11, 85:18, 87:5, 88:4, 88:5, 90:6, 90:23, 91:15, 92:22, 93:4, 93:14, 97:20, 100:9, 100:24, 101:9, 104:10, 105:24, 107:7, 110:6, 112:4, 114:17, 125:25, 127:5, 127:8, 127:13, 127:16, 128:1, 128:15, 129:2, 129:13, 129:22, 129:23, 130:16, 130:21, 130:22, 133:11, 133:25, 134:15, 134:23, 136:24, 139:14, 139:17, 139:22, 140:10, 140:15, 141:12, 142:3, 143:20, 144:17, 150:9, 152:21, 154:17, 155:3, 156:25, 157:23, 158:7, 158:18, 159:18, 160:5, 160:14, 162:20, 162:21, 163:12, 163:14, 164:10, 164:15, 165:8, 165:17, 170:5, 179:3, 185:5, 186:10, 187:5, 188:1, 191:22
**slides** [29] - 7:5, 7:7, 9:13, 9:18, 10:4, 10:5, 10:6, 16:4, 19:24, 21:4, 26:7, 30:19, 57:2, 62:7, 68:9, 72:4, 81:2, 94:18, 110:4, 120:8, 120:11, 137:7, 161:20, 162:12, 170:23, 175:20, 178:16, 187:10
**slippery** [1] - 144:10

**slope** [4] - 21:23, 23:3, 27:6, 144:10
**sloped** [1] - 82:10
**slopes** [2] - 31:18, 82:18
**slow** [2] - 175:10, 184:6
**slower** [1] - 175:13
**small** [5] - 18:22, 22:11, 27:17, 49:3, 166:4
**Smith** [2] - 9:22, 21:1
**snapshot** [2] - 20:4, 29:16
**snapshots** [1] - 30:8
**snippet** [2] - 150:9, 157:14
**so-called** [8] - 42:5, 42:9, 42:14, 42:18, 51:5, 52:12, 55:1, 176:4
**societies** [1] - 15:22
**society** [1] - 15:25
**software** [20] - 11:2, 11:3, 12:24, 16:15, 18:18, 19:12, 20:5, 23:16, 26:13, 28:21, 29:12, 29:18, 30:5, 30:21, 31:1, 31:16, 35:23, 49:9, 78:21
**solution** [1] - 18:16
**someone** [5] - 55:21, 58:8, 79:9, 180:8, 182:24
**sometimes** [4] - 24:10, 28:16, 54:24, 54:25
**somewhat** [2] - 45:7, 117:9
**sorry** [18] - 9:15, 13:4, 13:16, 64:24, 67:4, 69:9, 89:11, 110:6, 112:2, 128:3, 131:21, 134:16, 150:7, 166:6, 169:12, 171:16, 175:11, 190:14
**sort** [25] - 6:16, 8:6, 13:1, 44:4, 47:9, 48:12, 52:18, 52:23, 53:2, 54:7, 83:3, 97:21, 118:1, 129:20, 130:23, 139:12, 141:7, 141:17, 143:24, 145:19, 146:5, 162:24, 165:10, 170:4, 178:25
**sound** [3] - 44:25, 111:3, 179:18

**sounded** [1] - 111:3
**sounds** [3] - 6:24, 6:25, 161:3
**source** [3] - 8:18, 141:17, 149:15
**sources** [1] - 70:19
**south** [1] - 166:7
**southeastern** [1] - 12:1
**space** [7] - 41:7, 41:18, 42:15, 43:24, 46:20, 59:10, 136:21
**spades** [1] - 186:8
**speaks** [1] - 191:9
**spec** [4] - 118:12, 134:6, 156:23, 186:24
**species** [2] - 83:14, 180:14
**specific** [9] - 55:20, 56:4, 58:7, 58:25, 60:11, 61:22, 64:8, 79:24, 121:10
**specifically** [20] - 60:22, 68:3, 68:22, 79:13, 82:25, 87:1, 103:3, 122:22, 154:9, 154:10, 156:23, 160:4, 183:14, 184:25, 187:14, 188:6, 188:9, 191:11, 192:18, 193:7
**specification** [123] - 40:25, 42:2, 48:22, 49:5, 50:10, 51:16, 51:25, 52:3, 53:6, 54:24, 63:15, 63:22, 64:16, 67:7, 69:8, 69:11, 69:13, 83:1, 86:22, 86:25, 87:2, 87:13, 87:22, 88:7, 88:15, 88:21, 88:25, 89:7, 89:10, 89:13, 92:20, 93:1, 93:13, 93:17, 94:3, 94:13, 95:4, 95:7, 95:12, 95:20, 95:21, 96:1, 97:25, 98:12, 98:16, 98:22, 98:23, 100:5, 100:11, 105:9, 106:6, 108:12, 110:9, 110:11, 110:14, 110:21, 111:20, 113:10, 118:14, 118:18, 120:24, 121:11, 121:15, 125:9, 125:10, 125:12, 126:1, 126:16,

