# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | )  |  |
|---|---|---|
| Eagle View Technologies, Inc. *et al.*, | ) | |
| Plaintiffs, | ) | Civil No. 15-07025 (RBK/JS) |
| v. | ) | **Opinion** |
| | ) | |
| Xactware Solutions, Inc. *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

**KUGLER**, United States District Court Judge

    This is a patent infringement action brought by Eagle View Technologies and Pictometry International [together "Plaintiffs"] against Xactware Solutions and Verisk Analytics [together "Defendants"]. Before the Court is Defendants' motion for summary judgment ["the motion"] under Federal Rule of Civil Procedure ["Fed. R. Civ. P." or "Rule"] 56(a) to equitably estop this infringement action. For the reasons below, this motion is **DENIED**.

    An appropriate Order accompanies this Opinion.

## 1.0 Background and Procedure

    Plaintiffs are the owners of the patents at issue[1] that recite, among other things, business methods, systems, and computer readable storage media for providing a roof repair estimate. The claimed invention applies photogrammetric methods, that is, trigonometric calculations, to images of rooves in aerial photographs to compute roof measurements, in particular, roof pitch. Defendant Xactware Solutions, Inc., is a subsidiary of Defendant Verisk Analytics, and provides online technology tools and systems to insurance carriers, remodelers and construction service providers for determining replacement-cost. The parties have asserted they are competitors to each other (Doc. 15:¶1)[2].

---

[1] US8,078,436, re-examined (" '436 patent"); US8,170,840 (" ' 840 patent"); US8,818,770 (" '770 patent" ); US9,129,376 (" '376 patent"); US8,209,152 (" '152 patent"); US8,825,454 (" '454 patent" ); US9,135,737 (" '737 patent").

[2] "Doc." numbers refer to the document listed in the CM/ECF database of the U.S. District Court of New Jersey.

The Court assumes the parties' familiarity with the many proceedings in this litigation and summarizes only those events relevant to the motion. On 23 September 2015, plaintiffs filed their original complaint against defendants and on 30 November 2015, an amended complaint. Both of these (ECF Docs. 1 and 30) allege direct and indirect infringement under 35 U.S.C. §§ 271(a) and (b) of at least one claim of each patent at issue. The case has proceeded through various milestones, including the *Markman* hearing and the *Markman* opinion (ECF Doc. 332). The parties have completed discovery, exchanged expert reports and disclosures, and submitted summary judgment motions aiming to dispose of certain issues or of the case itself, as well as motions *in limine* to exclude experts' testimony ("*Daubert* motions"). ECF Doc. 459 - 474. This is one of the summary judgment motions.

### 2.0	Parties Contentions
### 2.1	Defendants

In seeking summary judgment that plaintiffs' infringement action should be equitably estopped, defendants assert plaintiffs' behavior over a years-long, contracted-for business relationship misled them into believing plaintiffs would not sue them for patent infringement. They further argue they invested substantial resources in their own roof analytics software in reliance on plaintiffs' behavior, which materially prejudices them and compels equitable estoppel of this action and dismissal.

Defendants contend the following signal plaintiffs' commitment not to sue defendants for patent infringement (ECF Doc. 460:1-6): a six-year, contracted-for business relationship between the parties from 2008 and lasting through 2014, in which plaintiffs paid defendants a fee for each of their roof estimate reports sold through defendants' cost estimation platform. During that period, although plaintiffs occasionally communicated in writing that defendants may be infringing plaintiffs' patents, plaintiffs never sued for infringement, not even in the face of the parties' contract dispute nor when suing others for infringement. Plaintiffs also affirmatively represented in 2014 in the executed, merger contract between the parties that defendants did not infringe the relevant patents. Defendants further assert they invested in the development of their own roof estimate report products during the 6-year business relationship because they relied on plaintiffs' continued non-action. (ECF Doc. 460: 7). Defendants state there is no dispute of material fact in that plaintiffs' consistent behavior during the parties' business relationship completely misled defendants that plaintiffs would ever sue for infringement.

