**PART II.    STIPULATED FACTS:**

The parties stipulate to the following facts, which require no proof at trial:

**I.    The Parties**

1.    Plaintiff EagleView is a corporation organized and existing under the laws of the State of Washington, having a principal place of business at 3700 Monte Villa Parkway, Suite 200, Bothell, WA 98021.

2.    Defendant Xactware is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 1100 West Traverse Parkway, Lehi, UT 84043.

3.    Defendant Verisk is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 545 Washington Boulevard, Jersey City, NJ 07310.

4.    Xactware is a wholly-owned indirect subsidiary of Verisk.

5.    Xactware was reorganized to form Geomni, Inc. ("Geomni,") a wholly-owned division of Insurance Services Office, Inc., which is in turn a wholly-owned division of Verisk. The parties entered into a Stipulation with Respect to Geomni, which was entered by the Court on March 13, 2018. Dkt. No. 406.

6.    Xactware and Geomni have directly competed with EagleView, including in the construction and insurance markets, by offering for sale reports generated by Aerial Sketch v.2, Roof InSight, and Property InSight.

7.    Verisk attempted to acquire EagleView in 2012 and submitted an offer for 100% of EagleView's capital stock. The bid amounted to ▮▮▮▮▮▮ up front, with an earn-out payment of up to an additional ▮▮▮▮▮▮ to be made based on 2013 revenue and EBITDA targets.

1

8. Verisk Analytics, Inc. ("Verisk") offered to acquire EagleView Technology Corporation in January 2014 for approximately $650 million.

9. EagleView Technology Corporation agreed to be acquired by Verisk in January 2014 for approximately $650 million.

10. Verisk and EagleView Technology Corporation signed a detailed agreement (the "Verisk Agreement") dated January 14, 2014 pursuant to which Verisk would acquire EagleView Technology Corporation for approximately $650 million.

11. EagleView does not publicly disclose or otherwise make publicly available its operational software or its source code for any of its Render House, Twister, or other roof estimation software programs.

## II.     The Asserted Patents

12. The Asserted Patents are owned by EagleView.

13. Each Asserted Patent issued on a different date:

   a) The '436 patent's reexamined claims issued on August 27, 2014;

   b) The '840 patent issued on May 1, 2012;

   c) The '770 patent issued on August 26, 2014;

   d) The '454 patent issued on September 2, 2014;

   e) The '376 patent issued on September 8, 2015; and

   f) The '737 patent issued on September 15, 2015.

### A.  U.S. Patent No. 8,078,436

14. The application for the '436 patent, which is entitled "Aerial Roof Estimation Systems and Methods," was filed on October 16, 2008, the reexamined claims of the '436 patent issued on August 27, 2014, and a Certificate of Correction issued on July 10, 2018.

15. Chris Pershing and David P. Carlson are the named inventors of the '436 patent.

2

16.     Claim 1 of the '436 patent states: "A computing system for generating a roof estimate report, the computing system comprising: a memory; a roof estimation module that is stored on the memory and that is configured, when executed, to: receive a first and a second aerial image of a building having a roof, each of the aerial images providing a different view of the roof of the building, wherein the first aerial image provides a top plan view of the roof and the second aerial image provides an oblique perspective view of the roof, and are not a stereoscopic pair; correlate the first aerial image with the second aerial image; generate, based at least in part on the correlation between the first and second aerial images, a three-dimensional model of the roof that includes a plurality of planar roof sections that each have a corresponding slope, area, and edges; and generate and transmit a roof estimate report that includes one or more top plan views of the three-dimensional model annotated with numerical values that indicate the corresponding slope, area, and length of edges of at least some of the plurality of planar roof sections using at least two different indicia for different types of roof properties."

17.     Claim 2 of the '436 patent states: "The computing system of claim 1 wherein the roof estimation module is further configured to correlate the first and second aerial images by receiving an indication of one or more corresponding points on the building shown in each of the first and second aerial images."

18.     Claim 18 of the '436 patent states: "A computer-implemented method for generating a roof estimate, the method comprising: receiving a first and a second aerial image of a building having a roof, each of the aerial images providing a different view of the roof of the building wherein the first aerial image provides a top plan view of the roof and the second aerial image provides a view of the roof that is other than a top plan view and neither of

3

the two images are part of a stereoscopic pair; correlating the first aerial image with the second aerial image; generating, based at least in part on the correlation between the first and second aerial images, a three-dimensional model of the roof that includes a plurality of planar roof sections that each have a corresponding slope, area, and edges; and transmitting a roof estimate report that includes one or more top plan views of the three-dimensional model annotated with numerical indications of at least one of the slope, area, and lengths of the edges of the plurality of planar roof sections, wherein the roof estimate report includes at least two different indicia for different types of roof properties."

19.     Claim 20 of the '436 patent states: "The method of claim 18 wherein correlating the first and second aerial images includes receiving an indication of one or more corresponding points shown in each of the first and second aerial images."

20.     Claim 21 of the '436 patent states: "The method of claim 20 wherein receiving the indication of the corresponding point includes receiving the indication from a user."

21.     Claim 36 of the '436 patent states: "A non-transitory computer-readable storage medium whose contents, which are computer executable instructions stored on the non-transitory computer-readable storage medium, when executed by a computer processor of a computing system, enable the computing system to generate a roof estimate report for a building having a roof, by causing, when executed by the computer processor of the computing system, the computing system to perform a method comprising: receiving two or more images of the building, wherein at least one of the two or more images provides an oblique perspective view of the roof and one of the images provides a top plan view of the roof; receiving an indication of pairs of points on the two or more images, each pair of points corresponding to substantially the same point on the roof depicted in each of the two

4

or more images; generating, based on the two or more images of the building, a three-dimensional model of the roof that includes a plurality of planar roof sections that each have a corresponding area and edges, wherein the generating, based on the two or more images of the building, the model of the roof includes generating the model of the roof based on the receiving the indication of the pairs of points on the two or more images of the building; and transmitting a roof estimate report that includes one or more views of the model, the report being annotated with numerical indications of the area and lengths of the edges of at least some of the plurality of planar roof sections, wherein the roof estimate report includes at least two different indicia for different types of roof properties."

### B. U.S. Patent No. 8,170,840

22.     The '840 patent, entitled "Pitch Determination Systems and Methods for Aerial Roof Estimation," was issued by the USPTO on May 1, 2012.

23.     The application for the '840 patent was filed on May 15, 2009.

24.     Chris Pershing is the named inventor of the '840 patent.

25.     Claim 10 of the '840 patent states: "A computing system for generating a roof estimate report, the computing system comprising: a memory; a roof estimation module that is stored on the memory and that is configured, when executed, to: display an aerial image of a building having a roof comprising a plurality of planar roof sections that each have a corresponding pitch; display a pitch determination marker operable to indicate pitch of a planar roof section, wherein the pitch determination marker is overlaid on the aerial image of the building having the roof; receive, based on the displayed pitch determination marker, an indication of the pitch of one of the plurality of planar roof sections of the roof of the building; modify a model of the roof based on the received indication of the pitch of the one planar roof section; and provide roof measurement information based on the model of

the roof, the roof measurement information including a measure of the pitch of the one planar roof section."

26.     Claim 16 of the '840 patent states: "A non-transitory computer-readable storage medium whose contents enable a computing system to generate a roof estimate report for a building having a roof, by performing a method comprising: displaying an aerial image of a building having a roof comprising a planar roof section that has a corresponding pitch; displaying a pitch determination marker operable to indicate pitch of the planar roof section, wherein the pitch determination marker is overlaid on the aerial image of the building having the roof; receiving, based on the displayed pitch determination marker, an indication of the pitch of the planar roof section; and modifying a model of the roof based on the received indication of the pitch of the planar roof section."

27.     Claim 18 of the '840 patent states: "The non-transitory computer-readable storage medium of claim 16 wherein the method further comprises: generating a roof estimate report based on the modified model of the roof; and transmitting the generated roof estimate report."

### C. U.S. Patent No. 8,818,770

28.     The '770 patent, entitled "Pitch Determination Systems and Methods for Aerial Roof Estimation," was issued by the USPTO on August 26, 2014.

29.     The application for the '770 patent was filed on April 3, 2012.

30.     Chris Pershing is the named inventor of the '770 patent.

31.     Claim 1 of the '770 patent states: "A computer-implemented process in a roof estimation system comprising: displaying, by the roof estimation system, a graphical user interface including a first aerial image of a roof structure of a building and also at least one first visual marker that is moveable by a user in a same display window as the first aerial image while said first aerial image is displayed within the graphical user interface; moving the

first visual marker with respect to the first aerial image of the roof structure to a first location in response to input from the user; storing data in a memory of the computer of the first location to which the first visual marker was moved; displaying a second aerial image of the roof structure of the building, the second aerial image providing a different view of the roof than the first aerial image; and displaying a location of a second visual marker on the roof structure of the building in the second aerial image of the roof structure based on an indication received from the stored data in the memory of the first location on the displayed first aerial image to which the user had moved the first visual marker; and generating and outputting a roof estimate report using a report generation engine, wherein the roof estimate report includes one or more top plan views of a model of the roof annotated with numerical values for corresponding slope, area, or lengths of the edges of at least some of the plurality of planar roof sections of the model of the roof."

32. Claim 12 of the '770 patent states: "The process of claim 1 further comprising: performing, by the roof estimation system, digital wire frame model construction of the roof structure based on the at least one location over the roof structure in the displayed aerial imagery to which the user moved the least one first visual marker."

### D. U.S. Patent No. 8,825,454

33. The '454 patent, entitled "Concurrent Display Systems and Methods for Aerial Roof Estimation," was issued by the USPTO on September 2, 2014.

34. The application for the '454 patent was filed on May 17, 2012.

35. Chris Pershing is the named inventor of the '454 patent.

36. Claim 26 of the '454 patent states: "A computer-implemented method in a roof estimate report system including a computer system and a memory coupled to the computer system, the method comprising: displaying, by the computer system of the roof estimate report

7

system, a first aerial image of a roof on a single display; displaying, by the computer system of the roof estimate report system, a second aerial image of the same roof on the same single display, the second aerial image providing a different view than the first aerial image, taken from a different angle of the same roof; displaying, by the computer system of the roof estimate report system, a first line drawing representing features of the roof overlaid on the first aerial image of the roof; displaying, by the computer system of the roof estimate report system, a second line drawing representing features of the roof overlaid on the second aerial image of the roof, the second line drawings having features in common with and that correspond to features in the first line drawing; in response to user input, changing, a line in the first line drawing representing a feature of the roof that overlies the first aerial image of the roof; changing, by the computer system of the roof estimate report system, a line in the second line drawing that corresponds to the same feature in the first line drawing that was changed by the user, the change in the second line drawing being made by the computer system in response to the change that was made by the user in the first line drawing; and generating and outputting a roof estimate report using a report generation engine, wherein the roof estimate report includes one or more top plan views of a model of the roof annotated with numerical values for corresponding slope, area, or lengths of the edges of at least some of the plurality of planar roof sections of the model of the roof."

### E. U.S. Patent No. 9,129,376

37. The '376 patent, entitled "Pitch Determination Systems and Methods for Aerial Roof Estimation," was issued by the USPTO on September 8, 2015.

38. The application for the '376 patent was filed on July 31, 2014.

39. Chris Pershing is the named inventor of the '376 patent.

40.    Claim 17 of the '376 patent states: "A computer-implemented method in a roof estimation

       system, the method comprising: displaying, by the roof estimation system, a graphical user

       interface including an aerial image of a roof structure of a building and a pitch

       determination marker that is an interactive user interface control that can be manipulated

       by the operator in order to specify pitch of the roof structure of the building; moving the

       pitch determination marker with respect to the aerial image of the roof structure to a first

       location in the graphical user interface overlaying the aerial image in response to input

       from the user; adjusting the pitch determination marker so that the pitch determination

       marker appears to lie substantially atop at least one of two adjacent planar roof sections of

       the aerial image of the roof structure; determining, by the roof estimation system, a pitch

       of the at least one of the two adjacent planar roof sections based on a configuration of the

       pitch determination marker; and generating and outputting, by the roof estimation system,

       a roof estimate report using a report generation engine, wherein the roof estimate report

       includes one or more top plan views of a model of the roof structure annotated with

       numerical values for corresponding slope, area, or lengths of edges of at least some of a

       plurality of planar roof sections of the roof structure, wherein the generated roof estimate

       report is provided for repair and/or constructing the roof structure of the building."

41.    Claim 20 of the '376 patent states: "A roof estimation system comprising: at least one

       computer processor; and at least one memory coupled to the at least one computer

       processor having computer executable instructions stored thereon that, when executed,

       cause the at least one computer processor to: adjust a pitch determination marker overlaid

       on a photographic aerial image in response to manipulation of the pitch determination

       marker by a user so that at least a portion of the pitch determination marker substantially

9

aligns with at least a portion of a planar roof section of the roof in the aerial image; calculate a pitch of the planar roof section roof based on the adjustment of the pitch determination marker; store the calculated pitch in the memory; and generate and output a roof estimate report, wherein the roof estimate report includes one or more top plan views of a model of the roof annotated with numerical values for corresponding slope, area, or lengths of edges of at least some of a plurality of planar roof sections of the roof, wherein the generated roof estimate report is provided for repair and/or constructing the roof structure of the building."

