Liza M. Walsh
Hector D. Ruiz
Eleonore Ofosu-Antwi
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, New Jersey 07102
(973) 757-1100

*Attorneys for Plaintiff*
*Eagle View Technologies, Inc.*
*[Additional counsel on signature page]*

Scott S. Christie
Matthew A. Sklar
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 848-5388

*Attorneys for Defendants Xactware*
*Solutions, Inc. and Verisk Analytics,*
*Inc.*
*[Additional counsel on signature page]*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| EAGLE VIEW TECHNOLOGIES, INC., *et al*., | Civil Action No.: 1:15-cv-07025 (RMB-JS) |
| Plaintiffs, | **JOINT [PROPOSED] JURY INSTRUCTIONS** |
| v. | **Trial Date: September 9, 2019** |
| XACTWARE SOLUTIONS, INC., *et al*., | |
| Defendants. | |

## TABLE OF CONTENTS

## CONTENTS

1.   P–1 DUTY OF JURY ................................................................ 5

2.   P–2 WHAT A PATENT IS AND HOW ONE IS OBTAINED ........ 6

3.   P–3 SUMMARY OF CONTENTIONS ................................................. 9

4.   P–5 DIRECT AND CIRCUMSTANTIAL EVIDENCE ................. 18

5.   P–6 USE OF DEPOSITION .............................................. 19

6.   P–7 OPINION TESTIMONY ................................................ 20

7.   P–8 CREDIBILITY OF WITNESSES ........................................... 21

8.   P–9 BURDENS OF PROOF" ............................................... 23

9.   P–10 TAKING NOTES ................................................... 27

10.  P–11 BENCH CONFERENCE AND RECESSES ........................... 29

11.  P–12 CONDUCT OF THE JURY ........................................... 30

1.   F–1 DUTY OF JURY ................................................... 33

2.   F–2 BURDENS OF PROOF " .......................................... 34

3.   F–3 STIPULATION OF FACT ............................................ 38

4.   F-4 CREDIBILITY OF WITNESSES ..................................... 39

5.   F-5 OPINION TESTIMONY ............................................. 40

6.   F–6 SUMMARY OF CONTENTIONS .................................... 41

7.   F–7 THE ROLE OF THE CLAIMS OF A PATENT .................... 44

8.   F–8 HOW A CLAIM DEFINES WHAT IT COVERS ................. 46

9.   F–9 INDEPENDENT AND DEPENDENT CLAIMS .................. 48

10.  F–10 CLAIM INTERPRETATION ' .................................... 50

i

11.  **F–11 INFRINGEMENT GENERALLY, ,** ..................................... 52

12.  **F–12 DIRECT INFRINGEMENT** .................................. 54

13.  **F–13 INDIRECT INFRINGEMENT—INDUCED INFRINGEMENT** .......................................................... 56

14.  **F–14 INFRINGEMENT WHERE ONE OR MORE SYSTEM COMPONENTS ARE LOCATED OUTSIDE THE UNITED STATES** ........................................................................... 59

15.  **F–15 INFRINGEMENT THROUGH THE SUPPLY OF COMPONENTS IN OR FROM THE UNITED STATES FOR COMBINATION ABROAD UNDER 35 U.S.C. § 271(f)(1)** ......... 60

16.  **F–16 INFRINGEMENT THROUGH THE SUPPLY OF ONE COMPONENT IN OR FROM UNITED STATES FOR COMBINATION ABROAD UNDER 35 U.S.C. § 271(f)(2)** ......... 62

17.  **F–17 INFRINGEMENT BY IMPORT, SALE, OFFER FOR SALE OR USE OF PRODUCT MADE BY PATENTED PROCESS (§ 271(G))** ........................................................... 63

18.  **F–18 INVALIDITY GENERALLY** ................................. 64

19.  **F–19 ANTICIPATION** ................................................... 65

20.  **F–20 OBVIOUSNESS** ................................................... 68

21.  **F–21 PRIOR ART** ........................................................... 73

22.  **F–22 PRIOR ART - INVENTION DATE** ........................ 74

23.  **F–23 PRIOR ART - PRIOR PATENT·** .......................... 76

24.  **F–24 PRIOR ART - PRINTED PUBLICATION** .......... 84

25.  **F–25 INCORRECT INVENTORSHIP** ........................... 87

26.  **F–26 UNPATENTABLE SUBJECT MATTER** .............. 89

27.  **F–27 DAMAGES GENERALLY** ................................... 93

28.  **F–28 DATE DAMAGES BEGIN** ................................... 96

29.   **F–29 KINDS OF DAMAGES THAT MAY BE RECOVERED 101**

30.   **F–30 LOST PROFITS** ........................................................ **102**

31.   **F–31 REASONABLE ROYALTY** ................................... **110**

32.   **F–32 WILLFUL INFRINGEMENT** .............................. **117**

33.   **F–33 EQUITABLE ESTOPPEL** ..................................... **119**

34.   **F–34 UNCLEAN HANDS** ................................................ **122**

35.   **F–35 DELIBERATIONS** ................................................... **123**

36.   **F–36 DEADLOCK** .............................................................. **127**

37.   **F–37 COMMUNICATION WITH COURT**[45] ............ **130**

38.   **F–38 RETURN OF VERDICT** ........................................ **131**

**<u>PRELIMINARY JURY INSTRUCTIONS</u>**

## 1.  P–1 DUTY OF JURY[1]

Now that you have been sworn, I have the following preliminary instructions for your guidance as jurors in this case.

You will hear the evidence, decide what the facts are, and then apply those facts to the law that I will give to you.

You and only you will be the judges of the facts.  You will have to decide what happened.  I play no part in judging the facts.  You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.  My role is to be the judge of the law.  I make whatever legal decisions have to be made during the course of the trial, and I will explain to you the legal principles that must guide you in your decisions. You must follow that law whether you agree with it or not.

---

[1]    Source: Third Circuit Model Jury Instructions (October 2017) at 1.1 available at
       https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 2.  P–2 WHAT A PATENT IS AND HOW ONE IS OBTAINED[2]

This case involves a dispute relating to United States patents. Before summarizing the positions of the parties and the legal issues involved in the dispute, let me take a moment to explain what a patent is and how one is obtained.

Patents are granted by the United States Patent and Trademark Office (sometimes called "the PTO"). A valid United States patent gives the patent holder the right for up to 20 years from the date the patent application was filed to prevent others from making, using, offering to sell, or selling the patented invention within the United States, or from importing it into the United States, during the term of the patent without the patent holder's permission. A violation of the patent owner's rights is called infringement. The patent owner may try to enforce a patent against persons believed to be infringers by a lawsuit filed in federal court.

The process of obtaining a patent is called patent prosecution.  To obtain a patent one must file an application with the PTO. The PTO is an agency of the federal government and employs trained examiners who review applications for patents. The application includes what is called a "specification," which must contain a written description of the claimed invention telling what the invention is, how it works, how to make it, and how to use it.  The specification concludes with

---

[2]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at A.1 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf ; AIPLA Model Patent Jury Instructions, Part II, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

one or more numbered sentences. These are the patent "claims." When the patent is eventually granted by the PTO, the claims define the boundaries of its protection and give notice to the public of those boundaries.

After the applicant files the application, a PTO patent examiner reviews the patent application to determine whether the claims are patentable and whether the specification adequately describes the invention claimed. In examining a patent application, the patent examiner reviews certain information about the state of the technology at the time the application was filed. The PTO searches for and reviews information that is publicly available or that is submitted by the applicant. This information is called "prior art." The Examiner reviews this prior art to determine whether or not the invention is truly an advance over the state of the art at the time. Prior art is defined by law, and I will give you at a later time specific instructions as to what constitutes prior art.  However, in general, prior art includes information that demonstrates the state of the technology that existed before the claimed invention was made or before the application was filed.  A patent lists the prior art that the examiner considered; this list is called the "cited references."

After the prior art search and examination of the application, the patent examiner then informs the applicant in writing what the examiner has found and whether any claim is patentable, and thus will be "allowed." This writing from the patent examiner is called an "office action."  If the examiner rejects the claims, the

7

applicant then responds and sometimes changes the claims or submits new claims. This process, which takes place only between the examiner and the patent applicant, may go back and forth for some time until the examiner is satisfied that the application and claims meet the requirements for a patent and the application issues as a patent, or that the application should be rejected and no patent should issue. Sometimes, patents are issued after appeals within the PTO or to a court. The papers generated during these communications between the Examiner and the applicant are called the "prosecution history."

The fact that the PTO grants a patent does not necessarily mean that any invention claimed in the patent, in fact, deserves the protection of a patent. For example, the PTO may not have had available to it other prior art that will be presented to you. A person accused of infringement has the right to argue here in federal court that a claimed invention in the patent is invalid because it does not meet the requirements for a patent. It is your job to consider the evidence presented by the parties and determine independently whether or not Xactware and Verisk has proven that the Asserted Patents are invalid.

## 3.  P–3 SUMMARY OF CONTENTIONS[3]

To help you follow the evidence, I will now give you a summary of the positions of the parties.

The parties in this case are Plaintiff EagleView Technologies, Inc. ("EagleView") and Defendants Xactware Solutions, Inc. ("Xactware") and Verisk Analytics, Inc. ("Verisk").

The case involves five United States patents owned by EagleView. The patents involved in this case are as follows:

- U.S. Patent No. 8,078,436 (the "'436 patent"),

- U.S. Patent No. 8,170,840 (the "'840 patent"),

- U.S. Patent No. 9,129,376 (the "'376 patent"),

- U.S. Patent No. 8,825,454 (the "'454 patent"), and

- U.S. Patent No. 8,818,770 (the "'770 patent").

These patents are collectively referred to as the "Asserted Patents" or the "EagleView Patents."  For your convenience, the parties and I will often refer to these patents by the last three numbers of the patent number. For example, Patent No. 8,078,436 may be referred to as the "'436 patent."

---

[3]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at A.2 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf

In this case, EagleView contends that Xactware and Verisk infringe the Asserted Patents.   EagleView further asserts that the infringement was willful. EagleView seeks damages sufficient to compensate it for Xactware's and Verisk's alleged infringement.   The specific patent claims alleged by EagleView to be infringed are referred to as the "Asserted Claims" of the Asserted Patents.

Xactware and Verisk deny that they have infringed or are otherwise liable for infringement of the Asserted Claims and also contend that the Asserted Claims are invalid.

Infringement is assessed on a claim-by-claim basis. In general, a patent claim is not infringed if an Accused Product fails to meet even one of the requirements of the patent claim.

Invalidity is measured against, among other things, the prior art.   In general, a patent claim is invalid if it is not new or is obvious in view of the state of the art at the relevant time, if it is directed to subject matter that is not entitled to receive patent protection; or if it does not meet other requirements for patent protection.

For a claim to be found invalid because it is not new, Xactware and Verisk must show, by clear and convincing evidence, that all of the elements of a claim are present in a single previous device or method, or sufficiently described in a single previous printed publication or patent. We call these "prior art." If a claim is not new, it is said to be "anticipated."

10

Another way that a claim may be found invalid is that it was obvious at the time of filing of the patent. Even though every element of a claim may not be shown or sufficiently described in a single piece of "prior art," the claim may still be found invalid if it would have been obvious to a person of ordinary skill in the field of technology of the patent at the relevant time. You will need to consider a number of questions in deciding whether the invention or inventions claimed in the Asserted Claims are obvious. I will provide you detailed instructions on these questions at the conclusion of the case.

The Xactware and Verisk systems, products, and processes that are accused of infringement in this case are: for the '436 Patent: Xactimate, Property Insight or Roof InSight, and the "Mass Production Tool"; and for the '840, '376, '454, and '770 patents: (1) Xactimate and Aerial Sketch, and (2) Xactimate, Property Insight or Roof InSight, and the "Mass Production Tool." These are called "the Accused Products" in this case. The Accused Products are alleged to infringe the Asserted Claims of the Asserted Patents.

Your job will be to decide whether or not any of the Asserted Claims have been infringed by any of the Accused Products, and whether or not those claims are invalid. If you decide that at least one Asserted Claim is infringed and is not invalid, you will then need to decide any money damages to be awarded to EagleView to compensate it for the infringement. You will also need to make a

11

finding as to whether the infringement was willful. If you decide that any infringement was willful, that decision should not affect any damages award you give. I will take willfulness into account later.

Before you decide whether the Accused Products of Xactware and/or Verisk have infringed the Asserted Claims or whether the Asserted Claims are invalid, you will need to understand the patent claims.  As I mentioned, the patent claims are numbered sentences at the end of the patent that describe the boundaries of the patent's protection.  It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation. However, my interpretation of the language of the claims should not be taken as an indication that I have a view regarding issues such as infringement or invalidity.  Those issues are yours to decide.

In this case, the parties have stipulated and agreed that certain claim terms have the following meanings:

- [Plaintiff's Version: "a" means "one or more"][4]  [Defendants' Version: (deleted)][5]

---

4   Defendants' expert argued that "a" means exactly one, or one and only one.  Plaintiff challenged that opinion via *Daubert* motion, arguing that the Federal Circuit consistently has held that "a" means "one or more."  Dkt. 472.  The Court ruled in Plaintiff's favor, citing that Federal Circuit precedent.  February 4, 2019 Daubert hearing transcript at 82:13-83:18.  The Court subsequently struck those opinions of Defendants' expert, Dr. Cohen.  Dkt. 563.  This amounts to a ruling from the Court that "a" means "one or more."  In the alternative, Plaintiff proposes an instruction stating: "a module" means "one or more modules," and "a memory" means "one or more memories," which Defendants appear to concede.

5   The parties did not stipulate or agree to a meaning of the word "a".  Further, the Court's Claim Construction Opinion did not provide a definition of the term "a".   The transcript cited by Plaintiff does not support the existence of any such agreement or stipulation. It merely supports the proposition that "a" does not mean "one and only one," *and only in the context of the terms* "a module" and "a memory."  Plaintiff's footnote

- "top plan view" in the '436 patent means: "an aerial view of an object that is taken from a position vertically or nearly vertically above the object;"

- "oblique perspective view" and "oblique view" and "perspective view" mean: "an aerial view of an object that is taken from a position that is neither vertically nor nearly vertically above the object;"

- "not a stereoscopic pair" means: "a pair of images of the same object taken from different view directions;"

- "a roof estimation module that is stored on the memory" means: "a module that is stored on the memory, and which performs image acquisition, roof modeling, and report generation functions;" and

- "aerial image" means: "an image taken from the air."

All other claim terms have their plain and ordinary meaning to a person of skill in the art.[6]

You may also hear references to a company called "Geomni." Technically, Geomni is a separate company owned by Verisk that took over doing certain things that Xactware used to do. The parties have agreed, for the purposes of this case, that there is no distinction between an action taken by Xactware and an action taken by Geomni. For example, whenever you see references to Xactware's products called "Roof Insight" or "Property Insight" you should consider those references to apply equally to Geomni's products called "Geomni Roof" and

---

mischaracterizes Defendants' experts testimony and the Court's ruling. The Court did not rule that "a" means "one or more."

[6]  Notwithstanding the proposed instruction, Defendants maintain their positions presented to the Court in connection with claim construction, and intend to continue to maintain these positions for the purposes of appeal, as necessary.

"Geomni Property," respectively.

**P–4  EVIDENCE**[7]

The evidence from which you are to find the facts consists of the following:

1. The testimony of the witnesses;

2. Documents and other things received as exhibits;

3. Any facts that are stipulated--that is, formally agreed to by the parties; and

4. Any facts that are judicially noticed–that is, facts I say you must accept as true even without other evidence.

The following things are not evidence:

1. Statements, arguments, and questions of the lawyers for the parties in this case;

2. Objections by lawyers.

3. Any testimony I tell you to disregard; and

4. Anything you may see or hear about this case outside the courtroom.

You must make your decision based only on the evidence that you see and hear in court.  Do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way.

---

[7]   Source: Third Circuit Model Jury Instructions (October 2017) at 1.5 available at https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

You should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are rules that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. This simply means that the lawyer is requesting that I make a decision on a particular rule of evidence. You should not be influenced by the fact that an objection is made. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe that evidence being offered is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other.

Also, certain testimony or other evidence may be ordered struck from the record and you will be instructed to disregard this evidence. Do not consider any testimony or other evidence that gets struck or excluded.   Do not speculate about what a witness might have said or what an exhibit might have shown.

