**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| EAGLE VIEW TECHNOLOGIES, INC., *et al.*, | ) ) ) | Civil No.: 1:15-cv-07025 |
|  | ) | **OPINION** |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
|  | ) |  |
| XACTWARE SOLUTIONS, INC., *et al.*, | ) ) | |
|  | ) |  |
| Defendants. | ) |  |

APPEARANCES:

WALSH PIZZI O'REILLY FALANGA LLP
By:  Liza M. Walsh, Esq.
     Hector D. Ruiz, Esq.
     Eleonore Ofosu-Antwi, Esq.
     Three Gateway Center
     100 Mulberry Street, 15th Floor
     Newark, New Jersey 07102

     and

KIRKLAND & ELLIS LLP
By:  Adam R. Alper, Esq.
     Brandon H. Brown, Esq.
     Reza Dokhanchy, Esq.
     555 California Street
     San Francisco, California 94104

     Michael W. DeVries, Esq.
     333 South Hope Street
     Los Angeles, California 90071

     Patricia Carson, Esq.
     Leslie M. Schmidt, Esq.
     601 Lexington Avenue

New York, New York 10022

Gianni Cutri, Esq.
Kristina Hendricks, Esq.
Joel R. Merkin, Esq.
300 North LaSalle
Chicago, Illinois 60654
*Counsel for Plaintiff*


McCARTER & ENGLISH, LLP
By:  Scott S. Christie, Esq.
     Matthew A. Sklar, Esq.
     Four Gateway Center
     100 Mulberry Street
     Newark, New Jersey 07102

     Lee Carl Bromberg, Esq.
     Thomas R. Fulford, Esq.
     265 Franklin Street
     Boston, Massachusetts 02110

     and

GIBSON DUNN & CRUTCHER LLP
By:  Mark A. Perry, Esq.
     1050 Connecticut Avenue N.W.
     Washington, District of Columbia 20036
          *Counsel for Defendants*

**BUMB**, UNITED STATES DISTRICT JUDGE[1]:

Approximately three weeks ago, a jury found that Defendants Xactware Solutions, Inc. and Verisk Analytics, Inc. ("Defendants") willfully infringed six of Eagle View's patents.  The jury awarded lost profits damages of $125 million to Eagle View.[2]  On September 26, 2019, this Court entered a temporary restraining order ("TRO") enjoining Defendants from, among other things, selling or offering to sell their Property Insight, Roof Insight, Geomni Roof and Geomni Property products [Docket No. 800] that are produced by computer software programs which the jury found infringed Eagle View's patents.  Shortly thereafter, Eagle View filed the instant Motion for a Permanent Injunction.  The Court held a hearing on the motion on October 8, 2019.  Immediately following the hearing, the Court extended the TRO to October 18, 2019 to allow Defendants to present their equitable estoppel defense at an evidentiary hearing to be

----

[1] Due to a combination of full trial calendars and judicial vacancies resulting in a declared judicial emergency, this case was reassigned from Senior District Judge Robert B. Kugler to the undersigned for trial, which was held on September 9 through 25, 2019.

[2] The jury also found that each patent at issue was not invalid.

held on October 18th.  A few days later, however, Defendants notified

the Court that they wished to withdraw their equitable estoppel

defense [Docket No. 835], and the parties agreed that there was no

longer a need for a hearing on that issue.  Thus, all that remains

for immediate adjudication is Eagle View's Motion for Permanent

Injunction.  For the reasons stated herein[3], the motion will be

granted, in part, and denied, in part.

## I.    BACKGROUND

Eagle View defines itself as a data analytics company, with the

"data" being derived from aerial imagery of roofs.  [Trial

Transcript, p. 705:24-706:1 ("A: . . . Eagle View is in the business

of capturing aerial imagery and then extracting roof measurements

from the imagery.").  Eagle View's patented processes are applied to

that data, and then a roof report is generated.   This is Eagle

View's "cornerstone product."  [Daga Sept. 26, 2019 Decl. ¶ 4]  In

contrast to Eagle View, less than half of one percent of Defendants'

revenue results from the generation of roof reports. [PTX-138; PTX-

---

[3]  This Opinion sets forth "the reasons why [the accompanying
     injunction is] issued." Fed. R. Civ. P. 65(d)(1)(A).

4

940; Dkt. No. 791-1, Exs. B-E] It is Defendants' generation of their roof reports from their software programs that the jury found to be infringing.

Putting Defendants' willful infringement of Eagle View's patents aside, ironically, Defendants provide some business value to Eagle View. Through the parties' contractual relationship, Defendants run approximately 25% of Eagle View's roof reports through its Xactimate cost-estimator platform. [Trial Transcript, 1506:17-25 (West Testimony)] That is, in addition to the generation of a roof report, a cost estimate to repair or replace the roof per the measurements of that roof report is also prepared through Defendants' platform. [Trial Transcript, p. 2175:7-15 (Webecke Testimony)] This contractual relationship runs through December, 2020. Suffice it to say it is indeed a paradoxical set of facts: the parties in this hotly contested litigation before the Court are business partners outside the courtroom, at least until the end of next year.

The developed record of the parties' relationship convinces this Court that the effects of a denial of injunctive relief to protect the patents at issue is far more consequential to Eagle View, a company whose essential existence relies upon the income

generated as a result of the patented software, than to Defendants, who are far more diversified.  [See _infra_ at Section III., D.]  As Eagle View's CEO, Rishi Daga, explained at trial, Eagle View's patents are critically important to its business.  To Eagle View, having patent protection means

> small companies like [Eagle View] . . . spen[d] a lot of time, energy, money . . . and do research and development, create new technology, and then file a patent . . . so then [it] can go and build a business and grow a business.  And if [those patents are not enforced] then any big company can come steal your idea and crush you.

