[Docket No. 863]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |
|---|---|
| EAGLEVIEW TECHNOLOGIES, INC., *et al.*, | Civil No.: 1:15-cv-07025 |
| Plaintiffs, | **OPINION** |
| v. | |
| XACTWARE SOLUTIONS, INC., *et al.*, | |
| Defendants. | |

APPEARANCES:

WALSH PIZZI O'REILLY FALANGA LLP
By:  Liza M. Walsh, Esq.
     Hector D. Ruiz, Esq.
     Eleonore Ofosu-Antwi, Esq.
     Three Gateway Center
     100 Mulberry Street, 15th Floor
     Newark, New Jersey 07102

     and

KIRKLAND & ELLIS LLP
By:  Adam R. Alper, Esq.
     Brandon H. Brown, Esq.
     Reza Dokhanchy, Esq.
     555 California Street
     San Francisco, California 94104

     Michael W. DeVries, Esq.
     333 South Hope Street
     Los Angeles, California 90071

Patricia Carson, Esq.
Leslie M. Schmidt, Esq.
601 Lexington Avenue
New York, New York 10022

Gianni Cutri, Esq.
Kristina Hendricks, Esq.
Joel R. Merkin, Esq.
300 North LaSalle
Chicago, Illinois 60654
          *Counsel for Plaintiff*


McCARTER & ENGLISH, LLP
By:  Scott S. Christie, Esq.
     Matthew A. Sklar, Esq.
     Four Gateway Center
     100 Mulberry Street
     Newark, New Jersey 07102

     Lee Carl Bromberg, Esq.
     Thomas R. Fulford, Esq.
     265 Franklin Street
     Boston, Massachusetts 02110

     and

GIBSON DUNN & CRUTCHER LLP
By:  Mark A. Perry, Esq.
     1050 Connecticut Avenue N.W.
     Washington, District of Columbia 20036
          *Counsel for Defendants*

2

**BUMB**, UNITED STATES DISTRICT JUDGE:

It is a great irony that the Defendants, Xactware Solutions, Inc., ("Xactware") and Verisk Analytics, Inc. ("Verisk") (collectively the "Defendants"), have described this litigation as a "journey through the looking glass" where the parties and this Court "ended up deep within some unreal wonderland where up is down, left is right." (Opposition Brief, Dkt. 874, at 6). It is so true. At times this Court felt like Alice. The Court strove to make sense of the farrago of shifting defenses, arguments transforming into new, but likewise unpersuasive ones. The Court worried also that the jury, too, might fall down the rabbit hole. In the end, however, the jury made sense of it all.

After twelve days of trial, the jury found that Defendants willfully infringed five of Plaintiff EagleView's patents, and that Defendants had failed to prove, by clear and convincing evidence, that EagleView's patents were invalid. The jury awarded EagleView $125 million in lost profits damages.

3

Defendants now move for a new trial[1], attacking every aspect of the jury's verdict, as well as an alleged "cascading series of errors" by the Court. (Moving Brief, Dkt. No. 864, at 1). For the reasons stated herein, the Motion will be denied, and the Court will "allow judgment on the verdict" pursuant to Fed. R. Civ. P. 50(b)(1). Unlike the jury in *Alice's Adventures in Wonderland*, this jury - who sat through ten days of testimony, heard from numerous

---

[1] Before the case was submitted to the jury, Defendants moved for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The instant motion is a renewed motion for a judgment as a matter of law, or alternatively, a motion for a new trial, pursuant to Fed. R. Civ. P. 50(b). After the Court reviewed the moving, opposition, and reply briefs, the Court determined that a more fulsome discussion of some of the trial evidence was required, and thus directed EagleView to file a sur-reply in further opposition to certain issues raised by Defendants' motion. (See Order, Dkt. 890) ("it is apparent that the parties have starkly divergent views of what occurred during the 12-day trial that is the subject of the Motion. . . . Indeed, Defendants have accused Plaintiff of 'distorting' the trial record. . . . Thus, the Court finds that in fairness to Plaintiff, and importantly, to assist the Court in drilling down to address the parties' fundamental disputes concerning the issues of ineligibility, invalidity and non-infringement, a sur-reply by Plaintiff is warranted."). The very next day Defendants filed a letter request to file a sur-sur-reply. (Dkt. 891) Because the Court has determined that a sur-sur-reply would not be helpful to it, Defendants' request is denied.

fact and expert witnesses, and considered thousands of exhibits - saw through the confusion and illusion, and held right is right.

**I.      BACKGROUND**

Plaintiff EagleView Technologies, Inc. ("EagleView" or "Plaintiff") is the owner of various patents directed to software for rooftop aerial measurements used to prepare roof repair estimates.  In relevant part, EagleView is the owner of five patents:  U.S. Patent No. 8,078,436 ("'436 Patent") entitled "Aerial Roof, Estimation Systems and Methods," U.S. Patent 8,170,840 ("'840 Patent") entitled "Pitch Determination Systems and Methods for Aerial Roof Estimation", U.S. Patent 8, 818,770 ("'770 Patent") entitled "Pitch Determination Systems and Methods for Aerial Roof Estimates," U.S. Patent No. 8, 825,454 ("'454 Patent") entitled "Concurrent Display Systems and Methods for Aerial Roof Estimation," and U.S. Patent 9,129,376 ("'376 Patent") entitled "Pitch Determination Systems and Methods for Aerial Roof Estimation" (collectively the "Patents" or the "Patents-in-Suit").[2]

_____

[2] In addition to these five patents, this case originally included a sixth patent, United States Patent No. 8,209,152 (the "'152

EagleView's two software tools, Render House and Twister, embody the inventions of the Patents and are used to generate EagleView's roof estimate reports.[3]

Defendants Verisk and Xactware, a wholly-owned indirect subsidiary of Verisk, are competitors of EagleView in the construction and insurance markets.  EagleView brought this case alleging that Defendants infringed its asserted claims[4] of the Patents by selling their Xactimate product in combination with Aerial Sketch Version 2, Property In Sight, Roof In Sight, and the

_____

Patent"), entitled "Concurrent Display Systems and Methods for Aerial Roof Estimation," which was issued by the United States Patent and Trademark Office ("PTO") on June 26, 2012. (Complaint, Dkt. 1, ¶ 11).  The parties resolved all of their disputes concerning the '152 Patent prior to trial. (See Stipulation, Dkt. 239)

[3]  Both of these tools (Render House and Twister) use aerial images to measure and create reports.  Each has a variety of subcomponents, including one that identifies aerial images, one that provides a user interface, and one that creates the 3D model.  The subcomponent that creates the roof report at the end of the process is called the House Report.  The House Report became the subject of a discovery dispute during trial and is discussed infra.

[4]  The asserted claims are Claims 2 and 36 of the '436 Patent, Claim 10 of the '840 Patent, Claim 20 of the '376 Patent, Claim 26 of the '454 Patent and Claim 12 of the '770 Patent ("Asserted Claims") and are set more fully below.

6

Mass Production Tool in combination with Xactimate, Property In Sight and Roof In Sight to generate their roof estimate reports.

The evidence at trial revealed that EagleView's patented technology revolutionized the roofing industry.  The technology obviated the need for manual measurements of roofs with a tape measure in order to estimate the cost of repairing a roof.  (Tr. Transcript, Dkt. 804, at 537, 540, 555; PTX-511).  Generally speaking, the patented technology uses aerial pictures of a roof to create a three-dimensional graphical representation or model, from which accurate measurements of roof dimensions can be calculated to determine the cost of repairs.  The Patents' improvement over the manual method had at least three clear advantages: improved safety-- the technology bypassed the need for a person to climb up onto a roof to take measurements, decreased measurement time, and perhaps most importantly, increased accuracy. (Tr. Transcript, Dkt. 804, at 537, 540, 563, 718).  The evidence regarding this breakthrough was overwhelming.

As early as 2009, years before this case began, even the Defendants recognized the value of EagleView's technology, praising it as "cutting-edge" (PTX-615.2), "very accurate" (PTX-615.1), "innovative," (PTX-076.1), "a breakthrough" (Id.), and unlike

7

"anything that [previously] emerged as possible." (PTX-615.1)
EagleView's product was in high demand; Defendants' own customers
were asking them about it. (See PTX-615)("We have received comments
from Liberty Mutual about EagleView and I know that Larry Bishop,
Juan and others have researched them and would like to see potential
success with roofs and this type of technology.  State Farm has
pushed us in this direction for the last two to three years, but we
did not have anything that emerged as possible.")

    EagleView was the only real competitor of Defendants in the
market[5] offering such a groundbreaking and valuable product.
Although the companies at one time discussed merging, see infra, the
deals fell through.  This litigation ensued.  Putting it mildly, the
trial exposed the parties' dislike of each other.  The jury sorted

---

[5]  The trial evidence established that the market for roof reports is
essentially a two-player market consisting of EagleView and
Defendants.  Both are each other's direct competitors. (Tr.
Transcript, Dkt. 805, at 792-94 ("Q: . . . [D]oes Eagle View have
any effective competitors other than the defendants? A: No."), Id.,
at 1491 ("Q: Are there any other [roof report] alternatives [other
than Defendants and Eagle View] in the marketplace?  A: No, there
are not."), Id., at 1511 ("Q: . . . what is EagleView's market
share[?]  A: I would say somewhere between 80 and 90 percent. . .
. Who has the other 10 to 20 percent?  A: The defendants."))

8

through all the evidence – an enmity - and sided for Plaintiff, finding that Xactware and Verisk willfully infringed EagleView's Patents by not only offering their own nearly similar version of a roof report but aggressively attempting to muscle EagleView out of the market by undercutting EagleView on price.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) provides, in relevant part, "[i]n ruling on the renewed motion [for a new trial], the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."

"The district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." Dunn v. HOVIC, 1 F.3d 1362, 1364 (3d Cir. 1993)(quoting Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)).

On a motion for judgment as a matter of law, the issue is "'whether the evidence and justifiable inferences most favorable to the [non-moving] party afford any rational basis for the verdict.'" Delli Santi v. CNA Ins. Companies, 88 F.3d 192, 200 (3d Cir. 1996)

(quoting <u>Anastasio v. Schering Corp.</u>, 838 F.2d 701, 705 (3d Cir. 1988)).

"'Determination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case.'" <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 546 U.S. 394, 401 (2006) (quoting <u>Cone v. West Virginia Pulp & Paper Co.</u>, 330 U.S. 212, 216 (1947)).

## III. ANALYSIS

### A.   <u>Ineligibility Under § 101</u>

Defendants first contend that they are entitled to judgment as a matter of law that the Asserted Claims are patent ineligible under 35 U.S.C. § 101 because the claims "are directed to" an abstract idea and the elements do not add any "inventive concept." (Moving Brief, Dkt. 864, at 9-17). EagleView disagrees, contending that the Asserted Claims are directed to inventive and concrete improvements in roof-estimation technology that rely on unconventional correlations of non-stereoscopic images to generate three-dimensional roof models. Specifically, the Patents "solve the specific problem of generating a roof repair estimate without direct human measurement of a roof" using the "concrete and specific

10

technological solution of a computer's correlating, with or without
user input, different location [ ] points on two, different, non-
stereoscopic aerial views."  (Sur-Reply Brief, Dkt. 897, at 2).  To
that end, the claims go on to recite specific implementations that
improve the functioning of the technological process.  Defendants
also contest Judge Kugler's[6] decision not to submit the question of
§ 101 eligibility to the jury.[7]

    (1) <u>The Asserted Claims</u>

    The Asserted Claims, Claims 2 and 36 of the '436 Patent, Claim
10 of the '840 Patent, Claim 20 of the '396 Patent, Claim 26 of the
'454 Patent and Claim 12 of the '770 Patent provide:

    <u>'436 Patent</u>

    Claim 1 of the '436 Patent states:

——————————————

[6] The Honorable Robert B. Kugler presided over the case until it was
reassigned to this Court on June 25, 2019.  Judge Kugler decided
the pre-trial issues of claim construction and validity.  For the
reasons set forth in this Opinion, Defendants' arguments that
those decisions were incorrect have no merit.

