[Docket No. 865]

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| EAGLEVIEW TECHNOLOGIES, INC., *et al.*, | ) ) ) | Civil No.: 1:15-cv-07025 |
|  | ) | **OPINION** |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
|  | ) |  |
| XACTWARE SOLUTIONS, INC., *et al.*, | ) ) | |
|  | ) |  |
| Defendants. | ) |  |


APPEARANCES:

WALSH PIZZI O'REILLY FALANGA LLP
By:  Liza M. Walsh, Esq.
     Hector D. Ruiz, Esq.
     Three Gateway Center
     100 Mulberry Street, 15th Floor
     Newark, New Jersey 07102

     and

KIRKLAND & ELLIS LLP
By:  Adam R. Alper, Esq.
     Brandon H. Brown, Esq.
     Reza Dokhanchy, Esq.
     555 California Street
     San Francisco, California 94104

     Michael W. DeVries, Esq.
     333 South Hope Street
     Los Angeles, California 90071

Patricia Carson, Esq.
Leslie M. Schmidt, Esq.
601 Lexington Avenue
New York, New York 10022

Gianni Cutri, Esq.
Kristina Hendricks, Esq.
Joel R. Merkin, Esq.
300 North LaSalle
Chicago, Illinois 60654
          *Counsel for Plaintiff*


McCARTER & ENGLISH, LLP
By:  Scott S. Christie, Esq.
     Matthew A. Sklar, Esq.
     Four Gateway Center
     100 Mulberry Street
     Newark, New Jersey 07102

     Lee Carl Bromberg, Esq.
     Thomas F. Foley, Esq.
     Thomas R. Fulford, Esq.
     Wyley S. Proctor, Esq.
     265 Franklin Street
     Boston, Massachusetts 02110

     and

GIBSON DUNN & CRUTCHER LLP
By:  Mark A. Perry, Esq.
     1050 Connecticut Avenue N.W.
     Washington, District of Columbia 20036
          *Counsel for Defendants*

**BUMB**, UNITED STATES DISTRICT JUDGE:

Before the Court is Plaintiff's ("EagleView" or "Plaintiff") Motion for Enhanced Damages under 35 U.S.C. § 284, Attorneys' Fees and Costs under 35 U.S.C. § 285, Pre- and Post-Judgment Interest, Accounting, and Taxable Costs. [Docket No. 865]. For the reasons stated herein, the Court will grant, in part, and deny, in part, the Motion. Specifically, the Court will award Enhanced Damages to the maximum allowable extent, award reasonable Attorneys' Fees for a specified period, award Pre- and Post-Judgment Interest as described herein, and refer the Taxable Costs to the Clerk of Court. The Court will deny Plaintiff's request for an accounting of infringing sales.

## I.   BACKGROUND

On September 25, 2019, after a two-week trial, a jury found that Defendants Verisk Analytics, Inc. ("Verisk") and Xactware Solutions, Inc. ("Xactware") (collectively "Defendants") infringed on five of Plaintiff EagleView's patents— U.S. Patent Nos. 8,078,436 (the "'436 patent"), 8,170,840 (the "'840 patent"), 9,129,376 (the "'376 patent"), 8,825,454 (the "'454 patent"), and 8,818,770 (the "'770 patent"). [Docket. No. 796]. The jury awarded EagleView $125 million in compensatory damages and found that Defendants' infringement was willful. The Court then enjoined Defendants from selling its infringing products. [See Docket Nos. 800 and 842].

3

Thereafter, Defendants filed a Motion for Judgment as a Matter of Law and For a New Trial. [Docket No. 863]. In an Opinion and Order dated September 9, 2019, the Court denied Defendants' Motion for a New Trial, upheld the jury's finding of willfulness, and allowed judgment on the verdict pursuant to Fed. R. Civ. P. 50(b)(1). [See Docket Nos. 901 & 902]. The Court now turns to the within Motion.

## II.   **ANALYSIS**

### A. 35 U.S.C. § 284 – Enhanced Damages

EagleView first moves the Court to treble the jury's damages under 35 U.S.C. § 284 because of Defendants' egregious misconduct and deliberate strategy to harm its business. For the reasons that follow, the Court will treble the jury's award. Section 284 provides that the Court "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923, 1932 (2016). The Court should assess enhanced damages only if the infringer's actions were "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or— indeed— characteristic of a pirate." Id. This assessment is to be made on a preponderance of the evidence standard. Id. at 1934.

4

A finding of willfulness is a significant factor in this analysis. The Federal Circuit has held both that willfulness "is, without doubt, sufficient . . . to increase a compensatory damages award," Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996) and that "[a] finding of willful infringement is a prerequisite to the award of enhanced damages." i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 858 (Fed. Cir. 2010), aff'd, 564 U.S. 91, 131 (2011). Here, the Court has already affirmed the jury's willfulness finding, [see Docket Nos. 901 & 902], and the Court will rely on that finding as one of several factors in its analysis.

    1. The Read Factors

In Read Corp. v. Portec, Inc., 970 F.2d 816 (Fed. Cir. 1992), the Federal Circuit established a list of factors for district courts to evaluate when considering whether an infringer's behavior warranted enhanced damages. Although Read was overruled in Halo, the Read factors still serve as "useful guideposts" in the § 284 analysis. See, e.g., Apple Inc. v. Samsung Elecs. Co., 258 F. Supp. 3d 1013, 1030 (N.D. Cal. 2017). As such, the Court uses Read as a tool in reviewing Defendants' conduct. Those Read factors are: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith

belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation to harm, and (9) whether defendant attempted to conceal its misconduct. 970 F.2d at 827.

The first Read factor concerns whether Defendants deliberately copied Plaintiff's design. Here, the evidence supports a conclusion that they did. As the Court noted at trial, "the very unique relationship between the parties offered fertile opportunity and grounds for Xactware to steal the patent[ed] technology." [Trial Tr. 1001:17-21[1]]. Defendants now contend that this "opportunity" cannot form the basis of enhanced damages, because opportunity alone is insufficient to establish "deliberate copying." On this narrow point, the Court agrees. But Defendants mistakenly contend that this fact ends the analysis.

As noted above, "a party seeking enhanced damages under § 284 bears the burden of proof by a preponderance of the evidence." WBIP, LLC v. Kohler Co., 829 F.3d 1317, 1339 (Fed.

---

[1]    "Tr." refers to the trial transcript from September 5, 2019 to September 25, 2019.

Cir. 2016). Plaintiff meets this burden when combining evidence of Defendants' "opportunity" with other facts. For instance, Xactware's Vice President Jeff Taylor— who did not testify at trial— toured Plaintiff's facilities as early as 2009, acknowledged that he knew how Plaintiff's technology worked, and noted that Defendants ultimately created products nearly identical to Plaintiff's. [See PTX-615[2]]. The trial evidence plainly showed that early in 2008, when Defendants started to hear of EagleView's products, they saw EagleView as a real threat to their business. Indeed, Defendants admitted at that time that they had two choices: either "adopt" EagleView's technology for themselves or work with EagleView. [PTX-269.003] ("He [a long time customer] tells me that the EagleView system is working very well and they are finding it to be a desirable service, particularly on complex roofs ... He felt the accuracy was impressive . . . He said at $50 per roof, he will use them without question if the roof has any degree of complexity . . . this service has the potential to displace a high number of Xactware estimates . . . I guess this is a confirmation that we should be working to either adopt it ourselves or work with EagleView."} EagleView presented evidence of what "adopting"

---

[2]    "PTX" and "DTX" refer to Plaintiff's and Defendants' trial exhibits, respectively.

EagleView's technology meant[3]: when Taylor toured EagleView's business, he "took a few pictures of one of the technicians and over the []shoulder of them ...working with the software to build a house model." [Trial Tr. 606:20-607:5[4]].

EagleView also demonstrated at trial that Taylor, along with Jeff Lewis and Brad Childs, were responsible for overseeing the development of Defendants' products. And, as the evidence showed, Defendants' Aerial Sketch v.2, Roof In Sight, and Property In Sight were "very similar and pretty much identical in most cases." [Trial Tr. 795:18-796:2]. Whether this conclusively proves "deliberate copying," as Defendants urge, is not the standard; the Court is satisfied that these facts meet Plaintiff's preponderance of the evidence burden as to this factor. Therefore, this factor favors enhancement.

---

[3]    EagleView also presented evidence of what "working with" meant. The parties attempted to do business together and entered into a merger agreement. But, in 2014, the FTC blocked the merger on competitive grounds. [See Trial Tr. 2376:13-25] ("But ultimately the Federal Government decided that they would block the merger . . . on competitive grounds. . . they wanted Verisk and Pictomertry and EagleView to compete.")

[4]    Christopher Pershing testified that, the day after Taylor's tour of the facilities, he e-mailed Taylor to ask that Taylor not share the photos he took with anyone outside of Xactware. [Trial Tr. 608: 17-24]. In response, Taylor said that he would "destroy any picture that shows your machines as [he] was only capturing memories of the trip." [Trial Tr. 609: 11-16].

The second Read factor asks whether Defendants, when they knew of Plaintiff's patent, investigated the scope of that patent, and formed a good-faith belief that Plaintiff's patent was invalid or that Defendants had not infringed. The Court finds that they did not. Defendants' argument on this point is largely just that they sought the advice of an attorney who informed them that their products likely did not infringe on Plaintiff's patents. [Docket No. 870, at 19-20].

The Court, however, is unable to evaluate the scope of that defense, or more precisely, Defendants' bald statement. Defendants contend only that after Plaintiff's patent issued, they "formulated an immediate strategy [which] included seeking legal advice." [Docket No. 870, at 20]. But Defendants have not disclosed those communications, nor have they otherwise substantiated their purported good-faith belief that they somehow did not infringe.

