[Dkt. No. 940]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| EAGLE VIEW TECHNOLOGIES, INC., *et al.*, | |
| Plaintiffs, | Civ. No. 15-7025 (RMB/SAK) |
| v. | **OPINION** |
| XACTWARE SOLUTIONS, INC., *et al.*, | |
| Defendants. | |

**RENÉE MARIE BUMB**, UNITED STATES DISTRICT JUDGE:

Plaintiff Eagle View Technologies, Inc. moves for an order to initiate contempt proceedings and for a temporary restraining order. [Dkt. No. 940]. For the reasons set forth below, Plaintiffs' Motion to Initiate Contempt Proceedings and for a Temporary Restraining Order will be **GRANTED**, in part, and **CONTINUED**, in part. Plaintiffs' request to conduct expedited discovery will also be **GRANTED**.

**I.   Factual Background and Procedural History**

This case is not new before this Court. In 2019, after years of litigation and a jury trial, the jury found in favor of Plaintiff Eagle View Technologies, Inc. ("Eagle View" or "Plaintiff"). Specifically, the jury determined that Eagle View's patents-in-suit were valid

and that Defendants Xactware Solutions, Inc. ("Xactware") and Verisk Analytics, Inc ("Verisk") (collectively "Defendants") willfully infringed each of the asserted claims.  Shortly thereafter, this Court issued an Order permanently enjoining Defendants' from, *inter alia*:

> making, offering to sell, selling, importing, and/or using  a) Xactimate in combination with Aerial Sketch version 2; and/or b) Xactimate in combination with Property Insight or Roof Insight, and the Mass Production Tool; and any products made by these processes including Property Insight, Roof Insight, Geomni Roof and Geomni Property, and any products not more than colorably different in or into the United States […]

[Dkt. No. 842].  Defendants argue now, as they did before the Court entered its injunction, that Eagle View "seeks to use its patents to block ***any*** use of an aerial image for any commercial purpose related to roofing."  Defendant's Opposition Brief, at 1 [Dkt. No 948] (emphasis in original).  The Court disagrees.  As it ruled earlier:

> [T]he [proposed] injunction plainly does not, as Defendants argue[d], enjoin Defendants from supplying aerial imagery in and of itself.  The entirety of the challenged clause prohibits Defendants from "Supplying or causing to be supplied . . . (b) Xactimate in combination with Property Insight or Roof Insight, <u>or any products made by these products</u>, <u>including</u> Property Insight, Roof Insight, Geomni Roof, and Geomni Property, and including the Mass Production Tool, aerial imagery, and any components not more than colorably different.

[Dkt. No. 841, p. 36] (emphasis in original) (internal citations omitted).

Now before this Court on contempt proceedings are allegations that Defendants have violated this Court's injunction order.  On August 9, 2021, Eagle View filed its Motion to Initiate Contempt Proceedings and for a Temporary Restraining Order and filed its supporting brief.  Plaintiff alleges that "on June 1, 2021, Defendants launched purportedly new roof report products, but these recently released products still infringe, and Defendants' sale of those new products is a clear violation of the Court's injunction," and that

"Defendants continue to use the output of the previously adjudicated infringing technologies to make the new products, which separately violates the Court's injunction." Plaintiff's Brief in Support, at 1 [Dkt. No. 941].

Defendants filed their Opposition on September 1, 2021, which denies all of Eagle View's allegations. [Dkt. No. 948]. Defendants rely principally upon the testimony of Jeffrey Lewis, the Vice President and Chief Operating Officer of Geomni, Inc. (of which Verisk is the parent corporation), and remonstrate against the motion. Defendants contend that the companies have taken all steps necessary to abide by this Court's injunction order. *See* Lewis Decl. at ¶ 8 [Dkt. No. 948-1] ("Verisk took the permanent injunction seriously, and continues to do so today. To the best of my knowledge, Verisk does not use the Enjoined Systems now and does not use any of the roof models or data previously generated by the Enjoined Systems.").