126:17, 127:14, 127:15, 127:17, 127:18, 127:22, 128:17, 129:12, 130:15, 131:10, 132:2, 132:19, 133:5, 133:6, 133:21, 133:23, 134:2, 134:10, 136:2, 136:3, 137:11, 137:18, 138:12, 141:10, 144:5, 148:2, 148:23, 149:4, 149:17, 153:8, 154:12, 156:6, 156:24, 157:9, 157:19, 157:22, 158:16, 158:23, 159:4, 159:11, 159:14, 162:2, 177:19, 183:9, 183:10, 186:13, 188:15, 189:8, 189:24, 192:7, 192:15, 193:2, 193:17, 194:15, 196:20

**specifications** [7] - 68:16, 94:16, 100:10, 118:12, 124:14, 124:16, 185:22

**specified** [4] - 56:5, 123:19, 159:9, 175:7

**specifies** [3] - 28:2, 67:19, 84:19

**specify** [10] - 84:12, 84:19, 85:12, 88:11, 88:18, 100:14, 101:12, 117:25, 123:15, 123:24

**specifying** [1] - 101:15

**spell** [3] - 14:22, 38:17, 61:17

**spend** [6] - 23:13, 39:15, 66:14, 83:1, 84:9, 84:21

**spent** [1] - 39:16

**spirit** [1] - 189:14

**split** [1] - 6:23

**spring** [5] - 133:1, 133:2, 145:15, 145:17, 145:23

**square** [3] - 23:7, 23:8, 143:22

**squares** [1] - 26:23

**stack** [1] - 30:20

**staff** [2] - 20:25,

194:23

**stage** [5] - 139:12, 145:13, 161:24, 161:25, 193:11

**stand** [2] - 38:6, 38:8

**standard** [4] - 35:16, 35:20, 43:8, 115:20

**standing** [1] - 16:8

**standpoint** [1] - 71:4

**stands** [2] - 106:1, 148:7

**start** [23] - 4:9, 4:11, 5:24, 6:22, 10:7, 22:21, 54:13, 54:16, 54:17, 81:1, 83:22, 85:1, 85:4, 104:5, 111:15, 113:3, 120:9, 139:11, 144:6, 144:10, 156:11, 180:6

**started** [5] - 35:5, 39:17, 40:3, 44:6, 123:11

**starting** [4] - 30:12, 126:12, 162:20, 174:13

**starts** [1] - 89:13

**state** [5] - 14:20, 17:14, 38:15, 137:4, 137:23

**statement** [15] - 14:6, 14:8, 106:1, 111:22, 111:23, 125:2, 125:3, 125:5, 128:2, 128:10, 128:12, 129:3, 144:20, 144:21, 144:5

**statements** [4] - 12:2, 119:8, 132:15, 151:4

**STATES** [3] - 1:1, 1:6, 1:10

**States** [2] - 12:2, 21:8

**states** [3] - 40:25, 104:3, 120:24

**stating** [2] - 31:15, 177:22

**steep** [2] - 18:6, 23:3

**steepness** [1] - 23:3

**step** [16] - 16:2, 23:22, 26:6, 50:19, 51:20, 56:15, 60:25, 74:17, 111:10, 118:24, 128:7, 156:18, 156:20, 176:23, 178:11, 185:3

**stepped** [1] - 191:14

**steps** [6] - 28:21, 51:20, 53:23, 104:7, 116:3, 158:10

**sticking** [2] - 48:15,

124:15

**still** [3] - 59:13, 171:5, 196:19

**store** [2] - 60:4, 115:18

**stored** [1] - 115:23

**storehouse** [1] - 11:8

**story** [4] - 18:4, 85:7, 85:17, 109:23

**straight** [2] - 52:17, 53:1

**straighten** [1] - 37:13

**STREETS** [1] - 1:7

**strength** [3] - 13:10, 13:17, 13:18

**strenuously** [1] - 33:14

**stretch** [4] - 79:12, 103:23, 113:17, 113:18

**strike** [4] - 7:14, 179:23, 179:24, 183:20

**strings** [1] - 44:10

**strong** [3] - 125:2, 125:7, 133:15

**strongly** [1] - 68:4

**structural** [2] - 133:2, 133:4

**structure** [8] - 25:16, 77:12, 78:21, 114:22, 114:23, 124:2, 138:3, 146:21

**structures** [4] - 115:7, 147:3, 149:25, 152:9

**stuck** [1] - 102:19

**students** [1] - 40:6

**study** [1] - 19:19

**studying** [1] - 40:14

**stuff** [1] - 198:7

**style** [2] - 107:15, 163:15

**subject** [5] - 6:4, 6:18, 13:14, 36:18, 41:12

**submissions** [1] - 198:4

**submit** [4] - 61:15, 62:1, 138:18, 197:25

**submitted** [1] - 62:2

**submitting** [1] - 117:11

**subsequent** [1] - 80:9

**subsequently** [1] - 59:3

**subsidiary** [1] - 12:21

**substantially** [22] - 76:21, 161:2, 161:13, 169:15, 169:19, 169:25, 171:15, 171:16,

176:17, 176:20, 176:21, 177:2, 182:18, 182:21, 186:7, 188:20, 188:21, 193:21, 193:25, 194:1