### 2.2 Plaintiffs

Plaintiffs argue defendants' equitable estoppel defense should be precluded under Fed. R. Civ. P. 37(c)(1) as defendants did not disclose the factual and legal bases for the defense with sufficient specificity in response to plaintiffs' interrogatories. ECF Doc. 600:1-2. Defendants argue in reply they included an equitable estoppel counterclaim in their answers and provided specific evidence to plaintiffs' interrogatories about equitable estoppel. ECF Doc. 521: 1.

Plaintiffs' further contend that, during the parties' business relationship, they did not mislead defendants into believing they would not sue for infringement and that multiple documents and emails exchanged between the parties evidence plaintiffs' notify defendants of possible patent infringement. Plaintiffs argue that, since such communications occurred between the parties' C-level employees and during their contractual relationship, they cannot support an inference of misleading behavior. Further, plaintiffs argue, such communications demonstrate the existence of a genuine dispute of material fact about whether this action should be equitably estopped (ECF Doc. 500: 3-7) and necessarily dispel an inference of defendants' reliance on plaintiffs' inaction. ECF Doc. 500:7. Even if plaintiffs' behavior were deemed misleading, defendants cannot have been prejudiced by it as no temporal or causal nexus exists between defendants' supposed reliance on plaintiffs' behavior and defendants' actions in investing in its own roof estimation software. ECF Doc. 500: 8.

### 3.0 Standards
### 3.1 Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

The movant bears the initial burden of proof to present those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P.* 56(e).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

The evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. *Callahan v. AEV, Inc.*, 182 F.3d 237, 252 n. 11 (3d Cir.1999) (*citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1234 n. 9 (3d Cir.1993)).

In evaluating whether there is a genuine dispute of material fact, the Court looks at the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in their favor (*Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir.2011)) but neither weighs the evidence nor makes credibility determinations. Those are for tasks for the fact finder. *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. Speculation, conclusory allegations, suspicions, or mere denials do not suffice to raise a genuine dispute of material fact. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-289 (3d Cir. 2018).

### 3.2     Equitable Estoppel

Equitable estoppel is recognized as a defense sufficient to defeat a patent infringement claim under 35 U.S.C. § 282(b) (*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028 (Fed.Cir.1992) (*en banc*), *abrogated on other grounds by SCA Hygiene Products Aktiebolag, et al. v. First Quality Baby Products, LLC, et al.*, 137 S.Ct. 954 (2017)) and is a matter committed to the sound discretion of the trial judge. *Id.* In asserting this defense, the defendant has the burden of proving:

"(1) the patentee, through misleading conduct, led the alleged infringer to reasonably believe that the patentee did not intend to enforce its patent against the infringer;

(2) the alleged infringer relied on that conduct; and

(3) due to its reliance, the alleged infringer would be materially prejudiced if the patentee were permitted to proceed with its charge of infringement." *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 609 F.3d 1305 (Fed.Cir.2010); *accord A.C. Aukerman Co.*, F.2d at 1028.

"Misleading 'conduct' may include specific statements, action, inaction, or silence when there was an obligation to speak." *Aspex Eyewear*, 605 F.3d at 1310. However, "silence alone is not enough when the parties are sophisticated business partners and there is no showing of bad faith." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1329 (Fed.Cir. 2016). Further, "mere silence must be accompanied by some **other** factor which indicates that the silence was sufficiently misleading as to amount to bad faith." *Hemstreet v. Comput. Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed.Cir.1992) (emphasis in original); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308-1309 (Fed.Cir.1992) [*quoting Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed.Cir.1987)][3].

---

[3] *See also Ecolab Inc. v. Amerikem Laboratories, Inc.*, 22 U.S.P.Q.2d 1710, 1992 WL 117446, at *3 (D.N.J. 24 March 1992) [*stating* "a threat of enforcement or an assertion of a right followed by inaction for unreasonably long period of time may constitute silence which is sufficiently misleading to warrant estoppel (*quotations omitted*)"].