42.  Claim 22 of the '376 patent states: "The system of claim 20 wherein the pitch determination marker is an envelope tool and wherein the computer executable instructions stored on the memory, when executed, cause the at least one computer processor to: change a position of a spine of the envelope tool to a position in which the spine substantially aligns with a ridge line of the roof."

43.  Claim 23 of the '376 patent states: "The system of claim 22 wherein the computer executable instructions stored on the memory, when executed, cause the at least one computer processor to: adjust an angle of a first surface of the envelope tool and a second surface of the envelope tool so that the first surface lies substantially atop a first section of the roof and the second surface lies substantially atop a second section of the roof that is adjacent to the first section at the ridge line."

### F.  U.S. Patent No. 9,135,737

44.  The '737 patent, entitled "Concurrent Display Systems and Methods for Aerial Roof Estimation," was issued by the USPTO on September 15, 2015.

45.  The application for the '737 patent was filed on August 1, 2014.

46.  Chris Pershing is the named inventor of the '737 patent.

10

47.     Claim 16 of the '737 patent states: "A non-transitory computer-readable storage medium,
        having computer executable instructions stored thereon that, when executed by at least one
        computer processor, cause the at least one processor to enable a computing system to
        generate a roof estimate report for a building having a roof, by performing a method
        comprising: overlaying a line drawing on corresponding locations of a roof feature of the
        roof on first and second aerial images of the roof, wherein the first aerial image provides a
        first view of the roof of the building and the second aerial image provides a second view
        of the roof of the building; in response to changes in the line drawing overlaid on the first
        aerial image, displaying corresponding changes to the line drawing overlaid on the second
        aerial image; and generate and output a roof estimate report using a report generation
        engine, wherein the roof estimate report includes numerical values for corresponding slope,
        area, or lengths of edges of at least some of a plurality of planar roof sections of the roof,
        wherein the generated roof estimate report is provided for repair and/or constructing the
        roof structure of the building."

48.     Claim 25 of the '737 patent states: "The non-transitory computer-readable storage medium
        of claim 16 wherein the method further comprises: modifying a three dimensional model
        of the roof based at least on the modification of the line drawing overlaid on the first aerial
        image."

## III.    Claim Construction

49.     The parties have agreed to constructions for several terms as set forth in the table below.
        *See* Dkt. No. 178.

| CLAIM TERM | ASSERTED CLAIMS | AGREED UPON CONSTRUCTION |
|---|---|---|
| "top plan view" | '436 patent, claims 2, 21, 36 | "an aerial view of an object that is taken from a position vertically or nearly vertically above the object" |

11

| CLAIM TERM | ASSERTED CLAIMS | AGREED UPON CONSTRUCTION |
|---|---|---|
| "oblique perspective view"/ "oblique view" / "perspective view" | '436 patent, Claims 2, 36 | "an aerial view of an object that is taken from a position that is neither vertically nor nearly vertically above the object" |
| "not a stereoscopic pair" | '436 patent, Claim 2 | "a pair of images of the same object taken from different view directions" |
| "a roof estimation module that is stored on the memory" | '436 patent, Claim 2 '840 patent, Claim 10 | "a module that is stored on the memory, and which performs image acquisition, roof modeling, and report generation functions" |
| "aerial image" | '840 patent, Claim 10 '770 patent, Claim 12 '376 patent, Claims 17, 20, 23 | "an image taken from the air" |

50.    The Court's *Markman* Order states, "the plain and ordinary meaning of each disputed claim term is clear to one of skill in the art and needs no claim construction; and therefore, no claim construction has been set forth herein." *See* Dkt. No. 332.

## IV.    The Accused Products

51.    Prior to January 1, 2016, Xactware was the entity making sales of the Accused Products. Between January 1, 2016 and March 15, 2017, the Geospatial Solutions business unit (also known as the Geomni business unit) of Verisk was the entity making sales of the Accused Products.  From March 15, 2017 to the present, Geomni has been the entity making sales of the Accused Products.

52.    Xactware provided (and Geomni provides) customer support for those who use its products as necessary, has customers located in the United States, and has employees based in the United States who provide customer support.

53.    The Mass Production Tool includes graphical user interface components that can be manipulated by users.

54.    Versions of the Mass Production Tool require computer memory in order to be executed.

55.    The Xactware product called Property InSight has been renamed Geomni Property.

12

56. The Xactware product called Roof InSight has been renamed Geomni Roof.

57. Xactware provided instructions to customers on how to order Roof InSight data packages.

## V.  **Invalidity**

58. "Hsieh" refers to a document by Hsieh, entitled "Design and Evaluation of a Semi-Automated Site Modeling System," Carnegie Mellon, November 1995.

59. "McKeown" refers to a document entitled "Chapter 9, Feature Extraction and Object Recognition, Automatic Cartographic Feature Extraction Using Photogrammetric Principles," by D. McKeown, Jr., et al. in Digital Photogrammetry: An Addendum to the Manual of Photogrammetry; by American Society for Photogrammetry and Remote Sensing (1996).

60. "Sungevity" refers to U.S. Patent No. 8,417,061 entitled "Methods and Systems for Provisioning Energy Systems."

61. Sungevity issued on April 9, 2013.

62. "Avrahami," refers to a document by Avrahami et al., entitled "Extraction of 3D Spatial Polygons Based on the Overlapping Criterion for Roof Extraction from Aerial Images," International Archives of Photogrammetry, Remote Sensing and Spatial Information Sciences, August 29-30, 2005

63. "Applicad," refers to a document by Applicad, entitled "Product Bulletin – November 2002: Key features of our Roofing Software," November 2002.

64. "Labe," refers to a document entitled "Robust Techniques for Estimating Parameters of 3D Building Primitives" by Thomas Läbe and Eberhard Gülch, International Society for Photogrammetry and Remote Sensing, Volume XXXII, Part 2, Commission II, Proceedings of the Commission II Symposium, Data Integration: Systems and Techniques, July 13-17, 1998 (1998).

65.     "Aerowest" refers to European Patent No. 1 010 966 to Aerowest GmbH, entitled "Verfahren zur Erzeungungeiner drei-dimensionalen Objektbeschreibunf" [Method for generating a three-dimensional object description].

66.     Aerowest issued on October 23, 2002.

67.     "Verma" refers to U.S. Patent Application Publication No. 2006/0061566 to Verma, entitled "Method and Apparatus for Performing Three-Dimensional Computer Modeling."

68.     Verma was published on March 23, 2006.

## PART III.   PLAINTIFF'S CONTESTED FACTS:

I.  Plaintiff intends to prove the following contested facts with regard to liability:

### A. Direct Infringement

1.  Xactware has directly infringed and continues to directly infringe Claims 2, 21, and 36 of the '436 patent, Claims 10 and 18 of the '840 patent, Claim 12 of the '770 patent, Claim 26 of the '454 patent, Claims 17, 20, and 23 of the '376 patent, and Claim 25 of the '737 patent.

2.  Xactware has, without authority, made, used, offered for sale, sold and/or imported in the United States the Accused Products[1] thereby infringing the Asserted Claims of the Asserted Patents.

3.  Pursuant to the Stipulation with Respect to Geomni, which was entered by the Court on March 13, 2018 (Dkt. No. 406), any and all references to "Xactware" include "Geomni," any and all references to "Roof InSight" include "Geomni Roof," and any and all references to "Property InSight" include "Geomni Property."

4.  Prior to 2013, EagleView and Pictometry International Corp. ("Pictometry") were separate legal entities. In 2013, EagleView merged with Pictometry.

5.  Defendants' Property InSight; Roof InSight; and the Mass Production Tool in combination with Xactimate, Property InSight, and Roof InSight are alleged to infringe the '436 patent.

6.  Defendants' Xactimate in combination with Aerial Sketch version 2; Property InSight; Roof InSight; and the Mass Production Tool in combination with Xactimate, Property

---

[1]     The Accused Products are defined as Defendants' Xactimate in combination with Aerial Sketch version 2; Property InSight; Roof InSight; and the Mass Production Tool in combination with Xactimate, Property InSight, and Roof InSight.

InSight, and Roof InSight are alleged to infringe the '840, '376, '454, '770, and '737 patents.

7.  The Accused Products are used to generate roof estimate reports and data packages, including Roof Insight, Property Insight and Aerial Sketch reports and data packages.

8.  Xactware's Aerial Sketch version 2 was released in February 2012; its Roof InSight product was first sold in April 2012; and its Property InSight product was first sold in January 2015.

9.  In the Mass Production Tool, changes to certain parameters or measurements of a roof, such as length, can impact roof pitch.  The Mass Production Tool can display an aerial image of a building having a roof, and can also display two aerial images of a building with a roof at the same time.

10.  In the Mass Production Tool, the ████████████████████████████ files are each compiled, and the resulting code is included in the application; discrete portions of such code may, under certain circumstances, be executed depending on what functions the user selects or uses, among other variables and factors.

11.  Users of the Mass Production Tool can upload a model of a property in a Sketch format to Defendants' data centers in the United States.

12.  Mass Production Tool version 3.14.0 has many features and functionality in common with other versions of the Mass Production Tool.

13.  Finalized Property InSight data packages and Roof InSight data packages are delivered to customers or other end-users and enable such customers or end-users to create a PDF report.

14.  Aerial Sketch can display an aerial image of a building having a roof, includes graphical user interface components that can be manipulated by the user, and includes a Set Slope

2

Tool mode of operation. The Set Slope Tool functionality gives the user the ability to estimate the slope of a roof from an oblique (non-overhead) image. And a user can click and drag a ridge point to set the slope of a roof ridge line's adjacent faces. Three-dimensional models of roofs in a Sketch format are a part of what is used in the creation of Property InSight data packages.

15.     Third parties, such as end users, of Aerial Sketch can cause Aerial Sketch to display, one after the other, separately, different images of a building with a roof.

16.     In Aerial Sketch, the ███████████████████████████████ ████████████████ are each compiled, and the resulting code is included in the application; discrete portions of such code may, under certain circumstances, be executed depending on what functions the user selects or uses, among other variables and factors.

17.     Xactware has used the Mass Production Tool and Aerial Sketch in the United States at least once.

18.     Xactware has generated a Property InSight data package and a Roof InSight data package in the United States at least once.

19.     Xactware, without authority, supplies or causes to be supplied from the United States the Mass Production Tool and aerial images which are each a substantial portion of the components of the Accused Products claimed by the '436, '840, '376, and '737 patents, where such components are uncombined in whole or in part, in such a manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. The Mass Production Tool is supplied by Defendants' servers in the United States, and is a software component that is executed on computer systems and constitutes a substantial component

of a roof estimation system that is combined outside of the United States in a way that would infringe the asserted patents if the combination had occurred within the United States. Aerial images used with the Mass Production Tool are components that are supplied by Defendants' servers in the United States, are substantial components of a roof estimation system, and are combined with the Mass Production Tool outside of the United States in a way that would infringe the asserted patents if the combination had occurred within the United States.

20.     Xactware, without authority, supplies or causes to be supplied, the Mass Production Tool and aerial images in or from the United States, which are each a component of the patented inventions that is especially made or especially adapted for use in the claimed inventions in the '436, '840, '376, and '737 patents, and is not a staple article or commodity of commerce suitable for substantial non-infringing use, uncombined in whole or in part, knowing that the Mass Production Tool and aerial images are so made or adapted and intending that the Mass Production Tool and aerial images will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States.   The Mass Production Tool and the aerial images used in the Mass Production Tool are supplied by Defendants' servers in the United States, were especially made and especially adapted for use in a roof estimation system, and are not a staple article or commodity of commerce suitable for substantial non-infringing use.

21.     Geomni has entered into an agreement with ███████████████   ██████████████
███████████████████████████. Employees of this company have used the Mass Production Tool and aerial images outside the United States.

22. Xactware has entered into agreements with ███████████████████ ██████████████████████████████. Employees of these companies have used the Mass Production Tool and aerial images outside the United States.

23. Xactware, Geomni, and their customers, without authority, imports into the United States or offers to sell, sells, or uses within the United States the Accused Products, which are made by the processes and methods of the Asserted Claims of the Asserted Patents. The Accused Products are tangible products sold to customers that are not materially changed by subsequent processes or trivial and nonessential components of another product. Defendants' Property InSight and Roof InSight roof reports are products made by processes patented in the United States, and no material change occurs to the product after it is made. By directing employees of companies Xactware and Geomni have entered into agreements with on how and when to use the Mass Production Tool, Xactware and Geomni induce them to perform each step of the methods or processes of the patented inventions in generating the roof reports.