Some evidence may be admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

## 4.  P–5 DIRECT AND CIRCUMSTANTIAL EVIDENCE[8]

There are two types of evidence that you may use in reaching your verdict. One type of evidence is called "direct evidence."  An example of "direct evidence" is when a witness testifies about something that the witness knows through his own senses — something the witness has seen, felt, touched or heard or did. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining. Another form of direct evidence is an exhibit where the fact to be proved is its existence or current condition.

The other type of evidence is circumstantial evidence.  "Circumstantial evidence" is proof of one or more facts from which you could find another fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

You should consider both kinds of evidence that are presented to you. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

---

[8]   Source: Third Circuit Model Jury Instructions (October 2017) at 1.6 (option 2) available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 5.  P–6 USE OF DEPOSITION[9]

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

---

[9]   Source: Third Circuit Model Jury Instructions (October 2017) at 2.5 available at https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 6.  P–7 OPINION TESTIMONY[10]

You will hear testimony containing opinions from Robert Stevenson, Jonathan Arnold, Geoff Cohen, Joseph Mundy, and Philip Green.  In weighing this opinion testimony, you may consider their qualifications, the reasons for their opinions, and the reliability of the information supporting those opinions, as well as the factors I have previously mentioned for weighing the testimony of any other witness.  The opinion of these witnesses should receive whatever weight and credit, if any, you think appropriate, given all the other evidence in the case.

In deciding whether to accept or rely upon the opinions of Robert Stevenson, Jonathan Arnold, Geoff Cohen, Joseph Mundy, and Philip Green, you may consider any bias that these witnesses may have, including any bias that may arise from evidence that these witnesses have been or will be paid for reviewing the case and testifying.

---

[10]   Source: Third Circuit Model Jury Instructions (October 2017) at 2.11 available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 7.  P–8 CREDIBILITY OF WITNESSES[11]

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. "Credibility" means whether a witness is worthy of belief.  You may believe everything a witness says or only part of it or none of it. In deciding what to believe, you may consider a number of factors, including the following:

(1) the opportunity and ability of the witness to see or hear or know the things the witness testifies to;

(2) the quality of the witness's understanding and memory;

(3) the witness's manner while testifying;

(4) whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;

(5) whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

(6) how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and

(7) any other factors that bear on believability.

---

[11]   Source: Third Circuit Model Jury Instructions (October 2017) at 1.7 available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.

## 8.  P–9 BURDENS OF PROOF[12,13, 14]

[Plaintiff's Version: EagleView contends that Xactware and Verisk import, make, use, offer to sell, or sell a product that infringes claims in dispute of the Asserted Patents. EagleView must prove that Xactware and Verisk infringe one or more claims of the Asserted Patents patent by a preponderance of the evidence. That means that EagleView must show that it is more likely that the Accused Products infringe than they do not infringe.

There are two ways in which a patent claim can be directly infringed.  First, a claim can be literally infringed. Second, a claim can be infringed under what is called the "doctrine of equivalents." To determine infringement, you must compare the Accused Products with each claim from the Accused Products that EagleView asserts is infringed. It will be my job to tell you what the language of the patent claims means. You must follow my instructions as to the meaning of the patent claims. You are not to define the patent claims yourselves.

---

[12]   [Plaintiff's Source: 2018 AIPLA Model Patent Jury Instructions Part II.B available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0]

[13]   [Defendants' Source: Third Circuit Model Jury Instructions (October 2017) at 1.10; The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 4.1.]

[14]   Plaintiff's version directly tracks a model jury instruction specific to patent cases.  2018 AIPLA Model Patent Jury Instructions Part II.B available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.
Defendants' instructions do not follow any model rule directly, combines two different rules, and expands on Plaintiff's burden but gives short treatment to their own burden regarding clear and convincing evidence, in contrast with the model rules it comes closest to, by deleting relevant text.

A patent claim is literally infringed only if the Accused Product includes each and every element or method step in that patent claim. If the Accused Product does not contain one or more elements or method steps in that claim, Xactware and Verisk do not literally infringe that claim. You must determine literal infringement with respect to each patent claim individually.

Xactware and Verisk deny that it is infringing the claims of the Asserted Patents and contends that the Asserted Patents patent are invalid and/or unenforceable.

Invalidity of the asserted patent claim(s) is a defense to infringement. Therefore, even though the Patent Examiner has allowed the claims of the Asserted Patents, you, the jury, must decide whether each claim of the Asserted Patents that is challenged by Xactware and Verisk is invalid. Xactware and Verisk must prove invalidity of each challenged claim by clear and convincing evidence in order to overcome the presumption of validity. Clear and convincing evidence means that it is highly probable that the fact is true. This standard is different from the standard that applies to other issues in this case. I have instructed you that other issues, such as infringement, may be found under a lower standard, namely, by a preponderance of the evidence. You may think of this "preponderance of the evidence" as slightly greater than 50%. This is different from the criminal law standard of "beyond a reasonable doubt." You may think of this "beyond a reasonable doubt" standard as

24

approaching certainty, without reasonable doubt. The "clear and convincing" standard is between the two. ][15]

[Defendants' Version: In any legal action, facts must be proved by a required weight of the evidence, known as the "burden of proof." In a civil case such as this, there are two different burdens of proof that are used. The first is called preponderance of the evidence. The second is called clear and convincing evidence.

EagleView has the burden of proving infringement and damages by a preponderance of the evidence. That means that EagleView has to prove to you, in light of all the evidence, that what EagleView claims is more likely so than not so. To say it differently: if you were to put the evidence favorable to EagleView and the evidence favorable to Xactware and Verisk on opposite sides of the scales, EagleView would have to make the scales tip somewhat on its side. If EagleView fails to meet this burden, the verdict must be for Xactware and Verisk. If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.

To prove that any claim of a patent is invalid, Xactware and Verisk must persuade you by clear and convincing evidence, i.e., you must be left with a clear conviction that the claim is invalid.

You may have heard of a burden of proof beyond a reasonable doubt in criminal cases. That requirement is the highest burden of proof. It does not apply to a civil case and you should, therefore, put it out of your mind.

As we go through the issues for you to decide, I will review for you the burden of proof to apply to each issue in this case.][16]

---

[16]   Defendants' proposal is based on the model instructions of the Federal Circuit Bar Association and the Third Circuit Court of Appeals. Unlike Plaintiff's proposed instructions, Defendants have modified the model instructions to fit the facts and law of this case.

Plaintiff's version is copied from the 2018 AIPLA Model Instructions. But, as the AIPLA model instructions explicitly state, they need to be modified in accordance with the specific facts of the case. Plaintiff has *not* made these modifications. For example, the Plaintiff has included language about the "Doctrine of Equivalents" in its proposal, despite the fact that the Model Instructions state that this should be removed in cases–like the instant case–where the Doctrine of Equivalents is not at issue.  Plaintiff's proposal also ignores the directive in the AIPLA Model Instructions to "[INSERT BRIEF DESCRIPTION OF THE PARTICULAR INVALIDITY AND UNENFORCEABILITY DEFENSES BEING ASSERTED]," presenting the jury with an unbalanced view of the claims and defenses at issue in this case.

## 9.  P–10 TAKING NOTES[17]

If you wish, you may take notes during the presentation of evidence, the summations of attorneys at the conclusion of the evidence, and during my instructions to you on the law.   My Courtroom deputy will arrange for pens, pencils, and paper.   Remember that your notes are for your own personal use -- they are not to be given or read to anyone else.

As you see, we have a court reporter here who will be transcribing the testimony during the course of the trial.   But you should not assume that the transcripts will be available for your review during your deliberations.   Nor should you consider notes that you or fellow jurors may take as a kind of written transcript.   Instead, as you listen to the testimony, keep in mind that you will be relying on your recollection of that testimony during your deliberations.   Here are some other specific points to keep in mind about note taking:

1.      <u>Note-taking is permitted, not required</u>.   Each of you may take notes. No one is required to take notes.

2.      <u>Be brief.</u>  Do not try to summarize all of the testimony.   Notes are for the purpose of refreshing memory.   They are particularly helpful when dealing with measurements, times, distances, identities, and relationships.   Overuse of note-

---

[17]    Source: Third Circuit Model Jury Instructions (October 2017) at 1.9 available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

taking may be distracting.  You must determine the credibility of witnesses; so you must observe the demeanor and appearance of each person on the witness stand. Note-taking must not distract you from that task.  If you wish to make a note, you need not sacrifice the opportunity to make important observations.  You may make your note after having made an observation.

3.     <u>Do not use your notes, or any other juror's notes, as authority to persuade fellow jurors</u>.  In your deliberations, give no more and no less weight to the views of a fellow juror just because that juror did or did not take notes.  As I mentioned earlier, your notes are not official transcripts.  They are not evidence, and they are by no means a complete outline of the proceedings or a list of the highlights in the trial.  They are valuable, if at all, only as a way to refresh your memory.  Your memory is what you should be relying on when it comes time to deliberate and render your verdict in this case.  You therefore are not to use your notes as authority to persuade fellow jurors of what the evidence was during the trial. Notes are not to be used in place of the evidence.

4.     <u>Do not take your notes away from court</u>.  I repeat, at the end of each day, please leave your notes in the jury room.

## 10. P–11 BENCH CONFERENCE AND RECESSES[18]

During the trial it may be necessary for me to talk with the lawyers out of your hearing by having a bench conference.  If that happens, please be patient.

We are not trying to keep important information from you. These conferences are necessary for me to fulfill my responsibility, which is to be sure that evidence is presented to you correctly under the law.

We will, of course, do what we can to keep the number and length of these conferences to a minimum.

I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

---

[18]   Source: Third Circuit Model Jury Instructions (October 2017) at 1.4 available at https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 11. P–12 CONDUCT OF THE JURY[19]

Now, a few words about your conduct as jurors.

First, I instruct you that during the trial and until you have heard all of the evidence and retired to the jury room to deliberate, you are not to discuss the case with anyone, not even among yourselves. If anyone should try to talk to you about the case, including a fellow juror, bring it to my attention promptly. There are good reasons for this ban on discussions, the most important being the need for you to keep an open mind throughout the presentation of evidence. I know that many of you use cell phones, smart phones, and other portable electronic devices; laptops, netbooks, and other computers both portable and fixed; and other tools of technology, to access the internet and to communicate with others. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate orally with anyone about the case on your cell phone, smart phone, or portable or fixed computer or device of any kind; or use these devices to communicate electronically by messages or postings of any kind including e-mail, instant messages, text messages, text or instant messaging services such as Twitter,

---

[19]   Source: Third Circuit Model Jury Instructions (October 2017) at 1.3 available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

or through any blog, website, internet chat room, or by way of any other social networking websites or services, including Facebook, LinkedIn, and YouTube.

If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, remember it is because they are not supposed to talk or visit with you, either.

Second, do not read or listen to anything related to this case that is not admitted into evidence. By that I mean, if there is a newspaper article or radio or television report relating to this case, do not read the article or watch or listen to the report. In addition, do not try to do any independent research or investigation on your own on matters relating to the case or this type of case. Do not do any research on the internet, for example. You are to decide the case upon the evidence presented at trial. In other words, you should not consult dictionaries or reference materials, search the internet, websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide the case. Please do not try to find out information from any source outside the confines of this courtroom.

Again, do not reach any conclusion on the claims or defenses until all of the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

# **FINAL JURY INSTRUCTIONS**

## 1.  F–1 DUTY OF JURY[20]

Members of the Jury: Now that you have heard all of the evidence it is my duty to instruct you as to the law of the case.

A copy of these instructions will be sent to you in the jury room when you deliberate.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

---

[20]   Source: Northern District of California Model Jury Instructions, available at: cand.uscourts.gov/filelibrary/313/Finjury.pdf ; *In re Bayside State Prison Litig.*, No. 11-4033 (RBK), 2011 WL 7505822 (D.N.J. Sept. 28, 2011), Jury instructions

## 2.  F–2 BURDENS OF PROOF [21,22, 23 24]

[Plaintiff's Version: EagleView contends that Xactware and Verisk import, make, use, offer to sell, or sell a product that infringes claims in dispute of the Asserted Patents. EagleView must prove that Xactware and Verisk infringe one or more claims of the Asserted Patents patent by a preponderance of the evidence. That means that EagleView must show that it is more likely that the Accused Products infringe than they do not infringe.

There are two ways in which a patent claim can be directly infringed.  First, a claim can be literally infringed. Second, a claim can be infringed under what is called the "doctrine of equivalents." To determine infringement, you must compare

---

[21]   [Plaintiff's Source: 2018 AIPLA Model Patent Jury Instructions Part II.B available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.]

[22]   [Defendants' Source: Third Circuit Model Jury Instructions (October 2017) at 1.10; The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 4.1.]

[23]   Plaintiff's version directly tracks a model jury instruction specific to patent cases.  2018 AIPLA Model Patent Jury Instructions Part II.B available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.
Defendants' instructions do not follow any model rule directly, combines two different rules, and expands on Plaintiff's burden but gives short treatment to their own burden regarding clear and convincing evidence, in contrast with the model rules it comes closest to, by deleting relevant text.

[24]  Defendants' proposal is based on the model instructions of the Federal Circuit Bar Association and the Third Circuit Court of Appeals. Unlike Plaintiff's proposed instructions, Defendants have modified the model instructions to fit the facts and law of this case.
Plaintiff's version is copied from the 2018 AIPLA Model Instructions. But, as the AIPLA model instructions explicitly state, they need to be modified in accordance with the specific facts of the case. Plaintiff has *not* made these modifications. For example, the Plaintiff has included language about the "Doctrine of Equivalents" in its proposal, despite the fact that the Model Instructions state that this should be removed in cases–like the instant case– where the Doctrine of Equivalents is not at issue.  Plaintiff's proposal also ignores the directive in the AIPLA Model Instructions to "[INSERT BRIEF DESCRIPTION OF THE PARTICULAR INVALIDITY AND UNENFORCEABILITY DEFENSES BEING ASSERTED]," presenting the jury with an unbalanced view of the claims and defenses at issue in this case.

the Accused Products with each claim from the Accused Products that EagleView asserts is infringed. It will be my job to tell you what the language of the patent claims means. You must follow my instructions as to the meaning of the patent claims. You are not to define the patent claims yourselves.

A patent claim is literally infringed only if the Accused Product includes each and every element or method step in that patent claim. If the Accused Product does not contain one or more elements or method steps in that claim, Xactware and Verisk do not literally infringe that claim. You must determine literal infringement with respect to each patent claim individually.

Xactware and Verisk deny that it is infringing the claims of the Asserted Patents and contends that the Asserted Patents patent are invalid and/or unenforceable.

Invalidity of the asserted patent claim(s) is a defense to infringement. Therefore, even though the Patent Examiner has allowed the claims of the Asserted Patents, you, the jury, must decide whether each claim of the Asserted Patents that is challenged by Xactware and Verisk is invalid. Xactware and Verisk must prove invalidity of each challenged claim by clear and convincing evidence in order to overcome the presumption of validity. Clear and convincing evidence means that it is highly probable that the fact is true. This standard is different from the standard that applies to other issues in this case. I have instructed you that other issues, such

as infringement, may be found under a lower standard, namely, by a preponderance of the evidence. You may think of this "preponderance of the evidence" as slightly greater than 50%. This is different from the criminal law standard of "beyond a reasonable doubt." You may think of this "beyond a reasonable doubt" standard as approaching certainty, without reasonable doubt. The "clear and convincing" standard is between the two.]

[Defendants' Version: In any legal action, facts must be proved by a required weight of the evidence, known as the "burden of proof." In a civil case such as this, there are two different burdens of proof that are used. The first is called preponderance of the evidence. The second is called clear and convincing evidence.

EagleView has the burden of proving infringement and damages by a preponderance of the evidence. That means that EagleView has to prove to you, in light of all the evidence, that what EagleView claims is more likely so than not so. To say it differently: if you were to put the evidence favorable to EagleView and the evidence favorable to Xactware and Verisk on opposite sides of the scales, EagleView would have to make the scales tip somewhat on its side.  If EagleView fails to meet this burden, the verdict must be for Xactware and Verisk.  If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.  To

prove that any claim of a patent is invalid, Xactware and Verisk must persuade you by clear and convincing evidence, i.e., you must be left with a clear conviction that the claim is invalid. You may have heard of a burden of proof beyond a reasonable doubt in criminal cases. That requirement is the highest burden of proof. It does not apply to a civil case and you should, therefore, put it out of your mind. At the end of the trial I will review for you the burden of proof to apply to each issue in this case.]