[Trial Transcript, p. 800:17-801:1]  The CEO's fears were born out by the trial evidence: in September, 2015, Defendants announced in their formal, written business strategy that they viewed Eagle View as a "threat" [PTX-530.0023], and so they set out to "aggressively" erode Eagle View's market share and undercut Eagle View's prices. [PTX-530.0001]  Indeed, within three years of the 2015 Five Year Business Strategy, Defendants had successfully eroded Eagle View's market share by as much as 20% [Trial Transcript, p. 1511:2-10] and undercut Eagle View's prices by as much as 50%. [Trial Transcript, p. 1504:17-18]  In short, the record evidence supports a finding that Defendants deliberately set out to, and did cause, irreparable harm to Eagle View.  Further, as explained below, Defendants have

provided the Court little assurance that, going forward, Defendants will not continue their aggressive business strategy of what the jury has found to be willful infringement and unfair competition. Unless an injunction issues, there remains, in this Court's mind, a possibility that Eagle View could be pushed out of business altogether.  It is a risk this Court is not willing to take.

## II.  LEGAL STANDARD

The Patent Act provides that injunctions "may" issue "in accordance with the principles of equity."  35 U.S.C. § 283.  "To obtain a permanent injunction, '[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc., 920 F.3d 777, 792 (Fed. Cir. 2019) (quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).  A patentee must

establish each of these <u>eBay</u> factors for an injunction to issue.
<u>Amgen, Inc. v. Sanofi</u>, 872 F.3d 1367, 1381 (Fed. Cir. 2017).[4]

**III. ANALYSIS**

    **A.**   **<u>Irreparable injury</u>**

    "To prove irreparable injury, a patentee must show (1) that
absent an injunction, it will suffer irreparable harm, and (2) that
a sufficiently strong casual nexus" connects the alleged irreparable
harm "to the [] infringement." <u>Presidio Components, Inc. v. Am.</u>
<u>Tech. Ceramics Corp.</u>, 875 F.3d 1369, 1383 (Fed. Cir. 2017).[5] "To
determine whether the patentee will suffer irreparable harm absent
an injunction, the court may consider factors such as the nature of
competition between the patentee and the infringer, the willingness
of a patentee to license, and any lost sales the patentee has
proven." <u>Id.</u> The court may also consider the harm to the
patentee's reputation in the market. <u>See</u> <u>Douglas Dynamics, LLC v.</u>
<u>Buyers Prod. Co.</u>, 717 F.3d 1336, 1344 (Fed. Cir. 2013) ("Irreparable

———————————————

[4] Cert. denied, 139 S. Ct. 787, 202 L. Ed. 2d 568 (2019).

[5] Cert. denied, 139 S. Ct. 144, 202 L. Ed. 2d 24 (2018), and cert.
denied, 139 S. Ct. 73, 202 L. Ed. 2d 23 (2018).

injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction."). The record before this Court amply supports a finding of each of these factors.

### i. Competition between the parties

The trial evidence establishes that the market for roof reports is essentially a two-player market consisting of Eagle View and Defendants. Both are each other's direct competitors. [Trial Transcript, p. 792:22-794:12 (Daga Testimony, "Q: . . . [D]oes Eagle View have any effective competitors other than the defendants? A: No."), p. 1491:2-3 (West Testimony, "Q: Are there any other [roof report] alternatives [other than Defendants and Eagle View] in the marketplace? A: No, there are not."), p. 1511:2-10 ("Q: . . . what is EagleView's market share[?] A: I would say somewhere between 80 and 90 percent. . . . Who has the other 10 to 20 percent? A: The defendants.")][6] With respect to the insurance carrier portion of the

_____

[6] The undisputed fact that the Federal Trade Commission did not approve the parties' proposed merger lends further support to this Court's finding that the market for roof reports effectively consists of two players: Defendants and Eagle View.

9

market, Defendants' own witness, Xactware's President, Mike Fulton, testified that Eagle View is Defendants' only "significant or relevant" competitor. [PTX-961, Deposition Transcript at 251:7-17] Indeed, in opposition to the instant motion, Defendants concede that the insurance carrier portion of the market is a two-player market, arguing that only the construction contractor portion of the market is not a two-player market. [Dkt. No. 825, Opposition Brief, p. 6][7] However, the evidence does not support a finding, by a preponderance of the evidence, that there are other significant or relevant competitors to Defendants and Eagle View in the construction contractor portion of the market. Defendants' evidence in this regard is vague and undeveloped. Defendants' expert, Philip Green, in his declaration filed in opposition to the instant motion[8], merely

---

[7] [See also Oct. 8, 2019 Hearing Transcript, p. 44 ("MR. PERRY: . . . In the insurer market . . . our point is not that it is not a two-player market, to be clear. There are two players, Eagle View and Xactware."]