[7] Defendants appear to concede that the jury has no role at the
first step.  (<u>See</u> Moving Brief, Dkt. 864, at 16) ("Judge Kugler
erred as a matter of law at step one").

"A computing system for generating a roof estimate report, the computing system comprising: a memory; a roof estimation module that is stored on the memory and that is configured, when executed, to: receive a first and a second aerial image of a building having a roof, each of the aerial images providing a different view of the roof of the building, wherein the first aerial image provides a top plan view of the roof and the second aerial image provides an oblique perspective view of the roof, and are not a stereoscopic pair; correlate the first aerial image with the second aerial image; generate, based at least in part on the correlation between the first and second aerial images, a three-dimensional model of the roof that includes a plurality of planar roof sections that each have a corresponding slope, area, and edge; and generate and transmit a roof estimate report that includes one or more top plan views of the three-dimensional model annotated with numerical values that indicate the corresponding slope, area, and length of edges of at least some of the plurality of planar roof sections using at least two different indicia for different types of roof properties."

Claim 2 of the '436 Patent states:

"The computing system of claim 1 wherein the roof estimation module is further configured to correlate the first and second aerial images by receiving an indication of one or more corresponding points on the building shown in each of the first and second images."

Claim 36 of the '436 Patent states:

"A non-transitory computer-readable storage medium whose contents, which are computer executable instructions stored on the non-transitory computer-readable storage medium, when executed by a computer processor of a computing system, enable the computing system to generate a roof estimate report for a building having a roof, by causing, when executed by the computer processor of the computing system, the computing system to perform a method comprising receiving two or more images of the building, wherein at

12

least one of the two or more images provides an oblique perspective view of the roof and one of the images provides a top plan view of the roof; receiving an indication of pairs of points on the two or more images, each pair of points corresponding to substantially the same point on the roof depicted in each of the two or more images; generating, based on the two or more images of the building, a three-dimensional model of the roof that includes a plurality of planar roof sections that each have a corresponding area and edges, wherein the generating, based on the two or more images of the building, the model of the roof includes generating the model of the roof based on the receiving the indication of the pairs of points on the two or more images of the building; and transmitting a roof estimate report that includes one or more views of the model, the report being annotated with numerical indications of the area and lengths of the edges of at least some of the plurality of planar roof sections, wherein the roof estimate report includes at least two different indicia for different types of roof properties."

<u>'840 patent</u>

Claim 10 of the '840 Patent states:

"A computing system for generating a roof estimate report, the computing system comprising: a memory; a roof estimation module that is stored on the memory and that is configured, when executed, to: display an aerial image of a building having a roof comprising a plurality of planar roof sections that each have a corresponding pitch; display a pitch determination marker operable to indicate pitch of a planar roof section, wherein the pitch determination marker is overlaid on the aerial image of the building having the roof; receive, based on the displayed pitch determination marker, an indication of the pitch of one of the plurality of planar roof sections of the roof of the building; modify a model of the roof based on the received indication of the pitch of the one planar roof section; and provide roof measurement information based on the model of the roof, the

13

roof measurement information including a measure of the pitch of the one planar roof section."

'770 Patent

Claim 1 of the '770 Patent states:

"A computer-implemented process in a roof estimation system comprising: displaying by the roof estimation system, a graphical user interface including a first aerial image of a roof structure of a building and also at least one first visual marker that is moveable by a user in a same display window as the first aerial image while said first aerial image is displayed within the graphical user interface; moving the first visual marker with respect to the first aerial image of the roof structure to a first location in response to input from the user; storing data in a memory of the computer of the first location to which the first visual market was moved; displaying a second aerial image of the roof structure of the building, the second aerial image providing a different view of the roof that the first aerial image; and displaying a location of a second visual market on the roof structure of the building in the second aerial image of the roof structure based on an indication received from the stored data in the memory of the first location on the displayed first aerial image to which the user had moved the first visual market; and generating and outputting a roof estimate report using a report generation engine, wherein the roof estimate report includes one or more top plan views of a model of the roof annotated with numerical values for corresponding slope, are, or lengths of the edges of at least some of the plurality of planar roof sections of the model of the roof."

Claim 12 of the '770 Patent states:

"The process of claim 1 further comprising: performing, by the roof estimation system, digital wire frame model construction of the roof structure based on the at least one location over the roof structure in the displayed aerial

14

imagery to which the user moved the least one first visual marker."

'454 Patent

Claim 26 of the '454 Patent states:

"A computer-implemented method in a roof estimate report system including a computer system and a memory coupled to the computer system, the method comprising: displaying, by the computer system of the roof estimate report system, a first aerial image of a roof on a single display; displaying, by the computer system of the roof estimate report system, a second aerial image of the same roof on the same single display, the second aerial image providing a different view than the first aerial image, taken from a different angle of the same roof; displaying, by the computer system of the roof estimate report system, a first line drawing representing features of the roof overlaid on the first aerial image of the roof; displaying, by the computer system of the roof estimate report system, a second line drawing representing features of the roof overlaid on the second aerial image of the roof, the second line drawings having features of the roof overlaid on the second aerial image of the roof; changing, by the computer system of the roof estimate report system, a line in the second line drawing that corresponds to the same feature in the first line drawing that was changed by the user, the change in the second line drawing being made by the computer system in response to the change that was made by the user in the first line drawing; and generating and outputting a roof estimate report using a report generation engine, wherein the roof estimate report includes one or more top plan views of a model of the roof annotated with numerical values for corresponding slope, area, or lengths of the edges of a least some of the plurality of planar roof sections of the model of the roof."

'376 Patent

Claim 20 of the '376 patent states:

15

"A roof estimation by system comprising: at least one computer processor; and at least one memory coupled to the at least one computer processor having computer executable instructions stored thereon that, when executed, cause the at least one computer processor to: adjust a pitch determination marker overlaid on a photographic aerial image in response to manipulation of the pitch determination marker by a user so that at least a portion of the pitch determination marker substantially aligns with at least a portion of a planar roof section of the roof in the aerial image; calculate a pitch of the planar roof section roof based on the adjustment of the pitch determination marker; store the calculated pitch in the memory; and generate and output a roof estimate report, wherein the roof estimate report includes one or more top plan views of a model of the roof annotated with numerical values for corresponding slope, area, or lengths of edges of at least some of a plurality of planar roof sections of the roof, wherein the generated roof estimate report is provided for repair and/or constructing the roof structure of the building."

(2) <u>Section 101</u>

The section 101 analysis begins by identifying whether an invention fits within one of the four statutorily provided categories of patent eligible subject matter. Patentable subject matter includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. Laws of nature, natural phenomena, and abstract ideas are not patentable. <u>Mayo Collaborative Servs. v. </u>

16

Prometheus Labs, Inc., 566 U.S. 66, 70-71 (2012); Biski v. Kappos, 561 U.S. 563, 601 (2010).

In Alice Corp. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014), the Court applied a two-step framework for analyzing whether claims are patent eligible.  First, are the claims "directed" to an exception? Id. at 2355.  The claims are "considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1346 (Fed. Cir. 2015).  If the claims are directed to an abstract idea, the inquiry ends.  If they are not, the inquiry proceeds to step two.

The second step of the Alice test, if necessary, requires an examination of the claims limitations.  They must "involve more than performance of 'well-understood routine [and] conventional activities previously known to the industry.'"  Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A., 776 F.3d 1343, 1348 (Fed. Cir. 2014)(quoting Alice, 134 S.Ct. at 2359).  In other words, do the claims contain an "inventive concept" sufficient to transform the nature of the claim into a patent eligible one?  Alice, 134 S. Ct. at 2355.

(3)  Alice Step One Analysis

17

Defendants essentially argue that EagleView's Patents fail the first _Alice_ step because they disclose nothing more than "putting a roofer on a roof" with a tape measure which measurements are then inputted into a computer from which a report is generated. Ironically, as mentioned above, at the time of EagleView's patented technology, Defendants sang a different tune hailing EagleView's invention as the "only one" that spans the two worlds of 3D imaging and analytics and accurate roof estimation. (PTX 624.0014)[8]  Putting aside Defendants' reversal of course, however, it is clear that EagleView's invention solved the problem of generating a roof repair estimate without direct "human measurement of a roof."  (Judge Kugler's Section 101 Opinion, Dkt. 557, at 10-11).  "The computer correlates with or without user input different location [] points on two, different, non-stereoscopic aerial views and then" generates a model of the roof. (_Id._)  The evidence at trial was undisputed that before EagleView's inventions, repairing or replacing a roof meant asking a roofer or contractor to climb the roof to take

---

[8]  _See also_ PTX-615.2, PTX-615.1, PTX-076.1 (Defendants' praising of EagleView's technology)

measurements of the roof, taking into account such things as the style and pitch.  Human involvement was necessary because, as common sense should dictate, all roofs are not the same.

Turning to Judge Kugler's Opinion, the Court first considered the first step under Alice, describing it as a "meaningful first-step filter." (Section 101 Opinion, Dkt. 557, p. 4).  As the Court correctly held, "for claims that recite a computerized method, the inquiry focuses on 'whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea.'" (Id.) (quoting Visual Memory LLC v. NVIDIA Corp., 867 F.3d 1253, 1258 (Fed. Cir. 2017)).

Judge Kugler rejected Defendants' argument that the Patents-in-Suit are just computerized routines of what a human could do without the software and because the use of a computer is nothing more than a replacement for mental activity, the claims are not abstract ideas.  The Court specifically found various claim elements that set forth a technological solution to the well-known problem of generating a roof report without a human's manual, direct measurement of a roof.

As it did at trial, and does so here again, this Court agrees with Judge Kugler's assessment of the claims.  An examination of the

19

'436 Patent uses specific images of a roof, one image "provid[ing] a top plan view of the roof" and the other image "provid[ing] an oblique perspective view of the roof." ('436 Patent, 1:31-32, 2:18-21).  The '436 Patent then correlates these <u>specific</u> images, <u>i.e.</u> non-stereoscopic images - in a <u>specific</u> way by "receiving an indication of pairs of points on the two or more images." (<u>Id.</u> at 1:38-39, 2:22-25) (emphasis added).  Thus, the Patent addresses a concrete, tailored approach to measure the roof from which a roof estimate report is generated.  There is nothing abstract about this.