Defendants' argument relies on certain e-mail communications. But these e-mails are unhelpful. One such e-mail chain is a March 8, 2012 discussion between Edmund Webecke (an Xactware Vice President) and Loveland (the Xactware President and CEO). In this e-mail, Webecke tells Loveland about a discussion he had with a Travelers representative. The representative was concerned about a conversation he had with EagleView, in which EagleView told him that it had a patent on

roof measurements and that Aerial Sketch is infringing. Webecke wrote:

> I reassured [the representative] that we reviewed the EagleView patent . . . and do not feel we are infringing. Also the patent may be invalid due to prior art . . . . I have also asked IP Counsel [redacted].

[DTX-479[5]] (emphasis added). This e-mail, without further elaboration, is vague and says nothing of what was asked of Defendants' outside IP counsel, or whether legal advice was rendered. Defendants also rely on an April 6, 2012, e-mail. [See DTX-478]. In this e-mail chain, Loveland wrote:

> the reason Chris [CEO of EagleView] requested this call to me [Loveland} was to inform me that their attorney did a specific review of Aerial Sketch as it relates to the EagleView patents. Chris wanted to inform me that their attorney believes that Aerial Sketch does indeed infringe on their patents and that as a "business partner" he wanted to pass the news along to me. I let him know that I was perplexed as to the timing of this information . . . . . I also let him know that we have also had our attorneys review their patent and Aerial Sketch that we do not believe we infringe on their patent. In addition, I informed him that we have an incredibly strong prior art argument. Sketch was invented back in 1999 and for nearly a decade now we have had underlay/overlay and import of satellite and aerial imagery capabilities. He conceded that even though they tried to a thorough review of prior art in their patent issuance, there certainly may have been other prior art out there that they missed in the process. He seemed to

---

[5]   DTX-479 is Exhibit 2 to the Christie Declaration [Docket No. 870-2, at 17].

> quickly back away from the subject when I made these points even though he left it as an open issue. <u>We both agreed to have an open dialogue between the two of us on this subject in the future.</u>

[DTX-478] (emphasis added). This e-mail likewise is not as compelling as Defendants make it out to be. Clearly, there was a question of infringement that lingered in Defendants' minds.

Defendants prevented EagleView, throughout the course of this case, from probing the good-faith reliance of counsel, and Defendants have similarly prevented the Court from doing the same now. The attorney-client privilege, however, cannot be used as a shield and a sword to the detriment of another party. <u>See</u> <u>Supernus Pharm., Inc. v. TWi Pharm., Inc.</u>, 265 F. Supp. 3d 490, 517 (D.N.J. 2017), <u>aff'd</u>, 747 F. App'x 852 (Fed. Cir. 2018) ("The mere involvement of counsel . . . does not permit [Defendant] to invoke the privilege as both a sword and a shield.").

Perhaps most instructive, however, is Defendants' own internal assessment of the strength of EagleView's patents which sheds some light on this issue. On May 9, 2012, about one month after the above e-mail and in a document entitled "Opportunity Assessment" made in connection with Defendants' offer to purchase EagleView [Trial Tr. at 2390:19-23], Defendants analyzed the pros and cons of acquiring EagleView:

> In our disciplined approach to acquisition . . .
> . . Instead of acquiring EagleView, Verisk could
> choose to develop similar solutions internally
> and compete with [EagleView] . . . <u>such
> development . . . would require overcoming
> [EagleView's] IP protection and may involve
> patent related litigation.</u>

[PTX-623, at 10] (emphasis added). By their assessment, then, Defendants appeared less than confident that they did not infringe EagleView's patents.

Moreover, Defendants offer no evidence showing that they actually investigated whether they were infringing EagleView's patents or even instructed their employees to avoid infringing EagleView's patents. The best that Defendants can argue is that investigating patents was outside the scope of the employees' responsibilities— the employees referenced by EagleView. [Docket No. 870, at 20-21]. Yet, the record is devoid of any evidence that Defendants had someone investigate EagleView's patents, a fact that also weighs in favor of enhanced damages.

The third <u>Read</u> factor concerns the infringers' behavior as a party to the litigation. Indeed, the Court's analysis of this factor overlaps significantly with its exceptionality analysis under § 285 below. As explained more thoroughly in that section of this Opinion, [<u>infra</u> at 36], Defendants repeatedly acted in a manner that ignored the weaknesses of their own arguments, increased Plaintiff's costs, and prolonged the litigation.

12

Accordingly, the third Read factor significantly favors enhanced damages.

The fourth Read factor asks the Court to evaluate Defendants' size and financial condition. Defendants challenge this factor as "violat[ing] the Due Process and Equal Protection Clauses to the United States Constitution, which ensure that all parties are entitled to the same treatment under the law." [Docket No. 870, at 23]. The Court disagrees with this argument, and notes that Defendants' appear to misunderstand the factor. A defendant's financial condition "typically is used as a reason not to grant enhanced damages to the fullest extent." Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 762 F. Supp. 2d 710, 722 (D. Del. 2011) (emphasis in original), vacated on other grounds, 711 F.3d 1348 (Fed. Cir. 2013). Indeed, courts "look at the financial condition of a defendant to assess the degree to which trebling damages would severely impair the defendant's ability to function[,]" id., not to penalize a defendant for their financial success. Plaintiff's argument is only that Defendants could financially withstand enhanced damages and there is no evidence before the Court to dispute that proposition.

In addition to their constitutional argument, Defendants also contend that their size and financial condition must be considered relative to the Plaintiff, and that the Court should

not consider the size or financial strength of Xactware's parent company in this analysis. The Court agrees with Defendants that their size and financial condition should be considered relative to EagleView but disagrees that it would be inappropriate to similarly evaluate parent companies in this analysis. In fact, Defendants cite cases for this position that undermine their own argument. For example, Defendants rely on Acantha LLC v. DePuy Synthes Sales Inc., 406 F. Supp. 3d 742 (E.D. Wis. 2019) for the position district courts should analyze a defendant's financial condition relative to the plaintiff. 406 F. Supp. 3d at 760. But two sentences later, the Court concludes that "Defendants' parent company is Johnson & Johnson and Defendants have the ability to pay enhanced damages. Accordingly, this factor weighs in favor of enhanced damages." Id. So, the Court will consider the financial condition of Xactware's parent company, Verisk, in this analysis[6]. Having reviewed the parties' arguments, the Court finds no reason to refrain from imposing enhanced damages on Defendants due to their financial condition[7].

---

[6]    Despite Defendants' arguments to the contrary, Xactware's relationship with Verisk is substantially dissimilar from Plaintiff's relationship with Vista. Xactware is a wholly-owned subsidiary of Verisk, while Vista is not a parent company to EagleView. In addition, Verisk is a defendant in this action.

[7]    In any event, the Court finds no reason for its conclusion to change even with Verisk excluded from this analysis.

The fifth Read factor concerns how "close" the case was. Like the above, this factor is also relevant in the Court's exceptionality discussion. [See infra at 29]. This case was not close. After a two-week trial, the jury reached a verdict in about two hours. Plaintiff won every significant issue at trial as well. Other courts have assessed enhanced damages, in part, because of how quickly the jury reached their verdict. See e.g., Chamberlain Grp., Inc. v. Techtronic Indus. Co. Ltd., 315 F. Supp. 3d 977, 1014 (N.D. Ill. 2018) ("This case was not close. [Defendant] lost on every issue at trial after less than two hours of jury deliberation. . . . This factor weighs in favor of enhanced damages"). Those same considerations are relevant here.

Defendants speculate that the jury's quick deliberation occurred only because the Court erroneously precluded them from presenting their non-infringement expert and the admissions contained in the Merger Agreements. Their disagreement with the Court's rulings, however, does not mean this was a close case.

Moreover, Defendants' view that they "succeeded in knocking out the great majority of EagleView's case" is spin. [Docket No. 870, at 38]. As set forth below, the record demonstrates that the Court, not Defendants, was the impetus for the streamlining of the case. Xactware and Verisk seemingly believe they deserve all the credit due to their filing of inter partes review applications that convinced EagleView that they had the better

15

of the invalidity arguments. With the exception of the 152 Patent, [infra at 32], that is not a fair reflection of the record. [See generally Docket No. 151, at 9-18]. What the record actually reflects is that time and time again, the case's Magistrate Judge, the Honorable Joel Schneider, directed EagleView to reduce its claims to a more manageable number which it eventually did. [See discussion infra at 50]; [see, e.g., Docket No. 143, at 7]. In any event, although the reduction in asserted claims may bear some relevance on other factors, it does little to rebut the evidence that this was a close case. The Court finds that this factor favors enhanced damages.

The sixth Read factor asks the Court to consider the duration of Defendants' misconduct. EagleView contends that this factor favors enhancement because Defendants continued to infringe from the time they received a notice of infringement in April 2012[8], until the Court enjoined Defendants post-verdict. Defendants respond that they should not be penalized for their continued infringement during trial because they maintained a

---

[8]   There can be no fair debate that Xactware and Verisk learned of their infringement by this time. The April 6, 2012, e-mail, [DTX-468] as well as Webecke's testimony confirms this. [See Trial Tr. 2357-58]. Other than the bald statement of Webecke and Defendants' misuse of the Merger Agreements, there was no evidence that Plaintiff advised Defendants that they did not infringe. Defendants' characterization that they were "repeatedly told [of non-infringement], [Docket No. 870, at 27], is just wrong.

good-faith belief of non-infringement and were not restricted from doing so by a preliminary injunction.