On September 15, 2021, this Court held oral argument. Neither party presented live testimony, but rested on their previously submitted declarations.

## II. Standard of Review

As an initial matter this Court has jurisdiction despite the pending appeal before the Court of Appeals for the Federal Circuit. *See Eagle View Techs., Inc. v. Xactware Solutions, Inc.*, No. 21-1048 (Fed. Cir.). Both parties agree. [Dkt. Nos. 941, 948].

To obtain discovery based on allegations of civil contempt, a moving party need only make a *prima facie* showing that a court-ordered injunction has been violated. *See Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 256 F. Supp. 2d 228, 229–30, 235 (D. Del. 2003). In similar cases, district courts have found that a *prima facie* showing of contempt was made upon the introduction of evidence that, if true, "would justify a finding of

3

contempt." *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 09-6148, 2012 WL 12932049, at *60 (S.D.N.Y. July 17, 2012), *R&R adopted*; *see also Shure Inc. v. ClearOne, Inc.,* 17-03078, 2020 WL 5214647, at *14 (N.D. Ill. Sept. 1, 2020) (*prima facie* case based on "one example … from a third-party integrator reporting on what a [defendant's] representative allegedly said," which would amount to infringement).

### III. Discussion

#### a. Eagle View's Evidence of Defendants' Violative Conduct

At oral argument and in its brief, Eagle View presented two main categories of evidence to the Court to establish its *prima facie* case: statements made on Verisk's website and Defendants' recent patent applications. Eagle View pointed to several statements on Verisk's website that describe the different products it offers to customers, as well as descriptions about the different technologies behind those products. Eagle View highlighted one webpage as of particular concern, which includes the following statement:

> Analytic insight extracted from high-resolution aerial imagery is available for population centers of 15,000 or more. Using top-down (orthogonal) and 45-degree angle (oblique) views, our analysis can help identify and confirm property features and conditions.

[Dkt. No. 940 Ex. 9]. Verisk's webpage also appears to include hyperlinks to similar or related products, each with their own descriptions of the features and processes that Eagle View contends suggests overlap with those of the enjoined products. In particular, one link takes the user to a Roof Underwriting Report ("RUR") for Homeowners. [Dkt. No. 957 Ex. 43].

Defendants do not dispute that they produce RURs. Rather, they argue that the RURs are created separately from the products this Court has enjoined. The reference on the linked website to "personal aerial imaging," they contend, is not an aspect of the RURs,

4

nor does it correlate top-down and oblique imaging or generate a three-dimensional model of a roof. Lewis Decl. at ¶ 21 [Dkt. No. 948-1]. As noted, Defendants rely heavily on the Declaration of Mr. Lewis.

As a general principle, Defendants distrust Mr. Lewis' testimony and urge the Court to do the same. For example, Eagle View reminds the Court of Mr. Lewis' testimony at trial regarding a product known as 360Value, a product that ultimately generates a precise roof replacement cost estimate. At trial, Mr. Lewis testified as to whether 360Value utilizes measurement data generated by the enjoined products (referred to as "PIF files") to generate its output:

> Q. What are the other Verisk products that can import in a PIF file?
> A. The ones I'm aware of are Xactimate, different variations of Xactimate, Xactimate online, desktop, mobile, and 360 Value.
> Q. What does 360 Value do with the PIF file?
> A. 360 Value takes data from that PIF file and uses it to create a valuation.
> Q. A valuation of what?
> A. Of a property.

[Dkt. No. 956 Ex. 39]. Eagle View insists that such testimony is irreconcilably inconsistent with Mr. Lewis' more recent testimony regarding 360 Value:

> 360Value does not use, and has never used, the Enjoined Systems, or any roof information generated by those Systems, in any way, including to provide information for the Roof Underwriting Reports. 360Value is not a continuation of, and does not have any connection to, the Enjoined Systems, or any information generated by any of those systems. It is an entirely separate system and shares no code with the Enjoined Systems.