**substantive** [1] - 186:15

**suburbs** [2] - 35:14, 35:15

**success** [1] - 36:17

**successive** [2] - 184:6, 184:11

**suddenly** [1] - 28:22

**sued** [1] - 35:24

**sufficient** [3] - 73:9, 135:2, 196:19

**suggest** [2] - 62:19, 69:11

**suggested** [4] - 56:21, 148:15, 170:19, 177:3

**suggesting** [4] - 60:14, 79:7, 111:1, 181:23

**suggestion** [1] - 112:5

**suggests** [4] - 53:12, 68:4, 152:10

**suit** [3] - 10:22, 12:19, 13:22

**summary** [2] - 23:10, 142:10

**superimposed** [2] - 97:7, 165:4

**supplemental** [1] - 73:20

**support** [6] - 70:25, 75:10, 96:20, 142:4, 157:23, 178:18

**supported** [2] - 118:12, 177:20

**supporting** [1] - 194:15

**supportive** [2] - 89:20, 99:2

**supports** [2] - 133:8, 177:6

**supposed** [4] - 33:17, 55:20, 68:16, 162:18

**supposedly** [1] - 63:17

**Supreme** [1] - 57:20

**surface** [3] - 48:20, 49:17, 65:19

**surfaces** [1] - 48:11

**surprised** [2] - 45:7, 64:12

**surprisingly** [1] - 191:1

**surveying** [1] - 42:24,

43:8

**survived** [1] - 13:24

**suspect** [1] - 8:13

**Sutherland** [2] - 47:9, 47:12

**sweep** [1] - 42:17

**swept** [1] - 42:15

**SWORN** [1] - 38:12

**sworn** [1] - 14:18

**symmetrical** [2] - 143:23, 144:2

**synonymous** [1] - 169:21

**SynQor** [1] - 93:23

**system** [48] - 29:10, 30:21, 31:3, 31:4, 31:10, 31:14, 47:18, 49:8, 49:11, 49:13, 49:14, 50:5, 50:24, 64:5, 82:11, 82:19, 105:3, 125:19, 131:2, 140:12, 140:18, 145:1, 153:23, 154:4, 155:1, 157:15, 159:9, 160:14, 163:9, 164:8, 171:24, 172:25, 173:3, 173:14, 173:19, 179:12, 179:15, 183:17, 183:18, 183:22, 184:1, 184:12, 184:18, 186:23, 190:18, 191:4, 192:20, 194:9

**systems** [3] - 153:24, 155:4, 160:18

---

## T

**tab** [3] - 10:3, 10:7, 10:8

**table** [6] - 43:3, 43:5, 43:7, 59:1, 170:13, 177:10

**tables** [2] - 34:24

**tabs** [1] - 10:3

**tails** [1] - 182:17

**takeaways** [1] - 110:23

**TAKEN** [1] - 32:16

**talks** [23] - 76:23, 77:17, 91:6, 91:15, 97:16, 149:13, 149:14, 150:10, 157:23, 158:3, 158:8, 158:11, 158:20, 160:8,

161:1, 161:23, 163:5, 165:12, 169:14, 185:1, 188:20, 193:24

**tall** [1] - 138:14

**task** [1] - 124:7

**Tate** [1] - 1:25

**teach** [1] - 15:7

**teaches** [4] - 118:14, 118:18, 183:9, 183:10

**teaching** [1] - 76:7

**team** [1] - 194:21

**technical** [3] - 10:4, 15:22, 15:25

**technician** [1] - 46:23

**techniques** [1] - 89:14

**TECHNOLOGIES** [1] - 1:2

**technologies** [11] - 10:15, 10:16, 10:17, 11:2, 11:3, 11:13, 12:16, 13:2, 13:8, 15:18, 29:15

**technology** [50] - 5:25, 6:8, 7:12, 7:20, 7:21, 8:9, 8:17, 8:18, 8:22, 10:23, 11:10, 12:3, 12:7, 12:13, 13:7, 13:14, 13:17, 14:3, 15:8, 15:12, 15:15, 16:11, 16:13, 16:16, 16:19, 17:13, 17:25, 19:23, 23:16, 24:13, 31:10, 31:21, 32:2, 33:3, 33:4, 33:17, 33:22, 34:12, 38:7, 40:17, 41:10, 41:12, 42:9, 48:3, 64:5, 127:4, 129:9, 198:7, 198:8, 198:9

**ten** [3] - 66:18, 72:11, 77:9

**tenable** [1] - 98:1

**tend** [1] - 17:10

**tens** [1] - 36:12

**tense** [1] - 116:18

**term** [51] - 6:22, 17:15, 22:6, 26:4, 48:6, 48:9, 54:18, 55:3, 55:14, 55:18, 58:8, 58:24, 58:25, 59:17, 61:15, 61:21, 62:8, 62:12, 62:16, 62:18, 63:12, 66:16, 69:21, 78:16, 80:3, 80:5, 83:23, 85:15, 85:19, 85:24, 86:3, 87:12, 91:25, 92:11, 101:11, 114:2,

132:12, 136:5, 136:8, 139:1, 142:5, 150:6, 150:21, 152:12, 154:10, 155:18, 159:11, 162:7, 184:14