The material prejudice supporting equitable estoppel "may be a change of economic position or loss of evidence." *A.C. Aukerman*, 960 F.2d at 1043.

An equitable estoppel defense must be proven by a preponderance of the evidence and ultimately turns on underlying factual determinations (*Hemstreet*, 972 F.2d at 1292), which are neither limited to a particular set of facts nor resolved by simple or hard and fast rules. *A.C. Aukerman*, 960 F.2d at 1041. Consequently, a trial court's equitable estoppel decision rendered on summary judgment is reviewed only for abuse of discretion, unless genuine issues of material fact precluded summary judgment. *High Point SARL*, 817 F.3d at 1328 (Fed.Cir.2016).

## 4.0    Discussion

As a preliminary matter, the Court reviews plaintiffs' contention whether defendants failed to disclose under Fed. R. Civ. P. 37(c) an intent to assert an equitable estoppel defense. Such failure, if shown, would render unnecessary the Court's resolution of this motion.

The Court finds undisputed in the parties' submissions that defendants included an equitable estoppel defense in their pleadings. Further undisputed is that defendants' response to plaintiffs' interrogatories included Bates numbers of documents that defendants considered relevant to the request. It is also undisputed that defendants, at the discovery stage, did not pinpoint those facts that prove the three prongs of an equitable estoppel defense.

However, that defendants did not specify those particular facts which support equitable estoppel is not fatal to this motion as this Court has characterized the exclusion of evidence under Rule 37 (c) as an extreme sanction, not to be imposed without a showing of flagrant disregard of a court order. *Seltzer v. I.C. Optics., Ltd.*, 339 F. Supp.2d 601, 607-608 (D.N.J. 2004) (Linares, J.). As no flagrant disregard has been shown here, the Court finds no Rule 37(c)(1) failure to disclose information as required under Rule 26.

Proceeding to the resolution of this motion, the Court considers whether a genuine dispute of a material fact exists for each of the separate prongs of equitable estoppel. If such a dispute exists for a single prong, the inquiry may end.

## 4.1 & 4.2   Whether Plaintiffs' Misleading Conduct Induced Defendants' Reasonable Belief Plaintiffs Would Not Sue for Patent Infringement and Whether Defendants Relied on Such Conduct.

The parties' business relationship began about 3 November 2008 with their executed contract in which Eagle View had the right to import Xactware's data into Eagle View's roof

---

In *Ecolab*, the period of inaction was 40 months, which this Court considered not unreasonably long so as to warrant a summary judgment grant of equitable estoppel.

estimation reports prepared for Eagle View's customers in return for a fee to Xactware for each sold roof estimation report containing Xactware's data.  The agreement was re-done in January 2011 and lasted through June 2014.  The re-worked agreement included a term that obligated Eagle View to remain more or less silent to its customers about the advantage of an Eagle View roof estimation report lacking Xactware data.

During this period, Eagle View began pursuing in the U.S. Patent and Trademark Office ["USPTO"] patent applications for the relevant patents, the first application date being 16 October 2008.  Grants of the relevant patents issued from 13 December 2011 (for the '436 patent) to 15 September 2015 (for the '737 patent).  This information is undisputed and important to keep in mind as plaintiffs did not become patentees until the end of 2011.

To be clear, the re-worked contract, having been done in January 2011, cannot have contained terms relating to Eagle View's patents because, at that point, none had been granted.   No misleading communications about patent infringement could have occurred before 2012, which was already three years into the parties' contractual relationship.

Below is a sampling of documents and information exchanged between the parties and dated from early 2012 until early 2016, which inform on various opinions and rationales whether defendants were infringing Eagle View's patents, as well as on the litigious conduct between the parties.

**4 Apr 2012**:  Four months after the '436 patent issued (Eagle View's first and seminal patent) and at the start of discussions between the parties relating to Xactware's possible acquisition of Eagle View, Eagle View's CEO Mr. Chris Barrow alerted Xactware's CEO, Mr. Edmund Webecke, that Eagle View's attorney believes Aerial Sketch infringes the '436 claims.  ECF Doc. 501, Ex. 1: 1.