### B.  Indirect Infringement

24. Xactware has knowingly induced and continues to knowingly induce its customers' direct infringement of Claims 2, 21, and 36 of the '436 patent, Claims 10 and 18 of the '840 patent, Claim 12 of the '770 patent, Claim 26 of the '454 patent, Claims 17, 20, and 23 of the '376 patent, and Claim 25 of the '737 patent, including through Xactware's customers' unauthorized use of Aerial Sketch, Roof Insight, and Property Insight, including by, *inter alia*, being involved in and maintaining control over the development, support, marketing, sale, and distribution of the Accused Products.

25. Xactware has had knowledge of the Asserted Patents and has intended to encourage its customers to use the Accused Products to infringe the Asserted Patents.

5

26.    Xactware induced its customers to infringe the Asserted Patents by intentionally
encouraging and continuing to encourage its customers to use Aerial Sketch—by, among
other things, providing customers with user guides, manuals, instructional videos, and
webcasts that include instructions on how to use Aerial Sketch in a way that infringes at
least the Asserted Claims of the '840, '376, '454, '770, and '737 patents—and knew that
encouraging customers to use Aerial Sketch, in combination with the Xactimate platform,
would induce its customers to infringe the Asserted Patents.

27.    Xactware specifically intended for its users to infringe the Asserted Patents because it knew
that its encouragement and instructions provided to customers would cause those customers
to use Aerial Sketch in a manner that infringes the Asserted Patents.

28.    Xactware's customers follow Xactware's instructions to use Aerial Sketch to create roof
reports in a manner that infringes the Asserted Patents.

29.    By using Aerial Sketch in combination with the Xactimate platform, Xactware's customers
directly infringe the Asserted Patents.

30.    Xactware induced its customers to infringe the Asserted Patents by intentionally
encouraging and continuing to encourage its customers to use its Roof InSight and Property
InSight products—by, among other things, providing customers with webcasts, literature,
and certifications that include instructions on how to order and use Roof InSight and
Property InSight products in a way that infringes the Asserted Claims of the Asserted
Patents—and knew that encouraging customers to use its Roof InSight and Property
InSight products would induce its customers to infringe the Asserted Patents.

31.    Xactware specifically intended for its users to infringe the Asserted Patents because it knew
that its encouragement and instructions provided to customers would cause those customers

6

to use the Roof Insight and Property InSight products in a manner that infringes the Asserted Patents.

32. Xactware's customers follow Xactware's instructions to use the Roof InSight and Property InSight products in a manner that infringes the Asserted Patents.

33. By using the Roof InSight and Property InSight products, Xactware's customers directly infringe the Asserted Patents.

34. Verisk has knowingly induced and continues to knowingly induce Xactware's direct infringement of Claims 2, 21, and 36 of the '436 patent, Claims 10 and 18 of the '840 patent, Claim 12 of the '770 patent, Claim 26 of the '454 patent, Claims 17, 20, and 23 of the '376 patent, and Claim 25 of the '737 patent, including through Xactware's manufacture, use, sale, offer for sale or importation of such products in a manner that infringes the Asserted Patents, including by, *inter alia*, being involved in and maintaining control over the development, support, marketing, sale, use, and distribution of the Accused Products.

35. Verisk has had knowledge of the Asserted Patents and knew that its intentional involvement in and control over the development, use, support, marketing, sale, and distribution of the Accused Products would encourage Xactware and Xactware's customers to infringe the Asserted Claims of the Asserted Patents and has intended that result to occur.

36. Verisk induced Xactware to infringe the Asserted Patents by, *inter alia*, intentionally encouraging and aiding Xactware's development, use, marketing and selling of the Accused Products. Verisk actively marketed and promoted the Accused Products through its own website, procured aerial images to be used in the Accused Products, took actions

to broaden Xactware's customer base, and actively encouraged Xactware's development and use of the Accused Products in a manner that infringed the Asserted Patents.

37.      Verisk specifically intended for Xactware to infringe the Asserted Patents because it knew that its encouragement and aid provided to Xactware, including through at least its involvement in and control over the development, support, sale, and distribution of the Accused Products, would cause Xactware to make and use the Accused Products in a manner that infringes the Asserted Claims of each Asserted Patent.

38.      Verisk, Xactware, and Geomni provide customer support for those who use their products as necessary, including customers located in the United States.

39.      By making, using, offering for sale, selling, and importing the Accused Products, Xactware directly infringes the Asserted Patents.

### C. Willful Infringement

40.      Xactware's infringement of the Asserted Patents has been and continues to be willful. Xactware has acted with knowledge of the Asserted Patents and without a reasonable basis for a good faith belief that it would not be liable for infringement of the Asserted Patents.

41.      Defendants were aware of the scope and coverage of EagleView's Asserted Patents while Defendants developed the infringing Accused Products.

42.      EagleView repeatedly notified Defendants of their infringement of, among other things, the Asserted Patents, and Defendants acknowledged the risk of infringement, but chose to proceed with their infringing activities.

43.      Xactware made no attempts and no plans to design around or otherwise avoid infringement of the Asserted Patents.

44.      Verisk made no attempts and no plans to design around or otherwise avoid infringement of the Asserted Patents.

45. All of the Asserted Claims have been or are being infringed by Defendants—and
Defendants are liable for the infringement of any of the Asserted Claims—at least in view
of the reasons set forth in the report of Plaintiff's expert that were presented during this
case and in view of the deposition testimony of Plaintiff's expert from this case.

### D. EagleView's Technology

46. EagleView has two software tools, Render House and Twister, both of which
independently embody the inventions of the Asserted Patents.

47. Render House and Twister, including the House Report functionality, are used to generate
EagleView's roof estimate reports.

48. Chris Pershing conceived of the inventions of the '436, '840, and '376 patents at least as
early as December 2, 2006 and reduced them to practice at least as early as January 2008.

49. Chris Pershing conceived of the inventions of the '454, '770, and '737 patents at least as
early as March 12, 2007 and reduced them to practice at least as early as January 2008.

50. At least as early as January 5, 2008, Chris Pershing and EagleView finished developing
the Render House software which embodies the inventions of the Asserted Patents.

51. At least as early as October 15, 2008, Chris Pershing and EagleView finished developing
the Twister software which incorporated all of the functionality of Render House and added
features providing additional information for its roof models, which also embodies the
inventions of the Asserted Patents.

52. Before this lawsuit, Defendants publicly lauded EagleView's technologies.    When
Xactware discovered EagleView, it praised EagleView's the inventions in the Asserted
Patents.    Subsequently, Defendants consistently lauded the patented inventions of
EagleView's Asserted Patents in various settings, including in their internal
communications, in press releases, and on investor conference calls.

9

53. EagleView's claimed inventions set forth new and radically different computerized approaches to specific aspects of roof estimation than were previously thought to be possible, increasing accuracy, reducing risk, and saving resources, among other benefits.

54. A person of ordinary skill in the art pertinent to the Asserted Patents is "someone with a bachelor's degree or higher in computer science, computer engineering, computer vision or visualization, physics, or an equivalent educational background, or someone having at least 5 years of industry experience in software development."

55. All of the Asserted Claims are valid at least in view of the reasons set forth in the report of Plaintiff's expert presented during this case and in view of the deposition testimony of Plaintiff's expert from this case.

**E. The '436 Patent**

56. The '436 patent is valid and enforceable.

57. The '436 patent was issued by the United States Patent and trademark Office ("USPTO" or "PTO") on December 13, 2011.

58. Defendants had notice of the '436 patent at least as early as May 22, 2012.

59. The asserted claims of the '436 patent are supported by the disclosures of the '436 patent's parent applications, Application No. 12/148,439, filed on April 17, 2008, and Provisional Application No. 60/925,072, filed on April 17, 2007, and are entitled to their earlier priority dates.

60. No combinations of any references previously disclosed by Defendants anticipate or render the asserted claims of the '436 patent obvious.

61. The asserted claims of the '436 patent are directed to an improved computer system for generating a roof estimate report with specific content based on correlating non-stereoscopic aerial images by receiving an indication of pairs of corresponding features.

10

All asserted claims of the '436 patent require correlating the two or more unique images. This claims a specific approach tailored to roof modeling.

62. The '436 patent improves the prior art computer systems by adding specific techniques never before used to solve the weaknesses in the prior art recognized by the inventors.

63. The asserted claims of the '436 patent are not obvious over publication by Hsieh, entitled "Design and Evaluation of a Semi-Automated Site Modeling System," Carnegie Mellon, November 1995 ("Hsieh").

64. The asserted claims of the '436 patent are not obvious over Hsieh in combination with publication by Applicad, entitled "Product Bulletin – November 2002: Key features of our Roofing Software," November 2002 ("Applicad").

65. The asserted claims of the '436 patent are not obvious over Hsieh in combination with European Patent No. 1 010 966 to Aerowest GmbH, entitled "Verfahren zur Erzeungung einer drei-dimensionalen Objektbeschreibunf" [Method for generating a three-dimensional object description], issued Oct. 23, 2002 ("Aerowest").

66. The asserted claims of the '436 patent are not obvious over publication entitled "Chapter 9, Feature Extraction and Object Recognition, Automatic Cartographic Feature Extraction Using Photogrammetric Principles," by D. McKeown, Jr., *et al.* in Digital Photogrammetry: An Addendum to the Manual of Photogrammetry; Published by American Society for Photogrammetry and Remote Sensing (1996) ("McKeown").

67. The asserted claims of the '436 patent are not obvious over McKeown in combination with AppliCad.

68. The asserted claims of the '436 patent are not obvious over McKeown in combination with Aerowest.

69. The asserted claims of the '436 patent are not obvious over publication by Avrahami *et al.*, entitled "Extraction of 3D Spatial Polygons Based on the Overlapping Criterion for Roof Extraction from Aerial Images," International Archives of Photogrammetry, Remote Sensing and Spatial Information Sciences, August 29-30, 2005 ("Avrahami").

70. The asserted claims of the '436 patent are not obvious over Avrahami in combination with AppliCad.

71. The asserted claims of the '436 patent are not obvious over Avrahami in combination with Aerowest.

72. The asserted claims of the '436 patent are not obvious over U.S. Patent No. 8,417,061 entitled "Methods and Systems for Provisioning Energy Systems," which issued on April 9, 2013 ("Sungevity").

73. The asserted claims of the '436 patent are not obvious over Sungevity in combination with AppliCad.

74. The asserted claims of the '436 patent are not obvious over Sungevity in combination with Aerowest.

75. The asserted claims of the '436 patent are not obvious over publication entitled "Robust Techniques for Estimating Parameters of 3D Building Primitives" by Thomas Läbe and Eberhard Gülch, International Society for Photogrammetry and Remote Sensing, Volume XXXII, Part 2, Commission II, Proceedings of the Commission II Symposium, Data Integration: Systems and Techniques, July 13-17, 1998 (1998) ("Labe").

76. The asserted claims of the '436 patent are not obvious over Labe in combination with AppliCad.

77.     The asserted claims of the '436 patent are not obvious over Labe in combination with
        Aerowest.

      **F.  The '840 Patent**

78.     The '840 patent is valid and enforceable.

79.     Defendants had notice of the '840 patent at least as early as May 22, 2012.

80.     The asserted claims of the '840 patent are supported by the disclosures of the '840 patent's
        parent application, Provisional Application No. 61/197,904, filed on October 31, 2008, and
        are entitled to its earlier priority date.

81.     No combinations of any references previously disclosed by Defendants anticipate or render
        the asserted claims of the '840 patent obvious.

82.     The asserted claims of the '840 patent are directed to an improved computer system for
        generating a roof estimate report through user manipulation of an interactive graphical
        interface tool that is overlaid on aerial roof images or shown in the same graphical user
        interface as the images.  The pitch determination marker ("PDM") requirements are
        specific and concrete.  The PDM is an important advancement that improves computer-
        based roof modeling systems by using the PDM user interface tool.

83.     The '840 patent improves the prior art computer systems by adding specific techniques
        never before used to solve the weaknesses in the prior art recognized by the inventor.  One
        way in which the '840 patent improves prior art technologies, among others, is by
        employing a "pitch determination marker" that is "overlaid on the aerial image of the
        building having the roof."  Employing a pitch determination marker improves upon the
        limitations of prior solutions at least by allowing a user to determine the elements and
        measurements of a roof by using one or more aerial images of a roof, without the need to
        climb on a physical roof.

84.    The asserted claims of the '840 patent are neither anticipated by, nor obvious over, Sungevity.

85.    The asserted claims of the '840 patent are neither anticipated by, nor obvious over, U.S. Patent Application Publication No. 2006/0061566 to Verma, entitled "Method and Apparatus for Performing Three-Dimensional Computer Modeling," published Mar. 23, 2006 ("Verma").