## 3.  F–3 STIPULATION OF FACT[25]

The parties have stipulated that certain facts are true, and those stipulations have been read to you during this trial. You must therefore treat these facts as having been proved for the purposes of this case.

---

[25]   Source: Third Circuit Model Jury Instructions (October 2017) at 1.7 available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 4.  F-4 CREDIBILITY OF WITNESSES[26]

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. "Credibility" means whether a witness is worthy of belief.  You may believe everything a witness says or only part of it or none of it. In deciding what to believe, you may consider a number of factors, including the following:

(1) the opportunity and ability of the witness to see or hear or know the things the witness testifies to;

(2) the quality of the witness's understanding and memory;

(3) the witness's manner while testifying;

(4) whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;

(5) whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

(6) how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and

(7) any other factors that bear on believability.

---

[26]    Source: Third Circuit Model Jury Instructions (October 2017) at 1.7 available at https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 5. F-5 OPINION TESTIMONY[27]

You have heard testimony containing opinions from Robert Stevenson, Jonathan Arnold, Geoff Cohen, Joseph Mundy, and Philip Green.  In weighing this opinion testimony, you may consider their qualifications, the reasons for their opinions, and the reliability of the information supporting those opinions, as well as the factors I have previously mentioned for weighing the testimony of any other witness.  The opinion of these witnesses should receive whatever weight and credit, if any, you think appropriate, given all the other evidence in the case.

In deciding whether to accept or rely upon the opinions of Robert Stevenson, Jonathan Arnold, Geoff Cohen, Joseph Mundy, and Philip Green, you may consider any bias that these witnesses may have, including any bias that may arise from evidence that these witnesses have been or will be paid for reviewing the case and testifying.

---

[27]   Source: Third Circuit Model Jury Instructions (October 2017) at 2.11 available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

## 6.  F–6 SUMMARY OF CONTENTIONS[28]

As I did at the start of the case, I will first give you a summary of each party's contentions in this case.  I will then tell you what each party must prove to win on each of its contentions.  As I previously told you, the case involves five United States patents owned by EagleView. The patents involved in this case are as follows:

- U.S. Patent No. 8,078,436 (the "'436 patent"),
- U.S. Patent No. 8,170,840 (the "'840 patent"),
- U.S. Patent No. 9,129,376 (the "'376 patent"),
- U.S. Patent No. 8,825,454 (the "'454 patent"), and
- U.S. Patent No. 8,818,770 (the "'770 patent").

These patents are collectively referred to as the "Asserted Patents" or the "EagleView Patents."

As I told you before, EagleView contends that Xactware and Verisk infringe the Asserted Patents.  EagleView further contends the infringement was willful. EagleView seeks damages sufficient to compensate it for Xactware's and Verisk's alleged infringement.  The specific patent claims alleged by EagleView to be infringed are referred to as the "Asserted Claims" of the Asserted Patents.  The

---

[28]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at B.1 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf

Asserted Claims are: Claims 2 and 36 of the '436 patent, Claim 10 of the '840 patent, Claim 12 of the '770 patent, Claim 26 of the '454 patent, and Claim 20 of the '376 patent.  These claims may be referred to as the "Asserted Claims" of the Asserted Patents.  EagleView also argues that Xactware and Verisk have actively induced others to infringe the Asserted Claims under Section 271(b) of the Patent Act.  I will explain the requirements of each of these types of infringement later.

Xactware and Verisk deny that they have infringed or are otherwise liable for infringement of the Asserted Claims and also argue that the Asserted Claims are invalid.  Each asserted claim must be considered individually.  In general, a patent claim is not infringed if an Accused Product fails to meet even one of the requirements of the patent claim.   Also, in general, a patent claim is invalid if it is not new or is obvious in view of the state of the art at the relevant time, if it is directed to subject matter that is not entitled to receive patent protection, or does not meet other requirements for patent protection.

The Xactware and Verisk systems, products, and processes that are accused of infringement in this case are: for the '436 Patent: Xactimate, Property Insight or Roof InSight, and the "Mass Production Tool"; and for the '840, '376, '454, and '770 patents: (1) Xactimate and Aerial Sketch, and (2) Xactimate, Property Insight or Roof InSight, and the "Mass Production Tool."  These are called "the Accused

Products" in this case. The Accused Products are alleged to infringe the Asserted Claims of the Asserted Patents.

Your job is to decide whether or not the Asserted Claims have been infringed and whether or not those claims are invalid. If you decide that at least one Asserted Claim is infringed and is not invalid, you then need to decide any money damages to be awarded to EagleView to compensate it for the infringement. You also need to make a finding as to whether the infringement was willful. If you decide that any infringement was willful, that decision should not affect any damages award you give. I will take willfulness into account later.

As I told you before, you may have heard references to a company called Geomni. "Xactware" and "Geomni" refer to the same company. All references to Xactware apply equally to Geomni, and all references to Geomni apply equally to Xactware. For example, whenever you see references to Xactware's products called "Roof Insight" or "Property Insight" you should consider those references to apply equally to Geomni's products called "Geomni Roof" and "Geomni Property," respectively.

## 7.  F–7 THE ROLE OF THE CLAIMS OF A PATENT[29]

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims." The patent claims are the numbered sentences at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid. The law says that it is my role to define the terms of the claims and it is your role to apply my definitions to the issues that you are asked to decide in this case. Therefore, as I explained to you at the start of the case, I have determined the meaning of the claims and I will provide to you my definitions of certain claim terms.  You must accept my definitions of these words in the claims

---

[29]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at B.2 2.1 available at
https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf

as being correct. It is your job to take these definitions and apply them to the issues

that you are deciding, including the issues of infringement and validity.

## 8. F–8 HOW A CLAIM DEFINES WHAT IT COVERS[30]

I will now explain how a claim defines what it covers.

A claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. If a device or a method satisfies each of these requirements, then it is covered by the claim.

There can be several claims in a patent. A claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed claim-by-claim. In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

Sometimes the words in a patent claim are difficult to understand, and therefore it is difficult to understand what requirements these words impose. It is my job to explain to you the meaning of the words in the claims and the requirements these words impose.

---

[30]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at 2.2 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf

By understanding the meaning of the words in a claim and by understanding that the words in a claim set forth the requirements that a product or process must meet in order to be covered by that claim, you will be able to understand the scope of coverage for each claim. Once you understand what each claim covers, then you are prepared to decide the issues that you will be asked to decide, such as infringement and invalidity.

## 9.  F–9 INDEPENDENT AND DEPENDENT CLAIMS[31]

This case involves two types of patent claims: independent claims and dependent claims.  An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, the following asserted claims are independent claims:

- Claim 36 of the '436 patent;

- Claim 10 of the '840 patent;

- Claim 20 of the '376 patent; and

- Claim 26 of the '454 patent.

The remainder of the asserted claims are "dependent claims." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim(s) to which it refers. The dependent claim then adds its own additional requirements. To

---

[31] Source: The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at 2.2a available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructi ons/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; AIPLA Model Patent Jury Instructions, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; *Wolverine World Wide v. Nike Inc.*, 38 F.3d 1192, 1196-99 (Fed. Cir. 1994) (citing *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577-89 (Fed. Cir. 1989)); *Wilson Sporting Goods v. David Geoffrey & Assocs.*, 904 F.2d 677, 685-86 (Fed. Cir. 1990); *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552-53 n.9 & n.10 (Fed. Cir. 1989); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 626 (Fed. Cir. 1985)

determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim(s) to which it refers. A product that meets all of the requirements of both the dependent claim and the claim(s) to which it refers is covered by that dependent claim.

In this case, the following asserted claims are dependent claims:

- Claim 2 of the '436 patent, which is dependent on a claim that is not asserted in this case -- independent claim 1 of the '436 patent; and

- Claim 12 of the '770 patent, which is dependent on a claim that is not asserted in this case -- independent claim 1 of the '770 patent.

## 10. F–10 CLAIM INTERPRETATION [32,33]

I will now explain to you the meaning of some of the words of the claims in this case. In doing so, I will explain some of the requirements of the claims. As I have previously instructed you, you must accept my definition of these words in the claims as correct. For any words in the claim for which I have not provided you with a definition, you should apply the plain and ordinary meanings of those words. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement or validity. These issues are yours to decide.

I instruct you that the following claim terms have the following definitions:

- [Plaintiff's Version: "a" means "one or more"][34], [Defendants' Version: (deleted)][35]

---

[32] [Plaintiff's Source: AIPLA Model Patent Jury Instructions, § 2, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.]

[33] [Defendants' Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 2.]

[34] Defendants' expert argued that "a" means exactly one, or one and only one. Plaintiff challenged that opinion via *Daubert* motion, arguing that the Federal Circuit consistently has held that "a" means "one or more." Dkt. 472. The Court ruled in Plaintiff's favor, citing that Federal Circuit precedent. February 4, 2019 Daubert hearing transcript at 82:13-83:18. The Court subsequently struck those opinions of Defendants' expert, Dr. Cohen. Dkt. 563. This amounts to a ruling from the Court that "a" means "one or more." In the alternative, Plaintiff proposes an instruction stating: "a module" means "one or more modules," and "a memory" means "one or more memories," which Defendants appear to concede.

[35] The parties did not stipulate or agree to a meaning of the word "a". Further, the Court's Claim Construction Opinion did not provide a definition of the term "a". The transcript cited by Plaintiff does not support the existence of any such agreement or stipulation. It merely supports the proposition that "a" does not mean "one and only one," *and only in the context of the terms* "a module" and "a memory." Plaintiff's footnote mischaracterizes Defendants' experts testimony and the Court's ruling. The Court did not rule that "a" means "one or more."

- "top plan view" in the '436 patent means: "an aerial view of an object that is taken from a position vertically or nearly vertically above the object[22];"

- "oblique perspective view" and "oblique view"-and "perspective view" mean: "an aerial view of an object that is taken from a position that is neither vertically nor nearly vertically above the object;"

- "not a stereoscopic pair" means: "a pair of images of the same object taken from different view directions;"

- "a roof estimation module that is stored on the memory" means: "a module that is stored on the memory, and which performs image acquisition, roof modeling, and report generation functions;" and

- "aerial image" means: "an image taken from the air."

## 11. F–11 INFRINGEMENT GENERALLY[36], [37], [38]

I will now instruct you as to the rules you must follow when deciding whether EagleView has proven that Xactware or Verisk infringed any of the Asserted Claims.

Patent law gives the owner of a valid patent the right to exclude others from importing, making, using, offering to sell, or selling the claimed invention within the United States during the term of the patent. Any person or business entity that has engaged in any of those acts without the patent owner's permission infringes the patent. Here, EagleView alleges that the Accused Products infringe the Asserted Claims.

You have heard evidence about both EagleView's commercial products and Xactware's and/or Verisk's accused products. However, in deciding the issue of

---

[36]   Source: AIPLA Model Jury Instructions, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; 35 U.S.C. § 271; *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014); *Merial Ltd. v. CIPLA Ltd.*, 681 F.3d 1283, 1302-03 (Fed. Cir. 2012); *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010); *WordTech Sys., Inc. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308, 1313-18 (Fed. Cir. 2010).

[37]   Plaintiff's addition is meant to aid the jury's understanding given that there are multiple forms of infringement at issue in this case, and that each distinct one of them is an independently-sufficient reason to find that that the claims are infringed, which may be unintuitive to jurors.

[38]  Plaintiff's added paragraph is not in the model instructions, nor is it related or similar to any passage in the model instructions.
Plaintiff claims that this addition is meant to inform the jury that there are "multiple forms of infringement at issue in this case," but the Model Rules already do that in the prior paragraph, rendering this paragraph unnecessary. Plaintiff's proposal also includes the sentence "Any of these types of infringement is an independent basis to find Xactware and Verisk liable for infringing the Asserted Patents," which serves no instructive purpose and could be interpreted by the jury as an exhortation to find liability in this case.

infringement you may not compare Xactware's or Verisk's accused products to EagleView's commercial products [Plaintiff's Version: (deleted)][39] [Defendants' Version: , or take into account EagleView's products, which are after all not the same thing as patent claims]. Rather, you must compare Xactware's or Verisk's accused products only to the six Asserted Claims when making your decision regarding infringement.

A claim of a patent may be infringed directly or indirectly. As explained further in the following Instructions, direct infringement results if an Accused Product is covered by at least one Asserted Claim. Indirect infringement results if the defendant induces another to infringe a claim of a patent.

[Plaintiff's Version: There are several different ways in which Xactware and Verisk have been alleged to infringe.  I will now explain each of these types of infringement in more detail.  Any of these types of infringement is an independent basis to find Xactware and Verisk liable for infringing the Asserted Patents.][40]

[Defendants' Version: (deleted)]

---

[39]   Defendants' addition is not in the model rules and is duplicative of the prior clause.
[40]   Plaintiff's suggestion is meant to aid the jury's understanding given that there are multiple forms of infringement at issue in this case, and that each distinct one of them is an independently-sufficient reason to find that that the claims are infringed, which may be unintuitive to jurors.

## 12. F–12 DIRECT INFRINGEMENT[41]

EagleView asserts that Xactware has directly infringed the Asserted Patents. Xactware is liable for directly infringing EagleView's patents only if you find that EagleView has proven that it is more likely than not that Xactware made, used, imported, offered to sell, or sold the invention defined in at least one claim of EagleView's patent.

[Plaintiff's Version: A party can directly infringe a patent without knowing of the patent or without knowing that what the party is doing is patent infringement.][42] [Defendants' Version: (deleted)] A patent's claims define what is covered by the patent. [Plaintiff's Version: A product directly infringes a patent if it is covered by at least one claim of the patent.][43] [Defendants' Version: (deleted)][44]

---

[41] Source:  AIPLA Model Jury Instructions §§ 3.0-3.2, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; *Limelight Networks, Inc. v. Akamai Techs., Inc.*, ___ U.S. ___, 134 S. Ct. 2111, 2117 (2014); *Intellectual Sci. & Tech. v. Sony Elect.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009); *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1380 (Fed. Cir. 2007); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330-31 (Fed. Cir. 2001).

[42] This is in the model instructions and is necessary to clarify a confusing point for jurors, and is in fact centrally relevant to explaining why one of Defendants' non-infringement defenses is incorrect under the law, as explained in Plaintiff's motion *in limine* no. 8.  AIPLA Model Patent Jury Instructions, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

[43] This sentence is necessary to clarify the instruction in the last sentence, so as not to imply that infringement of a patent requires showing that all claims are infringed.  If this instruction is deleted then the prior sentence should be as well.

[44] Defendants believe that this instruction will confuse more than it will aid the jury.  While this is in the AIPLA model rules, it is susceptible to misunderstanding by the jury. Whether a particular feature of an accused product meets multiple limitations of a particular claim depends on the language of the claim and the precise

To determine direct infringement, you must compare the Accused Products with each patent claim EagleView asserts is infringed, using my instructions as to the meaning of the terms the patent claims use.

A patent claim is literally infringed only if an Accused Product satisfies each and every requirement in that patent claim.  If an Accused Product does not contain one or more elements or method steps recited in a claim, the Accused Product does not literally infringe that claim.

You must determine direct infringement with respect to each patent claim separately.

The Accused Products should be compared to the invention described in each patent claim it is alleged to infringe. [Plaintiff's Version: The same element of the accused system, product, or process may satisfy more than one element of a patent claim.][45] [Defendants' Version: (deleted)]

---

operation of the accused product. For example, where two limitations are related by cause-and-effect, or are differentiated relative to each other, the same element cannot satisfy both limitations.