[8] Defendants elected not to call Mr. Green to testify at the permanent injunction hearing, although the Court provided Defendants the opportunity to do so. [Oct. 8, 2019 Hearing Transcript, p. 3, 90-91]

identifies three companies--"RoofShots/Roofers", "SkyMeasure", and
Home Depot-- which he asserts, in conclusory fashion, "offer reports
that are based on imaging such as that used by Eagle View and
Xactware." [Dkt. No. 825-2, Green Decl. ¶ 18][9] This evidence is
insufficient because Defendants provide no evidence that any of the
three vendors are *bona fide* competitors to Eagle View and
Defendants. Even if this Court were to assume-- which it does not--
that the reports "offered" by these companies are comparable to
Eagle View's roof reports in terms of similarity and accuracy[10],

---

[9] The trial testimony of Defendants' corporate designee, Edmund
Webecke, was even more vague: "Q: On the contractor side, what is
your understanding of the number of competitors to Eagle View and
Xactware in providing Roof Reports? A: Originally, there were
quite a few smaller companies doing this service. . . . And there
are a number of service companies out there that have, over the
years, provided reports or dimensions of roofs through their
service." [Trial Transcript, p. 2316:2-12] [See also, Trial
Transcript, p. 3100:5-12 (Green Testimony: "A: . . . We've heard
about . . . SkyTek, SkyMesh, Roof Shots, those kind of companies
help sells [sic] roof reports to contractors. . . . [Y]ou really
can't see what's going on in the contractor market. There's so
many of them, you don't know what they're buying.")].

[10] [See Trial Transcript, p. 1756:18-20 (Arnold Testimony explaining
that "accuracy problems" render some of Defendants' proposed
noninfringing alternatives "uncompetitive alternative[s].")]

nothing in the record provides any information concerning how many reports these alleged competitors actually sell or have sold. In the absence of such evidence-- and in light of Eagle View's evidence to the contrary[11]-- the Court concludes that these companies' presence in the roof report market is *de minimus*, and therefore Defendants' proffered evidence does not alter this Court's finding that the entire market for roof reports (the insurer and construction contractor portions combined) functions as a two-player market for purposes of assessing irreparable harm.

Indeed, some of the strongest evidence of the present competitive landscape is what has happened since this Court entered its temporary restraining order: rather than turning to some third, non-infringing provider of roof measurements, Defendants' roof

_____

[11] [Trial Transcript, p. 1898:15-20 (Arnold Testimony, "A: . . . the only commercially relevant choices for people who are buying this type of roof report, is either Eagle View or Xactware, and there are some examples of smaller players out there that have come in and out of the market, but they have no meaningful share."); p. 1922:10-15 (Arnold Testimony, "A. American Modern was an Eagle View customer, it went to SkyMeasure, and then it returned to Eagle View. So that tells me they tested it out, they did not find it to be acceptable, and they came back to [Eagle View]. So it looks to me as though SkyMeasure is not able to measure up to the competition that's presented by Xactware and Eagle View."]

report customers-- insurers and construction contractors alike--
have returned to Eagle View.  [Daga Oct. 1, 2019 Decl., Docket No.
817-2, ¶¶ 5-10]  As counsel for Eagle View correctly observed at the
permanent injunction hearing, Defendants have not provided any
evidence of even a single customer choosing an option that was not
Defendants or Eagle View.  [Oct. 8, 2019 Hearing Transcript, p. 11,
14, 77]  Thus, Defendants' gain is Eagle View's loss, and *vice
versa*.  Cf. Presidio Components, 875 F.3d at 1384 ("Since March 17,
2017, the injunction against [the infringer] from selling [the
infringing product] has been in effect.  Based on the evidence
presented to this Court, it appears that, fortuitously, this
injunction may have created the hypothetical market necessary to
determine whether consumers would purchase [the patent holder's
product] in the absence of [the infringer's product].  On remand,
the district court should consider whether consumers have turned to
noninfringing alternatives to the [patent holder's product] . . .
after the [the infringing product] became unavailable or whether
[the patent holder's] sales of the [patented product] have increased
because the [infringing product] is no longer on the market.").

**ii.  Eagle View's lost sales and lost market share to
Defendants**

Eagle View has also proven that it has lost highly valuable customers to Defendants because of Defendants' ability to undercut Eagle View's price. [Trial Transcript p. 1504:17-18 (West Testimony) ("we consistently see the defendants' products in the market at 30 to 50 percent below Eagle View's pricing.")] Indeed, the trial evidence demonstrated that Defendants *intended* to aggressively compete, head-to-head, with Eagle View with the express goal of luring away Eagle View's customers and decreasing Eagle View's market share. As mentioned, in September 2015, Defendants created a "Five Year [Business] Strategy" which set forth "how" Defendants planned to "aggressively grow [their roof report] market share": "[t]here is nothing more important at this time that [sic] to support and sell Roof InSight to US markets and beyond where possible. . . . [Eagle View] is very active in the market . . . . We need to erode their market share by selling Roof InSight right now[.]" [PTX-530.0001, p. 14, 21-22] Defendants specifically identified insurance customers State Farm and Nationwide as business Defendants sought to "take," from Eagle View thereby "hav[ing] [a] significant impact on the competition." [Id. at p. 14-15] Defendants also planned to "be aggressive on price." [Id. at p. 23]

14

The trial evidence further supports a finding that Defendants were successful in achieving their acquisitive goals. Nationwide did, in fact, switch to Defendants, as did MetLife, USAA, Travelers, and Country Financial, among others. [Trial Transcript, p. 797:18-798:2 (Daga Testimony), p. 1483:23-1485:24 (West Testimony); Daga Oct. 1, 2019 Decl. ¶ 7]. Why these customers did so is clear: Defendants were offering their roof reports "at a significantly lower price." [Trial Transcript, p. 1485:6-9, 1488:19-25 (West Testimony)]