An examination of the '840 Patent, '770 Patent, and '376 Patent leads the Court to the same conclusion.  Like the '436 Patent's claims, each asserted claim of the '840, '770, and '376 Patents requires specific, tangible images as inputs and generates tangible roof-estimate reports as outputs.  Each also requires modifying a model of the roof based on specific adjustments to claimed markers on the 2D roof images.  <u>See</u> '840 Patent at 24:40-60 ("modify a model of the roof based on the received indication of the pitch" using a "pitch determination marker"); '770 Patent at 23:66-24;28, 25:4-9 (creating a "digital wire frame model" based on "moving" "visual marker[s]" in a "graphical user interface"); '376 Patent at 26:25-48

20

(generating a report by "calculat[ing] a pitch roof section based on the adjustment of [a] pitch determination marker.")

More specifically, Claims 2 and 36 of the '436 require generating "a three-dimensional model of the roof that includes a plurality of planer roof sections that each have a corresponding slope, area, and edges" using the correlation technique of receiving pairs of points on two aerial images that are "not a stereoscopic pair."

Claim 10 of the '840 Patent requires "display[ing]" an image and "pitch determination marker" such that the marker "is overlaid on the aerial image of the building having the roof" and is "operable to indicate pitch of a planar roof section." ('840 Patent at 24:45-51). Based on the "indication of the pitch" from the marker, the system then "modif[ies] a model of the roof" and "provide[s] roof measurement information." (Id. at 24:40-60).

Claim 12 of the '770 Patent requires a graphical user interface in which a user moves a "first visual marker" in the same display window as a "first aerial image"; a "second visual marker" is then displayed in the same window as a "second aerial image" based on the user's movement of the first visual marker; and a "wire frame model"

21

of the roof is constructed based on where the user moved the first
visual marker. ('770 Patent at 23:66-24:29, 25:4-9).

Claim 20 of the '376 Patent requires "adjust[ing] a pitch
determination marker overlaid on a photographic aerial image in
response to [user] manipulation" of the marker; "calculat[ing] a
pitch of the planar roof section" based on the user's adjustment;
and "generat[ing] and output[ting] a roof estimate report ... for
[the] repair and/or constructing [of] the roof structure of the
building." ('376 Patent at 26:25-48).

Claim 26 of the '454 Patent requires displaying "line
drawing[s] representing features of the roof overlaid on the" aerial
images, then modifying the roof model "in response to user input
[that] chang[es] a line in [a] first line drawing." ('454 patent at
27:6-43).

As Judge Kugler found, and this Court concurs, the "claims are
directed to methods and systems by which a user may": 1) specify
points on two different, non-stereoscopic, aerial views of a roof or
roof section; 2) have those points correlated to each other; 3)
change locations of the specified points on the two aerial views;
and 4) then have the software calculate the geometry in terms of
slope, area, and perimeter of those roof views."  Dkt. 57, at 9.  In

22

short, the claims present a solution, having the computer correlate two non-stereoscopic views of different sections of a roof, to the method of climbing up on the roof.  There is nothing abstract about this, and they are not directed to abstract ideas.

Just as "the application of physics [can] create an improved technique for measuring movement of an object on a moving platform," and "claims directed to a new and useful technique for defining a database that runs a general-purpose computer equipment are patent eligible," EagleView's claims are directed to improved systems, media, and methods for using non-stereoscopic photographs to generate accurate roof models and reports.  See Thales Visionix Inc. v. United States, 850 F.3d 1343, 1349 (Fed. Cir. 2017)(citing Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1337–38 (Fed. Cir. 2016)).

This Court must be careful to avoid oversimplifying the claims by looking at them generally and "failing to account for the[ir] specific requirements." McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1313 (Fed. Cir. 2016)(citation omitted).  So, too, must Defendants.  Xactware and Verisk argue that the Asserted Claims are directed to the "abstract ideas of photogrammetry-- i.e., calculating measurements from photos using well-known mathematical

23

principles-- and/or modifying an output based on an input from a user" (Moving Brief, Dkt. 864, at 9), but they improperly oversimplify the Patents and focus on a few "well-known math equations" and "data-manipulation methods" to illustrate their flawed point. (See, e.g., '436 Patent at 4:54-57 and '840 Patent at 4:35-37 (describing a "calibration module" to calculate slope and length based on the rise and the run); '436 Patent at 7:1-7 and '840 Patent at 5:28-35 (describing a "reconstruction algorithm" from "textbooks, trade journals, and academic publications" to create a 3D model); '436 Patent at 8:49-52 and '840 Patent at 4:35-37 (describing the use of a photo instead of measuring tape to determine rise and run, without claiming a specific method of doing so even permitting measurements "automatically" by photo)). Simply, Defendants ignore the claim language. This approach is fatal to their § 101 challenge.

In the final analysis, Judge Kugler correctly held that the relevant claims are patent eligible under step one of the Section 101 inquiry. Thus, this Court need not address Defendants' step two argument and the asserted error of not submitting the issue to the

jury.[9]  Accordingly, because Defendants have not met their burden of demonstrating that the patented technology is directed to an abstract idea, Defendants' Motion for a New Trial on the issue of ineligibility will be denied.

> **B.   Invalidity**

The jury found that Defendants had not proven, by clear and convincing evidence, that any of the Asserted Claims were invalid as either obvious or anticipated. (Dkt. 796, Verdict Sheet Questions 5-12).  Defendants challenge that finding, arguing that (1) two primary pieces of prior art-- Sungevity and Hsieh-- render all of the asserted claims anticipated or obvious, as Defendants' expert, Dr. Mundy, testified at trial (Moving Brief, Dkt. 864, at 18); (2)

---

[9] Even if the Court were to reach step two of the § 101 inquiry, however, the Court would find, for the reasons expressed by Judge Kugler, that the Asserted Claims recite an inventive concept. (See Opinion, Dkt. 557, at 11)  This Court sat through the trial.  It became crystal clear that EagleView's inventions were nowhere close to resembling the practice of climbing on rooftops with tape measures in hand.  EagleView's inventions were groundbreaking, and no one disputed that until this litigation.  Thus, putting aside this Court's uncertainty as to what "material disputed facts at step two "Judge Kugler identified" according to Defendants (Def. Reply Brief, Dkt. 874, at 7), this Court properly declined to submit this § 101 challenge to the jury.

other prior art rendered certain claims obvious; and (3) a new trial
as to invalidity is warranted because the Court erroneously admitted
evidence of Defendants' nine *inter parties* review actions ("IPR")
all of which were rejected by the Patent and Appeal Board ("PTAB").
The Court addresses each argument in turn.

(1)  <u>Sungevity/Hsieh</u>

Defendants first argue that U.S. Patent No. 8,417,061 entitled
"Methods and Systems for Provisioning Energy Systems" and issued on
April 9. 2013, ("Sungevity") and a document by Hsieh entitled
"Design and Evaluation of a Semi-Automated Site Modeling System,"
Carnegie Mellon, November 1995 ("Hsieh") render all of the Asserted
Claims anticipated and obvious.  Both pieces of prior art, they
contend, disclose all elements of the Asserted Claims.  EagleView
disputes the premise of this argument, asserting that the trial
evidence demonstrated that neither Sungevity nor Hsieh are prior
art.  The jury found that Defendants had failed to meet their burden
of proof by clear and convincing evidence.  Thus, for Defendants to
prevail on the instant Motion for a New Trial on this issue,
Defendants must establish that their trial evidence was
"overwhelming, leaving no room for the jury to draw significant
inferences in favor of" EagleView.  <u>Gay v. Petsock</u>, 917 F.2d 768,

771 (3d Cir. 1990).  In other words, the trial evidence must demonstrate that "the jury's verdict in [EagleView's] favor was impermissible." Id.  See also Core v. Wireless Licensing S.A.R.L. v. LGElecs., Inc., 880 F.3d 1356, 1364 (3d. Cir. 2018).

A patent claim is invalid as anticipated if "the invention was . . . patented or described in a printed publication . . . before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a).  A patent claim may be invalid as obvious.  35 U.S.C. § 103(a).  "Obviousness is a question of law with several underlying factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the field of the invention; and (4) objective considerations such as commercial success, long felt but unsolved need, and the failure of others." Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc., 699 F.3d 1340, 1347 (Fed. Cir. 2012); see also Ecolochem, Inc. v. S. California Edison Co., 227 F.3d 1361, 1376 (Fed. Cir. 2000) (observing that secondary considerations of non-obviousness include commercial success, long felt but unsolved needs, and failure of others).

27

The Court turns to the question as to whether Sungevity or Hsieh are even prior art.  As to Sungevity, EagleView's inventor, Mr. Chris Pershing, testified that he conceived of the claimed inventions no later than December 2, 2006, and he reduced the inventions to practice by January 2008. (Tr. Transcript, Dkt. 804, at 505-06, 553).  The testimony of EagleView's expert, Professor Robert Louis Stevenson, and Mr. Pershing's notebooks further supported a finding that Sungevity, with an earliest possible filing date of February 1, 2008 (Mundy DDX-67), was not prior art. Professor Stevenson testified that on January 1, 2008, EagleView "started selling their roof reports. So, that's when they actually had a working system that practiced the patent."  (Tr. Transcript, Dkt. 807, at 1277).  Similarly, the December 2, 2006 notation in Mr. Pershing's notebook reads:

> How to calculate pitch?
>
> (1)  Locate several co-planer points on the on-axis image.  Calculate distance between points.
>
> (2)  Locate same points on off-axis (oblique) view.
>
> (3)  Solve the set of equations that maps the transformation of the coordinate systems from V1 to V2 using the markers location in steps (1) and (2).
>
> (4)  Once the transformation matrix is known, the length calibrated in step (1) can be mapped onto view V2.  New

>           distance in view V2 can now be calculated.   This will
>           allow pitch angle to be determined.

(PTX-457.0019)[10]

     As to Hsieh, EagleView introduced evidence at trial supporting

a finding that Hsieh was not publicly available.   The Hsieh

reference itself is a student paper which lacks any indication that

it was publicly available when it was completed at any time prior to

the critical dates. (DTX-354).   Moreover, while Defendants

introduced evidence that Hsieh's academic advisor, Professor Dave

McKeown, may have obtained Hsieh's paper, the jury could have found,

as EagleView argued at trial, that McKeown's possession of the paper

did not amount to public availability because McKeown was Hsieh's

lab supervisor and therefore would have had private access to his

student's research.   See Tr. Transcript, Dkt. 815, at 2970.

     Perhaps more to the point, Defendants' evidence regarding

Hsieh's public accessibility amounted to no evidence at all.

Relying on an article written by Professor McKeown, which cited

_____

[10]  This evidence corroborates Mr. Pershing's testimony and directly
      contradicts Defendants' assertion that EagleView offered no
      corroborating evidence at trial. (See Reply Brief, Dkt. 874, at 9)

Hsieh (DTX-377), Defendants attempted to draw the inference that Hsieh must have been publicly available; however, Defendants' expert, Dr. Joseph L. Mundy-- the only defense witness to address this issue-- did not know how Professor McKeown would have obtained the Hsieh paper (Tr. Transcript, Dkt. 815, at 2969-70), and only offered bald, conclusory speculation about its accessibility, merely stating, "a reference to a paper should be publicly available to other researchers." (Tr. Transcript, Dkt. 815, at 2667)

The record clearly established that there was more than sufficient evidence for the jury to conclude that neither Sungevity nor Hsieh were prior art.  Defendants' evidence was far from "overwhelming, leaving no room" for the jury to draw significant inferences in favor of" EagleView, Gay, 917 F.2d at 771.  The jury's verdict reflects that it did, indeed, draw those inferences and there is no reason to disturb their verdict.[11]

---

[11]  Even if these were prior art, the Court would find that Defendants failed to meet their burden of showing that either disclosed the Asserted Claims for the reasons set forth in EagleView's sur-reply brief. (See Dkt. 897) In particular, as Dr. Mundy testified, Hsieh's recommended approach used only single images (DTX-354.25-26), whereas the '436 Patent requires two aerial images. (Tr.