As Plaintiff contends in its reply brief [Docket No. 877, at 15], district courts have routinely rejected Defendants' argument. Indeed, the courts in many of these cases imposed enhanced damages, in part, because defendants infringed for years, despite maintaining that their products did not infringe and despite the absence of a preliminary injunction. See, e.g., Milwaukee Elec. Tool Corp. v. Snap-On Inc., 288 F. Supp. 3d 872, 903 (E.D. Wis. 2017) ("Moreover, the Court rejects [Defendant's] assertion that its period of infringement is 'zero' simply because it thinks its actions were non-infringing."); Izzo Golf Inc. v. King Par Golf Inc., 2019 WL 4023562, at *7 (W.D.N.Y. Aug. 27, 2019). Moreover, this factor would be significantly weakened if it favored enhancement only when an infringer violated a preliminary injunction or continued to infringe while acknowledging the illegality of its actions. The Court has other methods of addressing violations of injunctions. Importantly, as discussed more fully above, Defendants press the good-faith defense but never fill in the lacunae.

Defendants also contend that Read factor No. 6 considers only "'whether the infringer continued to infringe after a judicial finding on infringement'— not 'the entire duration of the infringement.'" [Docket No. 870, at 26]. Although a handful

of district courts have interpreted the sixth Read factor in this narrow manner, see e.g., Harris Corp. v. Fed. Express Corp., No. 6:07-cv-1819-Orl-28KRS, 2011 WL 13141674, at *7 (M.D. Fla. Feb. 28, 2011), this interpretation remains a minority view.

As EagleView correctly identified, Defendants routinely rely on caselaw in other portions of their brief that rejects this minority view of the sixth Read factor. For example, Defendants cite Nox Med. Ehf v. Natus Neurology Inc., No. 1:15-CV-00709-RGA, 2018 WL 6427686 (D. Del. Dec. 7, 2018), to support their arguments for Read factor No. 8. [See Docket No. 870, at 28]. But when considering Read factor No. 6, the Nox Med. court held that the sixth Read factor favored enhancement because the infringer "willfully infringed the [patent] for three years, starting on the date of its issuance. . . . Three years is an objectively lengthy time to knowingly infringe a valid patent." Nox Med. Ehf, 2018 WL 6427686 at *4. Similarly, Defendants argue that this Court should adopt the interpretation of the fourth Read factor as used in Canon, Inc. v. Color Imaging, Inc., 292 F. Supp. 3d 1357 (N.D. Ga. 2018). But when addressing Read factor No. 6, that Court considered the infringer's conduct for the "duration of infringement when the defendant had knowledge of the patent." Canon, 292 F. Supp. 3d at 1367.

Although Defendants are correct that a handful of district courts have narrowly applied the sixth Read factor, their own brief reveals just how infrequently that occurs. Accordingly, the Court will interpret Read factor No. 6 consistently with the vast majority of the cases that Defendants cite, and not limit its review of Defendants' misconduct to the post-judgment period. In sum, this factor favors enhancement.

The seventh Read factor concerns whether Defendants took remedial action. Defendants argue that they were under no obligation to take remedial action until after the jury verdict because they maintained a subjective, good-faith belief that their actions were non-infringing. But the Court rejects this argument. As other courts have explained, this factor concerns "whether conduct during the pendency of the suit evinces an unrepentant defendant." Acantha, 406 F. Supp. 3d at 761; Creative Internet Advert. Corp. v. Yahoo! Inc., 689 F. Supp. 2d 858, 869 (E.D. Tex. 2010) ("This factor looks to whether the defendant ceased the sale of the infringing product during the pendency of the litigation.") Under that standard, Defendants make no arguments, and the Court finds no persuasive evidence, of any attempts to take remedial action. Defendants continued to infringe, seemingly took no efforts to design around the patent, and kept their products on the market until the very end. Indeed, by their very own strategy developed at the time this

19

lawsuit was filed in September 2015, Defendants set out to "erode" EagleView's market share "right now." [See PTX-530, at 14] ("We need to erode their market share by selling Roof InSight right now . . . and eventually build the database and the Property InSight vision.").

Defendants object to any suggestion that their real-world competition on price, service, and other factors was unlawful. On that fine point they are correct. But lawful competition is a far cry from attempting to drive a competitor out of business through infringement. Thus, this factor favors enhancement.

The eighth Read factor asks whether the Defendants were motivated to harm Plaintiff. This action is distinct from "advancing its own interests," and requires "direct motivation on the part of the infringer to harm the patent holder." Canon, 292 F. Supp. 3d at 1368. Defendants argue that they competed with Plaintiff in a small market, and that their competitive tactics did not amount to harm. But the Court has already noted its view that Defendants "appear to be driven by a specific animus toward EagleView" [Docket No. 841, at 27]. Sometimes words are incapable of capturing a record. This case is one of those times. The animosity between the parties— both as business partners and as business competitors— radiated the courtroom. Thus, the notion that "infringement by a direct competitor in [a small] market mitigates in favor of enhanced damages",

TruePosition Inc. v. Andrew Corp., 611 F. Supp. 2d 400, 412 (D. Del. 2009), aff'd, 389 F. App'x 1000 (Fed. Cir. 2010), is more compelling here. Additionally, courts are even more willing to find that this factor should enhance damages when "the evidence supports the conclusion that [the infringer] preferred taking the risk of infringement over designing a non-infringing device." Polara Eng'g, Inc. v. Campbell Co., 237 F. Supp. 3d 956, 994 (C.D. Cal. 2017), aff'd in part, vacated in part on other grounds, Polara Eng'g Inc v. Campbell Co., 894 F.3d 1339 (Fed. Cir. 2018). Given Defendants' arguments that it was under no obligation to change its infringing behavior until the permanent injunction issued, the Court finds that Defendants "preferred taking the risk of infringement," in a small market, and thus, this factor favors enhancement.

The final Read factor concerns whether Defendants attempted to conceal their misconduct. Plaintiff argues that they did, largely by misleading customers about their infringement, by creating "uncertainty," "confusion," and "doubt in the market," and ultimately hoping to take EagleView's customers. Defendants respond that their products were "on public display," so nothing was concealed. They also reject Plaintiff's argument about misleading customers, and instead contend that they released a truthful letter [PTX-621] and "cannot be faulted (let alone

punished) for maintaining their innocence." [Docket No. 870, at 42].

The Court finds that this factor favors enhancement, albeit only slightly. As Defendants note, the litigation misconduct that Plaintiff has identified is more appropriately considered under other Read factors— namely factors 3 and 8. Nevertheless, Plaintiff is correct that the infringing Mass Production Tool was not always public. The Court similarly finds that some of Defendants' discovery strategies evinced an effort to withhold relevant, discoverable information— information that later revealed, in part, the scope of Defendants' infringement [see Trial Tr. 1302:10-1304:2]— rather than operate in good-faith. For example, the record demonstrates that Defendants attempted to obscure, rather than identify, the Mass Production Tool or its related software. EagleView sets forth the efforts it took to compel Defendants to produce the full database. [See Docket No. 866, at 40-41]. Moreover, as mentioned above, throughout discovery, Defendants invoked the attorney-client privilege to avoid answering questions about their allegedly infringing activities. While the assertion of privilege is customarily proper, what sets Defendants' behavior apart is their sword and shield approach to the attorney-client privilege. The Court will not rehash years' worth of discovery disputes here, particularly given the overwhelming strength of Plaintiff's other Read factor

22

arguments, but Plaintiff has clearly established some showing of concealment.

### 2. Additional Factors

The Court is also mindful that factors not contemplated in Read were present here. As stated in a previous opinion, Plaintiff "has also proven that it has lost highly valuable customers to Defendants because of Defendants' ability to undercut EagleView's price." [Docket No. 14] (citing Trial Tr. 1504:17-18). The Court concluded then that "the trial evidence demonstrated that Defendants intended to aggressively compete, head-to-head, with EagleView with the express goal of luring away EagleView's customers and decreasing EagleView's market share." [Id.] In short, "the record evidence supports a finding that Defendants deliberately set out to, and did cause, irreparable harm to EagleView." [Id. at 6]. This "egregious infringement behavior" further establishes the need for enhanced damages as a sufficient punitive measure. See Halo, 136 S. Ct. at 1932.

### 3. Amount of Damages

Finally, Defendants argue that enhancement, and most certainly a 3x enhancement, is unwarranted. The Court disagrees. When the Court concludes that enhanced damages are warranted, it "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. District Courts "enjoy discretion in deciding whether to award enhanced damages, and in what amount."

Halo, 136 S. Ct. at 1932. In determining the appropriate multiplier, the Court must "take into account the particular circumstances" of the case. Id. at 1933.

Defendants contend that a significant enhancement multiplier is unwarranted because Plaintiff's "$125 million verdict is already more than twice Defendants' total revenues ($50 million) from the accused products [and] there is no plausible basis to infer that [Plaintiff] ever could have made $375 million off roof reports that Defendants sold for only $50 million." [Docket No. 870, at 43]. But § 284 is not a compensatory statute. Instead, as noted above, enhanced damages under § 284 are a punitive sanction for egregious infringement behavior. Halo, 136 S. Ct. at 1932.

Given the totality of the circumstances and a review of the Read factors[9], the Court enhances damages to the maximum extent allowable. The Court is of course mindful of the damages in this

---

[9]     See Imperium IP Holdings (Cayman) Ltd. v. Samsung Elecs. Co., 203 F. Supp. 3d 755, 764 (E.D. Tex. 2016) ("In view of evidence of Defendants' conduct at the time of accused infringement and after reviewing the Read factors, the Court finds that enhancement is warranted. . . . The Court enhances damages to the maximum extent allowable under § 284 given the totality of the circumstances."); Centripetal Networks, Inc. v. Cisco Sys., Inc., No. 2:18CV94, 2020 WL 5887916, at *67 (E.D. Va. Oct. 5, 2020) ("The Court will use the Read factors to aid its analysis of whether infringement of the patents was willful, and to what degree enhanced damages should be assessed under the circumstances."

action, but its analysis is largely guided by the scope and severity of Defendants' misconduct. Thus, the Court finds that all the Read factors, as well as other considerations, favor enhancement, and treble damages will be awarded[10].