Lewis Decl. at ¶ 18 [Dkt. No. 948-1]. Reliance upon Mr. Lewis' testimony, Eagle View emphasizes, should be met with skepticism. In short, given the similarity of the descriptions of the functions and technological processes that are behind the enjoined products, Plaintiff's fears are that Defendants' RURs and perhaps other products are generated from its protected patents.

5

Eagle View also relies upon patent applications submitted by Defendants in 2019 and 2020, during the time period leading up to and following the Court's issuance of its injunction order. According to Plaintiff, as stated at oral argument, "these are very good evidence of what [the Defendants] were planning for their redesign." The problem, Eagle View asserts, is that because these patents confirm the use of correlation and teach multiple stereoscopic pairs (meaning some images are non-stereoscopic), Plaintiffs have every right to be concerned, and that concern is magnified, Plaintiff argues, because Mr. Lewis is saying that "this technology was developed for systems other than Roof Underwriting Reports." Lewis Decl. at ¶ ¶ 26-33 [Dkt. No. 948-1]. What are those systems, Eagle View asks.

      b.      <u>Defendants' Denial and Evidence of Compliance</u>

Defendants respond generally that Plaintiff is engaging in nothing more than a fishing expedition. Defendants argue that Eagle View fundamentally misunderstands and misdescribes the RURs. Further, Defendants argue that their RURs are entirely unrelated to the enjoined products because they serve a different purpose. Unlike the enjoined products, which produce "a near-exact model of the roof of a particular building to provide close estimates of the cost to repair or replace a roof that has been damaged or destroyed" for both contractors and insurers, RURs serve a much narrower purpose, allowing insurance underwriters to "quickly analyze whether a particular building or roof should be insured, or whether additional analysis and, possible, on-site inspections are needed before making that decision." Defendant's Opposition Brief, at 3, 5 [Dkt. No 948] (citations omitted).

In opposition, Defendants present the Declaration of Mr. Lewis to support their case that Defendants have rendered the enjoined products inoperable:

> Before the Court issued its permanent injunction, Verisk ceased all use of the Enjoined Systems. I participated, at the direction of counsel, with Verisk's compliance with the permanent injunction. On September 26, 2019, Verisk developers disabled the ability to access aerial imagery within Aerial Sketch version 2. This action rendered the product inoperable.
>
> On that same day, Verisk developers disabled the capacity for Geomni Roof (previously known as Roof Insight) and Geomni Property (previously known as Property Insight) to accept incoming customer requests for Geomni Roof or Geomni Property reports, and implemented functionality to forward new requests for Geomni Roof and Geomni Property reports to Eagle View Technologies, Inc. This action rendered Geomni Roof and Geomni Property inoperable. The Aerial Sketch version 2, Geomni Roof, and Geomni Property products remain inoperable.
>
> Verisk took the permanent injunction seriously, and continues to do so today. To the best of my knowledge, Verisk does not use the Enjoined Systems now and does not use any of the roof models or data previously generated by the Enjoined Systems. Given my job responsibilities, I believe that if any such use had occurred or were occurring, I would be aware of it.

Lewis Decl. at ¶¶ 6-8 [Dkt. 948-1]. Defendants also rely on Mr. Lewis' testimony for the position that "RURs are materially different from the Enjoined Systems, including because they lack features of the Enjoined Systems that were used to prove infringement, are produced in a different manner, yield a different output, and serve a different need." Defendant's Opposition Brief, at 11 [Dkt. 948] (*citing* Lewis Decl. at ¶¶ 5, 9-11, 17-18 [Dkt. No. 948-1]).

In detail, Mr. Lewis describes how the RURs are separate from the enjoined products. Generally, Verisk operates a certain platform on which the RURs are based. Defendants released the RURs on June 1, 2021, having begun development in 2020. In relevant part, Verisk's system for producing RURs generates one portion of the data in a RUR through analysis of a single aerial image by a certain system. Lewis Decl. at ¶ 10 [Dkt. No. 948-1]. According to Mr. Lewis' sworn testimony, that system has never used the enjoined systems "in any way." *Id*. Moreover, Defendants press, RURs are intended for

7

insurance underwriters and, unlike the enjoined products, are not intended to provide exact measurements. Put succinctly, they argue, the only thing the RURs share with the enjoined products is the word "roof."