**terminology** [1] - 21:14

**terms** [45] - 6:14, 21:17, 22:2, 24:18, 34:10, 37:2, 37:7, 37:18, 40:11, 46:6, 53:14, 54:14, 54:23, 55:2, 55:3, 66:6, 83:11, 83:12, 83:16, 84:22, 84:23, 85:6, 113:4, 113:8, 113:16, 114:7, 117:21, 119:17, 120:10, 126:11, 126:14, 133:13, 135:16, 139:2, 150:7, 151:10, 151:15, 153:17, 155:10, 155:11, 164:17, 173:10, 185:9, 190:25, 198:19

**testified** [1] - 14:18

**TESTIFIED** [1] - 38:12

**testify** [1] - 38:20

**testimony** [11] - 21:20, 30:18, 33:23, 34:4, 69:24, 95:14, 95:16, 95:25, 96:5, 100:25, 160:13

**Texas** [2] - 15:17, 15:21

**text** [14] - 56:6, 76:1, 76:2, 88:7, 125:12, 172:17, 172:20, 189:11, 189:12, 189:13, 189:14, 195:7, 195:8

**textbook** [1] - 43:1

**THE** [153] - 1:1, 1:9, 4:1, 4:3, 4:5, 4:15, 4:23, 5:3, 5:7, 5:10, 5:13, 5:23, 6:6, 6:10, 6:25, 7:2, 7:16, 8:2, 8:11, 8:15, 8:20, 8:23, 9:1, 9:3, 9:9, 9:12, 9:14, 9:16, 9:19, 9:21, 10:1, 14:4, 14:7, 14:11, 14:14, 14:16, 14:20, 14:21, 14:22, 14:23, 14:24, 16:5, 16:7, 16:10, 16:11, 20:21, 21:1, 21:10, 21:11,

30:16, 32:5, 32:9, 32:12, 32:15, 32:18, 32:19, 32:23, 33:19, 34:5, 36:22, 37:13, 37:20, 37:22, 38:9, 38:10, 38:11, 38:14, 38:15, 38:16, 38:17, 38:18, 38:19, 38:21, 38:22, 39:1, 39:4, 39:7, 53:15, 53:18, 54:12, 54:13, 54:19, 57:4, 57:15, 58:4, 58:10, 58:15, 58:20, 60:6, 60:14, 62:24, 63:1, 63:4, 63:7, 75:18, 75:21, 80:16, 80:19, 80:22, 81:5, 101:21, 102:1, 102:25, 103:4, 103:6, 103:8, 110:1, 112:2, 112:19, 112:22, 112:24, 113:3, 116:23, 119:22, 120:2, 120:5, 135:21, 138:23, 142:21, 143:5, 146:9, 146:11, 146:16, 147:6, 152:20, 153:16, 154:6, 154:18, 154:20, 155:7, 155:12, 156:2, 162:9, 167:18, 167:20, 174:4, 174:7, 174:9, 174:11, 175:10, 175:12, 181:5, 181:7, 181:12, 194:18, 194:24, 195:1, 195:3, 197:14, 197:17, 197:21, 197:24, 198:5

**theirs** [2] - 33:5, 124:12

**theme** [3] - 147:21, 181:23, 191:13

**themselves** [2] - 46:3, 56:10

**theory** [2] - 45:2, 45:6

**thereby** [3] - 106:22, 106:23, 107:1

**therefore** [6] - 48:12, 99:9, 99:11, 99:24, 128:21, 176:23

**therein** [3] - 19:14, 19:21, 149:21

**theta** [2] - 53:2, 53:5

**they've** [7] - 163:22, 170:18, 174:21,

177:12, 179:5, 193:24

**thin** [1] - 78:13

**thinking** [3] - 16:12, 85:6, 142:25

**thinks** [3] - 62:11, 129:25, 130:1

**third** [10] - 11:14, 25:14, 27:6, 33:10, 51:1, 53:24, 59:15, 60:24, 119:20

**third-party** [1] - 11:14

**three** [50] - 20:9, 20:12, 23:24, 24:9, 25:16, 25:19, 25:20, 25:21, 26:14, 27:15, 28:18, 29:6, 29:14, 30:1, 33:8, 40:15, 41:7, 43:24, 52:10, 56:17, 56:24, 74:20, 75:3, 79:21, 80:19, 81:13, 81:18, 81:20, 88:3, 102:20, 113:10, 117:7, 118:5, 119:21, 141:13, 153:10, 153:11, 153:17, 158:13, 159:24, 174:16, 178:2, 181:16, 185:23, 192:8, 193:1, 193:3

**three-dimensional** [23] - 20:9, 20:12, 23:24, 25:19, 25:20, 25:21, 26:14, 29:14, 40:15, 41:7, 43:24, 56:17, 56:24, 74:20, 75:3, 79:21, 141:13, 153:10, 153:11, 158:13, 159:24, 174:16, 178:2

**throughout** [2] - 157:19, 160:8

**thumbnail** [1] - 20:14

**thwart** [1] - 187:18

**tie** [1] - 141:11

**ties** [1] - 143:19

**tilt** [1] - 28:14

**timing** [2] - 167:20, 182:13

**title** [1] - 155:5

**Title** [1] - 1:23

**titled** [2] - 184:22, 191:9

**today** [18] - 4:10, 4:12, 5:9, 5:20, 10:11, 11:25, 13:22, 31:24, 36:4, 36:19, 37:2, 37:14, 40:17, 43:24, 67:23, 73:19, 120:1,