Defendants had already developed and were using in commerce their own roof analytics software.

**12 Apr 12 to Aug 2014**: Eagle View filed an action against Aerialogics LLC, a third party competitor, in the Western District of Washington, alleging infringement of the '436 patent claims.  Aerialogics went out of business by the fall of 2014.  From publically available Court records.

Defendants knew of this litigation (*see* entry below dated to May 2012).

**Q2, 2012:**  In his deposition, Mr. Webecke stated he had taken Mr. Barrow's alert seriously by notifying the Xactware Board of it.  ECF Doc. 501, Ex. 2:247.

An exhibit from Mr. Webecke's deposition--from a Verisk Power Point presentation summarizing its business growth and strategy--states Verisk's goal is to solidify its position in the Aerial Imagery space and an issue to such pursuit is the "informal notice of infringement by Chris Barrows".  That exhibit also states a "Need to formulate **immediate** strategy" regarding the infringement notice.   ECF Doc. 501, Ex. 3:24. [emphasis added].

**May 2012**: An internal Verisk document following its cash offer in early April 2012 of Eagle View's capital stock analyzes Eagle View's status in the U.S. market for automated roof measurement solutions.  This document admits Eagle View has become the industry standard and directly competes against Xactware's Aerial Sketch, which makes it increasingly more likely Xactware could be viewed as a primary competitor.  Further, the document states Eagle View has taken a more aggressive stance in defending its market position through the use of patent infringement litigation; and specifically: "Eagle View has demonstrated a willingness to leverage its patent position via litigation" and "views its U.S. process patents … as an important defensive and offensive tool".   ECF Doc. 501, Ex. 6: 5-6.
   It is unmistakable that Verisk is sizing up its market "position" relative to Eagle View and remarking on Eagle View's strategy as a "monopolist" (owing to its patents) to defend its market position.

**Between 7 Jan and 1 March 2013:**   Excerpt from an Xactware Power Point presentation: announces the merger of Eagle View and Pictometry and states the merger poses intellectual property risks.  However, it is also stated "[w]e feel comfortable we can defeat EV's patents but may have to litigate".  ECF Doc. 501, Ex.9:36.
   This document speaks to defendants' foresight in managing the risk of patent infringement and motivates against an inference of Defendants' reliance on Eagle View's "inaction", which at this point is not yet a year old.

**14 Jan 2014:**  Executed merger agreement between the parties for Xactware to acquire Eagle View, which represents no person has infringed or infringes any of Eagle View's intellectual property, except as set forth in an attached schedule, which does not list defendants.
   This agreement remained in place until about Jun 2014 when the Federal Trade Commission ["FTC"] blocked the merger.   These representations are the essence of Xactware's argument regarding Eagle View's bad faith about not pursuing a patent infringement action.

**Jun 2015:** Executed merger agreement between Vista Equity and Eagle View in which Vista Equity is to acquire Eagle View. This document also represents no person has infringed or infringes any of Eagle View's intellectual property, except as set forth in an attached schedule, which does not list defendants.

Thus, defendants assert that Eagle View made representations of no-infringement not once, but twice, in two, different merger documents.

**31 Aug 2015**: Internal Verisk email thread from a C-level employee of Verisk, copying Xactware's CEO Mr. Webecke, stating that Mr. Barrow (Eagle View's CEO) had brought up the intellectual property issue to that employee as far back as a year and a half ago (that is, early 2014). ECF Doc. 501.

This evidences that Eagle View's CEO informed different C-level employees of defendants over an 18-month period and well after the parties' business relationship ended of Verisk's possible patent infringement.

It is impossible to mistake this email as "silence", especially as it was sent more than a year after the FTC blocked Xactware's acquisition of Eagle View, which would have reverted the relationship of the parties to direct competitors, and ended the expectation they would be one entity.