86.    The asserted claims of the '840 patent are not obvious over Hsieh either alone or in view of Verma.

87.    The asserted claims of the '840 patent are not obvious over Labe either alone or in view of Verma.

88.    The asserted claims of the '840 patent are not obvious over Aerowest either alone or in view of Verma.

89.    The asserted claims of the '840 patent are not obvious over Hsieh in view of Verma, and in further view of AppliCad.

90.    The asserted claims of the '840 patent are not obvious over Hsieh in view of Verma, and in further view of Aerowest.

91.    The asserted claims of the '840 patent are not obvious over Labe in view of Verma, and in further view of AppliCad.

92.    The asserted claims of the '840 patent are not obvious over Labe in view of Verma, and in further view of Aerowest.

93.    The asserted claims of the '840 patent are not obvious over Verma in view of AppliCad.

94.    Claim 18 of the '840 patent is not obvious over Sungevity in view of AppliCad.

95.    Claim 18 of the '840 patent is not obvious over Sungevity in view of Aerowest.

### G. The '376 Patent

96.   The '376 patent is valid and enforceable.

97.   The asserted claims of the '376 patent are supported by the disclosures of the '376 patent's parent application, Provisional Application No. 61/197,904, filed on October 31, 2008, and are entitled to its earlier priority date.

98.   No combinations of any references previously disclosed by Defendants anticipate or render the asserted claims of the '376 patent obvious.

99.   The asserted claims of the '376 patent are directed to an improved computer system for generating a roof estimate report through user manipulation of an interactive graphical interface tool that is overlaid on aerial roof images or shown in the same graphical user interface as the images. The pitch determination marker ("PDM") requirements are specific and concrete. The PDM is an important advancement that improves computer-based roof modeling systems by using the PDM user interface tool.

100.  The '376 patent improves the prior art computer systems by adding specific techniques never before used to solve the weaknesses in the prior art recognized by the inventor. One way in which the '376 patent improves prior art technologies, among others, is by employing a "pitch determination marker" that is "overlaid on the aerial image of the building having the roof." Employing a pitch determination marker improves upon the limitations of prior solutions at least by allowing a user to determine the elements and measurements of a roof using one or more aerial images of a roof, without the need to climb on a physical roof.

101.  The asserted claims of the '376 patent are not obvious over Aerowest in view of Verma.

102.  The asserted claims of the '376 patent are not obvious over Hsieh in view of Verma, and further in view of AppliCad.

15

103. The asserted claims of the '376 patent are not obvious over Hsieh in view of Verma, and further in view of Aerowest.

104. The asserted claims of the '376 patent are not obvious over Labe in view of Verma, and further in view of AppliCad.

105. The asserted claims of the '376 patent are not obvious over Labe in view of Verma, and further in view of Aerowest.

106. Claim 17 of the '376 patent is not obvious over Verma in view of AppliCad.

107. Claims 17 and 20 of the '376 patent are not anticipated by Sungevity.

108. The asserted claims of the '376 patent are not obvious over Sungevity in view of AppliCad and/or Aerowest.

109. Claim 23 of the '376 patent is not obvious over Sungevity in view of Verma.

110. Claim 23 of the '376 patent is not obvious over Sungevity in view of Verma, and in further view of AppliCad.

111. Claim 23 of the '376 patent is not obvious over Sungevity in view of Verma, and in further view of Aerowest.

### H. The '454 Patent

112. The '454 patent is valid and enforceable.

113. Defendants had notice of the '454 patent at least as early as December 2014.

114. No combinations of any references previously disclosed by Defendants anticipate or render the asserted claims of the '454 patent obvious.

115. The asserted claims of the '454 patent are directed to an improved computer system for generating a roof estimate report with specific content by employing improved user feedback when the user manipulates an interactive graphical interface tool overlaid on aerial roof images.

16

116.    Embodiments of the '454 patent describe a system and method that improve upon the limitations of prior solutions at least by allowing a user to determine the elements and measurements of a roof without the need to climb on a physical roof using two or more aerial images of a roof.  In particular, one embodiment teaches that features of a roof can be determined by displaying corresponding changes to line drawings over two aerial images concurrently on one display.

117.    The '454 patent improves the prior art computer systems by adding specific techniques never before used to solve the weaknesses in the prior art recognized by the inventors.

118.    The asserted claims of the '454 patent are not obvious over Labe, either alone, or in view of AppliCad or Aerowest.

119.    The asserted claims of the '454 patent are not obvious over Avrahami, either alone, or in view of AppliCad or Aerowest.

120.    The asserted claims of the '454 patent are not obvious over Hsieh, either alone, or in view of AppliCad or Aerowest.

121.    The asserted claims of the '454 patent are not obvious over McKeown, either alone, or in view of AppliCad or Aerowest.

### I.   The '770 Patent

122.    The '770 patent is valid and enforceable.

123.    Defendants had notice of the '770 patent at least as early as December 2014.

124.    No combinations of any references previously disclosed by Defendants anticipate or render the asserted claims of the '770 patent obvious.

125.    The asserted claims of the '770 patent are directed to an improved computer system for generating a roof estimate report with specific content by employing improved user

feedback while the user manipulates an interactive graphical interface tool in the same display window as aerial roof images.

126.    Embodiments of the '770 patent describe a system and method that improve upon the limitations of prior solutions at least by allowing a user to determine the elements and measurements of a roof without the need to climb on a physical roof using two or more aerial images of a roof.  In particular, one embodiment teaches that features of a roof can be determined by displaying corresponding changes to visual markers over two aerial images concurrently.

127.    The '770 patent improves the prior art computer systems by adding specific techniques never before used to solve the weaknesses in the prior art recognized by the inventors.

128.    The asserted claims of the '770 patent are not obvious over Hsieh, either alone, or in view of AppliCad.

129.    The asserted claims of the '770 patent are not obvious over Avrahami, either alone, or in view of AppliCad.

130.    The asserted claims of the '770 patent are not obvious over McKeown, either alone, or in view of AppliCad.

### J.  The '737 Patent

131.    The '737 patent is valid and enforceable.

132.    No combinations of any references previously disclosed by Defendants anticipate or render the asserted claims of the '737 patent obvious.

133.    The asserted claims of the '737 patent are directed to an improved computer system for generating a roof estimate report with specific content by employing improved user feedback while the user manipulates an interactive graphical interface tool overlaid on aerial roof images.

18

134.  Embodiments of the '737 patent describe a system and method that improve upon the limitations of prior solutions at least by allowing a user to determine the elements and measurements of a roof without the need to climb on a physical roof using two or more aerial images of a roof. In particular, one embodiment teaches that features of a roof can be determined by displaying corresponding changes to line drawings over two aerial images concurrently.

135.  The '737 patent improves the prior art computer systems by adding specific techniques never before used to solve the weaknesses in the prior art recognized by the inventors.

136.  The asserted claims of the '737 patent are not obvious over Labe, either alone or in view of AppliCad or Aerowest.

137.  The asserted claims of the '737 patent are not obvious over Hsieh, either alone or in view of AppliCad or Aerowest.

138.  The asserted claims of the '737 patent are not obvious over Avrahami, either alone or in view of AppliCad or Aerowest.

139.  The asserted claims of the '737 patent are not obvious over McKeown, either alone or in view of AppliCad or Aerowest.

### K. The Sungevity Patent

140.  In addition to failing to disclose the claim elements of the asserted claims of the '436, '840, and '376 patents against which Defendants have asserted the Sungevity patent, the Sungevity patent is not prior art to the '436, '840, and '376 patents.

141.  The Sungevity patent claims priority to Provisional Application No. 61/047,086 ("'086 provisional"), filed on April 22, 2008, and Provisional Application No. 61/025,431 ("'431 provisional"), filed on February 1, 2008; however, the Sungevity patent's allegedly invalidating claims and disclosures are not supported by the disclosures in either of its

provisional applications, and it is not entitled to the earlier priority dates of those applications.

142. The '436 patent has a priority date at least as early as October 16, 2008.

143. The Sungevity patent is not prior art to the '436 patent because the application for the Sungevity patent was filed on February 2, 2009, later than the '436 patent's October 16, 2008 filing date.

144. The '840 and '376 patents are entitled to the priority date of Provisional Application No. 61/197,904, filed on October 31, 2008.

145. The Sungevity patent is not prior art to the '840 and '376 patents because the application for the Sungevity patent was filed on February 2, 2009, later than the '840 and '376 patents' October 31, 2008 priority date.

### L. **OBJECTIVE INDICIA OF NON-OBVIOUSNESS**

146. Xactware and Verisk copied EagleView's technology when developing Aerial Sketch and the Mass Production Tool. Defendants developed an extensive working knowledge of EagleView's patented technology of the Asserted Patents through the course of its partnership with, and due diligence of, EagleView. A number of Defendants' engineers and managers conducting diligence of and interacting with Eagle View's technology—including the EagleView products that embody the Asserted Claims—also worked on and developed the Accused Products. Despite their exposure to EagleView's technology embodying the Asserted Patents, Defendants made no effort to ensure that these same engineers were separated from Defendants' own development of an image-based roof measurement product (*e.g.*, establishing "clean rooms" during the course of development). Defendants used its extensive knowledge of EagleView's patented technology of the Asserted Patents to develop the Accused Products.

20

147.  Xactware engineers and representatives visited EagleView's facilities in early 2009 to tour the production floor and meet with EagleView's executives.   These engineers and representatives included at least Jeffrey Taylor, Jeffrey Lewis, and Brad Childs.   The agenda for this visit included time allotted for a presentation of Eagle View's operations and technical workflow, image sample review, technical questions, and a tour of Eagle View's operations.   Also, during this visit, Defendants' executive ████████████

████████████████████████████████████████████████████

███████████████████████████, which EagleView considered confidential and which relate to the claimed limitations of the Asserted Patents.

148.  Jeffrey Lewis and Jeffrey Taylor were involved in the development of the Mass Production Tool and the development of the Aerial Sketch program.

149.  Due to the inventions of the Asserted Patents, EagleView's products have been commercially successful, garnered widespread industry praise, and became the industry standard for aerial roof estimation.

150.  Eagle View's patented technology was initially met with industry skepticism, but as customers confirmed the accuracy of Eagle View reports, the technology began to experience widespread industry praise.

151.  EagleView's patented roof estimation method solved a long felt industry need by enabling roof measurements to be taken remotely with aerial images.

II.  <u>Plaintiff intends to prove the following contested facts with regard to damages:</u>

152.  EagleView is entitled to damages beginning on the date of first infringement under 35 U.S.C. §§ 286 and 287.

### A. **LOST PROFITS**

153. EagleView lost profits due to Defendants' infringement on sales to the insurance industry (excluding price erosion) of at least ▮▮▮▮ and to contractors (excluding price erosion) of at least ▮▮ from the time of Defendants' first infringement in February 2012 through January 2018.

154. Xactware's infringing sales also caused prices to erode substantially between 2012 and the present, causing EagleView to lose an additional ▮▮ on sales to the insurance industry, and an additional ▮▮▮ on sales to contractors.

155. Total profits lost by EagleView due to Defendants' infringement on sales to the insurance industry of ▮▮ and to contractors of ▮▮▮ , for total lost profits due to Defendants' infringement of ▮▮ .

156. Demand for EagleView's products that embody the Asserted Patents consistently rose, as evidenced by rising sales of both EagleView's and Defendants' products. EagleView and Defendants compete with one another in the same geographic area (*i.e.*, the United States and Canada). Aerial rooftop measurement products constitute their own market. Xactware was unable to compete in the aerial rooftop measurement products market until it began using EagleView's patented technology.

157. Before Defendants' infringement, EagleView was the only company capable of generating commercially acceptable roof models and reports based solely on aerial imagery.

158. EagleView has lost both sales and insurance and contractor customers to Xactware, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

159. Xactware entered into contracts with many of EagleView's former and current customers, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22



[REDACTED], for the use of the Accused Products

160. EagleView also employed other tactics to turn customers away from EagleView and towards the Accused Products.

161. Xactware has had no non-infringing substitute on the market during the infringing period, and no non-infringing alternatives have existed during the relevant damages period.

162. EagleView has always been able to supply roof report orders and has steadily increased in production capacity in response to actual and anticipated increases in order flow.

163. Other than price, customers do not appear to recognize a difference between Defendants' Accused Products and EagleView's products embodying the Asserted Patents. Several former EagleView customers admitted that Xactware's offering of lower prices for the Accused Products, among other price-focused sales tactics, were the reason the customers switched from EagleView to Xactware.

**B. REASONABLE ROYALTY**

164. To the extent that EagleView is not entitled to lost profits, a reasonable royalty would be between [REDACTED], and in no event below [REDACTED] through January 2018.

**C. QUANTIFIABLE BENEFITS**

23

165. Prior to EagleView's innovations, generating roof measurement reports required on-sight assessments.  Such in-person assessments often involved either climbing on rooftops to take measurements, or making estimates from the ground, both of which were costly and error-prone.  EagleView's patented technology enables more accurate roof measurement information than previously possible.