[45]   This is in the model rules.  AIPLA Model Patent Jury Instructions, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

## 13. F–13 INDIRECT INFRINGEMENT—INDUCED INFRINGEMENT[46]

Xactware and Verisk are also accused of actively inducing infringement of the Asserted Claims.   To find that Xactware and/or Verisk actively induced infringement, EagleView must prove by a preponderance of the evidence that (1) a single actor [Plaintiff's Version: (which can be a corporation or organization, or its various employees taken together)][47],[48] [Defendants' Version: (deleted)] is responsible for direct infringement, namely, [Plaintiff's Version: all of the components or method steps of the products or methods accused of infringing the patent, and][49] [Defendants' Version: each and every component or method step of the Asserted Claim is performed by that single actor, and] (2) Xactware or Verisk

---

[46]   Source: 2018 AIPLA Model Patent Jury Instructions § 3.8 available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; *Commil USA, LLC v. Cisco Sys.*, 135 S. Ct. 1920, 1927-28 (2015); *Limelight Networks, Inc. v. Akamai Techs., Inc.*, ___ U.S. ___, 134 S. Ct. 2111 (2014); *GlobalTech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754, 765-70 (2012); *Muniauction Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329-30 (Fed. Cir. 2008); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1340 (Fed. Cir. 2009)

[47]   Plaintiff's submit that this parenthetical will prevent jury confusion that only a single human person can be a direct infringer. Without this instruction, Plaintiffs believe that an ordinary person would read "single actor" as meaning an individual human person, and would not cover a group of individuals in a corporation, which could cause them to find a legally-impermissible non-infringement defense for Defendants on the basis that multiple people at the Defendants or their clients are the direct infringers and a "single actor" is not.

[48]   This parenthetical is not in the Model Instructions, which are already amply clear on the subject of direct infringement. There is no special circumstance in this case that would require additional instruction on this point – the defendants in patent cases are generally corporations or organizations, and yet still the AIPLA did not see fit to include this in its model instructions.

[49]   Plaintiff's version directly tracks the model rule that Defendants proposed using, and Defendants' version does not.  The rules refer to the accused products, not the claims.

56

actively induced these acts of infringement by the [Plaintiff's Version: alleged direct infringer] [50] [Defendants' Version: single actor.]

To prove active inducement, EagleView must establish that it is more likely than not that:

1. Xactware or Verisk aided, instructed, or otherwise acted with the intent to cause acts by the [Plaintiff's Version: alleged direct infringer][51] [Defendants' Version: single actor] that would constitute direct infringement of the patent;

2. Xactware or Verisk knew of the patent, or showed willful blindness to the existence of the patent at that time;

3. Xactware or Verisk knew, or showed willful blindness, that the actions of the [Plaintiff's Version: alleged direct infringer] [52] [Defendants' Version: single actor][53] would infringe at least one Asserted Claim of the patent; and

4. The [Plaintiff's Version: alleged direct infringer] [54] [Defendants' Version: single actor] infringed at least one Asserted Claim of the patent.

To find willful blindness, (1) Xactware or Verisk must have subjectively believed that there was a high probability that a patent existed covering the

[50] Plaintiff's submit that this parenthetical will prevent jury confusion that only a single human person can be a direct infringer.

[51] Plaintiff's version directly tracks the model rule that Defendants proposed using, and Defendants' version does not.

[52] Plaintiff's version directly tracks the model rule that Defendants proposed using, and Defendants' version does not.

[53] This instruction is related to active inducement. Not willfulness (the "willful blindness" mentioned here is not the same thing as "willfulness"). This specific instruction is necessary to aid the jury's understanding because the question of intent is relevant to other areas of the case as well. Plaintiff's apparent confusion regarding these topics merely confirms that this clarifying instruction is necessary.

[54] Plaintiff's version directly tracks the model rule that Defendants proposed using, and Defendants' version does not.

57

Accused Products, and (2) Xactware and/or Verisk must have taken deliberate actions to avoid learning of the patent.

[Plaintiff's Version: Even if Xactware or Verisk believe or believed any of the Asserted Claims of the EagleView's Patents are or were invalid, that is not a defense to a claim of induced infringement.][55],[Defendants' Version: (deleted)][56]

---

[55] Defendants have stated that they intend to argue that their belief in the invalidity of the claims led to a genuinely-held belief that they were not infringing and that they therefore had no intent. This instruction is necessary and is the law as explained by the Supreme Court. *Commil USA, LLC v. Cisco Sys.*, 135 S. Ct. 1920, 1927-28 (2015) ("The question the Court confronts today concerns whether a defendant's belief regarding patent validity is a defense to a claim of induced infringement. It is not."). This is also cited in the model rules for this section. 2018 AIPLA Model Patent Jury Instructions § 3.8 available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.

[56] This inclusion by Plaintiff is misleading and self-serving. It suggests that Defendants are attempting to raise a defense that is not at issue in the case. The AIPLA Model Instructions cites this case, but not for the particular proposition used here, and notably do not include any similar language in the instructions themselves. The AIPLA also cites the same case in the section on direct infringement, indicating that this case is *not* cited for the proposition raised by Plaintiff.

## 14. F–14   INFRINGEMENT   WHERE   ONE   OR   MORE   SYSTEM COMPONENTS ARE LOCATED OUTSIDE THE UNITED STATES[57]

The following instruction applies only to EagleView's assertions that the system claims are infringed by Xactimate, Property Insight or Roof InSight, and the "Mass Production Tool".  The system claims are: claims 2 and 36 of the '436 patent, claim 10 of the '840 patent, and claim 20 of the '376 patent.

Direct infringement requires that the accused system include every element recited in the claim.  EagleView claims that infringement occurred within the United States even if some (but not all) of the elements of the claim were located outside of the United States.

For infringement to occur within the United States, EagleView must prove by a preponderance of the evidence that the control of the system was exercised and the benefit of the system was enjoyed in the United States.

---

[57] Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (January 2016) at 3.6 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005).

**15. F–15 INFRINGEMENT THROUGH THE SUPPLY OF COMPONENTS IN OR FROM THE UNITED STATES FOR COMBINATION ABROAD UNDER 35 U.S.C. § 271(F)(1)[58]**

Xactware is liable for § 271(f)(1) infringement of a claim (active inducement of foreign combination of components supplied from the United States) if EagleView proves by a preponderance of the evidence that:

1. Xactware supplies, or causes to be supplied, components from the United States to a place outside the United States, which make up all or a substantial portion of the invention of any one of the Asserted Claims;

2. Xactware takes action intentionally to cause another party to assemble the components outside of the United States;

3. Xactware knows of the Accused Patents, and knows that the encouraged acts constitute infringement of the Accused Patents; and

4. The encouraged acts would constitute direct infringement of the Asserted Claims if they had been carried out in the United States.

[Plaintiff's Version: (deleted)][59] If you find that Xactware was aware of the Accused Patents, but believed that the acts it encouraged would not constitute

---

[58]   The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 3.4.

[59]   Defendants have waived all allegations of lack of intent, as explained in Plaintiff's Motion *In Limine* No. 7 related to willfulness, and so this instruction is irrelevant to any allegation that Defendants can raise.  Intent is already covered in the enumerated requirements, and instructions such as these on an affirmative defense are improper.  Defendants give no explanation as why the evidence or arguments related to intent should come in for the purposes of 271(f)(1) when they should not for willfulness.  "Willful blindness" which is a standard

infringement of the Accused Patents if carried out in the United States, Xactware cannot be liable for inducement.

In order to establish active inducement of infringement, it is not sufficient that an alleged direct infringer itself allegedly directly infringes the claim.  Nor is it sufficient that Xactware was aware of the acts that allegedly constitute the direct infringement.  Rather, you must find that Xactware specifically intended for the allegedly direct infringer to infringe the Accused Patents, in order to find inducement of infringement.  If you do not find that Xactware specifically intended to infringe, then you must find that Xactware has not actively induced the alleged infringement under § 271(f)(1).][60]

---

related to knowledge, is not the issue, contrary to Defendants' footnote.  The issue is intent, which is common to willfulness and 271(f)(1).

[60]   Defendants' proposed instruction addresses the intent requirement for infringement under this statutory basis. This is required irrespective of whether willful infringement is even in the case. See, also, Defendants' footnotes regarding induced infringement.

## 16. F–16   INFRINGEMENT   THROUGH   THE   SUPPLY   OF   ONE COMPONENT IN OR FROM UNITED STATES FOR COMBINATION ABROAD UNDER 35 U.S.C. § 271(F)(2)[61]

Xactware is also liable for § 271(f)(2) infringement of a claim if EagleView

proves by a preponderance of the evidence that:

1.      Xactware supplies a component, or causes a component to be supplied, from the United States to a place outside of the United States;

2.      The only substantial use for the component is in a product or process that would infringe if the combination had occurred in the United States;

3.      Xactware is aware of the Asserted Patents and knows that the component has no other substantial use and may be covered by a claim of the Asserted Patent; and

4.      Xactware intends for the component to be used in a product that would directly infringe the Accused Claims if it has been used in the United States.

---

[61]   The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 3.4.

## 17.  F–17 INFRINGEMENT BY IMPORT, SALE, OFFER FOR SALE OR USE OF PRODUCT MADE BY PATENTED PROCESS (§ 271(G)) [62]

Xactware is liable for direct infringement of a claim if EagleView proves thatXactware, without EagleView's authorization, imports, offers to sell, sells, or uses within the United States a product which was made outside of the United States during the time the Asserted Patents were in force by a process that, if performed in the United States, would infringe the claim.  However, if the product has been materially changed by an additional process or the product has become a trivial and nonessential component of another product, you must find Xactware did not infringe the Asserted Patents.

---

[62]   The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 3.5.

## 18.  F–18 INVALIDITY GENERALLY[63]

I will now instruct you on the rules you must follow in deciding whether or not Xactware and Verisk have proven that the Asserted Claims are invalid.   To prove that any claim of a patent is invalid, Xactware or Verisk must persuade you by clear and convincing evidence, i.e., you must be left with a clear conviction that the claim is invalid.

---

[63]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (January 2016) at 4.1 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf;

## 19. F–19 ANTICIPATION[64]

[Plaintiff's Version: In this case, Xactware and Verisk contend that some of the Asserted Patents are anticipated.  Xactware and Verisk contend that Claim 10 of the '840 patent and Claim 20 of the '376 patent are invalid because the claimed inventions are anticipated.

You must determine what is the prior art that may be considered in determining whether Claim 10 of the '840 patent and Claim 20 of the '376 patent are new or anticipated. There are different types of prior art and I will instruct you on each of the relevant types of prior art that you will need to consider.

To anticipate a claim, each element in the claim must be present in a single item of prior art and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation. In determining whether every one of the elements of the claimed invention is found in

---

[64]  Source:  AIPLA Model Patent Jury Instructions, § 6, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369-70 (Fed. Cir. 2008); *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1320-21 (Fed. Cir. 2004); *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377-78 (Fed. Cir. 2003). The Federal Circuit Bar Association's Model Patent Jury Instructions (January 2016) at 4.3b-1 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; AIPLA Model Patent Jury Instruction § 4, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0. 35 U.S.C. § 102 (pre-AIA).

65

the prior reference, you should consider what a person of ordinary skill in the art would have understood from his or her review of the particular reference][65],

[Defendants' Version: In order for someone to be entitled to a patent, the invention must actually be "new." In general, inventions are new when the identical product or process has not been made, used, or disclosed before. Anticipation must be determined on a claim-by-claim basis.

Xactware and Verisk contend that Claim 10 of the '840 patent and Claim 20 of the '376 patent are invalid because the claimed inventions are anticipated. An invention is anticipated if:

- it was known to or used by others in the United States before the date of the invention;

- it was already patented or described in a printed publication anywhere in the world before the date of invention;

- it was already patented or described in a printed publication, anywhere in the world by the inventor or anyone else more than one year before the effective filing date of the patent application for the invention; or

---

[65]   Plaintiff's proposal directly tracks the model rules and Defendants offer no reason for deviation. AIPLA Model Patent Jury Instructions, § 6, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0. Defendants' version by contrast does not directly track any model rule.

- it was described in (1) a published application for a patent by another filed in the United States before the date of the invention or in (2) a patent granted on an application for a patent filed by another in the United States where the application was filed before the date of the invention.

To anticipate a claim, each element in the claim must be present in a single item of prior art and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation. In determining whether every one of the elements of the claimed invention is disclosed in the prior publication, patent, or patent application, you should consider what a person of ordinary skill in the art would have understood the particular reference to disclose.][66]

---

[66] Defendants are presenting an instruction based off of the Federal Circuit Bar Association Model Jury Instructions and statutory language.  This instruction is better aligned with the anticipation arguments that will be presented in this case.

## 20. F–20 OBVIOUSNESS[67]

Xactware and Verisk also contend that each of the Asserted Claims is invalid because the claimed inventions are "obvious."

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

Xactware and Verisk may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of [Plaintiff's Version: aerial roof estimation][68],[Defendants' Version: aerial photogrammetry, that is, using aerial images and rules of geometry

---

[67]   Source:  The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at 4.3c available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; AIPLA Model Patent Jury Instructions, §§ 7.0-7.4, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251-52 (2011); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 405 and 421 (2007); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161-62 (Fed. Cir. 2007); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662-63 (Fed. Cir. 2000); *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220, 1222 (Fed. Cir. 2016); *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072-73 (Fed. Cir. 2018); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 747 (Fed. Cir. 2016); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361 1378 (Fed. Cir. 2000); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988).

[68]   The proper field is "aerial roof estimation" and not "aerial photogrammetry." U.S. Pat. No. 8,048,436 at Abstract, Title ("Aerial Roof Estimation Systems and Methods").  Contrary to Defendants' footnote here, in each of the disagreements below, Plaintiff's proposal follows the model rules and Defendants' wordsmithing does not.

to determine the dimensions of real objects on the ground, such as buildings and their roofs].[69]

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of aerial [Plaintiff's Version: aerial roof estimation][70] [Defendants' Version: photogrammetry] that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art.

In considering whether a claimed invention is obvious, you may but are not required to find obviousness if you find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field of [Plaintiff's Version: aerial roof measurement] [71] [Defendants' Version: aerial photogrammetry][72] to combine the known elements in a way the claimed

---

[69]   Defendants' proposal is based off of the Federal Circuit Bar Association model jury instructions.  This instruction is better aligned with the anticipation arguments that will be presented in this case. Aerial photogrammetry is the proper field for the patents in suit based on the entirety of the disclosure of the patents in suit.  Defendants have indicated where they disagree with Plaintiff's proposed instruction and despite Plaintiff's contention, their proposal does not "directly" track the current version of the Federal Circuit Bar Association model jury instructions.

[70]   The proper field is "aerial roof estimation" and not "aerial photogrammetry." U.S. Pat. No. 8,048,436 at Abstract, Title ("Aerial Roof Estimation Systems and Methods").

[71]   The proper field is "aerial roof estimation" and not "aerial photogrammetry." U.S. Pat. No. 8,048,436 at Abstract, Title ("Aerial Roof Estimation Systems and Methods").

[72] See previous footnote.

invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known functions; (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and (6) whether the change resulted more from design incentives or other market forces. To find it rendered the invention obvious, you must find that the prior art provided a reasonable expectation of success. Obvious to try is not sufficient in unpredictable technologies.

In determining whether the claimed invention was obvious, consider each claim separately. Do not use hindsight, that is, consider only what was known at the time of the invention.

In making these assessments, you should–take into account any objective evidence [Plaintiff's Version: (sometimes called "secondary considerations")][73]

---

[73]   This is in the model rules. The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at 4.3c available at

[Defendants' Version: (deleted)] that may shed light on the obviousness or not of the claimed invention, such as:

   a. Whether the invention was commercially successful as a result of [Plaintiff's Version: the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities)][74] the unique characteristics of the claimed invention rather than other economic and commercial factors unrelated to the claimed inventions; Commercial success is not relevant to validity unless the patent owner can show the success is a result of the claimed inventions, known as a "nexus";]

   b. Whether the invention satisfied a long-felt need;

   c. Whether others had tried and failed to make the invention;

   d. Whether others invented the invention at roughly the same time;

   e. Whether others copied the invention;

   f. Whether there were changes or related technologies or market needs contemporaneous with the invention;

   g. Whether the invention achieved unexpected results;

   h. Whether others in the field praised the invention;

---

https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf

[74] Plaintiff's version directly tracks the model rules and Defendants' does not, and Defendants' nexus instruction is redundant to what follows the enumerated list.  The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at 4.3c available at
https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf

i. Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

j. Whether others sought or obtained rights to the patent from the patent holder; and

k. Whether the inventor proceeded contrary to accepted wisdom in the field.

Not all of these factors may be present. No single factor is more or less important than the others.

To rely on objective evidence, EagleView must show that there is a connection, otherwise referred to as a nexus, between that evidence and the merits of the claimed invention.

## 21.  F–21 PRIOR ART[75]

Prior art may include [Plaintiff's Version: (deleted)][76] [Defendants' Version: items that were publicly known or that have been used or offered for sale, or][77] references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.  To be prior art, the item or reference must have been [Plaintiff's Version: (deleted)][78] [Defendants' Version: made, known, used,][79] published or patented either before the invention was made or more than one year before the filing date of the patent application.