Moreover, although Eagle View did not completely lose all of its customers to Defendants, Eagle View was nonetheless forced to lower the prices it offered to both its insurance and construction customers in order to compete with Defendants. [Trial Transcript, p. 1489-96, 1503-04 (West Testimony); PTX-641][12]

---

[12] Eagle View predicts that this pressure to maintain current, artificially deflated prices for its roof reports (which resulted from Defendants' infringement) will continue into the future. While Defendants dismiss this argument as speculative, the Court disagrees. Eagle View's evidence of past market conditions and contract negotiations may be used to reliably predict what will happen in the future. See TEK, 920 F.3d at 793 ("'[p]ast harm to a patentee's market share, revenues, and brand recognition is

The effects of Defendants' aggressive competition strategy persist, post-verdict[13], to today.  Mr. Daga states that at least one of Eagle View's customers is delaying negotiations on a contract renewal with Eagle View so that the customer may potentially take advantage of a lower price offered by Defendants.  [Daga Sept. 26, 2019 Decl. ¶ 5-6]

This mountain of evidence notwithstanding, Defendants erroneously assert that Eagle View's market share has remained constant over the relevant time period, and therefore assert that Eagle View has not proven that it has lost market share to Defendants.  This argument is not supported by the evidence.  Defendants' own document, the "Five Year Strategy", illustrates that between 2013 and 2015, Defendants "command[ed] a ~10% market share

_____

relevant for determining whether the patentee 'has suffered an irreparable injury.'" (quoting i4i, 598 F.3d at 861-62).

[13] The Court notes that by awarding Eagle View $125 million in lost profits damages, and $0 as a reasonable royalty, the jury necessarily, and resoundingly, found that Defendants' infringement caused Eagle View to lose sales and/or caused Eagle View to lower its prices.

vs. [Eagle View] for roof reports" in the US insurance carrier market. [PTX-530.0001, p. 21-22] Similarly, the evidence shows that Eagle View's overall market share (insurance customers and construction contractors combined) did not remain steady at 90%, as Defendants assert. Rather, Eagle View's market share has dipped as low as 80%. [Trial Transcript, p. 1511:2-10 (West Testimony)][14]

### iii.  Eagle View's unwillingness to license its patents

It is undisputed that Eagle View has not licensed the patents at issue. This factor also weighs in favor of a finding of irreparable harm. See Presidio Components, 702 F.3d at 1363 ("The district court correctly found [the patent holder's] unwillingness to license favored finding irreparable injury."). That Defendants' opposition to Eagle View's Motion completely ignores this fact is quite telling.

### iv.  Reputational harm

---

[14]  [See also, Trial Transcript, p. 3132:5-10 (Green Testimony: "Q: In fact, since being sued four years ago this day, defendants have increased their sales of their accused products, and their revenues on sales of the accused products have increased year over year over year, correct? A: Yes. They have had more sales, so there's greater revenue, we all agree.")]

The evidence also demonstrates that Eagle View's roof reports have lost some of their "distinctiveness and market lure" as a result of Defendants' infringement. Douglas Dynamics, 717 F.3d at 1344. The confusion and uncertainty in the market created by Defendants' infringement has negatively impacted Eagle View's relationships and business negotiations with its customers. [Dkt. No. 792-1, Sept. 22, 2019 Daga Decl. ¶¶ 4-7; see also Trial Transcript, p. 1484:1-4, 1496:5-10 (West Testimony)] Defendants have not offered any contrary evidence.

The combined effect of these market conditions-- direct, two-player competition, Eagle View's lost sales and market share to Defendants, and Eagle View's unwillingness to license its patents to Defendants or anyone else-- as well as the harm to Eagle View's reputation in the market, taken altogether, strongly supports the conclusion that Eagle View will suffer irreparable harm in the future absent a permanent injunction.

### v. Nexus

Moreover, Eagle View has also adduced sufficient evidence that the irreparable harm it will suffer absent an injunction is directly attributable to Defendants' infringement, thereby establishing the nexus requirement. As direct competitors in a two-player market,

18

Eagle View's harm was clearly and directly linked to Defendants'
infringement of Eagle View's patent property rights.  See Broadcom
Corp. v. Emulex Corp., 732 F.3d 1325, 1337 (Fed. Cir. 2013)("'Where
two companies are in competition against one another, the patentee
suffers the harm-- often irreparable-- of being forced to compete
against products that incorporate and infringe its own patented
inventions.'") (quoting Douglas Dynamics).  Indeed, the jury
explicitly found the requisite nexus when they awarded Eagle View
$125 million in lost profits "because of" Defendants' infringement.
[Docket No. 727]

The Court rejects Defendants' contrary argument.  Defendants
correctly observe that the patented technology at issue is not roof
reports.  Defendants, however, then take the unsupported leap that
there is no causal nexus between the patented technology-- i.e.,
Eagle View's software that *produces* roof reports-- and consumer
demand.  According to Defendants, consumers do not "want to buy roof
reports because they correlate points on stereoscopic roof images"
[Oct. 8, 2019 Hearing Transcript, p. 63], and so, Defendants reason,
this Court cannot find the requisite nexus between Eagle View's
patented software and consumer demand.