Finally, Defendants make no attempt in their briefs to show how the evidence was so "overwhelming" in their favor that there was no room for the jury to find that the other references were not prior art.  Only in their reply brief do they contend that as for Applicad, Labe and Avrahami only there was "uncontroverted evidence" that each was publicly available.  (Def. Reply Br., Dkt. 874, at 15).  Not true.  As Plaintiff set forth in its opposition, Dr. Mundy's testimony as to each reference was tenuous, perhaps speculative.  <u>See</u> Dkt. 872, at 32 (summarizing testimony).  Such evidence is insufficient to upset the jury's verdict.

(2). <u>Other Prior Art</u>

Defendants also argue that, in addition to Sungevity and Hsieh, (a) Labe, Labe in combination with Verma, and Labe in combination with Verma and Aerowest render obvious claim 10 of the '840 patent; (b) Labe in combination with Verma and Aerowest render obvious claim 20 of the '376 patent; and (c) Avrahami, and Avrahami in combination

---

Transcript, Dkt. 815, at 2970-73)  As to Sungevity, Dr. Mundy admitted that he had "no reason to dispute" (Tr. Transcript, Dkt. 815, at 2949-52) the PTO's conclusion that Sungevity's claims were copied from EagleView's patents. (DTX-461.0083)

with Applicad, render obvious claim 12 of the '770 patent. (Moving Brief, Dkt. 864, at 19).  According to Defendants, Dr. Mundy's expert opinion that these combinations rendered the Asserted Claims obvious was "unrebutted."  Id.  This argument, however, ignores the substantial volume of evidence of non-obviousness that EagleView presented at trial.

Most notably, the evidence of the long-felt but unmet need satisfied by EagleView's claimed inventions was overwhelming and unrebutted.  Indeed, even Defendants' own internal documents clearly established this element of non-obviousness.  (See Tr. Transcript Dkt. 808, at 1259:15-1260:8, 1263:11-1269:6, 1271:8-20; PTX630) ("Eagle View-Pictometry combination is the first that is even close to something that we feel is a potential winning solution"); PTX-615 ("State Farm has pushed us in this direction for the last 2 to 3 years but we did not have anything that emerged as possible."); PTX-631.0002 (Farmers Insurance account manager "would love to see this technology integrated into Sketch"); PTX-269; PDX-5.94)

Defendants attempt to ignore this and other evidence[12] by arguing that EagleView failed to show a nexus between the evidence and how roof reports are generated. (Reply Brief, Dkt. 874, at 10). The trial record, however, is replete with instances where EagleView demonstrated how the claimed inventions resulted in more accurate roof reports (see Tr. Transcript, Dkt. 804, at 488-89, 537, 1031; PTX-269.002-03) and how the accuracy of those roof reports, in turn, drove customer demand. (See, e.g., PTX-173.0012--Bloomberg News Article: "Joe Graham, a 28-year-old sales rep and estimator at Collis Roofing in Longwood, Fla., started using EagleView reports earlier this year for sales calls and estimates for people getting new roofs.  He says he continued to measure by hand for several weeks, because he didn't trust the software.  Now, Graham agrees that EagleView reports cut down on arguments with insurers, because

---

[12]  EagleView introduced evidence from which the jury could have found that Defendants copied its invention, see willfulness discussion infra, and that others had tried but failed to create a "winning solution" to the problem solved by EagleView's patented technology (PTX-630).

'most insurance carriers at this point treat it as gospel.'"; PTX-615.1).[13]

In a nutshell, there was overwhelming evidence of secondary considerations of non-obviousness to the specific inventions and claims in this case.

(3)  IPR Evidence

Defendants next assert that the IPR evidence was irrelevant, and "the Court erroneously permitted [EagleView] to confuse the jury" when it allowed EagleView to introduce that evidence. (Moving Brief, Dkt. 864, at 22).  However, as EagleView correctly observes, and the record reflects, the Court exercised its discretion to admit the IPR evidence to address Defendants' misleading presentation of

_____

[13] Indeed, this Court's Opinion granting EagleView's Motion for Permanent Injunction thoroughly explained why Defendants' argument in this regard fails.(See Dkt. No. 841, at 12 ("roof reports are made by the processes claimed in EagleView's patents . . . every Asserted Claim requires generation of a 'roof estimate report.' . . . Those reports, the evidence shows, are in demand because of their accuracy (and resulting cost savings) [Trial Transcript p. 1478-81, PTX-126], which accuracy is the direct result of the claimed inventions.  That is, the roof reports are accurate (and cost-effective) precisely because the patented software correlates points on stereoscopic roof images.  Thus, when customers demand accuracy, they are, contrary to Defendants' argument, effectively demanding the patented software.")

evidence to the jury.  Frankly put, it was Defendants who,
intentionally or not, confused the jury, not EagleView.  As the
record further reflects, preventing or at least minimizing
Defendants' misleading evidence presentation was no easy task in
this regard.  It was one of those *Alice's Adventures in Wonderland*
moments.

Where a motion for a new trial is based on the admissibility of
evidence, "the trial court has great discretion . . . which will not
be disturbed on appeal absent a finding of abuse." Link v. Mercedes
Benz of N. Am ., Inc., 788 F.2d 918, 921-11 (3d Cir. 1986)(internal
citation and quotation omitted); see generally Gen. Elec. Co. v.
Joiner, 522 U.S. 136, 141-42 (1997)("We have held that abuse of
discretion is the proper standard of review of a district court's
evidentiary rulings.  Indeed, our cases on the subject go back as
far as Spring Co. v. Edgar, 99 U.S. 645, 658, 25 L.Ed. 487 (1879),
where we said that '[c]lasses arise where it is very much a matter
of discretion with the court whether to receive or exclude the
evidence; but the appellate court will not reverse in such a case,
unless the ruling is manifestly erroneous.'").  Defendants sowed the

seeds of confusion[14] at the very outset of the trial, asserting in their opening statement that the Patent Office found invalid all 56 claims of the '436 Patent:

> Well, in this case, you will see it actually took over four-and-a-half years from 2007 until October 2011 before the claims of the '436 patent were allowed. 56 claims were allowed. And then that patent went into reexamination. And the next thing that happened was all 56 claims were rejected based upon prior art that the Patent Office considered during the reexam. So, here's the Patent Office telling you that, oops, we made a mistake in 2011 issuing those claims. Now that we see certain prior art references, we know those claims are invalid. <u>So, they are all rejected.  So that's what happened on the reexamination, the patent office itself acknowledging that it can make a mistake</u>.

Tr. Transcript Dkt. 803, at 388-89 (emphasis added).  Although the jury was then told that it was "the ultimate decision maker on whether or not it's a valid claim," <u>id.</u>, Defendants omitted any mention of what transpired after the PTO's reexamination.

---

[14] The Court observed on more than one occasion. (<u>See</u>, <u>e.g.</u>, Tr. Transcript, Dkt. 810, at 1773)("THE COURT: Well, what I think, and it comes up again . . . it's somewhat an exercise in paralipsis, and what I mean by that is, it seems as if the defendants are throwing out an idea without really saying why they're throwing it out there, to get the jury to think, hmm, what's going on here.. . . You kind of throw it out there without saying it, and then you plant the seed.")

Notably, it was the Defendants who had filed a pre-trial Motion
*in Limine* to preclude any reference to the IPR proceedings but not
reexamination proceedings.  <u>See</u> Dkt. 586.  They argued, in part,
that reference to the IPR proceedings would present a substantial
danger of confusing the issues and misleading the jury.  Dkt. 586-1,
at 6.  EagleView opposed the motion, arguing (1) that the IPRs were
directly relevant to willful infringement, (2) that the prior art
considered by the U.S. patent and Trademark Office was the same
prior art considered and rejected by its own expert, Dr. Stevenson,
and thus goes to the weight of the evidence, and (3) that the
proceedings were highly relevant to secondary considerations of non-
obviousness.  <u>See</u> Dkt. 637.  The Court recognized the probative
value of the IPRs, particularly as to the issue of willful
infringement, but deferred its ruling:

> This oral argument's (sic) convinced me that I need to defer
> my ruling on it.  I agree with the plaintiffs that it's
> relevant to willfulness, I think there is some probative
> value to it.  However, I think it requires a 403 balancing.
> Because I will not get into a whole trial within a trial
> about what . . . these proceedings before the patent board
> are.  It's going to get too confusing for the jury.

37

Tr. Transcript, Dkt. 802, at 106.[15]

After the opening statement, on cross-examination of
EagleView's first witness, Dr. Pershing, Defendants attempted to
limit Dr. Pershing's testimony regarding the '436 Patent in a manner
that again presented an incomplete-- and therefore misleading--
picture of what had happened with regard to the '436 Patent:

> Q. I think, Mr. Pershing, I think you testified yesterday
> that you saw the reexamination process as an affirmation of
> the validity of the original patent. Do you recall that,
> saying that, sir?
>
> A. Yes, that's my interpretation.
>
> Q. And that -- but you know during that reexamination process
> that the original patent had 56 claims, and they were all
> rejected based upon Aerowest as a prior art reference; isn't
> that correct?
>
> A. So there is a process that goes on with the examiner back
> and forth, and so initially I believe their first reaction
> was to reject the claims, but then after further discussion
> and --
>
> Q. I think you've answered my question, sir.[16]

---

[15] Defendants' current position that the IPR proceedings "were not
relevant" but reexamination proceedings are is perplexing. Dkt.
864, at 22.

[16] That counsel attempted to prevent the witness from finishing his
answer as to what exactly that "rejection" meant illustrates the
legerdemain that troubled the Court.

A. Then they were -- they were -- they were reissued, some of them, with the minor changes.

Q. All right. And I think that's what you said yesterday, but you recall that there was -- there was in the, and still is in the file history of that patent a page from July 2013 that says claims 1 to 56 are rejected; isn't that right? And we've displayed that --

A. If that's in the history, then that --

Q. All right. I'm going --

A. If that's what the history says is the reason for the rejection, but -- and I can't say that the examiner rejected them for a single solitary reason or through some combination of references that they saw at the time.

(Tr. Transcript, Dkt. 805, at 684-85)

Further on during the trial, on cross-examination of EagleView's expert, Dr. Robert Stevenson, Defendants asked, "Okay. And in fact the Patent Office during that reexamination procedure determined that all 56 of those claims weren't patentable. It rejected them, didn't it?" and Dr. Stevenson answered, "There was a -- you've shown numerous times this nonfinal rejection that they -- that they issued." (Tr. Transcript, Dkt. 808, at 1368) (emphasis added).