B. 35 U.S.C. § 285 – Exceptional Case Fees

Next, EagleView requests that the Court treat this case as "exceptional," entitling it to reasonable attorneys' fees because of the unreasonable manner in which the Defendants litigated this case. For the reasons that follow, this Court will award fees, in part, incurred from the preparation of the Joint Final Pretrial Order on May 30, 2019 [See Docket No. 669] through the end of trial[11]. The parties need no reminding that the Defendants themselves described the trial as Alice's journey through Wonderland. It was the Defendants, however, who chose to go down the rabbit hole, taking EagleView and the Court with them. As noted earlier, sometimes words are hard to capture what really happened inside the four walls of the courtroom. In its

---

[10]    Defendants' claim that treble damages are impermissibly punitive and unconstitutional under the Excessive Fines and Due Process Clause is without merit. See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 260, 268 (1989) ("We therefore hold, on the basis of the history and purpose of the Eighth Amendment, that its Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties. . . . the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government.") (emphasis added).

[11]    This includes the filing of motions in limine.

earlier Opinion, this Court attempted to describe an extraordinary trial in ordinary, and not-so-ordinary, words. As the Court attempted to make clear then, and does so here, it was a challenge to prevent the jury from hearing Defendants' impermissible evidence, either directly or in the form of innuendo and inference, and the Court worked overtime to prevent a mistrial. This regularly occurred despite the Court's repeated admonitions. Thus, this case most definitely "stands out" for the "unreasonable manner in which [it was] litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014). And although the discovery phase of the litigation- where Magistrate Judge Schneider also worked overtime- was unnecessarily litigious and nasty, to say the least, the Court is not prepared to rule that Defendants bear all the blame. Sure, there were times during the pretrial phase where the conduct of Defendants stands out as unreasonable- some are mentioned below- but in the Court's final analysis with respect to the pretrial phase, both parties are responsible for the unnecessary length, cost, and burden of the pretrial proceedings, such that neither party's actions stand-out from the other's as "exceptional."

1. Standard

Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing

party." 35 U.S.C. § 285. Whether a case is exceptional is to be determined on a case-by-case basis, considering the totality of the circumstances. Octane Fitness, 572 U.S. at 554. There is "no precise rule or formula for making" a determination as to whether a case is exceptional. Biax Corp. v. Nvidia Corp., 626 Fed. App'x 968, 970-71 (Fed. Cir. 2015) (citing Octane Fitness, 572 U.S. at 554). Instead, an exceptional case is one that "stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." Id.

The Supreme Court has cited a number of nonexclusive factors that district courts may consider in determining whether a case is exceptional. Those include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence." Octane Fitness, 572 U.S. at 554 n.6. Further, "[d]istrict courts may determine whether a case is exceptional in case-by-case exercises of their discretion, considering the totality of the circumstances." Id. at 554. Because the exceptional case designation is guided by the district court's "better position[]" to decide the issue, the finding is committed to the sound discretion of the district court. Hishmak Inc. v. Allcare Health Management System, Inc., 572 U.S. 559,

564 (2014). Patent litigants are required to establish their entitlement to fees by a preponderance of the evidence. Octane Fitness, 572 U.S. at 557-58.

Finally, in the event the court finds exceptionality, the district court has "considerable discretion" in determining the amount of a reasonable attorney fee award under § 285. Homeland Housewares, LLC v. Sorensen Research & Dev. Trust, 581 F. App'x 877, 880 (Fed. Cir. 2014). In determining the amount of the award, the court should exercise reasonable care, and the Federal Circuit has found a line-by-line review of billing entries to satisfy this requirement. Id.; Bywaters v. United States, 670 F.3d 1221, 1228 (Fed. Cir. 2012) (finding that such care includes a careful and thoughtful consideration of the billing records). Ultimately, a district court should consider the amount involved and the results obtained, as well as the administrative nature of the work and the fee agreement in determining the loadstar figure. Id.

2. Analysis

As a preliminary matter, the Court notes that the parties briefed this issue before the Court rendered its Opinion and Order on, among other topics, Defendants' challenge to the jury's finding of willful infringement. But the Court has since rejected Defendants' challenges to the jury's willfulness finding. [See Docket No. 901]. Thus, the Court rejects

Defendants' arguments against exceptionality that specifically
rely on the absence of willfulness.

a) Substantive Strength

The Court first considers the "substantive strength" of the
parties' litigating positions in this case. This factor weighs
in favor of finding the case exceptional. As detailed below,
prior to the trial, Defendants' numerous attempts to invalidate
the Patents before the Patent Office had failed. This should
have led Defendants to seriously question the viability of their
defenses. To be clear, the Court does not quarrel with
Defendants' decision to file petitions for inter partes review.
They, of course, have that right. Defendants' decisions,
however, to file repeated petitions that, in the words of the
Patent Office, "risks harassment of patent owners and
frustration of Congress's intent" (PTX-494 at 6-7)[12]—
particularly given that several of these petitions were repeat
challenges— was anything but reasonable[13].

_____

[12]   The Patent Trial and Appeal Board ("P.T.A.B.") did not make
such a finding against Xactware, but it is likely the Board
denied institution of its review because of the serial
challenges by Xactware to the same patent.

[13]   The serial nature of Defendants' filings was the topic of
discussion with Magistrate Judge Schneider and the parties on
November 30, 2016 [Docket No. 151] As he said, "What kind of
precedent does it set if every time you lose on one of these
issues, you just file another petition with another ground and
argue to the Court that that's a basis to stay the case? Is that
good public policy? Is that efficient judicial administration?

Defendants filed 15 IPRs seeking to invalidate the patents-in-suit. Eight were rejected at the institution stage:

- IPR 2016-00582 challenged asserted claims of the '436 Patent based on Hsieh and AppliCad;

- IPR 2016-00586 challenged all asserted claims of the '840 Patent based on Hsieh, Verma, and AppliCad;

- IPR 2016-00587 challenged all asserted claims of the '376 Patent based on Hsieh, Verma, Aerowest, and AppliCad;

- IPR 2016-01775 challenged all asserted claims of the '436 Patent based on Hsieh and AppliCad;

- IPR 2017-00021 challenged all asserted claims of the '436 based on Avrahami, McKeown, and AppliCad;

- IPR 2017-00025 challenged asserted claim 12 of the '770 Patent based on Avrahami, AppliCad, and McKeown;

- IPR 2017-00027 challenged all asserted claims of the '454 Patent based on Avrahami, AppliCad, and McKeown;

- IPR 2017-00363 challenged all asserted claims of the '737 Patent based on Avrahami, AppliCad, and McKeown.

[See Docket No. 637-1, at 89]. Three received final written decisions rejecting Defendants' arguments and were upheld on appeal:

---

Is that good practice?" [Id. at 15:9-14]. After much back and forth it became clear that even if Defendants were successful on the IPRs, the case would nonetheless move forward on three patents, and the Court denied Defendants' motion to stay discovery.

- IPR 2016-00589 challenged claims 26-28 and 34-36 of the '454 Patent;

- IPR 2016-00590 challenged claims 1, 10-11, 14, and 19 of the '770 Patent; and

- IPR 2016-00592 challenged claims 1, 9, 10, 16, 19, 22, 25-28, 31, and 34-36 of the '737 Patent.

[See Docket No. 637, at 1 n.1.]

An additional four IPRs addressed the '152, '732, and '880 patents, which were dismissed from this case before proceeding to trial:

- IPR 2016-00591 challenged claims 1, 3, 6, 8-10, 12-16, 19, 22, 23, and 25 of the '152 Patent.

- IPR 2016-00593 challenged claims 12-15, 21-23, 25-27, 33-38, 44, and 45 of the '732 Patent.

- IPR 2016-00594 challenged claims 1-10 and 13-20 of the '880 Patent.

- IPR 2017-00034 challenged claims 8 and 10 of the '152 Patent.

The P.T.A.B. concluded that, in IPRs 2016-00593, 2016-00594, and 2017-00034, Defendants had not shown by a preponderance of the evidence that the challenged claims were unpatentable. See Xactware Solutions, Inc. v. Eagle View Technologies, Inc., No. 2016-00593, 2017 WL 3723073 (P.T.A.B. Aug. 28, 2017); Xactware Solutions, Inc. v. Eagle View Technologies, Inc., No. 2016-00594, 2017 WL 3671031 (P.T.A.B. Aug. 28, 2017); Xactware Solutions, Inc. v. Eagle View Technologies, Inc., No. 2017-00034 (P.T.A.B. Apr. 13, 2017).

Of particular note, however, is IPR 2016-00591, in which the P.T.A.B. found that claims 1, 3, 6, 9, 12-14, 16, 19, 22, and 23 of the '152 patent were unpatentable. <u>Xactware Solutions, Inc. v. Eagle View Technologies, Inc.</u>, No. 2016-00591, 2017 WL 3484953 (P.T.A.B. Aug. 14, 2017). Although the Court disagrees with Defendants' contention that the reduction in claims throughout the litigation is due to their success in "knocking out 147 patent claims before trial began" [Docket No. 870, at 3], the Court does acknowledge Defendants' success before the P.T.A.B. with respect to most claims concerning the '152 Patent, which EagleView dismissed from its Complaint on August 1, 2018. [<u>See</u> Docket No. 674] ("On August 1, 2018 . . . EagleView further narrowed its infringement contentions . . . . In doing so, EagleView confirmed that the '152 patent no longer would be asserted in this case.")