At oral argument Defendants re-emphasized each of the foregoing points, specifically, that because RURs serve a different market purpose and do not utilize any features of the enjoined products, they are not in violation of this Court's order and there is no basis to initiate contempt proceedings.[1]

**c.    Analysis**

At this stage, Eagle View's fear that Defendants are in violation of this Court's order are well-founded. The similarity to the descriptions of the functions and technological processes that are behind the enjoined products set forth in Defendants' webpage is apparent. Although Defendants argue that no company in its right mind would "admit" to the world that it is using the patented technology (and Defendants did not) - a valid point to be sure - the Declaration of Mr. Lewis leaves several questions unanswered in this regard. First, as Eagle View implores, Mr. Lewis' self-serving testimony should be met with skepticism and this Court should not accept the testimony "just because."  In this regard, Eagle View has presented examples of what appears to be conflicting testimony that does raise the Court's eyebrows. *See* Lewis Decl. at ¶ 18 [Dkt. No. 948-1]; *see also* [Dkt. No. 956 Ex. 39]. Moreover, as was pointed out at oral argument, although Mr. Lewis avers that the Company undertook measures that "rendered the products inoperable," there is no mention

---

[1] Although Defendants had Lewis "available" to testify, they did not affirmatively present his testimony.

as to what happened to the existing data bases generated from the patented technology.  *See* Lewis Decl. at ¶ ¶ 6-7 [Dkt. 948].  It is a fair and valid observation.

Second, as became apparent during oral argument, the initial emphasis of the parties had been on the RURs.  Yet when pressed by the Court as to what was described by the "[u]sing top-down (orthogonal) and 45-degree angle (oblique) views" referred to in Defendants' webpage, it became clear that such language did not apply to RURs.  The question then turned to what product did such language – which resembles the claims of the patents-in-suit- apply.  Through some back and forth at oral argument, Defendants admitted -in response to the Court's question- that although no report is generated, a customer receives "JSON data" relating to the condition and features of the property.  To date, this data has been given to two clients, one an insurance carrier.  Exactly what that data is is unknown.  Understandably, Eagle View fears a here-we-go-again semantics problem.  Although Plaintiff was reluctant at oral argument to accuse Defendants of "dodging," hiding behind the "there's no report" semantics, Plaintiff argued the record certainly supported its request for further discovery on the issue.  The Court agrees that this raises serious questions.  Perhaps the emphasis on RURs deflected the more salient issue.

Finally, focusing on the RURs, this Court is not persuaded that the inferences drawn by Eagle View should be discredited simply because Defendants' RURs serve a different purpose than that of the enjoined products.  In fact, one of Eagle View's specific allegations concerning the RURs is that the reports include a projected roof replacement cost, a feature Eagle View contends must be the result of utilizing the enjoined products' outputs.

### IV. <u>Conclusion</u>

In the Court's final analysis, at this stage of the proceeding Eagle View has connected the in-contempt-dots reasonably to cause this Court concern.  It has made a sufficient *prima facie* showing.  That is not to say that Defendants are in violation of this Court's injunction order and the Court certainly hopes they are not, but expedited discovery will soon tell whether Defendants' RURs or other products are prohibited as a result of the Court's injunction.  Accordingly, Plaintiffs' Motion to Initiate Contempt Proceedings and for a Temporary Restraining Order will be GRANTED in part and CONTINUED in part.  Plaintiffs' request to conduct discovery will also be GRANTED.  An accompanying Order shall issue.

Date:  <u>9/16/2021</u>                                                       <u>/s/   Renée Marie Bumb        </u>
                                                                                            HON. RENÉE MARIE BUMB
                                                                                            UNITED STATES DISTRICT JUDGE