194:20

**together** [5] - 37:5, 46:17, 83:17, 129:16, 141:11

**Tom** [1] - 5:21

**TOM** [1] - 1:19

**took** [7] - 19:12, 29:16, 44:17, 44:24, 61:8, 78:13, 173:1

**tool** [66] - 26:15, 26:16, 26:18, 27:9, 35:7, 48:1, 49:6, 49:11, 52:6, 52:7, 53:9, 81:22, 81:23, 82:6, 82:12, 82:13, 83:13, 88:6, 88:9, 88:13, 88:14, 88:16, 94:11, 94:25, 95:1, 99:6, 99:7, 100:4, 100:6, 100:12, 100:15, 100:16, 100:19, 101:5, 101:11, 103:4, 103:6, 103:10, 103:11, 103:20, 103:24, 104:9, 104:12, 104:13, 104:18, 104:19, 105:1, 105:5, 105:13, 106:13, 106:14, 108:14, 109:18, 110:16, 110:17

**tools** [6] - 12:24, 26:12, 30:24, 47:2, 94:24, 147:25

**top** [31] - 12:12, 19:9, 19:10, 20:13, 21:21, 21:22, 22:11, 24:6, 24:20, 27:5, 43:3, 49:17, 49:22, 52:15, 56:7, 75:4, 82:17, 82:22, 83:7, 121:4, 127:1, 128:2, 129:13, 157:1, 164:24, 166:6, 166:8, 166:10, 166:11, 179:4

**top-down** [9] - 19:9, 19:10, 21:21, 21:22, 121:4, 164:24, 166:6, 166:8, 166:11

**topographic** [2] - 44:2, 45:22

**total** [1] - 22:16

**totally** [1] - 73:5

**touch** [6] - 13:11, 122:20, 160:23, 174:2, 178:15, 198:23

touched [1] - 182:4
touching [1] - 192:4
Tournachon [1] - 45:19
toward [1] - 157:14
towards [1] - 48:15
trace [1] - 44:4
tracing [1] - 116:3
track [1] - 163:15
tracks [2] - 131:16, 132:9
traditionally [1] - 12:22
transition [2] - 144:14, 158:2
translate [1] - 102:23
translated [1] - 82:10
translating [1] - 102:18
transparent [1] - 48:17
travels [1] - 31:3
traverse [1] - 109:6
treated [1] - 114:11
trial [1] - 142:10
triangle [1] - 41:22
triangulating [1] - 43:2
triangulation [12] - 41:3, 41:15, 42:1, 42:6, 42:25, 43:9, 43:18, 59:3, 59:14, 59:21, 78:23, 136:18
trickery [1] - 146:5
tried [2] - 31:25, 174:21
tries [1] - 130:9
triggering [1] - 191:16
triggers [1] - 185:7
trigonometric [1] - 42:3
trigonometry [1] - 41:23
Triomphe [1] - 45:17
true [10] - 1:23, 35:4, 58:19, 78:19, 78:25, 94:13, 116:23, 118:22, 154:6, 178:3
try [11] - 14:24, 15:6, 79:10, 120:11, 136:23, 166:9, 171:18, 173:9, 181:9, 181:19, 189:21
trying [19] - 44:6, 58:15, 60:24, 61:5, 79:12, 95:11, 102:8, 102:11, 103:23, 118:6, 123:6, 136:21, 141:18,
169:23, 175:18, 181:19, 188:1, 193:14, 193:15
turn [2] - 47:20, 162:7
tutorial [11] - 6:1, 7:20, 8:20, 9:8, 10:4, 15:4, 33:17, 33:21, 34:13, 40:17, 72:11
tutorials [1] - 98:17
Twentieth [1] - 59:12
twice [1] - 171:8
twin [1] - 29:1
Twister [1] - 29:18
two [126] - 5:19, 10:3, 10:22, 17:5, 20:8, 20:15, 24:16, 25:15, 25:21, 27:13, 28:1, 28:5, 28:19, 29:8, 30:19, 34:15, 35:24, 41:2, 41:4, 41:5, 41:20, 41:24, 42:13, 42:20, 43:22, 45:21, 49:25, 51:4, 52:15, 53:17, 54:9, 55:5, 56:20, 56:22, 56:23, 59:9, 59:15, 61:2, 61:6, 61:9, 61:13, 64:18, 64:22, 65:6, 65:7, 65:19, 66:1, 67:12, 67:20, 71:23, 72:4, 73:22, 74:10, 77:4, 77:20, 77:23, 77:24, 80:18, 83:11, 83:12, 84:23, 87:8, 87:20, 87:22, 92:13, 94:16, 100:1, 101:10, 102:14, 102:19, 102:23, 105:7, 105:13, 109:10, 110:23, 114:11, 119:18, 122:21, 123:8, 123:18, 129:8, 133:1, 133:4, 135:11, 136:11, 141:15, 142:4, 142:5, 143:7, 143:17, 143:21, 143:23, 144:8, 144:14, 145:18, 147:2, 147:3, 147:9, 147:17, 148:3, 148:16, 149:9, 150:7, 150:13, 151:10, 152:16, 152:25, 163:18, 163:22, 164:17, 165:15, 170:5, 176:7, 179:7, 183:16, 185:14,
196:22, 196:25, 197:4
two-dimensional [8] - 20:8, 28:1, 28:19, 29:8, 56:20, 56:22, 65:19, 102:14
two-dimensions [1] - 102:19
type [14] - 21:7, 63:15, 63:19, 63:21, 65:1, 65:10, 67:15, 67:20, 67:25, 68:23, 69:22, 70:23, 71:21, 150:5
types [3] - 22:23, 64:8, 69:16