Moreover, by this date, Vista Equity had already acquired Eagle View, which only emphasized the competition between Eagle View and Xactware.[4]

**29 Oct 2012 to Feb 2016:** As a backdrop to defendants' awareness of Eagle View's patents is the parties' litigation over the breach of their contract. Eagle View sued Xactware in the Western District of Washington for Xactware's breach of contract, requesting and getting a preliminary injunction to prevent Xactware from blocking Eagle View's access to Xactware's commerce. Upon Eagle View's request, the Ninth Circuit Court of Appeals extended the preliminary injunction through trial, which never took place.

The contract-breach litigation continued, however, into February 2016, thereby overlapping with this action. From publically available Court records.

---

[4] Vista Equity is an American private equity and venture capital firm that, among other things, finances software and technology-enabled startup businesses, taking the long-term perspective in developing the acquisition, rather than re-selling for a profit. In 2015, when it acquired Eagle View, Vista Equity had over $14 billion in cumulative capital commitments and currently has $43 billion in those commitments. Vista owns over 50 software companies, and is the fourth largest enterprise software company after Microsoft, Oracle, and SAP.

Because of Vista Equity's power and presence in the analytics and software market, it would have been well appreciated, upon Vista's acquisition of Eagle View, that Eagle View's competitive footprint in the roof measurement and report market had been greatly enlarged.

The picture that unfolds from this sampling does not depict undisputed reliance on the "good will" that Eagle View would refrain from suing Xactware for patent infringement because of their years-long business relationship. In fact, just the opposite. Very shortly after Eagle View's patents issued and during the early acquisition discussions in 2012, Eagle View notified Xactware of its possible patent infringement. Indeed, not a month later, Verisk recognized in an internal document that it may increasingly be regarded as the primary competitor to Eagle View and may have to deal with an Eagle View infringement action. Within a year of first being notified of the patents—that is, in 2013--defendants expressed some comfort not only in defending itself against an Eagle View infringement action, but in defeating the patents, implying defendants had considered the risk and a possible invalidity strategy. This expression of comfort does not convey reliance on inaction.

Importantly, during this same period, 2012 to 2013, Eagle View had not shown acquiescence of infringement or inaction. Rather, Eagle View had shown its hand and acted to protect its leadership position in the roof report market by suing a close competitor, Aerialogics. A sophisticated business partner of Eagle View's would have gotten the message that when it comes to its patents, Eagle View meant business.

This occurred all the while Eagle View was litigating a breach of contract action against Xactware even though Xactware and Eagle View were still discussing a possible merger. That Eagle View was suing its potential merger partner coupled with Eagle View's patent action against Aerialogics seems highly likely to draw attention to Eagle View's propensity to litigate not only to achieve its business goals but possibly to advance a lucrative acquisition deal. Eagle View's conduct, especially from 2012 through 2014, does not reflect an inactive, passive business strategy but shines with a no-holds-barred quality.

The Court notes that many material facts in the parties' declarations, affidavits, and assertions here are largely undisputed. What is disputed is the interpretation of those facts.

To the point, the material facts confirm without dispute that Eagle View did not sue for patent infringement for a period of three and a half years after first alerting Xactware of its patents. Also undisputed is that Eagle View was not-silent about defendants' possible patent infringement, and in fact was serially not-silent. What is disputed is whether Eagle View's communications regarding Xactware's possible patent infringement were enough to counter Eagle View's representations that no one was infringing its patents in the parties' executed, but unperformed merger agreement.

If Eagle View's inaction is deemed "silence", this Court has found previously that a total of about 40 months of purported silence—to wit, from April 2012 to September 2015—is not "an unreasonably long period of time". *Ecolab, Inc.*, 1992 WL 117446, at *4. Thus, the entire period of Eagle View's inaction on its face is not long enough to support equitable estoppel.

Further, this period is calculated with the expectation that Eagle View would sue the day after first informally notifying Xactware's CEO of the possible patent infringement, in April 2012. Given the parties' contract and continuing merger discussions, the Court finds it more reasonable to expect the "inaction clock" to have started ticking June 2014, when their business relationship ended. Thus, this infringement action began only fifteen months later and a mere three months after Vista Equity had acquired Eagle View. From that fact alone, equitable estoppel of this patent infringement action is not supported.