166. The patented inventions permit the production of roof reports (i) with greater accuracy, (ii) with more efficiency, and (iii) without the risk of physical harm associated with the traditional preparation of roof reports.  One study estimated that the cost-savings from using EagleView's patented technology was approximately $549/report.

167. The Accused Products are integral to Defendants' businesses and have been central to Defendants' growth.  And sales of the Accused Products increased overall sales at Xactware.

168. Defendants' Accused Products do not include any significant features or improvements, or an economically meaningful non-patented element or manufacturing process.

169. EagleView's rooftop reports are highly profitable—between 2013 and February 2018, its marginal profit ranged from ████████████ of revenue.  Between 2013 and 2017, EagleView expanded its annual sales of roof reports from ██ ███ to ███ ███.

170. EagleView does not license (and has never licensed) the Asserted Patents.

171. Using the Price-Differential model, royalty for Aerial Sketch is calculated to be $██, by subtracting the price of non-accused Aerial Sketch v.1 ($██) from the price of accused Aerial Sketch v.2 ($██).

172. Using the Cost-Savings model, EagleView's patented technology saved an average of $549/report to determine the quantifiable benefits of EagleView's patented technology.

The study also found that EagleView's patented technology saved 28 minutes (Aerial Sketch v.2) to 36 minutes (EagleView's Premium Report, Roof InSight, Property InSight) over manual measurement, which amounted to savings of $14.88 and $19.13, respectively and reduced to $14.13 to account for Defendants' incremental costs in time-savings per roof.

173. Using the Incremental-Profits model, three royalties are calculated based on one aspect of the Asserted Claims: the roof report generated and transmitted using EagleView's patented technology.   These royalties through January 2018 are (i) ███████, based on EagleView's lost roof-report profits to insurers and contractors; (ii) ██████, based on Defendants' 2013–2014 Roof InSight per-report pricing of ██ less incremental costs (███████) and the ███ royalty for Aerial Sketch (██████); and (iii) ██████, based on Defendants' discounted Roof InSight price of ████ (██████) and the ███ royalty for Aerial Sketch (█████).

## D. INJUNCTIVE RELIEF

174. EagleView has suffered an irreparable injury, and remedies available at law are inadequate to compensate for EagleView's injury.

175. Defendants' infringing sales of the Accused Products have resulted in irreparable harm to EagleView, and monetary damages alone would be inadequate.

176. Xactware's infringing sales have eroded EagleView's prices, caused EagleView to lose customers, and caused EagleView to lose market share.

177. All of the major customers are aware of Xactware's presence in the market and have sought (or are expected to seek) price reductions based on Xactware's market presence.

178. EagleView and the Defendants are the only competitors in the market.

179. Continued sales by Xactware serve to prolong and/or exacerbate price erosion of EagleView's products and cause EagleView to lose more customers and market share for an unknown and unknowable period of time into the future.

180. The balance of hardships favors entry of an injunction when considering, among other things, the products and revenue sources. The patented technology of the Asserted Patents is central to EagleView's business, and EagleView's market share, revenue, and business strategy depend on its ability to exclude others from using its patents. EagleView directly competes with Defendants, and Defendants' infringement has caused EagleView to lose market share. And Defendants' continued infringement will cause EagleView to lose more market share in the future. EagleView should not need to compete against its own patented invention, and Defendants will not be harmed by stopping their unlawful infringement.

181. The public interest favors entry of a permanent injunction because a permanent injunction would protect EagleView's patent rights, and EagleView has the capacity to fulfill all sales of the Accused Products and satisfy the relevant markets if Defendants are permanently enjoined from future development, manufacture and sale of the Accused Products.

26

**PART IV.   DEFENDANTS' CONTESTED FACTS:**

**Procedural history:**

1.   Plaintiffs EagleView Technologies, Inc. and Pictometry International Corp. filed a complaint on September 23, 2015, alleging that:

- U.S. Patent No. 8,078,436 (the "'436 patent") is infringed by Xactimate in combination with Roof Insight and/or Property Insight;
- U.S. Patent Nos. 8,170,840 (the "'840 patent"), 8,209,152 (the "'152 patent"), 8,825,454 (the "'454 patent"), 8,818,770 (the "'770 patent"), and 8,823,732 (the "'732 patent") are infringed by Xactimate in combination with Aerial Sketch; and
- U.S. Patent No. 8,532,880 ("'880 patent") is infringed by Xactimate in combination with Roof Insight and/or Aerial Sketch.

Dkt. 1.

2.   Defendants answered Plaintiffs' complaint on November 12, 2015, denying infringement of any of the '436, '840, '152, '880, '770, '732 and '454 patents and alleging that these patents are invalid. Dkt. No. 15. Defendants asserted counterclaims seeking declaratory judgments of non-infringement and invalidity with respect to all seven of these asserted patents. *Id.*

3.   Plaintiffs filed an amended complaint on November 30, 2015, adding allegations of infringement of U.S. Patent Nos. 9,129,376 (the "'376 patent") and 9,135,737 (the "'737 patent") by Xactimate in combination with Aerial Sketch. Dkt. No. 30. Plaintiffs contended that Defendants infringed a total of 153 claims spanning these nine asserted patents.

4.   Defendants answered Plaintiffs' amended complaint on May 18, 2017, denying that the Accused Products have infringed any of the '436, '840, '152, '880, '770, '732, '454, '376 and '737 patents and alleging that these patents are invalid. Dkt. No. 238. Defendants asserted counterclaims seeking declaratory judgments of non-infringement and invalidity with respect to all nine of these asserted patents. *Id*

5.   On May 18, 2017, EagleView narrowed its infringement allegations to 24 claims spanning the '436, '840, '152, '770, '454, '376 and '737 patents. Dkt. 239. In doing so, EagleView confirmed that the '880 patent and the '732 patent no longer would be asserted in this case. *Id.*

6.   On May 18, 2008, following the exchange of opening expert reports – including the exchange of EagleView's expert report concerning damages – but before the conclusion of expert discovery, EagleView further narrowed its infringement contentions by removing six additional patent claims from the case.

7.   On August 1, 2018, in response to this Court's order (Dkt. No. 449), EagleView further narrowed its infringement contentions by removing seven additional patent claims from

1

the case. In doing so, EagleView confirmed that the '152 patent no longer would be asserted in this case.

**Defendants intend to prove the following contested facts with regard to liability:**

8.     It is impossible to infringe a patent that has not yet issued.

9.     None of the Asserted Patents in this case, in their current form, had issued in or before April 2012.

10.    The earliest date of issuance of any patent asserted in this case, in its current form, was May 1, 2012.

11.    Xactware Solutions, Inc. ("Xactware") has not and currently does not directly infringe any Asserted Claim of any Asserted Patent.

12.    Xactware and Verisk Analytics, Inc. ("Verisk") (collectively, the "Defendants") have not and currently do not directly or indirectly infringe any Asserted Claim of any Asserted Patent.

13.    The Defendants have not and currently do not induce infringement, knowingly or otherwise, of any Asserted Claim of any Asserted Patent.

14.    Xactware has not and currently does not infringe any Asserted Claim of the '436 patent, the '840 patent or the '376 patent under 35 U.S.C. § 271(f)(1) or (2).

15.    Xactware has not and currently does not infringe, knowingly or otherwise, any Asserted Claim of any Asserted Patent under 35 U.S.C. § 271(g).

16.    Performance of any Asserted Claim, including method claims, by third parties, such as an end user, does not constitute direct or indirect infringement by either of the Defendants.

17.    None of Aerial Sketch, Roof InSight, Property InSight, the Mass Production Tool, or Xactimate individually, nor any combination of them ("Accused Products"), infringes, directly or indirectly, any Asserted Claim of any Asserted Patent.

18.    The accused Xactimate platform was commercially available prior to the earliest priority date of any Asserted Patent. Xactimate, by itself, does not infringe any Asserted Claim of any Asserted Patent.

19.    Roof InSight, Property InSight, the Mass Production Tool, and Aerial Sketch do not individually infringe any Asserted Claim.

20.    Roof InSight, Property InSight, the Mass Production Tool, and Aerial Sketch are not alleged to infringe any Asserted Claim except in combination with Xactimate.

21.    Any alleged notification by EagleView of supposed patent infringement by Defendants that occurred prior to May 1, 2012 does not constitute notice of alleged infringement of

2

any currently Asserted Claim of any Asserted Patent, because no currently Asserted Claim existed prior to May 1, 2012.

22. By using the Accused Products, end-users do not infringe any Asserted Claim of any Asserted Patent.

23. Aerial Sketch is primarily used by third-party end users who are not under the direction or control of either of the Defendants.

24. Neither Defendant, nor any Accused Product, employs, builds, sells, or otherwise uses a distributed-memory computer system or architecture.

25. The Accused Products employ a fundamentally different approach to generating roof models and reports than what is disclosed or claimed in any of the Asserted Patents.

26. The Accused Products do not correlate aerial images as claimed in the Asserted Claims.

27. The Accused Products do not constitute, contain, or comprise computer executable instructions stored on memory for performing correlation of aerial images or generation of three dimensional models based on any such correlation, as claimed in the Asserted Claims.

28. The Roof Insight/Property Insight system, including the Mass Production Tool, is a distributed system with components that are stored in and executed at multiple locations throughout the world.

29. The Accused Products are multi-component software, and cannot infringe, directly or indirectly, any claim directed to a "roof estimation module."

30. The Accused Products lack a "roof estimation module" as recited by the Asserted Claims.

31. The Accused Products do not generate a three-dimensional model as required by the Asserted Claims of the '436 patent.

32. The Accused Products do not contain a "memory" as recited by the Asserted System Claims.

33. The Accused Products do not generate a three-dimensional model based on a correlation, as required by the Asserted Claims of the '436 patent.

34. The Accused Products do not generate three-dimensional models by mapping ground points.

35. The Accused Products do not generate three-dimensional models by aerotriangulation.

36. The Accused Products do not generate three-dimensional models by identifying corresponding features from displayed roof elements.

3

37.     The Accused Products do not receive, based on a displayed pitch determination marker, an indication of the pitch of one or more planar roof sections, as required by the Asserted Claims of the '840 patent.

38.     The Accused Products do not modify a model of the roof based on the received indication of the pitch of the one planar roof section, as required by the Asserted Claims of the '840 patent.

39.     The Accused Products do not use any "pitch determination marker," as required by the Asserted Claims of the '840 and '376 patents.

40.     The Accused Products do not transmit any roof estimate report, as required by the Asserted Claims of the '840 and '436 patents.

41.     There are no embodiments of the '840 or '376 patents, nor any asserted claims of these patents, where the claimed pitch determination marker and the claimed wire frame model are the same item, element, or limitation.

42.     The Accused Products do not perform digital wire frame model construction of the roof structure based on at least one location over the roof structure in the displayed aerial imagery to which the user moved the least one [sic] first visual marker, as required by the Asserted Claims of the '770 patent.

43.     Aerial Sketch does not display a first and second aerial image "at the same time," as required by the Asserted Claims of the '737 patent.

44.     EagleView has presented no evidence that the Accused Products provide reports "for repair and/or construction," as required by the Asserted Claims of the '376 patent.

45.     None of Xactimate, Roof Insight, Property Insight, the Mass Production Tool, or Aerial Sketch are "memory" as claimed in the Asserted Patents.

46.     Any computer-implemented method for generating a roof estimate report by Defendants, to the extent any such method is performed at all, is practiced entirely or primarily outside of the United States.

47.     Defendants' computing system for generating a roof estimate report, to the extent any such system exists at all, is neither made nor used, entirely or primarily, as claimed within the United States, nor is it offered for sale in the United States.

48.     Defendants' non-transitory computer readable storage medium which performs a method of generating a roof estimate report for a building having a roof, to the extent any such medium exists at all, is neither made nor used as claimed, entirely or primarily within the United States, nor is it offered for sale in the United States.

49.     Roof models, data packages, or files, such as Sketch files, generated by Defendants' overseas Business Process Outsourcing ("BPO") partners using the Mass Production Tool are materially changed by subsequent processes.

4

50.     A roof model, data package, or file, such as a Sketch or ".skt" file, generated using the Mass Production Tool does not contain pitch or slope information.

51.     A roof model, data package, or file, such as a Sketch or ".skt" file, generated by Defendants' overseas BPO partners using the Mass Production Tool becomes a trivial and nonessential component of another product.

52.     The Mass Production Tool does not constitute a component especially made, adapted, used, offered for sale, sold, and/or imported for use in any product covered by the claims of any of the Asserted Patents, and is a staple article or commodity of commerce suitable for substantial non-infringing use.

53.     The Accused Products are not products made, used, offered for sale, sold, and/or imported in accordance with EagleView's patented process.

54.     Xactware does not supply from the United States all or a substantial portion of the components of Defendants' rooftop aerial measurement products, including Xactimate, Property InSight/Roof InSight, or the Mass Production Tool.

55.     The Mass Production Tool does not constitute a component that is combined outside of the United States in a way that would infringe the Asserted Patents if the combination had occurred within the United States.