---

[75] Source:  The Federal Circuit Bar Association's Model Patent Jury Instructions (January 2016) at 4.3a-1 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; AIPLA Model Patent Jury Instructions, § 5.0.1, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; 35 U.S.C. § 102 (pre-AIA).

[76]  The only prior art asserted by Defendants in this case are patents and alleged printed publications.  This instruction is unnecessary and would be confusing to the jury.

[77] There is no reason to limit the definition of prior art for this particular case; the instruction is not confusing and reflects the law

[78]  The only prior art asserted by Defendants in this case are patents and alleged printed publications.  This instruction is unnecessary and would be confusing to the jury.

[79] There is no reason to limit the definition of prior art for this particular case; the instruction is not confusing and reflects the law

## 22.  F–22 PRIOR ART - INVENTION DATE[80]

In this case, you must determine the date of invention for the claimed invention. The date of the invention is [Plaintiff's Version: the earlier of][81],[Defendants' Version: (deleted)][82]  either when the invention was reduced to practice or when it was conceived, provided the inventors were diligent in reducing the invention to practice.] Diligence means working continuously, though not necessarily every day.  Conception is the mental part of an inventive act, i.e., the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice, even if the inventor did not know at the time that the invention would work.  Conception of an invention is complete when the idea is so clearly defined in the inventor's mind that, if the idea were communicated to a person having ordinary skill in the field of the technology, he or she would be able to reduce the invention to practice without undue research or experimentation.  This requirement does not mean that the inventor has to have a prototype built, or actually explained her or his invention to another person.  But, there must be some evidence [Plaintiff's Version: (such as

---

[80]    FCBA Model Jury Instructions, § 4.3a-1; *Cooper v. Goldfarb*, 154 F.3d 1321, 1327-28 (Fed. Cir. 1998); 35 U.S.C. § 116(a); *Scott v. Finney*, 34 F.3d 1058, 1061 (Fed. Cir. 1994)

[81]    Plaintiff's version clarifies that the date of invention is the earlier of the reduction to practice or date of conception.

[82]  Plaintiff's proposal contains superfluous language that increases the potential for juror confusion.

inventor notebooks)][83] [Defendants' Version: (deleted)][84] beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea. Conception may be proven when the invention is shown in its complete form by drawings, disclosure to another person, or other forms of evidence presented at trial.

A claimed invention is "reduced to practice" when it has been constructed/used/tested sufficiently to show that it will work for its intended purpose or when the inventor files a patent application. An invention may also be reduced to practice even if the inventor has not made or tested a prototype of the invention, if it has been fully described in a filed patent application.

---

[83]   An inventor's notebook is a well-established type of evidence that can evince a date of conception that is
      relevant to the facts of this case and would aid the jury's understanding.
[84] Plaintiff's version inserts superfluous language that increases the risk of juror confusion.

## 23. F–23 PRIOR ART - PRIOR PATENT[85],[86]

[Plaintiff's Version: (deleted)][87] [Defendants' Version: The Court has already determined that Sungevity is prior art to the Asserted Patents because the U.S. Patent and Trademark Office allowed Sungevity to issue with claim language identical to the '436 patent, claim 1. Dkt. No. 543.][88]

[Plaintiff's Version: EagleView contends that Sungevity is not prior art.]

[Defendants' Version: (deleted)]   Xactware and Verisk contend that Sungevity is prior art [Plaintiff's Version: (deleted)][89] [Defendants' Version: , as this Court previously found,][90] and that certain claims of the Asserted Patents are invalid because the inventions or parts of the inventions defined in those claims were

---

85   Source: AIPLA Model Patent Jury Instructions, § 6.7.1, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; 35 U.S.C. § 102(a), (b) (both pre-AIA); *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1287-83 (Fed. Cir. 2000); *In re Carlson*, 983 F.2d 1032, 1035-36 (Fed. Cir. 1992).

86   [Defendants' addition: *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008);*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008); 35 U.S.C. §§ 119(e) and 120; 35 U.S.C. § 112; The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at B.4.2 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf.]

87   Defendants' addition is incorrect.  It misrepresents the Court's ruling, which was a denial of Plaintiff's summary judgment motion due to an issue of material fact, but did not affirmatively rule that Sungevity is prior art to Plaintiff's patents. This issue extends to other additions by Defendants seeking to argue the Court decided Sungevity is prior art, which it has not done.  Dkt. 543.

88   Defendant's version is more aligned with the circumstances of this case relating to the Sungevity reference. Plaintiff's proposal does not reflect the entirety of the circumstances in this case.

89   Defendants' addition is incorrect.  It misrepresents the Court's ruling, which was a denial of Plaintiff's summary judgment motion due to an issue of material fact, but did not affirmatively rule that Sungevity is prior art to Plaintiff's patents. This issue extends to other additions by Defendants seeking to argue the Court decided Sungevity is prior art, which it has not done.  Dkt. 543.

90   Defendants' instruction accurately reflects the Court's prior decisions in this case.

disclosed by Sungevity.   [Plaintiff's Version: (deleted)] [Defendants' Version: EagleView disputes the determination that Sungevity is prior art.]

[Plaintiff's Version: Xactware and Verisk have the initial burden to show that Sungevity is prior art.  Because the filing date of Sungevity is after the filing date of the '436 patent, Xactware and Verisk must show that Sungevity is entitled to claim priority to an application filed before the '436 patent's filing date.  If you believe that Xactware and Verisk have successfully done so, then the burden shifts to EagleView to show that the '436 patent is entitled to claim priority to an application filed before the Sungevity priority date.  If you believe that EagleView has done that, then Sungevity is not prior art to the '436 patent.  If you do not believe that EagleView has done that, then Sungevity is prior art to the '436 patent.

A later-filed patent application is entitled to claim priority to an earlier-filed application only if the earlier application discloses the claimed invention in accordance with certain requirements. Specifically, a party must show that the earlier-filed applications contain sufficient written description that supports the asserted claims of the later-filed application and that would enable a person having ordinary skill in the field of the technology of the later-filed application to make

and use the full scope of the asserted claims.  These requirements are known as, respectively, the written description and enablement requirements.][91] [92]

[Defendants' Version: EagleView has the burden to show that Sungevity is not prior art.  In order to do so, EagleView must show that its patent claims are each entitled to an effective filing date that predates the filing of the earliest application for Sungevity or that the date of invention of each of the patent claims predates the filing of the earliest application for Sungevity.

A patent application is entitled to claim priority to an earlier-filed application only if the earlier application discloses the claimed invention in accordance with certain requirements.  In this case, Xactware and Verisk claim that certain claims of the Asserted Patents are invalid in view of Sungevity, either by itself or in combination with other prior art references.  With respect to the '436 Patent, EagleView asserts that Sungevity should not be deemed prior art because claims of the '436 Patent are entitled to claim priority to earlier-filed patent applications.  In other words, in response to the arguments of Xactware and Verisk,

---

[91]   *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305–06 (Fed. Cir. 2008) ("Once T–Mobile established by clear and convincing evidence that the MobileStar Network was § 102(b) prior art to the asserted claims of the '658 and '400 patents, the burden was on PowerOasis to come forward with evidence to the contrary."); *In re Giacomini*, 612 F.3d 1380, 1385 (Fed. Cir. 2010) (patents can be prior art as of an earlier filing date only if "the [invalidating] disclosure was contained in substance" in the earlier application); *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–28 (Fed. Cir. 2008); see also 35 U.S.C. § 119(e).

[92]   Because both parties are arguing for entitlement to an earlier filing date, the jury needs generalized instructions about what that requires, not ones specific to EagleView and the '436 patent.  This also applies to disputes below.

EagleView asserts that the asserted claims of '436 Patent are entitled to a filing date that precedes the filing of the applications for Sungevity.

As I have explained, to prove that any claim of a patent is invalid, Xactware and Verisk must persuade you by clear and convincing evidence. However, EagleView has the burden to present evidence that the asserted claims of the '436 Patent are entitled to claim priority to earlier-filed patent applications in support of its position that Sungevity is not prior art to the '436 Patent. To do so, EagleView must show that the earlier-filed patent applications contain certain information regarding the asserted claims of the '436 Patent. Specifically, EagleView must show that the earlier-filed applications contain sufficient written description that supports the asserted claims of the '436 Patent and that would enable a person having ordinary skill in the field of the technology of the '436 patent to make and use the full scope of the asserted claims. These requirements are known as, respectively, the written description and enablement requirements.]

In deciding whether an earlier-filed patent application satisfies the written description requirement, you must consider the description of that application from the viewpoint of a person having ordinary skill in the field of technology of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent] when that application was filed. The written description requirement is satisfied if a person having ordinary skill reading the earlier-filed patent application would

have recognized that it describes the full scope of the claimed invention as it is finally claimed in the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent] and that the inventor actually possessed that full scope by the filing date of the earlier-filed application.  The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent application. The full scope of a claim or any particular requirement in a claim need not be expressly disclosed in the original patent application if a person having ordinary skill in the field of technology of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent] at the time of filing would have understood that the full scope or missing requirement is in the written description in the patent application.

In deciding whether an earlier-filed patent application satisfies the enablement requirement, you should consider whether the application contains a sufficiently full and clear description of how to make and use the full scope of the claimed invention of the claims of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent]. To be sufficiently full and clear, the description must contain enough information to have allowed a person having ordinary skill in the field of technology of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent] to make and use the full scope of the claimed invention at the time the earlier-filed patent application was filed.

80

In order to be enabling, the earlier-filed patent application must permit persons having ordinary skill in the field of technology of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent] to make and use the full scope of the claimed invention of the [Plaintiff's Version: later-filed application's] [Defendants' Version: '436 Patent] claim in question at the time of the application's filing without having to conduct undue experimentation.  However, some amount of experimentation to make and use the invention is allowable. In deciding whether a person having ordinary skill would have to experiment unduly in order to make and use the invention, you may consider several factors:

> (1) the time and cost of any necessary experimentation;
> (2) how routine any necessary experimentation is in the field of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent];
> (3) whether the application discloses specific working examples of the claimed invention;
> (4) the amount of guidance presented in the application;
> (5) the nature and predictability of the field of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent];
> (6) the level of ordinary skill in the field of the '[Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent]; and
> (7) the scope of the claimed invention.

No one or more of these factors is alone dispositive. Rather, you must make your decision whether or not the degree of experimentation required is undue based upon all of the evidence presented to you. You should weigh these factors and

determine whether or not, in the context of the invention and the state of the art at the time of the earlier-filed application, a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention of the [Plaintiff's Version: later-filed application] [Defendants' Version: '436 Patent] claim at issue.

Relatedly, [Plaintiff's Version: the party arguing for entitlement to an earlier priority date] [Defendants' Version: EagleView] can only show that the claims of [Plaintiff's Version: the later-filed application] [Defendants' Version: Sungevity] are not entitled to claim priority to its earlier-filed applications [Plaintiff's Version: (deleted)] [Defendants' Version: – U.S. Provisional Application No. 61/025,431 and U.S. Provisional Application No. 61/047,086 –] if it does so by clear and convincing evidence. In connection with that analysis, you must evaluate whether the earlier-filed applications of [Plaintiff's Version: the later-filed application] [Defendants' Version: Sungevity] satisfy the written description and enablement requirements with respect to the claims of [Plaintiff's Version: the later-filed application] [Defendants' Version: Sungevity]. In that instance, you should apply the written description and enablement tests that I have previously described, albeit by evaluating whether a person having ordinary skill in the art of the [Plaintiff's Version: the later-filed application] [Defendants' Version: Sungevity] patent would view the disclosures of the earlier-filed applications, at the time they were filed, as

permitting that person to make and use the full scope of the claimed invention of the claims of [Plaintiff's Version: the later-filed application] [Defendants' Version: Sungevity] without having to conduct undue experimentation and as describing the full scope of the claims of [Plaintiff's Version: the later-filed application] [Defendants' Version: Sungevity].

## 24. F–24 PRIOR ART - PRINTED PUBLICATION[93]

The parties dispute whether Hsieh is a printed publication and therefore whether it is prior art. Xactware and Verisk contend that Hsieh is a printed publication, and that [Plaintiff's Version: certain][94] [Defendants' Version: (deleted)][95] Asserted Claims of the Asserted Patents are invalid in light of the disclosures in Hsieh. [Plaintiff's Version: EagleView contends that Hsieh is not a printed publication and therefore is not prior art.][96] [Defendants' Version: (deleted)].

[Plaintiff's Version: The patent claim is invalid if a publication printed before the effective filing date, before the date of invention by the applicant, or more than one year before the date of application in the United States was][97]

---

[93] AIPLA Model Patent Jury Instructions, § 6.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; 35 U.S.C. § 102(a), (b) (both pre-AIA); 35 U.S.C. §§ 102(a)(1) & 102(a)(2) (both AIA); *In re NTP, Inc.*, 654 F.3d 1279, 1296-97 (Fed. Cir. 2011); *Orion IP v. Hyundai Motor Am.*, 605 F.3d 967 (Fed. Cir. 2010); *In re Lister*, 583 F.3d 1307, 1311-12 (Fed. Cir. 2009); *Kyocera Wireless Corp. v. Int'l Trade Comm.*, 545 F.3d 1340, 1350 (Fed. Cir. 2008); *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008); *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186 (Fed. Cir. 2008).

[94] Defendants have not asserted Hseih against all claims, and removal of this modifier is inaccurate.

[95] - Defendant's version is more aligned with the circumstances of this case relating to the Hsieh reference. Moreover, Plaintiff seeks an inapplicable instruction relating to enablement where the reference at issue will be used for obviousness-based arguments. *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991) ("While a reference must enable someone to practice the invention in order to anticipate under § 102(b), a non-enabling reference may qualify as prior art for the purpose of determining obviousness under § 103").

[96] EagleView should be permitted to have its position stated.

[97] Plaintiff's version directly tracks the AIPLA Model Patent Jury Instructions. AIPLA Model Patent Jury Instructions, § 6.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.

[Defendants' Version: A reference is a printed publication if it was] maintained in some tangible form, such as printed pages, electronic file, microfilm, photographs, Internet publication, or photocopies, and [Plaintiff's Version: must have been][98] [Defendants' Version: was] sufficiently accessible to persons interested in the subject matter of its contents.

Information is publicly accessible if it was distributed or otherwise made available such that persons interested and ordinarily skilled in the subject matter exercising reasonable diligence [Plaintiff's Version: can][99] [Defendants' Version: could] locate it. It is not necessary for the printed publication to have been available to every member of the public. An issued patent is a printed publication. A published patent application is a printed publication as of its publication date. [Plaintiff's Version: The disclosure of the claimed invention in the printed publication must be complete enough to enable one of ordinary skill in the art to use the invention without undue experimentation. In determining whether the disclosure is enabling, you should consider what would have been within the knowledge of a person of ordinary skill in the art as of the patent's priority date, and you may consider evidence that sheds light on the knowledge such a person

---

[98]   Plaintiff's version directly tracks the AIPLA Model Patent Jury Instructions.  AIPLA Model Patent Jury Instructions, § 6.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.

[99]   Plaintiff's version directly tracks the AIPLA Model Patent Jury Instructions.  AIPLA Model Patent Jury Instructions, § 6.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.

would have had.][100] [Defendants' Version: (deleted)][101]

---

[100]   Plaintiff's version mirrors the AIPLA Model Patent Jury Instructions.  AIPLA Model Patent Jury Instructions, § 6.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.  Any clarification to obviousness vs. anticipation can be made if necessary to address Defendants' concern.

[101]  Plaintiff's proposal is inadequate and further increases the risk of jury confusion.  As Plaintiff is aware, and as reflected in the Joint Proposed Pretrial Order, the Hsieh reference is not being presented as an anticipating reference.  There is no need for an enablement-based instruction relating to this reference.  *See* previous footnotes.

## 25. F–25 INCORRECT INVENTORSHIP[102]

[Plaintiff's Version: (deleted)][103]   [Defendants' Version: In this case, Xactware and Verisk contend that the asserted claims of four of the Asserted Patents are  invalid because of improper inventorship.   Those four patents are the '840 patent, the '376 patent, the '454 patent and the '770 patent.  The claims of a patent are invalid if the requirement that all of the actual inventors, and only the actual inventors, be named as inventors in the patent is not met. This is known as the "inventorship" requirement.  Xactware and Verisk contend that David Carlson, a named inventor on the '436 patent, was improperly omitted as an inventor for the '840 patent, the '376 patent, the '454 patent and the '770 patent, even though he made an inventive contribution to those patents, rendering the asserted claims of those Asserted Patents invalid.[104]  EagleView contends the inventorship is correct.