19

The Court finds two flaws in this argument. First, the patents at issue all claim inventions that "generate," "transmit" or "output" a "roof estimate report." Those reports, the evidence shows, are in demand because of their accuracy (and resulting cost savings) [Trial Transcript p. 1478-81, PTX-126], which accuracy is the direct result of the claimed inventions.[15] That is, the roof reports are accurate (and cost-effective) precisely because the patented software correlates points on stereoscopic roof images. Thus, when customers demand accuracy, they are, contrary to Defendants' argument, effectively demanding the patented software.[16]

---

[15] [See Trial Transcript, p. 495:21-24 (Pershing Testimony) ("I was thinking through the problem of how I was going to-- how I was going to use and correlate information from different photographs in order to produce a coherent accurate model of a roof.")]

[16] In this way, this case is distinguishable from the car and cup holder analogy discussed in Apple Inc. v. Samsung Elecs. Co., 735 F.3d 1352, 1368 (Fed. Cir. 2013) ("For example, consumers' willingness to pay an additional $10 for an infringing cup holder in a $20,000 car does not demonstrate that the cup holder drives demand for the car. The question becomes one of degree, to be evaluated by the district court."). [See Oct. 8, 2019 Hearing Transcript, p. 62-65] Defendants argue that customer demand for cars is not driven by cup holder preference, and Defendants have urged this Court to find that Eagle View's patented software is like a cup holder in a car. But the evidence does not support

Second, Eagle View has presented evidence that customers in the market were aware that Eagle View's patented technology was its software, and, thus, sought out Eagle View for its patented technology. [PTX-444.0001-04 (California Business Journal article: "Eagle View Measurements revolutionizes the roofing industry with a unique innovation that saves roofing contractors time and money."); PTX-511.0001 (CNN Money headline: "One small company reinvents a $30 billion market"); PTX-173.0011-12 (Bloomberg article: "EagleView's Software Measures Rooftops With Photos From the Sky"); Trial Transcript, p. 714:13-17 (Daga Testimony, "I thought it was amazing that even before any real marketing efforts, even before any . . . product launches . . . there were actually people who were spending money to buy this digitized computer-based roof report."), p. 1736:16-17 (Arnold Testimony, "A: I conclude that the patented technology is driving demand for [Eagle View's] product.")]

---

such a finding. A car is infinitely more complex than a roof report, and a cup holder certainly does not produce a car the way Eagle View's software generates a roof report.

The Court holds that Eagle View has established the first eBay factor.

**B.    Inadequate remedies at law**

"Difficulty in estimating monetary damages is evidence that remedies at law are inadequate." i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 862 (Fed. Cir. 2010).[17] "[L]oss of market share, brand recognition, and customer goodwill as the result of the defendant's infringing acts," are all losses which the Federal Circuit has recognized are "difficult to quantify." Id.

Concerning lost market share and lost profits, as discussed above, Eagle View has presented ample evidence proving that it lost market share and suffered price erosion as a result of Defendants' infringement, and the jury's award of lost profits necessarily means that the jury found those facts as true. While Defendants argue that the jury's award of lost profits demonstrates that loss of market share and price erosion can be adequately compensated with money damages, the Court disagrees. The jury's award of lost

---

[17]  Aff'd, 564 U.S. 91, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011).

profits for *past* injury is not irreconcilably inconsistent with a
finding that money damages will be inadequate to remedy *future*
injuries for two related reasons. First, that the jury was able to
award damages within a reasonable amount of certainty[18] does not, as
Defendants argue, necessarily lead to the conclusion that Eagle View
has been made whole for its past injuries resulting from Defendants'
infringement.[19] Defendants' calculated and targeted price erosion
strategy has rendered it impossible to predict exactly what price
the market would have sustained absent Defendants' infringement.

Second, an award of lost profits for past injury, of course,
cannot prevent future harm to Eagle View. Having seen all of the
evidence of Defendants' deliberate strategy of aggressive head-to-

––––––––––––––––––––

[18] As the Court instructed the jury in this case, "EagleView need
not prove the amount of damages with mathematical precision, but
it must prove the amount of damages with reasonable certainty."
[Docket # 794, p. 53]

[19] See generally, City of Walla Walla v. Walla Walla Water Co., 172
U.S. 1, 12 (1898)("the remedy at law, in order to exclude a
concurrent remedy at equity, must be as *complete*, as practical,
and as efficient to the ends of justice and its prompt
administration, as the remedy in equity.") (emphasis added); see,
e.g., TEK, 920 F.3d 789-794 (affirming jury's award of lost
profits and also affirming the District Court's imposition of a
permanent injunction).

head competition with Eagle View, and in light of the jury's finding

of willful infringement-- which continued until this Court

temporarily restrained Defendants-- this Court has no confidence

that absent a permanent injunction, Defendants will not continue to

infringe Eagle View's patent rights in a manner that will cause

additional long-term, irreparable harm to Eagle View. The longer

Defendants are permitted to exploit their unlawful infringement, the

longer Eagle View will be unfairly forced to compete against its own

patented technology, and the longer Defendants will artificially and

unfairly depress the market price for roof reports, thereby

rendering impossible any reasonably accurate post-hoc valuation of

lost profits in the future, just as that same conduct has precluded

a more accurate valuation of past lost profits.

When the Court pressed Defendants on this issue, Defendants

were unable to provide the Court with evidence sufficient to allay

the Court's concerns that the irreparable harm Eagle View fears will

not come to pass in the absence of an injunction. In response to

the Court's question, "[w]hat assurance do I have that the

defendants won't take this, what I will call scorched earth tactic,

and snatch Eagle View's customers absent an injunction?" Defendants

gave two answers: history and money damages. [Oct. 8, 2019 Hearing Transcript, p. 50]  Both are unpersuasive.