39

The cross-examination of Dr. Stevenson did not let up; a deliberate effort was made to get the point across to the jury that the Patent Office rejected the claims:

> Q. The patent Office never <u>rejected</u> that claim?
>
> A. The Patent Office was going back and forth with the inventors of this process. They added that language. The Patent Office never reached a determination that that claim was invalid as it stood.
>
> Q. The Patent office did <u>reject</u> that claim, though, you admitted it. During the reexamination process the Patent Office <u>rejected</u> the claim without that italic language, didn't it?
>
> A. It was a nonfinal rejection, which means the Patent office was considering and wanted to understand, understand deeper.
>
> Q. <u>A nonfinal rejection is a rejection, isn't it</u>, Dr. Stevenson?
>
> The Court: He's answered the question.

(Tr. Transcript, Dkt. 808, at 1372.)

Thus, by the time Defendants' own expert, Dr. Mundy took the stand, the misleading suggestion that the Patent Office had found the '436 Patent invalid had been repeatedly presented to the jury, as the Court so observed. (<u>See</u> Tr. Transcript, Dkt. 813, at 2590, "THE COURT: . . . I think that so much has been thrown at the jury, and what's just been highlighted for me in the opening . . . I think

40

was a mischaracterization.") Yet, the Court continued to exercise caution, advising the parties of its view that "to even the playing field, it just should all . . . come[ ] in" but the Court reserved judgment until it heard Dr. Mundy's testimony. Id. at 2590 ("it will depend upon how he says it, what he says, and in what context he says it"). (emphasis added).

Dr. Mundy continued on to render his expert opinion that the six Asserted Claims of the Patents were invalid. Dr. Mundy testified: "during the initial reaction during the reexamination, was that all the claims of the '436 Patent . . . were rejected over the information contained in AeroWest." Dkt. 813, at 2670 (emphasis added). The Court felt compelled to ask a clarifying question: "THE COURT: And a point of clarification. There's been some testimony that the jury has heard that it didn't necessarily mean that they were finally rejected because of 1A, the Claims 1 through 56 are subject to reexamination. Do you agree with that? THE WITNESS: I do. THE COURT: Okay. Thank you. Next question." (Tr. Transcript, Dkt. 813, at 2672). It is true that Dr. Mundy did go on to explain that the '436 claims were subsequently allowed during later reexamination because language was added to the claims. He opined

41

that the new language, however, was not sufficient to distinguish the claims over AeroWest:

> Well, one fact that I think wasn't available perhaps to the examiner is that any pair of images can be converted to a form which is equivalent to the form that would be provided by a stereoscopic pair.

(Tr. Transcript, Dkt. 813, at 2673). But by then the Court had determined that the damage had been done (a Rule 50(b) determination should defer to "the judge who saw and heard the witnesses and has the feel of the case," Unitherm 546 U.S. at 401). It was only after Dr. Mundy's direct testimony – after Defendants planted the misleading seed -- that the Court made the evidentiary ruling that all of the evidence regarding the IPRs was admissible, explaining, "the doors were opened [by Defendants] so widely that at this point I think the only fair thing to do is let them in and have the parties argue exactly what they've been arguing." (Tr. Transcript, Dkt. 138, at 2794, 3345-46).[17]

---

[17] In fact, in an earlier attempt to balance the prejudice and probative value factors, the Court had permitted cross-examination as to the IPR issue in a limited manner. (See Order granting in part and denying in part EagleView's Motion in Limine, Dkt. 780)

42

On cross-examination, counsel for EagleView attempted to cure the confusion and prejudice:

> Q. Okay. And let's, sticking at a high level, some of the prior art that Xactware submitted to the Patent Office, in its requests for the Patent Office to invalidate the [five] patents, is the same prior art that you were talking to the jury about.
>
> A. That's true.
>
> Q. Okay. And you did talk to - - testify to the jury about some of the Patent Office proceedings, specifically, the reexamination proceedings?
>
> A. Yes. I consider that different from IPR, though.  That's a completely different matter.  That was brought by EagleView themselves, and so . . .
>
> Q. And it's fair to say . . . in your direct testimony [you did not] tell the jury about the IPR proceedings that we are talking about now?
>
> A. No . . . .  It's not that I held it back.  It just wasn't relevant to what we were talking about.

(Tr. Transcript, Dkt. 813, 2808-10).

Clearly, the fact that Defendants (through Dr. Mundy's testimony) improperly suggested that the Patent Office had rejected the claims, without more of an explanation to the jury (other than a fleeting reference to later reexamination) could not stand without

43

some clarifying evidence.[18]  Moreover, whether Dr. Mundy did "hold

back" or intended to mislead the jury was something the jury would

have to decide.

In any event, Defendants can hardly complain that the admission

of IPR evidence caused by their misleading tactics prejudiced them.

The Court gave Defendants ample opportunity to explain what the PTAB

actions really meant.  Dr. Mundy testified, in part:

> Q. And, in total, there were nine separate requests by
> Xactware to invalidate the five patents-in-suit, correct?
>
> A. Sounds about right, I guess.
>
> Q. Okay. And the Patent Office rejected every single one
> of them, right?
>
> A. I wouldn't say that's fair to say.
>
> Q. Okay. The Patent Office denied all of Xactware's
> requests, correct?
>
> A. Well, there is a difference between denying that the
> patents are -- or claiming that the patents are valid versus
> not even considering to answer the question. So I would like
> to make a distinction between those two cases.
>
> Q. And, in response to Xactware's request -- withdrawn.

---

[18] Cf. *Alice's Adventures in Wonderland* Chap. XI ("For some minutes
the whole court was in confusion").

In response to Xactware's requests to invalidate the
patents-in-suit, the Patent Office did not find any of the
claims of the patents-in-suit invalid, correct?

A. That's true.

Q. Okay.

A. But some of them, they didn't even consider. So, I would
say it's zero outcome, right?

(Tr. Transcript, Dkt. 813, at 2808-09).

The foregoing demonstrates why this Court in the end admitted

the IPR evidence.  A Rule 403 balancing may not be a perfect one but

it is the best the Court can do to even the playing field.  Even in

the instant Motion, Defendants continue to downplay the prejudice

they created by suggesting that they introduced the evidence

regarding the rejection of the '436 Patent's claims because it "is

part of the prosecution history and hence directly relevant to that

patent's scope."  (Reply Brief, Dkt. 874, at 10).  Such

justification is a weak one at best.  Jurors should be given the

whole story, not half of one.

In sum, in the Court's final analysis, admission of the IPR

evidence was necessary during trial to remedy the misleading picture

that Defendants presented from the very outset of trial.[19]

Accordingly, because Defendants have not met their burden of

demonstrating that the Patents in Suit were anticipated or obvious,

Defendants' Motion for a New Trial on the issue of invalidity will

be denied.

---

[19]  It bears noting that the Court further attempted to balance the probative and prejudice factors by instructing the parties to prepare a limiting instruction to the jury to clarify that the PTAB's findings were not binding on the jury. (Jury Instructions, Dkt. 794, at 37 ("I instruct you that as a matter of law the decisions in any IPR proceedings are not binding on you with regard to the validity or invalidity of any of the patents in this case. You may give these decisions any weight you decide."))(See also Tr. Transcript, Dkt. 818, at 3449).

Moreover, it is also important to note that admission of IPRs is not per se prohibited.  Certainly, repeated failures to invalidate the patents are probative as to willfulness.  See, e.g., Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S.Ct. 1923, 1932-33 (2016) ("The subjective willfulness of a patent infringer, intentional or not knowing, may warrant enhanced damages.")  IPR denials may be relevant to rebutting a defendant's invalidity assertions at trial that conflict with positions taken earlier during the IPR.  There is also the risk in a given case that unless the IPR denials are introduced, the jury may wrongly infer that the prior art was not before the Patent Office even though it was considered and rejected.  The foregoing demonstrates valid reasons why a court might wish to admit IPR denials.  In this case, the Court did not fully address the foregoing reasons because of Defendants' conduct.

46

**C.    Infringement**

The jury found that EagleView proved, by a preponderance of the evidence, that Defendants directly, and indirectly, infringed all of the Patents-in-Suit. (Dkt. 796, Verdict Sheet Questions 1 - 3). Defendants assert that they are entitled to a judgment as a matter of law because they assert the Court erred in its claim construction and in excluding Defendants' evidence concerning certain language in the draft merger agreements between EagleView and Defendants.   The Court holds neither it, nor Judge Kugler, erred.

(1)  Claim Construction

Defendants assert that: (a) as to the '840 and '376 patents, "Judge Kugler erred in ruling that 'a wire frame *may be* a pitch determination marker'" and that "[a]t trial, the Court compounded Judge Kugler's error." (Reply Brief, Dkt. 874, at 13, 16)(italics in the brief); (b) as to the '454 and '770 patents, Judge Kugler erred by rejecting Defendants' proposed claim construction, ruling that no construction was needed; and (c) as to the '436 patent, the Court erred at trial by excluding Defendants' expert testimony as to whether Defendants' accused product fell within the scope of the claims.

(a)  '840 and '376 Patents

47

Defendants maintain that the pitch determination marker and the wireframe are distinct components of the patented invention. (Moving Brief, Dkt. 864, at 14). This Court disagrees, as did Judge Kugler. The specification of the '840 patent describes how the "wire frame" can be "directly manipulated by the operator in order to make adjustments to the underlying model of the roof," allowing the operator to "increase or decrease the length of [a] line segment" such that "the illustrated pitches are determined by the roof estimation system based [in part] on . . . the operator's specification of the wire frame model." (PTX-3.40-41 at 15:56-61, 15:27-34, 15:2-4, 14:24-46). As Judge Kugler found, the patents disclose an iterative process, and this Court agrees. (See Markman Opinion, Dkt. 332, p. 12). ("Pitch adjustment by the operator's action is an iterative activity. The previous roof model can, in effect, serve as the new pitch determination marker upon which an operator can act. . . Since the '840 patent unambiguously describes it, a person of ordinary skill in the art would understand the iterative and interrelated nature of pitch determination activity, roof model construction activity, and roof model review activity.") Indeed, Defendants conceded as much at trial, stating, "we fully

48

admit, there are even examples of wireframes in the patent that are pitch determination markers." (Tr. Transcript, Dkt. 810, at 1789)

Further, because this Court holds that Judge Kugler did not err, it necessarily follows that this Court's rulings consistent with Judge Kugler's claim construction were not error. Defendants proposed to introduce testimony "that the wireframe is not operable to indicate pitch." (Tr. Transcript, Dkt. 810, at 1783); (see also Id. p. 1389)("We are making the argument that the wireframe models of the accused products aren't pitch determination markers because they're not operable to indicate pitch."). As this Court held at trial, and reaffirms here, such evidence and argument were precluded by Judge Kugler's claim construction. (See Tr. Transcript, Dkt. 808 at 1391, 1393) ("Mr. SEEVE: . . . [our expert] will say that the wireframe models don't actually communicate in terms of pitch. When they're being moved, the wireframe model gets moved around the screen, but under the hood, like in the software communication between different modules of the software, pitch is never mentioned. Pitch is never exchanged, sent, received, nothing is modified. THE COURT: But they can be moved to indicate pitch. . . . I think to somehow say to the jury that it has to be operable to indicate pitch conflicts with Judge Kugler's ruling that a wireframe is a pitch

49

determination marker.  And so that's why, you know, I don't use the word 'cute' lightly, but that's why I think if you want to say nuanced, okay[.]")  A party is not permitted to introduce expert testimony that conflicts with the Court's claim construction not just because it violates a court's ruling but it also causes jury confusion.  See, e.g., EMC Corp. v. Pure Storage, Inc., 154 F.Supp. 3d 81, 109 (D. Del. 2016).