With the exception of the Noronha, Labe, and Sungevity references, all other references (and combinations) by the Defendants in this litigation were asserted in the IPR proceedings. Under the lower standard of proof to invalidate the Patent, the P.T.A.B. did not invalidate the patents-in-suit. Yet, Defendants pressed their claims at trial facing a higher burden- clear and convincing. Defendants offer different explanations, such as P.T.A.B.-imposed page limitations, as to why they filed serial applications and why they did not press

32

all their invalidity defenses. Defendants also emphasize that a failure to institute is not a finding on the merits. Although the Court is troubled by the manner in which Defendants proceeded before the P.T.A.B., this conduct does not warrant fee shifting. But how the results from the P.T.A.B. affected their litigation strategy is a different issue. When the P.T.A.B. declined to even institute review, Defendants should have been more critical of their own arguments and acknowledged the weaknesses of their case. Instead, Defendants forged ahead as though nothing happened. When the P.T.A.B. rejected Defendants' prior art arguments, they still attempted to rehash those rejected arguments at trial. This, in turn, increased EagleView's litigation costs. So, although true that Defendants had every right to litigate their defense in this manner, they did so at their own risk. That risk included the now-realized possibility that the Court would award costs for using a strategy that (1) relied on previously rejected arguments, and (2) unnecessarily increased Plaintiff's costs.

In addition, Defendants pursued an equitable estoppel defense throughout the litigation. Defendants withdrew this defense by letter in October 2019, only after the trial had ended. [See Docket No. 835]. But the fact that Defendants even attempted to pursue equitable estoppel at trial reflects the weakness of their arguments.

In August 2018, Defendants filed a Motion for Summary Judgment of Equitable Estoppel, in which they asked the Court to hold "that Plaintiff Eagle View Technologies, Inc.'s claims are barred by equitable estoppel." [Docket No. 459]. Judge Kugler, then the presiding Judge in this matter[14], denied Defendants' motion. [See Docket No. 548]. In his opinion, Judge Kugler explained that Plaintiff's pre-litigation behavior did not reflect a view that it would refrain from filing an infringement action against Defendants and instead showed "just the opposite." [Docket No. 547, at 9]. The opinion continued:

> [T]he Court finds defendants have not met their burden in showing how the relatively undisputed facts demonstrate Eagle View's bad faith in leading Xactware to reasonably believe it would not sue for patent infringement. What defendants have shown is: no dispute as to plaintiffs' repeated notifications, albeit informal, of defendants' possible patent infringement; no long term inaction on the part of Eagle View; and no dispute that Eagle View had litigation as a strategy to remedy a partner's contract breach.
>
> . . .
>
> [T]he Court notes its astonishment that defendants would have invested heavily in developing flagship software when relying solely on the apparent inaction of a business partner that had already sued them for contract breach.

---

[14]    This action was reassigned from Judge Kugler to the undersigned in June 2019. [Docket No. 718].

Id. at 10-11. Given this stern rebuke, the Court is perplexed by Defendants' apparent belief that this issue was critical to their trial defense.

Finally, the Court must address Defendants' attempts to use DTX-160, a patently irrelevant and inflammatory exhibit, at trial. DTX-160 is an excerpt from the deposition of EagleView President Rishi Daga along with several exhibits used in that deposition. Specifically, DTX-160 refers to portions of the deposition where Defendants questioned Daga about an e-mail chain in which EagleView employees commented on the Urban Dictionary definitions of Xactware's street address. [See Docket No. 582-1]. Evidently, Xactware's street address changed from "Morning Glory" to "Morning Vista," both of which have sexually related definitions in Urban Dictionary. In an e-mail chain, five EagleView employees shared news articles from the Washington Post, Salt Lake Magazine, and MSN discussing the street names and their Urban Dictionary entries. In addition, DTX-160 contained a 2011 meeting invitation e-mail in which an EagleView employee made an inappropriate comment that "we're like colored folk stripped down to our underwear and covered in gasoline at a KKK rally." [Docket No. 582-1]; [DTX-160]. This employee was no longer employed by EagleView at the time of trial, nor was he a witness at trial. Plaintiff filed a motion

in limine to exclude this exhibit, [Docket No. 581], which the
Court granted. [See Docket No. 754].

That Defendants' would attempt to use this exhibit in their
case speaks more about the weakness of their positions than
anything else. The various e-mails in DTX-160 have no relevance
to a claim or defense in the case and would have unfairly
prejudiced the jury against EagleView. These e-mails may have
embarrassed, shamed, or humiliated EagleView, all while
providing no probative value. But this appears to have been
Defendants' strategy. Their stated justifications for admitting
this exhibit lack support in the Rules of Evidence, and are more
likely pretext than good-faith argument. In either event, DTX-
160 was inadmissible and Defendants' insistence that these e-
mails were important to their defense reflects just how lacking
that defense was.

b) <u>Litigation Misconduct</u>

i.  *Re-litigating issues*

It certainly seemed that Defendants' litigation strategy
was to delay, obfuscate, and drive-up Plaintiff's costs. In
addition to re-litigating much of what they had lost before the
P.T.A.B., Defendants' unsuccessfully re-litigated various
arguments at trial. Sadly, "Defendants pursued a course of
conduct that had the effect of unduly burdening the Court . . .
and prolonging the litigation. <u>Saint-Gobain Autover USA, Inc. v.</u>

Xinyi Glass N. Am., Inc., 707 F. Supp. 2d 737, 752 (N.D. Ohio 2010).

This Court was burdened with having to re-visit issues previously ruled upon. For example, Defendants repeatedly tried to advance an argument that was inconsistent with the Court's claim construction of the '840 patent's phrase "modify a model based on the operation of a pitch determination marker." They did this in their opening statement, [see, e.g., Trial Tr. 404:4-13] (telling the jury that Defendants' use of a wireframe does not infringe because their wireframe is not "operable to indicate pitch" – an argument that also violated motion in limine No. 8[15]) and again during their questioning of EagleView's expert, Dr. Robert Stevenson. [Trial Tr. 1315:5-1325:22]. Defendants also tried to read a "simultaneous" display requirement into the '454 patent, even though such a requirement was rejected during claim construction. [Trial Tr. 1978:10-1987:1]. The Court rejected their arguments, finding that they conflicted with Judge Kugler's ruling. [Trial Tr. 2144:24-

---

[15]   Defendants' continued position that their particular wireframe is not a pitch determination marker because it is not operable to indicate pitch ignores Judge Kugler's ruling that a wireframe may be a pitch determination marker. Defendants' disagreement with Judge Kugler's ruling was not a license to violate it. To compound matters, Defendants seemed to have changed course when they at trial "fully admit[ed] there are even examples of wireframes in the patent that are pitch determination markers." [Trial Tr. 1789:21-24].

2145:19]. Moreover, Defendants tried to backdoor a construction that Judge Kugler had rejected. Although Defendants disagreed with the Court's ruling, it seemed clear that what the Defendants were trying to do, through their graphic, was to suggest to the jury that they had no single system for measuring roofs and generating roof reports. Thus, the Court found Defendants had acted disingenuously and contrary to Judge Kugler's construction. [Trial Tr. 1776:20-1777:11].

Throughout the trial, Defendants also tried to raise inequitable conduct claims that had been disallowed. Before trial, on February 9, 2018, Defendants moved to add an inequitable conduct counterclaim, claiming that EagleView purposely excluded Dave Carlson as an inventor on all but the '736 Patent. [Docket Nos. 374 & 376-2]. The Court denied that motion. [Docket No. 432]. Yet, at the motion in limine conference, Defendants' counsel tried unsuccessfully to re-raise "[t]he issue about the omitted co-inventor." [Trial Tr. 88:3-6]. Despite the Court's clear ruling, Defendants tried again during trial to admit deposition testimony from Dale and Chris Thornberry that "struck [this Court] as primarily, if not all, [about] inequitable conduct." [Trial Tr. 2925:21-2926:7]. They also tried to admit Mr. Carlson's deposition testimony, even though "the only real relevance of the Carlson testimony [was] inventorship." [Trial Tr. 3016:15-3017:5].

As discussed more thoroughly above, Defendants also attempted to re-litigate their equitable estoppel defense. Perhaps Defendants hoped that they might get a more-favorable reception to their equitable estoppel arguments a second time around. [See supra at 33]. Regardless of their intent, however, Defendants' arguments resulted only in needlessly increased litigation costs.

Finally, although technically not an issue of re-litigation, the record was burdened with the IPRs and the IPR history because of Defendants' litigation misconduct that occurred during trial. The Court's prior Opinion adequately addresses this issue, and the arguments will not be revisited here. [See Docket No. 901, at 34].

This conduct described above burdened the Court and jury, and certainly needlessly increased Plaintiff's fees and costs. For these reasons, as well as the additional reasons discussed below, this is an exceptional case in which awarding some attorneys' fees is appropriate.

    ii.   *Litigating new issues*

Re-litigation of the issues, however, was not Defendants' only mischief. Litigating issues for the first time at trial also caused unnecessary expense and delay. As became clear, Defendants attempted to raise new non-infringement arguments for the first time at trial. First, in their opening statement,

Defendants claimed that they did not infringe by using correlation because (1) they use primitives, [Trial Tr. 399:8-16], and (2) because they use metadata. [Id. at 399:24-400:13]. Neither argument, however, had ever been disclosed before trial, and the Court concluded that both defenses were unavailable. [Trial Tr. 1806:16-23, 2203:13-24]. The Court's frustration from Defendants' litigation misconduct during trial was hard to conceal at times. In this particular instance, the Court issued a stern warning: "All I say is if Dr. Cohen gets up and utters anything that sounds like 'we don't infringe because we use roof primitives,' I may not hesitate to declare a mistrial." [Trial Tr. 1809:14-19].

Second, in the middle of trial, about 36 hours before the testimony of Webecke- Defendants' 30(b)(6) witness- EagleView first learned that Webecke intended to testify about the section 324 language of each of the two Merger Agreements. This language limited the representations and warranties solely to the Merger and not for any other purpose. [See Docket No. 901, at 55-63]. EagleView was concerned that Defendants would use this contractual language as an admission by EagleView of non-infringement. [Trial Tr. 2156:13-20]. More specifically, EagleView was troubled that having been precluded by the Court from introducing the Agreements as to willfulness, Defendants

would backdoor them to prove non-infringement. The Plaintiff had every reason to be concerned.