## U

U.S [2] - 39:22, 39:24
U.S.C [1] - 1:23
ultimate [2] - 97:22, 130:17
ultimately [3] - 57:20, 141:13, 172:7
unaltered [1] - 163:18
unambiguous [5] - 57:6, 57:11, 57:16, 66:23, 75:13
unasserted [3] - 179:10, 179:22, 193:15
uncertain [1] - 72:4
unclear [1] - 193:19
undeniably [1] - 147:16
under [7] - 17:19, 62:15, 102:1, 118:22, 148:20, 148:21, 192:15
underbid [2] - 17:19, 17:20
underbidding [1] - 19:3
underlie [1] - 29:15
underline [1] - 172:22
underlying [13] - 7:21, 15:18, 16:16, 21:5, 41:3, 42:9, 44:8, 47:2, 48:5, 49:9, 98:15, 148:18, 153:2
undermines [2] - 163:2, 176:21
underneath [1] - 30:11
underpinnings [1] - 44:5
understood [7] - 9:2, 42:7, 44:15, 45:12, 49:9, 59:7, 115:8
underwriting [2] - 35:1, 35:21
undisputed [1] - 87:6
undisturbed [1] - 164:12
unduly [1] - 193:18
unequivocally [1] - 95:8
unique [2] - 146:14, 146:16
United [2] - 12:1, 21:8
UNITED [3] - 1:1, 1:6, 1:10
units [2] - 21:23, 21:24
University [4] - 15:16, 15:21, 39:20, 49:7
unknown [1] - 50:13
unless [5] - 30:18, 173:8, 196:5, 196:25, 197:12
unlike [2] - 65:22, 145:25
unmeritorious [1] - 193:20
unmistakable [1] - 178:13
unpersuasive [1] - 187:13
unquestionably [1] - 105:19
unsuccessful [2] - 13:12, 32:1
unvarnished [1] - 136:13
up [88] - 9:17, 11:6, 14:2, 14:16, 16:8, 17:23, 18:4, 18:7, 18:17, 19:4, 20:20, 21:4, 25:2, 32:19, 36:9, 36:11, 36:13, 38:2, 38:22, 39:8, 40:19, 44:13, 46:22, 49:22, 50:17, 50:20, 51:2, 52:20, 53:21, 54:17, 57:2, 66:9, 72:22, 73:17, 77:10, 77:14, 78:13, 78:15, 79:9, 79:17, 82:2, 82:7, 82:9, 82:18, 83:3, 83:12, 84:24, 86:8, 89:11, 91:18, 93:14, 93:15, 97:21, 101:7, 103:23, 103:24, 104:11, 104:12, 104:13, 105:21, 106:24, 111:25, 124:9, 127:18, 129:9, 132:13, 134:7,
135:9, 135:19, 136:2, 139:13, 142:8, 144:11, 155:22, 160:18, 165:11, 166:12, 167:10, 171:21, 172:3, 174:2, 181:10, 184:6, 185:16, 189:22
up-leveled [1] - 83:3
update [1] - 126:21
urging [1] - 167:14
user [86] - 27:2, 27:3, 27:12, 27:18, 27:24, 28:15, 28:16, 29:25, 72:21, 82:16, 83:4, 83:6, 84:11, 84:12, 85:10, 86:6, 88:10, 88:16, 88:22, 90:16, 92:11, 92:24, 100:13, 110:20, 114:24, 115:17, 116:6, 116:17, 117:24, 118:13, 118:16, 118:19, 120:24, 122:25, 123:17, 126:5, 134:18, 134:20, 137:20, 140:10, 140:11, 140:15, 147:18, 154:23, 155:21, 157:1, 157:15, 158:4, 163:9, 163:19, 163:25, 164:3, 164:20, 164:25, 165:12, 165:22, 166:5, 169:16, 171:25, 172:1, 173:1, 173:13, 173:19, 174:24, 175:3, 176:2, 176:7, 180:1, 183:20, 183:23, 184:2, 184:3, 184:4, 184:6, 184:13, 185:5, 185:15, 187:1, 189:18, 191:5, 191:14, 192:19, 194:8
user-operated [1] - 29:25
uses [2] - 21:14, 55:18