It is also undisputed that silence alone in terms of mere inaction cannot support equitable estoppel. *High Point SARL*, 817 F.3d at 1329. Defendants must demonstrate undisputed conduct by the plaintiffs that is sufficiently misleading as to signify bad faith, especially because the parties are sophisticated business partners. *Hemstreet,* 972 F.2d at 1295. To that end, defendants state plaintiffs' representations in both the January 2014 executed merger agreement between the parties and the June 2015 merger agreement between Vista Equity and plaintiffs' signify deception.

Although it is undisputed that the 2014 merger document states no one infringes Eagle View's patents, what is disputed is whether these representations were done with bad faith to induce defendants' reliance on them. Since the non-infringement representations in the Vista Equity – Eagle View merger document date to June 2015, and it is unclear when this document would have been accessible to Xactware, it is disputable whether Xactware relied on these representations. The focus of this inquiry, therefore, is on whether Xactware relied on the non-infringement representations in the parties' own merger document, and whether such reliance was spurred undisputedly by bad faith on Eagle View's part.

Eagle View's deception can have arisen only from the representations from the January 2014 merger document, not before. This is because the small sample of communications listed above between the parties (which are relatively undisputed) prompts an equally undisputed understanding that, from 2012 through 2013, Xactware knew it could have been infringing, considered acquiring Eagle View to avoid that risk, and could not have been lulled into believing Eagle View would ever abandon infringement litigation if the parties went their separate ways, primarily because Eagle View had already sued Xactware to achieve its business goals.

Whether the 2014 non-infringement representations in the parties' merger document rise to the level of bad faith is a wholly disputed interpretation of relatively undisputed facts. Other than the existence of the 2014 non-infringement representations, there is no other, specific conduct defendants point to that could indicate plaintiffs' bad faith.

Because of that, the Court finds defendants have not met their burden in showing how the relatively undisputed facts demonstrate Eagle View's bad faith in leading Xactware to

reasonably believe it would not sue for patent infringement. What defendants have shown is: no dispute as to plaintiffs' repeated notifications, albeit informal, of defendants' possible patent infringement; no long term inaction on the part of Eagle View; and no dispute that Eagle View had litigation as a strategy to remedy a partner's contract breach.

These undisputed showings highlight the important, disputed fact, which is defendants' interpretation that Xactware relied on Eagle View's <u>deception</u> in representing no infringement by any one. To the point, defendants have <u>not</u> shown how Xactware, a sophisticated business partner, would have reasonably believed Eagle View would not sue for patent infringement once the parties' business relationship, contentious for years, ended, and in light of the years-long informal infringement notices.

Whether the no-infringement representations in the June 2014 merger agreement were made in bad faith and whether Xactware relied on them in good faith are material, disputed facts, especially in light of the totality of the parties' communications, business relationship, and competitor status. Accordingly, the Court finds a summary judgment of equitable estoppel unsupported.

### 4.3 Material Prejudice Defendants Allege to Have Experienced

Given the Court's determination of a dispute of material facts, the inquiry may end here. The Court does take notice of defendants' assertion of material prejudice, alleging they developed their software in reliance of their belief that plaintiffs would not sue. Defendants' material prejudice can have accrued only in the 3-plus years since they were first alerted of plaintiffs' patents because until then, there was no reason for an infringement suit. Defendants' material prejudice allegation is ultimately based on the research and development of important, expensive, and commercially successful software, even after being notified several times of a significant and difficult-to-surmount business risk and within the space of 3-plus short years. While not making a determination of material prejudice here, the Court notes its astonishment that defendants would have invested heavily in developing flagship software when relying solely on the apparent inaction of a business partner that had already sued them for contract breach.

### 5.0 CONCLUSION

For the reasons discussed herein, defendants' summary judgment motion for equitable estoppel is **DENIED**.

Dated: 20 December 2018                                   s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Court Judge