56.     Aerial images used with the Mass Production Tool are not combined with the Mass Production Tool outside of the United States in a way that would infringe the Asserted Patents if the combination had occurred within the United States.

57.     Neither the export from or import into the United States, nor the general possession or use, foreign or domestic, of aerial images infringes, infringes or is within the scope of, any Asserted Claim of any Asserted Patent.

58.     Xactware does not import into the United States, offer to sell, sell, and/or use within the United States roof report products made by Defendants' rooftop aerial measurement products, including Xactimate, Property InSight/Roof InSight, and the Mass Production Tool.

59.     Defendants' Property InSight and Roof InSight roof reports are not products made by patented processes of the Asserted Patents.

60.     Defendants do not induce overseas BPOs to perform, and such BPOs themselves do not perform, each step of the methods or processes of any Asserted Claim of any Asserted Patent in generating roof models or roof reports.

61.     Roof reports sold by Defendants are not products offered for sale or sold in the United States that are made by a method or process of any Asserted Claim of any Asserted Patent.

5

62.     Verisk did not, could not, and does not possess any relevant knowledge or intent required for a claim of indirect infringement, particularly because Xactware's actions do not infringe, directly or otherwise, the claims of the Asserted Patents.

63.     Xactware has not and does not encourage its customers or anyone else to use Aerial Sketch or any other Accused Product in a way that infringes any Asserted Claim of any Asserted Patent.

64.     Xactware did not, could not, and does not possess any relevant knowledge or intent required for a claim of induced infringement, nor did it or does it encourage any infringement of any Asserted Claim of any Asserted Patent by customers or anyone else.

65.     The use of Aerial Sketch in combination with the Xactimate platform does not infringe, directly or otherwise, any Asserted Claim of any Asserted Patent, whether used by customers or anyone else.

66.     Defendants' customers' use of the Accused Products, including Aerial Sketch, is not done at the instruction of, nor under the direction and control of, either Defendant, nor would any such use of the Accused Products infringe any Asserted Claim of any Asserted Patent.

67.     Xactware did not and does not intend, specifically or otherwise, for its customers or other users to infringe the Asserted Patents, including because such users do not, in fact, infringe any Asserted Claim of any Asserted Patent.

68.     Xactware did not and does not possess any relevant knowledge or intent required for a claim of indirect infringement under any theory, nor did it or does it encourage or provide instructions for any infringement of any Asserted Claim of any Asserted Patent by customers or anyone else.

69.     The provision of literature instructing users how to order a Roof InSight or Property InSight roof report or data package does not infringe, directly or otherwise, any Asserted Claim of any Asserted Patent.

70.     The act of ordering a roof report, as well as the act of providing literature regarding how to order a roof report, is not within the scope of, recited or claimed in, or otherwise encompassed by any Asserted Claim of any Asserted Patent.

71.     The act of ordering a roof report is not, by itself, claimed in any Asserted Claim of any Asserted Patent.

72.     The act of purchasing a roof report is not, by itself, claimed in any Asserted Claim of any Asserted Patent.

73.     The act of requesting a roof report is not, by itself, claimed in any Asserted Claim of any Asserted Patent.

74.     The act of receiving a roof report is not, by itself, claimed in any Asserted Claim of any Asserted Patent.

75.  Defendants do not make, sell, or offer to sell computers or computer memory.

76.  Defendants have not and do not willfully infringe, either directly or indirectly, any Asserted Claim of any Asserted Patent. Defendants have acted with a reasonable basis and have a good faith belief that Defendants would not be liable for infringement of the Asserted Patents.

77.  Verisk and EagleView Technology Corporation signed a detailed agreement (the "Verisk Agreement") dated January 14, 2014 pursuant to which Verisk would acquire EagleView Technology Corporation for approximately $650 million.

78.  In the Verisk Agreement, EagleView warranted and represented that Verisk and Xactware did not infringe any EagleView patents. The Verisk Agreement remained in effect from January 14, 2014 until December 16, 2014, when it was terminated because the Federal Trade Commission prohibited the proposed acquisition.

79.  Vista Equity Partners ("Vista") and EVTC signed a detailed agreement (the "Vista Agreement") dated June 15, 2015 pursuant to which Vista would acquire EVTC ▮▮▮▮ ▮▮▮▮

80.  In the Vista Agreement, EVTC warranted and represented that Verisk and Xactware did not infringe any EagleView patents.

81.  Defendants relied upon EagleView's representation that Verisk and Xactware did not infringe any EagleView patents.

82.  Defendants were, are, and will be prejudiced by EagleView's infringement allegations and Eagle View's efforts to proceed with this litigation.

83.  Defendants' development and creation of the Accused Products relied exclusively on Defendants' own ingenuity, knowledge, technology, research, experience, and efforts, and did not involve any reliance on, emulation of, or reference to any of the Asserted Patents.

84.  No proprietary source code or operational versions for any of EagleView's Render House, Twister, or other roof estimation software programs were shared with Xactware or Verisk during the process of integrating EagleView's roof report data packages onto the Xactimate platform.

85.  The data provided by EagleView to the Xactimate platform as part of EagleView's integration and selling of reports on the Xactimate platform does not reveal any source code or proprietary information regarding any of EagleView's Render House, Twister, or other roof estimation software programs.

86.  The required format of the data provided by EagleView to the Xactimate platform as part of EagleView's integration and selling of reports on the Xactimate platform was dictated by Xactware.

7

87.     Customers do not purchase, license, or use either Render House or Twister.

88.     Customers have no direct access to either Render House or Twister.

89.     Customers do not see the operation of and have no knowledge of the implementation details of the Render House or Twister software.

90.     Simply being in the proximity of someone using EagleView's Twister or Render House software tools would not enable another to reverse engineer such software.

91.     EagleView's own employees confirm that if an individual observed the operation of Render House or Twister by looking over the shoulder of an individual running either of these software programs, he or she would not be able to reverse engineer such programs.

92.     EagleView's own employees believe that simply walking by a computer screen on which the Twister or Render House software program is operating would not enable them to understand the software.

93.     EagleView's own employees believe that even if an individual was provided with a computer running the Twister software application, that individual would not know how to use this application to analyze images.

94.     Only in or about 2017 did EagleView even begin research and development into the use of roof primitives for the purpose of generating roof models or reports.

95.     Never during any visits to any EagleView offices did any employee from any Defendant see a prototype of EagleView's technology or learn how EagleView created roof reports.

96.     None of the Asserted Claims have been or are being infringed, directly or indirectly, by Defendants—and Defendants are not liable for infringement, whether direct or indirect, of any of the Asserted Claims—at least in view of the reasons set forth in the reports of Defendants' experts that were presented during this case and in view of the deposition testimony of those experts from this case.

**Defendants intend to prove the following contested facts with regard to invalidity:**

97.     All of the Asserted Claims are invalid.

98.     All of the Asserted Claims are unpatentable and invalid under 35 U.S.C. § 101.

99.     All of the Asserted Claims are directed to patent-ineligible concepts.

100.    For each Asserted Claim, when the elements of the claim are considered individually and as an ordered combination, there is no transformation of the nature of the claim into patent-eligible subject matter.

101.    Prior to the issuance of any Asserted Patent and prior to the earliest priority date of any Asserted Patent, Xactware developed and offered commercially the ability to create

8

models of roofs, called Sketches, including the ability to underlay aerial images of the buildings having roofs that were the subject of such roof models.

102. Chris Pershing did not invent the math for performing the image analysis covered by the Asserted Claims of the '436 patent solely from the image data files.

103. Written computer code in the form of photogrammetric algorithms existed as generally known in the art prior to any conception of any supposed invention of Chris Pershing captured in the '436 patent.

104. Part of the supposed invention of the '436 patent is the use of existing, well-known mathematical principles from textbooks and journal articles.

105. As part of the supposed invention of the '436 patent, Chris Pershing did not invent any new programming language and, instead, used existing programing languages.

106. All entries in Chris Pershing's inventor notebooks after December 4, 2006 are entirely unverified and unauthenticated and do not sufficiently or properly evidence any conception or reduction to practice of any aspect of any supposed invention of any Asserted Claim of any Asserted Patent.

107. Chris Pershing did not fully conceive of the supposed inventions of the '436, '840, or '376 Patents by December 2, 2006, and did not reduce them to practice by January 2008.

108. David Carlson did not fully conceive of the supposed inventions of the '436 Patent by December 2, 2006, and did not reduce them to practice by January 2008.

109. Chris Pershing did not fully conceive of the supposed inventions of the '454, '770, and '737 patents by March 12, 2007, and did not reduce them to practice by January 2008.

110. Chris Pershing and EagleView did not finish developing any Render House software that embodied any supposed invention of any Asserted Patent by January 5, 2008.

111. No version of the Render House software embodies any supposed invention of any Asserted Claim of any Asserted Patent.

112. Chris Pershing and EagleView did not finish developing any Twister software that embodied any supposed invention of any Asserted Patent by October 15, 2008.

113. No version of the Twister software embodies any supposed invention of any Asserted Claim of any Asserted Patent.

114. The purported invention of each Asserted Claim is not an improvement to technology or computer functionality.

115. None of the Asserted Claims require the use of a specialized computer, computer system, memory, or machine.

9

116. Each of the Asserted Claims concern the application of a generic computer to implement an abstract idea.

117. The Asserted Claims of the '436 patent are not directed to an improved computer system for generating a roof estimate report with specific content based on correlating non-stereoscopic aerial images by receiving an indication of pairs of corresponding features.

118. The '436 patent disclosure does not improve prior art computer systems.

119. The Asserted Claims of the '436 patent are not supported by the disclosures of the '436 patent's parent applications, Application No. 12/148,439, filed on April 17, 2008, or Provisional Application No. 60/925,072, filed on April 17, 2007, and are not entitled to their earlier priority dates.

120. The Asserted Claims of the '840 patent are not directed to an improved computer system for generating a roof estimate report through user manipulation of an interactive graphical interface tool that is overlaid on aerial roof images or shown in the same graphical user interface as the images.

121. The '840 patent disclosure does not improve prior art computer systems.

122. The pitch determination marker is not illustrated at all in Fig. 6B of the '840 patent, which instead depicts a drawing tool that can be directly manipulated by the operator in order to specify roof features, such as edges, ridges, valleys, corners, etc.

123. Fig. 6B of the '840 patent includes a wire frame model.

124. Column 14, lines 9-13 of the '840 patent does not discuss the use of a drawing tool to determine pitch and do not recite a pitch determination marker.

125. The Asserted Claims of the '376 patent are not directed to an improved computer system for generating a roof estimate report through user manipulation of an interactive graphical interface tool that is overlaid on aerial roof images or shown in the same graphical user interface as the images.

126. The '376 patent disclosure does not improve prior art computer systems.

127. Neither the envelope tool nor any other embodiment of the pitch determination marker is illustrated at all in Fig. 6B of the '376 patent.

128. Fig. 6B of the '376 patent includes a wire frame model.

129. The Asserted Claims of the '454 patent are not directed to an improved computer system for generating a roof estimate report with specific content by employing improved user feedback when the user manipulates an interactive graphical interface tool overlaid on aerial roof images.

130. The '454 patent disclosure does not improve prior art computer systems.

10

131.   The Asserted Claims of the '770 patent are not directed to an improved computer system for generating a roof estimate report with specific content by employing improved user feedback while the user manipulates an interactive graphical interface tool in the same display window as aerial roof images.

132.   The '770 patent disclosure does not improve prior art computer systems.

133.   The Asserted Claims of the '737 patent are not directed to an improved computer system for generating a roof estimate report with specific content by employing improved user feedback while the user manipulates an interactive graphical interface tool overlaid on aerial roof images.

134.   The '737 patent disclosure does not improve prior art computer systems.

135.   The Asserted Claims contain subject matter that would be well understood, routine and conventional to a person of skill in the art prior to the filing of the applications that led to the Asserted Claims.

136.   All of the Asserted Claims are invalid under 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

137.   The Twister and Render House products do not embody or practice any of the Asserted Claims.

138.   There are no secondary considerations that weigh against a finding of invalidity with regard to any of the Asserted Claims.

139.   There is no nexus between the secondary considerations identified by EagleView and any of the Asserted Claims.

140.   Defendants have not copied Plaintiff's patented technology.

141.   No employee, past or present, of either Xactware or Verisk has ever copied, stolen, inspected, or even viewed EagleView's source code for any of its Render House, Twister, or other roof estimation software programs.

142.   EagleView has no evidence that anyone from Xactware or Verisk has ever stolen, copied, or otherwise obtained any EagleView source code source code for any of its Render House, Twister, or other roof estimation software programs.

143.   No employee, past or present, of Xactware or Verisk has ever operated or otherwise used any of EagleView's Render House, Twister, or other roof estimation software programs.

144.   Supposed praise and skepticism of EagleView's products and technology does not weigh against a finding of invalidity with regard to any of the Asserted Claims.