To  be  an  inventor,  one  must  make  a  significant  contribution  to  the conception of at least one or more of the claims of the patent even if that claim has not  been  alleged  to  be  infringed.   Whether  the  contribution  is  significant  is measured against the scope of the full invention.  If someone only explains to the

---

[102]   Source: The Federal Circuit Bar Association Model Patent Jury Instructions, B.4.3d (July 2016).

[103]   Defendants' earlier motion to amend to add this theory to the case was denied by this Court, and Plaintiff objects to this section of objections as improper and irrelevant to theories at issue in this case. Dkt. 432.  There should be no instruction on this issue as it is not an issue for trial or one that is currently in the case.

[104]   If Defendants' previously-denied theories are admitted in these instructions, Plaintiff objects to the following addition by Defendants as inaccurate and improper: ", even though he made an inventive contribution to those patents, rendering the asserted claims of those Asserted Patents invalid".  To the extent this phrase superficially states Defendants' position, that is made clear from the definition of who qualifies as an inventor.

87

actual inventors well-known concepts or the current state of the art, he or she is not an inventor. Merely helping with experimentation, by carrying out the inventor's instructions, also does not make someone an inventor. What is required is some significant contribution to the idea claimed.  Persons may be inventors even if they do not make the same type or amount of contribution, and even if they do not contribute to the subject matter of each claim of the patent. Persons may be joint or co-inventors even though they do not physically work together, but they must have some open line of communication during or at approximately the time of their inventive effort.][105]

---

[105] Based on the evidence that Defendants expect to elicit at trial, an instruction regarding incorrect inventorship is necessary.

## 26.  **F–26 UNPATENTABLE SUBJECT MATTER**[106]

[Plaintiff's position is that the question of unpatentable subject matter has already been determined by the Court in Plaintiff's favor and that all claims have been held patentable, and that no evidence adduced at trial can affect that ruling, and so it is not an CLS issue that can be tried to the jury. Dkt. 557.  In order to invalidate claims under Section 101, a party must show that the claims fail both Step 1 and Step 2 of the test laid out in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014).  If a patent holder shows that the claims satisfy Step 1, the claims are determined to be patentable, and no Step 2 analysis is required.  The Court held that all asserted claims satisfy Step 1.  Dkt. 557.  And in contrast with Step 2, which may have underlying issues of fact that can warrant denial of summary judgment, Step 1 is a purely legal question without underlying questions of fact. Therefore, no evidence presented at trial can affect the Court's ruling that the claims all satisfy Step 1 and therefore are drawn to patentable subject matter.

**Plaintiff's proposal in the remainder in this section are offered by Plaintiff**

---

[106]   Source: *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014); *Intellectual Ventures I  LLC v  Erie Indemn. Co.*, 711 F. Appx 1012, 1014-1019 (Fed. Cir. 2017).

**only in the event that the Court believes an instruction on unpatentable subject matter is warranted.**][107]

[Plaintiff's Version: In this case, Xactware also contends that the claims of the Asserted Patents are directed to subject matter that is ineligible for patent protection. Xactware and Verisk must prove this argument to you by clear and convincing evidence.  In step one of the §101 inquiry, the "abstract idea step," you must analyze whether the claims are directed to an abstract idea.  If so, you must in step two consider the elements of each claim both individually and as an ordered combination to determine if additional elements in each claim "transform the nature of the claim" into a patent-eligible invention. Step one is a meaningful first-stage filter and requires considering whether the character of the claims as a whole is directed to excluded subject matter. For claims that recite a computerized method, the step one inquiry focuses on "whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." Moreover, at step one, the court also reflects on the specifically recited elements in the claim to avoid characterizing the invention too generally. At this stage, if you find the claims recite a patent eligible invention, the § 101 inquiry ends. However,

---

[107]  Defendants' position is that invalidity under section 101 has not yet been resolved in this case and should be presented to the jury. The Court did not resolve section 101,but instead, merely denied Defendant's motion for summary judgment regarding this issue.  Moreover, notwithstanding the Court's summary judgment ruling, both steps of Alice can be reevaluated in view of the trial record.  Defendant's proposed instruction is an accurate reflection of the law.

if a claim is found to recite an abstract idea, you move to step two, the "inventive concept" step. This inquiry looks at what else is recited in the claim besides the patent ineligible idea, and particularly for an inventive concept that transforms the claim into something significantly more than the idea itself.  Step two requires the claims recite elements that are more than well-understood, routine, and conventional activities previously known in the art. The step two inquiry ensures that simply appending conventional steps, specified at a high level of generality is not enough to supply an inventive concept.][108]

[Defendants' Version: In this case, Xactware also contends that the claims of the Asserted Patents are directed to subject matter that is ineligible for patent protection. A patent claim that is directed to "laws of nature," "natural phenomena" or "abstract ideas" is ineligible for patent protection.  If the claim is directed to laws of nature, natural phenomena, or abstract ideas, then the claim is invalid unless it recites an "inventive concept" that transforms it into a patent-eligible invention. When evaluating whether there is an "inventive concept," you should consider the parts of the claim at issue individually and as an ordered combination.

The "inventive concept" cannot be simply elements that were "well-understood, routine or conventional in the art" at the time the Asserted Patents

---

[108]   Plaintiff's proposal is drawn directly from this Court's summary judgment order.  Dkt. 557, Sections 3.2, 3.3.

were invented.  If the elements were "well-understood, routine, or conventional," then the elements are not sufficient to make the patent claim eligible for protection.

Accordingly, you may need to determine whether certain elements in the claims were "well-understood, routine or conventional in the art" at the time the Patents-in-Suit were filed.  In determining whether these elements were "well-understood, routine or convention," you may consider a number of factors including: (i) admissions by EagleView that the elements were well-known or routine; (ii) statements in the Asserted Patents or their prosecution history indicating the elements were well-known or conventional; (iii) express statements in the prior art to the effect that the elements were well-known or conventional; (iv) testimony and other evidence showing the elements were well-understood, routine or conventional; (v) disclosure of the elements in references.][109]

---

[109] Invalidity under section 101 has not yet been resolved in this case and should be presented to the jury. The Court did not resolve section 101 ,but instead, merely denied Defendant's motion for summary judgment regarding this issue.  Moreover, notwithstanding the Court's summary judgment ruling, both steps of Alice can be reevaluated in view of the trial record.  Defendant's proposed instruction is an accurate reflection of the law.

## 27. F–27 DAMAGES GENERALLY[110]

If you find that the Accused Products infringe any Asserted Claim of the Asserted Patents, and that those claims are not invalid, you must determine what amount of damages to award to EagleView for the infringement.  On the other hand, if you find that each of the Asserted Claims is not infringed or is invalid, then you should not consider damages in your deliberations.

EagleView must prove each element of its damages claim—including the amount of the damages—by a preponderance of the evidence.  Preponderance of the evidence means more likely than not.

If proven by EagleView, damages must be adequate to compensate EagleView for the infringement. The purpose of a damage award is to put EagleView in about the same financial position it would have been in if the infringement had not happened. They are not meant to punish an infringer.  You may not add anything to the amount of damages to punish an accused infringer or to set an example.

---

[110]   Source:  AIPLA Model Patent Jury Instructions, § 10.0, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009); 35 U.S.C. § 284 (2004); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964); *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003); *Vulcan Eng'g Co. v. FATA Aluminum, Inc.*, 278 F.3d 1366, 1376 (Fed. Cir. 2002).

The fact that I am instructing you on damages does not mean that the Court believes that one party or the other should win the case.  My Instructions about damages are for your guidance only in the event you find in favor of EagleView. You will need to address damages only if you find that one or more of the Asserted Claims is infringed and that it is not invalid.

[Plaintiff's Version: (deleted)][111] [Defendants' Version: A damages award— either in the form of lost profits, which includes price erosion, or a reasonable royalty—must reflect the portion of the profits or royalty attributable to the respective inventions of the Asserted Claims. In other words, your damages award must reflect the value you find attributable to the patented inventions. The evidence tending to separate or apportion damages between the patented features and unpatented features must be reliable and tangible, and not conjectural or speculative. You may award damages based only on profits or royalty that are directly attributable to the value of the patented technology. You may not award damages based on profits or royalty attributable to unpatented features of the Accused Products. EagleView bears the burden of establishing amounts directly attributable to the patented features.][112]

---

[111]  Defendants' addition is not in the model rules and is redundant.  This goes to apportionment, which is discussed for reasonable royalty damages in the reasonable royalty section below.  Lost Profits analysis includes apportionment in the *Panduit* factors.  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017).

[112]   Apportionment is necessary to establish all damages, whether lost profits or reasonable royalty.  *See, e.g.*, *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017) ("Apportionment is an

[Plaintiff's Version: EagleView must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision.[113] [Defendants' Version: (deleted)]][114]

[Plaintiff's Version: There are different types of damages that EagleView may be entitled to recover. In this case, EagleView seeks either lost profits, including lost sales and price erosion, or a reasonable royalty. For an act of infringement proven by EagleView, EagleView may recover either lost profits or a reasonable royalty, but not both. The damage award cannot be less than a reasonable royalty.

I will give more detailed instructions regarding damages shortly.][115]

[Defendants' Version: (deleted)]

---

important component of damages law generally, and … it is necessary in both reasonable royalty and lost profits analysis.").  Apportionment should therefore be addressed at the outset of the damages instructions.  *See* D. Del. Patent Jury Instruction Handbook § 5:31.

[113]   This is in the model rules and is an important point of clarification for the jury in light of Defendants' arguments.  Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 6-1, available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360 (Fed. Cir. 1991)

[114]   Plaintiff's proposal injects unnecessary confusion into the jury instructions, requiring the jury to define "mathematical precision."  Plaintiff's proposal further invites the jury to award speculative damages.

[115]   This is in the model rules and Plaintiff disputes deleting this section, as it clarifies to the jury that any potential damages award cannot be less than the amount determined for a reasonable royalty.  Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 6-1, available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360 (Fed. Cir. 1991)

## 28.F–28 DATE DAMAGES BEGIN [116] [117] [118]

[Plaintiff's Version: If you find that EagleView sells a product that includes the claimed invention, you must determine whether EagleView has "marked" that product with the patent number. "Marking" is placing either the word "patent" or the abbreviation "pat." with the patent's number on substantially all of the products that include the patented invention or by associating its patents with the patented products on a publicly available internet site. EagleView has the burden of establishing that it substantially complied with the marking requirement. This means EagleView must show that it marked substantially all of the products it made, offered for sale, or sold under the Asserted Patents.

If you find that EagleView sells a product covered by the Asserted Patents but EagleView has not marked that product with the patent number, you must determine the date that Xactware and/or Verisk received actual notice of the Asserted Patents and the specific product alleged to infringe. Actual notice means

---

[116]   [Plaintiff's Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (January 2016) at 6.8 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373-74 (Fed. Cir. 2010); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001); *Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1327-28 (Fed. Cir. 2001); *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001); *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1220 (Fed. Cir. 2002)]]

[117]   [Defendants' Source: 2018 AIPLA Model Patent Jury Instructions § 10.1.2, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0 ; 35 U.S.C. § 287(a);

[118]   Defendants' proposed instruction comes from a version of the model rules that inaccurately states the law, by not stating what occurs if Plaintiff does not sell any products embodying the patents, namely, that there is no requirement to mark products or provide notice for the damages period to start, and instead implies that is always required.  Plaintiff's proposal corrects this, following a different model rule directly.

that EagleView communicated to Xactware and/or Verisk a specific charge of infringement of the Asserted Patents by a specific accused product or device. The filing of the complaint in this case qualified as actual notice, so the damages period begins no later than the date the complaint was filed, but can also begin earlier via marking or notice. EagleView has the burden of establishing that it is more probable than not Xactware and/or Verisk received notice of infringement before the complaint was filed.

However, even if you find EagleView does sell a product covered by the Asserted Patents, if you find that the Accused Products infringe claim 26 of the '454 patent and claim 12 of the '770 patent under 271(g), which is infringement by import, sale, offer for sale or use of product made by patented process, as I previously explained, then EagleView is not required to show that it marked the products or gave notice to Xactware and/or Verisk for those claims, and the damages associated with infringement of those claims would begin on the date of first infringement.

If you find that EagleView does not sell a product covered by the Asserted Patents or sells such a product but marks the product with the patent number,

damages begin without the requirement for actual notice. Damages would then begin on the date of first infringement of an issued patent.][119]

[Defendants' Version: The date that EagleView first notified Xactware or Verisk of its claim for patent infringement is the date for the start of damages for that defendant. The parties do not agree on that date, and it is up to you to determine what that date is.

EagleView must prove that it is more likely than not that Xactware and Verisk were put on notice of the claim for patent infringement as of the date alleged by EagleView. EagleView can give notice in either of two ways. The first way is to give notice to the public in general. EagleView can do this by marking substantially all products it sold which included the patented invention, or by including on the labeling of substantially all products the word "patent" or the abbreviation "PAT" with the number of the patent. EagleView also may give notice by marking substantially all products with "Patent" or "Pat" and a free

---

[119]  Plaintiff's version tracks the model rules from the FCBA. The Federal Circuit Bar Association's Model Patent Jury Instructions (January 2016) at 4.1 available at
https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructi
ons/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf
Plaintiff's only substantive modification to the model rules is to clarify that for infringement under 271(g),
marking and notice are not required, even if there is an embodying product. 35 U.S.C. §§ 287(a), (b)(1); *see
also Sorensen v. Ampro Tools Corp.*, No. C 08-00096 CW, 2009 WL 605831, at *4 (N.D. Cal. Mar. 9, 2009)
("[N]othing in the plain language of §§ 271(g) or 287(b) states that process patent claims require notice of any
kind.").
Defendants' version, modified from the AIPLA, misstates the law and implies that marking and notice are
always required. The law is that marking and notice are only a requirement to start the damages period if there
is an embodying product; otherwise damages start on the date of first infringement. *Texas Digital Sys., Inc. v.
Telegenix, Inc.*, 308 F.3d 1193, 1220 (Fed. Cir. 2002) ("The recovery of damages is not limited where there is
no failure to mark, i.e., where the proper patent notice appears on products or where there are no products to
mark."); 35 USC 287(a). Therefore, Plaintiff's version of the rules, which tracks the FCBA model rules, should
be adopted.

internet address where there is a posting that connects the product with the patent number.  This type of notice to the public in general starts from the date EagleView began to mark substantially all of its products that use the invention with the patent number.

EagleView contends that damages begin on the date of first infringement, which is May 1, 2012, the date that the '840 patent issued.  Xactware and Verisk contend that the date for damages for each patent begins no earlier than the date that patent issued in its current form.  Specifically, Xactware and Verisk contend that damages, if there are any, begin as follows for each of the Asserted Patents:

- '840 Patent: May 1, 2012

- '770 Patent: August 26, 2014

- '436 Patent:  August 27, 2014

- '454 Patent: September 2, 2015

- '376 Patent: September 8, 2015

A second way EagleView can give notice of its patents is to directly notify Defendants with a specific claim that the allegedly infringing product infringed an Asserted Patent. This type of notice starts from the date the Defendants received the notice.  If you find that EagleView, before filing this lawsuit, did not provide an effective public notice by properly marking its products to, and did not properly provide direct notice to the Defendants with a specific charge that the allegedly

infringing product infringed, then EagleView can only recover damages for infringement that occurred after it sued the Defendants on September 23, 2015. [120]

---

[120]  Defendants' proposal directly tracks the AIPLA model jury instruction § 10.1.2, except as noted below.
AIPLA Model Patent Jury Instructions, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.

Plaintiff's proposal, by contrast, deviates substantially from the FCBA model jury instructions.
Defendants' only substantive addition to the AIPLA model jury instructions is to correctly explain that each of the five Asserted Patents has a different issue date.  Plaintiff has represented that it will not seek pre-issuance damages. Defendants' proposed language is necessary in this case to identify the date upon which damages can begin for each of the Asserted Patents.

## 29. F–29 KINDS OF DAMAGES THAT MAY BE RECOVERED[121]

There are several kinds of damages that are available for patent infringement.