As to history, Defendants repeatedly relied upon the asserted "steadiness of [Eagle View's] market share data."  [Oct. 8, 2019 Hearing Transcript, p. 46, 50, 51, 54, 60]  However, as discussed above, Defendants' argument is not supported by the evidence; Eagle View has lost market share to Defendants[20], and the Court has every reason to believe that the trend will continue, unless halted by an injunction, because taking Eagle View's market share is Defendants' expressly stated business strategy.

As to money damages, "[p]atent property rights are especially difficult to protect with solely monetary relief because 'a calculating infringer may thus decide to risk a delayed payment to obtain use of valuable property' without the owner's permission." Broadcom, 732 F.3d at 1338 (quoting Presidio, 702 F.3d at 1362–63). Indeed, the evidence of Defendants' Five Year Strategy and the jury's finding of willful infringement supports a finding that

---

[20]  As Defendants conceded at the injunction hearing, "nobody disputes that . . . if it were proved, [] lost market share can be irreparable."  [Oct. 8, 2019 Hearing Transcript, p. 61]

25

Defendants decided-- ultimately unwisely-- to take precisely the risk that Presido and Broadcom identify.  This Court, sitting in equity, will not allow such conduct to continue.

Moreover, Eagle View has put forth unrebutted evidence that its reputation / brand recognition and goodwill in the marketplace have been damaged as a result of Defendants' infringement [Dkt. No. 792-1, Daga Sept. 22, 2019 Decl. ¶¶ 4-7, see also Trial Transcript, p. 1484:1-4 (West Testimony)], and this Court finds that Eagle View's goodwill and reputation will more likely than not suffer continuing damage in the future unless Defendants are enjoined from further infringement.

The Court holds that Eagle View has established the second eBay factor.

C.     **The intersection of eBay factors one and two**

While irreparable harm and the inadequacy of remedies at law are two separate factors to be considered, they do intersect.  See TEK, 920 F.3d at 792 ("The inherent difficulty of quantifying 'loss of market share, brand recognition, and customer goodwill' and of estimating monetary damages indicates that 'remedies at law are inadequate.'") (quoting i4i, 598 F.3d at 862).  At this intersection, the Court makes the following observation.

26

Defendants' "aggressive" approach seemed to be more than just business.  The Court carefully listened to the testimony of Defendants' Rule 30(b)(6) witness, Edmund Webecke.  Mr. Webecke testified that Defendants' business goal, specifically with respect to Eagle View, was to "quiet the noise" that Eagle View, its only competitor, was making in the market.  Specifically, Mr. Webecke testified that the "fear or uncertainty and doubt that the allegations of the patent infringement were causing in the market with [Defendants'] customers" was "noise" that Defendants specifically attempted to "quiet . . . in the marketplace" (when Defendants unsuccessfully sought to acquire Eagle View.)  [Trial Transcript, p. 2355:19 - 2356:24 (Webecke Testimony)]  Eagle View's evidence shows that that uncertainty and doubt in the market persist to this day [see Daga Sept. 26, 2019 Decl. ¶ 7 ("Certain of our former customers have indicated that they would like to return to Eagle View's products, but are hesitant to do so because they are unclear about what the status of the litigation is.")].  And, Defendants have made it known that its litigation with Eagle View is not over.  Thus, despite the jury's verdict, the "noise" continues. The Court is worried that Defendants, who appear to be driven by a specific animus toward Eagle View, would continue their aggressive

27

business strategy to a point this Court is not comfortable allowing it to go-- where Eagle View has lost the lion's share of its business to Defendants, perhaps to Eagle View's ultimate demise.

Moreover, at the permanent injunction hearing, this Court specifically asked Defendants, "can I be faulted, because I sat through the trial, for concluding that I don't have the trust [that Defendants will not take Eagle View's customers] given the corporate mentality this Court witnessed?  Is that a factor I can consider?" [Oct. 8, 2019 Hearing Transcript, p. 54:5-8]  Defendants answered, "it's not a matter of trust . . . . [I]t's a matter of evidence." [Id. at p. 54:10-13]  The Court agrees with Defendants-- it is, indeed, a matter of evidence.  The evidence conclusively demonstrates that Defendants have successfully pursued their aggressive strategy to take Eagle View's customers and erode their market share by at least 20%, leading this Court to have no confidence that, absent an injunction, Defendants will no longer desire to "quiet the noise" made by Eagle View and voluntarily abandon their Five Year Strategy.

### D.  Balance of relative hardships between the parties

"[T]he balance of hardships assesses the relative effect of granting or denying an injunction on the parties[.]  [T]he district

court [should] consider[] several factors in its analysis"
"includ[ing] the parties' sizes, products, and revenue sources."
i4i Ltd., 598 F.3d at 862.  All three of these factors weigh in
favor of finding greater hardship on Eagle View in the absence of an
injunction.