For the first time,[20] Defendants appear to argue that the invention expressly disclaimed the interpretation that the wireframe can be a pitch determination marker.  First, making such argument at this stage of the litigation is too late and, thus, is waived, Red Roof Franchising LLC, Inc. v. AA Hospitality Northshore LLC, 937 F. Supp. 2d 537, 543 (D.N.J. 2013).  Second, even if not waived, the argument is plainly wrong.  The Court agrees with EagleView that Defendants misconstrue the document.  None of the images show a wireframe.  Rather, the inventor clarified that the images do not depict a marker "overlaid on the aerial image of the building having

---

[20] Cf. *Alice's Adventures in Wonderland*, Chap. I ("Alice had got so much into the way of expecting nothing but out of the way things to happen.")

the roof," and thus could not be a pitch determination marker.  (See
Dkt. 873-1, at 10)

    (b)  <u>'454 and '770 Patents</u>

    Next, Defendants assert that Judge Kugler erred when he
rejected Defendants' claim construction that the "second line
drawing" be construed as "a second line drawing that is distinct
from the first line drawing and is displayed on a second aerial
image," holding, instead, that no construction was needed.
Defendants' argument in this regard is based on a distorted reading
of Judge Kugler's Markman Opinion.  Defendants assert that Judge
Kugler rejected their construction because "'[a] POSITA looking at
Fig. 6A would recognize without question that the two images therein
are of the same roof[.]'" (Moving Brief, Dkt. 864, p. 32, quoting
<u>Markman</u> Opinion, Dkt. 332, p. 16).  Based on this snippet of a
larger sentence, Defendants argue, "that two images are of the same
*roof* does not make them the same *image*" (Moving Brief, p.
32)(italics in the brief), subtly suggesting that Judge Kugler
mistakenly thought Figure 6A depicted the same image.  His opinion,
however, clearly indicates he did not. (See <u>Id.</u>, p. 16) ("Fig. 6A
shows two aerial views of the same roof 407, one an east view of the
roof (col 14:6-7), the other a top view (col. 14: 26-27)").

Moreover, the entire sentence-- rather than just the first half cited by Defendants-- reads: "A POSITA looking at Fig. 6A would recognize without question that the two images therein are of the same roof, of the same roof portion, outlined in the same way by a perforated rectangle, *and appear to be the same line drawing in both views*." (Id.)(emphasis added by this Court).  Because the specification does not teach two separate, distinct line drawings -- as evidenced by Figure 6A -- Judge Kugler correctly rejected Defendants' proposed construction.

(c) '436 Patent-- Exclusion of Expert Testimony

Defendants assert that their expert, Dr. Cohen, "would have testified that the two aspects of Defendants' processes identified by [EagleView]-- i.e., epipolar movement and aerotriangulation-- do not practice the 'correlate' steps of the claims because each uses metadata, instead of correlation to ascertain the camera's position and orientation." (Reply Brief, Dkt. 874, at 18-19).  The Court excluded Dr. Cohen's testimony in this regard because it found that Defendants failed to disclose the defense in their non-infringement contentions, or anywhere else.  (See Tr. Transcript, Dkt. 810, at 1941). ("You have not disclosed that you use metadata to do the correlation.  That is the problem.").  In arguing to the contrary,

Defendants point to two documents: their non-infringement contentions and Dr. Cohen's pre-trial expert report. (Reply Brief, Dkt. 864, at 19). As the Court discussed at great length with the parties during trial, however, neither document says what Defendants wanted it to say. (See Tr. Transcript, Dkt. 810, at 1952-53) ("THE COURT: . . . This has nothing to do with you don't infringe because you use metadata. It just doesn't . . . . It's not that hard to say, why didn't you just say [we don't infringe because we use metadata]?"). In short, Defendants failed to disclose any argument in their non-infringement contentions or expert report that metadata was a basis for non-infringement.

Defendants appear to suggest that this Court did not understand its argument, that they never argued that they do not infringe because they use metadata. "Defendants' position is not that 'the use of metadata does not infringe.'" (Reply Br., Dkt. 874, at 23). Rather, they declare Dr. Cohen would have testified that "epipolar movement and aerotriangulation do not practice the 'correlate' step of the claims *because each uses metadata* instead of correlation, to ascertain the camera's position and orientation." (Dkt. 874, at 23). (emphasis added). This illogical argument is reminiscent of the exchange that took place at trial:

53

Mr. Seeve: . . . so it's an argument - - it's a nuance, Your Honor, but it's an important nuance.

The Court: Well, you want me to find, which really defies logic, is that when the defendants say we don't infringe, we don't infringe because we use metadata.

Mr. Seeve: Yes.

The Court: It's not tantamount to a non-infringement defense.  That defies logic.  It is one and the same.

Mr. Seeve: We disagree, Your Honor.

The Court: Okay – <u>We don't need to infringe because we use metadata is not equal to we don't infringe because we use metadata.</u>

Mr. Seeve: They are different things, yes, Your Honor.

Dkt. 810, at 1954 (emphasis added).[21]  This Alice struggled to

understand the difference ("now, that's so nuanced that I can't get

---

[21] Truly, the Court's dialogue seemed like the conversation between the March Hare and the Hatter:

"Not the same thing a bit!" said the Hatter.  "You might just as well say that 'I see what I eat' is the same thing as 'I eat what I see!'", "You might just as well say," added the March Hare, "that 'I like what I get' is the same thing as 'I get what I like'!"

*Alice's Adventures in Wonderland*, Chap. VII.

54

my head around it"), and even gave Defendants an opportunity to brief the issue to persuade the Court that there was a genuine difference.  They failed to do so.[22]

(2) <u>Exclusion of the Merger Agreements</u>

On January 14, 2014, Defendant Verisk and others entered into an Agreement and Plan of Merger with EagleView.  <u>See</u> DTX 480 (Dkt. 867-2).  On June 15, 2015, Phoenix Holdco LLC and others entered into an Agreement and Plan of Merger with EagleView.  <u>See</u> DTX 481 (Dkt. 867-6).  Under each Agreement, the parties contemplated that the companies would merge (collectively, the "Merger Agreements").  Of course, the Merger Agreements were never consummated for reasons not relevant to this Court's rulings.

Both Defendants argue that this Court's evidentiary ruling disallowing the Merger Agreements was in error and was one of

───────────────

[22] The Court precluded Defendants' metadata theory and was careful to cover both ways of stating the same thing.  "I will preclude the defendant from getting up and saying we don't infringe because we use metadata.  That's one argument you're not making.  And the second argument is we don't infringe because we use metadata. That's the second argument you will not make.  Because I see them as one and the same.  To me it's doublespeak." (Tr. Transcript, Dkt. 811, at 87).

several erroneous evidentiary rulings that "crippled" its defense. Defendants rely solely on the language of each of the Merger Agreements that states, in essence, that to EagleView's knowledge, no one has or is infringing its Patents.  But Defendants do not tell the whole story.

In making their arguments Defendants omit critical facts that were material to this Court's ruling to exclude the admission of the Merger Agreements.  While Defendants are correct that the Court's initial instinct was to allow the Merger Agreements because they contained admissions by EagleView that Plaintiffs did not infringe the Patents, the record that unfolded before the Court made clear that admission of such evidence would be unfairly prejudicial to EagleView.  It is not a decision this Court rendered hastily.[23]

---

[23] Defendants label as "arbitrary" the Court's "concern" about how the disclosure was made (Dkt. No. 864, at 51), subtly accusing the Court of playing favorites by allowing the admission of other evidence, the House Report, when EagleView failed to disclose it in its infringement contentions.  The Rule 403 analysis is not a game of tit for tat.  It requires a balancing of many factors.  The admission of the House Report was much different.  As the Court explained, the evidence demonstrated that EagleView, through its expert, had disclosed how the company's embodying products, including the House Report, worked. (Tr. Transcript, Dkt. 802, at

After hours of oral argument and supplemental briefing, the Court disallowed the evidence for the following reasons.

First, the Court found the Defendants had not set forth the Merger Agreements in their non-infringement contentions or non-willfulness defense.  Defendants pooh-pooh Plaintiff's complaint of non-disclosure, characterizing it as unfairly elevating it to a non-infringement contention.  (Dkt. 811, Tr. Transcript, at 2220) ("My goodness, we're required to tell them, especially after the deposition of Mr. Barrow that, surprise, this may be relevant to non-infringement?  It elevates contentions, Judge, beyond all rational basis.")  Defendants' attitude is perplexing, and their failure to disclose even more head-scratching given that they fought mightily to introduce the Agreements as the "smoking gun" evidence of non-infringement.

There is no dispute that Defendants failed to specifically disclose the Merger Agreements as part of their non-infringement

---

131-32) Moreover, EagleView never took the position that the House Report practiced a single claim by itself.  And certainly the House Report was no "smoking gun" as Defendants considered the Merger Agreements to be.

defense until the filing of a pre-trial motion _in_ _limine_ by EagleView to prevent Defendants from using the Merger Agreements to support their equitable estoppel defense.  It was only in opposition to that motion _in_ _limine_, EagleView claimed, that it became aware that Defendants intended to use the Merger Agreements as a non-infringement defense.  Indeed, Defendants made no bones about it in that opposition stating that the Agreements are "relevant to several issues in this case, including non-infringement . . . ."  Dkt. 629, at 6.  See Dkt. 592.

Nowhere in Defendants' Third Amended Non-Infringement Contentions and Responses Pursuant to L. Pat. R. 3.2A (Dkt. No. 867) did Defendants disclose either of the Merger Agreements.  Required by L. Pat. R. 3.2A(a) to provide the written basis for their non-infringement contentions, Defendants were mum as to the Merger Agreements.  (Id., at 10).  Required by L. Pat. R. 3.2A(c) to produce or make available any documents upon which Defendants intended to rely for non-infringement, Defendants likewise did not list the Merger Agreements.  Second, when disclosure was required in response to pertinent interrogatories, Defendants did refer to the Merger Agreements as being relevant but only to issues distinct from infringement such as waiver, laches, estoppel, patent misuse and

58

injunctive relief. (See Dkt. Nos. 776-1, at 168, 189, 223, 250).  Of
course this raises the question, why did Defendants disclose the
Merger Agreements in response to the concepts of res judicata,
estoppel, et cetera, but not as part of its non-infringement
contentions when they clearly were meant to be the centerpiece of
their non-infringement defense at trial?  To this date, Defendants
have not given an adequate explanation.