When the Court pressed Defendants as to what they intended to ask Webecke about the Agreements, the following colloquy occurred:

> THE COURT: What questions do you intend to ask the witness about the agreement?
>
> MR. CHRISTIE: . . . We do not intend to ask him whether that informed his position on infringement or willfulness or anything else . . . . . We are cognizant of Your Honor's previous ruling that we are permitted to allow this document in evidence . . . the words speak for themselves.

[Trial Tr. 2158:7-25]. The colloquy continued later:

> MR. CHRISTIE: Mr. Webecke was not a 30(b)(6) witness as to infringement, so to the extent he was talking about infringement, he was talking in an individual capacity. In keeping with Your Honor's concerns and admonitions, we do not even intend to ask Mr. Webecke about infringement with regard to that language.
>
> THE COURT: So then of what use – of what relevance is the agreement? What would you use it for?
>
> MR. CHRISTIE: I'm saying that the agreement is relevant to infringement but I'm – non-infringement, sorry, but we do not intend to adduce any evidence of that nature from Mr. Webecke.
>
> THE COURT: So when you say that the documents are relevant to non-infringement, what that says to me is that you are going to show this, this is your first exhibit that you show the jury in your closing, that says, see, they said we don't infringe.

MR. CHRISTIE: Well, actually it's toward the tail end to get to that at the end when it's appropriate in the chronology.

THE COURT: In your closing?

MR. CHRISTIE: Oh, I'm sorry, I was talking about the testimony –

THE COURT: No, no, no.

MR. CHRISTIE: I'm sorry, in closing.

THE COURT: And so what I'm saying is what you're saying to me –

MR. CHRISTIE: Yes.

THE COURT: -- signals to me that what the defendant[s]' going to do in [their] closing is this will be the first exhibit that they splash on the screen and say see, they admit they don't infringe. Do you dispute that as a general principle?

MR. CHRISTIE: As a general principle, we do hope to use that document in closing to argue that there is evidence of non-infringement, yes.

[Trial Tr. 2213:7-2214:18].

EagleView objected strenuously to such testimony, contending that at no time pretrial did Defendants disclose Webecke's testimony, to wit, the contractual language of both Agreements, as a basis for non-infringement. First, when Webecke was deposed, he was asked:

Q. Where do you get the basis for the statement that Xactware was not infringing?

A. The basis comes from a number of things that are privileged or work product.

Q. Is there any aspect to the basis for the statement that Xactware was not infringing?

A. The basis comes from a number of things that are privileged or work product.

42

> Q. Is there any aspect to the basis that is not privileged or work product?
>
> A. Not that I can think of
>
>          . . .
>
> Q. Are there any underlying fact[s] that Xactware relies on to establish that it does not believe it's infringing those patents, that is not work product or privilege at this point?
>
> A. Not that I can think of, no.

[Trial Tr. 2153:22-2154:12].

Second, the first time that the issue of these Agreements arose was when Defendants filed a Motion for Summary Judgment of equitable estoppel. Prior to that, Defendants had never disclosed their non-infringement theory to EagleView in written interrogatories or other discovery responses. As EagleView put it:

> MR. DE VRIES: And so we never got to question their witnesses about it. And to the extent that they had some belief about it that would have been relevant to something that they could testify about, which is something I want to come back to, willful infringement, they clammed up, they claimed privilege, and we couldn't do it. So we didn't get to question the witness. He will sit on the stand, say things for the first time that we have never seen able to test and didn't have an opportunity to in discovery.

[Trial Tr. 2219:18-2220:1].

Of course, Defendants disagreed, contending that the documents speak for themselves and they did not have to tell EagleView for what purpose they would be used. When the Court

pressed Defendants as to when the documents should have been disclosed, Defendants response was simply "this is mere evidence." [Trial Tr. 2220:18].

Ultimately, it became clear to the Court that Defendants had failed to disclose in discovery that they would rely upon the Agreements for their non-infringement defense[16]. It also became clear to the Court why failure to follow the patent rules leads to mischief. No doubt, EagleView was caught by surprise. Had they known of Defendants' non-infringement theory, discovery could have and would have been conducted. Ironically, counsel for Defendants' response illustrated why the rules must be followed when he suggested how each side might respond to the documents:

> MR. CHRISTIE: I presume that one thing they're going to say is, well, number one, Judge, because we were going to join together, Verisk and EagleView, they knew that we had accused them of infringement and we didn't want to make it explicit in the agreement because we were going to become one big happy family. So everyone knew it, but for the purpose of niceties, we didn't do it.
>
> Or, to your Honor's earlier point, you know it was a contract negotiation, and we thought it wasn't critical to put it in because we wanted the money, and we thought that if we insisted

---

[16]   Defendants relied heavily upon the deposition testimony of Barrow, but the Court found that such reliance was insufficiently disclosed, and it certainly did not address the 2015 Agreement at all.

> that it go in, Verisk wouldn't pay the money, or
> various permutations on that, Judge.
>
>                    . . .
>
> I think, Judge, the document speaks for itself.
> They are going to argue that the parties were
> trying to join together as one unit, and they
> didn't want to embarrass each other by
> acknowledging the fact that there was this
> infringement, as they kept it out of the
> agreement. <u>And that's fine, they can argue what
> they want, we can argue what we want.</u>

[Trial Tr. 2214:18-2215:13] (emphasis added). Yet, it was not

fine. When the Court asked whether Defendants would dispute that

this type of language is standard get-along-with-each-other

language, Defendants made it clear they would dispute why this

language was included:

> THE COURT: Do you dispute that as a general
> principle? Does the defendant dispute the
> following proposition that the reason this
> language was put into these two merger agreements
> was because the parties wanted to get along and
> play nice?
>
> Mr. CHRISTIE: Yes, we dispute that.
>
> THE COURT: On what basis?
>
> MR. CHRISTIE: On the basis that it is an executed
> copy of a merger agreement between – signed by
> the CEOs of the respective companies that have
> various representations and warranties, and that
> in merger agreements, representations and
> warranties mean something.
>
> THE COURT: Okay.
>
> MR. CHRISTIE: If they are inaccurate or false,
> they could, and likely would result in legal
> claims or refunds having to be given, which
> likely would eviscerate a significant portion of
> the value of the deal.

[Trial Tr. 2215:18-2216:9].

And so, a trial within a trial, with no discovery having been done on this issue, would have ensued. Defendants' efforts to sneak in a non-infringement theory that had not been disclosed would have created confusion to say the least. The Court saw it then, and sees it now, as an underhanded tactic by Defendants.

Moreover, as the Court found, EagleView presented evidence that the Defendants had agreed not to use the language of the Agreements for any other purpose, i.e., a patent trial. First, as to the 2014 Agreement, [DTX-481], the language set such preclusion out explicitly. [See Docket No. 901, at 62-63]. Second, as to the 2015 Agreement, [DTX-483], EagleView presented evidence that the agreement contained the same language restricting its use for other purposes, and that in-house counsel for Defendants had signed this agreement. This evidence seemed to even catch Defendants' trial counsel off-guard:

> MR. DE VRIES: But, more importantly, and I do want to correct something, your Honor, because there is something – it's a little bit complicated because it came up for the first time when they sent us an e-mail the other night, they said Mr. Webecke is going to testify about of the Vista agreement. And they specifically said the Vista agreement that we produced in discovery that's marked attorneys-eyes-only.
>
> They've never they still to this day have never produced any discovery about that. They told us in an e-mail from counsel he got this shortly

after the agreement. The argument was that Verisk
was a warrant holder in EagleView, and so signed
the merger agreement, the Vista merger
agreement, signed on to it through a warrant
related agreement. We've never seen any
discovery about that, never had any opportunity
to question him about it.

But, what it did make us realize is this, and I
want to very much disagree when counsel said we
agree this comes in, they've agreed it does not
and cannot by their own admission. The disclosure
section –

THE COURT: What am I looking at?

MR. DE VRIES: This is the disclosure schedule,
DTX-481. This is the agreement – this is the
acquisition agreement and the disclosure
schedule that they – in the case of the 2014
agreement [DTX-481], that's the one that we're
looking at here. They of course were a signatory
to that agreement. Then they took the position
two nights ago for the first time, without
providing any evidence or e-mails or anything or
our ability to depose them they say . . . got
the Vista [DTX-483]. Schedule A are disclosed
solely for the purposes of the agreement, and
this is the critical part, and shall not be used
for any purpose other than the purposes
contemplated by the agreement. So that now, by
their own admission, which we never even heard
about until 36 hours ago, they have agreed in
both the 2014 agreement and the 2015 agreement
that they will not use this for any purpose
whatsoever. I actually have right here that
signed agreement from their counsel sitting in
the back of this courtroom.

                    . . .

THE COURT: What are you handing up to me?

MR. DE VRIES: This is the agreement where after
they disclosed this new assertion 36 hours ago,
we went to check and see had they in fact
received this agreement, although they hadn't
said that before, and signed on to it. And this
document that I'm holding here shows that they
did, and in fact there is an agreement called a

<u>warrant cash out agreement that agrees to all the terms of this agreement including the one I just read, which is that they shall not use this for any other purpose. And it was signed by Mr. Kenneth E. Thompson.</u> And so I'm happy to and that up to your Honor, if you'd like.

THE COURT: Do you know what – have you seen it, Mr. Christie?

MR. CHRISTIE: I have not Judge, I've been –

THE COURT: Have a look at it.

MR. CHRISTIE: - - told about this for the first time now, predictably[17].

MR. DE VRIES: And again, to be clear, I've handed over – this is because for the first time 36 hours ago they claimed to have received this.

MR. CHRISTIE: By virtue of this agreement, apparently we have. And counsel is unhappy that we have received it, and is raising concerns about that fact now.

MR. DE VRIES: We're not unhappy about it, we received the assertion for the first time and so investigated it.

THE COURT: What am I looking at? I'm getting a little lost.