## V

vague [2] - 61:21, 72:23
valley [2] - 66:1, 76:16
valleys [5] - 22:4,

22:17, 22:18, 31:18,
100:14
**value** [2] - 10:18, 13:6
**values** [3] - 49:4,
108:15, 108:21
**various** [6] - 22:6,
78:24, 89:14, 91:15,
110:21, 165:11
**Verisk** [8] - 5:22,
12:20, 13:19, 34:18,
34:20, 35:18, 35:25
**VERISK** [1] - 1:5
**versa** [1] - 55:16
**version** [3] - 31:1,
74:13, 108:1
**vertex** [4] - 48:14,
54:1, 65:6, 76:13
**vertical** [4] - 23:4,
50:23, 51:3
**vertically** [2] - 49:20,
52:17
**vertices** [1] - 48:25
**vice** [1] - 55:16
**video** [3] - 44:3, 46:5,
50:4
**VIEW** [1] - 1:2
**View** [36] - 4:19,
10:13, 10:16, 10:23,
11:1, 11:8, 11:16,
12:14, 13:1, 13:2,
13:8, 13:9, 13:16,
13:17, 13:21, 21:6,
29:18, 30:25, 31:6,
31:12, 31:16, 31:20,
31:25, 33:2, 34:19,
35:22, 35:24, 36:5,
36:8, 120:1, 128:3,
144:18, 177:21
**view** [28] - 21:22, 24:6,
24:8, 24:9, 24:10,
24:11, 24:20, 33:5,
52:16, 52:19, 53:4,
127:2, 129:7, 136:2,
157:23, 158:22,
161:11, 161:22,
166:8, 166:12,
172:2, 175:8,
175:14, 175:15,
175:16, 177:6
**View's** [9] - 11:12,
12:3, 12:7, 12:13,
13:7, 13:18, 31:3,
32:3, 36:12
**viewing** [1] - 77:24
**views** [12] - 19:16,
21:21, 23:25, 24:2,
29:1, 52:15, 91:15,
98:17, 188:12,
192:23
**violate** [2] - 63:23,

177:5
**violence** [1] - 149:2
**virtual** [1] - 43:23
**virtually** [1] - 36:4
**virtue** [8] - 151:2,
151:4, 151:5, 151:9,
151:17, 152:1,
154:3, 159:24
**visible** [1] - 24:10
**vision** [2] - 15:19,
40:13
**visual** [111] - 113:1,
113:4, 113:6, 113:8,
113:12, 113:21,
114:2, 114:5,
114:10, 114:13,
114:14, 114:24,
115:4, 115:12,
115:14, 115:16,
115:17, 115:20,
115:22, 115:23,
115:25, 116:2,
116:5, 116:8, 116:9,
116:10, 116:11,
116:15, 116:18,
116:19, 117:5,
117:6, 117:7, 118:4,
118:11, 119:4,
119:18, 120:10,
120:15, 120:16,
120:18, 121:17,
121:21, 121:23,
122:8, 122:13,
122:17, 122:22,
122:24, 123:2,
123:14, 123:23,
124:7, 124:10,
124:19, 125:16,
125:22, 126:3,
126:8, 126:14,
127:6, 127:11,
128:5, 128:6,
128:18, 129:11,
129:14, 129:15,
129:25, 130:6,
130:13, 130:25,
131:12, 131:18,
131:21, 131:22,
132:5, 132:12,
132:13, 133:16,
134:5, 134:12,
134:17, 134:24,
134:25, 136:25,
137:9, 137:14,
137:16, 137:19,
137:21, 138:4,
138:5, 138:11,
138:13, 138:15,
138:16, 138:20,
142:4, 147:24

**Visualization** [1] -
15:21
**visualize** [1] - 48:16
**visualized** [1] - 47:13
**visually** [1] - 166:3
**vitiate** [1] - 140:25
**voice** [1] - 38:22
**void** [1] - 17:24
**voila** [1] - 155:22
**voilà** [2] - 185:10,
191:15
**volumes** [1] - 191:9
**vs** [1] - 1:4

---

**W**

**wait** [3] - 184:7
**walk** [8] - 56:24, 82:1,
88:2, 102:20,
120:13, 129:5,
131:15, 141:7
**walked** [2] - 92:19,
117:17
**walkthrough** [2] -
122:1, 139:12
**wall** [1] - 44:11
**wallet** [1] - 61:20
**Walsh** [3] - 4:11, 4:19,
4:20
**WALSH** [10] - 1:12,
1:12, 4:13, 4:16,
4:24, 5:1, 5:4, 5:8,
5:11, 195:2
**wants** [2] - 27:24,
28:11
**War** [3] - 43:20, 46:5,
46:6
**WAS** [2] - 3:6, 20:24
**watched** [1] - 18:22
**water** [1] - 194:5
**ways** [5] - 10:18,
69:16, 79:13, 87:23,
180:14
**weight** [1] - 62:3
**welcome** [1] - 120:2
**well-established** [1] -
93:24
**west** [1] - 166:7
**Westlaw** [1] - 60:9
**whatsoever** [1] - 33:3
**wheels** [1] - 43:25
**whereby** [1] - 31:13
**wherein** [3] - 41:4,
48:24, 48:25
**white** [4] - 26:23, 27:1,
27:23, 76:12
**whole** [7] - 28:23,
44:13, 54:4, 56:19,
57:18, 61:4, 98:25