145.   Plaintiff's supposed solution to a long felt industry need does not weigh against a finding of invalidity with regard to any of the Asserted Claims.

ME1 30009062v.2

146. None of the Asserted Claims are entitled to claim priority to any parent application.

147. The following references are prior art to the Asserted Claims and the Asserted Patents:

    o    "Hsieh," which refers to a publication by Hsieh, entitled "Design and Evaluation of a Semi-Automated Site Modeling System," Carnegie Mellon, November 1995

    o    "McKeown," which refers to a publication entitled "Chapter 9, Feature Extraction and Object Recognition, Automatic Cartographic Feature Extraction Using Photogrammetric Principles," by D. McKeown, Jr., et al. in Digital Photogrammetry: An Addendum to the Manual of Photogrammetry; Published by American Society for Photogrammetry and Remote Sensing (1996)

    o    "Sungevity," which refers to U.S. Patent No. 8,417,061 entitled "Methods and Systems for Provisioning Energy Systems," which issued on April 9, 2013

    o    "Avrahami," which refers to a publication by Avrahami et al., entitled "Extraction of 3D Spatial Polygons Based on the Overlapping Criterion for Roof Extraction from Aerial Images," International Archives of Photogrammetry, Remote Sensing and Spatial Information Sciences, August 29-30, 2005

    o    "Applicad," which refers to a publication by Applicad, entitled "Product Bulletin – November 2002: Key features of our Roofing Software," November 2002

    o    "Labe," which refers to a publication entitled "Robust Techniques for Estimating Parameters of 3D Building Primitives" by Thomas Läbe and Eberhard Gülch, International Society for Photogrammetry and Remote Sensing, Volume XXXII, Part 2, Commission II, Proceedings of the Commission II Symposium, Data Integration: Systems and Techniques, July 13-17, 1998 (1998)

    o    "Aerowest," which refers to European Patent No. 1 010 966 to Aerowest GmbH, entitled "Verfahren zur Erzeungungeiner drei-dimensionalen Objektbeschreibunf" [Method for generating a three-dimensional object description], issued Oct. 23, 2002 and

    o    "Verma," which refers to U.S. Patent Application Publication No. 2006/0061566 to Verma, entitled "Method and Apparatus for Performing Three-Dimensional Computer Modeling," published Mar. 23, 2006.

148. Sungevity is prior art to the '436 patent, the '840 patent, and the '376 patent.

149. The Sungevity patent claims priority to Provisional Application No. 61/047,086 ("'086 provisional"), filed on April 22, 2008, and Provisional Application No. 61/025,431 ("'431 provisional"), filed on February 1, 2008, such claims and corresponding disclosures are fully supported by the disclosures in those provisional applications, and the claims are entitled to the earlier priority dates of those provisional applications.

150. Sungevity's priority date precedes the earliest priority date for both the '840 patent and the '376 patent.

151. The Patent Office's conclusion that Sungevity is prior art to the '436 patent is correct.

152. The Asserted Claims of the '436 patent are obvious in view of:

- o Hsieh
- o Hsieh in combination with Applicad;
- o Hsieh in combination with Aerowest;
- o McKeown;
- o McKeown in combination with Applicad;
- o McKeown in combination with Aerowest;
- o Avrahami;
- o Avrahami in combination with Applicad;
- o Avrahami in combination with Aerowest;
- o Sungevity;
- o Sungevity in combination with Applicad;
- o Sungevity in combination with Aerowest;
- o Labe;
- o Labe in combination with Applicad; and
- o Labe in combination with Aerowest.

153. The Asserted Claims of the '840 patent are anticipated by Sungevity.

154. The Asserted Claims of the '840 patent are anticipated by Verma.

155. The Asserted Claims of the '840 patent are obvious in view of:

- o Sungevity;
- o Verma;
- o Hsieh;
- o Hsieh in combination with Verma;
- o Labe;
- o Labe in combination with Verma;
- o Aerowest;
- o Hsieh in combination with Verma and Applicad;
- o Hsieh in combination with Verma and Aerowest;
- o Labe in combination with Verma and Applicad;
- o Labe in combination with Verma and Aerowest;
- o Verma in combination with Aerowest; and
- o Verma in combination with Applicad.

156. Claim 18 of the '840 patent is obvious over Sungevity in view of Applicad.

157. Claim 18 of the '840 patent is obvious over Sungevity in view of Aerowest.

158. Claim 17 of the '376 patent is anticipated by Sungevity.

159.   Claim 17 of the '376 patent is obvious in view of:

- o    Sungevity  in combination with Applicad;
- o    Sungevity  in combination with Aerowest;
- o    Verma  in combination with Applicad;
- o    Verma  in combination with Aerowest;
- o    Hsieh  in combination Verma and Applicad;
- o    Hsieh  in combination Verma and Aerowest;
- o    Labe  in combination Verma and Applicad; and
- o    Labe  in combination Verma and Aerowest.

160.   Claim 20 of the '376 patent is anticipated by Sungevity.

161.   Claim 20 of the '376 patent is obvious in view of:

- o    Sungevity in combination with Applicad;
- o    Sungevity in combination with Aerowest;
- o    Sungevity in combination with Applicad and Aerowest
- o    Verma  in combination with Aerowest;
- o    Hsieh in combination with Verma and Applicad;
- o    Hsieh in combination with Verma and Aerowest;
- o    Labe in combination with Verma and Applicad; and
- o    Labe in combination with Verma and Aerowest.

162.   Claim 23 of the '376 patent is obvious in view of:

- o    Sungevity in combination with Verma;
- o    Sungevity in combination with Verma  and Applicad;
- o    Sungevity in combination with Verma  and Aerowest;
- o    Sungevity in combination with Applicad;
- o    Sungevity in combination with Aerowest;
- o    Sungevity in combination with Applicad and Aerowest
- o    Verma in combination with Aerowest;
- o    Hsieh in combination with Verma and Applicad;
- o    Hsieh in combination with Verma and Aerowest;
- o    Labe in combination with Verma and Applicad; and
- o    Labe in combination with Verma and Aerowest.

163.   The Asserted Claims of the '454 patent are obvious in view of:

- o    Labe;
- o    Labe in combination with Applicad;
- o    Labe in combination with Aerowest;
- o    Avrahami;
- o    Avrahami in combination with Applicad;
- o    Avrahami in combination with Aerowest;
- o    McKeown;

14

- o McKeown in combination with Applicad;
- o McKeown in combination with Aerowest;
- o Hsieh;
- o Hsieh in combination with Applicad; and.
- o Hsieh in combination with Aerowest.

164. The Asserted Claims of the '770 patent are obvious in view of:

- o Hsieh;
- o Hsieh in combination with Applicad;
- o Avrahami;
- o Avrahami in combination with Applicad; and
- o McKeown;
- o McKeown in combination with Applicad.

165. The Asserted Claims of the '737 patent are obvious in view of:

- o Labe;
- o Labe in combination with Applicad;
- o Labe in combination with Aerowest;
- o Avrahami;
- o Avrahami in combination with Applicad;
- o Avrahami in combination with Aerowest;
- o McKeown;
- o McKeown in combination with Applicad;
- o McKeown in combination with Aerowest;
- o Hsieh;
- o Hsieh in combination with Applicad; and
- o Hsieh in combination with Aerowest.

166. At the priority date of each Asserted Patent, there was sufficient motivation for a person of ordinary skill in the art to combine the teachings and disclosures of the references that render each Asserted Claim obvious.

167. Hsieh is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

168. Hsieh is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

169. Hsieh was publicly accessible at least as early as November 1995.

170.   McKeown is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

171.   McKeown is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

172.   McKeown references and builds upon Hsieh, and was published in 1996.

173.   Sungevity is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

174.   Sungevity is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

175.   Avrahami is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

176.   Avrahami is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

177.   Avrahami was published in August 2005.

178.   Applicad is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

179.   Applicad is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

180.  Applicad was published in November 2002.

181.  Labe is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

182.  Labe is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

183.  Labe was published in July 1998.

184.  Aerowest is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

185.  Aerowest is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

186.  Verma is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, prior to the earliest possible application filing date for – and prior to the date of invention of the purported inventions of the claims of – each of the Asserted Patents.

187.  Verma is reflective of the knowledge and use by those other than the named inventors; public use; availability to the public; and/or sale of the purported inventions of the claims of the Asserted Patents, in this country and elsewhere, more than one year prior to the earliest possible application filing date of each of the Asserted Patents.

188.  David P. Carlson was a named inventor on Provisional Application No. 61/197,904, filed on October 31, 2008, to which all the Asserted Patents except the '436 patent claim priority. However, David P. Carlson is not listed as an inventor on any of the Asserted Patents except the '436 patent.

189.  David P. Carlson was involved in the development of EagleView's aerial roof measurement technology and system.

190.  David P. Carlson made inventive contributions encompassed in at least one Asserted Claim of each Asserted Patent.

17

191.   David P. Carlson was aware of a foreign company using aerial images to measure roofs prior to the earlier priority date of any Asserted Patent and prior to the earliest alleged conception of any Asserted Claim of any Asserted Patent.

192.   Neither David P. Carlson, Chris Pershing, nor anyone acting on their behalf disclosed to the U.S. Patent and Trademark Office Mr. Carlson's knowledge of a foreign company using aerial images to measure roofs prior to the earlier priority date of any Asserted Patent and prior to the earliest alleged conception of any Asserted Claim of any Asserted Patent.

193.   All of the Asserted Claims are invalid at least in view of the reasons set forth in the reports of Dr. Joseph Mundy that were presented during this case and in view of Dr. Mundy's deposition testimony from this case.

194.   All of the Asserted Claims are invalid at least in view of the reasons set forth in the reports of Defendants' experts that were presented during this case and in view of the deposition testimony of those experts from this case.

195.   A person of ordinary skill in the art with respect to the Asserted Patents is someone with a bachelor's degree in photogrammetry, computer vision, surveying, or civil engineering or an equivalent educational background, or having several years' worth of pertinent experience equivalent thereto, such as experience that is recognized by the American Society of Photogrammetry and Remote Sensing.

196.   Sungevity claims priority to U.S. Provisional Application No. 61/047,086 (the "'086 provisional"), which was filed on April 22, 2008, and U.S. Provisional Application No. 61/025,431 (the "'431 provisional"), which was filed on February 1, 2008.

197.   The '436 Patent is a continuation-in-part of U.S. Non-Provisional Application No. 12/148,439 (the "'439 non-provisional"), which was filed on April 17, 2008. The U.S. Patent and Trademark Office concluded, during prosecution of Sungevity, that the '436 Patent is not entitled to claim the priority of its U.S. provisional application filed April 17, 2007.

198.   During the prosecution of the application that issued as Sungevity, the pending claims were rejected by the patent examiner over the '436 Patent in an Office Action dated March 2, 2012.

199.   In a September 4, 2012 amendment that was made "[i]n response to the official [office] action dated March 2, 2012," the applicant for the application that issued as Sungevity ("the Sungevity Applicant") cancelled the pending claims and presented new claims for examination. Two of those new claims were "copied in substantial portion from [the '436 Patent]."

200.   In connection with its September 4, 2012 amendment, the Sungevity Applicant argued to the Patent Office that the '436 Patent's issued claims were not supported by the U.S. provisional application to which they claim priority.

201. In connection with its September 4, 2012 amendment, the Sungevity Applicant argued to the Patent Office that the '436 Patent's issued claims were not entitled to a priority date earlier than April 17, 2008.

202. Sungevity claims priority to U.S. Provisional Patent Application 61/025,431 (the "'431 provisional"), which was filed on February 1, 2008. I

203. In connection with its September 4, 2012 amendment, the Sungevity Applicant argued to the Patent Office that its amended claims were entitled to claim priority to the '431 provisional, that the '431 provisional "fully supports" the amended claims, and that the amended claims therefore were entitled to a filing date of February 1, 2008.

204. On October 18, 2012, the Sungevity Applicant modified the format of its claims for examination in response to a September 18, 2012 notice from the patent examiner. The Sungevity Applicant did not modify the arguments for allowance that it presented to the patent examiner on September 4, 2012.

205. In a December 12, 2012 notice, the patent examiner acknowledged the "amendment/persuasive arguments filed on 10/18/12" by the applicant for the application that issued as Sungevity and deemed the pending claims to be allowable.

206. The issue date of and the filing dates for the applications that led to Sungevity – and to which the patent claims priority – are listed on the face of Sungevity.

207. For each Asserted Patent, its issue date and the filing dates for the applications that led to the patent are listed on the face of the patent.

208. In her declaration executed on August 24, 2016, Lynn Berard states that she is "a Principal Librarian at Carnegie Mellon University Libraries" and that she has been "a professional librarian for approximately 31 years" and "employed as a professional librarian at Carnegie Mellon University since August 14, 1985." XW00389607.