One kind of damages is lost profits, that is, the additional profits that the patentee would have made if the defendant had not infringed. You may hear this referred to as the "but for" test—which means, "what profits would the patent owner have made 'but for' the alleged infringement?" Lost profits can include not only the profits the patentee would have made on sales lost due to the infringement, but also, under certain circumstances, profits that the patentee lost from being forced to reduce its price for its product or other related products to compete.

Another kind of patent damages is a reasonable royalty. A reasonable royalty is the amount that someone wanting to use the patented invention would have agreed to pay to the patent owner and the patent owner would have accepted. A reasonable royalty is the minimum amount of damages that a patent owner can receive for an infringement.

---

[121]   Source:  AIPLA Model Patent Jury Instructions, § 10.0, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

101

## 30.F–30 LOST PROFITS[122]

In this case, EagleView seeks to recover lost profits damages.  EagleView seeks both lost sales and price erosion as lost profits.

To prove lost profits, EagleView must show that, but for the alleged infringement, EagleView would have made additional profits through the sale of all or a portion of sales of infringing products made by Xactware. EagleView must prove this by a preponderance of the evidence, more likely than not. Part of your job is to determine what the parties who purchased the allegedly infringing product from Xactware would have done if the alleged infringement had not occurred. It is important to remember that the profits I have been referring to are the profits allegedly lost by EagleView, not the profits, if any, made by Xactware on the allegedly infringing sales.

EagleView has proven its lost profits if you find lost profits if you find that EagleView has proven each of the following factors by the more likely than not standard:

1. the demand for the patented product;

---

[122]   Source:  AIPLA Model Patent Jury Instructions § 10.2.1, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018); *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017); *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1329 (Fed. Cir. 2009)

2. absence of acceptable non-infringing substitutes;

3. that EagleView had the manufacturing and marketing ability to make all or a part of the infringing sales actually made by Xactware ; and

4. the amount of profit that EagleView would have made if it were not for Xactware or Verisk's respective infringement.

I will now explain each of these factors.

## DEMAND FOR THE PATENTED PRODUCT

The first factor asks whether there was demand for the patented product in the relevant market. [Plaintiff's Version: (deleted)] [123] (Defendants' Version: The parties disagree on whether there is a "patented product."

EagleView contends that its roof estimate reports are "patented products."

But Xactware and Verisk contend that the Asserted Claims are directed to methods and systems performed on EagleView's internal RenderHouse and Twister software, which are maintained as trade secrets and not sold to customers. Xactware and Verisk contend that EagleView's roof estimate reports are not "patented products."] [124]

---

[123]   Defendants' addition is not in the model rules and would lead to juror confusion and potentially an inconsistent verdict and should not be included.  If the jury has reached lost profits damages, they have already found a patented product to exist.  IPLA Model Patent Jury Instructions § 10.2.1, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

[124]   Defendants' proposed instruction clarifies an important factual dispute in this case: whether or not there is a "patented product."  Plaintiff's explanation above illustrates the need for this additional instruction; if the jury finds there is no "patented product," the jury cannot award lost profits.

EagleView can prove demand for the patented product by showing significant sales of EagleView's own patented product. EagleView also can prove demand for the patented product by showing significant sales of Xactware's or Verisk's product that are covered by one or more of the Asserted Claims of the Asserted Patents.  [Plaintiff's Version: (deleted)][125] [Defendants' Version: To use sales of Xactware's products as proof of this demand, however, EagleView's and Xactware's products must be sufficiently similar to compete against each other in the same market or market segment.][126]

## ACCEPTABLE NON-INFRINGING SUBSTITUTES

The second factor asks whether there were non-infringing, acceptable substitutes for EagleView's product that competed with Xactware or Verisk's infringing products in the marketplace and the impact of such substitutes on the marketplace absent the sale of Xactware or Verisk's products. If the realities of the marketplace are that competitors other than EagleView would likely have captured some or all of the sales made by Xactware or Verisk, even despite a difference in the products, then EagleView is not entitled to lost profits on those sales.

---

[125]   If the jury is considering the *Panduit* test then this requirement is already met, and so this instruction is unnecessary and confusing if demand is being considered under the *Panduit* test.

[126]   Defendants' proposal directly tracks the model rules; Plaintiff's version does not.  *See* AIPLA Model Patent Jury Instructions  § 10.2.1.3, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.

To be an acceptable substitute, the product must have had one or more of the advantages of the patented invention that were important to the actual buyers of the infringing products, not the public in general. The acceptable substitutes also must not infringe the patent because they were licensed under the patent or they did not include all of the features required by the patent. A non-infringing substitute may be one that involves the modification of the infringing product to avoid infringement or the removal of at least one feature of the invention from the product. [Plaintiff's version: If purchasers of Xactware and/or Verisk's products were motivated to buy that product because of features in that product that are protected by EagleView's patents, then that alternative product is not an acceptable substitute, even if it otherwise competed with a patent holder's and an alleged infringer's products.][127] [Defendants' Version: (deleted)][128]

The acceptable substitutes, in addition to being either licensed or non-infringing, must have been available during the damages period. The acceptable substitute need not have actually been sold at that time. But, if the acceptable

---

[127]  Source:  The Federal Circuit Bar Association's Model Patent Jury Instructions (January 2016) at 6.2 available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf. This is an important instruction missing from the AIPLA model rules.

[128]  Defendants' version tracks the AIPLA model jury instructions directly; Plaintiff's version does not.   AIPLA Model Patent Jury Instructions § 10.2.1.4, available at https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0.

Plaintiff's insertion of a portion of an instruction from a separate set of model jury instruction is redundant and confusing.

105

substitute was not sold during the damages period, then Xactware or Verisk must show by a preponderance of the evidence that, during the damages period, a competitor or Xactware or Verisk had all the necessary equipment, materials, know-how, and experience to design and manufacture the acceptable substitute. If you determine that some of Xactware's or Verisk's customers would just as likely have purchased an acceptable non-infringing substitute, then EagleView has not shown it lost those sales but for Xactware or Verisk's sales.

Even if you find that EagleView's and Xactware's or Verisk's products were the only ones with the advantages of the patented invention, EagleView is nonetheless required to prove to you that it, in fact, would have made Xactware's or Verisk's infringing sales.

## MARKET SHARE

If you find that there were other acceptable, non-infringing substitutes in the market, then EagleView may be entitled to lost profits on a portion of Xactware's or Verisk's infringing sales. The burden is on EagleView to prove that it is more likely than not that its product competed in the same market as Xactware's infringing product, and that EagleView would have made a portion of the infringing sales equal to at least EagleView's share of that market but for Xactware's or Verisk's infringement. It is not necessary for EagleView to prove that EagleView and Xactware and/or Verisk were the only two suppliers in the

106

market for EagleView to demonstrate entitlement to lost profits. The burden is on EagleView, however, to show that it is more likely than not that it would have sold that portion had Xactware and/or Verisk's product never existed.

## CAPACITY

The third factor asks whether EagleView had the manufacturing and marketing ability to actually make the sales it allegedly lost due to Xactware's or Verisk's infringement. EagleView must prove that it could have supplied the additional products needed to make the sales EagleView said it lost, or that someone working with EagleView could have supplied the additional products. EagleView also must prove that it more likely than not had the ability to market and sell these additional products.

## AMOUNT OF LOST SALES

EagleView may calculate  [Plaintiff's Version: the amount of][129] [Defendants' Version: (deleted)] its lost profits  [Plaintiff's Version: by calculating its lost sales][130] [Defendants' Version: on lost sales by computing the lost revenue for sales it claims it would have made but for the infringement] and subtracting from that [Plaintiff's Version: amount any additional costs or expenses that EagleView would have had to pay to make the lost sales][131] [Defendants' Version:

---

[129]  AIPLA Model Patent Jury Instructions § 10.2.1
[130]  AIPLA Model Patent Jury Instructions § 10.2.1
[131]  AIPLA Model Patent Jury Instructions § 10.2.1

figure the amount of additional costs or expenses it would have incurred in making those lost sales]. This might include additional costs for making the products, additional sales costs, additional packaging costs, additional shipping costs, etc. Any costs that do not change when more products are made, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from the lost sales amount. The amount of lost profits cannot be speculative, but it need not be proven with unerring certainty.

## PRICE EROSION

EagleView is entitled to recover additional damages if it can show that it is more likely than not that, but for Xactware or Verisk's infringement, EagleView would have been able to charge higher prices for its products. If you find that EagleView has met its burden of proof, then you may award as additional damages an amount equal to the difference between the profits that EagleView would have made at the higher price and the profits EagleView actually made selling its products at the lower price that EagleView charged. This type of damage is referred to as "price erosion damages."

If you find that EagleView suffered price erosion damages, then you also may use the higher price that EagleView would have charged in determining EagleView's lost sales and lost profits due to Xactware or Verisk's infringement. However, if you calculate price erosion damages using the higher price for the

patented product, then you also must take into account any decrease in EagleView's sales that might have occurred due to the higher price for the products. [Plaintiff's Version: (deleted)][132] [Defendants' Version: This is known as "price elasticity."][133]

In order to award damages based on price erosion, it is not required that EagleView knew that Xactware's or Verisk's competing product infringed the patent, if EagleView reduced its price to meet Xactware or Verisk's prices.

---

[132]   Defendants' suggestion is not in the model rules and is more properly a matter for expert testimony, not jury instruction.

[133]   Defendants' version provides the jury with the appropriate terminology for the concept described in this instruction.

## 31. F–31 REASONABLE ROYALTY[134]

If you find that EagleView has not proven its claim for lost profits, or if you find that EagleView has proven its claim for lost profits for only a portion of the infringing sales, then you must consider the issue of a reasonable royalty.

The amount of damages that Xactware or Verisk pay EagleView for infringing the Asserted Patents must be enough to compensate for the infringement, but may not be less than a reasonable royalty for the use of EagleView's claimed inventions.

[Plaintiff's Version: You must award EagleView a reasonable royalty in the amount that EagleView has proven it could have earned][135] [Defendants' Version: Upon proof of infringement, EagleView is entitled to a reasonable royalty] on any infringing sales for which [Plaintiff's Version: you have not already awarded][136] [Defendants' Version: it has not shown entitlement to] lost profit damages. A

---

[134]   Source:  AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0; 35 U.S.C. § 284; *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018); *Exmark Mfg. Co., v. Briggs & Stratton Power Group*, 879 F.3d 1332 (Fed. Cir. 2018); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Apple Inc. v. Motorola Inc.*, 757 F.3d 1286 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); Federal Circuit Bar Association Model Patent Jury Instructions 6.5-6.7, *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 807 F.3d 1283 (Fed. Cir. 2015).

[135]   Plaintiff's version tracks the model rules directly; Defendants' version does not.  AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

[136]   Plaintiff's version tracks the model rules directly; Defendants' version does not.  AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

royalty is a payment made to a patent owner by someone else in exchange for the right to make, use, or sell [Plaintiff's Version: a patented product] [137] [Defendants' Version: the claimed invention].

The reasonable royalty award must be based on the incremental value that the patented invention adds to the end product. When the infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by the patented features. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.

## HYPOTHETICAL NEGOTIATION

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between EagleView and Xactware or Verisk. Of course, we know that they did not agree to a license and royalty payment. But, in order to decide on the amount of reasonable royalty damages, you should assume that the parties did negotiate a license just before the infringement began. This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license just before the infringement

---

[137]   Plaintiff's version tracks the model rules directly; Defendants' version does not.  AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

began. You should also presume that the parties had full knowledge of the facts and

circumstances surrounding the infringement at the time of the hypothetical

negotiation.

In determining the amount of a reasonable royalty, you may consider

evidence on any of the following factors, in addition to any other evidence

presented by the parties on the economic value of the patent:

1. Any royalties received by the licensor for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

2. The rates paid by Xactware or Verisk to license other patents comparable to the patent-in-suit.

3. The nature and scope of the license, as exclusive or nonexclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5. The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

6. The effect of selling the patented product in promoting other sales of the licensee; the existing value of the invention to the licensor as a generator of sales of its nonpatented items; and the extent of such collateral sales.

7. The duration of [Plaintiff's Version: the patent] [138] [Defendants' Version: each Asserted Patent] and the term of the license [Plaintiff's

---

[138] Plaintiff's version tracks the model rules directly; Defendants' version does not. AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

Version: (deleted)] [139] [Defendants' Version: with respect to that patent].[140]

8.     The established profitability of the product made under the patents; its commercial success; and its popularity.

9.     The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10.    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by or for the licensor; and the benefits to those who have used the invention.

11.    The extent to which Xactware or Verisk has made use of the invention; and any evidence that shows the value of that use.

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.    The portion of the profits that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14.    The opinion testimony of qualified experts.

15.    The amount that a licensor [Plaintiff's Version: (deleted)] [141] [Defendants' Version: (such as the patent owner)] and a licensee (such as [Plaintiff's Version: Xactware and/or Verisk] [142] [Defendants' Version: the accused infringer])[143] would have agreed upon (at the

---

[139] Plaintiff's version tracks the model rules directly; Defendants' version does not.  AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

[140] Defendants' proposal provides clarification necessary to avoid juror confusion in light of the multiple patents asserted in this case.

[141] Plaintiff's version tracks the model rules directly; Defendants' version does not.  AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

[142] Plaintiff's version tracks the model rules directly; Defendants' version does not.  AIPLA Model Patent Jury Instructions § 10.2.5, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

[143] Defendants' proposed language provides helpful clarification to the jury for the terms "licensee" and "licensor."

113

time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product, or other factors such as marketing or advertising, or Xactware and/or Verisk's size or market position. In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the value attributable to the patented technology. In other words, the royalty base must be closely tied to the invention. It is not sufficient to use a royalty base that is too high and then adjust the damages downward by applying a lower royalty rate. Similarly, it is not appropriate to select a royalty base that is too low and then adjust it upward by applying a higher royalty rate. Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

### Entire Market Value Rule

A multi-component product may have both infringing and non-infringing components. In such products, royalties should be based not on the entire product,

114

but instead on the "smallest salable unit" that practices the patent and has close relation to the claimed invention. Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature, damages must only be based on the portion of the value of that product attributable to the patented technology. This may involve estimating the value of a feature that may not have ever been individually sold.

The entire market value rule is a narrow exception to this general rule. In order to recover damages as a percentage of revenues or profits attributable to the entire product, EagleView must establish that it is more likely than not that the patented feature drives the demand for an entire multi-component product such that it creates the basis for customer demand or 'substantially creates the value of the product.

## Multiple Patents

If you find that Xactware and/or Verisk infringed multiple patents, even by a single infringing act, and if you award a reasonable royalty for the infringement, then you may award separate royalties to EagleView for each patent that was infringed. You also may consider evidence of the number of patent licenses that are needed for the allegedly infringing product and the effect on the hypothetical negotiation of having to pay a royalty for each of those licenses.

## TIMING

115

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon. Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

## NON-INFRINGING SUBSTITUTES

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention. An acceptable substitute must be a product that is licensed under the patent or that does not infringe the patent.

## 32. F–32 WILLFUL INFRINGEMENT[144]

In this case, EagleView argues that Xactware and Verisk infringed its patents and, further, that Xactware and Verisk infringed willfully.  If you have decided that Xactware or Verisk has infringed, you must go on and address the additional issue of whether or not this infringement was willful.  [Plaintiff's Version: (deleted)][145] [Defendants' Version: Willfulness requires you to determine whether EagleView proved that it is more likely than not that the infringement by Xactware or Verisk was especially worthy of punishment.]  You may not determine that the infringement was willful just because Xactware and Verisk knew of the Asserted Patents and infringed them.  Instead, willful infringement is reserved for only the most egregious behavior, such as where the infringement is malicious, deliberate, consciously wrongful, or done in bad faith.

To determine whether Xactware and Verisk acted willfully consider all the facts.  These may include, but are not limited, to:

(1)     Whether or not Xactware and/or Verisk acted consistently with the standards of behavior for its industry;

(2)     Whether or not Xactware and/or Verisk intentionally copied a product of EagleView that is covered by the Asserted Patents;

---

[144]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 3.10.
[145]   Plaintiff believes that this instruction is overboard and unnecessary given the rest of the instructions.

(3)      Whether or not Xactware and/or Verisk reasonably believed they did not infringe or that the Asserted Patents were invalid;

(4) Whether or not Xactware and/or Verisk made a good-faith effort to avoid infringing the Asserted Patents, for example, whether Xactware and/or Verisk attempted to design around the Asserted Patents; and

(5) Whether or not Xactware and/or Verisk tried to cover up its infringement.