It is undisputed that Eagle View is much smaller in size than
Defendants, and the evidence at trial established that Eagle View's
primary product and primary source of revenue is its roof reports.
[Trial Transcript, p. 705:24-706:1 ("A: . . . Eagle View is in the
business of capturing aerial imagery and then extracting roof
measurements from the imagery.  We are a data analytics company.");
Daga Sept. 26, 2019 Decl. ¶ 4 ("roof reports are [Eagle View's]
cornerstone product")]  In contrast, Defendants' infringing products
comprise 0.4% of Defendants' total revenues during the infringement
period.  [PTX-138; PTX-940; Dkt. No. 791-1, Exs. B-E][21]  As discussed
above, Defendants deliberately leveraged their size and attendant

---

[21]  [See also Trial Transcript, p. 2170:7-15 (Webecke Testimony: "A:
We have three main segments of our business.  One [is] related to
insurance, which Xactware is part of.  We have another section
that is related to financial services, and then a third segment of
Verisk's business is related to energy and specialized markets.")]

ability to undercut Eagle View's prices to cause irreparable harm to Eagle View.  The price erosion in the market that has occurred in the past has rendered it impossible to know exactly what price the market would have sustained absent Defendants' infringement. Allowing Defendants to continue to unfairly compete in the marketplace will only compound this problem in the future, perhaps so much so that Eagle View will be forced out of business. Therefore, the Court concludes that Eagle View will suffer great hardship in the absence of an injunction.

This extreme hardship to Eagle View is not outweighed by the hardship Defendants assert they will suffer if an injunction is issued.  Defendants claim that they will lose sales of noninfringing products such as "wall, door, and window features," [Dkt. No. 825-1, Lewis Decl. ¶ 5]; Defendants' own evidence establishes that the sales of these noninfringing products presently cannot be "unbundled" from the sales of the infringing roof reports. [Id.; see also Dkt. No. 792-1, Daga Sept. 22, 2019 Decl. ¶ 4]  To the extent that a decrease in the sale of these complimentary noninfringing services or products is the natural consequence of Defendants' ceasing to sell infringing roof reports, such a result is not inequitable.  See i4i Ltd., 598 F.3d at 863 ("Similarly irrelevant

30

are the consequences to [the infringer] of its infringement, such as the cost of redesigning the infringing products.  As we explained in Broadcom, neither commercial success, nor sunk development costs, shield an infringer from injunctive relief.  [An infringer] is not entitled to continue infringing simply because it successfully exploited its infringement.").

The Court holds that Eagle View has established the third eBay factor.

### E.   The public interest

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects."  i4i Ltd., 598 F.3d at 863 (Fed. Cir. 2010).

Eagle View's proposed injunction would effectively eliminate one of only two roof report providers in the market.  Defendants assert that this will harm consumers in two ways.  First, Defendants question whether Eagle View will be able to expediently satisfy the increased demand.  Second, Defendants predict that absent any meaningful competition in the market, Eagle View will drastically

increase its prices, and consumers will have no choice but to pay the higher prices.

As to the first issue, Eagle View has put forth evidence that since the Court issued the TRO in this case, Eagle View has kept pace with the increased demand for roof reports, processing roof report orders from its construction customers "well within [Eagle View's] advertised turnaround time (which remains under 4 hours on average)." [Daga Oct. 1, 2019 Decl., Docket No. 817-2, ¶ 10] Indeed, there is no evidence before this Court that Eagle View has ever been *unable* to meet customer demand; the evidence establishes that, historically, Eagle View has met the demand-- even the high volume demands of its largest insurer customers. [Trial Transcript, p. 1470:3-10 (West Testimony) ("A: . . . we do a lot of work around natural catastrophes . . . an insurance company [] could have several thousand or tens of thousands of claims that happen at one time so the efficiency is a big deal. Q: . . . can Eagle View meet Yes."); Trial Transcript, p. 1758:7-9 (Arnold Testimony: "A . . .

Eagle View . . . did have the capacity and does have the capacity to make and sell those additional roof reports [sold by Defendants.")][22]

Defendants also suggest that issuing an injunction will remove all market pressures that currently keep consumer prices low, thereby resulting in significantly higher prices for consumers. The Court is not persuaded that Eagle View is more likely than not to greatly increase its price for roof reports if an injunction is issued. Eagle View has demonstrated that it highly values its reputation in the market and its customers' goodwill [Dkt. No. 792-1, Daga Sept. 27, 2019 Decl. ¶ 3; Trial Transcript, p. 1501:24-1502:2 (West Testimony)], and the record establishes that its customers are highly price sensitive. [Dkt. No. 817-1 Arnold Decl. ¶ 28 ("Having been accustomed to lower priced roof reports, customers

---

[22] Defendants raise the specter of an unprecedented spike in customer demand precipitated by a natural disaster, and speculate that Eagle View might not be able to meet increased demand under such circumstances. While Defendants' concerns in this regard lack evidentiary support at this time, in the event that such a disaster does occur, and if there is evidence that Eagle View cannot keep pace with demand, Defendants may seek an appropriate modification of the injunction.

will likely resent the increased prices, which will negatively impact Eagle View's customer relationships and reputation in the industry."); Trial Transcript, 3114:1 (Green Testimony: "A: . . . customers are price sensitive.")]  Thus, this Court finds that even with an injunction, an incentive remains for Eagle View to refrain from gouging its customers.[23]

Moreover, in a two-player market, increased prices that may result from enjoining the one infringing player is not a sufficient reason to deny an injunction.  Patent litigation between brand name and generic pharmaceutical manufacturers is instructive on this point.  In that context, the Federal Circuit has observed that "the

_____

[23]  At the permanent injunction hearing, the Court suggested that the Court might monitor Eagle View's post-injunction conduct.  Upon reflection, the Court concludes that the more appropriate course is to follow what Rule 60(b)(5) contemplates:  Defendants may apply to the Court for a modification of the injunction if the equities so warrant. See Fed. R. Civ. P. 60(b)(5) ("On motion and just terms, the court may relieve a party . . . from a[n] . . . order [if] applying it prospectively is no longer equitable."); see generally, Horne v. Flores, 557 U.S. 433, 447 (2009) ("Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest.").