At best, Defendants counter that they questioned EagleView's
former CEO, Chris Barrow, about the Merger Agreements and therefore
they did not "sandbag" EagleView.  (Tr. Transcript, Dkt. 802, at
48)("This is not something that they are being sandbagged about.
This has been in the case forever, Judge.  This is a classic party
opponent admission.")  That alone is really the full extent of
Defendants' disclosure.  Again, Defendants' failure to adhere to the
Local Patent Rules and disclose the Merger Agreements, and to offer
an adequate justification for its noncompliance was troubling at the
time of trial, and remains so.  The double standard Defendants have
used in this case is not lost on the Court.  For example, in seeking
to compel EagleView to amend their contentions (Dkt. 158 and 159),
Defendants preached the critical importance of adherence to the
Local Patent Rules.  As they wrote in their brief,

> Local Patent Rule 3.1 requires, among other things, that
> Plaintiffs identify "as specific[ally] as possible" each
> accused instrumentality, whether each limitation of each
> asserted claims is alleged to be literally present or
> present under the doctrine of equivalents, and, most
> importantly here, "a chart identifying *specifically* where
> *each* limitation of *each* asserted claim is found within each
> Accused Instrumentality."   L. Pat. R. 3.1(b), (c), (e)
> (emphasis added).   <u>Local patent rules, like those of this
> District, "exist to further the goal of full, timely
> discovery and provide all parties with adequate notice and
> information with which to litigate their cases." (citations
> omitted).   The rules are designed to require parties to
> crystallize their theories of the case early in the
> litigation and to adhere to those theories once they have
> been disclosed.</u>   (citations omitted).

(Dkt. 159, at 18)(underline added by the Court)

As Defendants rightly acknowledged before the Magistrate Judge, the Honorable Joel Schneider, the Court's Local Patent Rules are designed to prevent gamesmanship.  That this centerpiece evidence crystallized only shortly before trial-- when the motions <u>in</u> <u>limine</u> were filed-- led the Court to the conclusion that this time it was Defendants who were not "putting all their cards on the table." (See Dkt. 231, Tr., at 48). (Magistrate Judge Schneider referring to EagleView in granting the motion to compel: "They're smart enough to know the risk of not . . .  putting all their cards on the table . .

. . There's a tremendous risk if they don't do that tremendous

risk.")[24]

Turning to the language of the Merger Agreements, Defendants

contend that the Court committed error, abusing its discretion when

it excluded highly relevant and critical admissions of EagleView

because in the agreements EagleView admitted that Defendants had not

and were not infringing the Patents.   Specifically, Defendants rely

on Section 3.24(g) of each Agreement which provides, in relevant

part:

>  Except as set forth in the attached schedule . . . to the
>  Knowledge of [EagleView], no Person has infringed,
>  misappropriated, diluted or otherwise violated, or is
>  infringing, misappropriating., diluting or otherwise
>  violating, any Owned Intellectual Property . . . ."

(Dkt. 867-2, at 50; Dkt. 867-6, at 50) (emphasis added).

Defendants argue that this was "powerful evidence" that the

Court improperly excluded.   Defendants' argument, however, ignores

––––––––––––––––––––––

[24] Defendants incorrectly write that this Court warned EagleView that
its argument related to non-disclosure was not made in good faith.
(Dkt. 874, at 27).   This is an unfair distortion of the record.
(See Dkt. 812, at 2288) ("I don't think the plaintiffs are disputing
that they never knew about these merger agreements nor could they
in good faith.")

other contractual language that questions the admissibility of such admissions.  Although Defendants seek to rely on the fact that the disclosures to the Merger Agreements do not include them, they overlook the fact that the disclosure schedule language (referred to in Section 3.24(g) above) explicitly states that "This Disclosure Schedule and the disclosures and information contained in this Disclosure Schedule: (a) are disclosed <u>solely for the purposes of the Agreement and shall not be used for any purpose other than the purposes contemplated by the Agreement . . . .</u>" (Dkt. 867-5, at 1, Dkt. 867-8, at 2)(emphasis added).  Thus, although Defendants press their argument that EagleView admitted that Defendants did not infringe because they were not excepted by the disclosure schedules, such schedules could not be used for any other purpose, <u>i.e.</u>, to show non-infringement.  In other words, to prove to the jury that EagleView admitted non-infringement, Defendants would have had to demonstrate that they were not listed on the disclosure schedules as infringers.  Under the terms of each contract, however, they could only do so in the acquisition context, not a patent trial.

As the foregoing demonstrates, what the language actually meant, or what the parties intended by the language would have created a "trial within a trial," as this Court held.  For these

reasons, the Court properly denied Defendants' motion on this ground.[25]

**D..  <u>Willfulness</u>**

The jury found that EagleView proved, by a preponderance of the evidence, that Defendants' infringement was willful. (Dkt. 796, Verdict Sheet Question 4).  Defendants contend that EagleView's evidence was insufficient to support a finding of willfulness, arguing that EagleView introduced "no direct evidence of copying" (Reply Brief, Dkt. 874, p. 23 n.2), and that EagleView's other "shards of evidence" fall short. (Id., p. 24).  Defendants' argument in this regard, however, is another example of Defendants' distortions.  EagleView presented far more than "shards of evidence."

---

[25] Defendants appear to have abandoned their argument that the Merger Agreements should have at least been admitted with a limiting instruction to the issue of willfulness.  Even if the Agreements had been admitted for such limited purpose, it would not have altered the jury's verdict for reasons discussed <u>infra</u>.

In April, 2012, EagleView notified Defendants that "Aerial Sketch does indeed infringe [EagleView's] patents." (DTX-478.0001)[26] While Defendants emphasize that in response to EagleView's notice of infringement, Defendants "sought legal advice" (Reply Brief, Dkt. 874, p. 25), EagleView's evidence demonstrated that Defendants did nothing else; after being put on notice, Xactware's President Mike Fulton never investigated whether Defendants were infringing, nor did he instruct Xactware's engineers to avoid infringing EagleView's patents. (PDX-14.2 at 46:12-20, 50:6-13; PDX-14.3 at 64:1-11; PTX 961 at 0:26-0:44, 1:19-39)  Similarly, Mr. Fulton's predecessor, Jim Loveland, failed to tell his engineers to not infringe EagleView's patents, those engineers never investigated where the idea for Defendants' Aerial Sketch came from, and Xactware did not make changes to its infringing products in response to EagleView's notice

---

[26] Defendants had been aware of EagleView's technology-- and the value of it-- much earlier. In 2009, Defendants praised EagleView's "patent-pending software." (PTX-518.0001)

of infringement.  (DDX-576.0005 at 260:17-21, 279:13-22; DTX-576 at
9:30-9:42, 9:43-10:12; Tr. Transcript, p. 2521-22)[27]

Moreover, while EagleView presented no direct "smoking gun"
evidence of copying, EagleView did present sufficient evidence from
which the jury could infer that Defendants had both a motive and
opportunity to copy, and did in fact copy its patented technology.
First, it can hardly be disputed-- and indeed, Defendants do not
dispute-- that the parties had a unique business relationship.  As
this Court extensively discussed in its permanent injunction
opinion, the parties were simultaneously business partners and
competitors.  (Dkt. No. 841)   Thus, once EagleView's Patents had
issued, Defendants believed they had only two choices: either
"adopt" EagleView's technology for "[them]selves or work with
EagleView" (PTX-269.0003).  Moreover, as already discussed supra,
the trial evidence demonstrated that the accuracy of EagleView's
roof reports, which was a direct result of the patented technology,
was highly prized in the marketplace. (PTX-173.0012; PTX-615.1)

_____

[27] Notably, Defendants called neither Mr. Loveland nor Mr. Fulton to
testify at trial.

Indeed, EagleView's evidence showed that Defendants recognized that EagleView's technology "ha[d] the potential to displace a high number of Xactimate estimates." (PTX-269.0002-03).  From this evidence, the jury could find that Defendants had a strong motive to copy.

Second, EagleView introduced evidence that Defendants had been presented with a unique opportunity to copy.  In 2009, Defendants visited  EagleView's offices, receiving a "Tour of Operation" and "overview of [EagleView's] operations . . . and technical workflow." (PTX-616; Tr. Transcript, Dkt. 812, at 2512).  During the tour, Defendants "got to see the area where EagleView was producing its roof data packages," and "saw people that were developing those roof data packages." (Tr. Transcript, Dkt. 812, at 2513).  Mr. Taylor even "took a few pictures of one of the [EagleView] technicians and over the[] shoulder of them . . . working with the software to build a house model." (Id., p. 606-07).  The same employees who toured EagleView's offices-- Mr. Taylor, Jeff Lewis, and Brad Childs-- then "worked on," "led the team," or "overs[aw]" the development of Defendants' infringing products. (Tr. Transcript, Dkt. 812, at 2493, 2517).  EagleView also introduced evidence at trial that Defendants retained presentations showing EagleView's proprietary software

66

interface. (PTX-310.0001, 0011-13).  From this evidence, the jury could find that Defendants had a clear opportunity to copy.

Defendants emphasize, as they must in the face of the above-discussed evidence, that there is no direct evidence of copying, observing, for example, that there is no evidence that they used EagleView's source code or software.  However, the absence of "smoking gun" evidence of copying is no surprise given Defendants' demonstrated sophistication, and even so, EagleView's evidence came close.  EagleView presented testimony that Defendants' infringing Aerial Sketch v.2, Roof Insight, and Property InSight "are very similar and pretty much identical in most cases, and look really alike [to EagleView's roof-report products]" (Tr. Transcript, Dkt. 805, at 795-96).  And the evidence also showed Defendants intended it that way; Defendants stated that their product was "perfectly comparable to [EagleView's] offering." (PTX-530.0021)

Further, EagleView also argued that several of Defendants' own internal communications should be interpreted as veiled references to Defendants having copied EagleView's patented technology.  In 2010, when Defendants were in the process of developing Aerial Sketch, Mr. Taylor stated that Defendants were "absolutely on track with everything that EagleView and others are doing now." (PTX-

67

617.0001).  Then, in 2012, when Xactware Vice President Kevin

Crandall asked Mr. Taylor if Defendants "know how EagleView . . .

[is] coming up with slope," Mr. Taylor responded, "[t]alk to me in

the morning when I return and I will show you."  (PTX-613.0001)

Lastly, when Defendant Verisk was considering acquiring EagleView,

it noted its other choice was to compete with EagleView by

"develop[ing] similar solutions internally" which EagleView argued

was a euphemism for copying EagleView's technology.  (PTX-623.0010;

Tr. Transcript, Dkt. 812, at 2401).

    From this evidence, the jury could permissibly infer, and

apparently did infer, that Defendants copied EagleView's patented

technology.[28]  This evidence of motive, opportunity, and copying,

considered as a whole, was fully sufficient to support the jury's

finding that Defendants willfully infringed EagleView's patents.

Accordingly, because Defendants have not met their burden of

_____

[28] Defendants write in their brief that the Court "suggested during
     trial" that Defendants copied EagleView's Patents.  To be fair, any
     comments that Defendants may have construed as such were made
     outside the presence of the jury.  But more to the point, in this
     Court's mind, the evidence clearly supported a finding that
     Xactware copied EagleView's technology, willfully.  The jury saw
     it the same way as the Court.

demonstrating that the trial evidence was insufficient Defendants' Motion for a New Trial on the issue of willfulness will be denied.

**E.**   **Damages**

Lastly, the jury found that EagleView proved, by a preponderance of the evidence, that it was entitled to recover $125 million in lost profits.  Defendants attack this finding on two grounds.  First, Defendants argue that the Court erred when it allowed the testimony of EagleView's damages expert, Dr. Arnold. Second, Defendants argue that the damages evidence was insufficient.