MR. DE VRIES: Yes. So if you see, there's a first page, your Honor, July 20, 2015, that Verisk sends to the Continental Stock Transfer and Trust Company and it attaches a warrant cash-out agreement.

THE COURT: Okay.

---

[17]   Sadly, this exchange is just one of many that further reveals the parties' animosity toward each other. [See <u>supra</u> discussion of <u>Read</u> Factor 8, at 20]. Defendants suggest that Plaintiff "predictably" withheld a document until the last minute. But this ignores the fact that Plaintiff used this document- a document signed by in-house counsel for Defendants- only to rebut Defendants' own last minute attempts to present certain testimony through the 2015 merger documents.

MR. DE VRIES: And this warrant cash-out agreement relates to the –

THE COURT: Merger.

MR. DE VRIES: -- merger between Vista and EagleView.

THE COURT: yes.

MR. DE VRIES: And what it goes through and explains that the – it talks about the merger on the first part, there is an acknowledgement and agreement that's on the second page, and then it continues with some representations and warranties, and then at the very end there is a signature from counsel for the company, by virtue of which they have agreed to all the terms of this agreement.

And so there's two issues here, really. One is we now know by virtue of their disclosure 36 hours ago, that they have agreed to this provision in other of the documents we're talking about that says it shall not be used for any other purpose –

THE COURT: Can you tell me what page that is in the agreement?

MR. DE VRIES: Yes, it's DTX-481, on Page 1. And then I'll need to ask my colleagues for the trial exhibit number of the Vista agreement that it also relates to, but I'll have that momentarily. So it's Page 1 of both of the disclosure schedules. And it's DTX-483. So at D[T]X-481, Page 1 and DTX-483, Page 1, there are agreements in both documents in the fourth paragraph, Subsection (a), that these documents shall not be used for any other purpose.

And that not only is inconsistent with their attempt to use it now, but is in addition to the real issue here that I think, your Honor, the substantive issue which is what is this relevant to. It is clearly not relevant to willful infringement, and this witness cannot say that it is, and there won't be a witness who will be able to, given the way they handled the privilege instructions on willfulness.

49

THE COURT: Okay.

[Trial Tr. 2222:6-2226:16]. (emphasis added).

As the Court found, since the parties had agreed that the language could not be used for any other purpose, this should have also put an end to the issue. That it created an interruption in the trial and burdened the Court and increased EagleView's costs was unnecessary.

### iii.   Litigation animus

As stated several times, the animus between the attorneys, clients, and witnesses oozed. A review of the record paints a picture of parties that grew increasingly hateful of each other once the business deal fell through. Perhaps the strongest reflection of this hostility is Defendants' attempt to present the jury with two prejudicial e-mail chains from EagleView employees. As discussed above, these e-mails contained Urban Dictionary definitions and a former employee's troubling reference to the KKK. [See DTX-160]; [see also supra at 35]. These e-mails had no probative value, and while the e-mails themselves are beyond shameful, it is regretful that a party would contemplate making this part of the case.

### iv.   Discovery misconduct

The Court now turns to its decision not to award fees incurred prior to the preparation of the Final Pretrial Order. The Court must consider the conduct of the prevailing party too,

and it has done so. Romag Fasteners, Inc. v. Fossil, Inc., 866 F.3d 1330, 1340 (Fed. Cir. 2017). The case began with nine patents and 153 asserted claims, clearly an unreasonable number by any measure. [See Docket No. 30]. That Defendants were faced with a "daunting task" is perhaps an understatement. [See Docket No. 79; (May 2, 2016), 8:3-10] ("Mr. Christie: Well, Judge, in the context of what we're dealing with, unfortunately, we are at our wits end trying to deal with 163 separate asserted claims. We've tried to pare it back and we can continue to try to pare it back with the cooperation of plaintiffs, but it has been and will continue to be a daunting task given that not only are we dealing [with] 163 asserted claims but they are very detailed and have numerous issues embedded in many of them.")

In September 2016, Plaintiff reduced the case to seven patents and 46 claims. [Docket No. 119]. However, Plaintiff admitted that it never intended to try close to this number of claims. [Docket No. 143; (November 7, 2016) 11:1-3] ("Mr. Alper: . . . we do not intend to try 46 claims. We made a big reduction, and we're willing to do more, but we would like it to be a little bit of a two-way street.") By November 7, 2016, it seemed that EagleView got the message to streamline the case. [Id.] (Judge Schneider: "At present there are seven patents in the case and 46 claims . . . . When am I going to be able to tell Judge Kugler that you've reduced 46 claims to a reasonable

amount?") [Docket No. 143, at 7]. EagleView "committed" to reducing that number on December 9, 2016 when the Court made it clear how it saw things: "The Court is not comfortable that plaintiff has as of yet used its best efforts to focus the case on what's genuinely going to be at issue." [Docket No. 151, 91:20-21; 97:10-12] ("We are committed to the streamlining that your Honor has in mind, and we have been discussing these issues … for quite awhile now.") Then, by letter December 23, 2016, Plaintiff further reduced the claims from 46 to 24. [See Docket No. 152].

Four months later, on May 19, 2017, the parties entered into a Joint Stipulation dismissing various claims "[i]n an effort to streamline the proceedings and narrow the issues for trial." [Docket No. 239]. When this case finally proceeded to trial, it contained six patents and 11 asserted claims. [Docket No. 674, at 2]. Against this backdrop, discovery mischief occurred by both sides. For example, Defendants filed a Motion to Stay Discovery, based on their filing of a Motion to Dismiss under Section 101. [Docket No. 107]. Although Judge Schneider found no evidence of bad faith or sandbagging, he was "troubled by the fact that in [his] view th[e] motion could have been filed earlier before the parties started to engage in the discovery process. . ." [Docket No. 151, at 43: 2-9]. On December 7, 2016, Defendants filed another Motion to Stay, this

time based on their pending IPR reviews. Judge Schneider denied that motion, finding that "plaintiff will suffer undue prejudice from a stay." [Docket No. 150, at 8]. As for Plaintiff, Judge Schneider was very critical of its failure to comply with the Local Patent Rules in not serving fulsome contentions required by the Rules and not timely amending its infringement contentions when the Court repeatedly pointed out its deficiencies. [See Docket No. 329] ("This is a classic example of the mischief that occurs when a party does not faithfully follow the requirements in the Local Patent Rules . . . . the Court is now unfortunately compelled to wade through the parties' mind-numbing arguments . . .") Judge Kugler agreed. [See Docket Nos. 429 & 430].

In the end, this Court holds that when a party files a complaint alleging an "unreasonable and unwieldy number of patents and asserted claims"— which are certain to be reduced by any court— that party will face an uphill battle in convincing a court to declare the entire case exceptional, particularly when the unnecessary fighting is self-inflicted. Much of the fighting here arose from EagleView's decision to bring an unwieldy number of claims. Judge Schneider certainly appreciated this and understood the plight of Defendants at the outset of the case. [Docket No. 243, at 37:22-25 to 38:1-2] ("The Court is sympathetic to defendants' argument about why it took time to

finally formulate their present invalidity positions. This was occasioned in part by the fact that plaintiffs asserted an unreasonable and unwieldly number of patents and asserted claims in the case.") In the Court's final analysis, therefore, it will not find this case to be exceptional in the pretrial phase. But when this matter was about to be set for trial and then assigned to this Court, Defendants seemingly seized the trial as an opportunity for a "re-do." As set forth above, this is the misconduct that calls for a finding of exceptionality.

### c) Jury's Verdict

The Court is also mindful that the jury deliberated for only two hours before reaching its verdict. Given the length of trial, the money at stake, and the complexity of the subject matter, Plaintiff's success with the jury, in such a relatively short period of time, further supports the Court's view that Defendants' trial strategies were more likely governed, to a large degree, by something other than a likelihood of success on the merits. See Chamberlain, 315 F. Supp. 3d at 1014 (finding that the case was exceptional, in part, because Defendants lost on every issue at trial following two hours of jury deliberation.).

### d) Willfulness

Finally, the Court acknowledges that its finding of willfulness does not necessarily entitle Plaintiff to fees, nor

does it establish this case as exceptional. See Stryker Corp. v. Zimmer, Inc., 837 F.3d 1268, 1279 (Fed. Cir. 2016) (noting that a willfulness finding "does not necessarily" make a case exceptional.) Nevertheless, the Court's willfulness finding is both a factor in the Court's review and likely sufficient on its own. See Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1340 (Fed. Cir. 2004) ("[O]ur cases uniformly indicate that the willfulness of the infringement by the accused infringer may be a sufficient basis in a particular case for finding the case 'exceptional' for purposes of awarding attorney fees to the prevailing patent owner.") (quoting Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1567 (Fed. Cir. 1988)); see also Chamberlain, 315 F. Supp. 3d at 1018, vacated on other grounds, 935 F.3d 1341 (Fed. Cir. 2019); Rawcar Grp., LLC v. Grace Med., Inc., No. 13 CV 1105, 2014 WL 12577590, at *3 (S.D. Cal. Dec. 16, 2014); Comaper Corp. v. Antec, Inc., No. CV 05-1103, 2014 WL 12613394, at *1 (E.D. Pa. June 11, 2014). The Court previously noted that Defendants "appear to be driven by a specific animus toward EagleView" [Docket No. 841, at 27] and a thorough review of this case— in which willfulness is only one of many factors— has only strengthened that impression.

Broadly, Defendants contend that they "did what any accused infringer would do when faced with a suit seeking in excess of a hundred million dollars: they fought back." [Docket No. 870, at

44]. The issue, however, is not the fact that Defendants "fought back" but how they chose to do so. Even before this litigation commenced, Defendants lauded Plaintiff's technology as "breakthrough" technology, [see e.g., PTX-76], and clearly saw EagleView's technology as a threat to their business. When Defendants' efforts to buy its burgeoning and threatening competitor's business fell through in December of 2014, they turned to infringement, as the jury found. Then, when EagleView failed to capitulate, Defendants began an all-assault approach against EagleView.