**whoops** [1] - 13:4
**Wi** [1] - 184:8
**Wi-Fi** [1] - 184:8
**widely** [2] - 10:14,
11:13
**width** [2] - 50:14,
65:18
**win** [1] - 182:17
**windows** [1] - 22:9
**wire** [225] - 20:9,
25:22, 25:23, 26:15,
26:18, 27:3, 27:9,
27:10, 27:14, 29:20,
33:10, 33:13, 48:6,
48:7, 48:10, 48:25,
49:1, 49:25, 81:24,
82:14, 82:20, 82:21,
88:19, 88:20, 88:22,
88:23, 88:24, 89:1,
89:3, 89:5, 89:10,
89:11, 89:12, 89:15,
89:16, 89:18, 90:14,
90:16, 91:8, 91:18,
92:12, 92:14, 92:15,
92:16, 92:23, 92:25,
93:5, 93:7, 93:11,
93:17, 94:4, 94:21,
95:2, 95:5, 95:8,
95:18, 96:11, 96:13,
96:14, 97:6, 97:17,
97:19, 97:22, 97:23,
98:2, 98:4, 98:5,
98:10, 98:14, 98:21,
98:24, 98:25, 99:5,
99:10, 99:11, 99:19,
99:21, 99:23,
100:16, 100:20,
100:22, 101:4,
101:23, 102:2,
102:14, 102:15,
102:16, 103:8,
103:16, 103:18,
103:25, 104:1,
104:3, 104:5,
104:20, 104:24,
105:6, 105:9,
105:11, 105:22,
105:24, 106:3,
106:8, 107:3,
107:13, 107:17,
107:18, 108:5,
108:7, 108:9,
108:18, 108:20,
108:25, 109:1,
109:9, 109:13,
109:19, 110:9,
110:14, 110:17,
110:20, 111:5,
111:17, 111:23,
113:14, 113:15,

113:19, 113:20,
114:21, 115:5,
116:4, 116:7,
116:10, 116:12,
116:15, 116:16,
116:19, 117:2,
117:5, 117:7, 118:4,
119:3, 119:6,
119:19, 120:22,
120:23, 120:25,
121:7, 121:8,
121:14, 121:16,
122:15, 122:17,
122:18, 125:15,
125:17, 125:18,
125:20, 126:2,
126:3, 126:5, 126:6,
126:7, 126:15,
126:19, 127:10,
127:12, 127:14,
128:4, 128:5,
128:17, 129:14,
129:15, 129:25,
130:5, 130:14,
130:24, 131:3,
131:5, 131:9,
131:11, 131:12,
131:19, 131:23,
132:1, 132:3, 132:4,
132:6, 132:8,
133:17, 137:1,
137:9, 137:17,
137:19, 137:25,
138:3, 138:6,
138:17, 138:20,
141:20, 141:21,
141:23, 147:22,
147:23, 157:11,
164:21, 164:23,
165:3, 165:12,
165:18, 175:21,
176:1, 182:8,
186:21, 186:23,
186:25, 187:2, 187:3
**wires** [1] - 48:9
**wish** [4] - 49:3,
108:20, 192:11,
193:10
**WITNESS** [13] - 2:3,
14:21, 14:23, 16:7,
16:11, 21:11, 30:16,
38:10, 38:14, 38:16,
38:18, 38:21, 54:12
**witness** [5] - 7:24,
14:10, 14:18, 32:6,
34:14
**WOMER** [1] - 120:6
**Womer** [2] - 1:22,
120:3
**wood** [1] - 44:8

**word** [24] - 60:9,
63:14, 79:2, 84:20,
91:24, 101:17,
109:12, 116:24,
130:24, 134:2,
138:11, 139:4,
139:7, 140:3, 142:7,
142:9, 143:8,
143:15, 144:3,
145:8, 146:6, 147:1,
147:6, 147:7
**words** [12] - 9:6,
40:14, 59:10, 87:13,
123:19, 137:10,
143:6, 155:14,
170:2, 183:8,
193:23, 196:23
**works** [13] - 8:5, 8:18,
8:21, 19:25, 34:8,
37:24, 44:13, 44:19,
60:8, 60:17, 70:22,
104:6
**World** [3] - 43:20,
46:5, 46:6
**world** [29] - 56:25,
60:23, 61:3, 102:7,
102:18, 102:22,
103:13, 105:8,
107:4, 108:3,
108:19, 108:23,
109:5, 109:6,
109:15, 136:22,
143:24, 159:3,
161:22, 168:17,
169:24, 170:20,
172:4, 186:10,
186:11, 194:15,
195:21
**worried** [1] - 8:3
**worth** [4] - 95:14,
132:22, 139:9, 162:4
**worthy** [1] - 189:3
**wraps** [1] - 30:11
**write** [3] - 168:11,
180:13, 196:24
**writing** [2] - 198:1,
198:23
**written** [2] - 117:10,
198:12
**wrong-headed** [1] -
119:7
**wrote** [2] - 59:11,
152:23

## X

**Xactimate®** [8] - 35:8,
35:9, 35:16, 35:18,
35:19, 36:6, 36:10,
36:14

**Xactware** [10] - 5:22,
12:20, 12:21, 31:9,
31:20, 31:25, 32:1,
35:4, 35:25
**Xactware's** [4] - 31:3,
31:15, 36:10, 177:19

## Y

**year** [3] - 31:11, 34:19,
42:5
**years** [7] - 15:17,
39:19, 39:20, 40:7,
40:10, 63:18, 117:16
**yellow** [3] - 78:19,
94:6, 122:4
**York** [2] - 35:13, 39:18
**young** [1] - 9:21

## Z

**zero** [3] - 23:4, 65:22,
71:5