209. In her declaration executed on August 24, 2016, Lynn Berard states that the Engineering & Science Library at Carnegie Mellon University Libraries "is open to the general public throughout the year, with hours changing depending on the time of year." XW00389607. In that declaration, she explained:

> During the Fall and Spring Semesters, the Engineering & Science Library is generally open from 8:00 a.m.-11:00 p.m. Monday through Thursday, 8:00 a.m.-9:00 p.m. on Friday, 10:00 a.m.-9:00 p.m. on Saturday, and 12:00 p.m.-11:00 p.m. Sunday. During the summer, the Engineering & Science Library is generally open from 8:00 a.m.-11:00 p.m. Monday through Thursday, 8:00 a.m.-6:00 p.m. on Friday, 12:00 p.m.-5:00 p.m. on Saturday, and 12:00 pm.-5:00 p.m. on Sunday. The Engineering & Science Library is closed on some weekends throughout the year.

XW00389607.

210. In her declaration executed on August 24, 2016, Lynn Berard explains:

> I am familiar with the [Carnegie Melon University] Libraries' cataloguing practices and procedures and the Sorrells Engineering & Science Library practices and procedures, including the Libraries' catalogue and policies and procedures regarding the receipt, indexing and availability of technical reports from the Carnegie Mellon University School of Computer Science ("Technical Reports"). These practices and procedures have remained consistent throughout my tenure at the Libraries, and I am aware that they have remained consistent since at least 1990. . . .
>
> The universal practice for Technical Reports found at the Engineering & Science Library is to catalog the Technical Reports at Hunt Library, which is also a library within the Libraries system. According to the Libraries' policies and procedures, Technical Reports are indexed in the Libraries' catalogue and are made freely available to the faculty and student body of Carnegie Mellon University as well as to the general public. The Libraries' catalogue is searchable by subject, author, and keyword. These policies and procedures have been in effect and present in the catalogue searchable by subject, author, and keyword since the late 1980's. . . .
>
> The Libraries' procedures for processing Technical Reports found at the Sorrells Engineering & Science Library are as follows: All print Technical Reports are catalogued at Hunt Library and entered into an electronic library catalog. A bound copy of the Technical Report is shelved in the appropriate library. The general timeline for cataloguing a Technical Report for access to the public is approximately six months after the Technical Report is received by the Hunt Library. During the cataloguing process, a physical barcode and a date stamp are affixed to the bound copy of the Technical Report. Once cataloguing is completed, the Technical Report is sent to the Sorrells Engineering & Science Library for shelving. The shelving process typically takes one week following completion of cataloguing. After shelving, the Technical Report is publicly available.

XW00389607-XW00389608.

211. In her declaration executed on August 24, 2016, Lynn Berard explains that based on its stamped cataloguing date of 05/30/1996, Hsieh, which is labeled with CMU-CS-95-195 "would have been accessible to the public at the Engineering & Science Library by **June 6, 1996**." XW00389608-XW00389609.

**Defendants intend to prove the following contested facts with regard to damages:**

212.   In November 2008, Xactware and EagleView entered into an agreement allowing EagleView to sell its roof reports through the Xactimate platform for a certain fee per report.

213.   Verisk and EagleView Technology Corporation signed a detailed agreement (the "Verisk Agreement") dated January 14, 2014 pursuant to which Verisk would acquire EagleView Technology Corporation for approximately $650 million. In the Verisk Agreement, EagleView warranted and represented that Verisk and Xactware did not infringe any EagleView patents. The Verisk Agreement remained in effect from January 14, 2014 until December 16, 2014, when it was terminated because the Federal Trade Commission prohibited the proposed acquisition.

214.   Vista Equity Partners ("Vista") and EVTC signed a detailed agreement (the "Vista Agreement") dated June 15, 2015 pursuant to which Vista would acquire EVTC for ▮▮▮▮▮ ▮▮▮▮▮ In the Vista Agreement, EVTC warranted and represented that Verisk and Xactware did not infringe any EagleView patents.

215.   EagleView has not presented evidence supporting it entitlement to damages in the form of lost profits.

216.   EagleView improperly concluded that the market for roof reports contains only two suppliers, EagleView and Xactware.

217.   EagleView improperly disregarded companies offering competing products during the relevant period that constituted non-infringing alternatives to the Accused Products.

218.   Prior to EagleView acquiring the company, GeoEstimator was a competitor of EagleView offering similar aerial-image-based roof measurement and report services and products.

219.   Prior to EagleView acquiring the company, Pictometry was a competitor of EagleView offering similar aerial-image-based roof measurement and report services and products.

220.   The contractor market for roof reports is distinct from the insurance market for roof reports.

221.   There are significant differences between the insurance market for roof reports and the contractor marker for roof reports.

222.   EagleView failed to properly analyze the contractor market for roof reports and distinguish it from the insurance market for roof reports.

223.   EagleView has not lost customers as a result of any alleged infringement by Defendants.

224.   EagleView has not lost contractor customers as a result of any alleged infringement by Defendants.

21

225.   There is no evidence of demand for the inventions recited in the Asserted Claims.

226.   EagleView's marketing materials do not evidence demand for the inventions recited in the Asserted Claims.

227.   Neither Render House nor Twister practice the inventions recited in the Asserted Claims.

228.   Neither Render House nor Twister generate roof estimate reports.

229.   EagleView roof report customers rely on Xactware's cost estimation products.

230.   Verisk's attempt to purchase EagleView does not evidence any demand for EagleView's software or roof reports.

231.   The Accused Products contain features not recited in any of the Asserted Claims.

232.   The Accused Products contain features not offered by Eagle View's roof reports; there is no evidence that any consumer would have chosen EagleView's roof reports lacking these features but for the alleged infringement by Defendants.

233.   Access to the Xactimate platform increases demand for EagleView's roof reports.

234.   In November 2008, Xactware and EagleView entered into an agreement allowing EagleView to sell its roof reports through the Xactimate platform for a certain fee per report.

235.   Xactware has developed a library of aerial imagery used to create roof reports that is at least as accurate as EagleView's collection of aerial imagery used to create its roof reports.

236.   The relevant damages period, if any, began on the date the '840 patent issued, which is May 1, 2012.

237.   Xactware's Accused Products contain features that are not covered by any of the claims of the Asserted Patents.

238.   EagleView's roof reports contain features that are not covered by any of the claims of the Asserted Patents.

239.   EagleView has provided roof reports integrated with the Xactimate platform since at least as early as 2009.

240.   A portion of EagleView's insurance business relies on existing integration agreements with Xactware.

241.   EagleView negotiates contracts for roof report products with various insurance providers, and also provides those providers with access to roof reports via the Xactimate platform.

242. Contractors benefit from access to updated material pricing data and labor rates from the Xactimate platform.

243. Consumers' decisions in purchasing roof reports are influenced by price.

244. Dr. Arnold did not conduct empirical studies or surveys of customers to support any of his opinions.

245. Dr. Arnold's damages opinion relies, at least in part, on patent claims that are no longer asserted in this case.

246. EagleView states on its website that multiple patents not asserted against Defendants in this action cover EagleView's roof reports.

247. From 2012 to the present, EagleView has not experienced erosion in the price of its roof reports that is attributable to Defendants.

248. There is no evidence that "but for" the alleged infringement, Eagle View would have been able to charge higher prices for its roof reports.

249. To the extent EagleView lowered its prices for roof reports, it was not due to any act or omission of Defendants.

250. The price of EagleView's roof reports declined for the three years before the alleged infringement began.

251. Defendants were not the "only significant source of downward pricing pressure" on EagleView's roof reports.

252. The Accused Products and EagleView's products are not perfect substitutes for one another.

253. EagleView's contractual relationships with its customers and the bargaining power of its customers impact the prices it charges for its roof reports.

254. Price elasticity impacts the prices EagleView can charge for its roof reports.

255. The market for roof reports is not inelastic.

256. Non-infringing alternatives impacted the prices EagleView can charge for its roof reports.

257. A royalty equal to the entirety of Xactware's incremental profit from sales of roof reports would not be reasonable.

258. Xactware would not have agreed to pay all of its profits from sales of roof reports to Eagle View as a royalty.

23

259.    EagleView's assumed price of▮▮ for purposes of a reasonable royalty does not reflect Xactware's accused sales.

260.    EagleView's assumed cost of▮▮ for purposes of a reasonable royalty does not reflect all relevant incremental costs.

261.    Access to the Xactimate platform drives sales of EagleView's roof reports.

262.    A hypothetical negotiation between EagleView and Defendants at the appropriate time would have resulted in a maximum royalty rate of less than ▮▮ per report for all of the Asserted Patents.

263.    There is no evidence that any alleged decrease in the price of EagleView's roof reports is the result of Defendants' alleged infringement.

264.    There is no evidence that any alleged loss of Eagle View customers and market share is the result of Defendants' alleged infringement.

265.    There is no evidence of irreparable harm to Eagle View from any alleged infringement by Defendants.

266.    An injunction against Defendants would have a negative impact on the public interest.

267.    Any purported harm to EagleView would be compensated by a reasonable royalty on further sales, so that EagleView is unable to show irreparable harm in the absence of an injunction.

268.    Xactware would be irreparably harmed by an injunction which would destroy its roof estimation business; thus the balance of harms weighs against an injunction.

269.    The Federal Trade Commission has stated, "Since receiving its first patent in 2011, EagleView has aggressively asserted its patent rights against most actual or potential competitors, suing two competitors and sending cease-and-desist letter to at least [redacted] others. Within the past three years, EagleView has eliminated almost all of these competitors, either by threatening and/or bringing intellectual property challenges or by acquisition.

270.    The Federal Trade Commission has stated, "Though EagleView has yet to establish that any of its competitors infringe on its patents, any competitor or new entrant must be prepared to defend its products from EagleView's patent infringement claims, have access to a national library of high-resolution images and data, and be able to access insurance carriers through Claims Estimation Software.

271.    The Federal Trade Commission has found that eliminating competition between EagleView and Xactware would harm the public, and prevented the acquisition of EagleView by Verisk because it would substantially lessen competition in violation of the Clayton Act and would constitute an unfair method of competition in violation of the FTC Act.

24

272. Granting the injunction sought by EagleView would result in the very outcome the Federal Trade Commission found harmful and in violation of multiple federal statutes, and thus would have a substantially negative impact on the public interest.

273. An injunction is against the public interest because it would delay and hinder insurers, contractors, and other customers from obtaining information from Defendants needed to rapidly respond to insureds' claims and would hinder the ability to rebuild insureds' properties after fire, natural disaster, or other loss.

274. Aerial Sketch is an acceptable, non-infringing alternative to the Asserted Claims of the '436 patent.

275. Neither Render House nor Twister practices or embodies any Asserted Claim of any Asserted Patent.

276. EagleView's roof reports do not practice or embody any Asserted Claim of any Asserted Patent.

277. Rooftop aerial measurement products are not coextensive with the alleged inventions claimed in Asserted Claims.

278. "Roof reports" are not coextensive with the alleged inventions claimed in the Asserted Claims.

279. Any success of EagleView's business is due to EagleView's business model or other factors unrelated to the Asserted Patents.

280. The value of Pictometry's aerial imagery library, acquisition techniques, image processing techniques, and other technology exceeds the value of EagleView's roof measurement software or techniques.

281. Most of the value of EagleView as a company lies in its current ownership of Pictometry and Pictometry's aerial imagery library, rather than in any of EagleView's roof measurement software or techniques.

282. Any success of products allegedly embodying any of the Asserted Claims is due to technical and market factors other than the claimed technology, including: the weather, macroeconomic conditions and construction industry growth, the Pictometry imagery library, access to the Xactimate Platform, access to compatible cost estimation databases, other licensed-in technologies, distribution networks and speed of delivery, business-process outsourcing activities, production volume capacity, report layout, and EagleView's policy of threatening and/or filing patent infringement suits against potential competitors.

283. Any commercial success of EagleView's reports is attributable to unpatented features.

284. Any commercial success of EagleView's reports is attributable to features of the EagleView reports covered by patents not asserted against Defendants.

25

285. Prior art methods exist for generating roof reports.

286. Prior art methods for generating roof reports produce similar results to products allegedly embodying the Asserted Claims.

287. Third parties have not licensed the Asserted Patents, except under threat of lawsuit.

288. EagleView enjoyed significant revenue from its rooftop aerial measurement products prior to the filing of several of the Asserted Patents.

289. Verisk's attempt to purchase EagleView does not evidence any commercial success of EagleView's Asserted Patents, software or roof reports.

290. Defendants did not publicly laud or praise any supposed invention of any Asserted Claim of any Asserted Patent.

291. Defendants' public statements and documents, to the extent they mention EagleView, do not refer specifically to any of the Asserted Patents.

292. There is no nexus between any evidence of commercial success of Twister and Render House and the any Asserted Claim of any Asserted Patent.

293. Each Asserted Claim of each Asserted Patent is not coextensive in scope with Twister and Render House. As such, there is no presumption of nexus between any evidence of commercial success of Twister and Render House and an Asserted Claim of any Asserted Patent.

ME1 30009062v.2