## 33. F–33 EQUITABLE ESTOPPEL[146]

[Plaintiff's Version: (deleted)][147] [Defendants' Version: The owner of a patent may forfeit its right to any relief from an infringer where: (1) the patent holder communicates something in a misleading way to the infringing party about the lack of infringement or about not being sued, (2) the infringer relies upon the misleading communication from the patent holder, and (3) the infringer will be materially harmed if the patent holder is allowed to assert a claim relating to the issue that is inconsistent with the patent holder's prior misleading communication. This is referred to as an "equitable estoppel" and it is a defense that Xactware and Verisk contend precludes any recovery by EagleView in this lawsuit. Xactware and Verisk must prove each of these elements by a preponderance of the evidence, but even if all these elements are proven, equitable estoppel need not be found if such a finding would be unfair in light of the conduct of the parties.

Xactware and Verisk contend that EagleView made a misleading communication about the Asserted Patents before EagleView filed this lawsuit. A communication may be made through written or spoken words, conduct, silence, or a combination of words, conduct, and silence. Conduct may include action or inaction. Whether in fact EagleView communicated with Xactware and Verisk

---

[146]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 5.3

[147]   Plaintiff's position is that this section should not be included, because Defendants' equitable estoppel arguments should be excluded from the trial, as argued in Plaintiff's Motion *in Limine* No. 6.  Moreover, equitable issues are questions of law and are not for the jury to decide.

about the Asserted Patents prior to the filing of this lawsuit, and whether in fact that communication, if you find there to have been any, was misleading, are questions that must be answered by considering the facts and circumstances as they existed at the time.

Material harm to Xactware and Verisk can be evidentiary or economic in form. Whether Xactware and Verisk suffered evidentiary harm is a question that must be answered by evaluating whether Xactware and Verisk will be unable to present a full and fair defense on the merits of EagleView's claim(s). Not being able to present a full and fair defense on the merits of EagleView's claim(s) can occur due to the loss of important records, the death or impairment of an important witness(es), the unreliability of memories about important events because they occurred in the distant past, or other similar types of things. Whether Xactware and Verisk suffered economic prejudice is a question that must be answered by evaluating whether Xactware and Verisk changed its economic position as a result of its reliance on any misleading communication from EagleView about the Asserted Patents, resulting in losses beyond merely paying for infringement (such as if they could have switched to a noninfringing product if sued earlier) and

whether losses as a result of any change in economic position could have been avoided.][148]

---

[148] Equitable estoppel is still at issue at this case, and there should be no exclusion of evidence relating to this issue. To the extent this defense concerns issues of law, the Court can still – and should -- entertain the jury's findings relating to this issue. This instruction is based on the Federal Circuit Bar Association's Model Patent Jury Instructions

## 34. F–34 UNCLEAN HANDS[149]

[Plaintiff's Version: (deleted)][150][151] [Defendants' Version: The owner of a patent may be barred from enforcing the patent against an infringer where the owner of the patent acts or acted inequitably, unfairly, or deceitfully towards the infringer or the Court in a way that has immediate and necessary relation to the relief that the patent holder seeks in a lawsuit. This is referred to as "unclean hands," and it is a defense that Xactware and Verisk contends precludes any recovery by EagleView in this lawsuit. You must consider and weigh all the facts and circumstances to determine whether you believe that, on balance, EagleView acted in such an unfair way towards Xactware and Verisk or the Court in the matters relating to the controversy between EagleView and Xactware and Verisk that, in fairness, EagleView should be denied the relief it seeks in this lawsuit. Xactware and Verisk must prove unclean hands by a preponderance of the evidence.]

---

[149]   Source: The Federal Circuit Bar Association's Model Patent Jury Instructions (July 2016) at 5.5.

[150]   Unclean hands is not an issue in the case, as Defendants' only unclean hands theory, regarding alleged "inequitable" behavior in not disclosing the Sungevity reference during prosecution was rejected multiple times by Judge Kugler. Dkt. Nos. 408, 432.

[151]   Unclean hands is still at issue in this case, and there should be no exclusion of evidence relating to this issue. To the extent this defense concerns issues of law, the Court can still – and should -- entertain the jury's findings relating to this issue.  This instruction is based on the Federal Circuit Bar Association's Model Patent Jury Instructions.   The defense of unclean hands is not limited to inequitable conduct-related behavior. *See Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 797, 202 L. Ed. 2d 572 (2019).

## 35. F–35 DELIBERATIONS[152]

When you retire to the jury room to deliberate, you may take with you these instructions, your notes, and the exhibits that the Court has admitted into evidence. You should select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All the instructions are important, and you should consider them together as a whole.

---

[152]   Source: Third Circuit Model Jury Instructions (October 2017) at 3.1 available at https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf; New Jersey Model Civil Jury Charges, 1.15, available at: https://www.njcourts.gov/attorneys/civilcharges.html

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

You are to resolve the factual disputes in this case based upon the exhibits which you will have in the jury room with you and your recollection of the testimony of witnesses as bearing on those issues. You have been permitted to make notes during the course of this trial. But as I told you before we started, these notes are not evidence. You may use the notes during your deliberations to help you to recall what the testimony was. However, do not overemphasize the significance of a written note made by yourself or by a fellow juror. If a note does help to refresh your recollection, it has then been useful, but it is your recollection not the note which is important. If your memory differs, you have an absolute right to rely solely on your own recollection.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest convictions about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

124

When you start deliberating, do not talk to the jury officer, to me or to anyone but each other about the case.  During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as a cell phone, smart phone, or computer of any kind; the internet, any internet service, or any text or instant messaging service like Twitter; or any internet chat room, blog, website, or social networking service such as Facebook, LinkedIn, or YouTube, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. Information that you might see on the internet or on social media has not been admitted into evidence and the parties have not had a chance to discuss it with you. You should not seek or obtain such information and it must not influence your decision in this case.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer. The officer will give them to me, and I will respond as soon as I can.  I may have

125

to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages.  Never write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that a certain number is voting one way or another.   Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, each juror must agree to the verdict.  Your verdict must be unanimous.

A form of verdict has been prepared for you.  It has a series of questions for you to answer.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in, and have your foreperson date and sign the form.  You will then return to the courtroom and your foreperson will give your verdict. Unless I direct you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be.  It is your sole and exclusive duty and responsibility to determine the verdict.

126

## 36. F–36 DEADLOCK[153]

It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so consistent with your individual judgments. Each of you must decide the case for yourself, but you should do so only after a consideration of the case with your fellow jurors, and you must be open to their opinions.  You should not be influenced to vote a certain way, however, by the single fact that a majority of the jurors, or any of them, will vote in a certain way. In other words, you should not surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict, or solely because of the opinions of the other jurors.

In the course of your deliberations you should not hesitate to reexamine your own views, and to change your opinion if you are convinced that those views are wrong. To reach a unanimous result you must examine the questions submitted to you openly and frankly, with proper regard for the opinions of others and with a willingness to reexamine your own views.

Remember that you are not partisans; you are judges — judges of the facts. Your only interest is to seek the truth from the evidence. You are the judges of the credibility of the witnesses and the weight of the evidence.

---

[153]   Source: Third Circuit Model Jury Instructions (October 2017) at 3.4 available at
https://www.ca3.uscourts.gov/sites/ca3/files/1_Chaps_1_2_3_2017_Oct.pdf

If you should fail to agree on a verdict, the case is left open and must be resolved at a later time. There is no reason to think that another trial would be conducted in a better way or that a different jury would decide it any better. Any future jury must be selected in the same manner and from the same source as you.

We try cases to dispose of them and to reach a common conclusion if it is consistent with the conscience of each member of the jury. I suggest that, in deliberating, you each recognize that you are not infallible, that you listen to the opinions of the other jurors and that you do so carefully with a view to reaching a common conclusion, if you can. You may take all the time that you feel is necessary.

I remind you that in your deliberations you are to consider the instructions I have given you as a whole. You should not single out any part of any instruction, including this one, and ignore others. They are all equally important.

## 37. F–37 COMMUNICATION WITH COURT[45]

If it becomes necessary to communicate with me during deliberations, you may send a folded note through the marshal or clerk, signed by a juror.

Do not disclose the content of your note to the marshal or clerk. Do not communicate with the court about the case except by a signed note. I will only communicate with you regarding the case in writing or in open court.

Do not disclose any vote count in any note to the court.

---

[45] Source: Northern District of California Model Jury Instructions, available at: cand.uscourts.gov/filelibrary/313/Finjury.pdf

**38.F–38 RETURN OF VERDICT**

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

You may now retire and continue your deliberations.

# GLOSSARY[154]

Some of the terms in this glossary will be defined in more detail in the legal instructions you are given. The definitions in the instructions must be followed and must control your deliberations.

**Abstract**: A brief summary of the technical disclosure in a patent to enable the U.S. Patent and Trademark Office and the public to determine quickly the nature and gist of the technical disclosure in the patent.

**Amendment**: A patent applicant's change to one or more claims or to the specification either in response to an office action taken by an Examiner or independently by the patent applicant during the patent application examination process.

**Anticipation**: A situation in which a claimed invention describes an earlier invention and, therefore, is not considered new and is not entitled to be patented.

**Assignment**: A transfer of patent rights to another called an "assignee" who, upon transfer, becomes the owner of the rights assigned.

**Claims**: Each claim of a patent is a concise, formal definition of an invention and appears at the end of the specification in a separately numbered

---

[154]  Source: The Federal Circuit Bar Association's Model Patent Jury Instructions January 2016) at C available at https://fedcirbar.org/Portals/0/File%20Manager/Resources/Publications/Model%20Patent%20Jury%20Instructions/FCBA%20Model%20Patent%20Jury%20Instructions%20(UPDATED%20DRAFT%20July%202016).pdf; AIPLA Model Patent Jury Instructions, Part III, available at: https://www.aipla.org/docs/default-source/default-document-library/2018-07-23-clean---aipla-model-patent-jury-instructions.pdf?sfvrsn=8664a8dd_0

paragraph. In concept, a patent claim marks the boundaries of the patent in the same way that a legal description in a deed specifies the boundaries of land, i.e., similar to a landowner who can prevent others from trespassing on the bounded property, the inventor can prevent others from using what is claimed. Claims may be independent or dependent. An independent claim stands alone. A dependent claim does not stand alone and refers to one or more other claims. A dependent claim incorporates whatever the other referenced claim or claims say.

**Conception**: The complete mental part of the inventive act which must be capable of proof, as by drawings, disclosure to another, etc.

**Drawings**: The drawings are visual representations of the claimed invention contained in a patent application and issued patent, and usually include several figures illustrating various aspects of the claimed invention.

**Elements**: The required parts of a device or the required steps of a method. A device or method infringes a patent if it contains each and every requirement of a patent claim.

**Embodiment**: A product or method that contains the claimed invention.

**Examination**: Procedure before the U.S. Patent and Trademark Office whereby an Examiner reviews the filed patent application to determine if the claimed invention is patentable.

133

**Filing Date**: Date a patent application, with all the required sections, has been submitted to the U.S. Patent and Trademark Office.

[Plaintiff's Version: (deleted)]155156 [Defendants' Version: **Infringement**: Infringement of a patent occurs when someone makes, uses, or sells a patented invention, without permission of the patent holder, within the United States during the term of the patent. To establish infringement, each and every requirement of an Asserted Claim must be met exactly by the accused product or process.  If even a single requirement of the Asserted Claim is not met, there is no infringement. Infringement may be direct, by inducement, or contributory. Direct infringement is making, using, or selling the patented invention without permission. Inducing infringement is intentionally causing another to directly infringe a patent. Contributory infringement is offering to sell or selling an item that is a significant part of the invention, so that the buyer directly infringes the patent. To be a contributory infringer, one must know that the part being offered or sold is designed specifically for infringing the patented invention and is not a common object suitable for noninfringing uses.]

---

155   The concept of infringement is fully described in the instructions and a glossary is an improper place to summarize such a critical concept.

156  This definition is taken directly from the Federal Circuit Bar Association's Model Patent Jury Instructions. Infringement is an important part of the case and it does not make sense to leave it out of the glossary of terms. The glossary defines other important terms, such as anticipation.  EagleView does not want this instruction because it reminds the jury that EagleView must provide that each and every requirement of an Asserted Claim must be met for infringement.

**Limitation**: A required part of an invention set forth in a patent claim. A limitation is a requirement of the invention. The word "limitation" is often used interchangeably with the word "requirement."

[Plaintiff's Version: (deleted)][157][158] [Defendants' Version: **Nonobviousness**: One of the requirements for securing a patent. To be valid, the subject matter of the invention must not have been obvious to a person of ordinary skill in the field at the time of the filing date of the patent application or, if proven, an earlier date of invention.]

**Office Action**: A written communication from the Examiner to the patent applicant in the course of the application examination process.

**Patent**: A patent is an exclusive right granted by the U.S. Patent and Trademark Office to an inventor to prevent others from making, using, or selling an invention for a term of 20 years from the date the patent application was filed (or 17 years from the date the patent issued). When the patent expires, the right to make, use, or sell the invention is dedicated to the public. The patent has three parts, which are a specification, drawings and claims. The patent is granted after examination by the U.S. Patent and Trademark Office of a patent application filed

---

[157] The concept of non-obviousness is fully described in the instructions and a glossary is an improper place to summarize such a critical concept.

[158] This definition is taken directly from the Federal Circuit Bar Association's Model Patent Jury Instructions. Nonobviousness is an important part of the case and it does not make sense to leave it out of the glossary of terms. The glossary defines other important terms, such as anticipation. EagleView does not want this instruction because it reminds the jury that EagleView's patents must have been nonobvious at the time of filing.

by the inventor which has these parts, and this examination is called the prosecution history.

**Patent and Trademark Office (PTO)**: An administrative branch of the U.S. Department of Commerce that is charged with overseeing and implementing the federal laws of patents and trademarks. It is responsible for examining all patent applications and issuing all patents in the United States.

[Plaintiff's Version: (deleted)][159][160] [Defendants' Version: **Prior art**: Previously known subject matter in the field of a claimed invention for which a patent is being sought. It includes issued patents, publications, and knowledge deemed to be publicly available, such as trade skills, trade practices, and the like.]

**Prosecution History**: The prosecution history is the complete written record of the proceedings in the PTO from the initial application to the issued patent. The prosecution history includes the office actions taken by the PTO and the amendments to the patent application filed by the applicant during the examination process.  The prosecution history may also be referred to as the "file history" or "file wrapper" of the patent during this trial.

**Reads On**: A patent claim "reads on" a device or method when each required part (requirement) of the claim is found in the device or method.

---

[159] The concept of what qualifies as prior art is fully described in the instructions and a glossary is an improper place to summarize such a critical concept.

[160] This definition is taken directly from the Federal Circuit Bar Association's Model Patent Jury Instructions.  Prior art is an important part of the case and it does not make sense to leave it out of the glossary of terms.

136

**Reduction to Practice**: The invention is "reduced to practice" when it is sufficiently developed to show that it would work for its intended purpose.

**Requirement**: A required part or step of an invention set forth in a patent claim. The word "requirement" is often used interchangeably with the word "limitation," and sometimes with the word "element."

**Royalty**: A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to make, use, or sell the claimed invention.

**Specification**: The specification is a required part of a patent application and an issued patent. It is a written description of the invention and of the manner and process of making and using the claimed invention.

Dated:  September 4, 2019

By: *s/ Liza M. Walsh*
Liza M. Walsh
Hector D. Ruiz
Eleonore Ofosu-Antwi
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100

*Of Counsel*
Adam R. Alper
Brandon H. Brown
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104

By: *s/ Scott S. Christie*
Scott S. Christie
Matthew A. Sklar
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 848-5388

*Of Counsel*
Lee Carl Bromberg
Wyley S. Proctor
Brian M. Seeve
Thomas R. Fulford
Thomas F. Foley
James Thomson

137

(415) 439-1400

Michael W. De Vries
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400

Leslie M. Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4800

Gianni Cutri
Joel R. Merkin
Kristina N. Hendricks
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Attorneys for Plaintiff Eagle View
Technologies, Inc.*

MCCARTER & ENGLISH, LLP
265 Franklin St.
Boston, Massachusetts 02110
(617) 449-6500

*Attorneys for Defendants
Xactware Solutions, Inc. and
Verisk Analytics, Inc.*