public interest in obtaining lower-priced pharmaceutical compounds cannot justify entirely eliminating the exclusionary rights covered by pharmaceutical patents." Mylan Institutional LLC v. Aurobindo Pharma Ltd., 857 F.3d 858, 865 (Fed. Cir. 2017); see also, Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383–84 (Fed. Cir. 2006) (affirming the district court's conclusion "that the significant public interest in encouraging investment in drug development and protecting the exclusionary rights conveyed in valid pharmaceutical patents tips the scales in favor of [the brand name company]" even though the generic argued that "if the generic products were removed from the market, consumers would be inclined not to purchase their medication because of the accompanying price increase for the brand name drug, leading to possible deaths."). The same logic applies in this non-ANDA context where the market, like the ANDA context, consists of only two competitors.

The Court holds that Eagle View has established the fourth and final eBay factor.

### F.   Terms of the Proposed Injunction

Although Defendants oppose the entry of any injunction, they alternatively argue that Eagle View's proposed injunction is

"overbroad and unlawful" in three ways. [Dkt. No. 825, Opposition

Brief, p. 33]

First, Defendants suggest that Eagle View's proposed injunction

"attempts to extend the scope of the injunction far beyond" the four

product combinations adjudicated to infringe the patents at issue.

[Dkt. No. 825, Opposition Brief, p. 34]  The Court disagrees.  As

Eagle View observes, the proposed injunction tracks the jury

instructions and jury verdict about the scope of Defendants'

infringement and therefore is not overly broad.  Contrast Int'l

Rectifier Corp. v. IXYS Corp., 383 F.3d 1312, 1316 (Fed. Cir. 2004)

(vacating permanent injunction that "applie[d] to many more devices

than those actually adjudicated.").[24]

---

[24]  The proposed injunction plainly does not, as Defendants argue,
enjoin Defendants from supplying aerial imagery in and of itself.
The entirety of the challenged clause prohibits Defendants from
"Supplying or causing to be supplied . . . (b) Xactimate in
combination with Property Insight or Roof Insight, or any products
made by these products, including Property Insight, Roof Insight,
Geomni Roof, and Geomni Property, and including the Mass
Production Tool, aerial imagery, and any components not more than
colorably different." (emphasis added)  Compare United
Construction Prods., Inc. v. Tile Tech, Inc., 843 F.3d 1363, 1372
(Fed. Cir. 2016) (affirming a permanent injunction the "plain
language" of which "prohibits all acts of infringement, with
specific hypothetical examples following the term 'including.'").

36

Second, Defendants assert that requiring Defendants to give notice of the injunction to its customers is "inappropriate" in this case. While Defendants acknowledge that some courts have required such notice, see, e.g., Crane Security Technologies, Inc. v. Rolling Optics AB, 2018 WL 4039355 (D. Mass. 2018), they nonetheless contend that, in this case "notice to customers would serve no purpose." [Dkt. No. 825, Opposition Brief, p. 34] Eagle View, however, counters that requiring notice to customers will help remedy the confusion and uncertainty in the market concerning the parties' roof report products ("noise" according to Defendants)-- harm directly caused by Defendants' infringement. The Court agrees with Eagle View that requiring such notice to customers provides a valuable remedy reasonably calculated to correct a portion of the harm caused by Defendants' infringement. Accordingly, the Court will include the proposed notice provision.

Third, Defendants object to Eagle View's proposed requirement that Defendants provide notice to Eagle View before launching what Defendants assert will be a noninfringing alternative. Although tempting, the Court finds this proposed term unnecessary given the nature of the market in this case and the parties' ongoing relationships with each other and their customers. Eagle View will

most likely know from the market if Defendants intend to launch, or

have launched, a product which Defendants contend does not infringe

Eagle View's patents.  At that time, Eagle View may apply to the

Court for any and all appropriate remedies including, but not

limited to, a temporary restraining order and contempt sanctions.

Moreover, the Court will require Defendants to notify their

customers of this permanent injunction ruling. The Court therefore

presumes that, in the event that Defendants offer for sale a roof

report generated from a supposedly non-infringing design-around,

Defendants' customers will most likely carefully consider whether to

purchase such roof reports.  This is so because if Defendants'

design-around is ultimately found to infringe Eagle View's patents,

Defendants' customers who have purchased Defendants' roof reports

could face liability themselves.[25]

--------------------------------

[25]  See generally, 35 U.S.C. § 271(b) ("Whoever actively induces
infringement of a patent shall be liable as an infringer."); 35
U.S.C. § 271(g) ("Whoever . . . uses within the United States a
product which is made by a process patented in the United States
shall be liable as an infringer[.])"; see also, Permanent
Injunction Order accompanying this Opinion (permanently
restraining and enjoining, among other people, "those persons in
active concert or participation with [Defendants] who receive
actual notice of the [permanent injunction] order.").

## IV. CONCLUSION

For the foregoing reasons, the Court will grant, in part, and deny, in part, Eagle View's Motion for a Permanent Injunction as specifically set forth in the accompanying Order issued on this date.


Dated: October 18, 2019                  ___ s/ Renée Marie Bumb _____
                                         RENÉE MARIE BUMB
                                         UNITED STATES DISTRICT JUDGE