(1)  Dr. Arnold's Testimony

Defendants urge that various aspects of Dr. Arnold's expert opinion-- mainly Dr. Arnold's alleged failure to consider price elasticity, and his definition of the market (see Reply Brief, Dkt. 874, p. 27)-- render his expert opinion unreliable under Daubert,[29] and thus Defendants contend Dr. Arnold should not have been allowed to testify at trial.

---

[29] Daubert v. Merell Dow Pharm., Inc., 509 U.S. 579 (1993).  Under Daubert, "any step that renders [an expert's] analysis unreliable . . . renders the expert's testimony inadmissible."  In re Paoli R. R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994).

As to price elasticity, Judge Kugler recognized and explained in his pre-trial <u>Daubert</u> opinion (Dkt. 332), that Dr. Arnold's opinion sufficiently addressed the concept of price elasticity even though the words "price elasticity" were not specifically used. Judge Kugler found that Dr. Arnold's report "clearly talks about the effect of the hypothetically-increased price on the likely number of sales at that price in the market." (<u>Id.</u>, at p. 45).   This Court agrees.   Dr. Arnold's discussion of the downward price pressure Xactware's infringing competing products exerted in the marketplace, using specific examples of EagleView customers, MetLife and Nationwide-- MetLife switching to Xactware because of price, and Nationwide negotiating a lower price (<u>Id.</u>, p. 45-46, citing paragraphs 125 and 163-67 of Dr. Arnold's report)-- demonstrates his consideration of elasticity.[30]

---

[30] Defendants' citation to three lines of Dr. Arnold's 228-page deposition transcript-- "Q: [Y]ou haven't analyzed price elasticity as it relates to lost profits, correct? A: That is correct." (Reply Brief, Dkt. 874, p. 27)--does not, as Defendants argue, amount to an "admission" that Dr. Arnold did not consider price elasticity at all.   Dr. Arnold went on to explain why price elasticity was not a significant factor in his analysis given the nature of the market and the competition between EagleView and Defendants. (Dkt. 466-3,

As to the definition of the market, Defendants argue that Dr. Arnold unreliably defined the market of competitors by ignoring products that were "'similar in physical and functional characteristics to the patented invention.'" (Reply Brief, Dkt. 874, at 27, citing Micro Chem, Inc. v. Lextron, Inc., 318 F.3d 1119, 1124 (Fed. Cir. 2003)). The Court disagrees. As EagleView correctly observes, Dr. Arnold did not ignore comparable products. Rather, he concluded that no acceptable non-infringing alternatives existed,[31] and the jury's verdict reflects that the jury found this fact as

---

Arnold Dep. p. 183) ("But if Aerial Sketch Version 2 is found be infringing and has to be removed from the market, I think it is perfectly logical to imagine that -- to suppose that Travelers will switch back the previous state of affairs, which was to be a customer of EagleView's Premium product, their roof report.") Dr. Arnold's testimony in this regard is consistent with his report's discussion of MetLife and Nationwide.

[31] See Tr. Transcript, Dkt. 810, at 1756 ("This slide summarizes the various companies that have been flagged along the way as purported alternatives or possible alternatives to EagleView's patented technology, and I reviewed them. Many of them no longer exist. Some of them have accuracy problems that essentially make them a non- -- an uncompetitive alternative. A number of them don't even offer Roof Reports. So for either one reason or two reasons, each of them is not an available and acceptable non-infringing alternative.")

71

true.  Defendants' quarrel with Dr. Arnold's opinion in this regard

is simply not an issue of reliability, and therefore is not a basis

for excluding his testimony.[32]

---

[32] Defendants' Moving Brief includes other attacks on the reliability
of Dr. Arnold's testimony which require only brief discussion.
First, Defendants assert that Dr. Arnold failed to apportion
between patented and unpatented features. (Moving Brief, Dkt. 864,
at 51).  In opposition, EagleView noted that during the Daubert
hearing, Defendants conceded that apportionment goes to reasonable
royalty, which has no relevance now that the jury has awarded lost
profits. (Opposition Brief, Dkt. 872, at 52).  Defendants' reply
is silent as to this issue, and the issue does indeed appear to be
irrelevant at this stage of the case.

Second, Defendants argue that Dr. Arnold unreliably estimated the
scope of damages by treating the contractor market and the insurer
market as the same, thereby allegedly ignoring that "the contractor
market and the insurer market differ in critical ways." (Moving
Brief, Dkt. 874, at 52).  This argument, like the market definition
argument, is an issue of fact, not an issue of reliability under
Daubert.   The Court addresses the sufficiency of the evidence
concerning the nature of the market infra.

Third, Defendants' argument that Dr. Arnold failed to differentiate
between patents (Moving Brief, Dkt. 864, at 53) also does not render
his testimony unreliable.   The law does not require such
differentiation, see Crystal Semiconductor Corp. v. TriTech
Microelecs. Int'l, Inc., 246 F.3d 1336, 1357 (Fed. Cir. 2001)
("[l]ost profit damages do not depend on the number of patents
infringed by one single product[.]"), and during cross-examination
at trial, Dr. Arnold explained why he did not differentiate: "to
me as an economist, [it] does not require the type of analysis,
patent by patent, that you suggest because of the facts and

(2)   <u>Sufficiency of the Evidence</u>

As to lost profits, Defendants assert that EagleView failed to present sufficient evidence of each of the four <u>Panduit</u> factors: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that would have been made." <u>DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.</u>, 567 F.3d 1314, 1329 (Fed. Cir. 2009) (citing <u>Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.</u>, 575 F.2d 1152, 1156 (6th Cir. 1978)).  Defendants also assert that insufficient evidence supported a finding of price erosion.  On all points, the trial record clearly demonstrates otherwise.

---

circumstances of this particular case . . . saying Patent Number '840 is worth $2 million and something else is worth $1.6 million doesn't really make sense because all of these patents confer the ability, sort of the protection to EagleView . . . . So all I look at, and all I need to look at, is the downstream consequence.  How many Roof Reports were sold, how many would EagleView have captured, how much money would EagleView have made." (Tr. Transcript, Dkt. 811, at 2107-08); <u>see</u> <u>also</u>, Opinion granting EagleView's Motion for Permanent Injunction, Dkt. 841, at 12 ("roof reports are made by the processes claimed in EagleView's patents . . . every Asserted Claim requires generation of a 'roof estimate report.').

With regard to demand for the patented product, Defendants return to what has become a familiar refrain: making the false distinction between demand for the patented product and demand for roof reports.  Once properly viewed, however-- _i.e._, demand for accurate roof reports is effectively demand for the patented product[33]-- Defendants' argument as to the first _Panduit_ factor erodes completely, as the trial evidence clearly demonstrated that there was high demand for EagleView's Roof Reports.

With regard to the absence of acceptable non-infringing products, Defendants' argument relies on a version of the facts that the jury rejected.  While Defendants presented evidence of what they contended were non-infringing alternatives, EagleView presented, through Dr. Arnold's testimony, sufficient evidence from which a jury could find-- and ultimately did find-- that there were no _acceptable_ non-infringing products because the non-infringing products Defendants relied upon were not comparable to EagleView's product on key features such as accuracy. (_See_ Tr. Transcript, Dkt. 810, at 1756) ("This slide summarizes the various companies that

---

[33] _See_ _supra_ n. 11.

74

have been flagged along the way as purported alternatives or
possible alternatives to EagleView's patented technology, and I
reviewed them.  Many of them no longer exist.  Some of them have
accuracy problems that essentially make them a non- -- an
uncompetitive alternative.  A number of them don't even offer Roof
Reports.  So for either one reason or two reasons, each of them is
not an available and acceptable non-infringing alternative.")

As to EagleView's capability to exploit the demand, EagleView
presented evidence that it had been able to meet its customers'
demands-- even the high volume demands of its largest insurer
customers. (See Tr. Transcript, Dkt. 810, at 1470) ("we do a lot of
work around natural catastrophes . . . an insurance company [] could
have several thousand or tens of thousands of claims that happen at
one time so the efficiency is a big deal. Q: . . . can Eagle View
meet? A: Yes."); Id., at 1758 ("A . . . Eagle View . . . did have
the capacity and does have the capacity to make and sell those
additional roof reports [sold by Defendants.]"))  This evidence was
sufficient to support the jury's finding as to the third Panduit
factor.

As to lost profits, Defendants argue that Dr. Arnold failed to
distinguish between the insurance and contract markets.  This

75

argument, however, like Defendants' demand argument, rests on a false distinction. EagleView's trial evidence demonstrated that the product it sold was Roof Reports (which reports resulted from the patented processes), and its customers were insurance companies and contractors. (Tr. Transcript, Dkt. 808, at 1489-96, 1503-04, PTX-641 (demonstrating that Eagle View was forced to lower the prices it offered to both its insurance and construction customers in order to compete with Defendants); Tr. Transcript, Id., at 1466-68 (West testimony discussing both the insurance and contractor segments of EagleView's customer base and stating that there is "quite a bit" of "overlap in customers between the insurance and the construction business")). This evidence was sufficient to support a finding of a single market for roof reports, not two different markets, as Defendants assert.

Lastly, the evidence of price erosion was clear: EagleView was forced to lower its prices to compete with Defendants' infringing product. The trial evidence established that the market for accurate roof reports was functionally a two-player market

76

consisting of Defendants and EagleView,[34] and Defendants were offering their infringing competing product at a lower price.[35] Under such circumstances, price erosion was inevitable, and indeed, the evidence showed, intentional-- EagleView presented evidence that Defendants' stated business strategy was to "aggressively grow [their roof report] market share" by "erod[ing] [EagleView's] market share" and "be[ing] aggressive on price." (PTX-530.0001, p. 14, 21-23).  Thus, Defendants' attack on the evidence of price erosion fails.

Accordingly, because Defendants have not met their burden of demonstrating that the trial evidence was insufficient Defendants' Motion for a New Trial on the issue of damages will be denied.

---

[34] Tr. Transcript, Dkt. 805, at 792-94 ("Q: . . . [D]oes Eagle View have any effective competitors other than the defendants? A: No."), p. 1491 ("Q: Are there any other [roof report] alternatives [other than Defendants and EagleView] in the marketplace? A: No, there are not."), p. 1511 ("Q: . . . what is EagleView's market share[?] A: I would say somewhere between 80 and 90 percent. . . . Who has the other 10 to 20 percent? A: The defendants.")

[35] Tr. Transcript, Dkt. 808, at 1504 ("we consistently see the defendants' products in the market at 30 to 50 percent below Eagle View's pricing.")

**IV.   CONCLUSION**

To summarize, all of Defendants' challenges to EagleView's resounding trial victory-- from Defendants' section 101 challenge all the way through damages-- fail.  This Court holds that Defendants have failed to meet their burden of proving that the Court or Judge Kulger made any legal errors, and that Defendants have not carried their burden of establishing that the jury's verdict was not supported by sufficient evidence.

Like Alice's journey, this litigation's journey down the rabbit hole ultimately ended where it began: in the world of real facts. Those facts supported every aspect of the jury's verdict. Defendants have not met their burden to disturb it.  Thus, for the foregoing reasons, the Court will deny Defendants' Motion for a New Trial.  An appropriate Order accompanies this Opinion.


Dated: September 9, 2020                    s/Renée Marie Bumb _____
                                            RENÉE MARIE BUMB
                                            UNITED STATES DISTRICT JUDGE

78