In sum, the Court finds that Defendants' litigated this case in a manner that ignored the weaknesses of their own positions, advanced unreasonable arguments, and forced Plaintiffs to spend significant sums rebutting those unreasonable positions and arguments. This conduct occurred repeatedly, and at nearly every stage of the trial. Even within the backdrop of contentious patent litigation, the Court is satisfied that this case meets the exceptionality requirements. Moreover, Defendants undertook this unreasonable approach while willfully infringing Plaintiff's patents. Thus, pursuant to 35 U.S.C. § 285, this is an exceptional case in which Plaintiff is entitled to reasonable attorney fees. For the reasons discussed above, the Court will award attorney fees incurred in preparation for and during trial— that is, all fees incurred in

56

the preparation of the Motions in Limine and subsequent to the filing of the Final Pretrial Order on May 30, 2019. [Docket No. 669].

    C. <u>Pre-judgment Interest</u>

Pre-judgment interest ensures "adequate compensation for . . . infringement." <u>Oiness v. Walgreen Co.</u>, 88 F.3d 1025, 1033 (Fed. Cir. 1996). A Court's award of pre-judgment interest is not a punitive measure, but a compensatory one. <u>Id.</u> Indeed, the Supreme Court has explained that "prejudgment interest should be awarded . . . absent some justification for withholding such an award." <u>Gen. Motors Corp. v. Devex Corp.</u>, 461 U.S. 648, 657 (1983); <u>Whitserve, LLC v. Computer Packages</u>, Inc., 694 F.3d 10, 36 (Fed. Cir. 2012).

The Court's goal in awarding pre-judgment interest is to "ensure that the patent owner is placed in as good a position as [it] would have been in had the infringer entered into a reasonable royalty agreement." <u>Id.</u> at 655. The Court is not required, however, to award pre-judgment interest "whenever infringement is found." <u>Id.</u> at 656. Nevertheless, "[w]hen a patentee asserts a patent claim that is held to be valid and infringed, prejudgment interest is generally awarded." <u>Ecolab, Inc. v. FMC Corp.</u>, 569 F.3d 1335, 1353 (Fed. Cir. 2009).

Defendants contend that this case presents an adequate justification for denying pre-judgment interest— "[EagleView]'s

3 ½ year delay in filing suit [which] was self-serving and resulted in prejudice." [Docket No. 870, at 51] [cleaned-up]. More specifically, Defendants argue that Plaintiff notified Defendants of infringement in April 2012 but did not file this lawsuit until September 2015. This delay, Defendants conclude, occurred because Plaintiff was partnering with Xactware and "angled for a buyout by Defendant Verisk until the deal was blocked in December 2014," which caused the damages to escalate to the point where pre-judgment interest would be "severely prejudicial." [Docket No. 870, at 51].

Plaintiff responds that the "delay" in filing this action was due to Defendants' attempts to acquire EagleView in 2012 and 2013, which was later blocked by the FTC in 2014. [Docket No. 877, at 25-26]. Moreover, Plaintiff contends that Defendants did not suffer any prejudice due to the delay and have similarly not articulated what this purported prejudice was.

The Court does not believe that Plaintiff's pre-litigation conduct warrants a complete prohibition on pre-judgment interest. The denial of pre-judgment interest is typically disfavored, and Defendants have not established the requisite level of harm to warrant that complete denial. Moreover, a complete denial of pre-judgment interest would fail to adequately compensate Plaintiff for infringement. But, as discussed more thoroughly below, the Court does agree with

Defendants that the pre-judgment interest period should be limited.

Plaintiff argues that interest should be assessed beginning on May 1, 2012, the date that the '840 patent issued. In addition, Plaintiff requests a pre-judgment interest rate equal to "the interest rate that EagleView was forced to pay when it borrowed money to maintain its business operations." [Docket No. 866, at 48]. In response, Defendants argue, if there is to be an award of pre-judgment interest, that the pre-judgment interest period should begin when the litigation commenced on September 23, 2015. Defendants also request that the Court adopt an interest rate equivalent to the "standard T-Bill or prime rate." [Docket No. 870, at 52].

Practically speaking, these arguments amount to vastly different sums. Plaintiff calculates $26,060,453 in pre-judgment interest through the September 25, 2019 verdict, and an additional $40,800.08 per day thereafter, through the Court's entry of judgment[18]. Defendants calculated $5,086,791 (or $4,113,211 if no interest is awarded on pre-suit damages) using the T-Bill rate or $14,522,1920 (or $10,729,719 is no interested

---

[18]    Plaintiff also requests that, if the Court does not accept its preferred pre-judgment interest rate, then it instead apply the prime rate. [See Docket No. 866, at 49 n. 7]

is awarded on pre-suit damages) using the prime rate, through the September 26, 2019 Judgment. [See Docket No. 799].

The Court has "wide latitude in the selection of interest rates . . . and may award interest at or above the prime rate." Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991). As noted above, "[a]n award of prejudgment interest serves to make the patentee whole because the patentee also lost the use of its money due to infringement." Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1361 (Fed. Cir. 2001). The Court's selected rate must achieve this goal. The Court will impose a rate higher than the prime rate only when a party shows "evidence that [the prevailing party] borrowed money at a higher rate, what that rate was, [and] that there was a causal connection between any borrowing and the loss of the use of the money awarded as [damages]." Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997).

First, in its final analysis, the Court will not impose pre-judgment interest beginning in May 2012. Between the case's lengthy pre-litigation period, the parties' ultimately unsuccessful merger attempt, and their other negotiations, the Court finds that excluding the pre-litigation period from the pre-judgment interest award best reflects the appropriate period to award adequate compensation to Plaintiff. Given the unique circumstances regarding the relationship between the parties,

the Court is unable to find that Plaintiff pursued its claims without undue delay throughout the entire three-year pre-litigation period, and Plaintiff should not receive the same pre-judgment interest award as though it did. Therefore, the pre-judgment interest period shall begin on September 23, 2015.

Second, the Court will assess pre-judgment interest at the prime rate. Having reviewed the parties' arguments and preferred rates, the Court concludes that pre-judgment interest assessed at the prime rate, between the September 23, 2015 commencement of litigation and September 26, 2019 Judgment, [see Docket No. 799], correctly and adequately compensates Plaintiff. See Oiness, 88 F.3d at 1033. In addition, the Court rejects Plaintiff's arguments that it is entitled to a rate above the prime rate. Plaintiff's interest calculations largely rely on a pre-judgment interest period beginning in May 2012. But the Court has limited the pre-judgment interest period to beginning in September 2015. This is particularly important because Plaintiff's lien debt was incurred in July 2015. [See Docket 866-2]. Finally, the Court finds that Plaintiff's calculations have not fully established a "causal connection" between the money borrowed and the loss of the money awarded as damages. Therefore, the prime rate shall apply.

D. Post-Judgment Interest

Post-judgment interest is governed by 28 U.S.C. § 1961, which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." § 1961 (a). This rate is established by statute. Id. ("Such interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.") Although this is a patent case, the Court will apply § 1961 as construed by Third Circuit case law. See Transmatic, Inc. v. Gulton Indus., Inc., 180 F.3d 1343, 1347 (Fed. Cir. 1999) (holding that § 1961 is not a subject unique to patent law and is governed by regional circuit law).

The parties do not dispute that post-judgment interest is mandatory. See Nite Glow Indus., Inc. v. Cent. Garden & Pet Co., No. CV124047KSHCLW, 2020 WL 2847857, at *13 (D.N.J. June 1, 2020); Glass v. Snellbaker, No. CIVA 05-1971 (JBS), 2008 WL 4416450, at *12 (D.N.J. Sept. 23, 2008). Similarly, they do not dispute that post-judgment interest applies to each component of the award: the jury's damages award, pre-judgment interest, enhanced damages, attorneys' fees, etc. See generally Travelers

Cas. & Sur. Co. v. Ins. Co. of N. Am., 609 F.3d 143, 174 (3d
Cir. 2010). Indeed, post-judgment interest on each aspect of an
award "starts running when a judgment quantifying that award has
been entered." Id. at 175. Thus, post-judgment interest will be
assessed at the applicable rate on the jury's damage award
beginning from the entry of the Court's September 26, 2019
Judgment [Docket No. 799], and on all other damage awards from
the date of the entry of the Order accompanying this Opinion.

  E. Accounting

  Plaintiff has also requested an "accounting of
[Defendants'] infringing sales since March 2019," which were the
last sales that the jury was able to consider in rendering its
verdict. The Court will deny that request. As Defendants
convincingly argue, Plaintiff could have raised the issue of
pre-verdict accounting at trial. Moreover, the Court is
unpersuaded by Plaintiff's contention that a "tacit agreement"
established its right to leave this issue for post-trial
briefing. Perhaps the parties had reached some agreement about

an accounting for post-verdict infringing sales, but the Court finds no agreement as to pre-verdict infringing sales.

### F. Costs

Pursuant to Local Rule 54.1 the Court will refer the Bill of Costs to the Clerk of Court.

## III. **CONCLUSION**

Thus, for the foregoing reasons, Plaintiff's Motion will be granted, in part, and denied, in part. The Court will award Enhanced Damages, to the maximum allowable extent, pursuant to 35 U.S.C. § 284; award reasonable attorneys' fees, beginning with the filing of motions in limine through trial, pursuant to 35 U.S.C. § 285; award pre-judgment interest, at the prime rate, beginning on September 23, 2015; and award post-judgment interest pursuant to 28 U.S.C. § 1961. Plaintiff's request for an accounting of Defendants' infringing sales after March 2019 will be denied. Finally, the Court will refer the Bill of Costs to the Clerk of Court. An appropriate Order accompanies this Opinion.

Dated: February 16, 2021            s/Renée Marie Bumb
                                    RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE